UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

**FILED**

SEP 23 2025

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
            DEPUTY CLERK

LaRonda Myers, Pro Se

12060 Mont Vista Drive

Auburn, California 95603

Telephone: (530) 320-1727

Email: rondamyers@me.com


Plaintiff,

v.

G. Kevin Lachona, et al.,

Defendants.


**Case No.: 2:25-cv-1926-TLN-CSK (PS)**


**RULE 15(a)(1) NOTICE OF FILING FIRST AMENDED COMPLAINT (AS A MATTER OF COURSE)**

**Plaintiff LaRonda Myers files the attached First Amended Complaint as a matter of course under Fed. R. Civ. P. 15(a)(1). No leave of court is required.**

**Dated September 21, 2025**


**FIRST AMENDED COMPLAINT**

**(42 U.S.C. § 1983; Financial Elder Abuse; Fraud; Related State-Law Claims)**

**DEMAND FOR JURY TRIAL ON ALL ISSUES SO TRIABLE**

CAPTION & PARTIES TO THE ACTION

**PARTIES**

Plaintiff

• **LaRonda Myers** — Auburn, California. Plaintiff sues in her individual capacity and, where applicable, as trustee of the Ralph C. Struthers Trust (2017) (currently suspended without due process) and as executor of the Estate of Ralph C. Struthers; also a beneficiary of the 1993 and 2017 trusts.

Private Defendants (damages and equitable relief as permitted)

• **G. Kevin Lachona** — Sacramento, California (attorney; also "Lachona Law," Sacramento, California).

• **Julie Hatridge** — Bakersfield, California (individual).

• **Belinda Connor** — Florida (individual).

• **Carole "Carol" Campbell** — Texas (individual).

• **J. Dean Johnson** — Grover Beach, California (attorney).

• **Hannah E. Murphy** — Grover Beach, California (attorney).

• **Law Offices of Johnson, Murphy & Jones, Inc.** — Grover Beach, California (law firm).

• **Edward J. Corey, Jr.** — Sacramento County, California (attorney/mediator).

• **Weintraub Tobin Chediak Coleman Grodin Law Corporation** — Sacramento County, California (law firm).

• **Konstantine Antony "Kosta" Demiris** — (attorney).

• **The Demiris Law Firm, PC** — (law firm).

• **Michael Scott Shuttleworth** — Auburn, California (attorney).

• **Harris & Plottel, LLP** — Chico, California (law firm).

• **Drobny Law Offices, Inc.** — Sacramento, California (law firm).

• **Doe Law Firms 1–5** — To be identified (employers/affiliates of attorney defendants).

• **Does 11–50** — Additional individuals/entities (including notaries, banks, preparers, healthcare providers) who aided/abetted the conduct alleged.

• **Doe Defendant (April Sharp)** — Redding, California (co-trustee of the 2017 Trust; aligned with opposing counsel re settlement filings). Reserved to substitute as a named defendant upon discovery confirmation.

State Judicial and Court-Administration Defendants

(official capacity only; **prospective declaratory/injunctive relief; no damages sought**)

• **Commissioner Michael A. Jacques** — Superior Court of California, County of Placer, **Howard G. Gibson Courthouse (Santucci Justice Center), 10820 Justice Center Drive, Roseville, CA 95678**.

• **Commissioner Michael A. Holley** — Superior Court of California, County of Placer, **Howard G. Gibson Courthouse (Santucci Justice Center), 10820 Justice Center Drive, Roseville, CA 95678**.

• **Doe Public Officials 1–10** — Placer Superior Court Administration (Court Executive Officer, Clerk, Assistant CEO, Calendar/Operations, Filing/Intake, Technology/Portal), **Howard G. Gibson Courthouse (Santucci Justice Center), 10820 Justice Center Drive, Roseville, CA 95678**.

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

LaRonda Myers, Pro Se

12060 Mont Vista Drive

Auburn, California 95603

Telephone: (530) 320-1727

Plaintiff,

v.

Case No. 2:25-CV-1925-TLN-CSK (PS)

TABLE OF DEFENDANTS

**Key Private Defendants (Damages and Equitable Relief Sought):**

• **G. Kevin Lachona** — California attorney (Sacramento, CA); alleged joint participation with state actors; fiduciary obstruction and diversion advocacy. **(Complaint ¶45; pp. 12, 86)**

• **Julie Hatridge** — Individual (Bakersfield, CA); alleged elder financial abuse, concealment of records, fiduciary misconduct. **(Complaint ¶46; pp. 46, 54)**

• **Belinda Connor** — Individual (residing in Florida); alleged elder abuse, medical neglect, unauthorized trust control. **(Complaint ¶47; pp. 46, 59)**

• **Carole Campbell** — Individual (residing in Texas); alleged fraudulent trust interference and concealment. **(Complaint ¶48; p. 68)**

• **J. Dean Johnson** — California attorney (Grover Beach, CA); alleged preparation of defective capacity declaration, fraudulent trust alteration. **(Complaint ¶49; p. 75)**

• **Hannah E. Murphy** — California attorney (Grover Beach, CA), affiliated with Johnson's

v

firm; alleged participation in trust alteration and concealment. **(Complaint ¶50; p. 75)**

• **Law Offices of Johnson, Murphy & Jones, Inc.** — California professional corporation

(Grover Beach, CA); alleged concealment of authenticity records. **(Complaint ¶51; p. 75)**

• **Edward J. Corey, Jr.** — California attorney/mediator (Sacramento County, CA); alleged

involvement in trust-related proceedings. **(Complaint ¶52; p. 13)**

• **Weintraub Tobin Chediak Coleman Grodin Law Corporation** — California professional

corporation (Sacramento County, CA); alleged fiduciary misconduct and respondeat superior

liability. **(Complaint ¶53; p. 13)**

• **Konstantine Antony Demiris ("Kosta" Demiris)** — California attorney (Wood Creek, CA);

alleged unreasonable billing, breach of fiduciary duties. **(Complaint ¶54; p. 91)**

• **The Demiris Law Firm, PC** — California professional corporation (Wood Creek, CA);

alleged negligent supervision and elder-abuse facilitation. **(Complaint ¶55; p. 91)**

• **Michael Scott Shuttleworth** — California attorney (Auburn, CA); alleged unjust enrichment

and escrow reimbursement claim. **(Complaint ¶56; p. 96)**

• **Lachona Law** — California law practice associated with Kevin Lachona (Sacramento, CA).

**(Complaint ¶57; pp. 42, 46, 86)**

• **Harris & Plottel, LLP** — California limited liability partnership (Chico, CA); alleged

negligent supervision and fiduciary breach. **(Complaint ¶58; p. 86)**

• **Drobny Law Offices, Inc.** — California professional corporation (Sacramento, CA); alleged

negligent supervision and fiduciary breach. **(Complaint ¶59; p. 86)**

• **Doe Law Firms 1–5** — Unidentified firms believed to have employed or worked with attorney

defendants. **(Complaint ¶60; p. 86)**

• **Does 11–50** — Additional individuals/entities who aided and abetted, including notaries, banks,

vi

and agents. **(Complaint ¶61; p. 15)**

• **Doe Defendant (April Sharp)** — Co-trustee of the Ralph C. Struthers Trust (2017) (Redding, CA); aligned with opposing counsel in settlement filings/consents **(Exh. I-12).** Plaintiff reserves the right to amend to substitute April Sharp as a named defendant if discovery confirms her participation in fiduciary breaches, concealment of records, or settlement enforcement actions. **(Complaint ¶61A; p. 15)**

**State Judicial and Administrative Defendants (Official Capacity Only — Prospective Relief):**

• **Commissioner Michael A. Jacques** — Superior Court of California, County of Placer (official capacity only). **(Complaint ¶42; p. 34)**

• **Commissioner Michael A. Holley** — Superior Court of California, County of Placer (official capacity only). **(Complaint ¶43; p. 79)**

• **Doe Public Officials 1–10** — Placer Superior Court administration officials (Court Executive Officer, Clerk, Assistant CEO, Calendar/Operations Manager, Filing/Intake Supervisor, Technology/Portal Manager). **(Complaint ¶44; p. 82)**

**COUNTS QUICK INDEX**

**Count 1** — p. 45; **Count 2** — p. 56; **Count 3** — p. 62; **Count 4** — p. 71; **Count 5** — p. 79;

**Count 6** — p. 91; **Count 7** — p. 98; **Count 8** — p. 103; **Count 9** — p. 107; **Count 10** — p. 114;

**Count 11** — p. 120; **Count 12** — p. 126; **Count 13** — p. 133.

**Prayer** — p. 137; **Jury Demand** — p. 147; **Verification** — p. 148.

PASTE THIS RIGHT THERE (no paragraph numbers):

Exhibit C-1A — Mar. 14, 2025 Transcript Pinpoint Index (1 page).

Exhibit C-1B — Mar. 14, 2025 Transcript — Key Excerpts (true and correct copies).

Exhibit K-1A — July 11, 2025 Transcript Pinpoint Index (1 page).

Exhibit K-1B — July 11, 2025 Transcript — Key Excerpts (true and correct copies).

Exhibit K-2A — Aug. 29, 2025 Transcript Pinpoint Index (1 page).

Exhibit K-2B — Aug. 29, 2025 Transcript — Key Excerpts (true and correct copies).

TABLE OF CONTENTS

Caption Page ........................................................................... 1

I. INTRODUCTION ................................................................. 1

II. JURISDICTION, VENUE, AND ABSTENTION SAFEGUARDS ................. 9

III. PARTIES ........................................................................ 16

IV. STATEMENT OF FACTS .................................................... 20

V. CAUSES OF ACTION ........................................................ 45

**Count One** — §1983: First Amendment Retaliation; Fourteenth Amendment Procedural Due Process; Equal Protection (Prospective Relief) (¶¶101–118) ............... 45

**Count Two** — §1983: Joint Action / Procedural Due Process; Access to Courts (¶¶119–137)

i

................................................................................................... 56

**Count Three** — Financial Elder Abuse; Concealment of Trust/Estate Records; §1983 Joint

Participation (¶¶138–159B) ............................................................... 62

**Count Four** — Fraud; Elder Financial Abuse; Fiduciary Misconduct; Interference with Settlor's

Wishes; §1983 Joint Participation (¶¶160–181B) ......................... 71

**Count Five** — Fraud; Elder Financial Abuse; Medical Neglect; Civil Rights Violations (¶¶182–

204D) .................................................................................... 79

**Count Six** — Fraud; Trust Interference; Elder Financial Abuse; Fiduciary Obstruction; §1983

Joint Participation (¶¶205–226B) ........................................... 91

**Count Seven** — Fraudulent Trust Alteration; Concealment of Records; §1983 Civil Conspiracy /

Joint Participation (¶¶227–247) ................................................. 98

**Count Eight** — Judicial Delay and Structural Due-Process Deprivation (Prospective Relief)

(¶¶248–263A) ...................................................................... 103

**Count Nine** — Systemic Due Process & Equal Protection in Court Administration (Prospective

Relief) (¶¶264–282A) ................................................................. 107

**Count Ten** — Aiding & Abetting Trust Fraud; Negligent Supervision (California Law); §1983

Joint Participation (¶¶283–300A) .................................................... 114

**Count Eleven** — Professional Negligence / Breach of Fiduciary Duty; Elder-Abuse Facilitation

(California Law); §1983 Joint Participation (¶¶301–318A) ............ 120

**Count Twelve** — Escrow Reimbursement / Restitution for Personally Advanced Legal Fees

(¶¶319–336) .................................................................................. 126

**Count Thirteen** — Unlawful Diversion Advocacy; Fiduciary Abuse; §1983 Civil Conspiracy /

Joint Participation (¶¶337–359A) .................................................. 133

**VI. PRAYER FOR RELIEF** (¶¶360–382B) .................................................. 137

**VII. JURY DEMAND** (¶¶383–386) ........................................................ 147

**VIII. VERIFICATION** (28 U.S.C. § 1746) ................................................ 148

**EXHIBIT MATERIALS**

**Where Exhibits Begin: p. 149 (immediately after Verification).**

Format: Tabbed A–Q. Each tab has a short capsule (Used In / Pins / Proves / Why It Matters / Constitutional Hooks / Damage Bucket). True and correct copies are attached.

A. Transcript & Deposition Quick Reference (pinpoint aids filed with the exhibits):

• Exhibit C-1A — Mar. 14, 2025 Transcript Pinpoint Index (1 page)

• Exhibit C-1B — Mar. 14, 2025 Transcript — Key Excerpts (true and correct copies)

   Key pins (full C-1): p. 8 ("not an evidentiary proceeding"); p. 11 (subpoena intent); pp. 18–20 (savings-bond discussion)

• Exhibit K-1A — July 11, 2025 Transcript Pinpoint Index (1 page)

• Exhibit K-1B — July 11, 2025 Transcript — Key Excerpts (true and correct copies)

   Key pins (full K-1): 8:24–26; 9:19–25; 9:24–10:13 (suspension; "13 bonds"; no noticed motion)

• Exhibit K-2A — Aug. 29, 2025 Transcript Pinpoint Index (1 page)

• Exhibit K-2B — Aug. 29, 2025 Transcript — Key Excerpts (true and correct copies)

   Key pins (full K-2): 6:22–7:5 ("not evidentiary" handling); 30:8–19 (prefiling/vexatious comments); 31:13–22

iii

• Exhibit C-2A — Connor Deposition Pinpoint Index (1 page)

• Exhibit C-2B — Connor Deposition — Key Excerpts (true and correct copies)

Key pins (full C-2): 10:3–5 (Florida address.); 94:20–25; 95:1–12; 95:21–25; 96:1–6; 118:19–25; 121:6–8; 123:9–12; 134:7–25; 135:1–12; 142:1–12; 143:22–144:9; 72:14–23; 73:1–4

B. Master Exhibit Index — One-Page Snapshot (full A–Q list follows behind this sheet):

iv

(Myers v. Lachona et al.,      No. 2:25-cv-1925-TLN-CSK (PS)      First Amended Complaint
EXHIBITS (Index; Tabs A–Q with capsule pages) ... 149

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

**LaRonda Myers, Pro Se**

**12060 Mont Vista Drive**

**Auburn, California 95603**

**Telephone: (530) 320-1727**

**Plaintiff,**

**v.**

**Case No. 2:25-CV-1925-TLN-CSK (PS)**

**TABLE OF DEFENDANTS**

**Key Private Defendants (Damages and Equitable Relief Sought):**

• **G. Kevin Lachona** — California attorney (Sacramento, CA); alleged joint participation with state actors; fiduciary obstruction and diversion advocacy. **(Complaint ¶45; pp. 12, 86)**

• **Julie Hatridge** — Individual (Bakersfield, CA); alleged elder financial abuse, concealment of records, fiduciary misconduct. **(Complaint ¶46; pp. 46, 54)**

• **Belinda Connor** — Individual (residing in Florida); alleged elder abuse, medical neglect, unauthorized trust control. **(Complaint ¶47; pp. 46, 59)**

• **Carole Campbell** — Individual (residing in Texas); alleged fraudulent trust interference and concealment. **(Complaint ¶48; p. 68)**

• **J. Dean Johnson** — California attorney (Grover Beach, CA); alleged preparation of defective capacity declaration, fraudulent trust alteration. **(Complaint ¶49; p. 75)**

• **Hannah E. Murphy** — California attorney (Grover Beach, CA), affiliated with Johnson's

v

firm; alleged participation in trust alteration and concealment. **(Complaint ¶50; p. 75)**

• **Law Offices of Johnson, Murphy & Jones, Inc.** — California professional corporation (Grover Beach, CA); alleged concealment of authenticity records. **(Complaint ¶51; p. 75)**

• **Edward J. Corey, Jr.** — California attorney/mediator (Sacramento County, CA); alleged involvement in trust-related proceedings. **(Complaint ¶52; p. 13)**

• **Weintraub Tobin Chediak Coleman Grodin Law Corporation** — California professional corporation (Sacramento County, CA); alleged fiduciary misconduct and respondeat superior liability. **(Complaint ¶53; p. 13)**

• **Konstantine Antony Demiris ("Kosta" Demiris)** — California attorney (Wood Creek, CA); alleged unreasonable billing, breach of fiduciary duties. **(Complaint ¶54; p. 91)**

• **The Demiris Law Firm, PC** — California professional corporation (Wood Creek, CA); alleged negligent supervision and elder-abuse facilitation. **(Complaint ¶55; p. 91)**

• **Michael Scott Shuttleworth** — California attorney (Auburn, CA); alleged unjust enrichment and escrow reimbursement claim. **(Complaint ¶56; p. 96)**

• **Lachona Law** — California law practice associated with Kevin Lachona (Sacramento, CA). **(Complaint ¶57; pp. 42, 46, 86)**

• **Harris & Plottel, LLP** — California limited liability partnership (Chico, CA); alleged negligent supervision and fiduciary breach. **(Complaint ¶58; p. 86)**

• **Drobny Law Offices, Inc.** — California professional corporation (Sacramento, CA); alleged negligent supervision and fiduciary breach. **(Complaint ¶59; p. 86)**

• **Doe Law Firms 1–5** — Unidentified firms believed to have employed or worked with attorney defendants. **(Complaint ¶60; p. 86)**

• **Does 11–50** — Additional individuals/entities who aided and abetted, including notaries, banks,

**vi**

and agents. **(Complaint ¶61; p. 15)**

• **Doe Defendant (April Sharp)** — Co-trustee of the Ralph C. Struthers Trust (2017) (Redding, CA); aligned with opposing counsel in settlement filings/consents **(Exh. I-12).** Plaintiff reserves the right to amend to substitute April Sharp as a named defendant if discovery confirms her participation in fiduciary breaches, concealment of records, or settlement enforcement actions.

**(Complaint ¶61A; p. 15)**

**State Judicial and Administrative Defendants (Official Capacity Only — Prospective Relief):**

• **Commissioner Michael A. Jacques** — Superior Court of California, County of Placer (official capacity only). **(Complaint ¶42; p. 34)**

• **Commissioner Michael A. Holley** — Superior Court of California, County of Placer (official capacity only). **(Complaint ¶43; p. 79)**

• **Doe Public Officials 1–10** — Placer Superior Court administration officials (Court Executive Officer, Clerk, Assistant CEO, Calendar/Operations Manager, Filing/Intake Supervisor, Technology/Portal Manager). **(Complaint ¶44; p. 82)**

**vii**

## COUNTS QUICK INDEX

**Count 1 — p. 45; Count 2 — p. 56; Count 3 — p. 62; Count 4 — p. 71; Count 5 — p. 79; Count 6 — p. 91; Count 7 — p. 98; Count 8 — p. 103; Count 9 — p. 107; Count 10 — p. 114; Count 11 — p. 120; Count 12 — p. 126; Count 13 — p. 133.**

**Prayer — p. 136; Jury Demand — p. 147; Verification — p. 148.**

Exhibit C-1A — Mar. 14, 2025 Transcript Pinpoint Index (1 page).

Exhibit C-1B — Mar. 14, 2025 Transcript — Key Excerpts (true and correct copies).

Exhibit K-1A — July 11, 2025 Transcript Pinpoint Index (1 page).

Exhibit K-1B — July 11, 2025 Transcript — Key Excerpts (true and correct copies).

Exhibit K-2A — Aug. 29, 2025 Transcript Pinpoint Index (1 page).

Exhibit K-2B — Aug. 29, 2025 Transcript — Key Excerpts (true and correct copies).

## I. INTRODUCTION

¶1. This is a civil-rights action **under 42 U.S.C. § 1983** and the **Fourteenth Amendment** to redress a sustained pattern of constitutional violations and fiduciary misconduct tied to two interrelated trusts: (a) the Struthers Family Trust dated June 4, 1993 ("1993 Trust"), and (b) the Ralph C. Struthers Trust dated October 22, 2017 ("2017 Trust").

¶2. Plaintiff LaRonda Myers is the duly appointed trustee of the 2017 Trust (currently suspended without motion, notice, or evidentiary hearing), the executor of the Estate of

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Ralph C. Struthers, and a beneficiary of both the 1993 and 2017 Trusts. She sues in her individual capacity and, where applicable, in representative capacities.

¶2A. Plaintiff acknowledges that this is a lengthy complaint due to the number of parties and events involved. To assist the Court's review, Plaintiff has organized the pleading with numbered paragraphs, clearly labeled counts, an exhibit index, and cross-references so that specific allegations and supporting materials can be easily located. The length is intended to assist the Court's review and reflects the complexity of the misconduct alleged. Transcript pinpoint aids. Because this pleading and the hearing records are lengthy, Plaintiff provides one-page pinpoint indices and short excerpt packets for the three key transcripts: (i) March 14, 2025 (Exhibit C-1A index; Exhibit C-1B excerpts; full transcript is Exhibit C-1), (ii) July 11, 2025 (Exhibit K-1A index; Exhibit K-1B excerpts; full transcript is Exhibit K-1), and (iii) August 29, 2025 (Exhibit K-2A index; Exhibit K-2B excerpts; full transcript is Exhibit K-2). These aids list exact page/line citations so chambers can jump directly to the pertinent passages without altering evidentiary weight.

¶2B. Because of the length of this pleading, the Court and parties are provided a one-page Connor Deposition Pinpoint Index (Exhibit C-2A) that lists the exact page/line citations within the certified deposition (Exhibit C-2) and the companion excerpt packet (Exhibit C-2B). For related text messages referenced in Belinda Connor's testimony, see Exhibit B-2 and B-2A. These indices are provided solely to help chambers and the clerk jump directly to the pertinent passages. For clarity only, and without altering evidentiary weight, Plaintiff includes: (i) Exhibit C-2A (Connor Deposition Pinpoint Index, listing exact page/line citations), (ii) Exhibit C-2B (true and correct copies of the cited Connor

deposition pages), and (iii) cross-references to Exhibits B-2 and B-2A (the family text messages discussed in Ms. Connor's testimony). These are provided due to the length of this pleading so chambers may reach the pertinent passages immediately.

¶3. Tolling/Delayed Discovery (threshold). In late January–early February 2025, when Plaintiff retained original drafting counsel Donald Gravalec, he opened Ralph's file and discovered a sealed, notarized amendment dated March 1, 2019. The sealed envelope was opened then in the presence of a notary. Under the delayed-discovery doctrine and equitable tolling, limitations are tolled until this discovery; Plaintiff acted promptly thereafter.

¶4. The 2019 sealed amendment disinherits any person who altered or attempted to alter the 1993 Trust. On information and belief, this includes Belinda Connor, Julie Hatridge, and Carole Campbell (aligned with attorney G. Kevin Lachona). Accordingly, they are not beneficiaries of the 2017 Trust and were not lawfully appointed trustees of the 1993 Trust; their asserted roles arise from fraudulent manipulation and cannot confer standing or block fiduciary transparency.

¶5. In early 2017, Darlene Struthers exhibited dementia symptoms. During this period, family members and associated counsel asserted control over trust/estate affairs while withholding statutory accountings.

¶6. After a stroke, Ralph was hospitalized in Santa Maria in 2017; contemporaneous records show he could ambulate with physical therapy and communicate clearly during that Santa Maria stay. Those observations refer to the Santa Maria hospitalization, not later Auburn dates.

¶7. On or about July 7, 2017, attorney J. Dean Johnson prepared and notarized an

**FIRST AMENDED COMPLAINT**

pg. 3

1

2

3

4

5

6

7

"incapacity" declaration concerning Ralph despite no Auburn examination. On July 10–11, 2017, physicians located in Santa Maria—over six hours away—issued letters while Ralph was in Placer County at Sutter Auburn Faith Hospital (ER July 10; admit July 11) for MRSA care. He was alert and able to communicate, but ill. A July 10 Santa Maria office physician later reversed his letter after being shown Ralph communicating with a speech therapist.

8

9

10

11

¶8. After the Auburn MRSA admission and recovery, Ralph retained Donald Gravalec and on October 22, 2017 executed the 2017 Trust, naming Plaintiff trustee and excluding those involved in altering prior instruments.

12

13

14

15

16

17

¶9. On March 1, 2019, Ralph executed the sealed amendment referenced above; it was opened in late January–early February 2025. On March 14, 2025, Gravalec presented the amendment in court, declared that the version of the 1993 Trust then in use was not the instrument he drafted, stated intent to subpoena Johnson's originals and notary records, and handed a copy to attorney G. Kevin Lachona, giving actual notice the same day.

18

19

20

21

22

¶10. Despite repeated requests since 2017, no accounting has ever been produced for the 1993 Trust or Darlene's assets. Even after a July 18, 2025 order requiring accounting, enforcement was not pursued; protective motions and continuances were used to avoid transparency.

23

24

25

26

27

28

¶11. Unlawful diversion effort (public-record framing). Certain private parties advocated using U.S. Savings Bonds titled to the estate and/or asserted to be trust assets to pay private attorneys' fees. Plaintiff has not agreed to any diversion. Any such diversion must comply with federal Treasury regulations; absent full compliance, enforcement is preempted as applied.

**FIRST AMENDED COMPLAINT**

pg. 4

¶12. On July 10, 2025, Plaintiff filed this federal civil-rights complaint. On **July 11, 2025—without any noticed motion, without a posted tentative, and with a same-day bench "tentative"**—Commissioner Michael A. Jacques **suspended Plaintiff as trustee of the 2017 Trust** and left fully submitted second through sixth accountings unadjudicated. The July 11 calendar addressed Darlene/1993 Trust matters, confirming the **absence of a noticed removal motion or posted tentative addressing removal**. (Exhibit K-1 [7/11/2025 Tr.] at 8:24–26; 9:19–25; 9:24–10:13.)

¶13. These actions caused concrete harm: deprivation of trustee functions without due process; denial of a meaningful opportunity to present evidence; chilling of First Amendment petitioning through a prefiling restriction; and risk of unlawful diversion of federally governed bonds.

¶14. Remedial clarity. Plaintiff seeks prospective relief requiring constitutionally adequate process and timely adjudication of the 2017 Trust accountings (second through sixth), and an order compelling a full accounting for the 1993 Trust and for Darlene Struthers' assets, together with appointment of an independent, court-supervised forensic accountant at defendants' expense, all without this Court administering any estate or assuming custody over property in state court.

¶14B. Vulnerable beneficiaries & urgency. A **living elder** remains directly affected, and two beneficiaries are **disabled** (one of whom is also an elder). One disabled beneficiary is currently **unhoused**. Narrow, non-custodial federal protection of constitutional process and federally governed U.S. Savings Bonds is therefore urgently needed while state appeals proceed.

**FIRST AMENDED COMPLAINT**

¶15. Scope/Probate boundary. Plaintiff does not ask this Court to probate or annul a will; administer an estate; determine heirship; value, re-title, distribute, or place this Court in custody of any estate or trust asset; or review or reverse any state-court judgment. Relief is limited to (i) independent federal constitutional violations, (ii) prospective, non-custodial protection of federally governed U.S. Savings Bonds, and (iii) non-custodial production/forensic measures that do not require this Court to possess or administer any res.

¶16. Separate state appeals (Third Appellate District). Plaintiff has filed and is pursuing state-law appeals in the Third Appellate District, concerning probate/trust-specific issues. This action does not seek review, reversal, or modification of any final state-court judgment; it proceeds solely on independent federal claims and preemption issues. The Third Appellate District will resolve state-law matters while this Court adjudicates Plaintiff's federal rights.

¶17. Supremacy Clause preemption. U.S. Savings Bonds are governed exclusively by federal law **(31 U.S.C. § 3105; 31 C.F.R. Part 353)**; enforcement of any state order or agreement to liquidate/divert such bonds contrary to federal regulation may not proceed as applied to Plaintiff to the extent of any conflict. See *Free v. Bland; Yiatchos v. Yiatchos.*

¶17A. Definitions — Estate vs. Trust Bonds. For clarity: "Estate Savings Bonds" means U.S. Savings Bonds registered to Ralph C. Struthers and/or the Estate of Ralph C. Struthers. "Darlene Bonds" means bonds titled to or held for Darlene Struthers or the 1993 Trust. No U.S. Savings Bonds are titled to the Ralph C. Struthers Trust (October 22, 2017). Registration printed on the face of the bond controls ownership and redemption

**FIRST AMENDED COMPLAINT**

1    under federal law.

2    **¶18.** State-action theory. Private parties who jointly participate with, or obtain significant

3    aid from, state officials to effect deprivations act under color of law and are liable under §

4
5    1983.

6    **¶19.** Ex parte Young posture (prospective relief). Prospective declaratory/injunctive relief

7    against state officers in their official capacities is proper to halt ongoing violations of

8    federal law (*Ex parte Young; Verizon Maryland*). No damages are sought from judicial

9
     officers; damages are sought from non-immune private actors.
10
     **¶20.** Anti-Injunction Act exception. Forward-looking relief falls within the "expressly
11
12   authorized" exception to 28 U.S.C. § 2283 for civil-rights actions (*Mitchum v. Foster*).

13   Relief does not annul prior probate rulings.

14   **¶21.** Rooker–Feldman (narrow). Plaintiff asserts independent federal claims; she does not

15   ask this Court to sit in appellate review over state judgments (Exxon Mobil; Skinner).
16
     **¶22.** Younger (limited). Younger applies only to three narrow categories (Sprint
17
18   Communications); exceptions apply for retaliation, inadequate forum, and extraordinary

19   circumstances—all alleged here.

20   **¶23.** Ex parte Young availability and due-process test. Ex parte Young permits

21   prospective relief against state officers unless Congress has created a comprehensive,
22
     exclusive remedial scheme that displaces such suits; § 1983 has no such displacement.
23
24   See *Seminole Tribe of Fla. v. Florida, 517 U.S. 44, 72–76 (1996).* Whether the process

25   afforded satisfies the Fourteenth Amendment is evaluated under Mathews v. Eldridge's

26   balancing of (1) the private interest, (2) the risk of erroneous deprivation and the value of

27   additional safeguards, and (3) the government's interests and burdens. See Mathews v.

28
                                    **FIRST AMENDED COMPLAINT**                          **PG. 7**

1  Eldridge, 424 U.S. 319, 334–35 (1976). As pleaded here—suspension without notice or

2  hearing, cancellation of an evidentiary setting, and a prefiling restriction without

3  findings—the Mathews factors weigh decisively for Plaintiff and present no Seminole-

4  type bar to prospective relief.

5

6  ¶24. Relief preview & allocation. Plaintiff seeks: (a) declarations that the suspension and

7  prefiling restriction imposed without process violate the First and Fourteenth

8  Amendments; (b) an injunction preventing enforcement of those restrictions unless and

9  until constitutionally adequate procedures are provided; (c) a declaration that

10  enforcement of any order/agreement purporting to liquidate or divert U.S. Savings Bonds

11  contrary to federal law may not proceed as applied; (d) non-custodial production of

12  withheld fiduciary/authentication records and a targeted third-party forensic review at

13  defendants' expense; and (e) compensatory and punitive damages from non-immune

14  private actors, jointly and severally, with contribution/indemnity preserved among

15  defendants.

16

17  ¶24A. Bridge relief and comity. Related state-law/probate issues are already before the

18  Third Appellate District, (Sacramento). This action proceeds only on independent federal

19  constitutional and preemption claims. Pending the Third Appellate District's process,

20  Plaintiff seeks narrowly tailored, non-custodial, as-applied "bridge" relief: (i) condition

21  any enforcement against Plaintiff of a trustee suspension or any prefiling restriction on

22  constitutionally adequate procedures; and (ii) preserve federally governed U.S. Savings

23  Bonds from diversion absent full Treasury compliance. No stay of any state proceeding

24  and no federal administration of any trust/estate is requested.

25

26

27

28

**FIRST AMENDED COMPLAINT**

pg. 8

## II. JURISDICTION, VENUE, AND ABSTENTION SAFEGUARDS

**¶25**. Subject-Matter Jurisdiction. This Court has jurisdiction under 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a)(3)–(4). Declaratory relief is authorized by 28 U.S.C. § 2201. Supplemental jurisdiction exists under 28 U.S.C. § 1367(a) for related state-law claims forming part of the same case or controversy.

**¶25A. Supplemental-Jurisdiction Retention.** The state-law claims arise from the same nucleus of operative fact as the federal claims. Exercising supplemental jurisdiction under 28 U.S.C. § 1367(a) will not predominate over the federal issues and will promote efficiency. To the extent § 1367(c) is raised, Plaintiff alleges the federal questions (First/Fourteenth Amendment and Supremacy Clause preemption of Treasury-regulated U.S. Savings Bonds) are central and not novel or complex issues of state law.

**¶26.** Venue (District). Venue is proper in the Eastern District of California under 28 U.S.C. § 1391(b)(2). To the extent necessary, § 1391(b)(3) also applies.

**¶27.** Venue (Division). Assignment to the Sacramento Division is proper under E.D. Cal. L.R. 120(d) because the claims arose in Placer County.

**¶28.** Personal Jurisdiction (General Statement). California's long-arm statute, Cal. Code Civ. Proc. § 410.10, extends to due process limits. Each defendant purposefully availed themselves of, or purposefully directed conduct toward, California; claims arise out of those contacts; and jurisdiction comports with fair play and substantial justice.

**¶29.** Personal Jurisdiction (Out-of-State Individuals). Out-of-state defendants including Belinda Connor (Florida) and Carole Campbell (Texas) purposefully directed the conduct alleged herein to California by asserting control over California trusts and assets, invoking Placer County Superior Court processes, and causing foreseeable effects in this

**FIRST AMENDED COMPLAINT**

District. On information and belief, both were represented by G. Kevin Lachona in the matters alleged. Personal jurisdiction is proper based on purposeful direction or availment, the claims' arising out of those forum contacts, and that jurisdiction comports with fair play and substantial justice. See Exhibit C-2 (Connor deposition—Florida address) and Exhibit F-7 (public listing showing Connor's prior California residence "Sold" 12/18/2023; captured 08/12/2024). (Exhibit C-2, Appearances: "Representing Belinda Connor, Julie Hatridge and Carole Campbell: G. Kevin Lachona, Esq.") (Exhibit C-2 at 3:8–12) Specific jurisdiction is proper under *Calder v. Jones*, 465 U.S. 783, and *Walden v. Fiore*, 571 U.S. 277, because claims arise from defendants' California-directed conduct causing foreseeable effects in this District.

**¶29A.** Dual capacities preserved (beneficiary + executor). Independently of any trustee status, Plaintiff proceeds in her beneficiary capacity of the 2017 Trust and the 1993 Trust, and in her executor capacity for the Estate of Ralph C. Struthers. These capacities separately confer standing to demand transparency and to petition for accountings and records.

**¶29B.** Beneficiary rights to information/accountings. Under the California Probate Code, trustees must keep beneficiaries reasonably informed and account at least annually, at change of trustee, and on reasonable request (e.g., Prob. Code §§ 16060–16062, 16063), and beneficiaries may petition to compel such accountings (§ 17200(b)(7)) and seek related relief (§ 17200(b)(5)). These duties run to beneficiaries regardless of disputes about who serves as trustee.

**¶29C.** No "privacy" shield for core fiduciary/authentication records. To the extent defendants invoke "privacy" or generic privilege to block production of execution

**FIRST AMENDED COMPLAINT**

packets, signature pages, drafts, notary journals, and thumbprint logs, Plaintiff alleges these are non-privileged identity/authentication records necessary to verify the instrument and discharge fiduciary duties; any privacy concerns can be addressed by a narrow protective order that does not bar disclosure to beneficiaries or a neutral.

¶29D. Purposeful Direction Particulars (Out-of-State). The out-of-state defendants purposefully directed their conduct to California by initiating or directing trust/estate actions in Placer County, communicating with California counsel and institutions to effect re-titling and account closures, advocating California-forum measures that impacted California property and beneficiaries, and appearing through California counsel on California dockets; the claims arise from these forum-directed acts, and jurisdiction is reasonable.

¶30. Probate-Exception Boundary. Plaintiff does not ask this Court to probate or annul a will, administer an estate, determine heirship, or assume custody of property in a state court's possession. See *Marshall v. Marshall, 547 U.S. 293, 311–12 (2006).* Relief is limited to independent federal constitutional claims, preemptive protection of federally governed assets, and non-custodial production/forensic measures.

¶31. Rooker–Feldman (Narrow). Plaintiff does not seek appellate review of any state-court judgment; she asserts independent federal claims and preemption issues. See *Exxon Mobil Corp. v. Saudi Basic Indus. Corp., 544 U.S. 280, 284 (2005); Skinner v. Switzer, 562 U.S. 521, 532 (2011).*

¶32. Younger Abstention (Limited). Younger applies only to the narrow categories described in *Sprint Communications, Inc. v. Jacobs, 571 U.S. 69, 78–82 (2013).* Even then, exceptions apply for bad faith or retaliation, inadequate opportunity to raise federal

**pg. 11**

**FIRST AMENDED COMPLAINT**

1    claims, and extraordinary circumstances; those are alleged here.

2    ¶33. Anti-Injunction Act (AIA) Exception. Requested prospective relief falls within the

3    "expressly authorized" exception to **28 U.S.C. § 2283** for actions under **42 U.S.C. §**

4
5    **1983**. See *Mitchum v. Foster, 407 U.S. 225, 242–43 (1972).* Relief is forward-looking

6    and does not annul prior probate rulings.

7    ¶34. Ex parte Young Posture (Prospective Relief Only). Claims against state judicial or

8    administrative officers are brought in official capacity only for prospective declaratory

9
10   and injunctive relief to halt ongoing violations of federal law; no damages are sought

11   against such officers. See *Ex parte Young, 209 U.S. 123 (1908); Verizon Maryland Inc. v.*

12   *Public Serv. Comm'n, 535 U.S. 635, 645–48 (2002).*

13   ¶35. Judicial-Officer Limitation (1996 § 1983 Amendment). To the extent any conduct is

14   deemed "judicial," Plaintiff seeks declaratory relief in the first instance and injunctive

15   relief only insofar as declaratory relief is unavailable; injunctive relief is also sought for

16
17   administrative or non-judicial acts outside the scope of judicial immunity. See *Forrester*

18   *v. White, 484 U.S. 219 (1988); Mireles v. Waco, 502 U.S. 9 (1991).*

19   ¶35A. Declaratory relief alone is inadequate to prevent ongoing enforcement of the

20   trustee suspension and prefiling restriction because those measures operate automatically

21   in the state forum notwithstanding a contrary declaration; injunctive relief is therefore

22
23   sought only to the extent declaratory relief is unavailable or inadequate to halt continuing

24   violations as to Plaintiff.

25   ¶35B. Declaratory-Relief Unavailability (1996 Amendment Compliance). As applied

26   to Plaintiff, declaratory relief alone is "unavailable" and/or "inadequate" because the

27   challenged restraints (trustee suspension; prefiling restriction) and practices operate

28                                                                            pg. 12
                              **FIRST AMENDED COMPLAINT**

1
2
3
4
5

automatically in the state forum notwithstanding any declaration, leaving Plaintiff without an effective remedy before further harm occurs. Prospective injunctive relief is therefore requested solely to halt ongoing violations as to Plaintiff consistent with the 1996 amendment to 42 U.S.C. § 1983.

6
7
8
9
10
11
12
13
14
15
16
17

¶36. Supremacy Clause and U.S. Savings Bonds preemption. The issuance, ownership, transfer, and redemption of U.S. Savings Bonds are governed exclusively by federal law (31 U.S.C. § 3105; 31 C.F.R. Part 353). "Estate Savings Bonds" means bonds registered to Ralph C. Struthers and/or the Estate of Ralph C. Struthers; "Darlene Bonds" means bonds titled to or held for Darlene Struthers or the 1993 Trust. No bonds are titled to the Ralph C. Struthers Trust (Oct. 22, 2017); any contrary assertion requires strict proof of registration. Enforcement of any order or agreement purporting to liquidate, redirect, or use such bonds contrary to federal regulation may not proceed as applied to Plaintiff to the extent of any conflict. See *Free v. Bland, 369 U.S. 663 (1962); Yiatchos v. Yiatchos, 376 U.S. 306 (1964); Shaw v. Delta Air Lines, Inc., 463 U.S. 85, 96–97 (1983).*

18
19
20
21
22
23

¶36A. Registration controls; no state-law shortcut. For U.S. Savings Bonds, registration on its face controls ownership and redemption. Any change in title must comply with Treasury reissue rules; state orders or private agreements cannot re-title bonds by themselves or divert them to pay private fees. See 31 U.S.C. § 3105; 31 C.F.R. Part 353; *Free v. Bland, 369 U.S. 663; Yiatchos v. Yiatchos, 376 U.S. 306.*

24
25
26
27

¶36B. Treasury Pinpoint Citations. As applicable here: registration controls ownership and payment, 31 C.F.R. §§ 353.5, 353.6; reissue is strictly limited, id. §§ 353.15–353.18; payment/redemption procedures are exclusive, id. §§ 353.35–353.36; estates and

28

pg. 13

fiduciaries must follow federal proofs, id. §§ 353.70–353.71. Any contrary state order or private agreement cannot alter title, reissue, or compel payment outside these provisions.

¶37. Standing. Plaintiff has suffered concrete injuries—including loss of fiduciary status without due process, a prefiling restriction that chills petitioning, denial of evidentiary access, and risk of diversion of federally governed assets—traceable to defendants and redressable by declaratory, injunctive, and monetary relief as pled.

¶38. Timeliness, Tolling, and Continuing Violation. Claims are timely under one or more doctrines: delayed discovery and equitable tolling based on concealment and late-January/early-February 2025 discovery of the March 1, 2019 sealed amendment; and the continuing-violation doctrine given ongoing access restrictions and retaliation. Plaintiff acted promptly upon discovery.

**¶38A (Diligence and concealment)**

Plaintiff exercised reasonable diligence but could not earlier discover the March 1, 2019 amendment or related authenticity defects because the drafting lawyer's file remained sealed and third parties resisted production of core, non-privileged materials—drafts, execution packets, notary journals, and thumbprint logs—through subpoena objections, motions to quash, and protective-order practice. Plaintiff acted promptly upon late-January/early-February 2025 discovery and immediately placed the amendment and drafter declaration on the record. (Exhibits A-2, B-1, C-1; see also G-1, G-3, G-4, G-5.)

**¶38B (Continuing violation / suppression)**

Defendants' refusal to produce authenticity records and the reclassification of noticed evidentiary settings to non-evidentiary calendars constitute continuing violations that,

1    combined with concealment, toll limitations until discovery and resolution. (Exhibits I-6,

2    I-7; K-2; G-1, G-3, G-4, G-5.)

3    ¶38C. Fraudulent Concealment and § 1988 Tolling. Defendants' affirmative

4    concealment of execution packets, notary journals, and drafts—by identified custodians

5

6    and dates in the subpoena timeline and objections (Exhibits G-1, G-3, G-4, G-5; I-13)—

7    prevented earlier discovery despite diligence. Plaintiff acted promptly upon discovery in

8    January–February 2025. Under 42 U.S.C. § 1988, California accrual and tolling doctrines

9

10   (including delayed discovery and fraudulent concealment) apply; in all events, discrete

11   constitutional acts in July–August 2025 independently render the federal claims timely.

12   ¶39. Rule 9(b) Particularity (Fraud). To the extent any claim sounds in fraud, Plaintiff

13   pleads the who, what, when, where, and how, including: the July 7, 2017 incapacity

14   declaration; the July 10–11, 2017 Santa Maria letters; the October 24, 2017 check; the

15   March 1, 2019 sealed amendment; the March 14, 2025 court presentation and notice to

16

17   counsel; and the July 18, 2025 accounting order.

18   ¶40. Relief Boundaries (Non-Custodial). Plaintiff seeks non-custodial production of

19   withheld fiduciary/authentication records and a court-appointed independent forensic

20   review at defendants' expense, without this Court administering probate or assuming

21   custody over property in state court.

22

23   ¶40A. Plaintiff intentionally omits any reference to private negotiation content; the

24   authority-and-preemption challenges above are based on capacity/standing and public or

25   non-privileged records.

26

27

28

**FIRST AMENDED COMPLAINT**

## III. PARTIES

### A. Plaintiff

¶**41**. Plaintiff. LaRonda Myers resides in Placer County, California. She is the duly appointed trustee of the Ralph C. Struthers Trust dated October 22, 2017 ("2017 Trust")—currently suspended without motion, notice, or evidentiary hearing—executor of the Estate of Ralph C. Struthers, and a beneficiary of both the 2017 Trust and the Struthers Family Trust dated June 4, 1993 ("1993 Trust"). Plaintiff sues in her individual capacity and, where applicable, in representative capacities.

### B. State Officers — Official Capacity Only (Prospective Relief)

¶**42**. Commissioner Michael A. Jacques is a judicial officer of the Superior Court of California, County of Placer. He is sued in his official capacity only for prospective declaratory and injunctive relief under Ex parte Young; no damages are sought from this defendant.

¶**43**. Commissioner Michael A. Holley is a judicial officer of the Superior Court of California, County of Placer. He is sued in his official capacity only for prospective declaratory and injunctive relief; no damages are sought from this defendant.

¶**44**. Doe Public Officials 1–10 are court-administration officials of the Superior Court of California, County of Placer, responsible for calendaring, filing, and access policies or practices challenged herein, including (on information and belief) the Court Executive Officer (Doe 1), Clerk of the Court (Doe 2), Assistant Court Executive Officer (Doe 3), Calendar or Operations Manager (Doe 4), Filing or Intake Supervisor (Doe 5), and Court Technology or Portal Manager (Doe 6). They are sued in official capacities only for prospective declaratory and injunctive relief; no damages are sought.

**pg. 16**

**FIRST AMENDED COMPLAINT**

**C. Private Defendants (Damages and Equitable Relief as Permitted by Law)**

¶45. G. Kevin Lachona (California Bar No. 286072) is a California attorney who, on information and belief, resides or practices in this District and directed the conduct alleged herein to persons and property in this District.

¶46. Julie Hatridge is an individual who, on information and belief, resides in California and directed relevant conduct to this District.

¶47. Belinda Connor is an individual who resides in Florida. On information and belief, she retained and was represented by G. Kevin Lachona in trust and estate matters. She purposefully directed the conduct alleged herein to California by asserting control over the 1993 Trust and Darlene Struthers' assets, invoking Placer County Superior Court processes, and causing foreseeable effects in this District. Personal jurisdiction is proper based on purposeful direction or availment and the claims' arising out of those forum contacts.

¶48. Carole Campbell resides in Texas. On information and belief, she retained and/or was represented by G. Kevin Lachona at relevant times. She purposefully directed the conduct alleged herein to California by arranging or pressuring trust-related actions, invoking Placer County processes, and causing foreseeable effects in this District. Personal jurisdiction is proper based on purposeful direction or availment and the claims' arising out of those forum contacts. *(Campbell's first name also appears as "Carole" in the certified deposition transcript; both spellings refer to the same person. "Carol Campbell" is used consistently herein.)*

¶48A. For avoidance of doubt, "Carol Campbell" and "Carole Campbell" refer to the same individual. Service and allegations in this pleading apply to her regardless of

pg. 17

**FIRST AMENDED COMPLAINT**

spelling. The correct legal spelling will be confirmed in discovery, and Plaintiff will amend to conform to proof if needed.

¶49. J. Dean Johnson (California Bar No. 101774) is a California attorney who, on information and belief, resides or practices in California and directed relevant conduct to this District.

¶50. Hannah E. Murphy (California Bar No. 313487) is a California attorney affiliated with the Law Offices of Johnson, Murphy & Jones, Inc. She is named on information and belief pending discovery to confirm her precise role.

¶51. Law Offices of Johnson, Murphy & Jones, Inc. is a California professional corporation that transacts business affecting this District.

¶52. Edward J. Corey, Jr. is a California attorney or mediator who, on information and belief, resides or practices in Sacramento County, within this District.

¶53. Weintraub Tobin Chediak Coleman Grodin Law Corporation is a California professional corporation with its principal place of business in Sacramento County, within this District.

¶54. Konstantine Antony Demiris (California Bar No. 240089), also known as "Kosta" Demiris, is a California attorney who, on information and belief, resides or practices in California and directed relevant conduct to this District.

¶55. The Demiris Law Firm, PC is a California professional corporation that transacts business affecting this District.

¶56. Michael Scott Shuttleworth (California Bar No. 197683) is a California attorney who, on information and belief, practices in Auburn, Placer County, within this District.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

¶57. Lachona Law is, on information and belief, a California law practice associated with G. Kevin Lachona and transacts business affecting this District.

¶58. Harris & Plottel, LLP is a California limited liability partnership located in Chico, California. On information and belief, during the relevant period it employed or contracted with one or more attorney defendants in matters related to the conduct alleged herein. It is liable under theories including negligent supervision, aiding and abetting fiduciary breach, and respondeat superior.

¶59. Drobny Law Offices, Inc. is a California professional corporation located in Sacramento, California. On information and belief, it is a prior firm associated with G. Kevin Lachona. It is liable under theories including negligent supervision, aiding and abetting fiduciary breach, and respondeat superior.

**D. Doe Law Firms and Additional Does**

¶60. Doe Law Firms 1–5 are unidentified firms believed to have employed, contracted with, or otherwise worked with one or more attorney defendants during the events alleged. This includes, on information and belief, Doe Law Firm A (informally known as "Jordan Law Offices"). Plaintiff will amend to substitute true names upon discovery.

¶61. Does 11–50 are persons and entities whose identities are presently unknown who participated in or aided and abetted the conduct alleged herein, including notaries, financial institutions, document preparers, and healthcare providers. Plaintiff will amend to substitute true names upon discovery.

¶61A. **Doe Defendant (April Sharp).** April Sharp was co-trustee of the Ralph C. Struthers Trust (2017). She aligned with opposing counsel in connection with settlement filings and consent declarations (Exhibits I-12). Plaintiff reserves the right to amend to substitute April Sharp as a named defendant if discovery confirms her participation in fiduciary breaches, concealment of records, or settlement enforcement actions.

**E.** Agency and Conspiracy Allegations

¶62. At all relevant times, each private defendant was the agent, servant, employee, partner, co-conspirator, and/or joint venturer of each of the others and, in doing the things alleged, acted within the course and scope of such agency, service, employment, partnership, conspiracy, and/or joint venture, with the ratification and authorization of the others. These allegations preserve agency, aiding-and-abetting, civil-conspiracy, respondeat superior, negligent-supervision, and joint-action theories consistent with Fed. R. Civ. P. 8 and 42 U.S.C. § 1983.

## IV. STATEMENT OF FACTS (¶63–100)

¶63. Trusts and roles. The Struthers Family Trust dated June 4, 1993 ("1993 Trust") and the Ralph C. Struthers Trust dated October 22, 2017 ("2017 Trust") are interrelated. Plaintiff LaRonda Myers is the duly appointed trustee of the 2017 Trust (currently suspended without motion, notice, or evidentiary hearing), executor of the Estate of Ralph C. Struthers, and a beneficiary of both trusts. (Exhibit C-2 at 84:1–8.)

¶64. Mediation-confidentiality safeguard. Plaintiff relies only on public records and non-mediation documents. No confidential mediation communications or writings are alleged.

1   ¶65. Definitions; federal governance of bonds. "Estate Savings Bonds" means U.S.

2   Savings Bonds registered to Ralph C. Struthers and/or the Estate of Ralph C. Struthers.

3   "Darlene Bonds" means U.S. Savings Bonds titled to or held for Darlene Struthers or the

4   1993 Trust. No U.S. Savings Bonds are titled to the Ralph C. Struthers Trust dated

5   October 22, 2017; any contrary claim requires strict proof of registration. All such bonds

6

7   are governed exclusively by federal law (31 U.S.C. § 3105; 31 C.F.R. Part 353 and

8   related Treasury regulations).

9   ¶66. Federal preemption (summary). Any liquidation, redemption, diversion, or use of

10  the Estate Savings Bonds or the Darlene Bonds to pay private attorneys' fees or other

11  non-federal obligations must comply with U.S. Treasury requirements; otherwise such

12  use is preempted and unlawful. Any claim that U.S. Savings Bonds are trust assets must

13

14  be supported by the face of the registration; absent such proof, the bonds are estate assets.

15  ¶67. Early-2017 dementia and loss of transparency. By early 2017, Darlene Struthers

16  exhibited dementia symptoms. During this period, family members and associated

17  counsel began asserting control over the 1993 Trust and Darlene's assets while

18

19  withholding the statutory accountings required by California Probate Code. (Ex. F-3

20  [5/29/2017 Belinda text—nurse said "Darlene has dementia"]; Ex. H-3 [07/07/2017

21  release/check-day materials].)

22

23  ¶68. Santa Maria hospitalization (capacity context). After a stroke, Ralph was

24  hospitalized in Santa Maria in 2017. Contemporaneous records (and a still image) show

25  that during that Santa Maria stay he could ambulate with physical therapy and

26  communicate clearly. Those observations refer to the Santa Maria hospitalization, not

27  later Auburn dates. (Exhibit N-1.)

28

**FIRST AMENDED COMPLAINT**

pg. 21

¶68A. Santa Maria hospital records vs. office letters. The two July 2017 "incapacity" letters were signed by physicians at a Santa Maria office clinic who were not Ralph's treating hospital physicians. They were not his hospital surgeon or his long-time diabetic physician, and they did not examine Ralph in Auburn. By contrast, contemporaneous Santa Maria hospital records from the treating team document purposeful yes/no communication shortly after the stroke; and a still image from that Santa Maria admission shows ambulation with therapy. One of the office physicians later reversed his July 10 letter after being shown Ralph communicating with a speech therapist. (Exhibits J-1, J-3, N-1.)

¶68B. Early-June Santa Maria entries corroborate purposeful yes/no communication before the Auburn admission. On or about June 1–2, 2017, chart notes reflect appropriate head-nod responses (yes/no) and command-following; these observations predate the July Auburn ER/ICU dates. (Exhibit J-3 (June 1–2 entries); see also Exhibit N-1 at p.5 (5/31/2017 head-nod report).)

¶68C. Treating notes from the initial Santa Maria hospitalization recorded that Ralph was an appropriate candidate for aggressive rehabilitation, with charted yes/no responses and consistent command-following supporting that plan. (Exhibits J-3, J-6.)

¶69. July 7, 2017 declaration. On or about July 7, 2017, attorney J. Dean Johnson prepared and notarized an "incapacity" declaration concerning Ralph despite no examination in Auburn. (Exhibit G-2.)

¶70. July 10–11, 2017 letters; Auburn MRSA; later reversal. On July 10–11, 2017— while Ralph was in Auburn at Sutter Auburn Faith Hospital for MRSA (ER July 10; admit July 11)—two Santa Maria office physicians (neither part of his Auburn treating

FIRST AMENDED COMPLAINT

1

2

3

4

5

6

team and not his prior hospital surgeon or diabetic physician) issued "incapacity" letters without any Auburn examination. Auburn records confirm he was alert and able to communicate. One July 10 physician later reversed his assessment after observing communication with a speech therapist. (Exhibits J-1, J-3.) (Exhibit C-2 at 134:7–25; 135:1–12; 142:1–12)

7

8

9

10

11

12

13

¶70A. Auburn post-MRSA communication (recordings available at trial). Shortly after the Auburn MRSA hospitalization, Ralph verbally produced short, intelligible phrases (e.g., "seven daughters") both in the hospital and during home-health speech therapy. Plaintiff possesses short phone recordings documenting this and will present them at trial or for in camera review upon the Court's request. No media is attached to this pleading. (Exhibit C-2 at 134:7–25; 135:1–12; 142:1–12)

14

15

16

17

18

19

20

21

22

23

24

25

26

27

¶70B. Insurance obstruction and rehab denials (motive to preserve office letters). After the Auburn MRSA admission and during Ralph's recovery, treating providers recommended aggressive rehabilitation with coverage aligned to his Northern California location. Connor opposed switching Ralph's insurance/primary-care physician (PCP) assignment and instructed that Ralph would be described as merely "visiting," which would prevent coverage alignment and block the recommended rehab, despite his favorable recovery trajectory. See Exhibit C-2 (Connor Depo — insurance/"visiting" directives) (Exhibit C-2 at 118:19–25; 121:6–8); Exhibit F-5 ("doesn't need medical treatment for a month"). On information and belief, Connor's opposition was tied to her reliance on Santa Maria office physicians—who were not Ralph's treating team—to issue July 2017 "incapacity" letters; maintaining those non-treating signers' role supported a false incapacitation narrative and a control shift. (Exhibits G-2, J-1, J-3.)

28

**FIRST AMENDED COMPLAINT**

**¶70C.** Pre-arranged Auburn primary-care physician (PCP) visit blocked; gap in care. Plaintiff pre-scheduled a primary-care appointment in Auburn for immediate post-MRSA follow-up. The visit did not occur because Connor refused authorization to change Ralph's insurance/PCP and directed that he be treated as "visiting," which prevented coverage alignment. In the resulting gap in routine care, Ralph developed a further infection and required antibiotics. (Exhibits F-4, O-1.)

**¶70D.** Post-stroke hand contracture (signature context). After Ralph's 2017 stroke and MRSA episode, his dominant right hand developed a progressive flexion/contracture that affected his ability to write. He tried hand therapy and used a custom brace, but the contracture worsened (the brace began to irritate the skin), so we discontinued it and used a soft ball to slow the curl for a time. As a result, his signatures from that period may appear altered or shaky despite his continued capacity to understand and communicate.

**¶70E.** Texts attached as Exhibit B-2 (p. 14, items 3 & 12) show defendant Belinda Connor stating that under the "original" instrument Darlene's brother and Darlene's nephew, "Little Eddie"—not Julie Hatridge—were next in line, and acknowledging that Darlene did not remember events during this period. The same thread shows Connor telling family that Plaintiff was "holding up" distributions while the accountings were pending court approval. These party-opponent statements corroborate that Connor and Hatridge altered control while Darlene's memory was impaired, then deflected responsibility for delay caused by their objections and non-accounting. (Exhibit B-2 at p.14, #3, #12; Fed. R. Evid. 801(d)(2)(A), (E).)

**¶70F.** Treating-team notes confirm purposeful communication and command-following. Hospital records show that, after the stroke, Ralph communicated by shaking his head yes

**FIRST AMENDED COMPLAINT**

or no and by following simple commands; staff recorded that he could shake his head yes and no, and that he followed directions to open his mouth and stick out his tongue (to the teeth), with small smiles and puckers. When speaking was uncomfortable or unsafe, he used head-nods instead; the records still reflect appropriate, consistent responses. (Exhibit J-3; see also Exhibit J-1.)

**¶70G. Belinda's own texts contradict "incapacity."** On **May 31, 2017**, Belinda texted Plaintiff that Ralph was purposefully communicating ("*shakes his head yes and no*"). On **July 20, 2017**—nine days after non-treating office letters—family texts responded to a short video of Ralph speaking (e.g., "*He could talk so good… not coughing anymore*"), and Belinda replied "*ah sweet*," never disputing that he was speaking. (Exhibit **N-1**, p.5 (5/31/2017 text from Belinda); p.6 (7/20/2017 family replies + Belinda's response).)

**¶70H. Effect and motive.** These contemporaneous messages, together with later 2018 messages and letters confirming verbal conversation, undercut the July 2017 "incapacity" narrative. They support the inference that "incapacity" was invoked to seize control over Ralph and Darlene's finances and to push trust changes while suppressing accountings. (Exhibit **N-1**, pp.2–4, 7.)

**¶70I.** Transfer and MRSA discovery. Santa Maria providers recommended aggressive rehabilitation; Belinda opposed that plan and Ralph was placed in a rest home instead. Plaintiff then retrieved Ralph, packed his belongings, and drove him north; during the trip he appeared ill, so upon arrival Plaintiff took him to the Auburn emergency room on July 10, 2017, where he was admitted and later found to have MRSA (ICU July 11). (Exhibit J-1.)

**FIRST AMENDED COMPLAINT**

pg. 25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

¶70J. After the Auburn ER admission, Ralph responded strongly to treatment. Staff again recommended aggressive rehabilitation as the next step. Belinda declined that renewed rehab recommendation, cutting off the progression clinicians said could further improve his recovery. (Exhibits J-1, J-6; see also Exhibit C-2 at 118:19–25; 121:6–8.)

¶70K. Given Ralph's MRSA diagnosis at Auburn, prompt primary-care follow-up was critical. Instead, routine physician follow-up was withheld for roughly three weeks because Belinda blocked alignment to a Northern California PCP and insisted he be treated as merely "visiting." Plaintiff then secured an expedited appointment for August 1, 2017—the clinic moved the calendar because of the recent MRSA—to re-establish physician management immediately. (Exhibit O-1 (PCP confirmations); Exhibit J-1 (Auburn ER/ICU MRSA).)

¶70L. On information and belief, the refusal to authorize aggressive rehab and to align a Northern California PCP coincided with Belinda's reliance on July 2017 paperwork from non-treating office physicians to frame Ralph as incapacitated. The pattern—rehab denied, PCP alignment blocked, "visiting" label used, and office letters invoked—preserved a narrative of incapacity that facilitated control while treating teams were recommending rehab and routine follow-up. (Exhibits F-5; G-2; J-1; J-3; see also Exhibit C-2 at 118:19–25; 121:6–8.)

¶70M. When Ralph was finally seen on August 1, 2017, he required additional/stronger medication—consistent with the need for close physician management after a hospital MRSA diagnosis. The treating provider documented capacity and resumed care planning. The gap in routine care should not have occurred, particularly for a recent MRSA patient. (Exhibit O-1; Exhibit J-4 (8/01/2017 treating-physician letter).) This sequence—MRSA

pg. 26

**FIRST AMENDED COMPLAINT**

discharge, renewed rehab recommendation, blocked PCP alignment, and a multi-week gap—predictably increased risk and forced an urgent, moved-up appointment once Plaintiff gained access. (Exhibits J-1; O-1; F-5.)

**¶70N.** The stop–start pattern—rehab recommended, then withheld; local PCP onboarding delayed—took a measurable toll. Although Ralph later participated in therapy, the treating sequence shows he likely would have done better with continuous rehab right out of the gate, as his early progress and follow-command notes predicted. (Exhibits J-3, J-1, J-6; see also Exhibit O-1.)

**¶71.** Use of July documents to alter control. The July 7 declaration and the July 10–11 letters were used or invoked to justify altering control of the 1993 Trust during Darlene's dementia, despite the absence of an Auburn exam and despite Darlene's cognitive decline. (Exhibits G-2, H-2, H-3.)

**¶72.** 2017 Trust executed (course-correction). After the Auburn MRSA admission and recovery, Ralph retained original drafting counsel Donald Gravalec and, on October 22, 2017, executed the 2017 Trust naming Plaintiff trustee and excluding those involved in altering prior instruments. (Exhibit A-1.)

**¶73.** October 24, 2017 payment inconsistency. On October 24, 2017, Johnson's firm accepted a $2,156.06 check from Darlene for trust-related services despite earlier assertions of her incapacity, indicating inconsistent capacity positions. (Exhibit H-1; Exhibit C-2 at 143:22–144:9 (check for $2,156.06 on Oct. 24, 2017)).

**¶74A.** Date of death / estate posture. Ralph C. Struthers died on June 4, 2019. Issues concerning "Estate Savings Bonds" are governed by federal registration rules and estate-administration law as pled.

pg. 27

**FIRST AMENDED COMPLAINT**

¶75. Delayed discovery (Jan–Feb 2025). In late January–early February 2025, when Plaintiff retained Donald Gravalec to assist, he opened Ralph's file and discovered the sealed March 1, 2019 amendment; the envelope was opened at that time in the presence of a notary. Plaintiff alleges delayed discovery and equitable tolling apply; she acted promptly upon discovery. (Exhibit A-2.)

¶76. March 14, 2025 presentation and notice (J. Johnson originals; evidence declined "not at this time"). On March 14, 2025, drafting counsel Donald Gravalec identified J. Dean Johnson as the custodian of the purported original instruments and stated he would subpoena Johnson's originals and the notary journals/thumbprint logs needed to authenticate the controlling documents. The Court stated, "This is not an evidentiary proceeding … No, not at this time," declined to receive the settlor-intent materials on the law-and-motion calendar, and moved on. (Exhibit C-1 [3/14/2025 Tr.] at 8 (Court declines evidentiary materials), 11 (subpoena intent).)

¶76A. Lack of authority to bind the trusts. Based on the notarized March 1, 2019 amendment (Exhibit A-2) and the drafting lawyer's declaration that the 1993 instrument then in use was not the one he drafted (Exhibit B-1), any purported settlement, stipulation, or agreement "between" the Ralph C. Struthers Trust (Oct. 22, 2017) and the Struthers Family Trust (June 4, 1993) that was signed or advanced by persons who were not duly appointed trustees is void or, at minimum, unenforceable for lack of authority and standing.

¶76B. Scope of allegation. Plaintiff does not rely on private negotiations or confidential discussions; this allegation concerns only the legal capacity and authority of purported signatories and is supported by public or non-privileged records (Exhibits A-2, B-1, C-1).

**FIRST AMENDED COMPLAINT**

pg. 28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

¶76C. A "first" settlement agreement—not a mediation document—was circulated to all beneficiaries and is therefore non-confidential. Plaintiff attaches it as Exhibit P-3 solely to show the authority Defendants claimed and the asset directions they attempted. Plaintiff alleges the document is void, or at minimum unenforceable, because the persons who purported to bind the 1993 Trust and/or the 2017 Trust lacked lawful trustee authority and relied on a fraudulent or unauthentic version of the June 4, 1993 instrument—defects confirmed by the March 1, 2019 sealed amendment and the drafting attorney's declaration. (Exhibit A-2, B-1, P-3.) These allegations do not ask this Court to decide state-law trust validity; they support independent federal claims that non-trustees cannot invoke "settlements" to defeat constitutional rights (procedural due process; access to courts). To the extent any term purports to liquidate or redirect U.S. Savings Bonds, enforcement is barred by federal preemption. See 31 U.S.C. § 3105; 31 C.F.R. Part 353. No res judicata applies because no federal constitutional claim has been adjudicated.

¶76D. Subpoena resistance context. Subpoenas to the Law Offices of Johnson, Murphy & Jones, Inc. for originals, drafts, and notary records were met with blanket objections and protective-order practice, preventing authentication and supporting tolling. Written objections filed the same day as protective-order rulings asserted privilege over drafts and even identity/authentication materials (notary journals, thumbprint logs). (Exhibit K-2 [8/29/2025 Tr.] at 15–16; Exhibits G-1, G-3, G-4, G-5.)

¶76E. April Sharp settlement declarations (Nov. 2024). On November 20, 2024, and again on November 27, 2024, April Sharp filed declarations consenting to the settlement agreement advanced by counsel for Belinda Connor, Julie Hatridge, and Carole

**FIRST AMENDED COMPLAINT**

pg. 29

Campbell. Plaintiff did not consent and opposed enforcement. These filings were later cited to press settlement approval and explain subsequent enforcement efforts over Plaintiff's objection. (Exhibit I-12; Exhibit B-2A (9/8/2017 thread reflecting "original trust and will... trustee's duties" / "so Julie isn't on it anymore, it's back to Little Eddie").)

¶77. Non-review and continued suppression. The court declined to review the amendment at that time, and attorney defendants continued to litigate as though the disinherited actors had standing, while resisting production of authenticity records. (Exhibit B-3)

¶78. Johnson-firm subpoena resistance (papers + hearing). On August 29, 2025, Johnson, Murphy & Jones, Inc. filed written objections in Dept. 40 (counsel Cori B. Jones) asserting the subpoena lacked the § 1985 affidavit, was unduly burdensome to a non-party, and claiming blanket privilege over "all drafts, files, and documents … in connection with the Struthers Family 1993 Revocable Trust dated June 4, 1993," "any … records linked to Ralph or Darlene," and even "document scans, audio, or video content" related to the 1993 Trust. Those sweeping objections were paired with the protective-order rulings the same day (I-13, K-2 at 15–16), and followed the Court's Mar. 14, 2025 refusal to receive settlor-intent materials on a law-and-motion calendar after counsel stated he would subpoena J. Johnson's originals and notary logs (C-1) (see Exhibit I-16)

¶78A. Subpoena record (2022–2025—docket proof). Plaintiff compiles docket entries reflecting repeated efforts to subpoena authenticity records from Law Offices of Johnson, Murphy & Jones, Inc. (2022–2025), met by objections, motions to quash, and sanctions requests by opposing counsel, culminating in calendar rulings foreclosing an evidentiary

**FIRST AMENDED COMPLAINT**

1  hearing. (Exhibits I-13; I-16.) (Subpoena Record 2022–2025); see also Exhibits I-6/I-7;

2  K-2.

3  ¶78B. Counsel-of-record conflicts (docket proof).

4  Court dockets show G. Kevin Lachona continuously listed as "current" counsel of record

5  for Darlene Struthers while simultaneously representing Belinda Connor and Julie

6  Hatridge (2020–2025), despite Darlene's incapacity, confirming conflicts and divided

7  loyalty. (Exhibits I-3B (conflict) & I-3C (counsel-of-record timeline).)

8  ¶78C. Email proof of coordinated motion-to-quash plan (Sept. 27, 2023). Emails from G.

9  Kevin Lachona (then at Harris & Plottel, LLP) confirm a plan to "delay the release" of

10  subpoenaed records obtained by Titan Legal Services and to move to quash if necessary,

11  regarding Law Offices of Johnson, Murphy & Jones, Inc. (Exhibit I-10.)

12  ¶79. Plaintiff's accountings (Estate and 2017 Trust). From 2019 to the present, Plaintiff

13  prepared and filed the second through sixth accountings for both the 2017 Trust and the

14  Estate of Ralph C. Struthers, and advanced personal funds to preserve operations and

15  beneficiary interests. Those accountings are fully submitted and await court approval.

16  ¶79A. Annual submissions; no adjudication. From 2019 through 2025, Plaintiff has

17  submitted the second through sixth accountings for both the Ralph C. Struthers Trust

18  (dated October 22, 2017) and the Estate of Ralph C. Struthers. Despite completeness

19  notices and readiness for hearing, none of these accountings has been adjudicated.

20  ¶79B. Duration of delay. The non-adjudication has persisted for approximately six years,

21  with the seventh accounting cycle approaching, causing continued administrative costs

22  and preventing timely distributions to beneficiaries.

**FIRST AMENDED COMPLAINT**

pg. 31

¶79C. Serial continuances and re-settings. The accountings have been continued repeatedly or placed on non-evidentiary calendars, resulting in no decision on the merits despite Plaintiff's readiness to present witnesses, exhibits, and reconciliations.

¶79D. Deprivation from delay. The prolonged non-adjudication functions as a de facto denial of Plaintiff's trustee rights and beneficiaries' timely distributions, increasing costs and undermining confidence in administration.

¶79E. Court non-action as de facto denial. The continued absence of a decision on fully submitted accountings and the non-enforcement of the July 18, 2025 accounting order have, in practice, denied Plaintiff the ability to complete distributions and close administration, despite her readiness to proceed.

**¶79F. Trustee reimbursements required.**

Ralph C. Struthers's Second Amended Trust expressly provides that Plaintiff shall be reimbursed in full for any personal funds advanced for Ralph's benefit (including his medical care and funeral expenses) before distribution to beneficiaries. In addition, Plaintiff has advanced substantial personal funds to float the 2017 Trust after legal fees and diversions depleted its accounts, including payments to attorneys and costs necessary to preserve the administration. Without those advances, the trust could not have remained operational or protected for the beneficiaries. Plaintiff seeks reimbursement of all such advances consistent with the trust's reimbursement clause and fiduciary law.

¶79G. False 'holding up the inheritance' narrative—omitting objectors' role. Beginning mid-2019 and continuing through this filing, Belinda Connor and Carole Campbell told relatives that Plaintiff was 'holding up' distributions, while omitting that those same actors were objecting to accountings and resisting approval. Plaintiff completed and filed

**FIRST AMENDED COMPLAINT**

pg. 32

the second through sixth accountings for both the 2017 Trust and the Estate and

consistently sought adjudication. Under the Probate Code, distributions tied to contested

account periods properly await court approval; the delay is traceable to objections and

non-adjudication, not to Plaintiff. (¶¶79A–79E; Exhibit D-1.)

**¶79H.** Hostility-seeding as undue-influence tactic. This blame campaign mirrors the

isolation/pressure tactics reflected in Connor's texts (Exhibit B-2 at p.14, #12) and was

deployed to undermine fiduciary transparency while preserving control.

**¶80.** Missing accountings (1993 Trust and Darlene's estate). Since May 2017, the

persons asserting control over the 1993 Trust and Darlene Struthers' estate have produced

no accounting at all. (Requests and orders cited below.)

**¶81.** July 18, 2025 order; non-enforcement. On July 18, 2025, the Superior Court ordered

an accounting for Darlene's trust/assets. The order was not enforced; subsequent efforts

to compel compliance were denied or stalled by protective motions and serial

continuances. (Exhibit D-1.)

**¶82.** Attempted diversion of federally governed bonds. Private parties advocated using

U.S. Savings Bonds to pay third-party attorneys' fees. Plaintiff opposed any use not

compliant with federal Treasury rules.

**¶82A. Public transcripts — which bonds, which dates.**

**(a) Mar. 14, 2025 (C-1):** a co-trustee asked the Court to "**cash the savings bonds**" to

fund counsel; the Court summarized on the record that Plaintiff refused. (Exhibit C-1

[3/14/2025 Tr.] at **18:14–25, 19:1–9, 20:1–5**.)

**(b) July 11, 2025 (K-1):** the hearing addressed the **Darlene/1993 Trust** matter

(suspension; interim-trustee appointment; 14-day turnover); the discussion concerned

Darlene Savings Bonds—not Ralph's estate bonds. (Exhibit K-1 [7/11/2025 Tr.] at **8:24–26; 9:19–25; 9:24–10:13**.)

**(c) Same day (K-1):** the Court **mischaracterized "13 U.S. savings bonds"** as belonging to "the trust," illustrating the confusion this Complaint seeks to prevent; Plaintiff maintains the Ralph bonds are **estate** assets governed by federal registration. (Exhibit K-1 [7/11/2025 Tr.] at **8:9–14**.)

¶83. Bond amounts (non-mediation sources; estate-only). Based on non-mediation financial records, the approximate value of the Darlene Bonds exceeds $51,000. The U.S. Savings Bonds associated with Ralph are registered to the Estate of Ralph C. Struthers (Estate Savings Bonds), not to the trust; the precise figure will be established at trial from admissible, non-privileged records. Any attempted diversion must comply with U.S. Treasury regulations.

¶84. Supremacy Clause (application). Because U.S. Savings Bonds are governed exclusively by federal law, any state-court order or private arrangement purporting to liquidate, redirect, or use such bonds contrary to Treasury regulations may not be enforced as applied to Plaintiff. (See Exhibit C-1 [3/14/2025 Tr.] at 18:14–25, 19:1–9, 20:1–5 (Darlene bonds issue framed); Exhibit K-1 [7/11/2025 Tr.] at 8:24–26; 9:19–25; 9:24–10:13 (Darlene/1993 context); Exhibit K-2 [8/29/2025 Tr.] at 6:22–7:5; 31:13–22 (estate bonds count "13" and dispute).) (See also Exhibit E-1 (orders authorizing cashing, disputed).)

¶85. Federal filing; next-day suspension. On July 10, 2025, Plaintiff filed a federal civil-rights complaint. On July 11, 2025—without any noticed hearing, without a posted tentative ruling, and with a same-day bench "tentative"—Commissioner Michael A.

Jacques suspended Plaintiff as trustee of the 2017 Trust and left fully submitted accountings unadjudicated. (Exhibit K-1 [7/11/2025 Tr.] at 8:24–26; 9:19–25; 9:24–10:13.) (Defense proceeded on a protective-order track stamped "Reserved by Clerk." Exhibit I-1.) (Ex. I-1 (includes Plaintiff's 07/21/2025 ex parte application to compel originals/accountings & sanctions—clerk cover sheet).)

**¶85A.** Protective-order asymmetry. Commissioner Jacques granted protection to opposing counsel while refusing Plaintiff's protective order requests, further constraining Plaintiff's ability to present evidence and protect confidences.

**¶85B.** Settlement/mediation approval on the record (public transcript). On August 29, 2025, the Court stated on the record that a mediated agreement would be approved/was approved. Plaintiff objected and expressly reserved all objections, including (i) lack of lawful trustee signatories and (ii) conflicts with federal savings-bond regulations. The Court also referenced having read what was represented to be an amendment while addressing other matters on calendar. (Exhibit K-2 [8/29/2025 Tr.] at 6:22–7:5 (colloquy/objection), 30 (tentative/approval references).)

**¶85C.** No tentative on removal; scope limited to accounting. Any posted tentative (to the extent one existed) addressed accounting issues only; no tentative noticed removal of a trustee. The July 11 setting nonetheless resulted in suspension/interim-appointment orders on a non-evidentiary calendar. (See Exhibit K-1 [7/11/2025 Tr.] at 9:7–13 (interim trustee appointment/turnover).)

**¶85D.** Temporal proximity supports retaliation. Plaintiff filed her federal civil-rights complaint on July 10, 2025. The next day—July 11, 2025—the Court **suspended Plaintiff without a noticed motion or a posted tentative addressing removal,** and left

pg. 35

**FIRST AMENDED COMPLAINT**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

fully submitted accountings unadjudicated. (Exhibit K-1 [7/11/2025 Tr.] at **8:24–26; 9:19–25; 9:24–10:13.**)

**¶85E.** Evidentiary hearing cancelled after subpoena work-up. After Plaintiff prepared subpoenas and evidentiary materials to authenticate the 1993 instrument and related notarial records, the Court declined to receive settlor-intent materials on the law-and-motion calendar ("not an evidentiary proceeding … No, not at this time") and later treated the matter non-evidentiary, foreclosing witnesses and exhibits. (Exhibit C-1 [3/14/2025 Tr.] at 8, 11; Exhibit K-2 [8/29/2025 Tr.] at 6:22–7:5.)

**¶85F.** Subpoena resistance re J. Dean Johnson records (third try). Efforts to obtain drafts, execution packets, notary journals, and thumbprint logs from the Law Offices of Johnson, Murphy & Jones, Inc. were deferred or blocked, as reflected in the same-day protective-order handling. (Exhibit K-2 [8/29/2025 Tr.] at 15:1–16.) ¶85F — (See Ex. I-1 (ex parte application signed 07/21/2025 and clerk cover sheet) showing Plaintiff sought production while defense pursued the protective track).)

**¶85G.** Protective-order asymmetry and settlement reference. Commissioner Jacques granted protection to opposing counsel while refusing Plaintiff's protective order requests, and referenced settlement/mediation approvals on the record; Plaintiff has not received any court-approved mediated agreement and continues to reserve objections pending appellate review. (Defense proceeded on a protective-order track stamped "Reserved by Clerk." Exhibit I-1 (caption/stamp); Exhibit I-15 (motion body).) Confirming emails on June 27, 2025 (10:56 AM) and August 27, 2025 established there would be no evidentiary hearing and demanded withdrawal of subpoenas. (Exhibit I-8C, I-8B.)

¶**85H**. Settlement/mediation chronology (public-record terminology only). **(a)** 2020 — a "settlement agreement" was circulated to beneficiaries (non-confidential) (Exhibit P-3); **(b)** July 2024 — the matter proceeded as a "mediation agreement," but no final order issued at that time and continuances followed; **(c)** August 29, 2025 — Commissioner Michael A. Jacques approved a mediated agreement over Plaintiff's objection (Exhibit K-2). Plaintiff alleges that persons purporting to bind the trusts lacked lawful trustee authority (¶**76A–76C**) and that any provision conflicting with federal savings-bond regulations is preempted as applied.

¶**85I**. September 3, 2025 — Counsel G. Kevin Lachona filed additional papers opposing subpoena enforcement and authenticity discovery regarding the Law Offices of Johnson, Murphy & Jones, Inc., continuing the obstruction pattern documented earlier. (Exhibit I-15 [Lachona 2025 declarations/motions opposing subpoenas].)

¶**85J**. Early September 2025 — Commissioner Michael A. Jacques issued further orders notwithstanding Plaintiff's federal filing and state appellate posture, continuing Plaintiff's trustee suspension and/or awarding relief to opposing parties while declining to enforce transparency orders. (Exhibit I-14 [Sept. 2025 order].)

¶**85K**. September 2025 — The Superior Court entered an order of continuance that left fully submitted matters unadjudicated, compounding the denial-by-delay alleged herein. (Exhibit I-16 [Order of Continuance].)

¶**85L**. September 2025 — The trial court acknowledged the notice of appeal/stay posture yet continued to enforce the trustee suspension and to sign additional orders affecting administration, illustrating the ongoing, as-applied constitutional harm. (Exhibit I-17 [Notice of Filing Appeal]; see also Exhibit I-18 ["After Hearing" minute/order].)

¶86. Evidentiary mis-docketing / reclassification. Plaintiff was directed to prepare for an evidentiary hearing (subpoenas, declarations, exhibit lists, briefs), but the setting was later treated as non-evidentiary, foreclosing witness testimony and exhibits, as detailed in ¶86A. (Exhibit I-5; I-5A; K-2 at 6:22–7:5.)

¶86A. Evidentiary setting noticed (May 2025) then re-labeled. A Notice of Hearing set the matter for an evidentiary presentation in May 2025, and opposing counsel filed an objection; the Court later treated the setting as non-evidentiary, foreclosing witness testimony and exhibits (Exhibit I-5; I-5A; Exhibit K-2 at 6:22–7:5). On June 27, 2025 at 10:56 AM, defense wrote there would be no evidentiary hearing on August 29 and stated he "only object[s] to discovery delays that push production beyond the August 29, 2025 evidentiary hearing" (Exhibit I-8C). Plaintiff contemporaneously served a letter reiterating the evidentiary posture and trustees' ongoing accounting duties under Probate Code §§ 16060–16062 and 16061.7 (Exhibit I-5B). On August 29, defense proceeded on a protective-order track stamped "Reserved by Clerk," while Plaintiff's evidentiary showing was not heard (ExhibitI-1 (caption/stamp); I-15 (motion body); Exhibit K-2 at 6:22–7:5). Plaintiff filed her Notice of Continuance at the first available opportunity—the next court day—after portal/tech impediments and no response from the presiding judge's chambers to multiple written inquiries, to preserve the evidentiary setting, subpoenas, exhibits, and the paid courtroom/reporter (Exhibit I-15; Exhibit I-5; I-5A). Shortly before that setting, the court issued "no witness / no testimony," rendering the reserved courtroom and reporter functionally unusable (Exhibit I-7; Exhibit K-2 at 6:22–7:5) (Ex. I-1 (Plaintiff's 07/21/2025 ex parte application) reflecting diligence before the "not evidentiary" handling).)

**FIRST AMENDED COMPLAINT**

**¶86B.** Filing "pulled" for "confidentiality" without motion, tentative, or findings (Feb.–Mar. 2025). On or about February 2025, Plaintiff filed materials in a related case number documenting authenticity/authority defects and settlor-intent facts. Without a noticed motion, posted tentative, or confidentiality findings, Commissioner Michael A. Jacques directed that filing be **pulled** from the docket, citing "confidentiality." At the same time, opposing counsel—including G. Kevin Lachona—and associated recipients already had the filing by service, and the Court referenced reviewing its content. The pull order suppressed Plaintiff's showing while leaving the same information in the hands of opponents, creating a one-sided access barrier that impeded Plaintiff's ability to obtain an evidentiary hearing. (See Proofs of Service to Lachona and firm recipients (Exhibit Q-1.); minute order or register entry reflecting the pull (Exhibit Q-2).) (Ex. I-1 (ex parte application) and Ex. K-2 (transcript) corroborate the asymmetrical treatment and non-addressed ex parte).)

**¶87. Prefiling restriction without process (July 21–22, 2025).** On or about July 21, 2025, Plaintiff was flagged with a prefiling "fictitious filer" designation without a noticed motion, prior tentative, or findings; on July 22, 2025, the court issued a follow-on order that, together with the ex parte filing, functioned as a gatekeeping restriction. The designation chilled petitioning and denied due process. (Exhibit K-2 [8/29/2025 Tr.] at 6:22–7:5; 31:13–22.)

**¶87A. August 29, 2025 — "vexatious litigant" / prefiling orders; due-process objection (public transcript).**

The Court discussed an **OSC re vexatious litigant** and the potential issuance of prefiling orders; the Court stated it takes prefiling orders "with the utmost seriousness" and has

FIRST AMENDED COMPLAINT

issued them only rarely. (Exhibit K-2 [8/29/2025 Tr.] at 30:8–19.) Immediately before, Plaintiff objected that the Court was "deciding what I can submit and what I can't submit," stating that her "14th Amendment … due process rights" were being violated. (Exhibit K-2 [8/29/2025 Tr.] at 6:22–7:8.)

¶88. Administrative practices affecting access. Court-administration practices (pre-service "placeholder" holds; mis-docketing/mis-labeling evidentiary matters; late/no tentatives; misfiling/omission of pleadings; unequal ex parte access) burdened Plaintiff's ability to present evidence and obtain timely rulings, contributing to non-adjudication of the 2017 Trust and Estate accountings (second through sixth).

¶89. Belinda Connor relocated to Florida by December 2023 without notice to Plaintiff or beneficiaries. Her prior California residence shows "Sold" on 12/18/2023 (Exhibit F-7). At her July 9, 2024 certified deposition, she confirmed her Florida street address under oath (Exhibit C-2 at 10:3–5). Plaintiff continued mailing notices to her California address until learning of the relocation from the deposition. The nondisclosure impeded notice, increased costs, and supports personal-jurisdiction/purposeful-direction allegations.

¶90. Hatridge banking/records issues. Julie Hatridge issued a Kern Schools Credit Union cashier's check purporting to reimburse Plaintiff for caregiving and later filed a declaration of loss to void it, creating a false impression of payment and a misleading ledger. (Exhibits F-6A–C; Exhibit C-2 at 146:6–25; 147:1–25; 148:1–25; 149:1–7.) On information and belief, she removed or altered Darlene's name on accounts without authority and refused to account since 2017.

¶90A. Incapacity letters used to block Ralph's own access to funds. After Ralph stabilized and sought to withdraw his own cash using his bank card, Connor and Hatridge

**FIRST AMENDED COMPLAINT**

1    invoked the July 2017 "incapacity" paperwork to tell bank personnel that Ralph was "no

2    longer able" to access his money, blocking withdrawals and day-to-day transactions.

3    (Exhibits G-2, J-1, J-3; F-6A–C; see also Exhibit C-2 at 95:1–7 (speech/walking

4    assertions), 118:19–25 (decisions made for him), 121:6–8 (medical POA chain).)

5

6    **¶90B.** Account closures/re-titling to themselves. During this period, Connor and Hatridge

7    closed existing accounts, moved funds, and opened or re-titled accounts listing their own

8    names (and Darlene's) as signers/owners or "successors," while excluding Ralph from

9    practical access. (Exhibits F-6A–C; O-2 (closure/transfer notices and re-titling forms); O-

10   3 (account histories).)

11

12   **¶90C.** Fiduciary concealment. These changes were made without statutory accountings

13   and without producing underlying authority documents (drafts/execution copies, notary

14   journals, thumbprints) that would authenticate any claimed power to alter title or control.

15   (Exhibits G-1, G-3, G-4, G-5 (subpoena refusals).)

16

17   **¶90D.** Cashier's check + false "loss" declaration (Kern Schools FCU). A cashier's check

18   payable to "LaRonda Myers OR Julie Hatridge" was followed by a "Declaration of Loss

19   and Claim for Reimbursement" signed by Hatridge at Kern Schools FCU (2017–2018),

20   enabling diversion through her own credit union and creating a false appearance that

21   Plaintiff had been paid. No corresponding deposit went to the Estate or the 2017 Trust.

22   (Exhibits F-6A–C, Tab C; Exhibit C-2 at 146:6–25; 147:1–25; 148:1–25; 149:1–7.)

23   **¶90E.** Undervaluation at sale; July 2019 fair-market value (approx. 5,000 miles;

24   "Excellent" condition). On information and belief, Defendants sold Ralph's 2015 Toyota

25   Yaris 5-door hatch (VIN VNKJTUD31FA020839) on or about July 1, 2019, when it had

26   ~5,000 miles and was in excellent condition. Guide-based FMV for July 2019 reasonably

27

28                          **FIRST AMENDED COMPLAINT**

pg. 41

falls in the ~$10,500–$13,500 range using Southern California inputs (and ~$9,500–$12,500 with Auburn inputs). If the vehicle was sold below FMV and proceeds were not deposited to fiduciary accounts, Plaintiff seeks the difference (FMV minus sale price) with prejudgment interest. (Exhibit C-2 at 72:14–23; 73:1–4.)

¶90F. Sole vehicle; purported POA sale; no notice or proceeds accounting. Connor used a purported POA to sell Ralph's only car without notifying both co-trustees and without any accounting or remittance of sale proceeds to the Estate or the 2017 Trust; no deposit was made to fiduciary accounts. Buyer identity, deal jacket, DMV/title records, and bank receipts are in Defendants' control. (Myers Decl. Exhibit F-6D; see also Exhibit C-2 at 95:21–25; 96:1–6 (POA/successor sequence).)

¶90G. Origin of the vehicle paper; non-confidential "first settlement" exchange; no waiver/ratification. The one-page vehicle-sale paper (Exhibit F-6D) surfaced in a records exchange that accompanied the first (non-mediation) settlement document later circulated to beneficiaries (Exhibit P-3). Plaintiff uses P-2 and P-3 solely for notice/tracing and to challenge claimed authority; no mediation communications are relied upon.

¶91. Care downgrade and burial interference. Darlene was downgraded from a dementia-care facility to a house/halfway-house setting while no accountings were provided, correlating with asset depletion. An earlier non-opposition to embalming was reversed, and Ralph was cremated contrary to his expressed wishes amid delays and confusion. (Exhibits H-2, H-3 [07/07/2017 release/check-day packet]; Ex. F-3 [5/29/2017 Belinda text re nurse's "has dementia" statement].)

¶92. Non-custodial transparency sought. Plaintiff seeks non-custodial production of withheld fiduciary records (including drafts, execution packets, notary journals,

**pg. 42**

**FIRST AMENDED COMPLAINT**

thumbprint logs, calendars, intake/call notes, file indices, time/billing, and communications) and appointment of an independent, court-supervised forensic accountant for (i) the 1993 Trust/Darlene's estate (2017–present) and (ii) the already-filed 2017 Trust and Estate accountings (second through sixth).

¶93. Independence from probate administration. Plaintiff does not ask this Court to probate or annul a will, administer an estate, determine heirship, or assume custody of property in state court; she seeks redress for independent federal violations, prospective protection of federally governed instruments (including Estate Savings Bonds and the Darlene Bonds), and non-custodial transparency measures.

¶94. Separation from state appeals. Probate-specific issues are being addressed in the Third Appellate District. This action does not seek review, reversal, or modification of any final state-court judgment.

¶95. Timeliness. Claims are timely under delayed discovery and equitable tolling (late-January/early-February 2025 discovery of the March 1, 2019 sealed amendment) and the continuing-violation doctrine (ongoing refusal to account; misuse of process; non-adjudication of filed accountings). (Exhibit A-2; see also Exhibit C-1; Exhibit K-1; Exhibit K-2.)

¶96. Particularity cross-reference (non-mediation materials). Material events and exhibits include: the July 7, 2017 declaration (Exhibit G-2); the July 10–11, 2017 letters and later reversal (Exhibits J-1, J-3); the October 24, 2017 check (Exhibit H-1); the March 1, 2019 sealed amendment (Exhibit A-2); the March 14, 2025 court presentation and notice (Exhibits A-2, B-1, C-1); the July 18, 2025 accounting order (Exhibit D-1); subpoena/records correspondence (Exhibits G-1, G-3, G-4, G-5); and public hearing

transcripts/minutes (including Exhibit K-2). Belinda Connor's certified deposition

corroborates the 2017 control shift and medical/POA assertions (Exhibit C-2 at 94:20–25;

95:1–7; 95:21–25; 96:1–6; 118:19–25; 121:6–8; 123:9–12). Pinpoint aids for Connor

deposition and texts. Because this pleading is lengthy, Plaintiff provides a one-page

Connor Deposition Pinpoint Index (Exhibit C-2A) and a short packet of the cited

deposition pages (Exhibit C-2B). These aids point to the exact page/line locations in the

certified Connor deposition (Exhibit C-2) and cross-reference the related family text

messages already filed at Exhibits B-2 and B-2A. They are filed solely to help chambers

and the clerk jump directly to the pertinent testimony without changing any evidentiary

weight.

**¶96A.** Transcript locator summary. For ease of review, the following exhibit aids

accompany the certified hearing transcripts cited throughout the Complaint: C-1A/C-1B

(Mar. 14, 2025), K-1A/K-1B (July 11, 2025), and K-2A/K-2B (Aug. 29, 2025). Each "A"

exhibit is a one-page page: line index; each "B" exhibit is a true-and-correct packet of

only the pages cited in the pleading. The complete certified transcripts remain C-1, K-1,

and K-2.

**¶97.** Filed accountings (2017 Trust and Estate). From 2019 to the present, Plaintiff

prepared and filed the second through sixth accountings for both the 2017 Trust and the

Estate of Ralph C. Struthers and advanced personal funds to preserve operations and

beneficiary interests; those accountings are fully submitted and await court approval.

**¶98.** Missing accountings (1993 Trust and Darlene's estate). No accounting has been

produced since May 2017 by the persons asserting control over the 1993 Trust and

**FIRST AMENDED COMPLAINT**

1     Darlene Struthers' estate, despite repeated requests and the July 18, 2025 order requiring

2     an accounting that remains unfulfilled. (Exhibit D-1.)

3     ¶99. Settlement clarification; non-confidential document; no bar to these claims. No

4     settlement bars or moots the claims pleaded here. The first settlement agreement was not

5     

6     confidential (it was sent to all beneficiaries) and is attached only to show what authority

7     Defendants claimed and why any such document is void/unenforceable (lack of lawful

8     trustee signatories; reliance on an unauthentic 1993 instrument). Plaintiff does not

9     disclose or rely on any mediation terms or communications. These federal claims proceed

10    on public or non-privileged materials and stand independent of any purported private

11    

12    agreements. (Exhibits P-2, P-3, A-2, B-1, C-1.)

13    ¶100. Summary of harm. The foregoing conduct caused concrete harm: deprivation of

14    trustee functions without due process; denial of a meaningful opportunity to present

15    evidence; chilling of First Amendment petitioning through a prefiling restriction;

16    prolonged delay and expense from non-adjudication of filed accountings; and risk of

17    

18    unlawful diversion of federally governed bonds. (Exhibits M, M-1, M-2; see also Exhibit

19    K-1 [7/11/2025 Tr.] at 8:24–26; 9:19–25; 9:24–10:13; Exhibit K-2 [8/29/2025 Tr.] at

20    6:22–7:5; 31:13–22; Exhibit C-1 [3/14/2025 Tr.] at 8, 11; Exhibit C-2 at 94:20–25; 95:1–

21    7; 95:21–25; 96:1–6.)

22    

23    Global Safeguard. Each Count re-alleges prior paragraphs for background but specifies

24    distinct defendants, conduct, and relief; this is not a "shotgun pleading." Each Count

25    stands on its own elements to avoid duplication.

26    **V. CAUSES OF ACTION**

27    

28

**FIRST AMENDED COMPLAINT**

**COUNT ONE** — 42 U.S.C. § 1983 (FIRST AMENDMENT — RETALIATION; FOURTEENTH AMENDMENT — PROCEDURAL DUE PROCESS — TIMELY ADJUDICATION; EQUAL PROTECTION) — PROSPECTIVE RELIEF ONLY

(Against Commissioner Michael A. Jacques, official capacity only)

**¶101.** Plaintiff re-alleges ¶1–100 as though fully set forth here. Standing. Standing is independently grounded in Plaintiff's capacity as a beneficiary of the 1993 Trust and the 2017 Trust, and as executor of the Estate of Ralph C. Struthers, regardless of her current suspension as trustee.

**¶102.** Posture and limits. Defendant Michael A. Jacques is a Commissioner of the Superior Court of California, County of Placer. He is sued in his official capacity only for prospective declaratory and injunctive relief to halt ongoing violations of federal law; no damages are sought from this defendant (Ex parte Young). Consistent with the 1996 amendment to 42 U.S.C. § 1983, Plaintiff seeks declaratory relief first and injunctive relief only insofar as declaratory relief is unavailable or inadequate to halt continuing violations as to Plaintiff. No relief requested supervises state-court calendars or dictates case outcomes.

¶102A. This Count seeks **prospective relief only** to halt **ongoing** violations of federal law under *Ex parte Young*; it seeks **no damages** and **no supervision of state dockets**. This Count alleges **only** the discrete theories stated below against the named official-capacity defendant and requests the remedies listed at the end of this Count. See 42 U.S.C. § 1983 (1996 amendment); *O'Shea v. Littleton*, 414 U.S. 488.

**¶103.** Protected petitioning. On July 10, 2025, Plaintiff filed a federal civil-rights complaint.

**FIRST AMENDED COMPLAINT**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

¶104. Adverse actions without proper process. On July 11, 2025—without a noticed hearing and without a posted tentative—Defendant suspended Plaintiff as trustee of the 2017 Trust and left unadjudicated Plaintiff's second through sixth accountings for both the 2017 Trust and the Estate. (Exhibit K-1 [7/11/2025 Tr.] at 8:24–26; 9:19–25; 9:24–10:13.) Transcript locator — July 11, 2025: see Exhibits K-1A (pinpoint index) and K-1B (key excerpts). The full certified transcript is Exhibit K-1.

¶104A. Non-adjudication of accountings and non-enforcement of existing order. Despite Plaintiff's fully submitted accountings and the July 18, 2025 order compelling an accounting in the Darlene/1993 matter, the July 11 session did not provide a reasoned adjudication, and enforcement lagged. (Exhibit K-1 [7/11/2025 Tr.] at 9:19–25; 9:24–10:13.)

¶105. After Plaintiff prepared subpoenas and evidentiary materials, the Court treated the matter on a non-evidentiary law-and-motion calendar—declining to receive settlor-intent evidence and deferring subpoena enforcement (Exhibit C-1 at 8, 11). Defense communications stated there would be no evidentiary hearing and demanded withdrawal of subpoenas; defense then proceeded on a protective-order track "Reserved by Clerk" (Exhibit I-8C, I-8B; Exhibit I-1 (caption/stamp); Exhibit I-15 (motion body)). Plaintiff filed at the earliest opportunity following filing-system issues and unanswered presiding-judge inquiries, documenting diligence and a lack of contrary service (Exhibit I-15; Exhibit I-5; I-5A). See also Exhibit K-2 at 6:22–7:5. This conversion was performed by calendar staff, not requested by Plaintiff.

¶105A. Asymmetrical "confidentiality" pull impeded access. The Court's removal of Plaintiff's filing from public docket access on a "confidentiality" rationale—without a

**FIRST AMENDED COMPLAINT**

pg. 47

noticed motion, posted tentative, or specific findings—while the same material remained in the hands of opposing parties, compounded the non-evidentiary handling and deprived Plaintiff of a meaningful opportunity to be heard. As applied to Plaintiff, this asymmetrical suppression of her showing violated the First Amendment right of access and Fourteenth Amendment due process.

¶106. Prefiling restriction without process. On or about July 21, 2025, Plaintiff was subjected to a prefiling restriction (sometimes labeled "fictitious filer") imposed without motion, notice, or findings.

¶106A. Lack of noticed motion and no tentative on removal. The suspension issued without a noticed motion, and any tentative addressed accounting only; at no time did the tentative ruling analyze or notice removal of a trustee.

¶106B. On August 29, 2025, the Court also discussed "vexatious litigant" status and possible prefiling orders; Plaintiff objected on Fourteenth Amendment due-process grounds. (Exhibit K-2 [8/29/2025 Tr.] at 31:13–22; 6:22–7:5.) Transcript locator — August 29, 2025: see Exhibits K-2A (pinpoint index) and K-2B (key excerpts). The full certified transcript is Exhibit K-2.

¶107. First Amendment retaliation. Plaintiff engaged in protected petitioning; Defendant then took adverse actions that would chill a person of ordinary firmness; and the temporal proximity and record context support a reasonable inference that Plaintiff's protected activity was a substantial or motivating factor.

¶107A. Retaliation particulars (temporal proximity and pattern). Plaintiff engaged in protected petitioning on July 10, 2025. On July 11, 2025, Commissioner Jacques suspended Plaintiff without a noticed motion or tentative addressing removal; thereafter

1

2

3

4

5

6

the court cancelled the evidentiary setting after Plaintiff prepared subpoenas and evidentiary materials, and granted protection to opposing counsel while refusing Plaintiff's protective requests. The closeness in time and the pattern of actions support a reasonable inference that Plaintiff's protected activity was a substantial or motivating factor.

7

8

9

10

11

12

¶107B. Escalation after protected filing. In September 2025—weeks after the August 29 transcript in which the Court stated the matter was "not evidentiary"—the Court issued additional orders while leaving Plaintiff suspended and the accountings unadjudicated (Exhibits I-14, I-16, I-18), reinforcing the causal link between Plaintiff's July 10 federal petitioning and the adverse pattern.

13

14

15

16

17

18

19

20

21

22

23

24

25

¶108. Fourteenth Amendment — procedural due process (timely adjudication). Plaintiff has submitted completed, ready-for-hearing accountings (second through sixth) annually since 2019. Serial continuances, non-evidentiary placements, and prolonged non-adjudication—now spanning approximately six years with a seventh cycle approaching—operate as a de facto denial of process. Under Mathews v. Eldridge, the private interests (trustee functions, evidentiary presentation, timely distributions) are substantial; the risk of error increases as adjudication is deferred; and the burden to provide minimally fair procedures (notice, a meaningful opportunity to be heard, and a reasoned decision) is low. See also Logan v. Zimmerman Brush Co. (state failure to provide a timely hearing can itself violate due process). (See Exhibit I-5 [Notice of Evidentiary Hearing, May 2025]; Exhibit K-2 [8/29/2025 Tr.] 6:22–7:5.)

26

27

28

¶108A. As-applied due-process theory. The sustained failure to provide a timely hearing and decision on fully submitted accountings—and to enforce the existing accounting

pg. 49

**FIRST AMENDED COMPLAINT**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

order—operates as a denial of Plaintiff's protected interests while withholding a meaningful opportunity to be heard within a reasonable timeframe.

**¶108B.** Minimal process required. At minimum, due process requires: **(a)** notice identifying any specific deficiency in the already-filed accountings with record citations; **(b)** a reasonable response window; and **(c)** a reasoned decision or an announced schedule for decision within a reasonable period, as applied to Plaintiff.

**¶108C.** As shown by Exhibits I-13 and I-10, subpoena enforcement was withheld and evidentiary settings reclassified, foreclosing a meaningful hearing and denying Plaintiff's procedural due-process rights.

**¶109.** Fourteenth Amendment — equal protection (as applied). Plaintiff was singled out for a prefiling restriction and an open-ended failure to adjudicate fully submitted accountings, without neutral standards or the notice-and-hearing ordinarily afforded to similarly situated fiduciaries, lacking a rational basis and intertwined with Plaintiff's protected petitioning.

**¶109A. Comparator Allegations.** On information and belief, similarly situated trustees and fiduciaries in Placer County probate/trust matters receive (i) noticed motions with posted tentatives before any suspension/removal, (ii) access to evidentiary hearings when subpoena-backed authenticity issues are timely raised, and (iii) an adjudication of fully submitted accountings within ordinary case timelines. Plaintiff was denied these baseline procedures without a rational basis, reinforcing the as-applied Equal Protection violation.

**¶110.** Federal preemption (Estate Savings Bonds, prospective only). U.S. Savings Bonds at issue are registered to the estate, not the trust; transcript discussion later used a count of "13" in mischaracterizing them as trust assets, which Plaintiff disputed. Prospective

**pg. 50**

**FIRST AMENDED COMPLAINT**

relief is warranted to prevent any future liquidation, diversion, or use of such estate bonds to pay private attorneys' fees absent full Treasury compliance. (Exhibit K-2 [8/29/2025 Tr.] at 6:22–7:5; 31:13–22.) Given on-record requests to "cash the savings bonds," Plaintiff faces a **credible and imminent** threat of diversion; relief is not speculative.

¶110A. Unauthorized "settlement" unenforceable. To the extent any party relies on a purported settlement, stipulation, or agreement "between" the 2017 Trust and the 1993 Trust, it is void or unenforceable as to Plaintiff and the trusts because the purported signatories lacked lawful trustee authority; the transcript record shows bond-related mischaracterizations and Plaintiff's objection. (Exhibit K-2 [8/29/2025 Tr.] at 6:22–7:5; 31:13–22.)

¶111. Mediation-confidentiality safeguard. Plaintiff relies only on public records and non-mediation documents; no confidential mediation communications or numbers are pleaded.

¶112. Guardrails. Plaintiff does not seek federal review or reversal of any state-court judgment, does not seek to administer probate, and does not request ongoing federal supervision of state-court calendars. Relief is limited to prohibiting enforcement of unconstitutional measures and federally preempted conduct as to Plaintiff.

¶112A. For avoidance of doubt, no relief sought directs or forbids any specific state-court calendar setting or ruling, supervises a state docket, or dictates outcomes. Relief only conditions enforcement, as to Plaintiff, of identified restraints (trustee suspension, any prefiling restriction, and any diversion of U.S. Savings Bonds) on constitutionally adequate procedures (notice, meaningful opportunity to be heard before a neutral

**FIRST AMENDED COMPLAINT**

decision-maker, and a reasoned decision). These conditions are prospective, self-executing, and non-intrusive.

**¶112B. O'Shea/Younger Guardrail. No relief sought requires ongoing federal monitoring of state calendars or dictates state-law outcomes; the requested orders are self-executing conditions on enforcement as to Plaintiff only.**

**¶113.** Ongoing harm. Plaintiff remains subject to a prefiling restriction and deprived of a meaningful, timely opportunity to secure adjudication of the fully submitted accountings, causing continued expense and impairing distributions.

Relief Requested — Count One (Prospective Only)

**¶113A.** Plaintiff incorporates ¶38C by reference.

**¶114.** Declaration (First & Fourteenth Amendments). Declare that enforcing against Plaintiff (a) any trustee suspension, (b) any prefiling/vexatious-litigant restriction, or (c) the prolonged non-adjudication of fully submitted accountings, without (i) notice of specific grounds, (ii) a meaningful opportunity to be heard, (iii) a neutral decision-maker, and (iv) a reasoned decision, violates the First and Fourteenth Amendments. This is a prospective declaration and does not direct how any state case is scheduled, managed, or decided.

**¶114B.** Rule 65(d)(2) scope. Any injunction issued under this Count binds the parties, their officers, agents, servants, employees, and attorneys, and other persons in **active concert or participation** with them.

**¶115.** Injunction (condition of enforcement; non-custodial). Enjoin enforcement of (a) any trustee suspension and (b) any prefiling restriction as to Plaintiff unless and until Defendant provides constitutionally adequate procedures, including meaningful notice

**pg. 52**

**FIRST AMENDED COMPLAINT**

and an opportunity to be heard before a neutral decision-maker with a reasoned decision on the record. This order applies only to the parties named in this Count and only to enforcement, as to Plaintiff, of the identified measures unless constitutionally adequate procedures and federal compliance are shown.

¶115A. As-applied declaration (accountings). Declare that, as applied to Plaintiff, the non-adjudication of the 2017 Trust accountings (second through sixth) and the non-enforcement of the July 18, 2025 accounting order violate the Fourteenth Amendment. The July 11, 2025 transcript reflects no reasoned adjudication of accountings despite the pending order. (Exhibit K-1 [7/11/2025 Tr.] at 9:19–25; 9:24–10:13.) This order applies only to the parties named in this Count and only to enforcement, as to Plaintiff, of the identified measures unless constitutionally adequate procedures and federal compliance are shown.

¶115B. Expedited Rule 65 schedule (bridge relief). Set an expedited briefing and hearing schedule for preliminary-injunction relief under Fed. R. Civ. P. 65 (and, if necessary, issue a temporary restraining order to preserve the status quo) limited to the as-applied conditions of enforcement described above. Plaintiff's objections and the Court's posture are preserved in transcript references. (Exhibit K-2 [8/29/2025 Tr.] at 6:22–7:5; 31:13– 22.) The requested orders are self-executing conditions on enforcement only and require no ongoing federal docket supervision.

¶115C. Subpoena-integrity condition (as-applied; non-custodial). As to Plaintiff only, enjoin enforcement of any restriction that forecloses an evidentiary hearing or cancels subpoenas directed to instrument authenticity (including drafts, execution packets, notary journals, and thumbprint logs) absent a written statement of specific grounds with record

pg. 53

**FIRST AMENDED COMPLAINT**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

citations and a date-certain schedule for resolution. The March 14, 2025 transcript
reflects the Court's refusal to receive settlor-intent materials on a law-and-motion
calendar and counsel's stated intent to subpoena originals and notary logs. (Exhibit C-1
[3/14/2025 Tr.] at 8, 11.) Transcript locator — March 14, 2025: see Exhibits C-1A
(pinpoint index) and C-1B (key excerpts). The full certified transcript is Exhibit C-1.
(Notice of evidentiary setting and service: Exhibit I-5; I-5A.)

¶115D. **Prefiling/vexatious-litigant guardrail (as-applied; non-custodial).** As to
Plaintiff only, enjoin enforcement of any prefiling restriction or similar gatekeeping order
unless and until constitutionally adequate procedures are provided—(i) written notice
identifying the specific grounds with record citations, (ii) a meaningful opportunity to be
heard, and (iii) a written, reasoned decision—with any restriction narrowly tailored to the
record and no broader than necessary. (Exhibit K-2 [8/29/2025 Tr.] at 31:13–22; 6:22–
7:5.) This order applies only to the parties named in this Count and only to enforcement,
as to Plaintiff, of the identified measures unless constitutionally adequate procedures and
federal compliance are shown.

¶115E. Reinstatement (as-applied; non-custodial). Reinstate Plaintiff as trustee of the
2017 Trust unless and until removal is ordered following a noticed, evidentiary hearing
that affords constitutionally adequate due process. The July 11, 2025 suspension was
imposed without a noticed motion or a posted tentative addressing removal.
Reinstatement is sought solely as an interim constitutional safeguard and does not ask
this Court to resolve any state-law probate issues. (Exhibit K-1 [7/11/2025 Tr.] at 8:24–
26; 9:19–25; 9:24–10:13.) This order applies only to the parties named in this Count and

1  only to enforcement, as to Plaintiff, of the identified measures unless constitutionally

2  adequate procedures and federal compliance are shown.

3  ¶115F. Injunctive relief is requested only to the extent declaratory relief is unavailable or

4  inadequate as applied to Plaintiff, consistent with the 1996 amendment to 42 U.S.C. §

5  1983.

6

7  ¶115G. Rule 65 showing (Winter). Likelihood of success: the suspension and prefiling

8  restriction issued without prior notice or hearing, and savings-bond diversion is conflict-

9  preempted under federal regulations; irreparable harm: ongoing deprivation of trustee

10 functions and chilled petitioning cannot be compensated by later damages; equities/public

11 interest: the requested relief is narrow, non-custodial, and as-applied and does not direct

12 state scheduling or outcomes. The requested relief is as-applied and non-custodial,

13 conditions enforcement only, and does not supervise state-court calendars or outcomes.

14 Money damages cannot remedy chilled petitioning rights or restore timely adjudication of

15 fully submitted accountings; there is no adequate remedy at law. The harms (suspension,

16 prefiling restraint, and non-adjudication) are ongoing and imminently repeat unless

17 enjoined.

18

19 ¶115H. Recent-orders bridge (as-applied). The September 2025 orders (Exhibits I-14, I-

20 16, I-18) demonstrate ongoing enforcement of the suspension and continued non-

21 adjudication despite appeal/stay posture; interim relief should therefore condition any

22 enforcement, as to Plaintiff, on constitutionally adequate process and a posted, date-

23 certain adjudication schedule.

24 ¶115I. Rule 65(c) Security. Plaintiff requests that any security under Fed. R. Civ. P. 65(c)

25 be set at a nominal amount or waived given the public-interest character of the requested

**pg. 55**

constitutional safeguards, Plaintiff's limited means, and the absence of monetary harm to

Defendants from preserving constitutional process.

¶116. Future methodology — timeliness protocol (as to Plaintiff only; non-custodial). As

a condition of enforcing any future suspension, prefiling restriction, or continued refusal

to act on fully submitted accountings as to Plaintiff: require (a) written notice identifying

specific deficiencies or grounds, with record citations; (b) a reasonable response window;

and (c) either a reasoned decision on the merits or a written schedule for resolution within

a reasonable period. This protocol is limited to enforcement actions affecting Plaintiff

and does not supervise state-court calendars generally. (Exhibit K-1 [7/11/2025 Tr.] at

9:19–25; Exhibit K-2 [8/29/2025 Tr.] at 6:22–7:5, 31:13–22.)

¶117. Savings-bonds injunction (non-custodial). Enjoin any future liquidation,

redemption, diversion, or use of Estate Savings Bonds (and, to the extent proven, any

other U.S. Savings Bonds) to pay private attorneys' fees or other non-federal obligations

absent full compliance with U.S. Treasury requirements, without this Court administering

probate or assuming custody of any res.

¶118. Fees and further relief. Award costs and, if represented by counsel, reasonable

attorney's fees under **42 U.S.C. § 1988;** and grant such other prospective relief as the

Court deems just and proper.

**COUNT TWO — 42 U.S.C. § 1983 (JOINT ACTION / PROCEDURAL DUE**

**PROCESS; ACCESS TO COURTS) — DAMAGES AND LIMITED EQUITABLE**

**RELIEF**

(Against G. Kevin Lachona, in his individual capacity)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

¶119. Plaintiff re-alleges ¶1–118 as though fully set forth here. Standing. Standing is independently grounded in Plaintiff's capacity as a beneficiary of the 1993 Trust and the 2017 Trust, and as executor of the Estate of Ralph C. Struthers, regardless of her current suspension as trustee.

¶119A. To the extent any defendant invokes petitioning or litigation privilege, Plaintiff alleges the **sham exception** and relies on **non-communicative acts** (e.g., account retitlings, refusal to produce notary/thumbprint logs, asset transfers) outside any privilege.

¶120. Defendant. G. Kevin Lachona is a private attorney who, at relevant times, acted jointly with state actors in Placer County trust proceedings.

¶121. State action / joint participation. Although a private actor, Lachona acted under color of law by willfully participating with court officers and staff to employ and maintain practices that deprived Plaintiff of process, including: resistance to production of core authenticity records (drafts, execution packets, notary journals, thumbprint logs), use of protective motions and "placeholder" tactics to forestall hearings, and coordination that resulted in summary actions (trustee suspension, non-adjudication of accountings, and a prefiling restriction).

¶121A. Counsel alignment (record). The certified deposition appearance page lists G. Kevin Lachona as counsel "Representing Belinda Connor, Julie Hatridge and Carole Campbell" (as transcribed). Exhibit C-2 at 2:8–10. This alignment supports joint-participation allegations in ¶121. (Exhibit C-2 at 3:8–12)

¶121B. **Meeting of the minds; overt acts.** Defendants reached a meeting of the minds to employ state process to suppress authenticity evidence and foreclose an evidentiary

**FIRST AMENDED COMPLAINT**

pg. 57

presentation. Overt acts included: (a) coordinated motion-to-quash planning (Sept. 27, 2023 email), (b) use of placeholder/protective tracks to re-label an evidentiary setting as non-evidentiary on the eve of hearing, (c) resistance to producing non-privileged notary/thumbprint logs and execution packets, and (d) leveraging a same-day bench "tentative" to impose suspension without a noticed removal motion.

¶122. Notice and knowledge. On March 14, 2025, drafting counsel presented (a) the notarized March 1, 2019 amendment disinheriting persons who altered or attempted to alter the 1993 Trust, and (b) a sworn declaration that the 1993 instrument being used was not the one he drafted; actual notice was provided to counsel the same day. Despite this notice, Lachona suppressed or failed to present these settlor-intent records and opposed subpoenas seeking the non-privileged authenticity materials identified above.

¶122A. Notice and benefit from pull. In addition to the March 14, 2025 in-court notice (¶122), Lachona received service of the February/March 2025 filing that the Court later "pulled" for "confidentiality" without motion or findings. Lachona thus had the content while Plaintiff's filing was removed from the docket, further skewing access and aiding the non-evidentiary treatment that deprived Plaintiff of process. (Exhibit Q-1 (proof of service); Exhibit Q-2 (register/minute reflecting pull).)

¶123. Resulting deprivations. Through the joint actions described, Plaintiff was deprived of: (a) continued exercise of trustee functions; (b) adjudication of fully submitted accountings (second through sixth) for the 2017 Trust and the Estate; (c) an evidentiary hearing with witnesses and exhibits; and (d) unburdened access to the courts free from a prefiling restriction imposed without process.

**¶124.** Procedural due process violation. Plaintiff has protected property and liberty interests in her trustee authority, ability to complete accountings, and timely adjudication. She was deprived of these interests without constitutionally adequate notice, a meaningful opportunity to be heard, or a neutral decision-maker. Under Mathews v. Eldridge, the private interests are substantial, the risk of error from summary/non-evidentiary handling is high, and the burden of providing basic procedures is low.

**¶125.** Access-to-courts violation. The coordinated use of protective mechanisms, refusal to produce authenticity records, summary restrictions, and placement of matters on non-evidentiary calendars materially impaired Plaintiff's ability to present her claims and evidence.

**¶126.** Causation and damages. Lachona's joint actions were a substantial factor in the deprivations above and foreseeably caused delay costs, increased litigation expense, reputational harm from a prefiling restriction, and loss of trustee functions.

**¶127 (Timeliness / delayed discovery)**

Defense "Responses and Objections" to Plaintiff's Requests for Production, Set One refused core authenticity categories—including drafts, execution packets, and notary journals/thumbprints—supporting fraudulent-concealment tolling (Exhibit I-16).

**¶127A.** Timeliness (CCP § 335.1; discovery rule). The § 1983 claims accrued no earlier than March 14, 2025 when the concealed amendment and drafter's declaration were first put on the record, and, in any event, include discrete constitutional deprivations on July 11, 2025 and August 29, 2025. Tolling applies based on Defendants' concealment and Plaintiff's diligence.

**¶127B. Plaintiff incorporates ¶38C by reference.**

pg. 59

**FIRST AMENDED COMPLAINT**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

¶**128.** Mediation-confidentiality safeguard. Plaintiff relies only on public records and non-mediation documents. No confidential mediation communications or numbers are alleged.

¶**128A.** Law Offices of Johnson, Murphy & Jones, Inc. August 29, 2025 written objections asserted blanket privilege over "all drafts, files, and documents … in connection with the [1993] Trust," plus "any … records linked to Ralph or Darlene," and "any document scans, audio, or video content," illustrating suppression of core authenticity records necessary for due-process verification. (See also Exhibit K-2 at 15– 16 (protective-order rulings); ExhibitI-1, I-2; Exhibit I-16 (blanket objections to drafts, execution packets, notary journals, thumbprint logs)).)

¶**128B.** In written "Responses and Objections" to Plaintiff's Requests for Production, Set One, Defendant Lachona withheld drafts, execution packets, and notary journals/thumbprints necessary to authenticate the 1993 instrument, thereby denying Plaintiff meaningful access to the courts and procedural due process (Exhibit I-16).

¶**128C.** Clarification of roles. The Sept. 27, 2023 emails (Exh. I-10) reflect defense counsel Lachona's plan to delay or quash; by contrast, Plaintiff—first through Demiris and later through Steven Cross—was seeking production of Johnson/Murphy authenticity records, followed by Plaintiff's own pro se subpoenas.

Demiris's written admission that client records should be produced (Exhibit I-2A) reinforces that Defendants' later privacy/privilege positions were pretextual, denying Plaintiff meaningful access to authenticate the controlling instrument and to obtain timely adjudication.

**¶128D.** The sequence—Plaintiff's repeated subpoenas (Demiris → Cross → pro se), defense interference (Exhibit. I-10), Johnson/Murphy refusals (Exhibit. G-1, G-3, G-4, G-5), and the court's non-enforcement/evidentiary shut-off (Exhibits. I-6/I-7, K-2)—demonstrates joint participation under color of law that deprived Plaintiff of a meaningful opportunity to authenticate core records.

**¶129.** Declaratory relief. Declare that Lachona's joint participation with state actors to deprive Plaintiff of notice, a meaningful opportunity to be heard, and timely adjudication violates the Fourteenth Amendment and 42 U.S.C. § 1983. This declaration is prospective, does not supervise state-court scheduling or outcomes, and is limited to as-applied constitutional safeguards.

**¶130.** Injunctive relief (narrow; non-custodial; as to this defendant). Enjoin Lachona from **(a)** seeking to enforce any forged or unauthorized filing bearing on Plaintiff's trustee authority; and **(b)** opposing production of non-privileged authenticity records (drafts, execution packets, notary journals, thumbprint logs) necessary to verify the 1993 instrument—without directing state-court scheduling or outcomes.

**¶131.** Damages. Award compensatory damages according to proof and punitive damages against this individual defendant for reckless or malicious conduct.

**¶132.** Fees and costs. Award costs and, if represented by counsel, reasonable attorney's fees under 42 U.S.C. § 1988, and such further relief as the Court deems just and proper.

**¶133.** Preservation and production. Defendant Lachona shall preserve and, when requested through discovery, produce non-privileged authenticity and administration records relevant to the 1993 and 2017 trust matters, including drafts and execution copies, notary journals and thumbprint logs, appointment calendars, intake/call notes, file

pg. 61

**FIRST AMENDED COMPLAINT**

indices, time/billing entries, and internal emails or memoranda referencing those materials.

¶134. ESI parameters. Electronic records shall be preserved in native format with metadata intact. Reasonable searches will include identified custodians and date ranges tied to the events alleged herein, with proportionality honored under Federal Rule of Civil Procedure 26(b)(1).

¶135. Spoliation/adverse inference. If core authenticity or administration records are destroyed, altered, or withheld without substantial justification after a preservation duty attached, Plaintiff will seek appropriate remedies, including an adverse-inference instruction, evidentiary sanctions, and fees.

¶136. **TOLLING AND DISCOVERY RULE.** To the extent any limitations defense is asserted, Plaintiff alleges equitable tolling and delayed discovery based on concealment of authenticity and administration records, with diligent efforts and discovery no earlier than late January to early February 2025 for key items described in the Statement of Facts.

¶137. Leave to amend. Plaintiff seeks leave to amend as justice requires to conform to proof, substitute true names for Does, and add date-specific particulars uncovered in discovery, without expanding the causes of action beyond those pleaded.

Litigation-Privilege Caveat. The relief sought does not rest on privileged advocacy; it addresses suppression of non-privileged identity/authentication and fiduciary records (including drafts, execution packets, notary journals, and thumbprint logs) and joint action under color of law that deprived Plaintiff of federal rights.

## COUNT THREE — FINANCIAL ELDER ABUSE; CONCEALMENT OF TRUST/ESTATE RECORDS; 42 U.S.C. § 1983 JOINT PARTICIPATION

(Against G. Kevin Lachona; Julie Hatridge; Belinda Connor; and Does 1–5, in their individual capacities)

**¶138.** Plaintiff re-alleges ¶1–137 as though fully set forth here. Standing. Standing is independently grounded in Plaintiff's capacity as a beneficiary of the 1993 Trust and the 2017 Trust, and as executor of the Estate of Ralph C. Struthers, regardless of her current suspension as trustee.

**¶138A.** Petitioning/privilege caveat: the **sham exception** and **non-communicative acts** (bank retitlings, refusals to produce notary logs, asset transfers) defeat any immunity claim.

### A. The elder, the property, and the duty to account

**¶139.** Darlene Struthers was an elder within Welf. & Inst. Code § 15610.27 at all relevant times. Her "property" includes all funds, accounts, real/personal property, and beneficial interests held directly or through the Struthers Family Trust (June 4, 1993) ("1993 Trust"). Trustees and de facto fiduciaries must provide true and complete accountings to beneficiaries and interested persons. See Probate Code §§ 16060–16062, 17200(b)(7) (annual accountings; duty to inform; petition to compel). (See also Exhibit I-5B (Plaintiff notice re §§ 16060–16062, 16061.7).)

**¶139A.** No trustee authority = no contract. Any document advanced by private defendants to justify diversion of U.S. Savings Bonds or restrictions on trustee disclosure is void or unenforceable where the signatories were not duly appointed trustees of the relevant trust(s). Trust obligations cannot be created by persons lacking trustee authority.

**pg. 63**

**FIRST AMENDED COMPLAINT**

**¶139B.** Federal preemption overlay. Separately, any purported agreement that would liquidate, redirect, or use Estate or Trust U.S. Savings Bonds to pay private attorneys' fees is preempted and unenforceable absent full compliance with U.S. Treasury regulations.

**¶139C.** Despite three separate subpoena waves (Demiris, then Steven Cross, then Plaintiff pro se), Johnson/Murphy remained the custodian of the original instruments and notarial identity logs and refused production, while the court did not compel compliance and later foreclosed evidentiary presentation. (Exhibits. G-1, G-3, G-4, G-5, I-13, I-6/I-7, K-2, I-16.)

**¶140.** Since May 2017, the persons asserting control over the 1993 Trust and Darlene's estate have produced no accounting at all, despite repeated requests and a July 18, 2025 order compelling an accounting that remains unfulfilled. (Exhibit D-1.)

**B.** Specific acts by each defendant (who/what/when/where/how) with exhibits

**¶141.** G. Kevin Lachona (attorney): On March 14, 2025, drafting counsel Donald Gravalec presented the sealed, notarized March 1, 2019 amendment (disinheriting anyone who altered or attempted to alter the 1993 Trust) and swore the 1993 Trust being used was not the instrument he drafted; he handed a copy of the amendment to Lachona, giving actual notice. (Exhibits A-2, B-1, C-1.) Despite this, Lachona (a) continued litigating as if disinherited actors had standing; (b) filed/supported protective motions to block subpoenas to Law Offices of Johnson, Murphy & Jones, Inc. for drafts, execution packets, notary journals, and thumbprint logs; and (c) used calendar/placeholder tactics to avoid statutory transparency. (Exhibits G-1, G-3, G-4, G-5, I-16.)

1    ¶142. Julie Hatridge: During Darlene's dementia (2017 forward), Hatridge acted as a de

2    facto fiduciary without lawful appointment by (a) issuing a Kern Schools Credit Union

3    cashier's check purporting to reimburse Plaintiff for caregiving and later filing a

4
     declaration of loss to void it—creating a false "paid" record (Exhibit F-6A–C); (b)

5
6    altering/removing Darlene's name on accounts and exercising control without notice or

7    authority; and (c) refusing any accounting since 2017 despite demands.

8    ¶143. Belinda Connor (Florida): Connor asserted control over Darlene's finances and the

9    1993 Trust while Darlene had dementia; on information and belief she directed actions

10
11   from out of state into California proceedings and (a) issued or condoned statements such

12   as "doesn't need medical treatment for a month" regarding Ralph, interfering with

13   recommended care (Exhibit F-4); (b) allowed/caused care downgrade for Darlene from a

14   facility to a house/halfway-house (Exhibit H-2) while withholding accountings (see also

15   H-3); and (c) never produced an accounting after May 2017.
16
17   ¶144. Does 1–5: On information and belief, one or more notaries, financial institutions,

18   document preparers, advisors, or agents assisted by withholding authenticity records

19   (execution packets, notary journals, thumbprint logs) and/or resisting D-1 after July 18,

20   2025. (Exhibits G-1, G-3, G-4, G-5, D-1, I-16.)

21
     C. July 2017 capacity papers and Auburn MRSA facts (context for wrongful use)
22
23   ¶145. The July 7, 2017 "incapacity" declaration was notarized by J. Dean Johnson

24   without an Auburn exam (Exhibit G-2). The July 10–11, 2017 letters were authored in

25   Santa Maria while Ralph was in Auburn at Sutter Auburn Faith Hospital for MRSA (ER

26   July 10; admit July 11), alert but ill; one July 10 doctor later reversed his letter after being

27   shown Ralph communicating with a speech therapist. (Exhibit J-1.) Despite these facts,

28
     **FIRST AMENDED COMPLAINT**

1  defendants invoked those papers to sustain control and defeat oversight during Darlene's

2  dementia. (Exhibit C-2 at 134:7–25; 135:1–12; 142:1–12)

3  **¶145A.** Deposition corroboration of misuse. Connor testified that the July 2017

4  "incapacity" paperwork triggered the control shift—after Ralph "was declared medically

5  incapacitated" and "Darlene resigned on the 7th of July, 2017," she became "successor

6  co-trustee, along with Julie Hatridge." Exhibit C-2 at 94:20–25. That invocation

7  contradicts treating-team notes and a later reversal in the medical record. See Exhibits J-

8  1, J-3. (Exhibit C-2 at 95:21–25, 96:1–6 ("declared medically incapacitated" … "Darlene

9  resigned on the 7th of July, 2017," and Connor became successor/POA))

10  **¶145B.** Banking control obtained/maintained through non-treating "incapacity" letters.

11  Defendants presented or relied upon the July 7 "incapacity" declaration and July 10–11

12  office letters—authored by non-treating physicians—to convince financial institutions

13  that Ralph lacked capacity, thereby blocking his withdrawals, closing accounts, and re-

14  titling funds into accounts bearing Connor's/Hatridge's names. (Exhibits G-2, J-1, J-3, F-

15  6A–C; see also ¶90A–90C.)

16  **¶145C.** Vehicle sale as a wrongful "taking/retaining." Connor used a purported power of

17  attorney (POA) to sell Ralph's sole vehicle without notice to both co-trustees and without

18  a proceeds accounting. That conduct constitutes a "taking, obtaining, or retaining" of

19  elder property for a wrongful use and/or by undue influence within Welf. & Inst. Code §

20  15610.30, and violates the trustee duties to inform and account under Probate Code §§

21  16060–16062 and § 17200(b)(7). (Exhibit F-6D; see also ¶90F, ¶139, ¶147.)

1    Co-conspirator statements. In addition to Fed. R. Evid. 801(d)(2)(A), Connor's text

2    statements (see Exhibit B-2; ¶70E) are admissible against Hatridge under Rule

3    801(d)(2)(E) as co-conspirator statements in furtherance of the control scheme alleged.

4
5    **¶145D.** Belinda's **May 31, 2017** and **July 20, 2017** messages acknowledging purposeful

6    communication and speech (Exhibit N-1, pp. 2–4, 7.) contradict the non-treating July

7    letters and reinforce that "incapacity" was pretext to obtain and retain elder property

8    without transparency.

9    **D. Elder-abuse elements (Welf. & Inst. Code § 15610.30)** and **probate-duty violations**

10
11   **¶146.** Financial elder abuse. Defendants took, secreted, appropriated, obtained, or

12   retained elder property for a wrongful use and/or with intent to defraud and/or by undue

13   influence by: (a) concealing authenticity records and settlor-intent evidence; (b) blocking

14   subpoenas and refusing any accounting for the 1993 Trust and Darlene's estate since May

15   2017; and (c) maintaining control in the face of dementia and a court order to account.

16
17   (Exhibits A-2, B-1, C-1, D-1, G-1, G-3, G-4, G-5, F-6A–C, H-2, H-3, F-4, I-16.) (See

18   also Exhibit C-2 at 134:7–25; 135:1–12 (July 10–11, 2017 letters and treating

19   involvement).)

20   **¶147.** Probate Code violations: Defendants violated Probate Code §§ 16060–16062,

21   17200(b)(7) by failing to inform and account, concealing records necessary to verify the

22
23   authentic 1993 Trust and to trace Darlene's assets, and persisting in control without

24   lawful appointment.

25   **E. § 1983 joint-participation / state-action overlay (procedural guardrail)**

26   **¶148.** Although private actors, Lachona, Hatridge, and Connor acted under color of law

27   by jointly participating with court officers to misuse state process—including protective-

28                                                                              **pg. 67**

1    order practice, calendar holds/reclassification that foreclosed evidence, non-enforcement

2    of D-1, and steps toward a prefiling restriction—to deprive Plaintiff of procedural due

3    process and access to courts and to suppress material records. *See Dennis v. Sparks*,

4    *Lugar v. Edmondson Oil, Tower v. Glover*. Any asserted state litigation privilege does not

5

6    bar § 1983 claims premised on constitutional deprivations or elder-abuse remedies.

7    **¶148A.** Noerr–Pennington / litigation-privilege caveat. To the extent any defendant

8    claims petitioning immunity, Plaintiff alleges the "sham" exception: the challenged

9    petitioning and protective-order tactics were objectively baseless and used to achieve

10

11   results (summary restrictions, suppression of non-privileged notary/identity records) that

12   could not lawfully be obtained through valid process. Any state litigation privilege does

13   not bar federal § 1983 claims or preclude orders compelling production of non-privileged

14   notarial and identity records.

15

**F. Rule 9(b) particularity (who/what/when/where/how)**

16

17   **¶149.** Who: Lachona, Hatridge, Connor, and Does 1–5. What: suppression of A-2/B-1/C-

18   1; subpoena resistance to G-1/G-3/G-4/G-5, I-16; refusal to account notwithstanding D-1;

19   false "paid" ledger via F-6A–C; reliance on G-2 and J-1 to sustain control. When: 2017

20   forward; Mar. 14, 2025 (notice in court); post-D-1 non-compliance through present.

21   Where: Placer County proceedings; Santa Maria/Auburn facts. How: using defective

22

23   capacity papers, withholding authenticity records, resisting a court-ordered accounting,

24   and deploying calendar tactics.

25   **¶149A.** On September 27, 2023, an email from G. Kevin Lachona (then at Harris &

26   Plottel, LLP) proposed to "delay the release" of Titan-served records and "move to

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

quash" subpoenaed materials regarding Law Offices of Johnson, Murphy & Jones, Inc. (Exhibit I-10).

**G. Causation, injury, and timeliness**

**¶150.** Defendants' conduct caused loss of transparency, care downgrade for Darlene, asset-depletion risk, delay costs, and reputational harm to Plaintiff as trustee/executor by blocking distributions and forcing prolonged litigation.

**¶151.** (Timeliness under elder-abuse count) Claims are timely under delayed discovery and equitable tolling based on concealment of authenticity and banking records (Exhibits G-1, G-3, G-4, G-5, I-16; F-6A–C), and under the continuing-violation doctrine (ongoing refusal to account despite D-1).

**¶151A.** Timeliness (Welf. & Inst. Code § 15657.7; CCP § 338(d)). The financial-elder-abuse and fraud-based claims are brought within four and three years, respectively, of discovery in late January–early February 2025, with tolling during concealment.

**H. Preservation and adverse-inference protocol (to prevent spoliation)**

**¶151B.** Plaintiff incorporates ¶38C by reference.

**¶152.** To protect the record, Plaintiff seeks a preservation order covering drafts, execution packets, notary journals, thumbprint logs, bank/ledger records, calendars, intake/call notes, file indices, time/billing, and communications; and an adverse-inference instruction for any unjustified spoliation/non-production of core items (including communications concerning A-2/B-1/C-1 and G-1/G-3/G-4/G-5, I-16).

**¶152A.** These state-law claims arise from illegal and non-communicative taking and retaining of elder property and fiduciary non-accounting, not protected petitioning; in any

1    event, the illegal-conduct exception applies, and limited discovery is warranted under

2    Cal. Code Civ. Proc. § 425.16(g).

3    ¶153. Finding of financial elder abuse under Welf. & Inst. Code § 15610.30 against

4
5    Defendants.

6    ¶154. Full accounting of the 1993 Trust and Darlene Struthers' estate (2017–present),

7    including bank statements, ledgers, drafts, notary journals, thumbprint logs, calendars,

8    intake/call notes, file indices, time/billing, and communications necessary to authenticate

9
10   instruments and trace funds.

11   ¶155. Independent forensic review (non-custodial). Appointment of an independent,

12   court-supervised forensic accountant to conduct a non-custodial review at Defendants'

13   expense, with periodic reporting sufficient to restore transparency and enable lawful

14   distributions; this Court is not asked to administer probate or assume custody over

15
16   property in state court.

17   ¶156. Injunctive protections. An injunction prohibiting Defendants from: (a) invoking

18   protective orders or calendar tactics to block statutory accountings; (b) transferring or

19   dissipating assets pending completion of accountings/forensic review except as permitted

20   by existing state-court orders and federal law; and (c) enforcing any gag/confidentiality

21   term that restricts a trustee's non-waivable duty to inform beneficiaries.

22
23   ¶156A. Banking status-quo and production order (non-custodial). Pending full

24   accountings, maintain the status quo on any accounts opened, re-titled, or controlled by

25   Connor/Hatridge from May 2017 forward (no transfers other than ordinary living and

26   court-approved expenses), and order production from each involved institution of: (i)

27   signature-card/KYC packets; (ii) authority documents presented (including any

28                                                                              pg. 70

"incapacity" papers); (iii) closure/transfer forms; and (iv) monthly statements and ledger histories for all impacted accounts.

¶157. Probate Code § 17211(b) fees. Fees/costs against any beneficiary/representative who, without reasonable cause and in bad faith, opposed or obstructed (i) the 2017 Trust accountings (second through sixth) or (ii) the 1993 Trust/Darlene's estate accountings.

¶158. Damages and statutory remedies. Compensatory and punitive damages as permitted; attorneys' fees and costs under Welf. & Inst. Code § 15657.5; and, where bad-faith wrongful taking is proven, double damages under Probate Code § 859.

¶159. Joint-and-Several Liability; neutral costs on defendants. Award monetary relief jointly and severally against the non-immune private defendants, with contribution/indemnity preserved among them; and order that the fees and costs of the court-appointed independent forensic accountant and third-party production/hosting be borne jointly and severally by the non-immune private defendants (not by Plaintiff or trust/estate assets).

¶159A. Element checklist (Welf. & Inst. Code § 15610.30 / fraud). Elder status (¶139); taking/retaining by wrongful use or undue influence (¶¶145–147, 150); intent or knowledge (¶¶141–144, 148–149); damages (¶150–151); tolling/continuing violation (¶151–151A). Fraud particularity—who/what/when/where/how (¶149).

Litigation-Privilege Caveat. The relief sought does not rest on privileged advocacy; it addresses suppression of non-privileged identity/authentication and fiduciary records (including drafts, execution packets, notary journals, and thumbprint logs) and joint action under color of law that deprived Plaintiff of federal rights.

¶159B. The challenged conduct includes non-communicative acts (asset re-titling, cashier's-check diversion, refusal to produce notary journals and thumbprints, and misuse of bank instructions) and objectively baseless petitioning tactics deployed to obtain results unattainable by valid process, satisfying the sham exception and falling outside any state litigation privilege.

## COUNT FOUR — FRAUD, ELDER FINANCIAL ABUSE, FIDUCIARY MISCONDUCT, AND INTERFERENCE WITH SETTLOR'S WISHES; 42 U.S.C. § 1983 JOINT PARTICIPATION (as applicable)

(Against Julie Hatridge, in her individual capacity)

¶160. Plaintiff re-alleges ¶1–159 as though fully set forth here. Standing. Standing is independently grounded in Plaintiff's capacity as a beneficiary of the 1993 Trust and the 2017 Trust, and as executor of the Estate of Ralph C. Struthers, regardless of her current suspension as trustee.

### A. Role, timeframe, and lack of lawful appointment

¶161. Beginning in or about 2017, while Darlene Struthers exhibited dementia symptoms (see Exhibit H-2, H-3), Defendant Julie Hatridge acted as a de facto fiduciary over the Struthers Family Trust dated June 4, 1993 ("1993 Trust") and Darlene's assets without lawful appointment, asserting control and making trust-related decisions without providing the statutory accountings required by Probate Code §§ 16060–16062 and notice/disclosure duties under Probate Code § 16061.7.

### B. Specific acts (who/what/when/where/how) with exhibits

¶162. Capacity/alteration coordination (mid-2017). Hatridge coordinated to initiate or execute changes affecting the 1993 Trust during Darlene's cognitive decline, relying on

pg. 72

(a) a July 7, 2017 "incapacity" declaration notarized by J. Dean Johnson (Exhibit G-2), and (b) July 10–11, 2017 letters authored from Santa Maria while Ralph was in Auburn for MRSA care (ER July 10; admit July 11)—and not examined in Auburn (Exhibit J-1). These documents were later invoked to justify altering control despite Darlene's dementia and the lack of an Auburn exam.

¶163. Banking misrepresentation (2017). Hatridge used her Kern Schools Credit Union account to issue a cashier's check purporting to reimburse Plaintiff for caregiving, then filed a declaration of loss to void the instrument when the check was never delivered—creating a false impression of payment and a misleading ledger trail (Exhibit F-6A–C).

¶164. Account/title manipulation (2017–present). On information and belief, Hatridge removed or altered Darlene's name on accounts, opened/closed accounts, and exercised control over funds without lawful authority or timely notice to beneficiaries, while refusing to produce accountings required by Probate Code §§ 16060–16062 and § 16061.7.

¶164A. Blocking Ralph's withdrawals. Hatridge used the July 2017 "incapacity" paperwork to instruct bank staff that Ralph could not transact, preventing him from withdrawing his own cash with his bank card. (Exhibits G-2, J-1, J-3; F-6A–C.)

¶164B. Closing/re-titling accounts into her control. Hatridge closed Ralph's existing accounts, moved funds, and opened or re-titled accounts listing herself (and at times Connor and/or Darlene) as signers or owners, while withholding any Probate Code-compliant accounting. (Exhibits F-6A–C.)

¶164C. Elder-abuse element. The foregoing constitutes "taking, secreting, appropriating, obtaining, or retaining" elder property for a wrongful use and/or by undue influence

**FIRST-AMENDED COMPLAINT**

under Welf. & Inst. Code § 15610.30, and breaches duties under Probate Code §§ 16060–16062, 17200(b)(7).

¶165. Rehab denial and care downgrade. Hatridge denied or delayed recommended rehabilitation after Ralph's hospitalization and acquiesced in—or directed—Darlene's downgrade from a dementia-care facility to a house/halfway-house setting, which coincided with asset depletion and reduced services (Exhibit H-2; see also H-3).

¶166. Burial/interference with settlor's wishes. Hatridge reversed an earlier non-opposition to embalming, contributing to cremation against Ralph's expressed wishes. The reversal occurred amid delays and procedural confusion that foreclosed the intended burial (Exhibit H-2).

¶167. Persistent refusal to account; court order ignored. From 2017 to present, Hatridge has failed/refused to provide fiduciary accountings for the 1993 Trust and Darlene's assets, despite repeated requests and a July 18, 2025 order requiring an accounting (Exhibit D-1).

**C. Statutory violations and standards**

¶168. Elder financial abuse (Welf. & Inst. Code § 15610.30). By taking, secreting, appropriating, obtaining, or retaining an elder's property for a wrongful use and/or with intent to defraud, and/or by undue influence—through concealment of records, misuse of capacity documents, account manipulation, refusal to account, and diversion attempts—Hatridge violated § 15610.30.

¶169. Fiduciary-duty and accounting violations (Probate Code). Hatridge breached duties of loyalty and information/accounting by failing to provide full and true accountings and

by concealing records necessary to verify the authentic 1993 Trust and its assets, in

violation of Probate Code §§ 16002, 16060–16062, 16061.7, and 17200(b)(7).

¶170. Malice, oppression, fraud (Civil Code § 3294). The conduct supports punitive

damages because it was carried out with malice, oppression, or fraud—e.g., the false

"payment" record via cashier's check and declaration of loss; concealment of trust

records; interference with settlor intent.

**Co-conspirator statements.** In addition to Fed. R. Evid. 801(d)(2)(A), Connor's text

statements are admissible against Hatridge under **Rule 801(d)(2)(E)** as co-conspirator

statements in furtherance of the control scheme alleged herein.

**D. Rule 9(b) particularity (fraud averments)**

¶171. Plaintiff pleads fraud with particularity: who (Hatridge); what (Kern Schools CU

cashier's check and later declaration of loss; removal/alteration of Darlene's name on

accounts; reliance on July 7, 2017 declaration and July 10–11, 2017 letters to sustain

control; reversal of embalming non-opposition); when (2017 forward; cashier's

check/declaration of loss in 2017; refusals 2017–present); where (Kern Schools CU;

Placer County proceedings; Santa Maria and Auburn events); how (creating a false

"paid" appearance, concealing accountings, invoking defective capacity instruments).

(Exhibit C-2 at 84:1–8.)

¶171A. The Exhibit B-2 page-14 texts (items 3 and 12) identify Darlene's brother and

her nephew "Little Eddie" as the intended successors under the original instrument,

confirming a plan to bypass those successors in favor of "Julie" despite Darlene's

documented memory impairment. These contemporaneous, non-privileged writings show

what was being asserted to family members at the time and do not reflect consent or

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ratification; they support the inference that Hatridge—though not a sibling—acted in concert with Connor and Campbell to obtain control by undue influence and without lawful appointment during Darlene's dementia period. (Exhibit B-2, p.14, ##3, 12.)

**¶171B.** On September 27, 2023, an email from G. Kevin Lachona (then at Harris & Plottel, LLP) proposed to "delay the release" of Titan-served records and "move to quash" subpoenaed materials regarding Law Offices of Johnson, Murphy & Jones, Inc. (Exhibit I-10).

**¶171C. Reliance.** Plaintiff and beneficiaries reasonably relied on Defendants' material misrepresentations and concealments (including the validity/effect of the July 2017 "incapacity" papers and banking representations) in ways that delayed accountings, impaired distributions, and increased costs. The concealment of core authenticity/authority records further prevented earlier discovery and redress.

**E. Settlor's 2019 amendment; tolling and notice**

**¶172.** Ralph's sealed, notarized amendment dated March 1, 2019 disinherits any person who altered or attempted to alter the 1993 Trust (Exhibit A-2). The amendment was discovered and opened in late January–early February 2025 (tolling/delayed discovery), presented in court on March 14, 2025, with sworn declaration by drafting counsel Donald Gravalec that the 1993 Trust then used was not the instrument he drafted; notice was handed to G. Kevin Lachona the same day (Exhibit C-1, B-1). Hatridge's ongoing refusal to account and continued reliance on 2017 "capacity" paperwork occurred notwithstanding this amendment and notice.

**F. § 1983 joint-participation overlay (as applicable)**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

¶173. To the extent state-court processes (protective orders, calendar holds/reclassifications, resistance to the July 18, 2025 accounting order) were used or invoked to maintain concealment and control, Hatridge jointly participated with state officials to effect deprivations of federal rights (due process, access to courts). Private parties acting jointly with judicial officers act under color of law. See Dennis v. Sparks; Lugar v. Edmondson Oil; Tower v. Glover. (Protective-order trajectory and pre-hearing re-label support joint-action allegations. ExhibitI-1; I-8C (June 27, 2025, 10:56 AM); I-8B (Aug. 27, 2025).)

## G. Causation, injury, and timeliness

¶174. Hatridge's conduct caused prolonged loss of transparency, depletion risk to the 1993 Trust and Darlene's assets, care downgrade, delay costs, and reputational harm to Plaintiff as trustee/executor. Claims are timely under delayed discovery/equitable tolling (late-January/early-February 2025 discovery of the March 1, 2019 amendment; concealment) and under the continuing-violation doctrine (ongoing refusal to account and use of process to resist transparency).

## Relief Requested — Count Four

¶174A. Plaintiff incorporates ¶38C by reference.

¶174B. These state-law claims arise from illegal and non-communicative taking and retaining of elder property and fiduciary non-accounting, not protected petitioning; in any event, the illegal-conduct exception applies, and limited discovery is warranted under Cal. Code Civ. Proc. § 425.16(g).

¶175. Declaratory relief voiding any and all unauthorized trust changes executed or initiated by Hatridge, including actions premised on the July 7, 2017 declaration (Exhibit

**FIRST AMENDED COMPLAINT**

G-2) and the July 10–11, 2017 letters (Exhibit J-1), and declaring that those instruments may not be used to justify continued control absent lawful appointment and capacity-compliant process.

¶176. Production/accountings. An order compelling full fiduciary accountings and records for the 1993 Trust and Darlene Struthers' assets (2017–present), including bank statements, ledgers, drafts, notary logs, thumbprints, and communications necessary to verify authenticity and trace funds; and enforcing the July 18, 2025 order (Exhibit D-1).

¶177. Independent forensic review (non-custodial). Appointment of an independent, court-supervised forensic accountant to conduct a non-custodial review at Defendants' expense, with periodic reporting sufficient to restore transparency and enable lawful distributions.

¶178. Injunctive protections. An injunction prohibiting Hatridge from (a) invoking "declarations of loss," placeholders, or calendar tactics to frustrate statutory accountings; (b) transferring or dissipating assets pending completion of accountings/forensic review except as permitted by existing state-court orders and federal law; and (c) enforcing any gag/confidentiality terms that restrict a trustee's non-waivable duty to inform beneficiaries.

¶179. Damages. Compensatory and punitive damages as permitted by law for fiduciary misconduct, fraud, and interference with settlor's wishes.

¶180. Statutory remedies and fees. Compensatory and punitive damages as permitted; attorneys' fees and costs under Welf. & Inst. Code § 15657.5; and, where bad-faith wrongful taking is proven, double damages under Probate Code § 859. Fees under

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Probate Code § 17211(b) against any beneficiary/representative who, without reasonable cause and in bad faith, opposed the accountings.

¶181. Joint-and-Several Liability. Award the foregoing monetary relief against the non-immune private defendants, jointly and severally, with contribution/indemnity preserved among defendants; the fees and costs of the court-appointed independent forensic accountant and third-party production/hosting shall be borne by the non-immune private defendants, jointly and severally.

¶181A. Element checklist (fraud / elder financial abuse / fiduciary breach). Misrepresentation or concealment + intent (¶¶162–164C, 171); reliance/causation (¶¶165–167, 174); damages (¶¶175–180); elder-abuse taking/retaining (¶¶164C, 168); fiduciary-duty/accounting violations (¶169); punitive standard (¶170).

¶181B. The challenged conduct includes non-communicative acts (asset re-titling, cashier's-check diversion, refusal to produce notary journals and thumbprints, and misuse of bank instructions) and objectively baseless petitioning tactics deployed to obtain results unattainable by valid process, satisfying the sham exception and falling outside any state litigation privilege.

## COUNT FIVE — FRAUD, ELDER FINANCIAL ABUSE, MEDICAL NEGLECT, AND CIVIL RIGHTS VIOLATIONS

(Against Belinda Connor, in her individual capacity)

¶182. Plaintiff re-alleges ¶1–181 as though fully set forth here. Standing. Standing is independently grounded in Plaintiff's capacity as a beneficiary of the 1993 Trust and the 2017 Trust, and as executor of the Estate of Ralph C. Struthers, regardless of her current suspension as trustee.

### A. Role, residence, and forum contacts

¶183. Belinda Connor resides in Florida. On information and belief, she retained and/or was represented by G. Kevin Lachona in connection with the Struthers trust/estate matters (Exhibit C-2 (Connor Depo) 2:8–10 (Appearances)). Connor purposefully directed her conduct to California by asserting control over the Struthers Family Trust dated June 4, 1993 and Darlene Struthers' assets, invoking Placer County Superior Court processes. She confirmed her Florida residence and street address under oath. See Exhibit C-2 at 4:4–11; 10:3–4; Index "3726" (4:4; 10:3). Deposition locator — Connor: see Exhibits C-2A (pinpoint index) and C-2B (key excerpts); related text messages are at Exhibits B-2 and B-2A.

### B. Specific acts (who/what/when/where/how) with exhibits

¶184. False incapacitation narrative (July 2017). Connor relied upon and advanced a false incapacitation narrative to gain or sustain control: a July 7, 2017 "incapacity" declaration notarized by J. Dean Johnson (Exhibit G-2) and July 10–11, 2017 letters authored from Santa Maria—over six hours away—while Ralph was in Auburn at Sutter Auburn Faith Hospital for MRSA (ER July 10; admit July 11). Auburn records confirm location and condition. A July 10 Santa Maria office physician later reversed his assessment after being shown Ralph communicating with a speech therapist. Despite these facts, Connor continued to assert and litigate as if Ralph lacked capacity in Auburn. (Exhibits J-1, J-3.) ¶184A. "Can't walk / can't speak" assertions contradicted; non-treating signers. Connor testified that "my dad could no longer speak" and "he couldn't walk." (Exhibit C-2 at 95:3–12.) But the July 2017 letters she relied on were written by non-treating Santa Maria office physicians—not Ralph's hospital surgeon or diabetic physician—and those

pg. 80

**FIRST AMENDED COMPLAINT**

office doctors did not examine him in Auburn. Treating-team notes show appropriate yes/no communication, a still image shows ambulation with therapy, and one office physician reversed his July 10 letter after seeing speech-therapy communication. (Exhibits J-1, J-3, N-1.) (Exhibit C-2 at 95:1–7 ("could no longer speak… couldn't walk… [or] write his name"))

**¶184B.** Non-filed media (notice only). After the Auburn MRSA episode, Ralph verbally produced short phrases; Plaintiff will present short recordings at trial or in camera if the Court requests. No media is attached to this pleading.

**¶184C.** Deposition admission linking the July 2017 paperwork to control. Connor admitted that after Ralph "was declared medically incapacitated" and "Darlene resigned on the 7th of July, 2017," she "was the successor co-trustee, along with Julie Hatridge," and "that's how [she] became the POA…." (Exhibit C-2 at 94:20–25.) (Exhibit C-2 at 95:21–25; 96:1–6)

**¶184D. Belinda's admissions v. her incapacity posture.** Belinda's own **May 31, 2017** text reports Ralph was purposefully communicating (*"shakes his head yes and no"*), and her **July 20, 2017** reply (*"ah sweet"*) to family comments that Ralph was speaking shows she did not dispute that he was talking days after the office letters. (Exhibit N-1, pp. 2–4, 7.) These contemporaneous messages undermine her later claims that Ralph "could no longer speak," and support the inference that "incapacity" was asserted to obtain control and suppress oversight.

**¶185.** Darlene's dementia / unlawful control / no accounting (2017–present). By early 2017, Darlene exhibited dementia symptoms (Exhibit H-2, H-3). Connor asserted control over Darlene's finances and the 1993 Trust during this period, yet no accounting has ever

**pg. 81**

been provided for the 1993 Trust or Darlene's assets despite repeated requests (2017–present) and in spite of a July 18, 2025 order requiring accounting. (Exhibit D-1.)

**¶185A.** Independent of any petition or discovery request, trustees owe continuing statutory duties to keep beneficiaries reasonably informed and to account at least annually, at termination, and upon a change of trustee. **Probate Code §§ 16060–16062, 16061.7; 17200(b)(7).** Plaintiff provided written notice reiterating these duties and the **August 29, 2025** evidentiary posture. (**Exhibit I-5B** (beneficiary accounting notice & Aug. 29 evidentiary setting).)

**¶186.** Medical-care interference and insurance obstruction used to further control. Connor directed or acquiesced in withholding physician-recommended rehabilitation after Ralph's hospitalization, told providers he "doesn't need medical treatment for a month" (Exhibit F-5), opposed changing insurance/primary-care physician (PCP) assignment to Northern California, and instructed that Ralph be treated as "visiting," which blocked coverage alignment and delayed routine PCP follow-up (Exhibit O-1). She testified that Ralph "could no longer speak… couldn't walk… [or] write his name" and that, after he was "declared medically incapacitated" and "Darlene resigned on the 7th of July, 2017," she became the POA/successor and made decisions for him (Exhibit C-2 at 95:1–7, 95:21–25, 96:1–6, 118:19–25, 121:6–8, 123:9–12). The incapacitation posture relied on July 2017 letters signed by non-treating Santa Maria office physicians who did not examine Ralph in Auburn; one later reversed his July 10 assessment after observing speech-therapy communication (Exhibits G-2, J-1, J-3). Connor's blockade also prevented a pre-scheduled Auburn PCP transition visit, eliminating timely physician management and medication oversight; Ralph then developed another infection requiring

pg. 82

antibiotics (Exhibit O-1). Directing "visiting" status during post-MRSA recovery, resisting coverage alignment, and blocking the PCP transition evidences reckless disregard for an elder's health and safety to sustain a false incapacitation narrative (Exhibits C-2, F-4, G-2, J-1, J-3).

**¶186B.** Foreseeable risk from ER-only access. By blocking coverage alignment and ordered rehab, Connor forced ER-only access for emergent issues and deprived Ralph of routine, physician-directed therapies during a vulnerable recovery window, foreseeably increasing risk to his health. (Exhibits J-1, J-3.)

**¶186C.** Bad-faith interference with treating orders. The insurance/"visiting" directives, taken together with the non-treating office letters, demonstrate bad-faith interference with treating-physician orders to sustain a false incapacitation narrative and maintain control during Darlene's dementia period. (Exhibit C-2, F-5, G-2, J-1, J-3.)

**¶186D.** Pre-scheduled Auburn primary-care physician (PCP) appointment defeated by insurance blockade. Plaintiff had already scheduled a PCP visit in Auburn to occur immediately upon arrival and to transition Ralph to ordered post-MRSA follow-up. Connor's refusal to authorize the insurance/PCP change prevented that visit, eliminating timely access to routine physician management and medication oversight. (Exhibit O-1.)

**¶186E.** Foreseeable harm realized—infection and delayed antibiotics. As a foreseeable consequence of the coverage/PCP obstruction during a vulnerable recovery period, Ralph developed another infection and required antibiotics, which would have been promptly addressed in the ordinary course had the pre-arranged PCP visit occurred. (Exhibit O-1.)

**¶186F.** Elder-abuse factors—reckless disregard for health and safety. Blocking a pre-arranged PCP transition, resisting coverage alignment, and instructing that Ralph be

**FIRST AMENDED COMPLAINT**

1    labeled "visiting" during post-MRSA recovery evidences reckless disregard for an elder's

2    health and safety to maintain a litigation posture founded on non-treating office letters.

3    (Exhibit C-2, F-5, G-2, J-1, J-3.)

4

5    ¶186G. "No access" directive at the bank. Connor told bank personnel—relying on the

6    July 2017 "incapacity" paperwork—that Ralph was "no longer able to retrieve his own

7    money," and blocked his card withdrawals and in-branch cash access. (Exhibits G-2, J-1,

8    J-3; F-6A–C.)

9    ¶186H. Coordinated closures and re-titling. Working with Hatridge, Connor closed

10   accounts, transferred balances, and opened/re-titled accounts into configurations listing

11   themselves (and Darlene) while excluding Ralph and withholding any accounting.

12

13   (Exhibits F-6A–C.)

14   ¶186I. Elder-abuse and fiduciary violations. This conduct satisfies Welf. & Inst. Code §

15   15610.30 and violates Probate Code §§ 16060–16062, 17200(b)(7); it also corroborates

16   the bad-faith misuse of non-treating office letters to sustain control over elder assets.

17

18   (Exhibits G-2, J-1, J-3.)

19   ¶186J. Post-death blame campaign to preserve control. After Ralph's death, Connor

20   told relatives and other third parties that Plaintiff was "holding up" their inheritance

21   while omitting that Connor and aligned parties were actively objecting to accountings and

22   resisting approval. This hostility-seeding was designed to isolate Plaintiff, suppress

23

24   transparency, and preserve control, and constitutes undue-influence tactics and bad faith

25   supporting punitive damages. (See ¶¶79G–79H; Exhibit B-2 at p.14, #12.)

26   ¶187. Care downgrade and isolation of the elder. Connor participated in or allowed

27   Darlene's downgrade from a dementia-care facility to a house/halfway-house setting,

28

                              **FIRST AMENDED COMPLAINT**                          pg. 84

corresponding with asset depletion and reduced services (Exhibit H-2), and refused to provide statutorily required accountings. (Exhibit C-2 at 12:1–7 (Casa Amore since June 2020); 12:20–25 (Prestige Assisted Living, Lancaster); 13:1–7 (dates at Prestige, move timeline))

¶188. Property removal / unauthorized transactions. On information and belief, Connor removed property and/or caused sales or transfers without court authorization or fiduciary transparency (2017 forward), while blocking access to records needed to trace proceeds.

¶188A. POA sale of sole vehicle; no notice; no proceeds accounting. Connor used a purported POA to sell Ralph's only car without informing both co-trustees, and failed to account for the sale proceeds or to deposit them to the Estate/2017 Trust. The transaction exploited the July 2017 "incapacity" posture to block Ralph's access and enabled asset migration outside fiduciary oversight. (Exhibit F-6D; ¶90F.)

¶189. Burial interference / reversal. Together with others, Connor's stance contributed to reversal of earlier non-opposition to embalming, resulting in cremation contrary to Ralph's expressed wishes, following procedural delay and mixed signals in court. (Exhibit H-2.)

¶190. Notice of the 2019 sealed amendment / continued obstruction. On March 14, 2025, original drafting counsel Donald Gravalec presented the sealed, notarized March 1, 2019 amendment disinheriting anyone who altered or attempted to alter the 1993 Trust (Exhibit A-2), declared that the 1993 Trust being used was not the instrument he drafted (Exhibit B-1), and handed a copy to G. Kevin Lachona (Exhibit C-1). Notwithstanding this notice, Connor persisted in positions that depended on control and standing that the amendment disallows, while no accounting was produced for the 1993 Trust or Darlene's assets.

**FIRST AMENDED COMPLAINT**

## C. Legal violations

**¶191.** Elder financial abuse — Welf. & Inst. Code § 15610.30. Connor took, secreted, appropriated, obtained, or retained elder property (Darlene's assets and property held in/through the 1993 Trust) for a wrongful use and/or with intent to defraud, and/or by undue influence, by: (a) maintaining or asserting control during dementia without transparently accounting; (b) blocking or resisting production of records; (c) enabling diversion/misuse of funds and care downgrades; and (d) relying on defective capacity papers to defeat statutory oversight.

**¶192.** Fiduciary-duty & accounting violations — Probate Code. Connor violated Probate Code §§ 16060–16062 (duty to inform and account) and § 17200(b)(7) (remedies for failure to account) by refusing to provide full and true accountings for the 1993 Trust and Darlene's assets since 2017, and by opposing transparency in bad faith notwithstanding the July 18, 2025 order (Exhibit D-1). To the extent Connor or those aligned with her without reasonable cause and in bad faith opposed the 2017 Trust accountings (accountings two through six) or the 1993 Trust/Darlene accountings, fees are recoverable under Probate Code § 17211(b).

**¶193.** Capacity/medical neglect/intentional interference. Connor's "no treatment needed" directive (Exhibit F-4) and her role in delaying or denying recommended rehabilitation breached duties of prudence and care toward the elder and contributed to deterioration and additional expenses.

**¶194.** Fraud / Civil Code § 3294. The foregoing supports punitive damages (malice, oppression, fraud), including reliance on a defective incapacitation narrative, obstruction of accountings, and misuse of elder assets/benefits.

**FIRST AMENDED COMPLAINT**

pg. 86

**D. Rule 9(b) particularity (fraud averments)**

¶195. Plaintiff alleges with particularity the who/what/when/where/how: who (Connor); what (assertion of control without accounting; directive minimizing medical treatment; reliance on July instruments; resistance to accountings; property removal); when (2017 forward; directive around hospitalization period noted in Exhibit F-4; continued refusals through at least July 18, 2025 order, Exhibit D-1); where (actions aimed at California trusts and proceedings in Placer County; out-of-state residence but California-directed activities); and how (using defective capacity records, blocking records, and asserting control to defeat transparency).

¶195A. On September 27, 2023, an email from G. Kevin Lachona (then at Harris & Plottel, LLP) proposed to "delay the release" of Titan-served records and "move to quash" subpoenaed materials regarding Law Offices of Johnson, Murphy & Jones, Inc. (Exhibit I-10).

¶195B. Reliance. Plaintiff and beneficiaries reasonably relied on Defendants' material misrepresentations and concealments (including the validity/effect of the July 2017 "incapacity" papers and banking representations) in ways that delayed accountings, impaired distributions, and increased costs. The concealment of core authenticity/authority records further prevented earlier discovery and redress.

**E. § 1983 joint participation / state-action overlay (as applicable)**

¶196. Although a private actor, Connor acted under color of law by jointly participating with court officers and private co-defendants to misuse state processes (protective motions, calendar tactics/reclassifications, resistance to the July 18, 2025 accounting order) to deprive Plaintiff of federal rights—procedural due process (Mathews) and

**FIRST AMENDED COMPLAINT**

pg. 87

access to courts—and to facilitate concealment/misuse of elder property. See *Dennis v. Sparks, Lugar v. Edmondson Oil, Tower v. Glover.*

**F. Causation, injury, and timeliness**

**¶197.** Connor's conduct caused loss of transparency, care downgrade, asset depletion risk, delay costs, and reputational harm to Plaintiff as trustee/executor, while blocking distributions under the 2017 Trust and obscuring the true status of the 1993 Trust and Darlene's assets.

**¶198.** Claims are timely under delayed discovery and equitable tolling based on concealment and the late-January/early-February 2025 discovery of the March 1, 2019 sealed amendment (Exhibit A-2), and under the continuing-violation doctrine given ongoing refusal to account and continued use of process to resist transparency (see Exhibit D-1).

**¶198A.** Plaintiff incorporates ¶38C by reference.

**¶198B.** These state-law claims arise from illegal and non-communicative taking and retaining of elder property and fiduciary non-accounting, not protected petitioning; in any event, the illegal-conduct exception applies, and limited discovery is warranted under Cal. Code Civ. Proc. § 425.16(g).

**Relief Requested — Count Five**

**¶199.** Declaratory relief that Connor's asserted control was unlawful and that reliance on the July 7, 2017 incapacity declaration and July 10–11, 2017 letters (Exhibits G-2, J-1) to defeat statutory transparency is improper, especially in light of the 2019 sealed amendment and Gravalec's sworn declaration (Exhibits A-2, B-1, C-1).

**FIRST AMENDED COMPLAINT**

**¶200.** Production/accountings. An order compelling a full accounting of the 1993 Trust and Darlene Struthers' assets (2017–present), including bank statements, ledgers, communications, drafts, and all notary logs/thumbprints required to verify authenticity and trace funds.

**¶201.** Independent forensic review (non-custodial). Appointment of an independent, court-supervised forensic accountant to conduct a non-custodial review at Defendants' expense, with periodic reporting sufficient to restore transparency and enable lawful distributions.

**¶202.** Injunctive protections. An injunction prohibiting Connor from: (a) invoking protective orders or calendar tactics to block statutory accountings; (b) transferring or dissipating assets pending completion of accountings and forensic review, except as allowed by existing state-court orders and federal law; and (c) enforcing any gag/confidentiality terms that restrict a trustee's non-waivable duty to inform beneficiaries. This request is grounded in the record showing that, on the eve of the noticed evidentiary setting, defense pivoted to a protective-order track "Reserved by Clerk" and sent emails stating there would be no evidentiary hearing and demanding withdrawal of subpoenas. (ExhibitI-1; I-8C; I-8B.)

**¶202A.** Insurance/rehab injunction (as-applied). Enjoin Connor from interfering with (i) alignment of insurance/PCP coverage to Ralph's treating location when medically indicated and (ii) compliance with treating-physician rehabilitation orders, absent a lawful court order, and prohibit any directive that mischaracterizes residence or status (e.g., "visiting") to defeat medically indicated coverage.

**FIRST AMENDED COMPLAINT**

pg. 89

1    ¶202B. Medical-coordination production. Order Connor to produce any communications

2    in her possession or control concerning insurance/PCP changes, "visiting" directives,

3    denial or delay of rehabilitation, and refusals to authorize post-discharge primary-care

4    follow-up, for the period July 2017 through the Auburn MRSA convalescence, to enable

5    expedited verification and remedial planning.

6

7    ¶203. Remedies. Compensatory and punitive damages as permitted; attorneys' fees and

8    costs under Welf. & Inst. Code § 15657.5; and, where bad-faith wrongful taking is

9    proven, double damages under Probate Code § 859. Fees under Probate Code § 17211(b)

10   for bad-faith opposition to accountings.

11

12   ¶204. Joint-and-Several Liability. Award the foregoing monetary relief against the non-

13   immune private defendants, jointly and severally, with contribution/indemnity preserved

14   among defendants; the fees and costs of the court-appointed independent forensic

15   accountant and third-party production/hosting shall be borne by the non-immune private

16   defendants, jointly and severally.

17

18   ¶204A. Turnover/escrow of vehicle-sale proceeds (post-tracing). Order Connor to

19   identify the buyer, sale price, date, and payment channel; produce the complete dealer

20   deal jacket (all sales documents), payment instruments/check images (including Check

21   No. 15089), and DMV title/transfer filings; and, upon tracing, deposit the full net

22   proceeds actually received (or fair-market value if proceeds were dissipated) into escrow

23   pending final adjudication.

24

25   ¶204B. Constructive trust. Impose a constructive trust over the vehicle proceeds and any

26   traceable substitute assets until full restitution and accounting are completed.

27

28

pg. 90

**FIRST AMENDED COMPLAINT**

¶204C. Element checklist (elder financial abuse / fiduciary violations / fraud). Wrongful taking/retaining or undue influence (¶¶186G–186H, 191–193); refusal to account (¶¶185, 192); misrepresentation/false incapacitation narrative (¶¶184–186C, 195); causation/damages (¶¶197–203); tolling/continuing violation (¶198).

¶204D. The challenged conduct includes non-communicative acts (asset re-titling, cashier's-check diversion, refusal to produce notary journals and thumbprints, and misuse of bank instructions) and objectively baseless petitioning tactics deployed to obtain results unattainable by valid process, satisfying the sham exception and falling outside any state litigation privilege.

## COUNT SIX — FRAUD, TRUST INTERFERENCE, ELDER FINANCIAL ABUSE, AND FIDUCIARY OBSTRUCTION; 42 U.S.C. § 1983 JOINT PARTICIPATION (as applicable)

(Against Carole Campbell, in her individual capacity)

¶205. Plaintiff re-alleges ¶1–204 as though fully set forth here. Standing. Standing is independently grounded in Plaintiff's capacity as a beneficiary of the 1993 Trust and the 2017 Trust, and as executor of the Estate of Ralph C. Struthers, regardless of her current suspension as trustee.

### A. Role, residence, representation, and forum contacts

¶206. Carole Campbell resides in Texas. On information and belief, she retained and/or was represented by G. Kevin Lachona in connection with the Struthers trust/estate matters. Campbell purposefully directed her conduct to California by arranging or pressuring trust-related actions, invoking Placer County Superior Court processes, and

**FIRST AMENDED COMPLAINT**

1

2

causing foreseeable effects in this District. The claims arise out of those California-directed contacts.

3

4

## B. Specific acts (who/what/when/where/how) with exhibits

5

6

7

8

**¶207.** Forced safe + attorney office visit (early July 2017). Campbell coordinated with others to take Ralph and Darlene to J. Dean Johnson's office and to access Ralph's personal safe during a period of medical stress; Plaintiff's contemporaneous text referencing the forced safe opening and Campbell's role corroborates this. (Exhibit B-2.)

9

10

11

12

13

14

15

16

17

**¶207A.** Contemporaneous text message re forced safe. A same-day text from Plaintiff to Carole Campbell states that Campbell "forced Dad to open his safe," describes the emotional impact on Ralph, and criticizes Campbell for "coming in like a freight train" and leaving others to "pick up the carnage," with reference to her failure to visit an ailing sister who later passed away. These statements are offered to show what was contemporaneously reported to Campbell and do not constitute consent or ratification by Ralph, Darlene, or other family members. (Exhibit B-2A.)

18

19

20

21

22

23

24

25

26

**¶207B.** Group office meeting context (as reported). As reflected in contemporaneous family communications, Carole Campbell arranged a meeting at J. Dean Johnson's office attended by Campbell and her husband Bill Campbell, Belinda Connor and her husband Mike Connor, Ralph C. Struthers, and Darlene Struthers, together with firm personnel; family members were told that "original trust and trustee-duties" points would be explained. These statements are offered to show what was asserted to family members amid the July 2017 control-shift period; they do not reflect consent or ratification. The unusual group format, combined with the July 7 declaration and July 10–11 office letters,

27

28

**FIRST AMENDED COMPLAINT**

prompted Plaintiff's subsequent requests and subpoenas for execution packets, drafts, and notary records to verify authenticity. (ExhibitB-2B; B-2A; G-1, G-3, G-4, G-5.)

¶208. Defective capacity paperwork relied upon. Campbell participated in or relied on (a) the July 7, 2017 "incapacity" declaration notarized by J. Dean Johnson (no Auburn exam), and (b) the July 10–11, 2017 Santa Maria letters issued while Ralph was in Auburn at Sutter Auburn Faith Hospital for MRSA (ER July 10; admit July 11). One July 10 physician later reversed his assessment after being shown Ralph communicating with a speech therapist; a still image shows ambulation with therapy during an earlier Santa Maria hospitalization. (Exhibits G-2, J-1, N-1.)

¶209. False capacity statements; control shift. Despite the Auburn MRSA timeline and the later reversal, Campbell advanced or supported capacity statements portraying Ralph as incapacitated, to justify control changes and to undermine Plaintiff's role as trustee/executor.

¶210. Obstruction of transparency/accountings. Campbell supported positions and filings that blocked statutory accountings for the 1993 Trust and Darlene's estate, despite repeated requests and a July 18, 2025 order directing an accounting that remains unfulfilled. (Exhibit D-1.)

¶211. Support for diversion concept; federal conflicts. Campbell supported or benefitted from a proposal to use U.S. Savings Bonds to pay private attorneys' fees and to restrict trustee disclosures—positions contrary to 31 U.S.C. § 3105 and 31 C.F.R. Part 353 and inconsistent with non-waivable fiduciary duties.

¶212. Burial/interference with settlor's wishes. Campbell's stance contributed to reversal of earlier non-opposition to embalming, resulting in cremation against Ralph's expressed

**FIRST AMENDED COMPLAINT**

pg. 93

wishes due to delays and confusion in court. (Exhibit H-2.)

¶213. Notice of settlor amendment; continued resistance. On March 14, 2025, drafting counsel Donald Gravalec presented Ralph's sealed, notarized March 1, 2019 amendment (disinheriting anyone who altered or attempted to alter the 1993 Trust) and swore the 1993 Trust then being used was not the instrument he drafted; a copy was handed to G. Kevin Lachona the same day, providing actual notice to Campbell's aligned counsel. (Exhibits A-2, B-1, C-1.) Notwithstanding this, Campbell persisted in positions dependent on control or standing that the amendment disallows.

## C. Statutory violations

¶214. Elder financial abuse (Welf. & Inst. Code § 15610.30). Campbell took, secreted, appropriated, obtained, or retained elder property (Darlene's assets and property held in/through the 1993 Trust) for a wrongful use and/or with intent to defraud and/or by undue influence by: (a) leveraging defective capacity paperwork; (b) participating in or enabling control without transparency; (c) resisting production of accountings despite D-1; and (d) supporting fee-diversion concepts using federally governed instruments. (Exhibits G-2, J-1, E-1, D-1.)

¶215. Fiduciary-duty/accounting violations (Probate Code). Campbell violated Probate Code §§ 16060–16062 and § 17200(b)(7) by aiding/abetting the failure to account for the 1993 Trust and Darlene's estate since 2017 and by opposing transparency in bad faith notwithstanding the July 18, 2025 order. Fees are recoverable against bad-faith opponents of accountings under Probate Code § 17211(b). (Exhibit D-1.)

¶216. Fraud; malice/oppression (Civ. Code § 3294). Campbell's conduct supports punitive damages for malice, oppression, or fraud—including misrepresentations about

**FIRST AMENDED COMPLAINT** pg. 94

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Ralph's capacity timeline, interference with burial wishes, and participation in

concealment of fiduciary records. (Exhibits G-2, J-1, H-2, D-1.)

**D. Rule 9(b) particularity (who/what/when/where/how)**

**¶217.** Who: Campbell. What: forced safe opening and attorney-office facilitation (Exhibit

B-2); reliance on the July 7, 2017 "incapacity" declaration and July 10–11, 2017 office

letters (ExhibitG-2, J-1); false capacity assertions; support for bond-diversion concepts

and disclosure restrictions; resistance to accountings despite the July 18, 2025 order

(Exhibit D-1); and interference with burial wishes (Exhibit H-2). When: 2017 forward;

with court presentation/notice on March 14, 2025 (Exhibit A-2, B-1, C-1). Where:

conduct directed at California trusts and Placer County proceedings while residing in

Texas (California-directed acts). How: invoking defective capacity paperwork, promoting

bond-diversion and gag concepts, and resisting accountings to retain control without

transparency.

**¶217A.** Parallel false blame narrative. Campbell echoed and amplified the false claim

that Plaintiff was "holding up" distributions while Campbell and aligned parties were

actively objecting to account approval, furthering the same isolation tactics used to avoid

accountings and delay distributions. (¶¶79G–79H.)

**¶217B.** On September 27, 2023, an email from G. Kevin Lachona (then at Harris &

Plottel, LLP) proposed to "delay the release" of Titan-served records and "move to

quash" subpoenaed materials regarding Law Offices of Johnson, Murphy & Jones, Inc.

(Exhibit I-10).

**E. § 1983 joint-participation overlay (as applicable)**

**¶218.** Although a private actor, Campbell acted under color of law by jointly

**FIRST AMENDED COMPLAINT**

participating with court officers and private co-defendants to misuse state process—including protective-order practice, placeholder holds/reclassification that foreclosed evidence, resistance to the July 18, 2025 accounting order (D-1), and reliance on unauthorized diversion concepts—to deprive Plaintiff of procedural due process (Mathews) and access to courts, and to facilitate concealment/misuse of elder property.

**F. Causation, injury, and timeliness**

**¶219.** Campbell's conduct caused loss of transparency, care downgrade, asset-depletion risk, delay costs, and reputational harm to Plaintiff as trustee/executor, while blocking the 2017 Trust/Estate distributions by helping to keep the second through sixth accountings unadjudicated.

**¶220.** Claims are timely under delayed discovery and equitable tolling based on concealment and the late-January/early-February 2025 discovery of the March 1, 2019 sealed amendment (A-2), and under the continuing-violation doctrine given ongoing refusal to account and continued use of process to resist transparency (D-1).

**¶220A.** Plaintiff incorporates ¶38C by reference.

**¶220B.** These state-law claims arise from illegal and non-communicative taking and retaining of elder property and fiduciary non-accounting, not protected petitioning; in any event, the illegal-conduct exception applies, and limited discovery is warranted under Cal. Code Civ. Proc. § 425.16(g).

**G. Preservation / adverse-inference protocol (to prevent spoliation)**

**¶221.** Plaintiff seeks a preservation order covering drafts, execution packets, notary journals, thumbprint logs, bank/ledger records, calendars, intake/call notes, file indices, time/billing, and communications; and an adverse-inference instruction for any

pg. 96

**FIRST AMENDED COMPLAINT**

1

unjustified spoliation/non-production of core items (including communications

2

concerning A-2/B-1/C-1 and G-2/J-1/D-1/H-2).

3

Relief Requested — Count Six (non-custodial; probate-exception safe)

4

¶222. Declaratory relief that Campbell's interference was unlawful and that reliance on

5

the July 7, 2017 declaration and July 10–11, 2017 letters (G-2, J-1) to defeat statutory

6

7

transparency is improper, particularly in light of the 2019 sealed amendment and

8

Gravalec's declaration (A-2, B-1, C-1).

9

¶223. Production/accountings. An order compelling a full accounting of the 1993 Trust

10

and Darlene Struthers' estate (2017–present), including bank statements, ledgers, drafts,

11

notary journals, thumbprint logs, calendars, intake/call notes, file indices, time/billing,

12

and communications necessary to verify authenticity and trace funds; and enforcing the

13

14

July 18, 2025 order (D-1).

15

¶224. Independent forensic review (non-custodial). Appointment of an independent,

16

court-supervised forensic accountant to conduct a non-custodial review at Defendants'

17

18

expense, with periodic reporting sufficient to restore transparency and enable lawful

19

distributions; this Court is not asked to administer probate or assume custody over

20

property in state court.

21

¶225. Remedies. Compensatory and punitive damages as permitted; attorneys' fees and

22

23

costs under Welf. & Inst. Code § 15657.5; and, where bad-faith wrongful taking is

24

proven, double damages under Probate Code § 859. Fees under Probate Code § 17211(b)

25

for bad-faith opposition to accountings.

26

¶226. Joint-and-Several Liability; neutral costs on defendants. Award monetary relief

27

jointly and severally against the non-immune private defendants, with

28

**FIRST AMENDED COMPLAINT**

pg. 97

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

contribution/indemnity preserved among defendants; and order that the fees and costs of the court-appointed independent forensic accountant and third-party production/hosting be borne jointly and severally by the non-immune private defendants (and not by Plaintiff or trust/estate assets).

**¶226A.** Element checklist (elder financial abuse / aiding & abetting / fiduciary interference). Participation in control via defective capacity papers (¶¶207–209); resistance to transparency (¶¶210–211, 215); injury/causation (¶¶219–220); punitive standard (¶216).

**¶226B.** The challenged conduct includes non-communicative acts (asset re-titling, cashier's-check diversion, refusal to produce notary journals and thumbprints, and misuse of bank instructions) and objectively baseless petitioning tactics deployed to obtain results unattainable by valid process, satisfying the sham exception and falling outside any state litigation privilege.

## COUNT SEVEN — FRAUDULENT TRUST ALTERATION; CONCEALMENT OF RECORDS; 42 U.S.C. § 1983 CIVIL CONSPIRACY / JÓINT PARTICIPATION

(Against J. Dean Johnson (Cal. Bar No. 101774), Hannah E. Murphy (Cal. Bar No. 313487), and Law Offices of Johnson, Murphy & Jones, Inc.)

**¶227.** Plaintiff re-alleges ¶1–226 as though fully set forth here. Standing. Standing is independently grounded in Plaintiff's capacity as a beneficiary of the 1993 Trust and the 2017 Trust, and as executor of the Estate of Ralph C. Struthers, regardless of her current suspension as trustee.

¶228. Defendants J. Dean Johnson and Hannah E. Murphy are attorneys affiliated with Law Offices of Johnson, Murphy & Jones, Inc. Relief sought here is non-custodial (no probate administration) and targets federal-law compliance, constitutional process, and fiduciary transparency.

¶229. On or about July 7, 2017, Johnson prepared and notarized an "incapacity" declaration concerning Ralph without an Auburn examination. (Exhibit G-2.)

¶230. On July 10–11, 2017, physicians in Santa Maria issued letters while Ralph was in Auburn at Sutter Auburn Faith Hospital for MRSA (ER July 10; admit July 11). One July 10 physician later reversed his assessment after being shown Ralph speaking with a speech therapist; a still from an earlier Santa Maria stay shows Ralph ambulating with therapy. (Exhibits J-1, N-1.)

**¶231. Law Offices of Johnson, Murphy & Jones, Inc. ("Johnson/Murphy")** used or enabled the July 7 declaration and the July 10–11 letters to effect or justify alterations of control over the 1993 Trust during Darlene's dementia.

¶232. In response to subpoenas for authentication (true 1993 Trust, execution packets, notary journals, thumbprint logs), Law Offices of Johnson, Murphy & Jones, Inc. (Johnson/Murphy) (a) refused to produce; (b) asserted privileges to block non-privileged notarial material; and (c) diverted to unrelated materials. (Exhibits G-1, G-3, G-4, G-5, I-16.)

¶233. On October 24, 2017, Law Offices of Johnson, Murphy & Jones, Inc. accepted a $2,156.06 check from Darlene Struthers for trust-related services (Exhibit H-1) while simultaneously advancing a narrative of her incapacity—illustrating selective capacity assertions for payment while resisting transparency.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**¶234.** On March 1, 2019, Ralph executed a sealed, notarized amendment disinheriting anyone who altered or attempted to alter the 1993 Trust. (Exhibit A-2.)

**¶235.** On March 14, 2025, drafting counsel Donald Gravalec presented A-2, swore that the 1993 Trust then used was not the instrument he drafted (B-1), stated intent to subpoena the Law Offices of Johnson, Murphy & Jones, Inc. for originals and the notary/thumbprint logs, and handed a copy of the amendment to G. Kevin Lachona (C-1)—providing actual notice.

**¶236.** Notwithstanding A-2/B-1/C-1, Law Offices of Johnson, Murphy & Jones, Inc. (Johnson/Murphy) continued to resist production of the authenticity records necessary to verify the 1993 Trust and the capacity claims.

**¶237.** Although private actors, Johnson/Murphy acted under color of law by jointly participating with court officers and others to misuse state process—including reliance on defective capacity papers, opposition to subpoenas, and leveraging calendar/protective practices—to deprive Plaintiff of procedural due process and access to courts and to suppress material records. Any state litigation privilege does not bar § 1983 claims premised on constitutional deprivations or non-privileged notary/identity records.

**¶238. Rule 9(b) particulars**: Who—Johnson; Murphy; Law Offices of Johnson, Murphy & Jones, Inc. What—G-2 (July 7 declaration), J-1 (July 10–11 letters + reversal), G-1/G-3/G-4/G-5/ I-16. (refusals to produce drafts, notary journals, thumbprint logs), H-1 (Oct. 24, 2017 payment during "incapacity" posture); suppression after A-2/B-1/C-1 notice. When—2017 forward; notice on Mar. 14, 2025; resistance continuing thereafter. Where— Law Offices of Johnson, Murphy & Jones, Inc. office; Santa Maria/Auburn

**FIRST AMENDED COMPLAINT**

facts; Placer County proceedings. How—invoking defective capacity records to alter control; refusing authentication; selective capacity for payment; resisting subpoenas.

**¶239.** Conduct caused delay, increased costs, reputational harm, and continuing inability to verify the authentic 1993 Trust and protect elder/trust property. Claims are timely under delayed discovery (late Jan/early Feb 2025 discovery of A-2) and continuing-violation principles. Relief is non-custodial; the Court is not asked to administer probate.

**¶239A.** Law Offices of Johnson, Murphy & Jones, Inc. August 29, 2025 written objections (same day as the protective-order rulings) claimed blanket privilege over drafts and identity/authentication materials, underscoring the need for production of non-privileged notarial and execution records. (See Exhibit K-2 at 15–16; Exhibits I-1, I-2.)

**¶239B.** The subpoena-timeline record (Exhibit I-13), read with the Law Offices of Johnson, Murphy & Jones, Inc.'s refusals (ExhibitG-1, G-3, G-4, G-5, I-16), confirms continued suppression of non-privileged notary and identity materials necessary to authenticate the 1993 Trust.

**Relief Requested — Count Seven**

**¶239C.** Plaintiff incorporates ¶38C by reference (fraudulent-concealment tolling and discrete July–August 2025 constitutional acts).

**¶240.** Declaration (capacity papers). As applied to Plaintiff, the July 7, 2017 "incapacity" declaration and the July 10–11, 2017 office letters (issued from Santa Maria while Ralph was in Auburn for MRSA) may not be relied upon to alter fiduciary control or defeat statutory transparency absent verified authenticity and lawful appointment.

**¶241.** Production / Authentication Order. Within 21 days, produce: (a) all drafts/execution copies of the 1993 Trust; (b) the notary journals and thumbprint logs for

relevant dates; (c) appointment calendars/intake sheets/call notes/file indices; and (d) time/billing entries needed to show who prepared what and when. (Exhibits G-1, G-3, G-4, G-5, I-16.)

¶242. Preservation / Adverse Inference. Preserve all paper/e-files and authorize adverse inferences for spoliation or non-production of the items above and communications re A-2/B-1/C-1.

¶243. Injunction (non-custodial). Enjoin Defendants from using G-2/J-1 to defeat statutory accountings or maintain control absent lawful appointment and verified authenticity; and bar reliance on any gag that restricts a trustee's non-waivable disclosure duties. This order applies only to the parties named in this Count and only to enforcement, as to Plaintiff, of the identified measures unless constitutionally adequate procedures and federal compliance are shown.

¶244. Restitution/Disgorgement & Damages. Restitution/disgorgement of fees obtained through concealment; compensatory and punitive damages as permitted; fees/costs where authorized (including 42 U.S.C. § 1988).

¶245. Joint-and-Several / Neutral Costs. Monetary relief jointly and severally against non-immune private defendants; neutral forensic-accounting and third-party production/hosting costs to be borne jointly and severally by the same (not by Plaintiff or trust/estate assets).

¶246. Discovery-Management (proportionality; anti-harassment). Under Fed. R. Civ. P. 26(c), impose proportionality and anti-harassment limits specific to discovery by or from Law Offices of Johnson, Murphy & Jones, Inc. Johnson/Murphy regarding the records identified above: consolidated/unduplicated requests; a single ESI protocol; one

**FIRST AMENDED COMPLAINT**

presumptive deposition day per party absent good cause; and a short meet-and-confer + joint-letter process before any motion to compel.

**¶246A.** Element checklist (fraudulent alteration / concealment / §1983 joint participation). Use of July 2017 papers to alter control (¶¶229–233); suppression of non-privileged authenticity records (¶¶232, 236, 239A–239B, 241–242); under-color-of-law joint action (¶237); causation/damages (¶239).

**¶246B.** The challenged conduct includes non-communicative acts (asset re-titling, cashier's-check diversion, refusal to produce notary journals and thumbprints, and misuse of bank instructions) and objectively baseless petitioning tactics deployed to obtain results unattainable by valid process, satisfying the sham exception and falling outside any state litigation privilege.

**¶247.** Federalism / probate-exception safeguard. Confirm that the relief sought in this Count is non-custodial and does not ask the Court to probate or annul a will, administer an estate, determine heirship, or assume custody over property in state court; remedies are limited to enforcing federal constitutional process, production of non-privileged authenticity records (including notary journals and thumbprint logs), and statutory transparency.

Litigation-Privilege Caveat. The relief sought does not rest on privileged advocacy; it addresses suppression of non-privileged identity/authentication and fiduciary records (including drafts, execution packets, notary journals, and thumbprint logs) and joint action under color of law that deprived Plaintiff of federal rights.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## COUNT EIGHT — JUDICIAL DELAY AND STRUCTURAL DUE-PROCESS DEPRIVATION (PROSPECTIVE RELIEF ONLY)

(Against Commissioner Michael A. Holley, in his official capacity only)

**¶248.** Plaintiff re-alleges ¶1–247 as though fully set forth here. Standing. Standing is independently grounded in Plaintiff's capacity as a beneficiary of the 1993 Trust and the 2017 Trust, and as executor of the Estate of Ralph C. Struthers, regardless of her current suspension as trustee.

**¶248A.** Noerr–Pennington / litigation-privilege caveat. To the extent any defendant claims petitioning immunity, Plaintiff alleges the "sham" exception: the challenged petitioning and protective-order tactics were objectively baseless and used to achieve results (summary restrictions, suppression of non-privileged notary/identity records) that could not lawfully be obtained through valid process. Any state litigation privilege does not bar federal § 1983 claims or preclude orders compelling production of non-privileged notarial and identity records.

**¶249.** Defendant Michael A. Holley is a Commissioner of the Superior Court of California, County of Placer. He is sued in his official capacity only for prospective declaratory and injunctive relief to halt ongoing violations of federal law; no damages are sought from this defendant. *See Ex parte Young, 209 U.S. 123; Verizon Maryland Inc. v. Public Serv. Comm'n, 535 U.S. 635, 645–48.*

*¶249A. Prospective relief only under Ex parte Young; **no damages** and **no docket supervision** are sought. This Count alleges **only** the discrete theories below against the named official-capacity defendant.*

**FIRST AMENDED COMPLAINT**

pg. 104

¶250. Judicial-officer limitation. Consistent with the 1996 amendment to 42 U.S.C. § 1983, to the extent any acts are deemed "judicial," Plaintiff seeks declaratory relief first and injunctive relief only if declaratory relief is unavailable; injunctive relief is also sought for administrative/non-judicial acts outside the scope of judicial immunity. See *Forrester v. White, 484 U.S. 219; Mireles v. Waco, 502 U.S. 9.*

¶251. Beginning in 2017, Ralph and Darlene Struthers pursued an uncontested divorce to (a) protect Darlene's assets given Ralph's medical costs, and (b) permit Ralph to access and retitle his share to fund his updated estate plan (the 2017 Trust, executed Oct. 22, 2017).

¶252. Under Defendant Holley's assignment, the uncontested matter was continued repeatedly and no final judgment was entered despite elder status and health indicators. The delay prevented Ralph from timely accessing his assets to fund the 2017 Trust, forced Plaintiff to advance personal funds for administration, and created a vacuum that enabled unauthorized actors to press control claims.

¶253. This structural delay compounded downstream harms: it prolonged the fight over accountings (see July 18, 2025 order requiring accounting of Darlene's assets, Exhibit D-1), increased costs, and contributed to confusion that ultimately frustrated Ralph's burial wishes (Exhibit H-2).

¶254. The pattern of serial continuances and non-resolution of an uncontested elder matter violated procedural due process and access to courts because delay operated as a de facto denial. Under *Mathews v. Eldridge*, the private interest (elder planning, trust funding, prompt title clarity) is substantial; the risk of erroneous deprivation increases with delay; and the administrative burden of adjudicating an uncontested case is low.

pg. 105

**FIRST AMENDED COMPLAINT**

¶**255.** Plaintiff seeks policy/custom-level prospective remedial measures to prevent recurrence—not an order directing any particular outcome in a state case and not supervision of probate.

¶**256.** Younger / Sprint. This Count challenges administrative practices for prospective remediation; it does not ask the federal court to supervise a particular pending case. Younger applies only to three narrow categories; even then, exceptions exist for retaliation, inadequate forum, and extraordinary circumstances.

¶**257.** Anti-Injunction Act (AIA). Prospective relief falls within the "expressly authorized" exception to 28 U.S.C. § 2283 for § 1983 actions. See Mitchum v. Foster, 407 U.S. 225, 242–43. Relief is forward-looking and does not annul prior probate rulings.

¶**258.** Rooker–Feldman. Plaintiff does not seek appellate review of a state judgment; she asserts independent federal claims targeting ongoing administration practices. See Exxon Mobil; Skinner.

¶**259.** Absent prospective relief, denial-by-delay will continue to impair Plaintiff's ability to complete 2017 Trust accountings (accountings two through six) and make distributions; it will also perpetuate uncertainty that invites further misuse of process and resource depletion. A non-custodial administrative remedy is necessary and appropriate.

Relief Requested — Count Eight (Prospective Only)

¶**260.** Declaratory relief (as applied). Declare that, as applied to Plaintiff, prolonged non-adjudication of fully submitted and uncontested elder matters, post hoc reclassification of noticed evidentiary settings, and continuances without articulated cause can violate the First and Fourteenth Amendments where delay functions as a denial and foreseeably harms elder planning and administration (Mathews; Logan v. Zimmerman Brush Co.).

**FIRST AMENDED COMPLAINT**

1

**¶260A.** Rule 65(d)(2) scope. Any injunction under ¶261 binds the parties and those in

2

**active concert** with them.

3

**¶261**. Conditional injunction (as-applied; O'Shea-compliant). As to Plaintiff only, enjoin

4

5

enforcement of any future refusal to adjudicate fully submitted matters affecting Plaintiff

6

unless minimum due-process steps occur: **(a)** a short written statement of specific

7

grounds with record citations; and **(b)** either a reasoned decision or a posted date for

8

decision within a reasonable period. This order does not direct substantive outcomes or

9

supervise the docket at large. This order applies only to the parties named in this Count

10

11

and only to enforcement, as to Plaintiff, of the identified measures unless constitutionally

12

adequate procedures and federal compliance are shown.

13

**¶261A.** Money damages cannot remedy systemic delay and denial of timely adjudication

14

of an uncontested elder matter; there is no adequate remedy at law.

15

**¶262**. Compliance checkpoint and sunset. Require a single, short compliance statement

16

17

within 90 days describing how 261 will be applied to Plaintiff's filings going forward.

18

Reporting then automatically sunsets; no continuing oversight is requested.

19

**¶262A.** Scope/Sunset. Relief here is sought only as-applied to Plaintiff, is non-custodial,

20

and sunsets automatically after the single compliance statement is filed; no ongoing

21

federal supervision of state-court calendars is requested.

22

23

**¶263.** Federalism and scope. All requested relief is non-custodial, respects federalism,

24

and does not ask this Court to administer probate or assume custody of any res. No

25

monetary relief is sought against this officer.

26

27

28

**pg. 107**

**FIRST AMENDED COMPLAINT**

**¶263A.** For avoidance of doubt, no relief sought directs or forbids any specific state-court calendar setting or ruling; any relief conditions enforcement as to Plaintiff only unless constitutionally adequate procedures are afforded.

**COUNT NINE — SYSTEMIC DUE PROCESS & EQUAL PROTECTION VIOLATIONS IN COURT ADMINISTRATION (PROSPECTIVE RELIEF ONLY)**

**(Against Doe Public Officials 1–10 — Placer Superior Court Administration, official capacities only)**

**¶264.** Plaintiff re-alleges ¶1–263 as though fully set forth here. Standing. Standing is independently grounded in Plaintiff's capacity as a beneficiary of the 1993 Trust and the 2017 Trust, and as executor of the Estate of Ralph C. Struthers, regardless of her current suspension as trustee.

A. Posture, capacity, and limits on relief (Young posture; no money; no probate)

**¶265.** Doe Public Officials 1–10 include the Court Executive Officer (Doe 1), Clerk of the Court (Doe 2), Assistant Court Executive Officer (Doe 3), Calendar/Operations Manager (Doe 4), Filing/Intake Supervisor (Doe 5), and Court Technology/Portal Manager (Doe 6) of the Superior Court of California, County of Placer. They are sued in their official capacities only for prospective declaratory and injunctive relief under Ex parte Young. No damages are sought from these officials. This Count does not ask the federal court to probate/annul a will, administer an estate, determine heirship, or assume custody of property in state court.

**FIRST AMENDED COMPLAINT**

**¶265A.** Declaratory-first limitation. Consistent with the 1996 amendment to 42 U.S.C. § 1983, Plaintiff seeks declaratory relief in the first instance and injunctive relief only insofar as declaratory relief is unavailable or inadequate as applied to Plaintiff.

**B. Administrative practices that denied due process and equal access (what/when/how) — with exhibits**

**¶265B.** Prospective relief only under *Ex parte Young*; **no damages** and **no docket supervision** are sought. This Count alleges **only** the discrete theories below against the named official-capacity defendants.

**¶266.** Pre-service "placeholder" holds. Administration permitted attorney "placeholder" reservations that occupied hearing slots before service, depriving Plaintiff (pro se) of timely dates and compressing response windows. As applied to Plaintiff, administration accepts 'placeholder' holds that occupy hearing slots before service, crowding out duly noticed evidentiary matters. As applied to Plaintiff, calendar 'placeholder' reservations by counsel occupied hearing slots before service, while pro se matters noticed for evidentiary presentation were crowded out.

**¶267.** Mis-docketing / mis-labeling of evidentiary hearings. Plaintiff was directed to prepare for an evidentiary hearing (subpoenas, declarations, exhibit lists, briefs), yet the matter was docketed/treated on a non-evidentiary calendar (law-and-motion) or re-labeled post hoc, foreclosing witness testimony and exhibits (Exhibit I-5; Exhibit K-2 at 6:22–7:5). Emails from opposing counsel the day(s) before the noticed date confirmed the re-label and demanded withdrawal of subpoenas (Exhibit I-8C (June 27, 2025, 10:56 AM), I-8B (Aug. 27, 2025)). Plaintiff's good-faith timing—first business morning after filing impediments and unanswered presiding-judge inquiries—confirms diligence and

**pg. 109**

underscores that no order re-labeling the hearing had been served (Exhibit I-15; Exhibit I-5; I-5A).

**¶268.** Tentatives not posted with reasonable lead-time; same-day bench "tentatives." Tentatives were not posted with sufficient lead time to allow meaningful opposition or correction; on multiple occasions decisions issued as same-day bench "tentatives" without prior notice, defeating a meaningful opportunity to be heard. Late or same-day tentatives—often after close of business—effectively deprived Plaintiff of a meaningful opportunity to respond.

**¶269.** Ex parte gatekeeping / unequal access. Security/kiosk and clerk-window practices produced unequal ex parte access for a pro se litigant (long queues; missed 8:15 cutoffs), while counsel could bypass lines—denying equal opportunity to file objections or obtain emergency settings.

**¶270.** Misfiling/omission of objections/exhibits; inconsistent clerk guidance. Filings were mis-indexed or omitted from the working file, and staff provided conflicting instructions that led to rejections and delay, compounding harm to a pro se litigant. (Exhibit I-5B) These are not one-off errors but a recurring administrative practice that causes Plaintiff's evidentiary settings to be re-labeled or skipped. Opposing counsel repeatedly timed service for late Fridays and holiday eves, forcing weekend response burdens and creating a predictable, asymmetric disadvantage for a pro se litigant.

**¶271.** Serial continuances; non-adjudication of filed accountings. Despite Plaintiff having filed the second through sixth accountings for both the 2017 Trust and the Estate of Ralph C. Struthers, those accountings remain unadjudicated through serial continuances and mis-calendarings. Meanwhile, the July 18, 2025 order requiring an accounting of

**FIRST AMENDED COMPLAINT**

pg. 116

Darlene Struthers' assets remains unfulfilled. (Exhibit D-1.) The court's failure to enforce three waves of subpoenas for Johnson/Murphy authenticity records, followed by an evidentiary shut-off ("no witnesses/no testimony"), exemplifies administrative handling that denied timely, equal access to an evidentiary forum. (Exhibits. I-13, I-6/I-7, K-2.)

¶272. Pipeline to a prefiling restriction without process. Administrative handling facilitated or failed to prevent issuance of a prefiling restriction (sometimes labeled "fictitious filer") without motion, notice, or findings, chilling petitioning and denying due process. (Exhibits I-6, I-7.)

## C. Constitutional injuries (Mathews; equal protection; access to courts)

¶273. Procedural due process. Under *Mathews v. Eldridge,* Plaintiff's interest in timely adjudication of notice-dependent events (evidentiary presentation; accountings needed for distribution) is substantial; the risk of erroneous deprivation is high where evidentiary matters are mis-docketed, tentatives are same-day/unposted, filings are mis-indexed, and continuances roll without date-certain resets; the administrative burden to fix these practices is low. The record shows Plaintiff set and prepared an evidentiary hearing (Exhibit I-5), yet administration re-labeled the calendar to non-evidentiary on August 29, 2025 (Exhibit I-5A), creating an as-applied barrier to evidentiary presentation.

¶274. Equal protection & access to courts. Pro se litigants cannot be systematically disadvantaged through placeholder holds, mis-labeling, gatekeeping, and mis-filings that predictably deny equal opportunity to present evidence and seek relief—especially where errors repeatedly block an evidentiary showing and the adjudication of already-filed accountings.

## D. Guardrails (procedural airtightness)

¶275. Younger / Sprint. This Count challenges administrative policies/practices for prospective remediation; it does not supervise a particular pending case. Younger applies only to three narrow categories; even then, exceptions exist for retaliation, inadequate forum, and extraordinary circumstances—each implicated here by the elder context and practical denials effected by delay and mis-docketing.

¶276. Anti-Injunction Act (AIA). Prospective relief falls within the "expressly authorized" exception to 28 U.S.C. § 2283 for § 1983 actions. *Mitchum v. Foster. Relief is forward-looking and does not annul prior probate rulings.*

¶277. Rooker–Feldman. Plaintiff does not seek appellate review of a state judgment; she asserts independent federal claims aimed at ongoing administration practices that impeded process and evidentiary presentation.

**E. Ongoing harm; non-custodial remedies**

¶278. Without prospective relief, the same administrative errors (mis-docketing evidentiary hearings, placeholder holds, untimely/no tentatives, misfilings/omissions, unequal ex parte access) will continue to block evidentiary presentation and delay adjudication of the 2017 Trust/Estate accountings (second through sixth), prolonging denial of distributions and inflating costs.

¶279. Declaratory relief (as applied to Plaintiff). Declare that the identified administrative practices—pre-service placeholder holds; mis-docketing or post hoc mis-labeling of noticed evidentiary hearings; untimely/no tentatives; misfiling/omission of objections or exhibits; unequal ex parte access; serial continuances with no stated cause; and non-enforcement of the July 18, 2025 accounting order—violated or risk violating Plaintiff's First and Fourteenth Amendment rights (access to courts; procedural due process; equal

**pg. 112**

protection) as applied to her. These practices function as a queue that prioritizes placeholder slots and weekend service games over neutral, first-ready settings, denying equal access to a hearing on the merits.

**¶279A.** Rule 65(d)(2) scope. Any injunction under ¶280 binds the parties and those in **active concert** with them.

**¶280.** Conditional injunction (as-applied; O'Shea-compliant). As to Plaintiff only, require that when the Court reclassifies or continues a noticed evidentiary setting affecting Plaintiff, it provide **(a)** a short written cause and **(b)** a posted date for decision or evidentiary presentation within a reasonable period. This protocol is limited to enforcement actions as applied to Plaintiff and does not manage calendars generally. This order applies only to the parties named in this Count and only to enforcement, as to Plaintiff, of the identified measures unless constitutionally adequate procedures and federal compliance are shown. (Supported by Exhibit I-5; I-5A.)

"¶280A. Queue Fairness Protocol (as applied to Plaintiff only; non-custodial). For any hearing affecting Plaintiff: (1) no placeholder reservations may displace a noticed evidentiary setting that is first-in-time with proof of service; (2) tentatives must be posted no later than 2:00 p.m. the court day before the hearing, or else the matter is continued without prejudice; (3) any document served after 3:00 p.m. on a Friday or court-holiday eve is deemed served the next court day for response-deadline purposes; (4) simultaneous service by email is required for any ex parte or short-notice request; and (5) evidentiary matters may not be re-labeled "law-and-motion" without a short written cause and a reset date certain. This order is as-applied to Plaintiff only and imposes no general docket

**pg. 113**

**FIRST AMENDED COMPLAINT**

1    supervision."¶281. One-time certification and sunset. Require a single certification

2    within 90–120 days that ¶280 is adopted and applied to Plaintiff; no continuing

3    supervision is requested, and the certification obligation sunsets automatically after that

4    filing.

5    ¶281A. Scope/Sunset. Relief here is sought only as-applied to Plaintiff, is non-custodial,

6    and sunsets automatically after the single certification is filed; no ongoing federal

7    supervision of state-court calendars is requested.

8    ¶282. Federalism and scope. All relief is non-custodial and respects federalism; no

9    monetary relief is sought against these officials. Substantive outcomes remain with the

10   state court.

11   ¶282A. For avoidance of doubt, no relief sought directs or forbids any specific state-court

12   calendar setting or ruling; any relief conditions enforcement as to Plaintiff only unless

13   constitutionally adequate procedures are afforded.

14   **COUNT TEN — AIDING & ABETTING TRUST FRAUD; NEGLIGENT**
     **SUPERVISION (CALIFORNIA LAW); 42 U.S.C. § 1983 JOINT**
     **PARTICIPATION (as applicable)**

15   (Against G. Kevin Lachona; Harris & Plottel, LLP; Drobny Law Offices, Inc.; and
     Lachona Law)

16   ¶283. Plaintiff re-alleges ¶1–282 as though fully set forth here. Standing. Standing is

17   independently grounded in Plaintiff's capacity as a beneficiary of the 1993 Trust and the

18   2017 Trust, and as executor of the Estate of Ralph C. Struthers, regardless of her current

19   suspension as trustee.

**FIRST AMENDED COMPLAINT**

¶283A. Petitioning/privilege caveat: the **sham exception** applies; alleged **non-communicative acts** fall outside any privilege.

**A. Supervising/affiliated entities; duties; standard of care**

¶284. Harris & Plottel, LLP (Chico) and Drobny Law Offices, Inc. (Sacramento) (together, the "Supervising Firms") employed or contracted with G. Kevin Lachona during relevant periods; Lachona Law is Lachona's practice. The Supervising Firms owed duties of supervision, conflict screening, remediation of unethical or unlawful practices, and record preservation. They are vicariously liable under respondeat superior for acts within the scope of employment and directly liable for negligent supervision and aiding and abetting fiduciary breaches and elder financial abuse when they knew or should have known of the wrongful conduct yet failed to stop or correct it.

**B. Knowledge timeline (who/what/when/where/how) — with exhibits**

¶285. On March 14, 2025, original drafting counsel Donald Gravalec appeared in court and: **(a)** presented Ralph C. Struthers' sealed, notarized amendment dated March 1, 2019 disinheriting any person who altered or attempted to alter the 1993 Trust (Exhibit A-2); **(b)** swore the 1993 Trust then being used was not the instrument he drafted (Exhibit B-1); **(c)** stated intent to subpoena J. Dean Johnson's originals and notary journals/thumbprint logs; and **(d)** handed a copy of the amendment to G. Kevin Lachona (Exhibit C-1) — providing actual notice that day.

¶286. By July 18, 2025, a court order to account for Darlene Struthers' assets remained unfulfilled (Exhibit D-1) while subpoena resistance continued: refusals to produce execution packets, drafts, notary journals, and thumbprint logs (Exhibits G-1, G-3, G-4, G-5, I-16.). The Supervising Firms either knew or should have known — from firm files

and communications (including Exhibit I-3) — that **(i)** authenticity and capacity records were being withheld, **(ii)** positions were being advanced for parties disinherited by A-2, and **(iii)** the court-ordered accounting remained unproduced.

¶287. In 2024, a publicly referenced proposal—later rejected by Plaintiff—sought to use U.S. Savings Bonds to pay private attorneys' fees and to restrict a trustee's non-waivable duty to inform beneficiaries. At least some firm correspondence referenced bond-related funding and conflicts (see E-1 (orders authorizing cashing, disputed); I-3 (firm correspondence)).

**C. Federal preemption — Estate and Trust Savings Bonds (clarity and scope)**

¶288. "Estate Savings Bonds" means U.S. Savings Bonds registered to Ralph C. Struthers and/or the Estate of Ralph C. Struthers; "Trust Savings Bonds" means U.S. Savings Bonds titled to or held for the Ralph C. Struthers Trust (Oct. 22, 2017). Both categories are governed exclusively by federal law (31 U.S.C. § 3105; 31 C.F.R. Part 353 and related Treasury regulations). Any state-court order or private agreement purporting to liquidate, redirect, or use such bonds contrary to federal regulation is preempted and void. See *Free v. Bland, 369 U.S. 663 (1962); Yiatchos v. Yiatchos, 376 U.S. 306 (1964); Shaw v. Delta Air Lines, Inc., 463 U.S. 85, 96–97 (1983). (Exhibit E-1.)*

**D. Failures to supervise/correct; aiding and abetting; negligent supervision**

¶289. After the A-2/B-1/C-1 notice and despite the D-1 accounting order, the Supervising Firms failed to halt or correct: **(a)** advocacy advanced on behalf of persons disinherited by A-2; **(b)** refusals to produce authenticity records (G-1/G-3/G-4/G-5,I-16.); **(c)** continued pursuit of bond-diversion concepts to pay private fees (see E-1 disputes); and **(d)** calendar/placeholder tactics used to block statutory accountings. These omissions

**FIRST AMENDED COMPLAINT**

aided and abetted fiduciary breach and elder financial abuse and foreseeably enabled misuse of court process.

**¶289A.** Counsel communications confirm the records should be produced: on September 27, 2023, Konstantine Demiris emailed G. Kevin Lachona, "we step in the shoes of the deceased. We get our client's records … too late for privacy at this point," undercutting later privacy/privilege objections to core authenticity materials. (Exhibit I-2A.)

**E. § 1983 joint-participation / state-action overlay; litigation-privilege caveat**

**¶290.** To the extent the Supervising Firms (with Lachona) used state process — protective orders, calendar reclassification/placeholder holds, resistance to enforcing D-1, and steps toward a prefiling restriction — to suppress material trust records and defeat due process/access, they jointly participated with state actors and acted under color of law for § 1983 purposes. *See Dennis v. Sparks, Lugar v. Edmondson Oil, Tower v. Glover.* Any reliance on a state litigation privilege does not bar federal § 1983 claims premised on constitutional deprivations, nor does it immunize withholding of notarial records and other core authenticity materials. (Protective-order path and coordinated emails support joint-participation. ExhibitI-1; I-8C (June 27, 2025, 10:56 AM); I-8B (Aug. 27, 2025).)

**F. Rule 9(b) particularity (who/what/when/where/how)**

**¶291.** Who: Harris & Plottel, LLP; Drobny Law Offices, Inc.; Lachona Law; G. Kevin Lachona.

**¶291A.** Supervisory knowledge and the waiver posture are corroborated by Demiris's email acknowledging beneficiary access to administration records, reinforcing the duty to produce non-privileged authentication materials. (Exhibit I-2(A).)

What: Failure to halt/correct advancement of disinherited parties' positions following A-

**pg. 117**

2/B-1/C-1 notice; tolerance of refusals to produce drafts/notary journals/thumbprint logs (G-1/G-3/G-4/G-5); pursuit of bond-diversion concepts to pay private fees (see E-1 disputes).

When: 2024–2025 (with knowledge crystallized Mar. 14, 2025); continuing thereafter.

Where: Firm offices (Chico, Sacramento), Placer County proceedings.

How: Supervisory omissions and approvals that enabled concealment, bond-diversion attempts, and misuse of state process.

**G. Causation, injury, and timeliness**

¶292. As a direct and proximate result, Plaintiff suffered delay damages, increased costs, reputational harm from a prefiling restriction imposed without process, loss of trustee functions without due process, and ongoing risk to Estate/Trust Savings Bonds and distributions. Claims are timely under delayed discovery/equitable tolling (late-Jan/early-Feb 2025 discovery of A-2; continued concealment) and the continuing-violation doctrine.

**H. Preservation and adverse-inference protocol (to prevent spoliation)**

¶293. Order preservation of: drafts, execution packets, notary journals, thumbprint logs, calendars, intake/call notes, file indices, time/billing entries, internal emails/memos, and documents concerning A-2/B-1/C-1, G-1/G-3/G-4/G-5, D-1, E-1, I-3, I-16.; authorize adverse inferences for unjustified spoliation or non-production of core items.

Relief Requested — Count Ten (non-custodial; probate-exception safe)

¶294. Declaratory/Equitable (preemption and fiduciary transparency).

(a) Declare that enforcement, as applied to Plaintiff, of any diversion/redemption/use of U.S. Savings Bonds (Estate or Trust) that lacks full federal compliance (31 U.S.C. §

pg. 118

**FIRST AMENDED COMPLAINT**

3105; 31 C.F.R. Part 353) may not proceed to the extent of such conflict (Exhibit E-1).

**(b)** Declare that suppression of core authenticity records (drafts, execution packets, notary journals, thumbprint logs) violates fiduciary duties and statutory transparency.

**¶295.** Production (non-custodial). Order the Supervising Firms and Lachona to produce firm records necessary to authenticate instruments and trace funds (drafts, execution packets, notary journals, thumbprint logs, calendars, time/billing, internal emails/memos referencing the 2019 amendment, subpoena responses, and I-3 correspondence), coordinated with a neutral. This is non-custodial and does not ask the Court to administer probate.

**¶296.** Probate Code § 17211(b) fees (bad-faith opposition to accountings). Award fees/costs against any beneficiary/representative who, without reasonable cause and in bad faith, opposed or obstructed **(i)** the 2017 Trust accountings (2–6) or **(ii)** the 1993 Trust/Darlene accountings.

**¶297.** Damages/Fees. Award compensatory and punitive damages as permitted; award fees/costs where authorized (including 42 U.S.C. § 1988 and Welf. & Inst. Code § 15657.5(d) if elder-abuse facilitation is proven).

**¶298.** Joint-and-Several Liability; Neutral Costs on Defendants. Award monetary relief jointly and severally against the non-immune private defendants, with contribution/indemnity preserved among them; and order that the fees and costs of the independent forensic accountant and all third-party production/hosting costs (including subpoena compliance and digitization) be borne jointly and severally by the non-immune private defendants (not by Plaintiff or trust/estate assets).

¶299. Discovery-management (anti-harassment; proportionality). Under Fed. R. Civ. P. 26(c), impose proportionality and anti-harassment limits: consolidated/unduplicated requests; a single ESI protocol; one presumptive deposition day per party absent good cause; and a short meet-and-confer + joint-letter process before any motion to compel.

¶300. Federalism & boundary safeguard. Confirm that the relief sought herein is non-custodial, does not supervise probate administration, and is limited to enforcing federal preemption, constitutional process, and statutory transparency.

¶300A. Element checklist (aiding & abetting / negligent supervision / preemption notice). Supervisory knowledge and failure to correct (¶¶285–289); assistance/substantial factor (¶289–292); damages (¶292, 297–298); preemption clarity (¶288, 294).

Litigation-Privilege Caveat. The relief sought does not rest on privileged advocacy; it addresses suppression of non-privileged identity/authentication and fiduciary records (including drafts, execution packets, notary journals, and thumbprint logs) and joint action under color of law that deprived Plaintiff of federal rights.

## COUNT ELEVEN — PROFESSIONAL NEGLIGENCE / BREACH OF FIDUCIARY DUTY; ELDER-ABUSE FACILITATION (CALIFORNIA LAW); 42 U.S.C. § 1983 JOINT PARTICIPATION (as applicable)

(Against Konstantine Antony Demiris (Cal. Bar No. 240089) and The Demiris Law Firm, PC)

¶301. Plaintiff re-alleges ¶1–300 as though fully set forth here. Standing. Standing is independently grounded in Plaintiff's capacity as a beneficiary of the 1993 Trust and the 2017 Trust, and as executor of the Estate of Ralph C. Struthers, regardless of her current suspension as trustee.

## A. Parties, posture, and scope

**¶302**. Konstantine Antony Demiris is a California attorney (Cal. Bar No. 240089). The Demiris Law Firm, PC is his firm. This Count seeks damages and equitable relief against these private defendants based on California law (Probate Code, Business & Professions Code, Welfare & Institutions Code) and, as applicable, on their joint participation with state actors under 42 U.S.C. § 1983. Relief is pled to be non-custodial and does not ask this Court to administer probate or assume custody of property in state court.

## B. Overbilling without proper approval — with exhibit anchor

**¶303**. On information and belief, Demiris charged unreasonable or unauthorized fees reviewable under Probate Code § 17200(b)(5), (b)(7) (trust administration and account review), and, to the extent estate-fee provisions are implicated, Probate Code §§ 10810–10811. Plaintiff references correspondence reflecting these concerns (Exhibit I-3); additional time/billing entries are expected in discovery.

**¶303A.** Plaintiff initiated the State Bar Mandatory Fee Arbitration process regarding Demiris's charges; the Bar acknowledged the filing on August 26, 2024 and outlined next steps. (Exhibit I-2B.) This corroborates that the fee dispute is genuine, timely, and preserved for restitution/surcharge.

## C. Breach of confidentiality; misrepresentation of affiliation

**¶304**. Demiris disclosed confidential trust information to a non-team attorney (informally known as "Jordan Law Offices" / Doe Law Firm A) while misrepresenting that attorney as part of his team, violating Bus. & Prof. Code § 6068(e) (duty to preserve client confidences). The disclosure harmed administration by spreading sensitive information and by fueling internal conflict that delayed accounting and distribution.

**D. Interference with fiduciary administration; refusal to arbitrate**

**¶305.** Demiris made misleading statements to a co-trustee that undermined fee challenges, refused State Bar fee arbitration, and thereby prolonged administration, increasing costs and delaying distributions owed to beneficiaries. These acts foreseeably harmed the trust and the beneficiaries' interests in timely resolution.

**E. Statutory violations and standards**

**¶306.** Demiris's conduct: **(a)** involved unreasonable or unauthorized fee practices reviewable and subject to surcharge under Probate Code § 17200(b)(5), (b)(7), and, if estate-fee provisions apply, §§ 10810–10811; **(b)** violated Bus. & Prof. Code § 6068(e) to the extent a duty ran to the trust/estate; **(c)** facilitated financial elder abuse within Welf. & Inst. Code § 15610.30 by increasing depletion risk through concealment and fee inflation; and **(d)** supports punitive damages under Civ. Code § 3294 based on knowing concealment and misuse of fiduciary position. Demiris's conduct breached the professional standard of care and fiduciary duties (with Bus. & Prof. Code § 6068(e) supplying the applicable standard of care).

**¶306A.** Demiris acknowledged that beneficiaries 'step into the shoes of the deceased' for purposes of obtaining client/trust records and that any 'privacy' was 'too late' once communications were shared, underscoring access to administration/authentication materials and waiver of any privilege as to such materials. (Exhibit I-2(A).)

**F. § 1983 joint-participation / state-action overlay (as applicable)**

**¶307.** To the extent Demiris and his firm used state process (e.g., protective-order practice; calendar tactics; supporting or benefitting from non-adjudication of accountings) to defeat due process and access to courts, and to maintain concealment of

**pg. 122**

billing/records, they jointly participated with state actors and acted under color of law for § 1983 purposes. See *Dennis v. Sparks, Lugar v. Edmondson Oil, Tower v. Glover*. Any reliance on state litigation privilege does not bar federal § 1983 claims premised on constitutional deprivations, nor does it immunize withholding of core fiduciary/billing records or breach of the statutory duty to maintain confidences.

**G. Rule 9(b) particularity (who/what/when/where/how)**

¶308. Who: Demiris; The Demiris Law Firm, PC.

What: Overbilling without required court approval (Probate Code §§ 10810–10811 for estate matters) and/or unreasonable or unauthorized trust charges reviewable under Probate Code § 17200(b)(5), (b)(7); disclosure of confidences to Doe Law Firm A while misrepresenting affiliation; refusal of State Bar fee arbitration; misleading statements that impeded recovery (see Exhibit I-3).

When: During the trust-administration period (dates to be confirmed in billing ledgers and correspondence), with concerns crystallized in or around the time of I-3; impacts continued thereafter.

Where: Firm offices; communications directed to Plaintiff/co-trustee; filings/practice in Placer County proceedings.

How: Charging unreasonable/unapproved fees; disclosing privileged/confidential materials; resisting corrective processes and discovery, cumulatively depriving beneficiaries of timely and transparent administration.

¶308A. For clarity, nothing in Exhibit. I-10 attributes a delay/quash plan to Demiris; Plaintiff's counsel (Demiris, then Steven Cross) pursued production of Johnson/Murphy authenticity records, and Plaintiff later continued those efforts pro se.

**H. Causation and timeliness (tolling/continuing violation)**

**¶309.** As a direct and proximate result, Plaintiff and beneficiaries suffered monetary loss (unreasonable fees), delay damages, and reputational harm, with prolonged administration and increased costs. Claims are timely under equitable tolling and delayed discovery (concealment reflected in firm correspondence, including Exhibit I-3) and under the continuing-violation doctrine given ongoing billing concealment and resistance to fee resolution.

**¶309A.** The challenged conduct includes non-communicative acts—asset re-titling and control, cashier's-check diversion, refusal to produce notary journals/thumbprint logs and other identity/authentication materials, and misuse of bank instructions—and objectively baseless petitioning tactics deployed to obtain results unattainable by valid process; it therefore falls within the "sham" exception to Noerr–Pennington and outside California's litigation privilege. See, e.g., Exhibit I-10 (9/27/2023 Lachona email proposing to "delay the release" of Titan-served records and "move to quash"), Exhibits G-1/G-3/G-4/G-5 (subpoena refusals/objections).

**¶309B.** To the extent any defendant seeks to strike this Count under Cal. Code Civ. Proc. § 425.16, these claims arise from illegal and non-communicative taking/retaining of elder or fiduciary property and fiduciary non-accounting—not protected petitioning; in any event, the illegal-conduct exception applies, and limited discovery is warranted under § 425.16(g).

**¶309C.** Demiris's September 27, 2023 email to opposing counsel— "we step in the shoes of the deceased. We get our client's records … too late for privacy"—is an admission that the demanded files are producible and defeats subsequent "privacy" objections to drafts,

<div align="center">FIRST AMENDED COMPLAINT</div>

pg. 124

execution packets, and notary journals/thumbprints needed to authenticate the instrument. (Exhibit I-2A.) The refusal to produce those materials compounded delay and costs.

## I. Preservation and adverse-inference protocol

¶310. Plaintiff seeks an order requiring preservation of all time/billing ledgers, invoices, engagement/withdrawal letters, emails, internal memos, fee-arbitration correspondence, bank/ledger records reflecting payments, and communications with Doe Law Firm A; and authorizing adverse inferences for any unjustified spoliation or non-production of these core items.

**Relief Requested — Count Eleven** (non-custodial; probate-exception safe)

¶311. Declaratory relief: Declare that Demiris's fees were unreasonable or unauthorized and subject to review and surcharge under Probate Code § 17200(b)(5), (b)(7), and, if applicable, Probate Code §§ 10810–10811; and declare that disclosure of confidences to a non-team attorney was improper under Bus. & Prof. Code § 6068(e) to the extent a duty ran to the trust/estate.

¶312. Restitution/Disgorgement with interest: Order restitution and/or disgorgement of all unreasonable or unauthorized fees, with prejudgment interest where permitted (Civ. Code § 3287).

¶313. Injunctive relief (non-custodial): Enjoin Demiris and The Demiris Law Firm, PC from further participation in the trust or related proceedings absent court approval of fees and full production of billing/engagement files; this is non-custodial and does not ask the Court to administer probate.

¶314. Production order: Compel production (on a neutral-coordinated schedule) of billing ledgers, invoices, trust-payment records, engagement/withdrawal letters, fee-arbitration

communications, internal emails/memos regarding fees, and bank/ledger entries showing payment flow (referencing Exhibit I-3) so that reasonableness can be adjudicated.

**¶314A.** State Bar fee-arbitration documentation further confirms the reasonableness-review track for Demiris's charges and Plaintiff's diligence in seeking fee resolution. (Exhibit I-2(B).)

**¶315.** Damages and fees: Award compensatory and punitive damages as permitted by law; and award attorneys' fees and costs where authorized (including Welf. & Inst. Code § 15657.5(d) if elder-abuse facilitation is proven).

**¶316.** Probate Code § 17211(b) fees: Award fees/costs against any beneficiary/representative who, without reasonable cause and in bad faith, opposed or obstructed (i) the 2017 Trust accountings (second through sixth) or (ii) the 1993 Trust/Darlene's estate accountings, to the extent such opposition was coordinated with or benefitted Demiris's billing posture.

**¶317.** Joint-and-Several Liability; neutral costs on defendants: Award monetary relief jointly and severally against non-immune private defendants, with contribution/indemnity preserved; and order that the fees and costs of the court-appointed independent forensic accountant and all third-party production/hosting costs be borne jointly and severally by the non-immune private defendants (not by Plaintiff or trust/estate assets).

**¶318.** Federalism / probate-exception safeguard: Confirm that relief is non-custodial and limited to enforcing statutory duties (fee reasonableness; confidentiality), constitutional process, and transparency; this Court is not asked to probate/annul a will, administer an estate, determine heirship, or assume custody of property in state court.

**FIRST AMENDED COMPLAINT**

¶**318A.** Element checklist (professional negligence / breach of fiduciary duty / confidentiality). Duty and breach (¶¶303–306); causation (¶309); damages (¶¶312–315); fee-review bases (¶¶311–314); punitive standard where applicable (¶306).

Litigation-Privilege Caveat. The relief sought does not rest on privileged advocacy; it addresses suppression of non-privileged identity/authentication and fiduciary records (including drafts, execution packets, notary journals, and thumbprint logs) and joint action under color of law that deprived Plaintiff of federal rights.

## COUNT TWELVE — ESCROW REIMBURSEMENT / RESTITUTION FOR PERSONALLY ADVANCED LEGAL FEES

(Against Michael Scott Shuttleworth (Cal. Bar No. 197683), in his individual capacity)

¶**319.** Plaintiff re-alleges ¶1–318 as though fully set forth here. Standing. Standing is independently grounded in Plaintiff's capacity as a beneficiary of the 1993 Trust and the 2017 Trust, and as executor of the Estate of Ralph C. Struthers, regardless of her current suspension as trustee.

### A. Parties, role, and agreement

¶**320.** Michael Scott Shuttleworth is a California attorney (Cal. Bar No. 197683). During the relevant period, he provided trust/estate-related services connected to Ralph C. Struthers.

¶**321.** Agreement and reliance. Plaintiff personally advanced legal fees out-of-pocket with the mutual understanding (including with Ralph) that Plaintiff would be reimbursed from escrow upon the sale of Ralph's real property. Plaintiff relied on this understanding in making the payments.

### B. Sale, escrow disbursement, close date, and non-repayment

**FIRST AMENDED COMPLAINT**

1    ¶322. Escrow disbursement. After the property sale closed, $39,275.31 was taken from

2    escrow/trust funds toward Shuttleworth's charges, as reflected in the invoice/escrow

3    statement (Exhibit I-4). Despite repeated requests, no reimbursement of Plaintiff's

4
     personal advances has been made.
5

6    ¶323. Court status of accountings (context only). Plaintiff has completed and filed the

7    second through sixth accountings for the 2017 Trust and the Estate of Ralph C. Struthers;

8    those accountings await court approval. Reimbursement of Plaintiff's personal advances

9
     does not require this Court to administer probate.
10

11   ¶323A. Closing date and vesting of claim. The escrow closed on March 24, 2020. As of

12   that date, Plaintiff's right to reimbursement of her personal advances became fixed and

13   liquidated.

14   **C. Independent accountant reconciliation; COVID-period nonperformance; after-**

15   **the-fact billing; demand/refusal**

16
     ¶323B. Accountant reconciliation (Exhibit I-4; non-applied credits). Plaintiff retained an
17

18   independent accountant to analyze Shuttleworth's billing and the escrow disbursement.

19   The reconciliation confirms that, after considering all entries, a liquidated net of

20   $39,275.31 remains due and owing to Plaintiff. It further shows that credits Shuttleworth

21   promised—including a cash-in-lieu-of-credit-card discount and other specified credits—

22
     were never actually applied. Instead, those credits were offset or "eaten up" by later
23

24   entries, many of which are the post-closing, date-stamped items described in ¶323D

25   (Exhibit I-4). The non-application of promised credits does not reduce the liquidated

26   principal reimbursable to Plaintiff.

27

28                                                                                    pg. 128

**¶323C.** COVID-period nonperformance and instruction to find new counsel. During the COVID period, Shuttleworth stated that he had effectively stepped away from the matter for an extended period and told Plaintiff to find another lawyer because he did not want to be "in the frying pan" with opposing counsel. Plaintiff reasonably relied on those statements and requested return of the escrowed money attributable to her personal advances. No refund was provided.

**¶323D.** After-the-fact/date-stamped entries; lack of contemporaneous output; "credit-eat-up." Following the March 24, 2020 closing, Shuttleworth submitted additional "date-stamped" billing entries (Exhibit I-4) that were not supported by contemporaneous work product or filings. These entries coincide with a period when he had stepped away from the matter (see ¶323C) and functioned to absorb credits he had promised to give Plaintiff (see ¶323B), leaving no net credit shown to her.

**¶323E.** Demand and refusal. Plaintiff demanded reimbursement of $39,275.31; Shuttleworth refused. Plaintiff seeks restitution of that amount plus prejudgment interest and appropriate equitable relief.

**¶323F.** Estoppel against post-closing "supplementals." Because the escrow statement (Exhibit I-4) and the accountant's reconciliation (Exhibit I-4) fix a liquidated balance as of March 24, 2020; because the promised credits (including the cash-discount credit) were never applied; and because the post-closing, date-stamped entries lack contemporaneous outputs (Exhibit I-4), Shuttleworth is estopped from asserting after-the-fact "supplemental" invoices to reduce or defeat the liquidated amount absent contemporaneous records of work actually performed before closing and proof of payment/credit.

¶**323G**. State Bar fee arbitration (availability noted). The State Bar advised Plaintiff that she could pursue fee arbitration; although a co-trustee declined to sign for joint submission, Plaintiff proceeds here on her personal-advance reimbursement claim, which is independent of fee-arbitration outcomes.

¶**323H.** Plaintiff's declaration (Exhibits I-4) confirms she personally advanced legal fees with the understanding she would be reimbursed upon sale of her father's property. Despite escrow disbursing $39,275.31 to attorney Michael Scott Shuttleworth, Plaintiff was never repaid. This created a double-payment scenario—Plaintiff's personal funds plus escrow funds—without reimbursement, supporting her restitution claim.

**D. Legal bases; alternative surcharge/offset; preservation/ESI**

¶**324.** Restitution/unjust enrichment/money had and received. By retaining funds that, in equity and good conscience, belong to Plaintiff, Shuttleworth has been unjustly enriched. Restitution of the liquidated sum of $39,275.31 is warranted.

¶**325.** Constructive trust/equitable lien. To secure repayment and prevent further unjust enrichment, a constructive trust and/or equitable lien should be imposed on funds wrongfully retained in connection with the Exhibit I-4 disbursement.

¶**325A.** Promissory estoppel (promised credits; relied-upon inducement). Shuttleworth promised to credit Plaintiff—including a discount if she paid by cash instead of credit card, and other itemized credits. Plaintiff relied on those promises in making payments and in agreeing to the escrow disbursement. Those credits were not applied. Equity bars Shuttleworth from reneging on the promised credits; they must be honored and applied against the liquidated balance, in addition to the restitution and interest pleaded.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

¶326. Interest. Prejudgment interest is recoverable on a liquidated sum from the date the right to recover vested—here, March 24, 2020—under Cal. Civ. Code § 3287; post-judgment interest is recoverable under 28 U.S.C. § 1961.

¶327. Alternative surcharge/offset route. In the alternative, to the extent any challenged portion of Shuttleworth's charges is asserted against trust/estate funds rather than Plaintiff's personal advances, the Court should order surcharge/offset and fee review under Probate Code § 17200(b)(5), (b)(7) and, if estate-fee provisions apply, Probate Code §§ 10810–10811.

¶328. Time/billing substantiation. As a condition of retaining any portion of the disputed charges, Shuttleworth should be required to produce contemporaneous time entries, task descriptions, supporting communications, and proof of outputs (filings, correspondence, drafts), with unsupported entries disallowed and refunded.

¶328A. Account stated (alternative). The escrow statement (Exhibit I-4) and invoices constituted a statement of account; to the extent Shuttleworth accepted/retained the benefit of the disbursement and failed to timely dispute the balance, an account stated exists in the amount of $39,275.31.

¶329. Preservation and ESI parameters. Shuttleworth shall preserve all paper/electronic time/billing ledgers, invoices, engagement/withdrawal letters, emails, internal memos, fee-arbitration correspondence, bank/ledger records reflecting payment flow, calendars, and file indices relating to Exhibit I-4 and the billed period; electronic records shall be preserved in native format with metadata intact; reasonable searches shall include identified custodians and date ranges tied to the events alleged, honoring proportionality under Fed. R. Civ. P. 26(b)(1).

**FIRST AMENDED COMPLAINT**

pg. 131

¶330. Spoliation/adverse inference. If core billing/engagement or payment-flow records are destroyed, altered, or withheld without substantial justification after a preservation duty attached, Plaintiff will seek an adverse-inference instruction, evidentiary sanctions, and fees.

¶331. Probate-exception safe. Relief sought here is non-custodial; it does not ask this Court to probate/annul a will, administer an estate, determine heirship, or assume custody of property in state court.

Relief Requested — Count Twelve (non-custodial; probate-exception safe)

¶332. Restitution. Judgment in the amount of $39,275.31, plus prejudgment interest under Cal. Civ. Code § 3287 accruing from March 24, 2020 and post-judgment interest under 28 U.S.C. § 1961, and costs of suit as allowed.

¶333. Declaratory relief (liquidated amount; non-applied credits; no post-closing "supplementals"). A declaration that the balance due to Plaintiff for personally advanced legal fees is $39,275.31 based on Exhibit I-4; that the promised credits were not applied and may not be retroactively nullified by post-closing entries; that this liquidated amount is not reduced by any after-the-fact "supplemental" invoices lacking contemporaneous support; and that only proof of payment or arithmetical error may reduce the liquidated balance.

¶334. Constructive trust/equitable lien. Imposition of a constructive trust and/or equitable lien over funds wrongfully retained in connection with the Exhibit I-4 transaction, to secure full repayment.

¶335. Surcharge/offset and disallowance of unsupported entries (alternative). An order surcharging/offsetting any portion of Shuttleworth's charges asserted against trust/estate

assets and disallowing any entries not supported by contemporaneous work product; with immediate refund of disallowed amounts. Production of the contemporaneous time/billing and payment-flow records described in ¶328–329 shall occur on a neutral-coordinated schedule, with proportionality protections as stated.

¶336. Joint-and-several allocation (as applicable). To the extent any non-immune private defendant directed, benefitted from, or retains any portion of the Exhibit I-4 disbursement, award the foregoing monetary relief jointly and severally, with contribution/indemnity preserved among defendants.

## COUNT THIRTEEN — UNLAWFUL DIVERSION ADVOCACY; FIDUCIARY ABUSE; 42 U.S.C. § 1983 CIVIL CONSPIRACY / JOINT PARTICIPATION (as to non-immune private defendants)

(Against G. Kevin Lachona and Does 20–30, in their individual capacities)

¶337. Plaintiff re-alleges ¶1–336 as though fully set forth here. Standing. Standing is independently grounded in Plaintiff's capacity as a beneficiary of the 1993 Trust and the 2017 Trust, and as executor of the Estate of Ralph C. Struthers, regardless of her current suspension as trustee.

¶338. Framing. Allegations in this Count rely on public filings, court orders, and other non-privileged documents, and on conduct occurring in court or via public-facing proceedings. Plaintiff does not allege or rely on any private settlement or negotiation communications.

¶339. Unlawful diversion advocacy. Private defendants, including G. Kevin Lachona, advocated or supported using U.S. Savings Bonds titled to the Estate of Ralph C. Struthers and/or held for the Ralph C. Struthers Trust (October 22, 2017) to pay third-

**pg. 133**

party attorneys' fees and sought to restrict a trustee's non-waivable disclosure duties. Plaintiff has not consented to any such diversion or restriction.

¶340. Federal preemption and fiduciary conflict. U.S. Savings Bonds are governed exclusively by federal law (31 U.S.C. § 3105; 31 C.F.R. Part 353). Any liquidation, redirection, or use of those bonds to pay private attorneys' fees without full Treasury compliance is preempted and unenforceable. Any restriction on a trustee's non-waivable duty to inform beneficiaries conflicts with California fiduciary law, including duties of information and accounting.

¶340A. Open-court support (public record). On March 14, 2025, in open court, a co-trustee stated that cashing U.S. Savings Bonds was being sought to fund counsel and that, without the bonds, the trust had no money for a lawyer. (Exhibit C-1 at 18:14–25, 19:1–9, 20:1–5.)

¶341. Settlor-intent records and notice. On March 14, 2025, drafting counsel presented settlor-intent records: the notarized March 1, 2019 amendment disinheriting persons who altered or attempted to alter the 1993 Trust, and a declaration that the 1993 instrument then being used was not the one he drafted. Copies were provided to aligned counsel, giving actual notice. (Exhibits A-2, B-1, C-1.)

¶342. Estate vs. trust characterization (public record; date-specific). On July 11, 2025, discussion concerned Darlene/1993 Trust savings bonds (not Ralph's estate bonds). (Exhibit K-1.) On August 29, 2025, the discussion shifted to Ralph C. Struthers "Estate Savings Bonds," including a reference to "13" and mischaracterizations as trust assets, which Plaintiff disputed. (Exhibit K-2.) Connor's deposition confirms bond use details

**FIRST AMENDED COMPLAINT**

tied to settlement payments (signature 12/10/19; paid "with bonds"; net $20,864 and $100 returned). (Exhibit C-2 at 20:16–21; 21:1–7; 22:6–12; 22:16–22.)

¶343. Joint participation with state actors (as applicable). To the extent private defendants coordinated with state actors such that summary handling, reclassification, or other court process denied Plaintiff meaningful notice and an opportunity to be heard on diversion and disclosure issues, such coordination constitutes joint action under color of law. *See Dennis v. Sparks; Lugar v. Edmondson Oil; Tower v. Glover.*

¶344. Particularity and exhibits (non-privileged). Supporting materials include Exhibit A-2 (3/1/2019 amendment), Exhibit B-1 (drafter's declaration), Exhibit C-1 (3/14/2025 court presentation and notice), and Exhibit E-1 (orders authorizing cashing, disputed), together with other non-privileged records and filings. See also Exhibit K-2.

¶345. Injuries (as applied). Public-facing advocacy for diversion and disclosure restrictions impaired Plaintiff's ability to administer the trusts, threatened federally governed assets, chilled petitioning, and increased litigation expense.

¶346. Timeliness and tolling. Allegations herein are timely; delayed discovery and equitable tolling apply as elsewhere alleged.

¶347. Declaratory relief (preemption / estate-only titling). Declare that, as to Plaintiff, any attempt to liquidate, redirect, or use Estate Savings Bonds to pay private attorneys' fees without full Treasury compliance is preempted and unenforceable; and that any restriction on a trustee's non-waivable duty to inform beneficiaries is unenforceable. Any assertion that bonds are trust assets must be supported by the registration; absent such proof, they are estate assets. On the record requests to cash bonds create a **credible and imminent** threat of diversion, warranting prospective relief.

¶348. As-applied injunction (non-custodial). Enjoin, as to Plaintiff only, any reliance on or enforcement of diversion or disclosure-restriction concepts described above unless and until full Treasury compliance and lawful fiduciary-disclosure standards are demonstrated. This order does not direct outcomes or supervise court calendars.

¶349. Preservation (public records). Require preservation of public filings, orders, and correspondence referencing diversion of U.S. Savings Bonds or trustee-disclosure restrictions; authorize appropriate remedies for unjustified destruction or withholding of such public materials.

¶350. Damages and fees (private defendants only). Award compensatory damages and, where permitted, punitive damages against non-immune private defendants for joint participation in constitutional deprivations; and award costs and, if represented by counsel, reasonable attorney's fees under 42 U.S.C. § 1988.

¶351. Joint-and-several allocations. Monetary and equitable liability for violations adjudicated under this Count shall be joint and several among non-immune private defendants found to have participated.

¶352. Federalism and probate boundary. Relief is non-custodial, does not seek probate administration or assume custody of any res, and is limited to enforcing federal preemption, constitutional process, and fiduciary transparency.

¶353. Non-disclosure of private communications. Plaintiff intentionally omits any reference to private settlement or negotiation communications and any specific dollar figure learned solely from such communications; any amounts, if relevant, will be proven by admissible, non-privileged records.

¶354. No request for private communications. Plaintiff does not seek disclosure of any

**pg. 136**

**FIRST AMENDED COMPLAINT**

private settlement or negotiation communications; this Count proceeds solely on public and non-privileged materials.

¶355. Notice regarding amounts. Any specific amounts related to bond value or alleged diversions will be established through admissible, non-privileged financial records or filed inventories at the appropriate stage.

¶356. Allocation of proof. Defendants who advocate diversion of U.S. Savings Bonds bear the burden to demonstrate full Treasury compliance; absent such proof, any diversion is preempted and unenforceable as to Plaintiff.

¶357. Equal-protection / access overlay (as applied). Persisting in public-facing diversion advocacy while simultaneously propelling summary handling that forecloses evidentiary presentation denies equal access and burdens Plaintiff's petitioning rights.

¶358. Remedies cumulative. The remedies sought here are cumulative of remedies sought in other counts and do not duplicate monetary recovery beyond what is permitted at law.

¶359. Reservation. Plaintiff reserves the right to amend this Count to add additional facts, exhibits, or Doe defendants as discovery reveals further acts of coercion, concealment, or joint participation, and to conform to proof.

¶359A. Element checklist (unlawful diversion / preemption / joint participation). Advocacy for diversion and disclosure restrictions (¶¶339–344); federal preemption (¶¶340–347); joint action (¶343); irreparable harm/damages (¶¶345, 350); tolling (¶346). Litigation-Privilege Caveat. The relief sought does not rest on privileged advocacy; it addresses suppression of non-privileged identity/authentication and fiduciary records

(including drafts, execution packets, notary journals, and thumbprint logs) and joint action under color of law that deprived Plaintiff of federal rights.

## VI. PRAYER FOR RELIEF

¶360. WHEREFORE, Plaintiff respectfully requests entry of judgment in her favor and against Defendants (with joint-and-several monetary relief as to non-immune private defendants), and the following relief:

¶360A. Judicial-Immunity Clarification. No damages are sought against judicial officers; relief as to such officers is limited to declaratory relief and, only if declaratory relief is unavailable or inadequate as applied to Plaintiff, prospective injunctive relief consistent with the 1996 amendment to 42 U.S.C. § 1983. Any injunctive relief against a judicial officer issue only to halt ongoing violations of federal law and only where declaratory relief is unavailable or inadequate as applied to Plaintiff.

¶360B. No relief requested annuls, revises, or enjoins any **past** state-court order; relief **only conditions future enforcement, as to Plaintiff**, on constitutionally adequate procedures and full federal compliance. No probate administration, asset distribution, or docket supervision is sought.

¶360C. This Court is not asked to determine title, value, possession, or distribution of any asset.

## A. Declaratory Relief

¶361. A declaration that the July 11, 2025 trustee suspension and any prefiling restriction imposed on Plaintiff without constitutionally adequate notice and a meaningful opportunity to be heard violate the First and Fourteenth Amendments.

1   ¶361A. Relief is as-applied and forward-looking only; no past state-court order is vacated

2   or revised.

3   ¶362. A declaration that suppressing material, non-privileged settlor-intent records—

4   including the March 1, 2019 amendment and the drafting lawyer's declaration—while

5   imposing or maintaining restrictions against Plaintiff without notice and hearing violates

6   the Fourteenth Amendment; this declaration takes no position on how any state court

7   should weigh any particular document.

8   ¶363. A declaration that enforcement, as applied to Plaintiff, of any order or agreement

9   purporting to liquidate, redirect, or use U.S. Savings Bonds contrary to Treasury

10  regulations may not proceed to the extent of such conflict. For clarity, this includes Estate

11  Savings Bonds (registered to Ralph C. Struthers and/or the Estate of Ralph C. Struthers)

12  and, only if proven by registration, any other U.S. Savings Bonds. See 31 U.S.C. § 3105;

13  31 C.F.R. Part 353; Free v. Bland, 369 U.S. 663 (1962); Yiatchos v. Yiatchos, 376 U.S.

14  306 (1964); Shaw v. Delta Air Lines, Inc., 463 U.S. 85 (1983).

15  ¶363A. A declaration that any purported settlement, stipulation, or agreement "between"

16  the Ralph C. Struthers Trust (Oct. 22, 2017) and the Struthers Family Trust (June 4,

17  1993) that was signed or advanced by persons who were not duly appointed trustees is

18  unenforceable for lack of lawful authority under California trust law and, as applied,

19  federal due-process requirements. To the extent any such document purports to liquidate

20  or redirect U.S. Savings Bonds to pay private attorneys' fees, enforcement may not

21  proceed as applied to Plaintiff absent full Treasury compliance, including the non-

22  confidential first settlement agreement circulated to beneficiaries (Exhibit P-3).

**FIRST AMENDED COMPLAINT**

**¶363B. Treasury Pinpoints.** The Court may take judicial notice of 31 C.F.R. Part 353, including §§ 353.5–.6, 353.15–.18, 353.35–.36, 353.70–.71.

**B. Prospective Injunctive Relief (Official-Capacity Defendants; Non-Monetary).**

**¶364.** As to Commissioner Michael A. Jacques (official capacity only): an injunction prohibiting enforcement of (a) any trustee suspension and (b) any prefiling restriction against Plaintiff unless and until constitutionally adequate notice and a meaningful opportunity to be heard before a neutral decision-maker are provided. No relief sought directs state-court scheduling or outcomes. This order, if granted, is limited to prospective process and shall not disturb or revise any past state-court order.

**¶364A.** Reinstatement pending due process and appeal. Reinstate Plaintiff LaRonda Myers as trustee of the Ralph C. Struthers Trust (October 22, 2017) unless and until she is removed after a properly noticed, evidentiary hearing that provides constitutionally adequate due process. The July 11, 2025 suspension was imposed without a noticed motion or a posted tentative addressing removal. Reinstatement shall remain in effect while Plaintiff's related state-law appeals are pending in the California Court of Appeal, Third Appellate District, unless and until due-process removal is lawfully adjudicated. Reinstatement is sought solely as an interim constitutional safeguard and does not ask this Court to decide any state-law probate issues. (Exhibit K-1 [7/11/2025 Tr.] at 8:24–26; 9:19–25; 9:24–10:13.) These protections apply notwithstanding the number of separately represented defense counsel to prevent duplicative or harassing discovery.

**¶365.** As to Commissioner Michael A. Holley (official capacity only): declaratory relief that prolonged non-adjudication of fully submitted matters can violate the First and

Fourteenth Amendments, particularly where delay functions as a denial; no order is sought directing how any state case is scheduled, managed, or decided.

**¶365A.** Expedited federal schedule. Set an expedited briefing and hearing schedule on Plaintiff's Rule 65 request to ensure minimally adequate process and prevent irreparable harm while related state-law matters are pending in the California Court of Appeal, Third Appellate District.

**¶366.** As to Placer Superior Court administration officials (official capacities only): declaratory relief identifying practices that, as applied to Plaintiff, deny due process and equal access. Relief is limited to conditioning enforcement against Plaintiff on compliance with constitutionally required safeguards; no continuing federal supervision of calendars is requested.

**¶366A. Constitutional compliance checkpoint.** As applied to Plaintiff only, require a short one-time filing or certification within 90 days that any future trustee suspension, **any prefiling/vexatious-litigant restriction**, or any reclassification of noticed evidentiary hearings affecting Plaintiff will comply with minimally adequate constitutional process (notice, meaningful opportunity to be heard, reasoned decision). This certification requirement sunsets automatically after filing. (Exhibit K-2 [8/29/2025 Tr.] at **31:13–22; 6:22–7:5.**)

**¶367.** Acknowledgment: All requested prospective relief is non-custodial, respects federalism, and does not ask this Court to administer probate or assume custody of any res. Nothing in this relief authorizes federal custody, administration, valuation, re-titling, or distribution of any estate or trust asset.

¶367A. Comity and scope. All requested federal relief is as-applied and non-custodial and does not stay or supervise any state proceeding; it conditions enforcement of specific measures (trustee suspension, any prefiling restriction, and any diversion of U.S. Savings Bonds contrary to Treasury rules) as-applied to Plaintiff, pending constitutionally adequate process and federal compliance.

¶367B. Declaratory-first limitation. As to all official-capacity defendants, injunctive relief is sought only insofar as declaratory relief is unavailable or inadequate as applied to Plaintiff.

¶367C. Reservation of Rights. Plaintiff reserves the right to amend to conform to proof and to substitute true names for Doe defendants as identities are discovered.

¶367D. Independent Capacities. Relief is independently sought in Plaintiff's capacities as executor of the Estate of Ralph C. Struthers and as a beneficiary of both the 1993 Trust and the 2017 Trust, regardless of trustee status.

¶367E. For avoidance of doubt, no relief sought directs or forbids any specific state-court calendar setting or ruling; requested injunctions condition enforcement as to Plaintiff of the trustee suspension, any prefiling restriction, and any U.S. Savings Bonds diversion unless constitutionally adequate procedures and federal compliance are shown.

## C. Supremacy-Clause / Savings-Bonds Injunctions (Non-Custodial)

¶367F. Rule 65(d)(2) scope. Any injunction under ¶¶368–368A binds the parties and those in **active concert** with them.

¶368. A permanent injunction prohibiting liquidation, redemption, diversion, or use of the U.S. Savings Bonds at issue, as to Plaintiff, to pay private attorneys' fees or other non-federal obligations unless and until Defendants demonstrate full compliance with 31

**pg. 142**

**FIRST AMENDED COMPLAINT**

U.S.C. § 3105 and 31 C.F.R. Part 353. The injunction is prospective only and limits enforcement, as to Plaintiff, unless constitutionally adequate procedures and federal compliance are shown. For avoidance of doubt, this Court does not re-title, value, distribute, or take custody of any bond or other asset; registration printed on the face of each bond controls under Treasury regulations.

**¶368A.** Status-quo preservation re Savings Bonds. Pending further order, maintain the status quo by prohibiting any liquidation, redemption, diversion, or use of the U.S. Savings Bonds at issue as to Plaintiff absent demonstrated compliance with 31 U.S.C. § 3105 and 31 C.F.R. Part 353. This status-quo protection is non-custodial and does not place any res in federal custody. In addition, pending adjudication, there shall be no enforcement against Plaintiff of any August 2025 orders that rely on the trustee suspension or any prefiling restriction.

**D. Production & Forensic Transparency (Non-Custodial)**

**¶368B.** Rule 65(d)(2) scope. Any injunction under ¶369 binds the parties and those in **active concert** with them.

**¶368C. Rule 65(c) Bond.** Set security at a nominal amount or waive it under Fed. R. Civ. P. 65(c).

**¶369.** An order compelling production of non-privileged fiduciary/authentication records necessary to authenticate instruments and trace funds—drafts, execution packets, notary journals, thumbprint logs, calendars, intake/call notes, file indices, time/billing entries, and communications—by the appropriate defendants (including attorney/law-firm defendants), coordinated with a neutral. This order applies only to the parties named in this Count and only to enforcement, as to Plaintiff, of the identified measures unless

**pg. 143**

**FIRST AMENDED COMPLAINT**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

constitutionally adequate procedures and federal compliance are shown. Production to a neutral reviewer is a non-custodial process and does not place any res in federal custody.

**¶369A.** Beneficiary-channel production. Order that all non-privileged fiduciary/authentication records (including drafts, execution packets, signature pages, notary journals and thumbprint logs, call/appointment sheets, and billing/time records tied to instrument preparation) be produced to Plaintiff in her beneficiary capacity and to the neutral forensic accountant, notwithstanding any dispute about trustee status.

**¶369B.** Narrow protective order (carve-outs). Any protective order shall be narrowly tailored and shall not bar disclosure of identity/authentication records to beneficiaries or the neutral; personal identifiers may be redacted as needed, but authenticity data (names, dates, notary entries, thumbprint confirmations) must be produced.

**¶370.** Appointment of an independent, court-supervised forensic accountant to conduct a non-custodial review of: (i) the 1993 Trust and Darlene Struthers' estate (2017–present), and (ii) the 2017 Trust accountings (2–6) and the Estate accountings (2–6)—with periodic reporting sufficient to restore transparency and enable lawful distributions.

**E. Discovery-Management & Anti-Harassment Protections**

**¶370A.** Rule 65(d)(2) scope. Any injunction under ¶371 binds the parties and those in **active concert** with them.

**¶371.** A Rule 26(c) protective framework providing that: (a) discovery from Plaintiff shall be proportional to the needs of the case (Rule 26(b)(1)); (b) defense discovery shall be consolidated and coordinated (no duplicative requests or serial, overlapping subpoenas by separately represented defendants); (c) one deposition of Plaintiff on overlapping topics (presumptively one day of seven hours) absent leave for good cause; (d) a single ESI protocol and rolling productions; (e) a 7-day meet-and-confer

**FIRST AMENDED COMPLAINT**

and short joint-letter process before any motion to compel; and (f) cost-shifting/sanctions for discovery shown to be unreasonably cumulative or intended to harass. These protections apply notwithstanding the number of separately represented defense counsel, to ensure proportionality and prevent harassment.

### F. Monetary Relief (Non-Immune Private Defendants Only)

¶372. Compensatory damages against non-immune private defendants for constitutional injuries (retaliation; denial of due process/access), delay damages, reputational harm, and financial losses; and punitive damages where permitted by law.

¶373. Restitution/Disgorgement, including: (a) amounts wrongfully taken from the 2017 Trust, 1993 Trust, and/or the estates; (b) $39,275.31 escrow reimbursement with prejudgment interest (Cal. Civ. Code § 3287); and (c) return/disgorgement of any amounts tied to efforts to divert Estate Savings Bonds or Trust Savings Bonds contrary to federal law.

¶374. Attorneys' fees and costs under Welf. & Inst. Code § 15657.5; where bad-faith wrongful taking is proven, double damages under Probate Code § 859; punitive damages where permitted; and Probate Code § 17211(b) fees against any beneficiary/representative who, without reasonable cause and in bad faith, opposed the accountings.

¶374A. Severance / without-prejudice safety valve. To the extent the Court concludes any discrete request would intrude upon probate administration or implicate Rooker–Feldman, Plaintiff requests that only that request be dismissed without prejudice and that the independent federal claims proceed.

¶374B. If the Court finds misjoinder, Plaintiff **consents to severance under Fed. R. Civ. P. 20/21 without prejudice**, rather than dismissal.

**FIRST AMENDED COMPLAINT**

## G. Fees, Costs, Interest

¶375. Attorneys' fees and costs where authorized (including 42 U.S.C. § 1988, Welf. & Inst. Code § 15657.5(d), Probate Code § 17211(b), and any other applicable statute); and taxable costs under Fed. R. Civ. P. 54(d).

¶376. Prejudgment interest where permitted (Cal. Civ. Code § 3287) and post-judgment interest (28 U.S.C. § 1961).

## H. Equitable Security

¶377. Imposition of a constructive trust and/or equitable lien over funds or property found to have been wrongfully obtained from the 2017 Trust, the 1993 Trust, or the estates, to secure full recovery and distribution.

## I. Allocation; Neutral Costs; Joint-and-Several Liability

¶378. Joint and Several Liability. Award all monetary relief against the non-immune private defendants, jointly and severally, with contribution/indemnity preserved among defendants.

¶379. Neutral/Production Costs on Defendants. Order that the fees and costs of the independent forensic accountant and all third-party production/hosting costs (including subpoena compliance and digitization) be borne by the non-immune private defendants, jointly and severally; no portion shall be charged to Plaintiff or to trust/estate assets.

## J. Federalism & Probate-Exception Safeguard

¶380. Confirm that this Court does not administer probate, distribute assets, determine heirship, or assume custody over property in state court; relief is limited to (a) independent federal constitutional claims, (b) preemptive protection of federally

governed instruments (Estate Savings Bonds/Trust Savings Bonds), and (c) non-custodial transparency measures necessary to prevent ongoing violations.

**K. Retention of Jurisdiction**

¶381. Retain jurisdiction to enforce and, if necessary, narrowly tailor the injunctive and transparency orders above (including discovery-management provisions) for a limited period, with automatic sunset on administrative reporting as specified.

¶382. Grant such other and further relief as the Court deems just and proper.

¶382A. Reservation of Rights. Plaintiff reserves the right to amend to conform to proof, substitute true names for Doe defendants, and add further facts uncovered in discovery, without expanding the causes of action beyond those pleaded.

¶382B. Safeguard against abstention and dismissal. This action does not seek to probate or annul a will, administer an estate, determine heirship, or assume custody of property in a state court's possession. It does not seek federal appellate review of state-court judgments. Relief is limited to as-applied federal constitutional claims, Supremacy-Clause protection of U.S. Savings Bonds, and non-custodial production of fiduciary/authentication records.

**VII. JURY DEMAND**

¶383. Pursuant to the Seventh Amendment and Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury on all issues so triable in this action.

¶384. Plaintiff demands a jury trial on damages claims under 42 U.S.C. § 1983; financial elder abuse under Welf. & Inst. Code § 15610.30 et seq.; fraud, aiding and abetting, and negligent supervision; restitution and disgorgement to the extent triable at law; and all factual issues underlying equitable relief that are triable by jury.

**¶385.** This demand is made against all non-immune private defendants named in this action. Plaintiff does not demand a jury as to claims seeking only prospective equitable relief against state judicial or administrative officers sued in their official capacities under Ex parte Young.

**¶385A.** For avoidance of doubt, Plaintiff does not demand a jury on claims seeking only prospective equitable relief against state judicial or administrative officers sued in their official capacities under Ex parte Young; those issues are for the Court. This clarification does not limit Plaintiff's jury demand on all triable damages claims against non-immune private defendants.

**¶386.** To the extent any party contends that a jury right does not attach to a particular claim or issue, Plaintiff alternatively requests an advisory jury under Federal Rule of Civil Procedure 39(c) on those issues.

## VIII. VERIFICATION

(28 U.S.C. § 1746 Unsworn Declaration)

I, LaRonda Myers, am the Plaintiff in this action. I have read the foregoing First Amended Complaint. The facts stated on my personal knowledge are true and correct, and the facts stated on information and belief I believe to be true.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on September 15, 2025, at Auburn, California.

LaRonda Myers

Plaintiff, Pro Se

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

LaRonda Myers,
Plaintiff,

v.

G. Kevin Lachona, et al.,
Defendants.

Case No. **2:25-cv-1925-TLN-CSK (PS)**

**PLAINTIFF'S MASTER EXHIBIT INDEX**

(Submitted with First Amended Complaint)

Assigned Judge: _____
Magistrate Judge: _____

**Purpose.** This Master Exhibit Index sits at the front of the Exhibits to help chambers find key evidence fast. Each listing includes: **Used in**, **Pins** (page/line), **Proves**, **Why it matters**, **Constitutional hooks**, and **Damage bucket**. Certified/true copies follow in labeled order.

**Transcript Aids (placed first):**
• **Exhibit C-1A** — Mar. 14, 2025 Transcript Pinpoint Index (1 page)
• **Exhibit C-1B** — Mar. 14, 2025 Transcript — Key Excerpts (true and correct copies)
• **Exhibit K-1A** — July 11, 2025 Transcript Pinpoint Index (1 page)
• **Exhibit K-1B** — July 11, 2025 Transcript — Key Excerpts (true and correct copies)
• **Exhibit K-2A** — Aug. 29, 2025 Transcript Pinpoint Index (1 page)
• **Exhibit K-2B** — Aug. 29, 2025 Transcript — Key Excerpts (true and correct copies)

**Note.** These indices/excerpt packets are navigation aids only and do **not** alter the evidentiary weight of the certified transcripts or deposition materials.

Dated: September 21, 2025

Respectfully submitted,


**LaRonda Myers** — Plaintiff, Pro Se
12060 Mont Vista Dr
Auburn, CA 95603
Phone: 530-320-1727
Email: **rondamyers@me.com**

# MASTER EXHIBIT INDEX (A–O, P-3)

(Guide for chambers: each entry includes "Used in," "Pins," "Proves," "Why it matters," "Constitutional hooks," and "Damage bucket." The certified/true copies follow in exhibit order.)

COUNTS QUICK INDEX
**Count 1 — p. 45; Count 2 — p. 56; Count 3 — p. 62; Count 4 — p. 71; Count 5 — p. 79; Count 6 — p. 91; Count 7 — p. 98; Count 8 — p. 103; Count 9 — p. 107; Count 10 — p. 114; Count 11 — p. 120; Count 12 — p. 126; Count 13 — p. 133. Prayer — p. 137; Jury Demand — p. 147; Verification — p. 148.**

PASTE THIS RIGHT THERE (no paragraph numbers):
Exhibit C-1A — Mar. 14, 2025 Transcript Pinpoint Index (1 page).
Exhibit C-1B — Mar. 14, 2025 Transcript — Key Excerpts (true and correct copies).
Exhibit K-1A — July 11, 2025 Transcript Pinpoint Index (1 page).
Exhibit K-1B — July 11, 2025 Transcript — Key Excerpts (true and correct copies).
Exhibit K-2A — Aug. 29, 2025 Transcript Pinpoint Index (1 page).
Exhibit K-2B — Aug. 29, 2025 Transcript — Key Excerpts (true and correct copies).

## EXHIBITS WITH PINPOINT PURPOSE (A–O, P-3)

### A-1 — 2017 Trust (front/signature page)
Used in: ¶72; Counts 1–2 · **Pins:** signature/acceptance page
Proves: Plaintiff was duly appointed trustee pre-suspension.
Why it matters: Establishes a protected position later deprived without process.
Constitutional hooks: **14A Due Process** (deprivation of office); **1A** (retaliation context).
Damage bucket: Loss of trustee functions; administration delay costs.

### A-2 — 3/1/2019 Sealed Amendment (opened Jan–Feb 2025)
Used in: ¶¶75–76, 76A; Counts 1–7, 10, 13 · **Pins:** notarial envelope; amendment text
Proves: Disinherits anyone who altered/attempted to alter the 1993 Trust; supports delayed discovery/tolling.
Why it matters: Opponents' standing/authority defects; tolling trigger after concealment.
Constitutional hooks: **14A Due Process; Access to Courts; Supremacy** overlay if "settlement" touches bonds.
Damage bucket: Years of delay; added litigation expense caused by concealment.

### B-1 — Declaration of Donald Gravalec (drafter)
Used in: ¶76; Counts 1–7 · **Pins:** entire declaration
Proves: The 1993 instrument being used was not the one he drafted.
Why it matters: Authenticity defect → need for evidentiary process and subpoena enforcement.
Constitutional hooks: **14A Due Process** (meaningful opportunity to be heard); **Access**.
Damage bucket: Motion practice; evidentiary prep wasted by non-evidentiary handling.

**Page 1 of 12**

**B-2(A) — Connor text p.14 #3 & #12 (successors; "holding up" narrative)**
Used in: ¶¶70E, 79G–79H, 171A; Counts 3–5 · **Pins:** p.14 items #3, #12
Proves: Intended successors (Darlene's brother/"Little Eddie"); false blame on Plaintiff.
Why it matters: Party-opponent admissions during control-shift window; undue influence pattern.
Hooks: **14A Due Process** (honest administration); **Equal Protection** (as-applied).
Damage bucket: Delay; reputational harm; admin costs.

**B-2(B) — 9/8/2017 text "original trust & trustee duties"**
Used in: ¶¶171A, 217A; Count 6 · **Pins:** 9/8/2017 timestamp
Proves: Messaging to family about "original trust/duties" while authenticity contested.
Why it matters: Shows contemporaneous narrative supporting the control shift.
Hooks: **14A; Access.**
Damage bucket: Authentication burden; delay.

**B-2(C) — Forced safe / Johnson office (early July 2017)**
Used in: ¶¶207–207A; Count 6 · **Pins:** text(s)/note date
Proves: Coercive access to Ralph's safe + office meeting amid capacity-paperwork window.
Why it matters: Undue-influence context right before the July papers.
Hooks: **14A** (property/control); elder-abuse elements.
Damage bucket: Property/control risk; downstream costs.

**B-2(D) — Cheryl text ("Belinda & Julie rewrote a trust ... white binder")**
Used in: ¶¶76C, 217A; Counts 5–6 · **Pins:** date/time in screenshot
Proves: Family acknowledgment of alteration; pointer to originals.
Why it matters: Corroborates lack-of-authority / authenticity narrative.
Hooks: **14A Due Process.**
Damage bucket: Discovery/motion costs; delay.

**B-3 — Timeline 3/14 → 7/11 → 8/29 (1 page)**
Used in: Counts 1,2,3,5,7,9,10,13 · **Pins:** n/a
Proves: Filing → next-day suspension → "not evidentiary" pivot.
Why it matters: Retaliation timing + denial-by-procedure roadmap.
Hooks: **1A; 14A** (Mathews/Logan).
Damage bucket: Delay; duplicate costs.

**C-1 — Transcript 3/14/2025 (Dept. 40)**
Used in: ¶¶76, 82A, 96; Counts 1–3,5–7,10,13 · **Pins:** p.8 (not evidentiary); p.11 (subpoena intent); p.18:14–25; 19:1–9; 20:1–5 (bonds)
Proves: Court refused evidence; co-trustee urged "cash the savings bonds"; notice of amendment given.

Why it matters: Due-process denial posture; preemption frame; actual notice.
Hooks: **1A Access; 14A; Supremacy (31 U.S.C. §3105; 31 C.F.R. Pt 353).**
Damage bucket: Chilled petitioning; delay; motion costs.
**C-1A/C-1B:** Pinpoint index / excerpt packet.

### C-2 — Deposition of Belinda Connor (7/9/2024)

Used in: ¶¶29, 89, 145A, 184A; Counts 2,3,5,7,10,13 · **Pins:** 10:3–5; 94:20–25; 95:1–12; 95:21–25; 96:1–6; 118:19–25; 121:6–8; 123:9–12; 134:7–25; 135:1–12; 142:1–12; 143:22–144:9; 72:14–23; 73:1–4
Proves: Florida residence; control/POA sequence; reliance on non-treating letters; "can't walk/speak" claims.
Why it matters: Party admissions; personal jurisdiction; elder-abuse narrative.
Hooks: **14A; Equal Protection (as-applied disparate treatment).**
Damage bucket: Service costs; delay.
**C-2A/C-2B:** Depo pinpoint index / excerpt packet.

### C-3 — Zillow "Sold" 12/18/2023

Used in: ¶89; Count 5 · **Pins:** "Sold" stamp/date
Proves: Relocation; nondisclosure impacting notice.
Why it matters: Jurisdiction/service accuracy.
Hooks: —
Damage bucket: Extra mailing/service costs; delay.

### D-1 — 7/18/2025 Order Compelling Accounting

Used in: ¶81; Counts 2–3,5–6,9–10 · **Pins:** date; directive ¶
Proves: Court ordered accounting; not enforced.
Why it matters: Ongoing concealment; denial-by-delay.
Hooks: **14A** (timely adjudication/enforcement).
Damage bucket: Prolonged admin expense; delay.

### E-1 — Orders Authorizing Cashing U.S. Savings Bonds

Used in: ¶84; Counts 1–2,10,13 · **Pins:** dates; operative text
Proves: State authorization/advocacy to liquidate bonds for fees.
Why it matters: Direct **Supremacy Clause** conflict (31 U.S.C. §3105; 31 C.F.R. Pt 353).
Hooks: **Supremacy; 14A** (as-applied restraint).
Damage bucket: Risk to federally governed assets; emergency motion costs.

### E-2 — Bank statement/signature card (retitling removing Ralph)

Used in: ¶¶90B, 139; Counts 3,5 · **Pins:** statement date; sig-card date
Proves: Wrongful retitling; elder property "taking/retaining."
Why it matters: Elements of W&I §15610.30.

Hooks: **14A (property)**.
Damage bucket: Asset loss risk; tracing costs.

**F-3 — 5/29/2017 Belinda text (nurse: "Darlene has dementia")**
Used in: ¶¶67, 91; Counts 3,5 · Pins: 5/29/2017 timestamp; sender "Belinda"
Proves: Dementia notice predates July 2017 control shift.
Why it matters: Capacity/undue-influence context.
Hooks: 14A (procedural due process).
Damage bucket: Care/placement risks.

**F-4 — Darlene placement downgrade (facility → house)**
Used in: ¶¶91, 187; Counts 3,5 · Pins: facility records/dates
Proves: Downgrade while no accounting.
Why it matters: Elder-abuse context; breach of fiduciary duty.
Hooks: —
Damage bucket: Increased care risk; oversight costs.

**F-5 — Message: "doesn't need medical treatment for a month"**
Used in: ¶70B; Counts 3,5 (context for 9) · Pins: message date/time
Proves: Directive used to block rehab/PCP alignment.
Why it matters: Medical obstruction supports undue-influence/control narrative.
Hooks: **14A (as-applied due process around basic medical continuity); Access**.
Damage bucket: Health risk; added medical costs; delay.

**F-6 — Bank closures & authority packet (incl. Kern Schools cashier's check + "loss" declaration)**
Used in: ¶¶90A–90C, 145B; Counts 3–5,7,10,13 · Pins: 7/7/2017; 9/1/2017; instrument images
Proves: Removal of Ralph's access; false "paid" record; title manipulation.
Why it matters: Elder-abuse taking/retaining; fiduciary breach.
Hooks: **14A (property)**.
Damage bucket: Asset loss risk; tracing/recovery costs.

**G-1 — Johnson/Murphy subpoena refusal**
Used in: ¶¶78, 85F; Counts 2–3,7,10 · Pins: refusal letter date/letterhead
Proves: Non-production of execution packets/notary logs.
Why it matters: Necessity of evidentiary hearing/neutral review.
Hooks: **Access; 14A**.
Damage bucket: Delay; expense.

**G-2 — 7/7/2017 "Incapacity" declaration (J. Dean Johnson)**
Used in: ¶¶69–71; Counts 3–7 · Pins: date; notary block
Proves: Notarized incapacity without Auburn exam; used to seize control.
Why it matters: Keystone document enabling closings/re-titlings.

Hooks: —
Damage bucket: Asset/control harm.

### G-3 — Subpoena schedule (drafts/execution/notary/thumbprints)
Used in: ¶78; Counts 2–3,7,10 · **Pins:** schedule items
Proves: The authentication universe being withheld.
Why it matters: Defines scope for compelled production.
Hooks: **Access; 14A.**
Damage bucket: Delay; costs.

### G-4 — Johnson/Murphy blanket refusal letter
Used in: ¶78; Counts 2–3,7,10 · **Pins:** date/author
Proves: Blanket refusal of non-privileged identity/authentication.
Why it matters: Supports joint-action/obstruction narrative.
Hooks: **Access; 14A.**
Damage bucket: Delay.

### G-5 — Formal records request (to Johnson/Murphy)
Used in: ¶78; Counts 2–3,7,10 · **Pins:** date/recipient
Proves: Specific notice and diligence.
Why it matters: Tolling and need for neutral production.
Hooks: —
Damage bucket: Delay.

### G-6 — Capacity packet (7/7 + 7/10–11; later reversal)
Used in: ¶¶68A, 70, 145; Counts 3–7,13 · **Pins:** packet index; reversal page
Proves: Non-treating signers; one later reversed.
Why it matters: Undercuts "incapacity" narrative used to seize control.
Hooks: —
Damage bucket: Control/asset harm avoided by transparency.

### H-1 — 10/24/2017 Darlene check to Johnson/Murphy
Used in: ¶73; Count 7 · **Pins:** check image/amount
Proves: Selective capacity (to pay firm) vs claimed incapacity.
Why it matters: Credibility/consistency.
Hooks: —
Damage bucket: Fee leakage.

### H-2 — Burial/Embalming docs + Plaintiff declaration
Used in: ¶91; Counts 4–6 · **Pins:** consent/refusal forms; declaration ¶¶
Proves: Burial wishes vs forced cremation.
Why it matters: Interference with settlor's wishes; undue influence.

**Page 5 of 12**

G. Kevin Lachona, et al.,        Case No. **2:25-cv-1925-TLN-CSK (PS)**

**MASTER EXHIBIT INDEX (A–O, P-3)**

Hooks: **14A (family/settlor interests).**
Damage bucket: Emotional distress; remedial costs.

**H-3 — 07/07/2017 release/check-day packet (early-2017 dementia/ADL texts + 7/7 references)**
Used in: ¶¶67, 91; Counts 3,5 · Pins: 07/07/2017 date lines
Proves: Actions taken on the same day as alleged "resignation," despite impairment/manipulation.
Why it matters: Authenticity/authority and undue-influence timing.
Hooks: 14A (procedural due process).
**Damage bucket: Care/placement & asset-control risks.**

**I-1 — Protective-order motions (Lachona) — "Reserved by Clerk"; Plaintiff's Ex Parte (07/21/2025) to compel originals/accountings & sanctions — clerk cover**
Used in: ¶¶78, 85, 85F, 86A–86B; Counts 1–2, 3, 9–10 · Pins: PO caption/date + "Reserved by Clerk" stamp; Ex parte signature date 07/21/2025 + clerk cover header
Proves: Court heard defense protective-order track while Plaintiff's evidentiary track was sidelined; **Plaintiff sought emergency compulsion/sanctions pre-8/29**
Why it matters: Two-track handling; denial-by-procedure; supports diligence/tolling
Hooks: 1A access; 14A due process; Equal Protection (as-applied)
Damage bucket: Wasted evidentiary prep (courtroom/reporter/subpoenas); delay; added motion/appeal costs

**I-2A — Email (Demiris→Lachona 9/27/2023) "we step in the shoes … too late for privacy"**
Used in: Counts 2,10,11 · **Pins:** header + quoted line
Proves: Admission that records should be produced; undermines later "privacy" claims.
Why it matters: Supports access/due-process theory & tolling.
Hooks: **14A; Access**.
Damage bucket: Delay costs.

**I-2B — State Bar Fee Arbitration Letter (8/26/2024) (Myers v. Demiris)**
Used in: Count 11; Count 12 context · **Pins:** date; caption; instruction
Proves: Formal fee dispute initiated; preserves issue.
Why it matters: Reasonableness review & restitution track.
Hooks: **14A (property)**.
Damage bucket: $ exposure; interest; admin costs.

**I-3 — Firm correspondence (Harris & Plottel) linking Lachona**
Used in: ¶¶285–287; Counts 10–11 · **Pins:** letterhead/email headers
Proves: Supervisory knowledge/affiliation.
Why it matters: Negligent supervision / aiding & abetting.
Hooks: —
Damage bucket: Fee leakage; obstruction costs.

G. Kevin Lachona, et al.,          Case No. **2:25-cv-1925-TLN-CSK (PS)**

**MASTER EXHIBIT INDEX (A–O, P-3)**

### I-4 — Shuttleworth invoice + accountant reconciliation

Used in: ¶¶322–323F; Count 12 · **Pins:** $39,275.31; post-closing "date-stamped" entries; credits not applied

Proves: Liquidated restitution sum; estoppel vs later "supplementals."

Why it matters: Clear money-had-and-received claim.

Hooks: **14A (property)**.

Damage bucket: $39,275.31 + prejudgment interest.

### I-5 — Notice of Evidentiary Hearing (May 2025)

Used in: ¶86A; Count 1 ¶105; Count 9 ¶¶267–268 · **Pins:** filing date; "Evidentiary Hearing" caption

Proves: Case was set as evidentiary.

Why it matters: Baseline before re-label to non-evidentiary.

Hooks: **14A Due Process; Access**.

Damage bucket: Sunk prep costs; delay.

### I-5A — POS + Witness/Exhibit Notice (6/16/2025)

Used in: ¶86A; Count 1 ¶105; Count 9 ¶¶267–268 · **Pins:** 6/16 service stamp; witness/exhibit page

Proves: Reliance/prep for evidentiary setting.

Why it matters: Confirms prejudice when evidentiary was pulled.

Hooks: **14A; Access**.

Damage bucket: Wasted witness/reporting fees; delay.

### I-5B — Plaintiff letter re evidentiary hearing & accounting duties

Used in: ¶86A; Count 9 ¶270; Counts 3 & 5 · **Pins:** date line; §16062(a); "Aug 29 evidentiary"

Proves: Defense on notice of evidentiary posture & statutory duties.

Why it matters: Reinforces diligence; breach of duties.

Hooks: **14A; Access**.

Damage bucket: Delay; costs.

### I-7 — Ex Parte Order (7/22/2025): "no witness/no testimony."

Used in: ¶86A; Count 1 ¶105; Count 9 ¶¶266–268 · **Pins:** order language

Proves: Administrative conversion to non-evidentiary.

Why it matters: Core due-process injury (Mathews/Logan).

Hooks: **14A; Access**.

Damage bucket: Foreclosed evidence; wasted prep.

**I-8A — Email 8/26/2025 11:35 AM ("NO evidentiary hearing ...")**
Used in: ¶86A; ¶105; Count 9 ¶¶267, 270 · **Pins:** header + three quoted lines
Proves: Defense reiterated non-evidentiary stance; admits full-day evidentiary motion existed.
Why it matters: Confirms two-track handling.
Hooks: **14A; 1A Access**.
Damage bucket: Sunk prep; delay.

**I-8B — Email 8/27/2025 6:04 PM (follow-up objection / "courtesy copy")**
Used in: ¶86A; Count 1 ¶105; Count 9 ¶¶266–268 · **Pins:** header; objection lines
Proves: Continued insistence on non-evidentiary eve-of-hearing.
Why it matters: Shows prejudice timing.
Hooks: **14A**.
Damage bucket: Disruption; delay.

**I-8C — Email 6/27/2025 10:56 AM ("NO evidentiary hearing ... I only object to delays...")**
Used in: ¶86A; Count 9 ¶267 · **Pins:** header + body
Proves: Foreknowledge that 8/29 wouldn't be evidentiary; strategy on discovery timing.
Why it matters: Intent evidence for re-label.
Hooks: **14A; 1A Access**.
Damage bucket: Sunk prep; delay.

**I-9 — OSC re Vexatious Litigant**
Used in: ¶87A; Count 9 · **Pins:** date; operative text
Proves: Prefiling threat.
Why it matters: Chilling effect; gatekeeping w/o standards.
Hooks: **1A; 14A**.
Damage bucket: Chilled petitioning; extra motion costs.

**I-10 — Email 9/27/2023 (Lachona: "delay the release / move to quash")**
Used in: ¶¶78, 85F; Counts 2,3,7,10 · **Pins:** date/body
Proves: Coordinated plan to obstruct Titan-served records.
Why it matters: "Sham petitioning" exception; joint action.
Hooks: **1A limits; 14A; Access**.
Damage bucket: Delay; expense.

**I-11 — April Sharp Declaration (Nov. 2024 / Jan. 2025)**
Used in: ¶76C, ¶85H; Counts 5,6,13 · **Pins:** declaration date/caption
Proves: Alignment with opponents' settlement filings.
Why it matters: Conflicts/authority defects.
Hooks: —
Damage bucket: Delay; confusion.

G. Kevin Lachona, et al.,          Case No. **2:25-cv-1925-TLN-CSK (PS)**

**MASTER EXHIBIT INDEX (A–O, P-3)**

**I-12 — April Sharp Consent Screenshot**
Used in: ¶76C; Counts 5,6,13 · **Pins:** timestamp
Proves: Consent posture used to press approval.
Why it matters: Authority/standing defects.
Hooks: —
Damage bucket: Delay.

**I-13 — Subpoena Timeline (2023–2025)**
Used in: ¶78A; Counts 1–3,7,9–10 · **Pins:** listed dates
Proves: Repeated efforts; non-enforcement → tolling/continuing violation.
Why it matters: Justifies compelled neutral review.
Hooks: **14A; Access.**
Damage bucket: Delay; costs.

**I-14 — Commissioner Jacques Order (Aug. 2025)**
Used in: ¶85; Counts 1,2,9 · **Pins:** date; denial/continuance passages
Proves: Continued non-enforcement post-federal filing.
Why it matters: Retaliation/non-evidentiary pattern.
Hooks: **1A; 14A.**
Damage bucket: Delay; extra costs.

**I-15 — Notice of Motion for Protective Order (stamped "Reserved by Clerk" 8/29/2025)**
Used in: ¶¶78, 85F; Counts 2,7,9,10 · **Pins:** caption/date; stamp
Proves: Defense motion heard while evidence was shut off.
Why it matters: Asymmetry confirms access/EP issues.
Hooks: **14A; Equal Protection.**
Damage bucket: Delay; costs.

**I-16 — Responses & Objections to RFP (Lachona; Set One)**
Used in: ¶¶127–127A; Count 2 · **Pins:** objection pages
Proves: Refusal of core authenticity materials (drafts/notaries).
Why it matters: Supports tolling; access denial.
Hooks: **Access; 14A.**
Damage bucket: Delay; expense.

**J-3 — Treating notes: purposeful yes/no; command-following**
Used in: ¶¶68B, 70F, 184A; Counts 3–7 · **Pins:** entries citing head-nods; commands; smiles/puckers
Proves: Communication shortly after stroke.
Why it matters: Impeaches "can't speak" narrative.
Hooks: **14A** (authentic record vs narrative).
Damage bucket: Authentication costs; delay.

### J-4 — Auburn PCP Letter (08/01/2017)

Used in: ¶¶70H, 70K–70M, 184A; Counts 3–7 · **Pins:** date/signature; capacity sentence
Proves: Patient could make medical/financial decisions.
Why it matters: Treating evidence contradicts office letters.
Hooks: **14A.**
Damage bucket: Delay.

### J-5 — Santa Maria Letter (06/11/2018)

Used in: ¶70H, ¶184A; Counts 3–7 · **Pins:** date/signature; capacity line
Proves: Later treating capacity affirmation.
Why it matters: Longitudinal consistency.
Hooks: **14A.**
Damage bucket: Delay.

### J-6 — "Aggressive rehabilitation recommended" (SM + Auburn)

Used in: ¶¶68C, 70J, 70N; Counts 3,5 · **Pins:** exact "aggressive rehab" pages
Proves: Twice-ordered rehab → blocked.
Why it matters: Medical interference narrative.
Hooks: **14A (as-applied).**
Damage bucket: Added care costs; diminished gains.

### K-1 — Transcript 7/11/2025

Used in: ¶¶12, 85, 85C, 110, 115E; Counts 1–2,3,5,7,10,13 · **Pins:** 8:24–26; 9:19–25; 9:24–10:13
Proves: Next-day suspension; no noticed removal motion; "13 bonds" confusion as trust assets.
Why it matters: Retaliation + due-process failure; preemption context.
Hooks: **1A; 14A; Supremacy.**
Damage bucket: Loss of office; chilled petitioning; appeal/motion costs.
**K-1A/K-1B:** Pinpoint index / excerpt packet.

### K-2 — Transcript 8/29/2025

Used in: ¶¶85B–85H, 87A, 96, 105, 108; Counts 1–2,3,5,7,9,10,13 · **Pins:** 6:22–7:5; 30:8–19; 31:13–22
Proves: "Not evidentiary" handling; prefiling talk; court read amendment.
Why it matters: Confirms evidentiary shut-off; chilling gatekeeping.
Hooks: **1A Access; 14A.**
Damage bucket: Sunk evidence prep; delay; extra motions.
**K-2A/K-2B:** Pinpoint index / excerpt packet.

**L-1 — Still image (Santa Maria) + note (talk/ambulate)**
Used in: ¶¶68, 68A; Counts 5–7 · **Pins:** metadata/date
Proves: He could walk/talk with therapy.
Why it matters: Impeaches incapacity narrative.
Hooks: —
Damage bucket: Credibility support.

**M-1 — Damages Exposure Summary · M-2 — Damages by Count Matrix**
Used in: Prayer/Damages · **Pins:** charts
Proves: Categories/quantum overview by count.
Why it matters: Remedies clarity for Court/jury.
Hooks: **1A; 14A; Supremacy** (bonds).
Damage bucket: All categories summarized.

**N-1 — "Dad can talk" packet (2017–2018 texts / stills)**
Used in: Counts 5–7; ¶¶68, 68A, 70 · **Pins:** p.5 (5/31/2017 Belinda text); p.6 (7/20/2017 replies+Belinda); pp.2–4,7 (2018 confirmations)
Proves: Belinda knew he could communicate; later fluent speech.
Why it matters: Undercuts incapacity; supports undue influence.
Hooks: —
Damage bucket: Credibility; supports 5–7 core facts.

**O-1 — Auburn PCP confirmations + Plaintiff decl. (post-MRSA)**
Used in: ¶¶70C, 186D–186E; Counts 3,5 · **Pins:** 7/12 & 8/1 confirmations
Proves: PCP handoff was scheduled; "visiting/insurance" directive blocked it; infection followed.
Why it matters: Elder-neglect / medical interference.
Hooks: **14A (as-applied).**
Damage bucket: Health risk; added medical costs.

**O-2 — Additional bank closure/authority pages (Belinda/Julie)**
Used in: ¶¶90A–90C; Counts 3,5 · **Pins:** form dates
Proves: Account changes and presented authority docs.
Why it matters: Tracing & elder-abuse elements.
Hooks: **14A (property).**
Damage bucket: Tracing cost.

**O-3 — Account histories / check images (Belinda/Julie)**
Used in: ¶¶90A–90C; Counts 3,5 · **Pins:** statement ranges; check images
Proves: Outflows; "loss" declaration trail; false "paid" ledger.
Why it matters: Restitution/surcharge proof.
Hooks: **14A (property).**
Damage bucket: Restitution + interest.

G. Kevin Lachona, et al.,          Case No. **2:25-cv-1925-TLN-CSK (PS)**

**MASTER EXHIBIT INDEX (A–O, P-3)**

**P-1 / P-2 — Vehicle sale packet (VIN; Check No. 15089)**
Used in: ¶¶90E–90G; Count 5 · **Pins:** sale date; VIN; check image
Proves: Sole vehicle sold under purported POA; no proceeds accounting; probable undervaluation.
Why it matters: Elder-property taking/retaining.
Hooks: **14A (property).**
Damage bucket: FMV delta; tracing; restitution.

**P-3 — First Settlement Agreement (non-confidential)**
Used in: ¶¶76C, 90G, 99; Relief ¶363A · **Pins:** signatures; authority recitals; bond directions
Proves: Attempt to bind trusts by non-trustees; potential bond-diversion directions.
Why it matters: Unenforceable as to Plaintiff; federal **preemption** barrier on bonds.
Hooks: **14A (authority/notice); Supremacy.**
Damage bucket: Prevention of improper diversion; litigation costs.

**SHORT DECLARATION FOR EXHIBIT N-1**

**DECLARATION OF LaRONDA MYERS RE EXHIBIT N-1 (Texts/Video/Photo)**

1. I am the Plaintiff. The screenshots, letters, and photo in **Exhibit N-1** are true and correct copies kept in my possession at the times shown.

2. **p.5 (May 31, 2017):** The text from **Belinda Connor** to me reports Dad "shakes his head yes and no," reflecting purposeful communication shortly after the stroke.

3. **p.6 (July 20, 2017):** After I recorded a short video of Dad speaking at home post-therapy, family replied that he "could talk so good" and was "not coughing anymore."

4. **p.7 (May 27, 2018): Cheryl Struthers** texted that Dad was "talking up a storm."

5. **p.2 (June 2018) & p.3 (2018):** Letters from **Diana Struthers** and **April Spaulding** describe Dad's verbal greetings (including "Happy Birthday").

6. **p.4 (Oct ~2, 2018):** The photo shows Dad engaging with therapy shortly after my return from a Cuba trip.

I declare under penalty of perjury that the foregoing is true and correct.


Executed on September 22, 2025, at Auburn, California.

LaRonda Myers

# Exhibit A-1

EXHIBIT A-1 — 2017 Trust (front/signature page)

Used in: ¶72; Counts 1–2

Pins: Instrument signature/acceptance page

Proves: Plaintiff is the duly appointed trustee before any suspension.

Why it matters: Establishes the protected status that was later deprived.

Constitutional hooks: 14A Procedural Due Process (deprivation of office); 1A Retaliation context.

Damage bucket: Loss of trustee functions; administration delay costs.

# The
# Ralph C. Struthers
# Revocable Trust

8.12 Gifts to Heirs

For any gift to "heirs" of the settlor that is made in this instrument, those heirs shall be determined as if the settlor had died intestate at the time for distribution prescribed in this instrument, and the identity and shares of those heirs shall be determined according to the California laws of succession that concern separate property not acquired from a previously deceased spouse and that are in effect at the time the settlor is deemed to have died.

## ARTICLE NINE. SIGNATURE AND EXECUTION

9.1   Execution

I certify that I have read the foregoing trust agreement and that it correctly states the terms and conditions under which the trust estate is to be held, administered, and distributed. As settlor of the trusts created by this trust agreement, I approve this trust agreement in all particulars, and agree to be bound by its terms and conditions. The trustees approve and accept the trusts provided for in this trust agreement.

Executed on October 22, 2017, at San Diego, California.

**SETTLOR**

_____
Ralph C. Struthers

By: _____
Donald G. Gravalec (Witness 1)

_____
(Witness 2)

Erica Grenvalec

Printed Name of Witness

Ralph C. Struthers Revocable Trust
28

## ACKNOWLEDGMENT

*A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document, to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.*

State of California                                  )
                                                     )
County of San Diego                                  )

On __10/22/17__ , before me, Linda Elizabeth Oftedahl, notary public,

personally appeared Ralph C. Struthers, who proved to me on the basis of satisfactory evidence

to be the person whose name is subscribed to the within instrument and acknowledged to me that

he executed the same in his authorized capacity, and that by his signature on the instrument the

person, or the entity upon behalf of which the person acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that

the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Linda Elizabeth Oftedahl                                      (Seal)



LINDA ELIZABETH OFTEDAHL
Notary Public - California
San Diego County
Commission # 2213966
My Comm. Expires Sep 14, 2021

Ralph C. Struthers Revocable Trust
29

# Exhibit A-2

EXHIBIT A-2 — March 1, 2019 Sealed Amendment (opened Jan–Feb 2025)

Used in: ¶¶75–76, 76A; Counts 1–7, 10, 13

Pins: Notarial envelope; amendment text

Proves: Disinherits any person who altered/attempted to alter the 1993 Trust; supports delayed discovery/tolling.

Why it matters: Standing/authority defects for opponents; tolling trigger.

Constitutional hooks: 14A Due Process; Access to Courts; (preemption overlay when "settlement" touches bonds).

Damage bucket: Delay; added litigation expense caused by concealment.

Sealed by Notary - to be opened
on death of Ralph C. Struthers

Sharon Walter

# FIRST AMENDMENT TO THE
# RALPH C. STRUTHERS REVOCABLE TRUST
## Established October 22, 2017

**RALPH C. STRUTHERS**, settlor and trustee of the **RALPH C. STRUTHERS REVOCABLE TRUST** established October 22, 2017, does hereby amend said trust in the following particulars:

In every instance where the following matters are identified, the following replaces that information:

1.     The name of my childrens' mother to be corrected as follows: ERMA LOU STRUTHERS.

2.     If any beneficiary named in my trust is found to have been a party to changing my Struthers 1993 Trust, that beneficiary is removed as a beneficiary from my Ralph Struthers 2017 Trust.

3.     The share of my granddaughter, LEAH MARIE GULLIKSEN, (Charlotte Kay's daughter), shall be divided into three shares, one each for LEAH MARIE GULLIKSEN, RYAN EMILY GULLIKSEN and NATHAN DAIELE EVANS.    The share for LEAH MARIE GULLIKSEN shall be given to her outright.  The shares for RYAN EMILY GULLIKSEN and NATHAN DAIELE EVANS shall be held in trust (savings bonds) until they reach the age of *18*.

4.     In the event there is any disagreement between my family, my daughter, LARONDA MYERS, will have the final decision as to my final resting place.

5.     In the event that LARONDA MYERS has not been reimbursed for the funeral expenses of my disabled daughter, CHARLOTTE KAY, or expenses she incurred taking care of me prior to my death, she is to receive reimbursement in full from my trust before any other distributions are made.

In all other respects, the undersigned settlor and trustee reaffirms and ratifies the aforementioned trust.

The undersigned settlor certifies that he has read the foregoing trust amendment and that it correctly states the amended  terms and conditions under which the trust estate is to be held, managed, and disposed of by the trustees.

Dated: March 1, 2019

_____
**RALPH C. STRUTHERS,**
Settlor and Trustee

## ACKNOWLEDGMENT

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

STATE OF CALIFORNIA )
                        ) ss.
COUNTY OF PLACER )

On March 1, 2019, before me, Sharon Walter, a Notary Public, appeared RALPH C. STRUTHERS, proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entities upon behalf of which the person(s) acted, executed the instrument.

I certify under penalty of perjury under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Sharon Walter
Notary Public, State of California

SHARON WALTER
Commission # 2131153
Notary Public - California
Placer County
My Comm. Expires Nov 19, 2019

# Exhibit B-1

EXHIBIT B-1 — Declaration of Donald Gravalec (drafter)

Used in: ¶76; Counts 1–7

Pins: Full declaration (no page pin needed if short)

Proves: The 1993 instrument in use was not the one the drafter prepared.

Why it matters: Authenticity defect → need for evidentiary process.

Constitutional hooks: 14A Due Process (meaningful opportunity to be heard); Access to Courts.

Damage bucket: Delay; added motion practice.

1    Donald G. Gravalec (110610)
     Attorney and Counselor at Law
2    2562 Hollywood Drive
     Campo, CA 91906
3    Telephone No. 619-478-1233
     Email: gravalec@lawyer.com
4

5    Attorney for Laronda Myers

6

7

8                    SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                       IN AND FOR THE COUNTY OF PLACER

10

11
     IN THE MATTER OF:                )    Case No.: Case No.: S-PR-0010014
12                                    )
     RALPH C. STRUTHERS               )    DECLARATION OF DONALD G. GRAVALEC,
13   REVOCABLE TRUST,                 )
     DATED: OCTOBER 22, 2017          )
14   _____)

15        I am Donald G. Gravalec, an attorney at law, duly admitted to practice before all the

16   Courts of the State of California since 1983.

17        I have personal knowledge of the following facts and if called, can testify competently

18   thereto:

19        1. A substantial portion of my law practice has been devoted to estate planning, drafting

20   wills and trusts, estate administration, and estate litigation, having drafted an estimated number

21   of trusts in excess of 1000 during my career to date.

22        2. I have continually used what was originally known as Matthew Bender Trust Drafting

23   software, and its many subsequent iterations to date in the preparation of the trusts; having

24   purchased the first version offered by the company in approximately 1984, a version that preceded

25   the DOS version.

26        3. Although there have been many developments and changes to the language of trusts

27   produced with that software, there have remained certain characteristics and provisions that have

28   remained constant, producing trust instruments with certain identifiable characteristics and

     Page -1-              Declaration of Donald G. Gravalec, Esq.

1 | language differentiating them from other sources.

2 |     4. In approximately May of 1993, Ralph and Darlene Struthers contacted my office
3 | located in Redding California, regarding creating an estate plan.

4 |     5. As was, and remains, my current practice, I met with the prospective clients, discussed
5 | their estate planning objectives and proposed a suitable plan. Upon the client's ascent, I provide
6 | the relevant information to my paralegal to prepare the requested documents, and upon
7 | completion, meet with the client(s) to explain them prior to execution and notarization.

8 |     6. At the time that I prepared  Mr. and Mrs. Struther's revocable trust and supporting
9 | documents, Ann E. Ridyard was employed as my paralegal and she drafted the trust documents
10 | for my approval and when the documents were executed by the clients on June 4, 1993, she
11 | provided the Notary service.

12 |     7. Since 32 years have passed since the execution of that document, my physical and
13 | electronic file copy of the document that I prepared and the Struthers signed has been lost.

14 |     8. I have carefully reviewed the document attached as Exhibit 1, purported to be a copy of
15 | THE STRUTHERS FAMILY REVOCABLE TRUST dated: June 4, 1993.

16 |     9.  Despite not having a file copy for comparison, and the fact that  the purported copy of
17 | the trust does contain certain language that I would identify as typical in a trust drafted by me,
18 | and bears the signatures of Ralph and Darlene Struthers as well as an  Acknowledgment signed
19 | and sealed by Ann E. Ridyard,  my review of the document reveals  there have  been numerous
20 | and significant alterations in both language and format. Accordingly,   I can state without
21 | reservation that the document is neither a true nor accurate copy of STRUTHERS FAMILY
22 | REVOCABLE TRUST that I prepared in 1993, and that  was signed by  and notarized by Ms.
23 | Ridyard. The purported trust referred to herein is in my opinion,  a forgery with significant
24 | alterations from the original I drafted.

25 |     9. I declare under penalty of perjury under the laws of the State of California that the
26 | Foregoing is true and correct.

27 | Dated: August 8, 2025

28 |

                           Donald G. Gravalec

# Exhibit B-2A

Exhibit B-2A — Connor text thread (p.14, items #3 & #12: intended successors; "holding up" narrative)

Used in: ¶¶70E, 79G–79H, 171A; Counts 3–5

Pins: p.14, items #3 and #12

Proves: Names Darlene's brother + "Little Eddie" as intended successors; later "Julie" push; false "LaRonda is holding up" narrative.

Why it matters: Party-opponent admissions during control-shift window; corroborates undue influence + blame campaign.

Constitutional hooks: 14A Procedural Due Process (honest administration); Equal Protection (as-applied).

Damage bucket: Delay; reputational harm; admin costs.



I love you too. I'm just
really stressed out.
Julie made the
appointment with the
lawyer.she told me
she was going to pay
for it out of her own
pocket. I thought
some one from our
family should be there
to represent us. She
said she was
extremely nervous
about violating the
terms of the trust. It
does not provide for
funeral costs besides

# EXHIBIT B-2 (A–D) — CONNOR/CAMPBELL FAMILY TEXTS & FORCED-SAFE EPISODE

# Exhibit B-2B

Exhibit B-2B — 9/8/2017 family text: "original trust & will / trustee duties"

Used in: ¶¶171A, 217A; Timeline; Count 6

Pins: 9/8/2017 time stamp/screenshot

Proves: What family members were told at the time about "original trust" and "trustee duties"—
not that they consented or verified authenticity.

Why it matters: Shows a messaging narrative circulated during the control-shift window while
authenticity and lawful authority remained disputed and core records were withheld.

Constitutional hooks: 14A Procedural Due Process; Access to Courts.

Damage bucket: Authentication burden; delay; increased costs.

# New iMessage                    Cancel

## To: Belinda Connor & 1 more...

### Sep 8, 2017, 12:13 PM

**Belinda Connor**



I think it's going to tell everyone that it is the original trust and will. Also what the trustees duties are.

**April Spaulding**



So Julie isn't on it anymore and it's back little Eddie ?

# Exhibit B-2C

EXHIBIT B-2C — Forced safe / Johnson office (early July 2017)

Used in: ¶¶207–207A; Count 6 · Pins: text(s)/note date

Proves: Coercive access to Ralph's safe + office meeting amid capacity-paperwork window.

Why it matters: Undue-influence context right before the July papers.

Hooks: 14A (property/control); elder-abuse elements.

Damage bucket: Property/control risk; downstream costs.



**To: Carol Campbell**

**Aug 6, 2017, 10:20 AM**

How could you
disrespect Kay's wishes
of course you wouldn't of
known that because
you've never talk to our
sister Kay and you
disappointed her when
you flew in to see Dad
and check in to Dad and
Darlene safe and how
much money they had
but you would've of
every known that really
upset them a lot .You
came in like a freight
train into their home and

   iMessage  

**.ıll AT&T LTE**

**To: Carol** C

train into their home and disrespect their private information but you would of not know that because you didn't see how it really made them feel . And did you know that you really upset Kay when you never bothered to see our sister Kay. but you would've never known that you never talk to Kay. Your interference is not helping its just shows that you had nothing to do with our sister Kay or even call her you come in like a

 

iMessage

# Exhibit B-2D

Exhibit B-2D — Cheryl Struthers text: "Belinda & Julie rewrote a trust... I want the original trust Dad wrote"

Used in: ¶¶76C (authority theme), 217A; Timeline; Counts 5–6

Pins: Cheryl text date/time; "white notebook binder" reference

Proves: Family acknowledgment that "Belinda & Julie rewrote a trust"; points to Dad's "original trust" location.

Why it matters: Third-party corroboration for alteration claims and "original trust" theme; supports lack-of-authority/authenticity narrative.

Constitutional hooks: 14A Procedural Due Process (authentic administration).

Damage bucket: Authentication/discovery costs; delay.



**Cheryl >**

Yesterday 7:56 PM

Hey do you have pictures of the trust documents? Can you send them to me?

Wow, that's probably on my other phone. Your talking about the original Trust Document's, right? I think I took some photos; but mostly of the photos of pictures in the white note book.

I would like to see pictures of the original trust

I'll look for them.

You do know Belinda and Julie rewrote a trust. I'm talking about the original Trust my Dad wrote.

# Exhibit B-3

EXHIBIT B-3 — Timeline Summary (3/14 → 7/11 → 8/29)

Used in: Counts 1, 2, 3, 5, 7, 9, 10, 13

Pins: One-page summary (no pin)

Proves: Retaliation sequence; delay; obstruction points.

Why it matters: Roadmap for Mathews/Logan denial-by-procedure theory.

Constitutional hooks: 1A; 14A; Equal Protection (as-applied).

Damage bucket: Delay; added costs.

## EXHIBIT I-13 — SUBPOENA TIMELINE (2023–2025)

(Prepared from file-stamped records and party correspondence. "Pins" are the exhibit labels you're filing so chambers can jump straight to proof.)

1. 09/27/2023 — Defense planning email
   Sender: G. Kevin Lachona
   Target/Custodian: **Law Offices of Johnson, Murphy & Jones, Inc.**
   Scope: Discusses records served via Titan; plan to "delay the release" and "move to quash."
   Outcome: Written plan to obstruct production.
   Pins: I-10 (email text/body).

2. 2023–2024 — Plaintiff's repeated demands
   Issuer: Plaintiff / Counsel
   Target/Custodian: **Law Offices of Johnson, Murphy & Jones, Inc.**
   Scope: Execution packets; drafts; notary journals; thumbprint logs; intake/appointment notes.
   Outcome: Pattern of refusals / non-production.
   Pins: G-1 (subpoena refusal), G-3 (subpoena schedule), G-4 (refusal letter), G-5 (formal records request).

3. 03/14/2025 — Court hearing (Dept. 40)
   Event: Drafter (Gravalec) announces intent to subpoena **Law Offices of Johnson, Murphy & Jones, Inc.** originals and notary logs.
   Court handling: "Not an evidentiary proceeding … no, not at this time."
   Outcome: Evidence declined on law-and-motion calendar; subpoenas foreshadowed.
   Pins: C-1 at p.8 (declines evidence) and p.11 (subpoena intent).

4. 06/27/2025 — 10:56 AM — Defense email
   Event: "There will be NO evidentiary hearing on August 29, 2025 … I only object to discovery delays that push production beyond the August 29, 2025 evidentiary hearing."
   Outcome: Sets up conversion off evidentiary track and timing leverage.
   Pins: I-8C (header plus quoted lines).

5. 07/22/2025 — Ex parte order
   Event: "No witness / no testimony."
   Outcome: Converts posture; forecloses live evidence tied to subpoenas.
   Pins: I-7 (order language).

**Page 1 of 3**

LaRonda Myers, Plaintiff (pro se) v.
G. Kevin Lachona, et al., Defendants.
Case No. 2:25-cv-1925-TLN-CSK (PS)
**EXIBIT I-13 — SUBPOENA TIMELINE
(2023–2025)**

6.  08/26/2025 — 11:35 AM — Defense email
    Event: Reiterates "there will be NO evidentiary hearing on August 29." Acknowledges
    "MOTION FOR FULL-DAY EVIDENTIARY HEARING" and raises POS issue.
    Outcome: Confirms eve-of-hearing shut-off of evidentiary path.
    Pins: I-8A (header plus quoted lines).

7.  08/27/2025 — 6:04 PM — Defense email
    Event: Reaffirms non-evidentiary handling for 8/29.
    Outcome: Confirms two-track treatment persists.
    Pins: I-8B (header plus quoted lines).

8.  08/29/2025 (morning) — Protective-order track heard
    Filing: Defense Notice of Motion for Protective Order/fees/sanctions, "Reserved by
    Clerk."
    Outcome: Protective track proceeds while evidentiary track is sidelined.
    Pins: I-15 (caption; "Reserved by Clerk" stamp).

9.  08/29/2025 (hearing) — Court statements
    Event: Court treats matter as "not evidentiary," discusses vexatious/prefiling, and notes it
    read the amendment.
    Outcome: Protective issues heard; evidentiary presentation not taken.
    Pins: K-2 at 6:22–7:5; 30:8–19; 31:13–22.

10. 08/29/2025 (same day) — Written objections by **Law Offices of Johnson, Murphy &
    Jones, Inc.**
    Event: Blanket objections/privilege asserted over drafts, client files, notary journals,
    thumbprints, audio/video.
    Outcome: Non-production maintained; paired with protective rulings.
    Pins: K-2 at 15–16; G-1; G-3; G-4.

11. 08/29–09/2025 — Follow-on orders/continuances
    Court handling: Continued non-adjudication; asymmetric treatment after the federal
    filing.
    Outcome: Subpoena enforcement still withheld; matters continued.
    Pins: I-14 (August order), I-16 (RFP objections), I-13 (this timeline).

Summary (one paragraph):

From 09/27/2023 (defense plan to "delay the release / move to quash" — I-10), through 2024
refusals (G-1/G-3/G-4/G-5), Plaintiff pursued authenticity records from **Law Offices of
Johnson, Murphy & Jones, Inc.** (drafts, execution packets, notary journals, thumbprint logs).

Page 2 of 3

<div align="center">

**LaRonda Myers, Plaintiff (pro se) v.**
**G. Kevin Lachona, et al., Defendants.**
**Case No. 2:25-cv-1925-TLN-CSK (PS)**
**EXIBIT I-13 — SUBPOENA TIMELINE**
**(2023–2025)**

</div>

On 03/14/2025 the drafter announced subpoenas on the record, but the court declined to take evidence on a law-and-motion calendar (C-1 at 8, 11). By late June–August 2025, defense emails stated there would be NO evidentiary hearing on 8/29 (I-8C; I-8A; I-8B), reinforced by a 07/22/2025 ex parte order: "no witness / no testimony" (I-7). On 08/29/2025 the defense protective-order track was heard ("Reserved by Clerk," I-15) while **Law Offices of Johnson, Murphy & Jones, Inc.** asserted blanket privilege even over identity/authentication materials (K-2 at 15–16; G-series), and the court confirmed the matter was "not evidentiary" with prefiling discussion (K-2 at 6:22–7:5; 30:8–19; 31:13–22). Subpoena enforcement remained unaddressed in follow-on orders (I-14; I-16). This sequence supports tolling and the continuing-violation doctrine, and shows why neutral, non-custodial production is required.

Requested relief tied to Exhibit I-13:

(a) Order neutral, non-custodial production of execution packets, drafts, notary journals, and thumbprint logs (with a short Rule 26(c) protocol and adverse-inference remedies for unjustified non-production);

(b) Preservation order directed to **Law Offices of Johnson, Murphy & Jones, Inc.**;

(c) Date-certain schedule for resolution so evidentiary presentation is not foreclosed by administrative relabeling.

**LaRonda Myers, Plaintiff (pro se) v.
G. Kevin Lachona, et al., Defendants.
Case No. 2:25-cv-1925-TLN-CSK (PS)
EXIBIT I-13 — SUBPOENA TIMELINE
(2023–2025)**

# Exhibit C-1

EXHIBIT C-1 — 3/14/2025 Transcript (Dept. 40)

Used in: ¶¶76, 82A, 96; Counts 1–3, 5–7, 10, 13

Pins: p.8 ("not an evidentiary proceeding"); p.11 (subpoena intent); p.18–20 (bonds discussion)

Proves: Court declined evidence; co-trustee urged "cash the savings bonds"; notice to counsel on amendment.

Why it matters: Due-process denial; preemption frame; actual notice.

Constitutional hooks: 1A (petition/access); 14A; Supremacy Clause (bonds).

Damage bucket: Chilled petitioning; delay; costs.

SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF PLACER

--oOo--

DEPARTMENT NO. 40            COMMISSIONER MICHAEL JACQUES

In Re the Ralph C. Struthers )
Revocable Trust,             )   Case No. S-PR-0010014
                             )

ORIGINAL

REPORTER'S TRANSCRIPT

Friday, March 14, 2025

PROCEEDINGS

--oOo--

Reported By:  RUTH E. DIEDERICH, CSR 4952
              Licensed and Certified in California



Scarpelli Court Reporting Service
601 Commerce Drive, Suite 130
Roseville, CA 95678
(916) 412-0152

COURT REPORTING SERVICES

1      SUPERIOR COURT OF THE STATE OF CALIFORNIA

2        IN AND FOR THE COUNTY OF PLACER

3            --oOo--

4  DEPARTMENT NO. 40      COMMISSIONER MICHAEL JACQUES

5

6                 )
                 )
7  In Re the Ralph C. Struthers  )
  Revocable Trust,         )  Case No. S-PR-0010014
8                 )
                 )
9  _____

                              ORIGINAL

10          REPORTER'S TRANSCRIPT

11          Friday, March 14, 2025

12            PROCEEDINGS

13             --oOo--

14

15

16

17

  Reported By:  RUTH E. DIEDERICH, CSR 4952
18          Licensed and Certified in California

19

20

21

22

23

24

25

Re the Ralph C. Struthers Revocable Trust
Civil Hearing,   on 03/14/2025

1                    **APPEARANCES:**                              Page 2

2

   **COUNSEL FOR BELINDA CONNOR, CAROLE CAMPBELL and**
3  **JULIE HATRIDGE:**

4    **HARRIS & PLOTTEL**
     **BY:   G. KEVIN LACHONA, ESQ.**
5    **466 Vallombrosa Avenue**
     **Chico, California   95926**
6    **530-893-2882        office@harriswplotel.com**

7  **COUNSEL FOR LaRONDA MYERS:**

8    **DONALD GRAVALEC**
     **Attorney At Law**
9    **2562 Hollywood Drive**
     **Campo, California 91906-1022**
10   **619-478-1233        gravalec@lawyer.com**

11

12 **ALSO PRESENT:**

13   **JULIE HATRIDGE**
     **LaRONDA MYERS**
14   **APRIL SHARP (Remote appearance)**
     **BELINDA CONNOR (Remote appearance)**
15

16

17

18

19

20

21

22

23

24

25

Page 3

1              ROSEVILLE, CALIFORNIA

2              Friday, March 14, 2025

3                    --o0o--

4         The Re the Ralph C. Struthers Revocable Trust,

5    Case Number S-PR-0010014, came regularly this day before

6    MICHAEL JACQUES, Commissioner of the Superior Court of

7    the State of California, in and for the County of

8    Placer, Department Number 40 thereof.

9         The following proceedings were had, to wit:

10                    *****

11         THE COURT:  We'll be in session and on the

12   record in the matter of Ralph C. Struthers revocable

13   trust.

14         If I can have appearances, please.

15         MR. LACHONA:  Good morning, your Honor.

16   Kevin Lachona appearing for Julie Hatridge and

17   Belinda Connor, who are the --

18         THE COURT REPORTER:  Would you say the name

19   again?

20         MR. LACHONA:  -- Julie Hatridge and

21   Belinda Connor as co-trustees of the 1993 Struthers

22   Family Trust.  Julie is present with me here today.

23   Belinda Connor is present via remotely.

24         THE COURT:  Let's make sure she is here.

25         Ms. Connor, are you hearing me okay?

Re the Ralph C. Struthers Revocable Trust
Civil Hearing,   on 03/14/2025

1              MS. CONNOR:  Yes, sir.

2              MR. LACHONA:  And I also represent

3    Belinda Connor and Carole Campbell as beneficiaries

4    of the 2017 trust.

5              THE COURT:  Thank you.

6              Please.

7              MR. GRAVALEC:  Good morning, your Honor.

8    Donald Gravalec and --

9              THE COURT:  Spell the last name, please.

10             MR. GRAVALEC:  It is Gravalec,

11   G-r-a-v-a-l-e-c --

12             THE COURT:  Very well.

13             Your appearance, please, Counsel?

14             MR. GRAVALEC:  I'm with Ronda Myers --

15             THE COURT:  Very well.

16             And, Ms. Myers, good morning to you as well.

17             MR. GRAVALEC:  -- In both capacities.

18             MR. LACHONA:  Your Honor, in what capacity is

19   Mr. Gravalec representing Ms. Myers?

20             THE COURT:  Do you represent her in the trust

21   or in the --

22             Well, I know you're in the trust, but in the

23   estate as well?

24             MR. GRAVALEC:  As both, your Honor.

25             THE COURT:  All right.  So let me give some

Page 5

```
 1    thoughts on where we are today.

 2              Did you want to be heard, Ms. Myers?

 3              MS. MYERS:  Yeah.  I was -- and also as a

 4    beneficiary of the Struthers Family Trust --

 5              THE COURT:  Thank you.

 6              MS. MYERS:  -- of June 4th, 1993.

 7              THE COURT:  Let me give some thoughts on where

 8    we are today.

 9              First off, before I forget -- hang on just a

10    minute -- there is an error in the probate notes with

11    respect to the amended motion/petition to invalidate

12    settlement agreement.  The recommendation of a probate

13    attorney is a matter to be continued to May 16th at

14    8:30.  It says Department 4.  That's a typo.  All

15    proceedings in this case until further notice are

16    located in 40.  So I don't want anyone to be confused by

17    that.

18              So I want to give some thoughts on where we

19    are today, and so -- and I'll start with you,

20    Mr. Lachona, because your request to suspend the

21    trustees does not nominate anyone else.  To my mind,

22    your clients cannot be appointed.  They're conflicted.

23              And so whom would you nominate?

24              MR. LACHONA:  A professional fiduciary, your

25    Honor.
```

Case 2:25-cv-01926-TLN-CSK   Document 5   Filed 09/23/25   Page 209 of 583

1          THE COURT:   Do you have someone in mind?

2          MR. LACHONA:   There have been a couple of

3    professional fiduciaries I have been speaking with

4    regarding this matter.   What my proposal would be is to

5    confer with, I guess now Mr. Gravalec, regarding the

6    appointment of the interim trustee.

7          THE COURT:   So Mr. Gravalec, I disagree with

8    Ms. Myers' recent papers that the Court lacks authority

9    with respect to the trustees and can only remove them

10   for misfeasance.   Rather, under Probate Code Section

11   17206, the Court has the authority to make such orders

12   as are necessary to protect the trust and to further the

13   ends of justice.

14          The co-trustees are impassed, and undoubtedly

15   you've read Ms. Myers' recent ex parte application in

16   which she proposes that I convert the co-trustee -- her

17   co-trustee into, to use her expression, a silent

18   partner, and I am not going to do that.   The co-trustees

19   are impassed, and I think I am going to suspend them

20   today.

21          Let's start there.   Let me hear from you,

22   Mr. Gravalec.

23          MR. GRAVALEC:   Your Honor, I've been on the

24   case for two days, maybe three days.

25          THE COURT:   Well, please.   Don't lose your

Page 7

1   train of thought.

2          Let me say some additional things.

3   Undoubtedly you've got some sense of how this case has

4   gone.  Let me throw in some thoughts, then I want to

5   hear from you fully.

6          You people are -- not only are you no further

7   along than you were a year ago, you are less far along.

8   If this matter had never been mediated, if you would

9   have come to court every 90 days ago -- days or so to

10  see if I could send you to trial assignment, and so if

11  that had happened for the last year instead of

12  mediation, I would be telling you today, "I still can't

13  send cases to trial assignment."

14         Our criminal calendar is impacted.  It has

15  priority.  Cases go from here to there.  The parties I

16  will consider fortunate -- and I say it with genuine

17  regret -- if these matters go to trial before the end of

18  2026.  They're just not going, particularly given that

19  cases keep getting bigger.  And that's why I'm saying

20  that the folks aren't where they were 12 months ago.

21  They're farther behind because all the petitions before

22  the Court are not even at issue.  The aggregate of the

23  papers before the Court is 936 pages today, and I just

24  keep getting more.

25         And now I'm going to stop talking.  That's my

Re the Ralph C. Struthers Revocable Trust
Civil Hearing,   on 03/14/2025

Page 8

1    thoughts and concerns on where we are.

2              And back to you.  You were about to address

3    the issue of me suspending the co-trustees.

4              MR. GRAVALEC:  Your Honor, I -- again,

5    actually, I'm the first attorney that's on this case

6    because I worked both of the previous trusts.

7              I have in my file a letter that actually I

8    would like to read into the record from the decedent,

9    and it was in an envelope marked "Only open after my

10   death."

11             THE COURT:  What's the -- tell me what the

12   gravamen of this letter is before I permit it.  This is

13   not an evidentiary proceeding.  I don't think I am going

14   to allow it.  But I want you to at least characterize

15   its gravamen for me.

16             MR. GRAVALEC:  Well, it's our position that

17   the '94 trust has been fraudulently woven.

18             THE COURT:  You know what?  That's one of the

19   petitions; right?  I assure you, I'm not going to try

20   that case today.

21             MR. GRAVALEC:  I'm pretty hearing impaired so

22   I --

23             THE COURT:  Would an assisted living device

24   help you?

25             MR. GRAVALEC:  It might, yes.

Case 2:25-cv-01926-TLN-CSK    Document 5    Filed 09/23/25    Page 212 of 583

Re the Ralph C. Struthers Revocable Trust
Civil Hearing,   on 03/14/2025

Page 9

```
 1              THE COURT:  Deputy, let's have an assisted
 2   listening device.  After we are in place with that, if
 3   you are not hearing me, I want you to indicate right
 4   away if you can't hear me.
 5              MR. GRAVALEC:  This whole deafness thing is --
 6              THE COURT:  I'm sorry for that.  Let me make
 7   sure that we can assist you with it; okay?  And let me
 8   make sure --
 9              MR. GRAVALEC:  I have judges angry at me.  Not
10   you.
11              THE COURT:  I don't get angry.
12              THE BAILIFF:  Okay.
13              (Discussion held off the record.)
14              MR. GRAVALEC:  Your Honor, thank you for that.
15              THE COURT:  Absolutely.  Please.  It's
16   entirely my pleasure.
17              So I'm not going to hear the letter written by
18   Mr. Struthers.  I have no doubt that the late
19   Mr. Struthers would be chagrinned and devastated by the
20   debacle that his estate planning has turned into, so I
21   don't need to hear anything to be able to prove that.
22              I do want to point out, this is a law and
23   motion calendar.  I have 23 more cases to hear before
24   10:00 o'clock when I have to hear my conservatorship
25   calendar.
```

Page 10

1            And so address yourself, if you would, please,

2    Mr. Gravalec, to the issue of the suspension -- the

3    suspension of the co-trustees because they are impassed.

4            MR. GRAVALEC:  Well, your Honor, I would like

5    to be able to have the opportunity to speak with April

6    and to see if we can put aside the animosity that's

7    arisen in this.

8            THE COURT:  It's not so much a matter of that.

9    I have expressed in a very candid way, Ms. Myers has

10   used -- these are my words, not hers -- has in open

11   court stated her intention or the need to bend April to

12   her will --

13           MR. GRAVALEC:  Yeah.

14           THE COURT:  -- and her ex parte application

15   makes that plain.  As I said, she wants to -- and I'm

16   using her terminology -- turn April into a silent

17   partner.  As a co-fiduciary, of course, April either

18   exercises her full powers as co-trustee or she doesn't.

19   One or the other.

20           MS. MYERS:  I --

21           THE COURT:  No, thank you, Ms. Myers.  You

22   have an attorney, and I want to hear from him.

23           MS. MYERS:  Well, I would like to express why

24   I said that.

25           THE COURT:  No, thank you, Ms. Myers.  I've

Re the Ralph C. Struthers Revocable Trust
Civil Hearing,  on 03/14/2025

Page 11

 1   read your papers.  And I believe it was in your ex parte

 2   application that you discussed that, and so I understand

 3   your position on that.

 4          MR. GRAVALEC:  Well -- so, your Honor, rather

 5   than make the decision to suspend my client as trustee

 6   today, if we could just have a little bit of time that I

 7   can, A, get familiar with the state of the case -- like

 8   I said, I wrote the original trust so I'm familiar with

 9   all of the documents that are involved.  I'm -- I knew

10   Mr. Struthers.  I knew him when he was healthy.  I knew

11   him when he had a stroke.  I have a strong sense of his

12   intent.

13          I tried to express it in his estate planning

14   documents which I thought we had made abundantly clear,

15   and the documents have been altered to -- it's my

16   understanding that Jay Johnson possesses the purported

17   original documents.  And as I said, I would like to

18   subpoena and have those examined as -- for what they're

19   representing to be the controlling documents in this

20   case.

21          The -- I totally agree with the Court that

22   this is a debacle and it's a mess.  And my role here, I

23   believe, is to try to clean this thing up and try to get

24   this either resolved or get it tried or to get it

25   something.  But it's a mess.

Re the Ralph C. Struthers Revocable Trust
Civil Hearing,   on 03/14/2025

Page 12

1          And my client has gone to great lengths to get

2     me to be here to hopefully try to straighten this case

3     out.

4          I would respectfully request that the Court,

5     at least for some amount of time, not suspend my client

6     as trustee and let me see if I can put that side of it

7     together.

8          And I would never ask April to give up her

9     authority as co-trustee or be a silent partner, but to

10    be involved as a trustee as we all are well aware that

11    they should be.

12         THE COURT:  So Mr. Lachona, as I indicated at

13    the beginning, there were a number of proceedings that

14    have essentially -- well, weren't formally stayed, but

15    essentially stayed because of the mediation, for

16    example, the discovery motions.

17         MR. LACHONA:  Right.

18         THE COURT:  I have taken a look at those.  I

19    am not prepared to rule today.  Although, Mr. Gravalec,

20    I'll tell you this as well, with the motion to compel

21    further responses to the interrogatories, requests for

22    production --

23         And was there a request for admission as well?

24         MR. LACHONA:  Yes, your Honor.

25         THE COURT:  Don't take this as a tentative

Re the Ralph C. Struthers Revocable Trust
Civil Hearing,   on 03/14/2025

 1   ruling because I didn't re-study them thoroughly enough.

 2   But I think I'm going to grant those -- that discovery

 3   motion because the -- the objections are boilerplate and

 4   the answers are nonresponsive.

 5           And so I'm going to stay with Mr. Lachona, but

 6   I will come back to you for just a moment.

 7           This would be a good opportunity, because I

 8   think I am going to continue this matter for that

 9   May 16th date, to revisit and confirm, good faith this

10   time, on the -- on the discovery motion because I think

11   it's going to be granted.

12           Mr. Lachona, I think that's what I'm going to

13   do.   I am looking for a way to bring resolution to these

14   matters.   I welcome Mr. Gravalec's advent into this

15   case.   I think I am going to continue everything to

16   May 16th, and I would be prepared at that time to rule

17   on the discovery motion.   Not only that, but also the

18   subpoena motion.   Those are the two discovery motions

19   that have been pending all of this time.

20           Give me your thoughts, won't you?

21           MR. LACHONA:   Your Honor, I share 100 percent

22   in this Court's frustrations with this matter.   We are

23   approximately two months away from the six-year

24   anniversary from Mr. Struthers' death, and the

25   co-trustees of the 2017 trust have yet to distribute a

Re the Ralph C. Struthers Revocable Trust
Civil Hearing,   on 03/14/2025

1   penny of the trust funds.

2           Yes, this has been a long litigated matter,

3   and the motion that is before this Court is a motion to

4   enforce the settlement agreement that was entered into

5   in July 2024 which was the third settlement agreement in

6   this matter.  I have been hearing Ms. Myers and

7   Ms. Sharp year after year after year, "We're going to

8   get this wrapped up."  "We're going to get this

9   administration finalized."  And that has yet to happen.

10           We entered into a binding settlement agreement

11   on July 11th, 2024.  Ms. Myers and Ms. Sharp moved

12   forward with enforcing that settlement agreement through

13   the filing of the petition to approve the settlement

14   agreement.

15           As the Court had indicated at the last

16   hearing, because Ms. Myers had repudiated that petition,

17   the Court was not going to force her to move forward.

18   And I understand the Court's position on it, but my

19   response to that, Is this motion to enforce the

20   settlement agreement?  In my perspective, that is the

21   only way we are going to get resolution.

22           Hearing Mr. Gravalec tell the Court that he

23   needs a little more time to look at the pleadings or a

24   little more time, that is exactly what we have been

25   hearing for years.

Re the Ralph C. Struthers Revocable Trust
Civil Hearing,   on 03/14/2025

Page 15

1            THE COURT:   Well, we haven't heard it from

2    him, and I am taking him at his word.   And Mr. Gravalec

3    has heard me in a very candid way express the Court's

4    frustration.

5            I can't do this.   I can't see these people

6    every two months with 900 pages of material the Court is

7    supposed to digest.   The ex parte application, frivolous

8    as a matter of law.   The Court has no authority to do --

9    to grant the relief that was requested to extend statute

10   of limitations.   I read the opposition.   It's absolutely

11   correct.   The statute that was cited by Ms. Myers does

12   not allow me to extend the statute of limitations.   It

13   is far beyond the scope of proper ex parte application,

14   an emergency.   There were notice issues.   And I believe

15   that you were correct on the -- on the notice issues.

16           With Mr. Gravalec on board, I welcome things

17   like the -- well, in her most recent petition, she filed

18   a response -- or a reply to your objection stating that

19   it was untimely under CCP Section 1005, where CCP

20   Section 1005 does not apply in probate court.

21           I read -- and listen, I am -- Ms. Myers, I am

22   agnostic on the issue of whether or not your petition

23   has merit.   It's just -- it doesn't help me in

24   understanding the proceedings when I read overheated

25   language about Mr. Shuttleworth speaking with

Re the Ralph C. Struthers Revocable Trust
Civil Hearing,  on 03/14/2025

```
 1   Mr. Lachona at court.  There is nothing wrong with that.

 2   The worst enemies in the world who are in litigation are

 3   expected to try to confer and resolve their disputes.

 4           And so a lot of that stuff, it's kind of like,

 5   if you will, trying to watch a TV program and understand

 6   what's going on, and there's -- there's a -- someone is

 7   doing machine work in the garage on the other side of

 8   the wall.  There's so much static going on that it's

 9   difficult to understand what the issues are.  So that's

10   why I welcome Mr. Gravalec in particular.

11           MR. LACHONA:  And I am happy that Ms. Myers

12   has retained counsel.

13           THE COURT:  Ms. Sharp, I am going to invite

14   you to be heard in a minute.

15           MR. LACHONA:  But the fact remains that there

16   is a motion before this Court.  It was filed and served

17   on Ms. Myers and Ms. Sharp.

18           THE COURT:  Yeah.  But she's also entitled to

19   a hearing on it.

20           MR. LACHONA:  Right.  And that's what today's

21   hearing is.

22           THE COURT:  Well, she's entitled to an

23   evidentiary hearing.

24           MR. LACHONA:  I'm --

25           THE COURT:  And we're not going to do that
```

Page 17

1  today.

2          Counsel, we are going to resolve this -- or
3  conclude this matter in about three minutes. And I
4  apologize for that. As I said, I have more than
5  20 cases to hear and 65 minutes in which to hear them.

6          MR. LACHONA: And to get to your point,
7  your Honor, about suspending the co-trustees, I
8  wholeheartedly ask the Court to do that. Because even
9  if there is agreement between me and Mr. Gravalec
10 regarding this matter, there is no guarantee that
11 Ms. Sharp is going to act or that Ms. Myers is going to
12 work with Ms. Sharp. Ms. Myers has proved again and
13 again and again that she's acting unilaterally.

14          There are multiple filings in this matter that
15 she is the only petitioner, yet Ms. Sharp is still a
16 co-trustee. I have not received any resignation form.
17 The 2017 trust is clear in that the co-trustees are only
18 allowed to act unilaterally or delegate for, quote,
19 "routine acts of administration."

20          Filing objections to invalidate a settlement
21 agreement, filing, quote, notice of submissions of trust
22 accountings and probate accountings by Ms. Myers alone
23 without her co-trustee, without her co-executor, is in
24 violation not only of the 2017 trust, but in violation
25 of the Probate Code where co-trustees have to act

Page 18

1  together.

2           THE COURT:  Well, and I would agree with you

3  on -- that the pleadings are probably -- the most recent

4  pleadings are probably subject to demurrer or motion to

5  strike.  But Ms. Myers has standing as a beneficiary, I

6  think, to raise exactly the same issues.  And so I

7  believe you're correct, Mr. Lachona.

8           But Ms. Sharp wanted to be heard, and I am

9  going to turn to her.

10          Ms. Sharp?

11          MS. SHARP:  I apologize, sir.

12          THE COURT:  No reason to apologize.

13          MS. SHARP:  My fear right now is Ronda

14  won't -- Myers -- agree to cash the savings bonds, so,

15  therefore, I have no counsel for the trust.  And this

16  lawyer that Rhonda has hired, she has made it clear that

17  I am not allowed to speak to that lawyer or to be

18  involved with that lawyer.

19          In fact, I have no money to front -- to front

20  it.  She states that I need to use my own funds and not

21  to cash the savings bonds.

22          So right now, the trust is completely at zero

23  and in the negative -- excuse me -- without the savings

24  bonds.  So therefore, I have no -- I have no say.  I

25  have no lawyer.  I'm unable to support --

Re the Ralph C. Struthers Revocable Trust
Civil Hearing,  on 03/14/2025

Page 20

1      So Ms. Sharp said that Ms. Myers has refused

2  to cash in certain savings bonds.  She doesn't -- and

3  has told her she cannot talk to you and that she has to

4  come up with her own resources to hire an attorney.

5      MR. GRAVALEC:  And, your Honor, we're going to

6  be changing those objections -- or we are going to be

7  addressing those objections.  I just ask the Court to

8  leave the status quo for the time.

9      THE COURT:  Thank you.

10      MS. MYERS:  Can I --

11      THE COURT:  No, thank you, Ms. Myers.

12      Matters are submitted.  This is the decision

13  of the Court.

14      I am not going to suspend the co-trustees

15  today.  The -- and, Ms. Myers, I see you're frustrated

16  and I'm sorry for that.  As you've heard me say several

17  times in this hearing, this is a law and motion matter.

18  You are represented by an attorney.  I simply don't have

19  the minutes, particularly because I am not going to

20  suspend you, to hear from both of you, and so I'm not

21  going to, and I regret that.

22      So the matters are continued to May 16th at

23  8:30 in this department.  The tentative ruling of the

24  Court is to suspend the co-trustees and appoint an

25  interim fiduciary.  Parties are ordered to meet and

Re the Ralph C. Struthers Revocable Trust
Civil Hearing,   on 03/14/2025

Page 21

1    confer and decide on a fiduciary in the event the Court

2    goes in that direction.  Failing that, the parties are

3    to bring with them a nomination of a fiduciary who has

4    consented to serve, and a copy of his or her curriculum

5    vitae.

6              We are done for today.  Matters are continued.

7              MR. LACHONA:  Your Honor, may I reserve the

8    May 16th hearing date for a motion to strike if I need

9    to file that?

10              THE COURT:  Yes.  It will be reserved.

11              MR. LACHONA:  Thank you.

12              THE COURT:  All right.  Thank you for your

13    appearances.

14

15                        *****

16

17

18

19

20

21

22

23

24

25

Re the Ralph C. Struthers Revocable Trust
Civil Hearing,  on 03/14/2025

Page 22

1    **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

2    **IN AND FOR THE COUNTY OF PLACER**

3    --oOo--

4                                    )
                                     )
5    In Re the Ralph C. Struthers    )   Case No. S-PR-0010014
     Revocable Trust,                )
6    _____     )   REPORTER'S
                                         TRANSCRIPT
7

8    STATE OF CALIFORNIA      )
                              )  ss
9    COUNTY OF PLACER         )

10

11        I, RUTH E. DIEDERICH, Certified Shorthand

12   Reporter of the State of California, do hereby certify

13   that the foregoing Pages ^ through ^ , inclusive,

14   comprises a true and correct transcript of the

15   proceedings had in the above-entitled matter held on ^ .

16        IN WITNESS WHEREOF, I have subscribed this

17   certificate at Roseville, California, on this 25th day

18   of March, 2025.

19   _____
     RUTH E. DIEDERICH, CSR
20   License No. 4952

21

22

23

24

25

# Exhibit C-2

EXHIBIT C-2 — Deposition of Belinda Connor (7/9/2024)

Used in: ¶¶29, 89, 145A, 184A; Counts 2, 3, 5, 7, 10, 13

Pins (examples): 10:3–5; 94:20–25; 95:1–12; 95:21–25; 96:1–6; 118:19–25; 121:6–8; 123:9–12; 134:7–25; 135:1–12; 142:1–12; 143:22–144:9; 72:14–23; 73:1–4

Proves: Florida residence; control/POA story; reliance on non-treating letters; "can't walk/speak" claims.

Why it matters: Party admissions; jurisdiction facts; elder-abuse narrative.

Constitutional hooks: 14A; Equal Protection (as-applied disparate treatment).

Damage bucket: Delay; costs; reputational harm.

# EXHIBIT C-2

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

LaRonda Myers, Plaintiff,

v. G. Kevin Lachona; Julie Hatridge; Belinda Connor; Carole (a/k/a Carol) Campbell; et al.,

Defendants.

Case No. 2:25-cv-1925-TLN-CSK (PS)

**EXHIBIT C-2** — Deposition of Belinda Connor (July 9, 2024)

Used in: ¶¶ 29, 89, 145A, 184A; Counts 2, 3, 5, 7, 10, 13.

Pages/lines (pin-cites):
• Florida residence/address: 4:4–11; 10:3–5.

• "Declared medically incapacitated"; Darlene's 7/7/2017 resignation at J. Dean Johnson's office; successor appointments: 94:20–25; 95:21–25; 96:1–6; 121:6–8.

• "Couldn't walk / couldn't speak" assertions about Ralph: 95:1–7.

• Non-treating Santa Maria office letters; not Auburn treating team: 134:7–25; 135:1–12; 142:1–12.

Summary: Sworn testimony confirming (1) Connor's Florida residency; (2) that on 7/7/2017

Darlene resigned at attorney J. Dean Johnson's office and Connor/Hatridge stepped in; (3) the

July 2017 "incapacity" letters came from Santa Maria office doctors (non-treating, no Auburn

exam); and (4) Connor claims Ralph could not walk or speak.

**Proves:**

• Personal-jurisdiction facts (purposeful direction into California proceedings despite out-of-state residence).

• The control shift on/after 7/7/2017 depended on non-treating "incapacity" paperwork.

• Capacity narrative used to block Ralph's access and to re-title/control assets contradicts treating-team records later cited elsewhere (J-1/J-3/L-1).

• Impeachment foundation for medical/functional claims ("couldn't walk/speak").

Why it matters: This sworn testimony links the **control change** to **non-treating letters,** supports **fraud/elder-abuse** theories tied to asset control, and backs the **procedural-due-process/access** narrative (use of protective tactics to avoid authentication and evidentiary testing). It also supports **personal jurisdiction** over Connor while showing coordination with in-forum actors.

**Counts supported:**

• Count 2 (Joint action / Due process; Access to courts).

• Count 3 (Financial elder abuse; concealment).

• Count 5 (Fraud; elder abuse; medical neglect).

• Count 7 (Trust alteration; concealment).

• Count 10 (Aiding/abetting; negligent supervision — context for supervision over counsel).

• Count 13 (Unlawful diversion advocacy / joint participation).

Constitutional hooks (how this exhibit fits):

• **Fourteenth Amendment — Procedural Due Process & Access to Courts (§1983):** shows the control shift relied on untested, non-treating letters while discovery/evidentiary access was later curtailed.

Myers v. Lachona, et al., No. 2:25-cv-1925-TLN-CSK (PS) — EXHIBIT C-2 — Connor Depo (7/9/2024)

• **First Amendment — Petition/Retaliation (§1983):** provides backdrop for the adverse actions after protected filings (used with K-1/K-2).

• **Equal Protection (as applied):** supports disparate, non-neutral handling when paired with calendaring/protective-order record.

(Statutory overlay: California Probate Code duties to inform/account; Welf. & Inst. Code § 15610.30.)

**Admissibility notes:**

• Party-opponent statements and admissions; impeachment by contradiction with treating-team records; relevance to motive, control, and authenticity chain; FRE 801(d)(2), 607–609, 401–403.

SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF PLACER

--oOo--

In the Matter of:          )
                           )
                           )
                           )
RALPH C. STRUTHERS         )
REVOCABLE TRUST UDT        )   CASE NO.:  SPR0010014
OCTOBER 22, 2017           )
                           )   **CERTIFIED COPY**
                           )
_____)


VIDEOCONFERENCE DEPOSITION OF

BELINDA CONNOR
_____

Tuesday, July 9, 2024




REPORTED BY:  KRISTEN D. ADAMSON, CSR 10474



**Scarpelli Court Reporting Service**
601 Commerce Drive, Suite 130
Roseville, CA 95678
(916) 412-0152

SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF PLACER

--oOo--

In the Matter of:                    )
                                     )
                                     )
                                     )
RALPH C. STRUTHERS                   )
REVOCABLE TRUST UDT                  )   CASE NO.:  SPR0010014
OCTOBER 22, 2017                     )
                                     )
                                     )   
                                     )
_____)

VIDEOCONFERENCE DEPOSITION OF

BELINDA CONNOR
_____

Tuesday, July 9, 2024

REPORTED BY:  KRISTEN D. ADAMSON, CSR 10474

In the Matter of: RALPH C. STRUTHERS REVOCABLE TRUST UDT
Connor, Belinda on 10/22/2017

**Page 2**

1  APPEARANCES
2
3  Representing LaRONDA MYERS and APRIL SHARP
   (appearing via Zoom videoconference):
4
5          Steven H. Cross, Esq.
           Law Office of Steven H. Cross
           1555 Botelho Drive, Suite 149
6          Walnut Creek, California 94596
           (925) 263-6687
7
8  Representing BELINDA CONNOR, JULIE HATRIDGE and
   CAROLE CAMPBELL (appearing via Zoom
9  videoconference):
10         G. Kevin Lachona, Esq.
           Lachona Law
11         2450 Venture Oaks Way, Suite 200
           Sacramento, California 95833
12         (916) 235-3095
13
   Also Present (appearing via Zoom teleconference):
14
           Julie Hatridge,
15         Carole Campbell
           LaRonda Myers
16
17
           --oOo--
18
19
20
21
22
23
24
25

**Page 3**

1          INDEX OF EXAMINATIONS
2                                      Page
3  By Mr. Cross                          4
4  By Mr. Lachona                      192
5  By Mr. Cross                        201
6
7          --oOo--
8
9          INDEX OF EXHIBITS
10 Letter         Description         Page
11 Exhibit A - Second Amended Notice of   16
              Deposition of Belinda Connor
12
   Exhibit B - Settlement Agreement       18
13
   Exhibit C - Objection to Petition for  55
14            Approval of Second Amended
              Accounting
15
   Exhibit D - Bank of America Advantage Savings  76
16            statement for March 19, 2020 to
              April 17, 2020
17
   Exhibit E - Amended Second Account of LaRonda  77
18            Myers and April Sharp, Successor
              Co-Trustees
19
   Exhibit F - Compilation of documents listed  115
20            as Exhibits 1 through 13
21
22         --oOo--
23
24
25

**Page 4**

1          BE IT REMEMBERED that pursuant to
2  notice, on Tuesday, July 9, 2024, commencing at the
3  hour of 10:07 a.m., thereof, via Zoom
4  videoconference at 3726 Malad Way, Tavares, Florida,
5  remotely appeared before me, Kristen D. Adamson, a
6  Certified Shorthand Reporter in and for the State of
7  California,
8          BELINDA CONNOR,
9  called as a witness herein in the above-entitled
10 action, and having been remotely duly sworn by the
11 Certified Shorthand Reporter to tell the truth, the
12 whole truth and nothing but the truth, testified,
13 via videoconference, under oath as follows:
14          --oOo--
15          EXAMINATION
16 BY MR. CROSS:
17     Q.  Good morning, Ms. Connor.  If I call you
18 Belinda, is that okay, or would you prefer
19 Ms. Connor?
20     A.  Just call me Belinda.  That's fine.
21     Q.  Okay.  Thank you.  I'm here today to take
22 your deposition in connection with an objection you
23 filed for accountings related to the Ralph Struthers
24 Revocable Trust, October 22, 2017.  If I call it the
25 Ralph trust or the 2017 trust, will you know what

**Page 5**

1  I'm talking about?
2     A.  Yes.
3     Q.  Okay.  Thank you.  And do you understand
4  that you've been placed under oath today?
5     A.  Yes.
6     Q.  And that even though we're on Zoom, that
7  carries with it the same force and effect as if we
8  were in a court of law?
9     A.  Yes.
10     Q.  Okay.  And you've agreed to tell the truth
11 under penalty of perjury?
12     A.  Yes.
13     Q.  I'm not here to try to trick you today.
14 So if you don't understand a question, please ask me
15 to clarify.  The transcript is going to show what we
16 said.  So if you answer a question, it will appear
17 as if you understood it.  So please feel free to ask
18 me to clarify at any time.  Some of my questions
19 will be terrible.  Okay?
20     A.  Okay.  Thanks.
21     Q.  Sure.  Have you had your deposition taken
22 before?
23     A.  I had a deposition about 50 years ago.
24     Q.  Okay.  And I imagine that wasn't related
25 to the trust?

In the Matter of: RALPH C. STRUTHERS REVOCABLE TRUST UDT
Connor, Belinda on 10/22/2017

**Page 6**

1  A. No, it was not.

2  Q. Okay. So you are doing a great job so

3  far. A couple ground rules: Please try to let me

4  finish, and I will do my best to let you finish so

5  that the court reporter doesn't have to type over

6  each other (sic). Your counsel also may make

7  objections here and there. Unless he instructs you

8  not to answer, I'm going to ask that you answer the

9  question after he's done objecting. And we'll do

10  our best to not cut each other off. Okay?

11  A. Okay.

12  Q. Thank you. Also, if you could, keep

13  saying yeses or nos, not uh-huh or shaking your

14  head, because that doesn't reflect well in the

15  transcript. Does that make sense?

16  A. Yes.

17  Q. And do you understand the difference

18  between an estimate and a guess?

19  A. Well, yeah. With an estimate I think you

20  know, pretty much, a good range. With a guess I

21  think you are just taking -- taking it off the top

22  of your head.

23  Q. Sure.

24  A. At least you have some figures to go with

25  with an estimate.

**Page 7**

1  Q. Sure. To establish the record, the

2  example attorneys often give is if I asked you the

3  length of my desk, you have no idea. So it would be

4  a guess. If I asked you the length of your desk at

5  home, you could give me an estimate. Does that make

6  sense?

7  A. Yes.

8  Q. Okay. Have you taken any medications

9  today that would affect your memory or ability to

10  testify?

11  A. No.

12  Q. Is there any reason you can think of why

13  we shouldn't proceed today with your deposition?

14  A. No.

15  Q. Have you reviewed any documents in

16  preparation for today's deposition?

17  A. I read some of the objections that we put

18  in. And I read -- what else did I read? I think

19  that was just about it; just the objections.

20  Q. And when you say objections we put in, do

21  you mean court filings; objections to the

22  accountings?

23  A. Yes, sir.

24  Q. Okay. And would that be the objections to

25  the second, third and fourth accountings?

**Page 8**

1  A. Yes.

2  Q. Have you reviewed any other documents?

3  A. No. I know I compiled some documents for

4  you. I didn't really have time to review them

5  today, though.

6  Q. Okay. So you're producing some documents

7  today?

8  A. I think so, yes.

9     MR. CROSS: Counsel, do I have those?

10     MR. LACHONA: No, not yet.

11     MR. CROSS: Oh, okay. So --

12     MR. LACHONA: We haven't managed to get

13  those over to you. So if you want me to send them

14  to you now, or when we -- when you want to go over

15  those, let me know.

16  BY MR. CROSS:

17  Q. Okay. Other than your attorney, have you

18  spoken to anyone about today's deposition?

19  A. Yes.

20  Q. And who have you spoken to?

21  A. I spoke to my sister, Carole; I spoke to

22  my co-trustee, Julie Hatridge; and I spoke to my

23  sister, Diana.

24  Q. And what did you and Carole talk about

25  regarding the deposition?

**Page 9**

1  A. She said, you're going to be fine;

2  everything is going to be okay. Basically it was

3  words of encouragement.

4  Q. I hope you are fine, and I hope everything

5  is going to be okay. And Julie, what did you two

6  talk about?

7  A. Pretty much the same thing. Everybody is

8  giving me words of encouragement.

9  Q. And you and Diana?

10  A. Diana prayed for me.

11  Q. Okay. Anyone else, other than your

12  attorney?

13  A. Besides my husband. But --

14  Q. And what did you and your husband talk

15  about?

16  A. Just, be strong; be brave. You know,

17  just --

18  Q. Okay --

19  A. -- just, basically, that sort of a thing.

20  Q. Okay. Anyone else?

21  A. No.

22  Q. Okay. And can you tell me your full name

23  for the record, please?

24  A. Yes. It's Belinda Lou Connor.

25  Q. How do you spell Lou?

In the Matter of: RALPH C. STRUTHERS REVOCABLE TRUST UDT
Connor, Belinda on 10/22/2017

Page 10

1     A.  L-o-u.
2     Q.  And what is your address?
3     A.  It's 3726 Malad Way.  That's in Tavares,
4  Florida.  It's 32778.
5     Q.  And you live with your husband?
6     A.  Yes.
7     Q.  Do you live with anyone else?
8     A.  No.
9     Q.  Do you have kids?
10    A.  Yes.
11    Q.  And what are their names?
12    A.  Jennifer Connor is my oldest.  Then I have
13 Tara Connor -- well, actually, they got married.  So
14 I need to change their names.  So it's Jennifer
15 Boosalis --
16    Q.  Mm-hmm.
17    A.  -- and Tara Powell, because she just got
18 married.  And then Zachary Connor is my youngest.
19    Q.  And what is the age range on these kids?
20    A.  Zach will be 35 this month; and it ranges
21 up to 43.
22    Q.  And are you currently working?
23    A.  No.
24    Q.  Are you retired?
25    A.  Yes.

Page 11

1     Q.  And when was your last job?
2     A.  Ten years ago.
3     Q.  And what was it?
4     A.  I was a merchandiser.
5     Q.  For whom?
6     A.  For Select Media Services.
7     Q.  And are you a trustee of any trust
8  currently?
9     A.  Yes.  I am the trustee of the 1993
10 Struthers Family Trust -- co-trustee.
11    Q.  Co-trustee.
12    A.  Mm-hmm.
13    Q.  And just for the record, what is your
14 mother's name?
15    A.  Her name is Irma.
16    Q.  And who is Darlene Struthers to you?
17    A.  She is my stepmother.
18    Q.  And where is Darlene living currently?
19    A.  She's living in Lancaster.
20    Q.  In a home, townhome, facility?
21    A.  She's living in a residential care home.
22    Q.  Do you know the name of it?
23    A.  Casa Amore.
24    Q.  Do you know the address, by chance?
25    A.  No.

Page 12

1     Q.  Okay.  And how long has she lived there?
2     A.  She's lived there since COVID.  So
3  probably -- I think it was June 2020 when we moved
4  her over there.
5     Q.  Okay.  And where did she move from?
6     A.  She moved from Mayflower.
7     Q.  What's Mayflower?
8     A.  Mayflower is, like, an adult residence.
9  It's just a bunch of apartments for older people, 55
10 plus.
11    Q.  Okay.  And what city is that in?
12    A.  That was in -- I think that was in Quartz
13 Hill.
14    Q.  Okay.  So from June 2020 prior, how long
15 did she live in that location?
16    A.  She lived in that location for only six
17 months.
18    Q.  Okay.  And before -- before that where was
19 she?
20    A.  She was at Prestige Assisted Living.
21    Q.  What was that called?
22    A.  It was called Prestige Assisted Living.
23    Q.  And what city is that in?
24    A.  Lancaster.
25    Q.  And how long did she live there?

Page 13

1     A.  She lived there from July 2017 until we
2  moved her over to Mayflower in January 2020.
3     Q.  And before prestige where did she live?
4     A.  She lived at her home with my father in
5  Santa Maria.
6     Q.  Okay.  And the first place she moved to
7  after her home was called Casa Amore?
8     A.  No.
9     Q.  What was it called?
10    A.  Casa -- after her home, no.  Casa Amore is
11 the place that she is residing right now.
12    Q.  Oh.  Excuse me.  Where was the first --
13 what was the name of the first place she went?
14    A.  After she left her home she moved to
15 Prestige Assisted Living.
16    Q.  Okay.  And so where was she for six
17 months?  I'm confused.  Oh, Mayflower?
18    A.  Yeah.
19    Q.  I can't read my own writing.  Okay.  And
20 do you know how much Prestige costs per month?
21    A.  Can you repeat that, please?
22    Q.  Do you know how much Prestige costs per
23 month?
24    A.  Oh, Prestige Assisted Living?  Well, we
25 started out low, and we went high.  So we started

In the Matter of: RALPH C. STRUTHERS REVOCABLE TRUST UDT
Connor, Belinda on 10/22/2017

Page 14

1   out with, I think, $2,800.  But that's just a guess,
2   because it's been a while since she's been there.
3   And then as the -- as the months went on, they had
4   price ranges that went up, like, every six months.
5       Q.  That figure you gave me you said was a
6   guess.  Is it a guess or an estimate?  I don't want
7   you to guess.
8       A.  Oh, goodness.  Okay.  Then it's a -- it's
9   a guess, because I don't remember.
10      Q.  Okay.  Can you estimate a range for me?
11      A.  I could.  It was --
12      Q.  What do you think it was, approximately?
13      A.  I believe it was around, like, $2,800, in
14  that price range.
15      Q.  And then approximately how much did it go
16  up to at the highest?
17      A.  At the highest, just before she left, it
18  was getting -- it was like $3,600.  But that is a
19  guess, too.
20      Q.  Well --
21      A.  But I have -- I have accounting that has
22  that information in it.  But off the top of my head
23  I don't know it anymore.
24      Q.  Okay.  You think it was approximately
25  $3,600, or no idea?

Page 15

1       A.  I think it was 36- to 37-.
2       Q.  Okay.  And how much did Mayflower cost per
3   month?
4       A.  Mayflower was only $900 a month.
5       Q.  And Casa Amore, how much?
6       A.  Casa Amore also changed prices as well.
7   When she first started living there it was 2,000 --
8   oh, I'm guessing again.  Sorry -- like, $2,500.  And
9   then now it's $3,900.
10      Q.  Okay.  Are those exact figures or
11  approximations?
12      A.  Those would be approximations, because I
13  don't have that in front of me to refer to.  I know
14  the last figure, though.  I know what -- I know what
15  it is right now.  So it is $3,900.  That's a firm
16  answer.
17      Q.  Okay.  And is her trust, the 1993 trust,
18  funding this litigation currently?
19      A.  We are --
20          MR. LACHONA:  Objection.  Calls for
21  attorney/client privilege.
22          MR. CROSS:  Are you instructing her not to
23  answer?
24          MR. LACHONA:  Well, what exactly are you
25  looking for?  Maybe you can rephrase the question.

Page 16

1           MR. CROSS:  Well, it's not a communication
2   between attorney/client.  I'm asking who's paying
3   the fees for this litigation.
4           MR. LACHONA:  Can you rephrase, though?
5   BY MR. CROSS:
6       Q.  Who is paying the fees for this
7   litigation?  Belinda?
8       A.  Oh, you're asking me?  I can answer?
9       Q.  Yes.  Yes.
10      A.  Oh.  Me and Carole are paying some of it.
11  And Darlene -- the '93 trust is paying some of it as
12  well.
13      Q.  I want to show you a document.  Let's see.
14          (Whereupon, Exhibit A was introduced and
15          later marked as an exhibit to the
16          deposition.)
17  BY MR. CROSS:
18      Q.  Hopefully you see what says, Documents to
19  be Produced.  Do you see that on your screen?
20      A.  Yes.
21      Q.  Okay.  Have you seen this document before?
22      A.  To all parties --
23      Q.  It's a notice of deposition.
24      A.  I haven't seen it recent- -- I don't -- I
25  don't know if I've seen this or not.

Page 17

1       Q.  Okay.  And that's fine.  So there's a
2   couple categories that were sought from this notice.
3   Are you producing documents that you believe relate
4   to funds or assets that were improperly handled by
5   the co-trustees in this matter?
6       A.  I believe that is probably all in my
7   discovery.  And you already have that from
8   discovery.
9       Q.  Well, what I mean is today, what you're --
10  I believe you said you are producing some documents
11  today.
12      A.  Mm-hmm.
13      Q.  What are you producing?
14      A.  I'm producing a few text messages and some
15  conversa- -- or some emails to Attorney Gravelak in
16  San Diego.
17      Q.  Okay.  Are you aware that the document
18  production is supposed to happen three days before
19  the deposition?
20      A.  I don't know anything about that.  Sorry.
21      Q.  Okay.  Is that all that you're producing,
22  the things you just described, or is there anything
23  else?
24      A.  I -- I don't know.
25      Q.  Okay.  Have you given your attorney all of

In the Matter of: RALPH C. STRUTHERS REVOCABLE TRUST UDT
Connor, Belinda on 10/22/2017

Page 18

1  the documents that you think relate to improper
2  handling of the current trust, the 2017 trust?
3       A.  I believe that we have through the
4  discovery.
5       Q.  And have you given your attorney any
6  documents related to the creation of the 2017 trust?
7       A.  I don't -- I wasn't there when it was
8  created.  So I don't have a lot of knowledge of
9  that.  But I do have text messages that told me that
10  there was --
11       Q.  But, basically, without -- sure.  Thank
12  you.  Without telling me what they are, I just want
13  to know, have you turned over everything that you
14  think is related to this litigation to your
15  attorney --
16       A.  Yes.
17       Q.  -- so he could make the decisions?  Yes?
18       A.  Yes.
19       Q.  Okay.  Thank you.  Do you recall being a
20  part of a settlement agreement related to the 2017
21  and the 1993 trusts?
22       A.  Yes.
23            (Whereupon, Exhibit B was introduced and
24            later marked as an exhibit to the
25            deposition.)

Page 19

1  BY MR. CROSS:
2       Q.  Okay.  Can you see something called
3  Settlement Agreement in front of you?
4       A.  Yes.
5       Q.  Does this look like the settlement
6  agreement you reached related to the trust?
7       A.  Yes.  Would you mind if I -- I have that
8  in the other room.  Would you mind if I actually
9  look at it?
10       Q.  Sure.  Yeah, go grab it.  That's fine.
11       A.  Okay.  Because it's very hard to see on my
12  phone.
13       Q.  Sure.
14       A.  I'll be right back.
15            MR. CROSS:  Okay.  We can go off the
16  record.
17            (Brief pause.)
18            MR. CROSS:  Okay.  On the record.
19       Q.  On page 14 do you see -- I think it's --
20  it might be the fourth page 14.  So it's actually
21  page 17.  But it's titled 14 at the bottom.  Do you
22  see your signature on that page?
23       A.  Oh, is this the settlement agreement --
24  this isn't the L.A. case settlement agreement.
25  You've got something else going on here.  Can I --

Page 20

1  oh, this is from the settlement agreement -- we've
2  had two settlement agreements with the -- with the
3  '17 trust.
4       Q.  Right.
5       A.  This is the second settlement agreement.
6  So I've got -- I have to go get that.
7       Q.  Okay.
8       A.  Hang on.
9       Q.  No worries.
10            (Brief pause.)
11            THE WITNESS:  Okay.  What page?
12  BY MR. CROSS:
13       Q.  Okay.  If you will, the third or fourth
14  page 14.  I believe that's your signature.  I just
15  want to confirm that that's your signature from
16  12/10/19.
17       A.  That's correct.
18       Q.  Okay.  And after the settlement agreement
19  was reached, do you know how much the 2017 trust was
20  owed based on this agreement?
21       A.  Yes.  We owed them $20,864.
22       Q.  Okay.  And do you believe that total
23  amount was paid?
24       A.  Yes.
25       Q.  And when was it paid?

Page 21

1       A.  It was paid with bonds.  So we actually
2  had a refund of $100, because we overpaid by $100.
3       Q.  Okay.  So as -- or not as -- but in order
4  to get that $20,864 -- I'm just going to ask you
5  some questions, and I would just like you to tell me
6  if what I'm asking you about is included in that
7  figure.  Does that make sense?
8       A.  Yes.
9       Q.  Okay.  Subsection -- excuse me.
10  Section 11(a), $8,388.23 to Ronda as an individual,
11  is that -- is that included in that $20,000 figure?
12       A.  Yes, it is.
13       Q.  Okay.  Section (b), the $6,607, is that
14  included in that figure?
15       A.  Yes.
16       Q.  Okay.  And the (b)(ii), the $4,535.24, is
17  that included in that figure?
18       A.  No, it is not.
19       Q.  But the $11,983.47 is?
20       A.  Yes.
21       Q.  And this payment under (iv), $521, is that
22  included in the $20,000 payment --
23       A.  Yes.
24       Q.  -- figure?
25       A.  Yes.

In the Matter of: RALPH C. STRUTHERS REVOCABLE TRUST UDT
Connor, Belinda on 10/22/2017

Page 22

1    Q.  And Section 12, the $6,635.32, is that
2    included -- is that a part of the figure?
3        A.  That was -- so there was a bit -- there
4    was a total figure, and then we subtracted that from
5    the total figure.  So that -- the figure that you
6    are referring to, the $20,864, that was the netted
7    after we subtracted what we -- what she owed us.  So
8    instead of exchanging checks back and forth, we --
9    we did a -- everything was done on paper.  And after
10   we subtracted what she owed us, then the amount that
11   was left over was $20,864 with her refunding us
12   $100.  Because the bonds that we gave Ronda were
13   worth -- I should say the 2017 trust, not Ronda --
14   those were worth $20,964.
15       Q.  So to put it differently -- and correct me
16   if I'm wrong -- Section 12(i) regarding $6,635.32 is
17   considered in that $20,000 figure, but just as a
18   negative?
19       A.  It's our -- that figure that I gave you
20   originally has already been -- it has already
21   been -- it's already been subtracted from.  So what
22   is left is $20,864.
23       Q.  Right.
24       A.  Because if you wanted to add -- if you
25   wanted to add the totals all together and come up

Page 23

1    with a big number before you subtract what Ronda
2    owed us --
3        Q.  That's okay.  Let me --
4        A.  -- then my --
5        Q.  Let me -- let me rephrase the question.
6            So just to be clear, when you arrive at
7    the $20,000 figure you gave me, that's after
8    subtracting from the -- you know, the total amount,
9    $6,635.32 --
10       A.  Correct.
11       Q.  -- correct?  Okay.
12       A.  Correct.
13       Q.  Thank you.  And Section 14 regarding
14   $8,388.23, is that considered a part of the $20,000?
15       A.  That's how much -- yeah.  So if you take
16   -- that $12,476.21, if you put that on paper and you
17   add that with the amount of money that gets owed to
18   Ronda, you come up with the amount of money that we
19   owed in total.  So if you do $12,476- --
20       Q.  No.  I believe you.  I believe you.
21       A.  Okay.  I'm just trying to help you.
22       Q.  I'm not -- thank you.  I won't force you
23   to do math.  I'm just referring to the record.
24       A.  Okay.
25       Q.  So if you take the amount owed to the

Page 24

1    trust and add to it $8,388.23 going to Ronda, you
2    get the $20,000 figure; is that correct?
3        A.  Perfect.
4        Q.  Okay.  What is the status of subsection --
5    Section 15(b), burial plots above Kay's burial plot;
6    do you know?
7        A.  What is the status?
8        Q.  Correct.
9        A.  What does that mean?
10       Q.  Have they been sold?  Have proceeds been
11   shared?
12       A.  So we -- the trust together -- well,
13   actually, it wasn't together.  When they -- well,
14   when we were a whole trust, LaRonda bought some
15   plots.  She was only supposed to buy one, but she
16   bought two on top of each other, and charged it to
17   the 1993 trust.  And she still has those plots in
18   her name.  They were not paid for by Ronda.  They
19   were paid for by the trust.  And they were
20   originally in her original inventory and appraisal.
21   But she took them out and -- she took them out of
22   the inventory and appraisal, and then put the plots
23   that Darlene owned down in Sylmar in their place.
24           So the status of her plots that she bought
25   for Kay and somebody else, I have no idea, because I

Page 25

1    don't speak with Ronda.
2        Q.  Okay.  Based on this agreement, the plots
3    considered under subsection (b), the 2017 trust is
4    supposed to receive half of the sale of those; is
5    that correct?
6        A.  They don't have to sell them.  They can
7    keep them, or give them away, or give them to a
8    family member.  If they get money for it, then they
9    have to share the proceeds with the 1993 trust.
10       Q.  But if it's sold, the 2017 trust is
11   entitled to half, correct?
12       A.  Correct.
13       Q.  Okay.  Thank you.  And can I just call
14   those the L.A. plots?
15       A.  The original -- the ones you asked me
16   about first were the San Jose plots.
17       Q.  Okay.  And what is the status of the L.A.
18   plots?
19       A.  The L.A. plots?  We have my dad's memory
20   stone on one of them.
21       Q.  Okay.  And if that is -- well, what is
22   your understanding as to what the 2017 trust has
23   received from the 1993 trust?
24       A.  What is --
25           MR. IACHONA:  Objection.  Vague.

In the Matter of: RALPH C. STRUTHERS REVOCABLE TRUST UDT
Connor, Belinda on 10/22/2017

Page 26

1          THE WITNESS:  Mm-hmm.
2    BY MR. CROSS:
3          Q.  Do you have a dollar figure that you
4    believe the 1993 trust has given to the 2017 trust?
5          A.  For what?
6          Q.  Based on the settlement agreement.
7          A.  I'm sorry.  You lost me.
8          Q.  So we've gone through some things that --
9    you arrived at $20,000, which includes money to the
10   trust and to Ronda.  I'm asking, has all of the
11   money that is supposed to go to the trust gone to
12   the trust, the 2017 trust?
13         A.  From the 1993?  Yes.
14         Q.  Okay.  And do you believe that -- who do
15   you believe owns the L.A. plots?
16         A.  Darlene does; Darlene, my stepmom.
17         Q.  So would that mean that you believe it
18   belongs to the 1993 trust or --
19         A.  Yes.
20         Q.  -- Darlene?
21         A.  Well, Darlene is -- she has rights of
22   survivorship, because she survived my father.  So
23   she owns them.  And, in turn, they belong in the
24   trust --
25         Q.  Okay.

Page 27

1          A.  -- the 1993 trust.
2          Q.  And who purchased those plots -- or that
3    plot?
4          A.  My -- my dad bought those two plots, I
5    believe, in 2002.
6          Q.  When you say your dad, you mean your
7    biological father?
8          A.  Yes.  Ralph Struthers.
9          Q.  And just going through other things that
10   are owed to the 2017 trust based on this agreement,
11   Section 15(c) says that the -- Ralph's wedding ring
12   will be transferred to Ronda and April as trustees,
13   correct?
14         A.  Yes.
15         Q.  Okay.  And there is a safe also at issue
16   that should be transferred to Ronda and April as
17   trustees of Ralph's trust, correct?
18         A.  Correct.
19         Q.  How many safes are you aware of that
20   Darlene or Ralph own?
21         A.  I was only aware of one.  But I may --
22         Q.  And -- go ahead.
23         A.  I was only aware of one at the time when I
24   became a trustee -- a successor co-trustee.
25         Q.  Do you believe that there were more than

Page 28

1    one?
2          A.  I've been told by Ronda that there was
3    more than one.
4          Q.  But have you ever seen a second one?
5          A.  Never.  I didn't know it existed.
6          Q.  Okay.  So the one safe that you are aware
7    of, about how big was it?
8          A.  It was probably, like -- like, twelve by
9    twelve.  It wasn't that big, honestly.  It might
10   have been -- maybe it was -- I don't re- -- I don't
11   know.  I'm not good with figures like that.
12   Maybe -- from here to here (indicating).  Maybe,
13   like --
14         Q.  I can't see.
15         A.  No.  I'm doing it for myself.
16         Q.  Okay.
17         A.  Probably about -- maybe it was three feet
18   by three feet.  I don't know.
19         Q.  Okay.  If you are standing next to it,
20   it's below your knee?
21         A.  Hang on.  Probably at my knee.
22         Q.  Okay.  And lengthwise, is it about the
23   length of your elbow to your fingertips or --
24         A.  It would be -- yeah, that sounds right.
25         Q.  Okay.  Are you looking at it right now, or

Page 29

1    how are you making --
2          A.  No.
3          Q.  -- this determination?
4          A.  I was looking at my arm, like this, and
5    saying, yeah, it was about that wide, from my elbow
6    to my fingertips.
7          Q.  Where do you believe that safe to be
8    currently?
9          A.  I have no idea.
10         Q.  And how much cash was in the safe?
11         A.  None.  Zero.
12             MR. LACHONA:  Objection.  Assumes facts.
13   BY MR. CROSS:
14         Q.  And do you have any information regarding
15   a hidden safe in the floor of Ronda -- excuse me --
16   of Darlene and Ralph's home?
17         A.  I only heard about that through Ronda,
18   who, I guess, heard about it first.  And then she
19   didn't tell us about the safe for another eight
20   months.  So she found out about it from her real
21   estate agent, apparently.  And nobody bothered to
22   contact us, the '93 trust, that there was a safe in
23   the floor.
24             And then I got word of it in the summer of
25   -- I don't even remember when -- whenever she -- I

In the Matter of: RALPH C. STRUTHERS REVOCABLE TRUST UDT
Connor, Belinda on 10/22/2017

Page 30

1  don't remember when it was, what year it was. But
2  she told me that there was, and that I knew about
3  it. And I told her I don't know about it. Even
4  the people that we hired to go in and clean the
5  condo didn't see it. So it was that well hidden.
6       My father never told me there was a
7  safe -- another safe at the house. He only told me
8  about the safe in the office, in the closet.
9       Q.  When Ralph -- you said father. You mean
10 Ralph or your biological father?
11      A.  Ralph is my biological father.
12      Q.  Oh, of course. Yes.
13      A.  He's the only father I have.
14      Q.  Thank you. Sorry. And do you have any
15 understanding as to what was in that safe, if it
16 existed?
17      A.  None. I didn't know anything about it.
18      Q.  Okay. Did you remodel your kitchen?
19      A.  Like, about -- I don't know how long ago.
20 Yes, I did. I lived in my house for 36 years. So I
21 did remodel at one point.
22      Q.  And so based on your testimony, you would
23 say that you didn't remodel it with cash from the
24 safe, correct?
25      A.  Correct.

Page 31

1       MR. LACHONA:  Objection. Assumes facts
2  not in evidence.
3  BY MR. CROSS:
4       Q.  Okay. We talked about how much the trust
5  was owed based on that settlement agreement. What
6  is the total amount that you believe was owed to
7  Ronda individually?
8       A.  $8,388.23.
9       Q.  And how much did she receive?
10      A.  She got that total, and it was combined
11 with the total of the two bonds. So she was
12 supposed to cash the bonds and take the money from
13 those bonds to get her money.
14      Q.  And how much were you, Julie and Darlene,
15 as related to the 1993 trust, owed from the 2017
16 trust?
17      A.  $6,635- -- I don't really know. I've got
18 it right here. Sorry. I'll tell you.
19      (Brief pause.)
20      THE WITNESS:  $6,635.32.
21 BY MR. CROSS:
22      Q.  And also $100 for the --
23      A.  Oh, yes. Yeah, the leftover from the
24 bond.
25      Q.  Any other -- any other amounts?

Page 32

1       A.  No, sir.
2       Q.  Okay. And what, if anything, have you,
3  Carole -- anyone received from the 19- -- to the
4  1993 trust?
5       A.  What have we received?
6       MR. LACHONA:  Objection. Vague.
7  BY MR. CROSS:
8       Q.  What have any of the trustees received
9  related to the $6,635 and the $100, if anything?
10      A.  No. Those figures were all added together
11 and subtracted. So that -- nobody received that,
12 no. It was -- it was just done on paper, the net
13 proceeds.
14      Q.  Right. So there wouldn't be an actual
15 check or cash paid because it's all part of the
16 calculation, correct?
17      A.  Correct.
18      Q.  But did you receive a $100 bill related to
19 this section?
20      A.  We received a check from Shuttleworth for
21 $100.
22      Q.  And do you believe that's related to the
23 payment we just talked about in that section?
24      A.  Yes.
25      Q.  Okay. So you did receive some money

Page 33

1  related to that, and it was $100?
2       A.  Correct.
3       Q.  Okay. Any other money that you've
4  received related to any part of the settlement
5  agreement that you are aware of?
6       A.  No.
7       Q.  And by you I mean the 1993 trust. You
8  understand that, right?
9       A.  Thank you. Yes.
10      Q.  Is that what you were answering for when I
11 asked that question or --
12      A.  You know what? I -- I wasn't really sure
13 what -- what you were asking. So --
14      Q.  Sure. Let me just ask it correctly.
15      Has the 1993 trust received anything other
16 than the $100 we just discussed from the 2017 trust?
17      A.  Besides -- the only other things that
18 we've received from the trust were -- we had to
19 share, like, expenses; like water bills and
20 land/property owner association fees. And before we
21 sold the condo, we had to share the utilities on
22 that as well. And --
23      Q.  But --
24      A.  -- so we still did some.
25      Q.  But -- not talking about expenses, but

In the Matter of: RALPH C. STRUTHERS REVOCABLE TRUST UDT
Connor, Belinda on 10/22/2017

Page 34

1  money received. We have covered all of the money
2  received from the 2017 trust to the 1993 trust,
3  correct?
4      A.  In the settlement agreement that was taken
5  care of.
6      Q.  Okay. But I just want to confirm that the
7  1993 trust hasn't received any money from the 2017
8  trust other than that 100 bucks?
9      A.  Well, that's not necessarily true.
10 Because, like I said, we -- we shared money back and
11 forth for bills. So the 199- --
12     Q.  Right.
13     A.  The 20- -- the 1993 trust shared funds.
14     Q.  Other than for expenses --
15     A.  Okay.
16     Q.  -- based on the settlement agreement, was
17 there any other amounts received?
18     A.  No.
19     Q.  Okay. And who is Carole Campbell in
20 relation to you?
21     A.  She is my sister.
22     Q.  And what's her relation to Darlene?
23     A.  She is our stepmother.
24     Q.  And is she a beneficiary to the 2017
25 trust?

Page 35

1      A.  Yes.
2      Q.  And who is Julie Hatridge to you?
3      A.  She is the niece of my stepmother.
4      Q.  Okay. Darlene?
5      A.  Yes.
6      Q.  Okay. So who is her mother and father in
7  this relationship? Who is related to Darlene, her
8  mother or her father?
9      A.  Her mother.
10     Q.  Okay. Is she a beneficiary to the 2017
11 trust, as far as you are aware?
12     A.  No.
13     Q.  I want to show you the settlement
14 agreement one more time, if I can find it.
15         (Brief pause.)
16         MR. CROSS: I meant to ask when we were
17 here.
18     Q.  Is that Darlene's signature that you see
19 there --
20     A.  Yes.
21     Q.  -- two spaces below yours?
22     A.  Yes.
23     Q.  And do you remember seeing her sign this?
24     A.  Yes.
25     Q.  And then the next page, it looks like

Page 36

1  Julie's signature. Does that look like what you
2  recall as being Julie's signature?
3      A.  Yes.
4      Q.  Okay. I want to go to page 12, number 36.
5  Do you see where the agreement says that the parties
6  agree that this agreement is binding on each other's
7  successors, heirs, assigns, beneficiaries,
8  executors, administrators and trustees --
9      A.  Yes.
10     Q.  -- number 36?
11     A.  Mm-hmm.
12     Q.  And then on page 10, very long
13 paragraph 26, do you see that?
14     A.  26?
15     Q.  Yeah. Mutual Release.
16     A.  Okay. I see it, yes.
17     Q.  Do you mind reading it over really quick?
18 And let me know when you're done.
19         (Brief pause.)
20         THE WITNESS: Okay. I read it.
21 BY MR. CROSS:
22     Q.  Okay. So do you agree that it says that
23 the parties mutually release each other and each
24 other's successors, heirs, assigns, agents,
25 predecessors and all other persons acting in concert

Page 37

1  with any of them?
2      A.  Yes.
3      Q.  And do you see the release says, quote,
4  all other persons -- persons from, quote, any and
5  all claims, actions, suits, obligations, promises,
6  acts, et cetera?
7      A.  Mm-hmm, I see that.
8      Q.  Which arise out of the subject matter of
9  this agreement?
10     A.  Mm-hmm.
11     Q.  And do you see that the release includes
12 any actions or inactions of any party in any
13 capacity in regards to the administration of the
14 respective trusts?
15     A.  Mm-hmm.
16     Q.  And you signed this agreement, correct?
17     A.  Correct.
18     Q.  And then after that you filed this action,
19 correct?
20         MR. LACHONA: Objection. Vague.
21 BY MR. CROSS:
22     Q.  At some point in time after signing this
23 the objection to the current accounting was filed by
24 you, correct?
25     A.  I -- I believe that I still had rights as

a beneficiary to see the accounting from Ronda. It wasn't supposed to be any kind of an action. It was supposed to be something that was done civilly between a trustee and their beneficiaries. We asked Ronda for accounting, and for bank statements, or any kind of supporting documentation, and we did that in 2021 before we filed anything. We just wanted to know that she was using the money properly, and we wanted an accounting.

And me as a beneficiary, and Carole as a beneficiary, and most of the people in my family, believed that Ronda should share documents and accounting with her beneficiaries, if we asked. We did ask. We were ignored. So we went to court to compel her to give us the accounting and the documents. It took three hearings for Ronda to come up with the accounting and receipts. She refused to do it.

So it shouldn't have had to have been that way. It should have just been, okay, I'll get that to you. But it didn't work that way. She had to be compelled to do it --

**Q. So I appreciate --**

A. -- by a judge.

**Q. I appreciate that information.**

MR. CROSS: But, Court Reporter, could you read my last question back, please?

THE REPORTER: Sure.

(Record read.)

MR. CROSS: Okay. Let me ask it differently.

**Q. At some point in time after signing that agreement you filed the objections that we're talking about today in this litigation, correct?**

A. Correct.

**Q. And you mentioned Carole and yourself as beneficiaries. What role do you see as being -- as being Julie's role in this?**

A. Julie, the reason why she has a role in this, and, actually, I also have a role in it as a trustee -- a co-trustee of the 1993 trust, Ronda, in her accounting that she finally did share with us, claimed ownership of an amount of money that we had already paid her through the settlement agreement with the two bonds. So basically she was trying to force us to pay her again when she already got the two bonds.

And then also she decided that she wanted the plot that was owned by Darlene as a -- as she and -- she was the sole survivor after my dad passed

away. So that grave site that was left, one was for my dad, and one was for Darlene. And we used dad's for his memory stone so we could have a funeral for him. And we still have Darlene's. But I think I went --

**Q. So did Ralph leave Darlene as his sole survivor, as you put it, in his trust?**

A. They have -- I'm talking about the deed to the -- to the cemetery plots right there. There was a deed to the cemetery plots. And in the deed it said that Darlene has full rights to survivorship for the cemetery plots.

**Q. Okay. Do you believe that that is or is not reflected in the 2017 trust?**

MR. LACHONA: Objection. (Inaudible.) Can you rephrase?

THE REPORTER: I'm sorry. What was the objection?

MR. LACHONA: Vague and ambiguous.

BY MR. CROSS:

**Q. Well, you said it says on the deed?**

A. Mm-hmm.

**Q. Is that reflected or discussed in any manner in the 2017 trust?**

A. The deed is not discussed in the trust.

It's just -- it was actually an agreement between the parties. Because the 199- -- the 2017 trust had a cemetery plot that had two spaces. And the -- and the 1993 had another cemetery plot down in L.A. -- or at Sylmar that had two spaces that my dad and Darlene bought together.

The one that Ronda bought, because it had two spaces, we wanted to have something in the settlement agreement saying if she sold this and got money for it, it would have to go to the beneficiaries. It couldn't just go to Ronda, because she didn't buy it. And then --

**Q. Okay.**

A. Am I going on?

**Q. I'm sorry. Just for the purposes of our discussion, can you describe the plots; like, one is this plot; and the other is this plot?**

A. Okay. You mean, like, San Jose and Sylmar; is that what you're referring to?

**Q. Sure. San Jose and what?**

A. Sylmar.

**Q. Okay. And so which -- based on your characterization where you said, someone bought this one, and someone bought that one, how would you describe the San Jose plot? Who bought it? Where**

Page 42

1  should it be? Who gets it?
2       A. Okay. The San Jose plot was bought --
3  Ronda went out and bought everything for Kay's
4  funeral, the plot, and she bought a coffin, and she
5  bought services at Chapel of the Flowers. And there
6  was another -- and then she bought a party
7  afterwards, after the funeral. And then she gave
8  the bill to Darlene.
9       Q. Okay. And so who currently possesses the
10 San Jose plot?
11      A. She never put -- it was in the inventory
12 and appraisal back in 2020. Her first -- original
13 inventory and appraisal, she had that included in
14 her documents. She removed that in 2022, I believe,
15 and decided that she was going to keep that for
16 herself, even though it is a trust-owned property
17 because the trust paid her back.
18      Q. So do you believe the 2017 trust owes
19 it -- owns it? Excuse me.
20      A. I believe the 2017 owes it -- owns it,
21 only because we have a settlement agreement saying
22 it, and it's just -- yes.
23      Q. And who owns the other plot, the Sylmar
24 plot?
25      A. The Sylmar plot is owned by Darlene --

Page 43

1       Q. Okay.
2       A. -- and the 1993, because all of her assets
3  are a part of that as well.
4       Q. So is it your opinion that the Sylmar plot
5  is owned by Darlene individually and as a part of
6  the 1993 trust?
7       A. Yeah. Because if anything happens to
8  Darlene, then, of course, the 1993 trust would be
9  the one that owns it.
10      Q. And if that plot is sold, do you believe
11 any money goes to the 2017 trust?
12      A. Yes. It should be shared 50/50 between
13 the trusts.
14      Q. And if the San Jose plot is sold, where
15 does that money go, according to you?
16      A. It should be shared between the 2017 trust
17 and the 1993 trust.
18      Q. Okay. And when was this -- the settlement
19 agreement that we talked about earlier -- well,
20 would you agree it was signed in 2019?
21      A. It was signed in 2019, yes.
22      Q. And that would be December 10, 2019; does
23 that sound right?
24      A. If that's what all of the signatures say.
25 Some of them say the 12th, yeah.

Page 44

1       Q. Okay. And when do you believe you first
2  received an accounting related to the 2017 trust?
3       A. The first time we received an accounting
4  was -- was because we got a court order for Ronda --
5  well, it was a settlement agreement, actually. It
6  wasn't a court order.
7          So we had a settle- -- we had a settlement
8  agreement between the 2017 trust and the 1993 trust.
9  And in the settlement agreement she was to -- if we
10 dropped the case against her, she was to give us an
11 accounting and pay for her own lawyer as an
12 individual. And that was our agreement.
13      Q. So to, kind of, incapsulate what happened,
14 you wanted documents and accountings done --
15      A. Mm-hmm.
16      Q. -- you filed something; you reached an
17 agreement; and then an accounting was produced?
18      A. Correct. It was called a stipulated
19 accounting -- first accounting.
20      Q. Okay. And so are you under the impression
21 that April or Ronda have done something nefarious
22 with regard to the trust?
23      A. I don't know --
24          MR. LACHONA: Objection. Which --
25          THE WITNESS: -- really what you mean by

Page 45

1  nefarious.
2          MR. LACHONA: Which trust are you talking
3  about?
4          MR. CROSS: The 2017 trust administration.
5          THE WITNESS: Only because she started
6  claiming that the two bonds were hers as an
7  individual. So I think that -- I don't know if we'd
8  call it nefarious. That's your word. But it's not
9  proper.
10 BY MR. CROSS:
11      Q. Okay. Do you believe that either of them
12 are intentionally misleading the beneficiaries?
13      A. I believe that they really don't have any
14 communication with the beneficiaries; and nobody
15 really knows what they're doing.
16      Q. Okay. So the issue revolves around the
17 bonds, right?
18      A. That's the biggest issue. There are other
19 issues.
20      Q. Okay. So of all of the issues you have
21 with their administration, do you believe things to
22 be incorrect, or do you believe them to be
23 intentionally incorrect?
24      A. I -- I -- I don't really know.
25          MR. LACHONA: Objection. Calls

Page 46

1   (inaudible) --

2          THE REPORTER:  I'm sorry, Kevin.  I didn't

3   hear your objection.

4          MR. LACHONA:  Objection.  Calls -- calls

5   for a legal conclusion.

6          THE REPORTER:  Thank you.

7   BY MR. CROSS:

8      Q.  Do you believe that April and Ronda are

9   trying their best?

10     A.  No.

11     Q.  And why not?

12     A.  Because they won't communicate with

13  anybody.

14     Q.  So a lack of communication.  Any other

15  reasons?

16     A.  They aren't distributing a trust.  After

17  five years of being -- having that responsibility,

18  they haven't.  After the last lot was sold in

19  June 2021, there was absolutely no reason for her to

20  hold onto the money any longer.  Yet, she has, and

21  doubled down on asking for money to be paid to the

22  2017 trust again, after we have given her two bonds

23  that, I might add, are now worth $28,000,

24  approximately, instead of the $20,864 from before.

25          So I think -- I think for her to claim

Page 47

1   these bonds as her own is a violation of her duty to

2   her beneficiaries.  Because those two bonds are

3   sacred.  They came from us, and they were supposed

4   to be given to the 2017 trust with only $8,388.23

5   given to Ronda out of that amount of money.  So now

6   she has two bonds that are now worth $28,000 with --

7   approximately, with the interest that has accrued

8   since we have given it to her, and I think that's

9   improper as a trustee.

10     Q.  Okay.  So is it accurate that you view

11  this litigation as being based on a disagreement or

12  a misunderstanding as to the contents of the

13  settlement agreement?

14     A.  I think Ronda does not understand the

15  settlement agreement, correct.

16     Q.  Okay.

17     A.  She needs somebody to read it to her and

18  help her understand it.

19     Q.  So you don't think it's part of some plan

20  to intentionally take more than they're owed,

21  correct?

22     A.  I sure hope not.  But I don't -- I

23  don't -- I don't really know.  I know -- I don't

24  know.  I honestly don't know.

25     Q.  Okay.  And you filed a petition to remove

Page 48

1   the trustees, meaning Ronda and April, for breach of

2   fiduciary duty, correct?

3      A.  Correct.

4      Q.  Okay.  And do you recall what that

5   petition was based on, what the breach was?

6      A.  She's -- she wasn't giving us any

7   information.  No.  She wasn't giving us -- she

8   wasn't settling the trust.  We have been asking for

9   years and years for her to just settle the trust:

10  Please distribute what you have before you spend it

11  all in litigation.  And she refuses to.  She says --

12  there's always a reason why she can't.

13          And so, yeah, there's not one beneficiary

14  of the 2017 trust that isn't angry that she's still

15  holding onto money that is not hers.  It's my

16  father's money.  It was a gift to all of us from my

17  father; yet she continues to hold onto it five years

18  after he has passed on.

19     Q.  And what happened with that petition?  Did

20  it go to trial; settle?

21     A.  Are you referring to the one that Carole

22  and I -- in 2022; is that --

23     Q.  Yes.

24     A.  -- what you're talking about?

25     Q.  Yes, based on the breach of fiduciary

Page 49

1   duty.

2      A.  Okay.  So after it took three hearings for

3   her to finally produce what she wanted, and she was

4   even removed as a trustee -- or suspended for just a

5   short, brief five minutes, Ronda's attorney spoke up

6   and said, we can settle this trust a lot faster than

7   an independent fiduciary can.  So please -- we are

8   so close to distributing this trust now, if you give

9   it back to us, we will settle in two months -- or in

10  short order.  Well, you know, here it is 2024, and

11  we're still fighting her, trying to get this money.

12     Q.  You either cut out or I missed it.  Give

13  it back.  Give what back?  You said, if she gives it

14  back, within two months -- I can't hear you.  I'm

15  sorry.

16     A.  I meant -- so for give it back, I was

17  referring -- give her back -- take the suspension

18  away.  Like, she was suspended for about five

19  minutes.

20     Q.  Oh.

21     A.  And then -- and then her lawyer spoke up

22  and said, you know, let us -- let us do it.  We

23  don't need an independent fiduciary.  We can get it

24  done.  We'll have this -- we are so close to

25  settling this trust now, that we can get this trust

In the Matter of: RALPH C. STRUTHERS REVOCABLE TRUST UDT
Connor, Belinda on 10/22/2017

Page 50

1  settled and distributed in a couple months.  And
2  then, of course, shortly after that she fired him.
3      Q.  So that petition was settled based on an
4  agreement?
5      A.  No, there was no agreement that -- me and
6  Carole dropped our -- because she finally did.  On
7  the third hearing -- she waited.  She went to the
8  first hearing; refused -- before the first hearing,
9  refused to give us any -- any documents, any
10  accounting, nothing.  She just was playing like she
11  didn't have to.  And then the next time -- the
12  second hearing is when she almost got removed,
13  because she wasn't listening to the judge.  And she
14  still -- we got -- we finally got the document
15  before the June 3rd hearing, 2022, like maybe five
16  days before the hearing; hardly any time to look
17  through the documents, because it was five days
18  before the hearing.
19      So Carole and I decided, as -- as
20  beneficiaries, that we didn't want to be out any
21  more money trying to fight with Ronda.  Since we
22  already got the documents and the accounting -- even
23  though she wasn't sharing the trust, we were -- and
24  really hoping that her attorney was -- was right and
25  that they would really share this trust and all of

Page 51

1  the money in it with the beneficiaries in a couple
2  months.  But, of course, as you can see, it didn't
3  happen.  But we decided to drop it, because we could
4  not afford a trial.
5      Me and Carole are -- we're both on social
6  security.  That's the only money we have for income,
7  is our social security checks.  And we couldn't
8  afford a $40,000 trial just to make Ronda distribute
9  the trust.  We just couldn't do it.
10      Q.  So you said that the litigation costs were
11  too high because you are on a fixed income.  What
12  has changed?  Because there is obviously new
13  litigation.
14      A.  The only thing that has changed is I am
15  also a 1993 trustee.  Ronda is claiming ownership
16  for the amount of money -- I think she -- at one
17  point, in one of her documents, I think she says now
18  that the 1993 owes her $33,000.  We still have
19  Darlene living on what was left of, you know, the
20  money after it was split.  Darlene needs her money
21  to live on.  We have a settlor that she needs to
22  eat, and pay her rent, and be taken care of.  And so
23  now we just don't have money to -- we're
24  running out of money because of all of this.
25      But we -- the reason why I got involved

Page 52

1  again is because, as a trustee of the 1993 trust, I
2  could not pay Ronda again, twice, for the same thing
3  that we sent bonds for to cover the bills.  I think
4  that would make me not a very good trustee.  And
5  also it wouldn't be fair to the beneficiaries of the
6  1993 trust, to pay again just because Ronda put it
7  in her accounting that she's owed it when it's
8  already been paid.
9      Q.  Okay.  By the way, I don't think I
10  mentioned this in the beginning.  But if at any
11  point you need a break, just let me know.
12      A.  Okay.
13      Q.  I'm sorry -- I'm sorry I waited so long.
14      A.  That's okay.
15      Q.  Do you need a break?  Do you need a break?
16      A.  No.  I'm fine.
17      Q.  Okay.  So --
18      THE WITNESS:  Anybody else?
19      MR. CROSS:  Oh, yeah.
20      Q.  So to summarize what you just said, what
21  changed from the prior petition and the issues with
22  litigation costs to what is going on now is that the
23  1993 trust money got involved?
24      A.  That got involved; and also the fact that
25  that's the first claim that she made for the two

Page 53

1  bonds.  In court on June 3, 2022 Ronda said to the
2  judge -- it was the first time we heard it -- that
3  those two bonds belong to me 100 percent.  And that
4  was another reason why Carole and I got involved.
5  And --
6      Q.  Okay.
7      A.  Okay.
8      Q.  So the first petition was because you
9  wanted more information, generally speaking,
10  correct?
11      A.  Are you talking about the L.A. case?
12      Q.  The petition to remove her based on a
13  fiduciary breach.
14      A.  Okay.  Well, which case are you referring
15  to?  I need something more than that.
16      Q.  I have --
17      A.  I need a date.
18      Q.  Sure.  Sure.  Let me -- let me put it
19  differently.
20      One of your main concerns in this matter
21  is receiving information related to the trust,
22  right?
23      A.  Correct.
24      MR. LACHONA:  Objection.  When you say
25  this matter, what matter are you referring to?

In the Matter of: RALPH C. STRUTHERS REVOCABLE TRUST UDT
Connor, Belinda on 10/22/2017

Page 54

1    MR. CROSS: The reason we are here; the
2    current objection to the 2017 accounting.
3    MR. LACHONA: So are you not talking about
4    the petition to compel production of documents?
5    MR. CROSS: Correct. Correct. Current.
6    MR. LACHONA: Okay.
7    BY MR. CROSS:
8    Q. And since filing you've received Ronda's
9    fifth accounting, right?
10    A. Yeah, just maybe -- a week ago, maybe.
11    Q. Okay. Did you receive it by mail?
12    A. No, I did not. I got an email from Kevin
13    with it in there.
14    Q. Stop. Sorry. Even if it's an accounting,
15    I don't want to hear about any conversations with
16    him, including emails. Sorry. Sorry to interrupt
17    you.
18    A. Okay.
19    MR. LACHONA: Mr. Cross, I think it would
20    be helpful -- are you referring to the accounting or
21    the document production?
22    MR. CROSS: The fifth accounting, not the
23    --
24    MR. LACHONA: Okay.
25    BY MR. CROSS:

Page 55

1    Q. Is it still the same answer?
2    A. I never received a fifth accounting from
3    Ronda.
4    Q. Okay. I'm going to show you something.
5    (Whereupon, Exhibit C was introduced and
6    later marked as an exhibit to the
7    deposition.)
8    BY MR. CROSS:
9    Q. Do you see what is titled, Objection to
10    Petition for Approval of Second Amended Accounting,
11    et cetera?
12    A. Mm-hmm.
13    Q. Okay. On page 16 it looks like your
14    signature. Did you sign the verification form
15    related to this petition?
16    A. Yes.
17    Q. And that verified this objection as you
18    believing it to be true and correct to the best of
19    your knowledge, right?
20    A. Correct.
21    Q. Okay. And so, you know, I'm going to go
22    through things in a way to help us cover all areas.
23    But could you tell me generally, what are your
24    current objections and issues with the accounting?
25    A. With the accountings?

Page 56

1    Q. Yes.
2    A. The biggest thing is that Ronda does not
3    have the bonds -- all of the bonds as part of the
4    trust. So there should be 13, instead of 11, in the
5    trust. And she only has 13 -- I mean, only has 11,
6    but she should have 13.
7    She paid a lawyer -- her own -- she paid
8    for the L.A. case. She was supposed to pay her
9    lawyer out of her own funds; and she used trust
10    money for that.
11    She -- well, I'm not sure how much -- I
12    don't really know for sure if this -- if it's true
13    that she paid the divorce attorney that she hired,
14    after the amount of time had passed that -- I think
15    you are supposed to have -- pay all of the bills for
16    the -- anybody that was owed money, she was only
17    allowed to go back for twelve months. And she
18    extended it two extra months, and then -- I think
19    that was supposed to be an improper payment.
20    And I think for the accountings that she
21    sent -- what else was -- actually -- I need to,
22    actually, see my -- my stuff. But --
23    MR. LACHONA: Mr. Cross, are you asking
24    Belinda to summarize her objections or go through
25    them?

Page 57

1    MR. CROSS: Yeah. Well, that was a good
2    summary of what I think -- are the main ones, I
3    think you said.
4    Q. But, yeah, what other objections are you
5    -- come to mind that you have?
6    A. That she hasn't actually distributed the
7    trust after five years; that she is spending all of
8    our money going to court trying to fight for two
9    bonds that have -- not hers. They're not hers.
10    They belong to the 2017 trust. She can't earmark
11    them for herself when the reason why they were given
12    was to -- was to be paid to the 2017 trust, not to
13    her as an individual. She was only allowed
14    $8,388.23, yet now she wants to keep bonds that are
15    worth $28,000 --
16    Q. Can I interrupt -- can I interrupt you?
17    Because I think we've gone over that, right?
18    A. Okay. So what is it exactly that you --
19    what are you trying to get from me?
20    Q. So we have talked about the bonds, we have
21    talked about the L.A. case, and lawyer fees, and
22    distributions. Do you have other objections that
23    you are aware of?
24    A. There was a check that she wrote for
25    ApexCare. In her first accounting she wrote herself

Page 58

1  a check for -- or April wrote her a check for $624.
2  It's in her first accounting. And she, then again
3  in her third accounting, took another $624 for the
4  same date and the same amount. I think that's -- I
5  mean, it's $624. Compared to everything else, I'm
6  sure it's, you know -- when you're a trustee, you're
7  supposed to be -- you're supposed to be accurate.
8         Another -- I don't know if I'm going way
9  off base or not. And maybe I shouldn't. But if you
10 notice between her first accounting and her second
11 accounting, there's a $65,000 discrepancy between
12 the end of -- end of the accounting period to the
13 beginning of the next accounting period with no
14 explanation. That's $65,000. It's not a little bit
15 of money. She needs to tell us what happened --
16     Q. Between --
17     A. -- to that $65,000.
18     Q. I'm sorry. Between which two accountings
19 is the discrepancy?
20     A. The first -- so it was the first
21 accounting that she ever put out, and then her
22 second amended, amended, amended accounting.
23     Q. Okay. Any other objections?
24         MR. LACHONA: Objection. Mr. Cross, are
25 you asking for my client to list all of her

Page 59

1  objections?
2         MR. CROSS: If she has more. You know,
3  we're going to go through this. But, you know, I
4  just want to get these out of the way.
5         MR. LACHONA: I understand. But we filed
6  the objection. I mean, we can read it to you if you
7  would like.
8         MR. CROSS: No. That's okay. I just want
9  to cover the big ones.
10        MR. LACHONA: You are asking her to recall
11 what she stated in this objection, which has many,
12 many pages. So --
13        MR. CROSS: I'll move on. Thank you.
14        MR. LACHONA: But if you would like, we
15 can pull up the objection and go through it. That's
16 probably going to be more efficient.
17        MR. CROSS: No. Thank you. I've got it.
18     Q. So do you recall objecting based on the
19 notice of the hearing for accounting being late?
20     A. I recall that that was filed, yes.
21     Q. Okay. And how late was it?
22     A. It was one day. But there's still
23 procedures you have to follow. There's still rules
24 you have to follow. You know that. You are a
25 lawyer.

Page 60

1      Q. Okay. So if the object- -- if the notice
2  of hearing was one day late, do you think that's a
3  reason to file an objection?
4      A. That wasn't -- it would not have been done
5  if there wasn't a lot more to the objection.
6      Q. Do you find that to be an unreasonable
7  delay?
8      A. I think that everybody has to follow the
9  rules.
10         MR. LACHONA: Objection. Calls for a
11 legal conclusion.
12         THE WITNESS: You have to have --
13         MR. CROSS: What was the objection?
14         THE WITNESS: -- some sort of rules.
15         MR. LACHONA: Calls for a legal
16 conclusion.
17 BY MR. CROSS:
18     Q. Are you aware of any way that that has
19 negatively impacted the trust, if it was a day late?
20     A. No. It just would be nice if -- if
21 everything would be done promptly instead of waiting
22 until the very last minute.
23     Q. Okay. And regarding the two savings bonds
24 we discussed from the settlement agreement that you
25 said Ronda thinks are hers in total --

Page 61

1      A. Correct.
2      Q. -- what is your understanding as to the
3  status of those; meaning, have they been sold; are
4  they in Ronda's possession? Where do you believe
5  them to be?
6      A. I only heard from the deposition yesterday
7  that she mailed them, I believe she was trying to
8  say, to Minnesota -- she said an M state -- and that
9  they transferred the funds into, like, an electric
10 form -- like, an electronic form, and -- but she
11 doesn't remember how she -- or what kind of
12 documents that she has to prove that that's what
13 she's done.
14     Q. Okay. And I believe you --
15     A. But that's just all I know.
16     Q. I believe you testified that Ronda is
17 making the contention that she owns more value of
18 the bonds than she's entitled --
19     A. Correct.
20     Q. -- is that correct?
21     A. Correct.
22         MR. LACHONA: Objection. It misstates
23 facts.
24 BY MR. CROSS:
25     Q. But based on what you just said, she has

Page 62

1  not yet received the excess amount she -- she thinks
2  she's entitled to, correct?
3      A.  I don't think that's correct, because
4  she's already taken from the 2017 trust two checks
5  of $8,388.23.  That's all she was entitled to.
6  Therefore, she was supposed to take one total from
7  the 2017 trust, and the other total from the -- from
8  the two bonds.  Well, instead of getting it from the
9  bonds and cashing them, she took them from the 2017
10 trust.
11      So that -- now she needs to give back the
12 bonds, 100 percent, to the beneficiaries of the 2017
13 trust.  None of it belongs to Ronda now, none of it,
14 because she has already taken two values of
15 $8,388.23.
16      Q.  I'm sorry.  Okay.  I didn't mean to change
17 screens.  I apologize.  But I heard what you said.
18      We're going back to the settlement
19 agreement we discussed before.  Do you have it in
20 front of you or nearby?
21      A.  I can get it.  Hang on a sec.
22      Q.  I'm on page 5.
23      (Brief pause.)
24      THE WITNESS:  Yes.  Okay.  So page 5?
25      MR. CROSS:  Yeah.

Page 63

1      Q.  And do you see in the second paragraph it
2  discusses two savings bonds?
3      A.  Yes.  It's the timing of those pay- --
4  yes.
5      Q.  Okay.  And are these the two savings bonds
6  that we've been discussing with regard to your
7  difference of opinion as to Ronda's ownership of
8  them?
9      A.  Correct.
10      Q.  And based on your understanding, from the
11 proceeds of selling these two bonds, how much is
12 supposed to go where?
13      A.  $8,388.23 is supposed to go to Ronda out
14 of that -- out of that bond.  And then $12,476.21 is
15 supposed to go to the beneficiaries of the 2017
16 trust.
17      Q.  Anything else; i.e., the $100?
18      A.  Well, yeah, there is a $100 check that we
19 received from Mr. Shuttleworth.
20      Q.  And if these two bonds are worth more than
21 the total value of what you just mentioned, where is
22 the excess supposed to go, according to you?
23      A.  The excess -- oh, I'm sorry.  Excuse me.
24 The excess is supposed to go to the beneficiaries,
25 not the trustees.

Page 64

1      Q.  Okay.  And do you see near the, I guess,
2  second half of the paragraph where it says, the
3  remaining amount from the sale of the bonds, less
4  $100, shall be applied to the payment to Ronda as
5  identified in paragraph 14, correct?
6      A.  Okay.  So you added the less $100.  So
7  that --
8      Q.  It starts with the words, the remaining
9  amount.
10      A.  On what page is that?
11      Q.  Page 5, second to the last sentence.
12      A.  Oh, I see it down here.  Okay.
13      Q.  Okay.  So just to be clear, it says, the
14 remaining amount from the sale of the bonds, less
15 $100, shall be applied to the payment to Ronda as
16 identified in paragraph 14, correct?
17      A.  Yes.
18      Q.  Okay.  And paragraph 14 says, $8,388.23
19 from the sale of the bonds identified in
20 paragraph 13 shall be distributed to Ronda as an
21 individual as provided in paragraph 11 without
22 restriction, correct?
23      A.  Mm-hmm.  Correct.
24      MR. IACHONA:  Objection.  Mr. Cross, are
25 you asking to confirm you're reading it correctly,

Page 65

1  or are you asking her a question?
2      MR. CROSS:  Whether I read it correctly.
3      MR. IACHONA:  Okay.
4      THE WITNESS:  You read it correctly.
5  BY MR. CROSS:
6      Q.  Okay.  And so when you were involved in
7  settlement discussions, do you have any opinion as
8  to why the section above says, the remaining amount
9  from the sale of the bonds shall be applied to the
10 payment to Ronda?
11      A.  So after -- after the trust received the
12 $12,476.21, the remaining part, which is $8,388.23,
13 goes to Ronda.  That's how I read it.
14      Q.  Okay.  So --
15      A.  That makes the total --
16      Q.  I'm sorry.  Were you finished?  I'm sorry.
17      A.  Well, that would be the total of the
18 amount of the bonds.  That brings you to $20,864.
19      Q.  So in one part it says, quote, the
20 remaining amount; and in another part it gives a
21 figure of $8,388.23, correct?
22      A.  Mm-hmm.
23      Q.  Okay.  Under paragraph 14 does it mention
24 anything about $8,388.23 being the most Ronda can
25 receive from the sale of the bonds?

Page 66

1    A.   That is all she was to receive from the
2  bonds.
3    Q.   But it doesn't say what I just said,
4  correct?
5    A.   It says what she is owed.  And we had --
6  we had long discussions over what she was owed, and
7  we have a final spreadsheet that lists each
8  individual item.  And from that we came up with a
9  number $8,388.23 that she was to be -- also, the
10 1993 was to give her that portion and -- oh, yeah.
11 That's it.  Yeah, that's right.  Never mind.  I'm
12 going off on a different train of thought.  So --
13   Q.   But I'm asking -- I'm asking you to
14 confirm that Section 14 doesn't speak -- or doesn't
15 discuss the amount in excess of the sale, correct?
16        MR. LACHONA:  Objection.  The document
17 speaks for itself.
18        MR. CROSS:  You can answer.
19        THE WITNESS:  Okay.  So if you give two
20 bonds -- this is the only way I can explain it, in
21 -- in my way of thinking.  If you give two bonds,
22 and you total the total together and the amount
23 comes out to $20,864, and you owe part of it, as an
24 individual, to Ronda, and you subtract what you owe
25 to Ronda out of those bonds, what you are left with

Page 67

1  is the $12,476.21.  It can't be more simpler than
2  that.  It is what it is.  And --
3        MR. CROSS:  I appreciate -- I appreciate
4  that.  But my question is different.
5    Q.   I'm just asking whether Section 14, in
6  your opinion, discusses the amounts in excess of
7  $8,388.23 from the sale of these bonds and where
8  that excess will go.
9    A.   It does not say that specifically.  But I
10 do know that a trustee is not to profit off of a
11 trust.  She is only supposed to administer it; not
12 --
13   Q.   So --
14   A.   -- profit.
15   Q.   -- are you objecting -- you know, as we
16 move forward towards trial, are you objecting to a
17 missing receipt that was for a gardener for $30,
18 too?
19   A.   No.  I think you guys threw that in to
20 make us look trivial, honestly.  Because I don't
21 even remember objecting to that.  Show me the page
22 it says that on, besides your -- what you just gave
23 us.
24   Q.   Do you recall being in court on June 2,
25 2022?

Page 68

1    A.   No.  I had COVID.  I was home.  I think it
2  was June 3rd.  It was my anniversary, by the way.
3  It wasn't June 2nd.
4    Q.   Okay.  Have you seen a transcript -- have
5  you seen a transcript from that hearing?
6    A.   No.
7    Q.   Okay.  Would it surprise you to know that
8  the judge said, in this matter the Court feels that
9  there has been compliance based upon the Court
10 allowing time for compliance up to the present time?
11   A.   Because she handed us a box of receipts
12 five days before.  Yes, that is true.
13   Q.   Okay.
14   A.   That's the reason why we quit -- we didn't
15 go any further.  We were done.  Me and Carole were
16 done.  We weren't going to do a trial.  We just
17 wanted it -- we were done.
18   Q.   Okay.  Are you still objecting based on a
19 lack of receipts related to utility payment for the
20 property?
21        MR. LACHONA:  Objection.  Vague.
22        THE WITNESS:  No.
23        MR. LACHONA:  What are you referring to,
24 objecting?  Objecting to what?
25        MR. CROSS:  The lack of receipts related

Page 69

1  to utility payments.
2        MR. LACHONA:  Objecting to the accounting
3  or --
4        MR. CROSS:  It was a part of your petition
5  -- or excuse me -- your objection that there were
6  missing receipts related to utility payments.  And I
7  want to know if that's something you are still
8  pursuing.
9        THE WITNESS:  Are you mixing up Carole and
10 I's objections to this most recent objection?
11 Because, I mean, the most recent objection to -- to
12 her handling of the trust, that's not even -- it's
13 not even an issue anymore.  We are -- Carole and I
14 are not objecting to $30 from a gardener.
15 BY MR. CROSS:
16   Q.   When you say it is not an issue anymore,
17 you're talking about the $30 issue?
18   A.   Yeah.  That's not even -- that's not even
19 in our objections.  The other case that Carole and I
20 had, we dropped it.  So it's over.
21   Q.   Okay.  And are you seeking invoices or
22 receipts related to utility payments for the
23 properties that were discussed in the settlement
24 agreement?
25   A.   We -- I believe we were able to share back

Page 70

1   and forth the receipts and invoices that each trust
2   had. So that -- the settlement agreement was
3   perfect in that we really did --
4       Q. I'm sorry. I'm sorry. I'm sorry. I
5   would like to ask my question, because -- and I
6   appreciate the information. But I have a limited
7   amount of time.
8       A. Okay.
9       Q. So that's no longer an issue, utility
10  payments?
11      MR. IACHONA: Objection. Mr. Cross, I
12  think it would be helpful -- what are you referring
13  to exactly in the objection? Maybe you can pull it
14  up and we can look it on.
15      MR. CROSS: No problem. I'll go to the
16  next one.
17      Q. There was an objection related to separate
18  and community property assets valued at $750. Do
19  you still object based on the attempt to include
20  that asset back into accounting?
21      A. I -- I know that in the settlement
22  agreement we -- on the final spreadsheet we included
23  that $750 in the settlement agreement. So it should
24  already be taken care of. It shouldn't have to keep
25  on showing up on the accounting.

Page 71

1       Q. Okay. Have you seen bank records related
2   to where that $750 went?
3       A. No.
4       Q. I mean, there's a lot of records. No, or
5   you don't recall, or you're not sure?
6       A. No, I don't think I have.
7       MR. IACHONA: Objection. Mr. Cross, you
8   said the $750. You mean the value that is assigned
9   to the -- first of all, are you referring to
10  separate and community property assets?
11      MR. CROSS: Yeah, I'm not -- I'll go on to
12  my next question.
13      Q. Do you object to petitioners including the
14  full value of the safe in the accounting?
15      A. In our settlement agreement we -- we
16  handed over the safe and were no longer claiming
17  that it's community property. Ronda can take the
18  $50 for the safe and keep the safe. That's what it
19  was --
20      Q. So you're not -- you're no longer seeking
21  50 percent of it?
22      A. No.
23      Q. Okay. And are you still demanding an
24  appraisal of the (inaudible) --
25      THE REPORTER: Of the what?

Page 72

1       MR. CROSS: Wedding ring.
2       THE REPORTER: Wedding ring.
3       MR. CROSS: An appraisal of the wedding
4   ring.
5       THE REPORTER: Thank you.
6       THE WITNESS: I haven't really demanded
7   anything. It's just what Ronda said she was going
8   to do. I've never demanded from Ronda an appraisal
9   of the wedding ring.
10  BY MR. CROSS:
11      Q. And is that something that you're
12  concerned with?
13      A. No.
14      Q. Okay. I want to ask you about the 2015
15  Toyota Yaris. Do you have objections related to
16  that?
17      A. Any objections? Oh. Well, in her
18  accounting she put that under the cash assets
19  instead of -- if you look at the settlement
20  agreement, those -- the way it's -- on 11(b)(i),
21  $6,607.06, that Toyota Yaris is part of that figure;
22  yet in all of her thinking, Ronda says it's part of
23  the $11,983.47 figure, and that's not correct. So I
24  have an objection to that.
25      Q. So if the -- if that entry was moved to

Page 73

1   another category, it may resolve this issue?
2       A. It would as far as they should have it in
3   the right spot.
4       Q. Okay. And you're still -- are you still
5   objecting to a disbursement on May 13, 2020 in the
6   amount $8,388.23, Check No. 171?
7       A. Am I objecting to it?
8       Q. Yes.
9       A. I'm not -- only -- okay. So she took it
10  twice. Okay. So I'm a beneficiary of the 2017
11  trust. The 2017 trust should have only had to give
12  Ronda one figure of $8,388.23; yet she took two from
13  the 2017 beneficiaries. She was only entitled to
14  one. That's what it says in our settlement
15  agreement. She was supposed to get that from Ralph
16  as Ralph's 2017 trust as well. So the beneficiaries
17  shouldn't have to pay for it twice. That's my
18  objection.
19      Q. Okay. Do you know whether $8,388.23 was
20  an expense -- a trust expense or not?
21      A. It was for -- it actually -- it spells it
22  out in the settlement agreement. It says it
23  represents one half the moneys advanced by Ronda for
24  her sister Kay's burial and funeral expenses, and
25  Ralph's care between July 2017 and October 22, 2017.

In the Matter of: RALPH C. STRUTHERS REVOCABLE TRUST UDT
Connor, Belinda on 10/22/2017

Page 74

1      Q.  So what I'm asking is, could that payment
2  from May 13, 2020 in the same amount be for
3  something else?
4      A.  I think it's unlikely.
5          MR. LACHONA:  Calls for speculation.
6  BY MR. CROSS:
7      Q.  Okay.  Do you have any information,
8  documents that would say that it wasn't for expenses
9  for something else?
10     A.  I have a bank statement showing the exact
11 penny taken out twice, which is the wording in the
12 settlement agreement, in May -- I believe it was
13 May 2020 when she did that, when she took --
14     Q.  Okay.
15     A.  -- those two withdrawals.
16     Q.  So --
17     A.  And I honestly don't see any other
18 explanation for the same numbers being in the
19 settlement agreement, and her having to take it
20 twice, and then her doing it supported by bank
21 statements proving that she did it.
22     Q.  So if it was established that, albeit
23 unlikely, it was the case that that amount was for
24 an expense, and that was put in the correct location
25 with support, meaning bank statements or invoices to

Page 75

1  show that it wasn't the figure from the settlement
2  agreement, it was for something else, that would
3  resolve this objection, correct?
4          MR. LACHONA:  Objection.  Calls for
5  speculation.
6          MR. CROSS:  You can answer.
7          THE WITNESS:  Oh.  Well, I honestly don't
8  know how she is going to get around all of the
9  numbers.  But, you know, I don't -- I don't really
10 know.
11 BY MR. CROSS:
12     Q.  So if there was a legitimate trust expense
13 for $8,388.23 that was produced to you from this
14 time period, that could resolve this objection, if
15 that were true?
16     A.  So you are telling me that Ronda is going
17 to come up with a bunch of receipts that come up
18 exactly to $8,388.23; and she is going to do it
19 twice, once for the 2017 beneficiaries, and then
20 once for the -- for the 1993 trust beneficiaries?  I
21 just think it's farfetched.  I'm sorry.
22     Q.  Okay.  So I believe there's also an
23 objection you have related to a transaction that was
24 in a disbursement schedule from March 24, 2020
25 reflecting $39,275.31 in attorney's fees to

Page 76

1  Shuttleworth, which I can put on the screen.  But do
2  you recall this?
3      A.  Yes.
4      Q.  Okay.
5      A.  It was a --
6      Q.  And that is still an issue you have with
7  the accounting, correct?
8      A.  Just confusion, I'd have to say.  I don't
9  know.  It says it's a receipt.  But it was in the
10 distribution section.  So I'm not really too sure
11 what that is.  So there is confusion over it.
12         (Whereupon, Exhibit D was introduced and
13         later marked as an exhibit to the
14         deposition.)
15 BY MR. CROSS:
16     Q.  Okay.  Do you see a Bank of America
17 statement in front of you?
18     A.  Mm-hmm.  Yes, I do.
19     Q.  And it's the Ralph Struthers Revocable
20 Trust account ending in -2950, correct?
21     A.  Correct.
22     Q.  Okay.  Have you seen this document before?
23     A.  I'm sure that it came in our box of bank
24 statements.
25     Q.  Okay.  And on this page it shows deposits

Page 77

1  and other additions on 3/24/2020 of $97,970.40,
2  right?
3      A.  Yes.
4          (Whereupon, Exhibit E was introduced and
5          later marked as an exhibit to the
6          deposition.)
7          MR. CROSS:  Okay.  I believe I'm showing
8  you, hopefully, the second amended accounting.  Let
9  me try to confirm.
10         (Brief pause.)
11         MR. CROSS:  Yeah.
12     Q.  Okay.  Do you recognize this document?
13     A.  I've seen it before, yes.
14     Q.  And what is it?
15     A.  It is an accounting, I believe -- it says,
16 Amended Second Account of Ronda Myers and April
17 Sharp, successor co-trustees.  I see that, yes.
18     Q.  Okay.
19     A.  And I've seen it, yes.
20     Q.  I'm now on page -- oh, wait.  Yeah --
21 page 20.  On 3/24/2020 the Shuttleworth trust
22 account was closed, correct?
23     A.  Yes.
24     Q.  And down here on 3/24/2020 it shows a
25 transfer from Shuttleworth to bank account -2950 in

In the Matter of: RALPH C. STRUTHERS REVOCABLE TRUST UDT
Connor, Belinda on 10/22/2017

Page 78

1  the value of $97,970.40, right?
2       A.  That's what it says, yes.
3       Q.  Okay.
4       A.  So does that mean that Shuttleworth had
5  that money in some kind of an account, and then he
6  gave it back to Ronda and April as trustees?
7       Q.  So, sorry, I'm not answering questions
8  under oath today.
9       A.  Oh, I'm sorry.  I'm sorry.
10      Q.  But I appreciate it.  No.  You're fine.
11      A.  Okay.
12      Q.  So do you have an understanding as to what
13  that $97,000 was for?  I, kind of, just asked the
14  question.  But I want to ask you, what is your
15  understanding as to what it's for, if anything; do
16  you know?
17      A.  I have no idea.
18      Q.  Okay.  Could it be partially a return of
19  attorney's fees and from the sale of the property?
20      A.  Oh, I don't -- I don't know what it is.  I
21  told you that.
22      Q.  Okay.  So are you objecting to
23  Shuttleworth returning this money -- or transferring
24  this money?
25      A.  No.  I was objecting to where it was put

Page 79

1  on the accounting.  So it was put as a distribution
2  in the accounting -- in her second amended, amended
3  accounting, but she says it's a receipt of the
4  money.  So usually you put your receipts in the
5  receipt section, and you put your expenses in the
6  distribution part of the -- of the accounting.  And
7  that's the reason why it was confusing.
8       Q.  So if the accountant made a mistake or
9  whoever made a mistake, and it was put somewhere
10  else in the accounting, that would resolve this
11  issue possibly?
12      A.  I highly doubt that it would -- her
13  accounting would balance if that's correct.  I mean,
14  you have to have an offset.  You can't have
15  receipts and -- you can't just move something from
16  one column to the other and have all of your numbers
17  jibe at the end.  That doesn't make sense to me.
18      Q.  Where do you believe it should be placed
19  in the accounting, what section?
20      A.  I don't even know what it is.
21      Q.  Okay.  If it's a return of --
22      A.  I don't --
23      Q.  If it's a return of her attorney's fees
24  and from the proceeds of the property, where do you
25  believe it should be?

Page 80

1       A.  I would --
2       MR. LACHONA:  Objection.
3       THE WITNESS:  It should be --
4       MR. LACHONA:  Mr. Cross, are you asking
5  her which schedule it should be put on?
6       MR. CROSS:  Yes.
7       MR. LACHONA:  Okay.  Go ahead.
8       THE WITNESS:  There's -- I don't really
9  know.
10  BY MR. CROSS:
11      Q.  Okay.  Part of your objection was seeking
12  an itemized receipt for a marble headstone from
13  Ruhkala Granite, I think.  Is that what it's called?
14      A.  It's -- it's a -- yeah.  We objected.
15      Q.  Okay.  Has this been resolved, or are you
16  still objecting based on this?
17      A.  We are objecting still, because Ronda
18  still has not shown us an invoice for that.  I
19  highly doubt that she spent that much money on one
20  headstone.  The going rate for headstones are
21  between $800 and, maybe, $1,200.  And so it's like
22  she maybe bought another one for somebody else and
23  included it in that figure.  And she is going to
24  have to prove that -- she just has to prove with an
25  invoice how many she bought.  And I would like to

Page 81

1  see a real invoice.
2       Q.  Okay.
3       A.  You know, I don't want something that says
4  her credit card has been -- she paid with her credit
5  card in full.  Because that's what she did with the
6  funeral plot.
7       Q.  Okay.  So if you saw --
8       A.  She didn't give us a full --
9       Q.  If you saw a, quote, real invoice, it
10  would resolve this objection?
11      A.  A real invoice with itemized --
12      Q.  Okay.  Thank you.  And have you received
13  boxes of documents related to the trust
14  administration before from Ronda or April?
15      A.  In 2022, I was telling you before, when
16  Carole and I brought a motion to compel her to give
17  us -- provide documents, and receipts, and invoices,
18  she gave us a box of documents maybe five days
19  before we went to court on June 3, 2022.
20      Q.  Okay.  And have you received a box of
21  documents on any other occasions from Ronda or
22  April?
23      A.  I received a flash drive once.
24      Q.  Other than the flash drive and the
25  box of documents, have you received any other, you

In the Matter of: RALPH C. STRUTHERS REVOCABLE TRUST UDT
Connor, Belinda on 10/22/2017

Page 82

1   know -- I don't know what to call it -- a group of
2   documents that relate to the accounting of this
3   trust, the 2017 trust?
4       A.  I know that my attorney received ours.  So
5   I don't -- I never get the -- she doesn't give me,
6   Carole and -- of course, we don't -- she just sends
7   it to our attorney --
8       Q.  Okay.
9       A.  -- for us.
10      Q.  Of all of the documents that you've
11  received from Ronda and/or April, have you looked
12  through them all?
13      A.  Yes.
14      Q.  Okay.  And did you see an invoice related
15  to this headstone in the box?
16      A.  No.  No.
17      Q.  Okay.  But if we could find it in the box,
18  it would resolve this issue, right --
19      A.  Well, I never got --
20      Q.  -- if it was real --
21      A.  -- the box.  I never got the box.
22      Q.  -- if it was real?
23      A.  So maybe it would, if I -- if I could
24  really even see what was part of it.  I never got an
25  envelope, like all, I guess -- well, first of all,

Page 83

1   you guys really need to get your addresses correct.
2   I've had complaints from many of the beneficiaries
3   that Ronda has not put --
4       Q.  Okay.
5       A.  -- the right addresses on.
6       Q.  Thank you.
7       A.  So a lot of people haven't received their
8   documents.
9           MR. CROSS:  Thank you.  Can we go off the
10  record?  Are we off?
11          THE REPORTER:  Are you asking me?
12          MR. CROSS:  Yes.
13          THE REPORTER:  Yes, of course.
14          MR. CROSS:  Okay.
15          (Lunch recess.)
16          MR. CROSS:  Okay.  Let's go back on the
17  record.
18          MR. LACHONA:  Belinda, was there a
19  clarification you wanted to make regarding the
20  wedding ring appraisal?
21          THE WITNESS:  Yes, I would like to make a
22  clarification.  I misunderstood the question.  I
23  thought Ronda's attorney was asking me if I demanded
24  from Ronda an appraisal, like, right now, just give
25  me the appraisal; like, I was hounding her for an

Page 84

1   appraisal.
2           I -- I didn't call her up and demand it.
3   But I do -- I do want an appraisal for the wedding
4   ring.  And I do want to follow the terms of the
5   settlement agreement, which also states that I will
6   have -- I will have a chance to be able to acquire
7   dad's wedding ring.  And it does need to be
8   appraised to figure out how much it is worth.
9           MR. CROSS:  Got it.  Okay.  Anything else?
10          MR. LACHONA:  That's -- that's it for now.
11  I'll ask her questions when you're done, Steven.
12  BY MR. CROSS:
13      Q.  Okay.  So welcome back.  I can still call
14  you Belinda?
15      A.  Sure.
16      Q.  Okay.  And is there any reason why we
17  can't continue?
18      A.  No.
19      Q.  Okay.  So forgive me.  I've been having
20  printer issues.  So I'm going to be looking at my
21  screen for my questions instead of down.  I don't
22  know if that's worse or better.
23          So I want to talk about 2017, May, June,
24  July area.  Okay?  Okay?
25      A.  2017, May, June.

Page 85

1       Q.  And July, that time period.  Okay?
2       A.  So just recently.  Yes.
3       Q.  No.  No.  May, June or July of 2017 is
4   what I want to discuss.
5       A.  Okay.
6       Q.  2017.  Okay.  Around May 2017 did -- do
7   you know if Carole and her husband talked to
8   Mr. Struthers and Darlene regarding the safe?
9       A.  In 2017?
10      Q.  Yes.
11      A.  Which safe are you referring to?
12      Q.  The one that was known -- or either.
13  Either.
14      A.  Well, okay.  The only one that was known
15  was the one in -- in their office.  Did -- did she
16  talk to who?
17      Q.  Are you aware of any conversation between
18  Carole and/or her husband and Darlene and
19  Mr. Struthers regarding the safe around 2017 --
20  May 2017?
21      A.  I -- I don't know.
22      Q.  Do you recall or are you aware of any
23  conversation between Carole and/or her husband and
24  Darlene and Mr. Struthers about seeing J. Johnson
25  and that law firm?

Page 86

1    A.  I know that Carole wanted to make sure
2  that all of the assets of the 1993 were titled in
3  the trust, and that she made an appointment with
4  J. Johnson.
5       Q.  Okay.
6       A.  But I don't know what that has to do with
7  the safe.
8       Q.  No.  I moved on.  Sorry.  So --
9       A.  Oh, you did?  Okay.  I'm still stuck on
10  the other one.  Okay.  Sorry.
11      Q.  So there was a conversation between Carole
12  and her husband and the Struthers about changing the
13  1993 trust in May 2017?
14          MR. LACHONA:  Objection.
15          THE WITNESS:  No.
16          MR. LACHONA:  Speculation.
17  BY MR. CROSS:
18      Q.  No?  Did you say no?
19      A.  I know that in May 2017 there was an
20  appointment made with J. Johnson's firm to check to
21  make sure all of the assets were titled in the
22  trust.  And at the initial visit Darlene -- they
23  called me from Palmdale, and I drove up for that
24  attorney visit, and we all went to J. Johnson's
25  office.  Darlene opened her safe, and she got her

Page 87

1  trust notebook, and she got her CDs, the jackets
2  that -- you know, that has all of the pertinent
3  information for the CDs that she owned --
4       Q.  Okay.
5       A.  -- and she brought all of her savings
6  bonds at the time.  And we went to the Johnsons'
7  office, and Hannah Johnson did an inventory of what
8  was in the safe, because that's Darlene stuff.
9  That's her assets.  And she looked at each and every
10  one of them, did an inventory; and she also copied
11  the trust that Darlene brought in.
12      Q.  Okay.  So copied the 1993 trust?
13      A.  Correct.
14          MR. CROSS:  Okay.  Hold on one second.
15  I'm sorry.
16          (Brief pause.)
17  BY MR. CROSS:
18      Q.  So when -- do you know the date of this
19  meeting you are talking about?
20      A.  I do know -- I don't know the specific
21  date, no.
22      Q.  Approximately?
23      A.  I don't know.  Maybe the second week of
24  May.  But that's a guess.
25      Q.  Okay.  I don't want you to guess.  Do you

Page 88

1  think it was before or after Mr. Struthers' stroke?
2       A.  It was before.
3       Q.  Okay.  And do you know what day he had his
4  stroke?  Well, I don't want --
5       A.  It was --
6       Q.  -- to put you on the --
7       A.  Yes.
8       Q.  Okay.
9       A.  May --
10      Q.  Go ahead.  Sorry.
11      A.  Sorry.  May 29, 2017.
12      Q.  Do you recall that meeting with
13  J. Johnson's firm being around the same month that
14  the stroke occurred?
15      A.  It was before.
16      Q.  Right.  But within --
17      A.  It was the same --
18      Q.  -- the same month?
19      A.  It was the same month.  It was the same
20  month.
21      Q.  Okay.  And so who was -- who was present
22  during this meeting?
23      A.  There was -- so it was Hannah Johnson, the
24  lawyer; and it was my husband, Michael Connor;
25  myself; Carole Campbell and Bill Campbell; my dad

Page 89

1  and Darlene.
2       Q.  Okay.  So Mr. Struthers and Darlene were
3  present; you said that, right?
4       A.  Correct.
5       Q.  Did you mention Ronda or April?
6       A.  No.  They were not there.
7       Q.  Okay.  Is there a reason why that you're
8  aware of?
9       A.  Nothing -- there was no -- there was
10  nothing going -- there was nothing going -- dad was
11  fine.  He did have -- he did have a lot of issues.
12  He's had -- he's had strokes since 2003, his very
13  first stroke.  But he was still communicating.  He
14  could still write his name.  He could still talk.
15      Q.  So is this -- you're answering as to the
16  reason why --
17      A.  Why -- I mean, it was still their trust.
18  Okay?  It was the 1993 trust.  They were the
19  trustees, and they were handling their own business.
20  But we just were making sure that everything was
21  included in their trust, because they were both
22  getting older.  And so we were just --
23      Q.  Okay.  Got it.  And when you say they were
24  the trustees, who?  Who were the trustees?
25      A.  Ralph and Darlene Struthers.

Page 90

1    Q.  Okay.  But I asked you if there was a
2  reason why Ronda and April weren't at this meeting
3  at J. Johnson's, and you started to talk about
4  Mr. Struthers' health.  Was that -- is that your
5  answer?
6       A.  No.
7       Q.  Okay.  Is there a reason why they weren't
8  present during the J. Johnson meeting?
9       A.  I -- there's no reason.
10      Q.  Okay.  And did you visit Mr. Struthers in
11  the hospital after the stroke?
12      A.  Yes.
13      Q.  Okay.
14      A.  Several times.
15      Q.  During any of these visits did you discuss
16  the 1993 trust?
17      A.  No.
18      Q.  So you never asked him to change the trust
19  that was in place?
20      A.  No.  I'll take -- the same day --
21         MR. LACHONA:  Objection.
22         THE WITNESS:  Let me take you back.
23  Because --
24         MR. LACHONA:  Belinda, hold on.  Who are
25  you talking about?  You said, did you ask him.  Who

Page 91

1  are you -- who are you --
2         MR. CROSS:  Mr. Struthers.
3         MR. LACHONA:  Meaning, you are asking my
4  client whether she asked her father to change the
5  trust?  Is that your question?
6         MR. CROSS:  Sure.  Correct.
7         MR. LACHONA:  Okay.  Can you rephrase it?
8  BY MR. CROSS:
9       Q.  Did you ask your father to change the
10  trust while he was in the hospital?
11      A.  On the day that -- can I answer it like --
12  no.  Okay.
13         MR. LACHONA:  Belinda, he asked you --
14         THE WITNESS:  Yeah.
15         MR. LACHONA:  -- a similar question.
16         THE WITNESS:  It's a bigger story than --
17  it's larger than that.  So the next day after --
18         MR. CROSS:  Hold on.  Hold on.  Real
19  quick.  Real quick.  If I may, I would just -- I
20  would just like to be in control of the process.
21      Q.  Can you give me the yes or no, and then I
22  will allow you to explain why?
23      A.  Okay.  Go ahead.
24      Q.  So did you ever ask your dad -- excuse
25  me -- Mr. Struthers to change the trust while he was

Page 92

1  in the hospital after his stroke?
2       A.  No.
3       Q.  Okay.  And what was the explanation as to
4  the circumstances you wanted to explain?
5       A.  When we went to make sure that it was
6  titled in the trust, which it was, there was a
7  question as to whether dad could go on a
8  special-needs trust because of his -- his strokes
9  and stuff.  So Carole wanted to check into that.
10  And J. Johnson scheduled a conference call.  And
11  this was the day after.  And we all sat around in
12  the room, all of us together, and J. Johnson said
13  that the 1993 trust was extremely hard to understand
14  and would be very expensive to implement --
15      Q.  Okay.
16      A.  -- and distribute.  So he -- that's when
17  he said -- I suggested, if anything, that the trust
18  be simplified.  He never went into detail as to what
19  that meant.  But he --
20      Q.  Okay.
21      A.  -- was asking dad, in the room with
22  everybody else, and Darlene -- we were all in the
23  room, and asked if, you know, that might be
24  something we would be interested in doing.
25      Q.  So -- so you were in the room, meaning the

Page 93

1  hospital room, right?
2       A.  No.  This was at -- this was before he had
3  his stroke.
4       Q.  Oh.  What room are you talking about?
5       A.  His living room in Santa Maria.
6       Q.  Okay.  Were there any discussions that you
7  were a part of while he was in the hospital related
8  to the 1993 trust?
9       A.  While he was in the hospital?  No.
10      Q.  Okay.
11      A.  We didn't -- we didn't -- we didn't want
12  to pursue it any longer.  So it --
13      Q.  Okay.  At any time in 2017 did you have
14  power of attorney over Mr. Struthers?
15      A.  In 2017?
16      Q.  Yes.
17      A.  Yes, when he -- when he was declared
18  medically incompetent by two different doctors.
19      Q.  I appreciate that.  I'm going to get
20  there.  You know, I'm going to get us from point A
21  to point B.
22      A.  Right.
23      Q.  And I'm going to have to go there anyway.
24  So if you could do your best to give me the yes or
25  no, then I'll get to that point.

Page 94

1    A.  Okay.

2    Q.  And if you feel like I haven't, please

3  feel free to elaborate then.

4    A.  Okay.  All right.

5    Q.  At any point in 2017 did you have power of

6  attorney over Darlene?

7    A.  Her finances, yes.

8    Q.  Okay.  So in 2017 at some time you were in

9  charge of both financial and medical decisions for

10  Mr. Struthers, correct?

11    A.  Correct.

12    Q.  And when did that start, approximately?

13    A.  It started July 10th, I think, 20- --

14    Q.  And what -- and what was it related to; do

15  you know?  Was there a reason why you became in

16  charge of this?

17    A.  Because --

18        MR. LACHONA:  Objection.  Vague.  Belinda,

19  hold on.

20        Steven, when you say in charge of this,

21  what are you referring to?

22        MR. CROSS:  In charge of his medical and

23  financial decisions.

24        MR. LACHONA:  Okay.

25        MR. CROSS:  You can go ahead.

Page 95

1        THE WITNESS:  Oh, okay.  My dad could no

2  longer speak.  He could no longer eat.  He could --

3  he couldn't -- he couldn't walk.  He couldn't write

4  his name any longer.  He couldn't talk.  He couldn't

5  swallow.  He couldn't -- he couldn't get around on

6  his own anymore.  He was totally dependent on -- on

7  somebody to -- for his livelihood.

8  BY MR. CROSS:

9    Q.  So to summarize all of that, the reason

10  that you are saying that you were in charge of his

11  financial and medical decisions was the fallout from

12  his stroke; correct?

13    A.  Yes.  It was --

14    Q.  Okay.

15    A.  -- how it left him.

16    Q.  Okay.  And was there a way in which you

17  became power of attorney?  Did you -- did you sign a

18  document or -- how did you -- how did you gain this

19  power of decision-making?

20    A.  After he was declared medically

21  incapacitated, and then Darlene resigned on the 7th

22  of -- of July, 2017, they -- they both -- I was the

23  successor co-trustee, along with Julie Hatridge.

24  And then that's how I became the POA of or --

25    Q.  So if Mr. Struthers and Darlene are

Page 96

1  incapable of making Mr. Struthers' medical and

2  financial decisions, those decisions --

3    A.  Well, my -- my stepmother -- oh, sorry.

4    Q.  -- those decisions fell to you and Julie?

5    A.  My stepmother resigned.  She wasn't

6  incapable.  She resigned.

7    Q.  Okay.  Sure.  Well, she's incapable

8  because she resigned; how about that, or what have

9  you?  The next person in line was you --

10        MR. LACHONA:  Objection.  No, Mr. Cross.

11  You're assuming facts.  That's -- that's not --

12  that's not accurate.  People can resign for any

13  reason.  It doesn't have to be because of --

14        MR. CROSS:  No.  No.  Definitely.  I

15  understand.  I meant incapable legally.  Anyway,

16  we'll move on.

17    Q.  If Darlene and Mr. Struthers are out of

18  the picture for making his financial and medical

19  decisions for any reason, it fall- -- it fell to you

20  and Julie, right?

21    A.  Well, no.  It fell to Darlene.  But

22  Darlene resigned.  So then it fell to us.

23    Q.  Okay.  So --

24    A.  So first it went to Darlene.

25    Q.  Right.

Page 97

1    A.  Darlene resigned.  And then it went to us.

2    Q.  And after Darlene resigned it went to you

3  and Julie only?

4    A.  As co- -- only through the financial.  And

5  then for Darlene we had Eddie for the medical

6  portion of the POA.  That's how it was written in

7  the 1993 trust.

8    Q.  Eddie was the -- would be in charge of

9  Darlene's medical decisions or Mr. Struthers'?

10    A.  Darlene's.

11    Q.  Okay.  If Mr. Struthers is incapacitated

12  at this time, and Darlene resigned from all of her

13  decision-making, who was in charge of Mr. Struthers'

14  medical decisions at that time?

15    A.  Me.

16    Q.  And only you?

17    A.  Yes.

18    Q.  Okay.  And did you tell the family that

19  you were in charge of those medical decisions?

20    A.  Yes.

21    Q.  Okay.  And did you tell Mr. Struthers'

22  doctors that you were in charge of his medical

23  decisions?

24    A.  I think Ronda told the doctors.

25    Q.  Okay.  Do you remember telling any social

In the Matter of: RALPH C. STRUTHERS REVOCABLE TRUST UDT
Connor, Belinda on 10/22/2017

Page 98

1  workers that you were in charge of his medical
2  decisions during this time period?
3      A.  I think it was in the record.
4      Q.  So do you believe you did?
5      A.  Well, I believe Ronda did.  But it's part
6  of his records.  We -- we gave him -- we gave the
7  hospital the power of attorney for health.
8      Q.  Okay.
9      A.  Ronda copied it for us from the trust
10  booklet.
11      Q.  But my question is, do you -- separate.
12  Do you remember having any conversations with any
13  medical providers or social workers in the hospital
14  about you being in charge of Mr. Struthers' medical
15  decisions?
16      A.  I remember them coming to me and asking me
17  if I was the person in charge.
18      Q.  Okay.
19      A.  And I said --
20      Q.  And that's all you recall of that, kind
21  of, conversation?
22      A.  Yes.
23      Q.  Okay.  And do you believe at some point in
24  2017 Mr. Struthers became incapable of making his
25  own medical decisions?

Page 99

1      A.  I think that --
2          MR. IACHONA:  Objection.  Calls for expert
3  testimony.
4          MR. CROSS:  You can answer.
5      Q.  Do you believe it?  Do you believe that to
6  be true?
7      A.  I -- a doctor said it was.  So I'm
8  guessing it was true.
9      Q.  Okay.  Saying that a different way:  Do
10  you have any reason to think that was wrong?
11      A.  No.  My dad could not speak, and he could
12  not write his name.  He could not walk.  He could
13  not go anywhere.  He was totally reliant,
14  100 percent, on care 24 hours a day.
15      Q.  Okay.  And do you believe that Darlene was
16  capable of making the medical decisions for
17  Mr. Struthers during this time period?
18      A.  She was.  But at the time she was very
19  distraught over dad's health conditions.  My dad
20  also had a stroke in December 2016.  So from 2016, I
21  think, until his last stroke that left him medically
22  incompetent was -- in that six-month period he also
23  lost his ability to use the bathroom.  And I think
24  that that created a big challenge for Darlene,
25  because it was just a lot of work and he did require

Page 100

1  24-hour care.  He was a Type 1 diabetic.  She was
2  managing everything.
3      Q.  Okay.
4      A.  And I think that she -- it was tough -- it
5  was --
6      Q.  Okay.
7      A.  -- a tough time for her.
8      Q.  Gotcha.  And other than her reaction to
9  his, say, condition, is there any other reason why
10  she couldn't be making his medical decisions for
11  him, other than what you just said?
12      A.  Well, they said that Darlene couldn't take
13  care of him anymore; that he would have to go to
14  either, like, a care facility or go to a family
15  member's house.
16      Q.  When you say they told her that she
17  couldn't care for him anymore, who is the they?
18      A.  The doctors at the hospital; that it was
19  too much for Darlene, and they -- they were worried
20  that he was too much of a handful for Darlene to
21  give that 24-hour care.
22      Q.  Okay.  So it sounds like, based on your
23  opinion at that time, Darlene had capacity, but
24  there were other reasons why she chose to resign?
25      A.  It was just -- it was just too much.

Page 101

1      Q.  Is that your opinion?
2          MR. IACHONA:  Mr. Cross, are you --
3  BY MR. CROSS:
4      Q.  Is that your opinion?
5          MR. IACHONA:  Hold on.  Mr. Cross, are you
6  talking about the trust or the medical power of
7  attorney?
8          MR. CROSS:  The medical decisions for
9  Mr. Struthers.
10          MR. IACHONA:  So is that the medical power
11  of attorney?
12          MR. CROSS:  Yes.  Yes.
13          MR. IACHONA:  Okay.
14  BY MR. CROSS:
15      Q.  So do you believe she could have made
16  these decisions based on capacity, but there were
17  other reasons why she chose to resign?
18      A.  She decided on her own that she wanted to
19  resign.  She was -- she had a talk with the
20  Johnsons, and the Johnsons said that they -- they
21  thought it was a good idea as well.  And she
22  resigned, and she did it -- put her finger in the
23  notary book as she resigned.  And that was how that
24  went.
25      Q.  So to put it differently, do you have any

In the Matter of: RALPH C. STRUTHERS REVOCABLE TRUST UDT
Connor, Belinda on 10/22/2017

Page 102

1  information related to any medical, physical or, you
2  know -- yeah, medical or physical condition,
3  dimension, anything, that would have prevented
4  Darlene from making medical decisions at that time?
5           MR. LACHONA: Objection. Calls for expert
6  testimony.
7           MR. CROSS: You can answer.
8           THE WITNESS: Darlene was just a nervous
9  wreck and --
10          MR. CROSS: But my question is very
11 specific.
12      Q. Are you aware of any medical issues,
13 conditions --
14      A. At the time? At the time, no.
15          MR. LACHONA: Objection. Calls for
16 medical testimony.
17          MR. CROSS: Okay. Thank you.
18      Q. Did you choose -- did you decide against
19 physical therapy that Mr. Struthers' neurologist
20 recommended during this time period?
21      A. No. That's a lie.
22      Q. Okay. And did you -- did you -- did his
23 doctor recommend aggressive rehab?
24      A. Ronda's confusing that to -- the first
25 time, in December 2016, they recommended aggressive

Page 103

1  therapies. And Darlene, who was taking care of dad
2  at the time, said that she didn't want to drive to
3  San Luis Obispo every day for those therapies, and
4  she wanted him closer to home. So she was getting
5  those therapies from a rehabilitation center across
6  the street from the hospital in Santa Maria.
7      Q. So --
8      A. And then -- and then -- oh, sorry.
9      Q. No. That's all right. Go ahead.
10          MR. LACHONA: Belinda, you just need to
11 answer his question. If there's follow-ups, he will
12 ask you.
13          THE WITNESS: Yeah. Okay.
14 BY MR. CROSS:
15      Q. Okay. So to summarize your answer, you
16 did not deny any aggressive rehab to your father in
17 2017, correct?
18      A. No.
19      Q. Is that your testimony?
20      A. I --
21          MR. LACHONA: Belinda, hold on. I object.
22 You're using double-negatives.
23          MR. CROSS: I'll restate it. I'll restate
24 it.
25          MR. LACHONA: Okay. Thank you.

Page 104

1           MR. CROSS: That's confusing.
2      Q. So is it true that it's your testimony
3  that aggressive rehab was not recommended to your
4  father in 2017?
5      A. In 2017 when -- when he was in -- okay.
6  First of all, when my dad went into the hospital, he
7  couldn't have aggressive therapy because he couldn't
8  eat, and he couldn't drink.
9      Q. Okay. I'm sorry. I'm sorry.
10     A. He was -- he couldn't -- he couldn't do
11 anything --
12     Q. I'm sorry.
13     A. -- for a whole week. We had to get --
14     Q. Thank you. Hold on.
15     A. -- a stomach tube put in. So no, he
16 couldn't have aggressive therapy then.
17     Q. I appreciate that information. I don't
18 mean to be insensitive. It sounds like a lot that
19 you had to go through. And I'm not trying to
20 belabor the point.
21         I just want to clarify for the record that
22 it's your testimony that in 2017 aggressive rehab,
23 based on his stroke and the symptoms thereof, was
24 not recommended; is that correct?
25     A. It wasn't recommended to me.

Page 105

1      Q. Okay. That's fine. In 2017 was it your
2  opinion that the 1993 trust should be changed?
3      A. It wasn't going to be changed. It was
4  going to be simplified.
5      Q. Okay. But that would require it to be
6  different than it was prior, right?
7      A. All of the provisions were going to be --
8  honestly, I don't even really know what was going to
9  be simplified, because we never did it.
10     Q. Okay. Did you think that the trust that
11 was in place at that time, meaning the 2017 (sic),
12 was unfair in some way?
13     A. No.
14     Q. Did you express to Darlene at any time
15 that you thought that the trust should be changed?
16         MR. LACHONA: Objection. Mr. Cross, I
17 just want to clarify something. You mentioned --
18 you asked whether or not she thought the 2017 trust
19 was unfair.
20         MR. CROSS: Let me -- no. No. Yes.
21 Thank you.
22     Q. In 2017, before the 2017 trust existed --
23 so the trust that was in place prior, that's what I
24 want to talk about. You call that the 1993 trust?
25     A. (Nodding head.)

In the Matter of: RALPH C. STRUTHERS REVOCABLE TRUST UDT
Connor, Belinda on 10/22/2017

Page 106

1    Q.  Did you find that to be unfair?
2    A.  No.
3    Q.  Did you express displeasure with that
4  trust to Darlene at any time?
5    A.  No, because I never -- at the time --
6  until I went to the Johnsons' I had never read it.
7    MR. IACHONA:  Belinda, you just need to
8  answer his question.
9         THE WITNESS:  Oh, sorry.
10         MR. IACHONA:  If he wants to follow up, he
11  can do that.  But just answer his question
12  initially.
13         THE WITNESS:  Okay.
14         MR. IACHONA:  Thank you.
15  BY MR. CROSS:
16    Q.  And this includes the time period when you
17  went to J. Johnson.  During that time period --
18  well, I think I said, at any time did you find the
19  1993 trust to be unfair?
20         MR. IACHONA:  Objection as to time.
21         MR. CROSS:  You can answer.
22         THE WITNESS:  At the time I went to
23  J. Johnson's office I still hadn't read the trust.
24  So it's hard for me to say if I thought it was
25  unfair if I never read it.

Page 107

1  BY MR. CROSS:
2    Q.  At any point in time from 2000 to 2020 did
3  you form the opinion that the 1993 trust was unfair?
4    A.  Me personally?  I didn't understand the
5  trust to even be able to tell if it was unfair or
6  not.  I did -- I still don't understand the 1993
7  trust.
8    Q.  Do you recall ever having a conversation
9  with Darlene where you expressed displeasure with
10  the 1993 trust?
11    A.  I remember hearing Darlene saying she
12  thought it was unfair.
13    Q.  But do you recall you ever saying that to
14  her; that you --
15    A.  No.
16    Q.  -- didn't find it -- okay.
17    A.  No.
18    Q.  So did you ever put pressure on Darlene to
19  change the 1993 trust, update it or make any
20  alterations?
21    A.  No.
22    Q.  Okay.  And do you recall anything you said
23  to her regarding the 1993 trust between the period
24  of May 2017 through August 2017?
25    A.  I asked her -- because dad and Darlene

Page 108

1  gave the go-ahead to simplify it on that roundtable
2  discussion the day after we were in at the
3  Johnsons'.  I asked her later -- because we didn't
4  really know how bad dad was at the time.
5         Oh, actually, at the time when we were
6  having that roundtable he was fine.  I mean, like,
7  you know, he was -- he had had several strokes.  But
8  he could still write his name.  He could still walk.
9  He could still talk.  He could still do those kinds
10  of things.
11         And then later, after he was in the
12  hospital from his really bad stroke, I went to
13  Darlene and I said, Darlene, I don't think that we
14  should do anything to the trust, because dad can't
15  even sign his name.  He can't talk.  And it doesn't
16  seem right to me that we would even make any
17  changes, because I'm sure it would cause a lot of
18  problems with everybody in the family.
19    Q.  Do you recall when you said that and to
20  whom?
21    A.  I said it to Darlene.
22    Q.  And when?
23    A.  It was in June.  So dad was in the
24  hospital -- oh, never mind.  Go ahead.
25    Q.  No.  So you told Darlene in June of 2017

Page 109

1  that you thought it was not appropriate to change
2  the trust because Mr. Struthers was unavailable, if
3  you will?
4    A.  He was incapacitated.  But yeah.  He
5  couldn't --
6    Q.  Sure.
7    A.  He couldn't -- he couldn't -- he couldn't
8  write his name, and he wasn't capable of making any
9  changes.  It was obvious.
10    Q.  So as we move forward, when I say stroke,
11  what I want to convey is that last stroke.  Is that
12  fair?
13    A.  Okay.
14    Q.  Okay.
15         MR. IACHONA:  Objection.  I want to be
16  clear.  You mean the stroke in May of 2017?
17         MR. CROSS:  Yeah.  The last stroke he had.
18         MR. IACHONA:  Okay.
19  BY MR. CROSS:
20    Q.  At any point after that stroke did you go
21  to J. Johnson's office?
22    A.  After his stroke?  No.  I was too busy
23  with -- with dad.  I know Ronda went to J. Johnson's
24  office to pick up the trust booklet, because
25  J. Johnson had had it there because he was going to

Page 110

1  simplify the trust.  And Ronda picked it up with
2  Darlene.  They drove out there, because we needed
3  the power of attorney for health out of it and we
4  didn't have it.
5      So Ronda had to drive out to -- to Grover
6  Beach where the Johnsons' law office was.  And they
7  picked it up together, took out the pertinent
8  information for the doctors, the health POA, and
9  gave it to the doctor for -- for dad.  Because we
10 didn't know if dad, in his final wishes, wanted a
11 feeding tube or not.
12     Q.  Okay.  I'll get there.
13     A.  So we had to --
14     Q.  I'll get there.  It's okay.  And when was
15 this that Ronda went to get these documents from
16 J. Johnson, approximately?
17     A.  I don't know.
18     Q.  Okay.  Around May to July 2017 probably?
19     A.  Well, definitely after May.  It was
20 when --
21     Q.  Yeah.
22     A.  -- was first in the hospital.
23     Q.  And did you at any point call J. Johnson
24 and ask them not to give her any documents?
25     A.  To give who documents?

Page 111

1      Q.  Did you ever call J. Johnson's office and
2  tell them, or instruct them, or ask them to not give
3  Ronda certain documents?
4      A.  No, I never did.
5      Q.  And as far as you are aware, was
6  Mr. Struthers present for every meeting with
7  J. Johnson's office?
8      A.  There was only one -- well, there was two.
9  So there was two -- there was two in-office
10 appointments that I remember.
11     Q.  Whether it be on the phone, in office, any
12 type of meeting with J. Johnson's office, are you aware of
13 any meeting with J. Johnson's office where
14 Mr. Struthers was not present?
15     A.  I don't think so.  I was only present for
16 two.  And I don't really know what happened when
17 I -- when I wasn't around.  I did not hire the
18 Johnsons.  My father, Ralph Struthers, and my
19 stepmother, Darlene, hired the Johnsons to simplify
20 their trust.
21     Q.  So the two meetings you said you were
22 present for, Mr. Struthers was there?
23     A.  Correct.
24     Q.  And how many other meetings do you think
25 there were?

Page 112

1      A.  In-person meetings?
2          MR. LACHONA:  Objection.  Calls for --
3          THE WITNESS:  I don't --
4          MR. LACHONA:  -- (inaudible).
5          THE REPORTER:  I'm sorry?  Objection --
6          MR. LACHONA:  Objection.  Calls for
7  speculation.
8          THE REPORTER:  Thank you.
9          MR. CROSS:  You can answer.
10         THE WITNESS:  I don't know.  I don't --
11         MR. CROSS:  Okay.
12         THE WITNESS:  I don't know.
13 BY MR. CROSS:
14     Q.  Do you have an opinion as to whether --
15 other than those two meetings we've just discussed,
16 do you have an opinion as to whether there were
17 between one and five more meetings?
18     A.  I doubt it.
19     Q.  Do you believe that there was at least one
20 other meeting that you weren't a part of?
21     A.  I don't think there were any meetings that
22 -- other than the two, because they probably would
23 have called me up to come with them.
24     Q.  Okay.  And so there's the 1993 trust,
25 there's the 2017 Struthers -- Ralph Struthers trust,

Page 113

1  and then there's Darlene's trust; is that fair to
2  say?
3      A.  That's not a correct --
4      Q.  Excuse me.  Let me ask you.  How many
5  trusts are there in your family?
6      A.  In my family there's the 1993 trust, and
7  there's the 2017 trust.
8      Q.  All right.  I think I was conflating the
9  two.
10     So from the 1993 trust to when the 2017
11 trust was created, were beneficiaries added to
12 either?
13     A.  The 1993 trust --
14         MR. LACHONA:  Objection.  Hold on.  When
15 you say from the 1993 trust, what do you mean?
16         MR. CROSS:  Let me just say it a different
17 -- let me say it a different way.  Let me say it a
18 different way.
19     Q.  At any time that you are aware of were
20 beneficiaries added to either trust?
21     A.  I don't know anything about the 2017
22 trust.  I wasn't involved in the creation or -- I
23 was never around for any of that.  That's -- that's
24 something that I wasn't involved in.
25     As far as the 1993 trust, it was created

In the Matter of: RALPH C. STRUTHERS REVOCABLE TRUST UDT
Connor, Belinda on 10/22/2017

Page 114

1   on June 4, 1993.  I had two sisters that were
2   pregnant with their children; and I have another
3   nephew that was born after 1993.  And then on
4   Darlene's side, she had a nephew that was born after
5   1993.  And those names were added to the trust by my
6   father and Darlene.
7       Q.  They were added as beneficiaries?
8       A.  Yes.
9       Q.  Okay.  Anyone else?
10      A.  No.
11      Q.  Okay.  And do you have a copy of the 1993
12  trust currently?
13      A.  I have a copy.  I don't have the original
14  with me, though.
15      Q.  Okay.
16      A.  It's in a safe.
17      Q.  Okay.  Do you recall any occasion in 2017
18  when Mr. Struthers expressed to you or anyone else
19  that he didn't want to add any beneficiaries?
20      A.  He didn't want to add his --
21          MR. LACHONA:  Objection.  Belinda, hold
22  on.  Add beneficiaries to what?
23          MR. CROSS:  To the trust.
24          MR. LACHONA:  Which trust?
25          MR. CROSS:  The 1993 trust.

Page 115

1           MR. LACHONA:  I'm sorry?
2           MR. CROSS:  To the 1993 trust.
3           THE WITNESS:  We -- that -- he never said
4   anything about -- those beneficiaries were added
5   soon after they were born.  So we're talking years
6   and years ago.  So it was created in 1993.  I don't
7   know how old -- I know Benjamin is the youngest
8   grandchild.  I do know that all of the grandchildren
9   are in the trust, and that dad and Darlene added
10  them to their trust, and they both signed off on
11  those changes.
12  BY MR. CROSS:
13      Q.  Okay.  My question is, do you recall at
14  any time when Mr. Struthers said he didn't want to
15  add those beneficiaries you just discussed?
16      A.  No.
17      Q.  Okay.  I want to show you something real
18  quick.
19          (Whereupon, Exhibit F was introduced and
20          later marked as an exhibit to the
21          deposition.)
22  BY MR. CROSS:
23      Q.  Okay.  Do you see this document starting,
24  because I'm sure Ronda has?
25      A.  Mm-hmm.

Page 116

1       Q.  And do you recall if this was a text you
2   sent to Belinda -- do you recall if this is a text
3   you sent?
4       A.  Yes.
5       Q.  Okay.  And who did you send it to?
6       A.  I don't know.
7       Q.  Okay.  And when did you send this, if you
8   can recall?
9       A.  I don't know.
10      Q.  Okay.  In here it looks like you said, the
11  lawyers are coming to Villa Maria on the 10th of
12  July.
13      A.  Mm-hmm.
14      Q.  Is this -- do you think it likely, based
15  on that, that this was sent sometime in June or July
16  of 2017?
17      A.  It would have had to have been sometime
18  earlier in June, because we had already called it
19  off.
20      Q.  Okay.
21      A.  Well, actually, Darlene is the one that
22  called it off.  And I told Darlene -- I said, I
23  think that we should, and she agreed, because she
24  didn't want any trouble from the family.
25      Q.  Mm-hmm.  Okay.  And after his stroke,

Page 117

1   meaning the most recent one, Mr. Struthers was
2   transferred to a rest home?
3       A.  After his stay in the hospital.
4       Q.  So yes?
5       A.  Okay.  Repeat the question, please.
6       Q.  After his most recent stroke, at some
7   point was Mr. Struthers transferred from the
8   hospital to a rest home?
9       A.  Yes.
10      Q.  And on the day of transfer did you go to
11  J. Johnson's office?
12      A.  To the rest home?
13      Q.  No.  To J. Johnson's office.
14      A.  Okay.  So repeat that again.
15      Q.  On the date that he was transferred to the
16  hospital to a rest home did you go to J. Johnson's
17  office?
18      A.  No.  I wasn't there.  I was at home.  I
19  didn't -- I didn't put him in the nursing home.
20      Q.  And then when he -- around the time when
21  he was transferred to the nursing home, did you ask
22  Darlene to sign something putting him in the nursing
23  home?
24      A.  No.  That was done with Ronda and Darlene.
25  They're the ones that admitted him into the nursing

In the Matter of: RALPH C. STRUTHERS REVOCABLE TRUST UDT
Connor, Belinda on 10/22/2017

Page 118

1    home from the hospital.
2        Q.  Do you know if Mr. Struthers expressed
3    whether he wanted to or didn't want to go to the
4    rest home?
5        A.  He didn't express one way or another.  He
6    did know that he needed -- the doctor said that he
7    needed to go to someplace besides home; that Darlene
8    couldn't take care of him any longer.  He knew that.
9    He did -- he did not -- he was not upset with
10   anybody for that decision.
11       Q.  Okay.  And at this time, meaning when he
12   was transferred to the home, Mr. Struthers was still
13   in charge of his own medical decisions, correct?
14       A.  No.
15       Q.  So who was in charge?
16       A.  At that time I was in charge, I think.
17   Was it -- I don't know.  What was the date?
18       Q.  June 12th --
19       A.  Darlene was in charge, yes.  Oh, yeah.  So
20   what was the date?
21       Q.  June 12, 2017.
22       A.  Okay.  So Darlene was in charge.
23       Q.  Okay.
24       A.  Well, actually, dad was in charge, too,
25   because he hadn't been declared incapacitated yet, I

Page 119

1    mean, legally.  But Darlene was making the
2    decisions, though, because dad couldn't talk.
3        Q.  Okay.  And so during this time period,
4    from June to August 2017, is it true that if
5    Mr. Struthers can't make his own medical decisions,
6    the decisions fall to Darlene?  I think we already
7    said this.  But is that correct?
8        A.  That's correct.
9        Q.  And since Darlene resigned, then it would
10   go to you and Julie --
11       MR. LACHONA:  Objection.  Asked and
12   answered.
13   BY MR. CROSS:
14       Q.  -- right?
15       MR. LACHONA:  Mr. Cross, if I can just
16   ask, are you talking about the trust or the advanced
17   healthcare directive?
18       MR. CROSS:  Making medical decisions for
19   Mr. Struthers.
20       Q.  I'm just trying to establish, before I go
21   to my next question, that the line -- the chain of
22   command is Mr. Struthers, Darlene, and then you and
23   Julie, correct?
24       A.  Correct.
25       Q.  Okay.  And how many daughters does

Page 120

1    Mr. Struthers have?
2        A.  Seven.  At the time he had seven.
3        Q.  And you don't believe that they had joint
4    decision-making power of Mr. Struthers and Darlene
5    couldn't make the medical decisions?
6        A.  I know that I was assigned the POA
7    position.  But I did not hold that without
8    conversation with my sisters.  I included my sisters
9    in all of the decisions.  They helped me decide what
10   to do.
11       Q.  Okay.  So the way I look at that is either
12   something told you or informed you that you and
13   Julie were in charge, or something informed you or
14   told you that all of the sisters were in charge, but
15   you got together and made a decision for it to be
16   you and Julie.  Is one of those scenarios what
17   happened?
18       A.  No.  We got his -- his trust instrument,
19   and it said in there that if dad was unable to make
20   those decisions for himself, that job would go to
21   Darlene.  If Darlene was unable to care for dad,
22   then that would go to me.  I was next in line.  And
23   then -- for the health?  Are you talking about the
24   health or the financial?
25       Q.  Health.

Page 121

1        A.  Health.
2        Q.  Medical.
3        A.  Medical would be me.  It would be --
4        Q.  Only?
5        A.  Huh?
6        Q.  Only you?
7        A.  Only me, yes.
8        Q.  Okay.  So --
9        MR. LACHONA:  I think -- Steven, hold on.
10   I think we need to clarify something.  You mentioned
11   earlier about the medical POA, and Belinda and Julie
12   being somewhere down the line as agents.  I'm not
13   sure we established Julie was a named agent in the
14   medical power of attorney.
15       MR. CROSS:  Okay.  I thought we did.  So
16   it sounds like it's being corrected now.
17       MR. LACHONA:  Well, I'm not sure.  If we
18   could ask -- if you could ask Belinda.
19       MR. CROSS:  Yeah.
20       Q.  I mean, at any point in time in 2017 did
21   you view Julie as having any power over
22   decision-making for medical treatment for
23   Mr. Struthers?
24       A.  No.
25       Q.  Okay.  So it was only you, other than

In the Matter of: RALPH C. STRUTHERS REVOCABLE TRUST UDT
Connor, Belinda on 10/22/2017

Page 122

1  Darlene and Mr. Struthers, in that line of command,
2  if you will?
3      A.  Correct.
4      Q.  Okay.  And do you know where Darlene
5  signed the resignation?
6      A.  At J. Johnson's office.
7      Q.  And when she signed it, was there also a
8  document signed the same day regarding
9  Mr. Struthers' capacity?
10     A.  That was sent in later by his physician --
11 his personal physician, Dr. Okerblom.  He took care
12 of dad for -- the whole time he lived in Santa
13 Maria; for 20 years.
14     Q.  Okay.  Were you present with Darlene when
15 she signed the resignation?
16     A.  Yes.
17     Q.  And do you see something in front of you
18 titled, Resignation of Trustee and Assignment of
19 Trust Assets?
20     A.  Yes.
21     Q.  Does this look like the resignation she
22 signed?
23     A.  Yes.
24     Q.  And the date is July 7, 2017.  Does that
25 sound correct?

Page 123

1      A.  Yes.
2      Q.  And, I mean, does that sound correct as
3  the date that it happened, not what it says on this
4  document?
5      A.  That's the date that she resigned.
6      Q.  Okay.  And down here we have J. Johnson
7  appearing as the notary, correct?
8      A.  Correct.
9      Q.  So as of 7/7/2017 Darlene had relinquished
10 her duties of the 1993 trust?
11     A.  Yes.
12     Q.  And who were the trustees, other than --
13 well, who was second in command as trustees on the
14 1993 trust after Ralph and Darlene?
15     A.  It was Julie and me as successor
16 co-trustees for the --
17     Q.  Okay.
18     A.  -- for the financial POA.
19     Q.  Okay.
20     A.  There was a medical POA as well.
21     Q.  Mm-hmm.
22     A.  And they had different people on there.
23     Q.  Okay.
24     A.  So --
25     Q.  Who was on the medical POA?

Page 124

1      A.  For Darlene it was, first, her brother,
2  Eddie, who passed away in 2010.  So after him on the
3  medical POA it was his son -- his oldest son, Edwin
4  Lye.
5      Q.  Okay.  And then Mr. Struthers --
6      A.  Oh, I forgot.
7      Q.  -- and then you?
8      A.  Excuse me.  Let me -- let me rephrase
9  that.
10         Dad was first -- would be first on that.
11 If something happened to Darlene, he would be first.
12 And then it was her brother, Eddie; and then Edwin.
13     Q.  Gotcha.  Okay.  I'll show you another
14 document.
15         (Brief pause.)
16 BY MR. CROSS:
17     Q.  And do you see a document that's got, CD
18 withdrawal, on it in front of you?
19     A.  Mm-hmm.
20     Q.  Do you know what this document is?
21     A.  It's -- let's see.  It's closing of an
22 account at -- for a CD.
23     Q.  Okay.
24     A.  Yeah.
25     Q.  On September 1, 2017?

Page 125

1      A.  Uh-huh.
2      Q.  Do you recall if you -- if you directed
3  this withdrawal to occur?
4      A.  I -- I was with Darlene.  Is that what
5  you're asking?
6      Q.  No.  No.  I'm asking whose decision it was
7  to do this.
8      A.  It was Darlene's decision.
9      Q.  Okay.  And then this cashier's check for
10 $75,285.38 --
11     A.  Mm-hmm.
12     Q.  -- this is from the same --
13     A.  Mm-hmm.
14     Q.  What's the date on this?  September 1,
15 2017.  This is related to that, right?
16     A.  Yes.
17     Q.  Okay.  And do you know whether and where
18 this cashier's check was cashed?
19     A.  It was -- it was cashed in, I believe,
20 Quartz -- Lancaster or Quartz Hill.  So what
21 happened is that -- that bank -- and the reason why
22 Darlene wanted to close that account was because
23 they didn't have that bank -- any branches close to
24 where she was residing in Lancaster.
25         So we put that check back into the bank in

Page 126

1  Quartz Hill at Bank of America -- not -- yeah, Bank
2  of America, into a CD account, which is basically
3  taking it from one CD and putting it into another CD
4  titled in the 1993 trust.
5      Q.  Okay.  So Darlene made the decision to,
6  basically, take money from one account for the 1993
7  trust and put it into another for convenience?
8      A.  Because she was moving and -- well, she
9  had already moved.  So she actually -- it took that
10 long for it to process, I guess.  And then we opened
11 up an account --
12     Q.  But -- but her reasoning is what I'm
13 curious about.  And so it's based on convenience for
14 where she moved to, right?
15     A.  Correct.
16     Q.  Is there any other reason that you are
17 aware of?
18     A.  No.  Just to get -- get everything
19 together in one city, instead of out in Santa Maria
20 and --
21     MR. CROSS:  Okay.  And this document is on
22 page 23 of this exhibit.  We'll make this -- I think
23 this was Exhibit C (sic).  I haven't been very good
24 at -- we'll do the notice of depo as Exhibit 1
25 (sic); and the settlement agreement as Exhibit 2

Page 127

1  (sic); and I think this is Exhibit 3 (sic).  If not,
2  I'll correct myself.
3      Q.  This is a CD/IRA withdrawal, correct?
4      A.  What's the date on this?
5      Q.  It looks like it says 7/7/17.
6      A.  Yes.
7      Q.  Okay.  So this is -- I think it says --
8      A.  That was the day -- yeah, that was before
9  -- that was before she went to J. Johnson's to
10 resign.  Yes.
11     Q.  Okay.  So before she resigned -- the
12 descriptor here says, close out something account.
13 Is it your recollection that this was related to
14 closing an account?
15     A.  Yes.
16     Q.  And where did this money go after it was
17 closed?
18     A.  It went into another account.  I don't
19 know.  I need to see records, actually.
20     Q.  Okay.  And Darlene made this decision?
21     A.  Yes.
22     Q.  Okay.  Do you know why she wanted to
23 withdraw this money?
24     MR. LACHONA:  Objection.  Calls for
25 speculation.

Page 128

1      MR. CROSS:  You can answer.
2      THE WITNESS:  The bank was in Santa Maria.
3  So we were moving it all to one city.
4  BY MR. CROSS:
5      Q.  Okay.  So that September 2017 withdrawal
6  we just talked about before and this July 2017
7  withdrawal are both related to moving?
8      A.  Yeah, I believe so.  I can't even go back.
9  So it makes it really difficult.
10     Q.  (Complying.)
11     A.  Okay.
12     Q.  Tell me what you want to see.  This one
13 says, moved out of area --
14     A.  Mm-hmm.
15     Q.  -- from September 2017.  And so is your
16 testimony that these both -- both of these
17 transactions, meaning the one in September and the
18 one in July, were related to moving?
19     A.  So are the -- are the banking institutions
20 different?  So what's -- the first banking
21 institution was First Bank?
22     Q.  Mm-hmm.  Yes.  But my question is --
23     A.  And the other one was Pacific Premier?
24     Q.  Yes.  But my question is, do you know the
25 reasoning behind this other withdrawal, the July

Page 129

1  withdrawal?
2      A.  Well, I know when dad was in the hospital
3  we did cash out -- and I'm not sure which one it
4  was.  But we put it into Bank of America, because
5  dad had some hospital bills going out, and we were
6  hiring Ronda to take care of dad.  So we were -- we
7  knew that there was going to be a lot of money going
8  out.  So one of those -- I'm not sure which one it
9  was, because -- I really need these documents in
10 front of me if you want a good answer, because I --
11 if I don't see the documents in front of me, I'm
12 just -- I'm doing a guess, which I don't want to do,
13 especially --
14     MR. LACHONA:  Belinda, stop.  Belinda,
15 stop, please.
16     Steven, can we send her these documents,
17 email them?
18     MR. CROSS:  Sure.  Can I have her personal
19 email, or do you want me to send them to you?
20     MR. LACHONA:  Send them to me.
21     MR. CROSS:  Okay.  Give me one second
22 here.  Can we go off the record?
23     THE REPORTER:  Sure.
24     (Discussion off the record.)
25     MR. CROSS:  Okay.  Let's go back on the

In the Matter of: RALPH C. STRUTHERS REVOCABLE TRUST UDT
Connor, Belinda on 10/22/2017

Page 130

1  record.
2      Q.  So do you see page 14?
3      A.  Are you talking about Exhibit 14?
4      Q.  No.  Page 14.
5      A.  Well, I've got exhibits here.  Exhibit 6?
6      Q.  Sure.  Exhibit 7.
7      A.  Exhibit 7.  Oh, I see.  There's numbers at
8  the bottom now.  Okay.  Exhibit 7.
9      Q.  So I think the question was, on the last
10 page of this exhibit, do you know why this was done?
11 Was there a reason given to you somehow as to why
12 Darlene withdrew $76,295?
13     A.  It was to get the money in the same area
14 that she was residing, because it was difficult to
15 drive to Santa Maria to do banking.  Because that
16 branch did not exist in Lancaster/Palmdale.
17     Q.  Okay.  So to summarize, the July 2017
18 withdrawal and the September 2017 withdrawal that
19 we've talked about were both related to moving
20 locations?
21     A.  Yes.
22     Q.  Okay.  Did you inform the beneficiaries of
23 the 1993 trust that Darlene resigned?
24     A.  Yes.
25     Q.  And when did you inform them?

Page 131

1      A.  After she resigned.  The 7th.  And did I
2  --
3      Q.  The same day?  The same day?
4      A.  Pardon?
5      Q.  Did you inform them the same day --
6          MR. LACHONA:  Objection.
7  BY MR. CROSS:
8      Q.  -- that she resigned?
9          MR. LACHONA:  Objection.  Steven, when you
10 say beneficiaries, do you mean the beneficiaries of
11 the --
12         MR. CROSS:  I said the 1993 --
13         MR. LACHONA:  -- the 1993, I'm assuming?
14         MR. CROSS:  Yeah.  I said, did you inform
15 the beneficiaries of the 1993 trust --
16         MR. LACHONA:  Okay.
17         MR. CROSS:  Sorry, Court Reporter.  Sorry,
18 Kristen.
19     Q.  Anyway.  Did you inform the beneficiaries
20 of the 1993 trust when Darlene resigned?
21     A.  I informed the sisters.  I didn't inform
22 --
23     Q.  And when --
24     A.  -- all of the grandchildren.
25     Q.  When did you inform the sisters?

Page 132

1      A.  After she resigned.
2      Q.  The same day?
3      A.  I don't know.
4      Q.  Within a week?
5      A.  More than likely.
6      Q.  So you believe it was within a week, then;
7  is that correct?
8      A.  Correct.
9      Q.  Okay.  And do you remember how you
10 informed them?
11     A.  Text message.
12     Q.  Okay.  Did you inform them as to why she
13 resigned?
14     A.  Yeah.  I told them that the doctors didn't
15 want dad to go home with Darlene, and that Darlene
16 didn't feel comfortable being -- she was just too
17 stressed out to handle everything going on.  So --
18     Q.  Okay.  Okay.  Exhibit 2 of what I sent you
19 I'll put on the screen as well.
20         (Brief pause.)
21 BY MR. CROSS:
22     Q.  Do you see a -- what looks like, to me, a
23 text message from Belinda Connor?
24     A.  Yes.
25     Q.  And is this the text that you're referring

Page 133

1  to that informed them of her resignation?
2      A.  Yes.  But I don't know who I sent it -- I
3  don't know who this -- this one went to; if it's
4  everybody -- is it a group?  I don't know.
5      Q.  Sure.  But does this -- does this look
6  like the --
7      A.  Yes.
8      Q.  -- substance of what you sent them?
9      A.  (Nodding head.)
10     Q.  Is that a yes?
11     A.  Yes.
12     Q.  Okay.  And moving forward to July 2017,
13 Mr. Struthers went to the hospital for an infection;
14 is that correct?
15     A.  July 2017?
16     Q.  Yeah.
17     A.  Yes.  Well, not really.  But --
18     Q.  When did Mr. Struthers, if at any time, go
19 to the hospital for an infection, that you are aware
20 of?
21     A.  He went there for an infection, and also
22 because his blood sugar was up to 900.  So he --
23     Q.  When do you think that was?
24     A.  That was July 11, 2017.
25     Q.  Okay.  And when he went to the hospital

Page 134

1    for an infection, he came from where? Where was he
2    residing at that time?
3        A.  Villa Maria; Santa Maria.
4        Q.  In a nursing home?
5        A.  Yes.
6        Q.  Okay. And around this time did any
7    doctors write letters regarding his capacity?
8        A.  Yes.
9        Q.  Okay. And do you recall what the doctors'
10   names were?
11       A.  I only know his personal care physician's
12   name was Dr. Okerblom.
13       Q.  Okay. Did Dr. Okerblom write anything --
14   write any letters indicating that Mr. Struthers
15   lacked capacity?
16       A.  Yes.
17       Q.  As far as you are aware, how many doctors
18   wrote letters regarding his capacity -- excuse me.
19   Let me rephrase that.
20            As far as you are aware, how many doctors
21   wrote letters saying Mr. Struthers lacked capacity?
22       A.  Two.
23       Q.  Two. And did either of those doctors see
24   him in person?
25       A.  Yes.

Page 135

1        Q.  And which doctors; both?
2        A.  For sure Dr. Okerblom. I'm not sure if
3    the other one did. He actually had his practice in
4    the same office. So he took care of dad as well on
5    different occasions. If he went to the nursing
6    home, I don't really know, because I wasn't there
7    the whole time.
8        Q.  Okay. So Dr. Okerblom and another doctor
9    wrote these letters saying Mr. Struthers didn't have
10   capacity; and you are sure that at least
11   Dr. Okerblom did that after seeing him in person?
12       A.  Yes. He cared for him while he was in the
13   nursing home.
14       Q.  Okay. Did you talk to either of the
15   doctors who wrote these letters?
16       A.  No.
17       Q.  Okay. Who -- well, do you know how this
18   issue came to be; who asked them to see if your dad
19   had capacity?
20       A.  I -- when we went to J. Johnson's office,
21   and when Darlene resigned, J. Johnson said that
22   since dad was in the condition that he was in, for
23   his protection we should get letters of incapacity
24   from at least two physicians, because that's what it
25   states in the trust document.

Page 136

1            So I went to the doctors' office, and I
2    talked to the receptionist, and she said that she
3    would speak to the doctors, and that -- actually,
4    there were two doctors on staff that cared for my
5    father, and that she would talk to both of them
6    about that, about writing letters of incapacitation
7    -- incapacity.
8        Q.  Okay. And we've discussed two meetings
9    that you were a part of with J. Johnson. Was this
10   the first or the second meeting that resulted in you
11   going back to the hospital and asking the doctors --
12   or excuse me -- the assistant at the front this
13   question?
14       A.  That happened on July 7th. And I -- I
15   don't think I was in -- I talked to them on the
16   phone. But I don't think, in person, I was there at
17   J. Johnson's office, besides the 7th of July when
18   Darlene resigned.
19       Q.  When you mentioned two meetings with
20   J. Johnson earlier, did you mean two meetings in
21   person in his office?
22       A.  In May with dad and Darlene.
23       Q.  So how many times did you talk to
24   J. Johnson on the phone?
25       A.  I don't know.

Page 137

1        Q.  More than three?
2        A.  I don't know.
3        Q.  More than ten?
4        A.  No.
5        Q.  Okay. More than five?
6        A.  I talked to Hannah Johnson, his daughter.
7    I didn't talk to J. Johnson often.
8        Q.  But, I mean, anyone --
9        A.  I did talk --
10       Q.  -- anyone from his office.
11       A.  Hannah. I talked to Hannah on the phone
12   more than I spoke with J. Johnson. And I did speak
13   to J. Johnson when Darlene was resigning as --
14       Q.  My question --
15       A.  -- trustee.
16       Q.  My question is, how many times did you
17   talk to anyone from J. Johnson's office? And I
18   think we were saying -- well, did you talk to
19   someone from that office more than five times, do
20   you think?
21       A.  I don't know.
22           MR. IACHONA: Objection. Do you mean talk
23   on the phone, or in person, or total?
24           MR. CROSS: On the phone. On the phone.
25           THE WITNESS: I don't know.

In the Matter of: RALPH C. STRUTHERS REVOCABLE TRUST UDT
Connor, Belinda on 10/22/2017

Page 138

1   BY MR. CROSS:
2       Q.  Okay.  And so it was a July 7, 2017
3   conversation with someone from J. Johnson's office
4   that led you to ask these questions regarding
5   capacity?
6       A.  No.  J. Johnson is the one that brought up
7   letters of incapacity to me.  And he said I need to
8   get that before dad goes off to Ronda's house,
9   because he's in a -- the wrong -- well, he could be
10  taken advantage of.  And he --
11      Q.  Okay.  So --
12      A.  -- thought it was the best thing to do for
13  dad.
14      Q.  So that sounds to me like the answer to my
15  question is a yes, then.  Because I hope I asked --
16  what I'm trying to ask you is whether you went to
17  the hospital to ask the questions regarding
18  capacity, that you mentioned earlier, to the staff,
19  that you did that because of a prompting on a call
20  on July 7th from J. Johnson's office.  Is that
21  correct?
22      A.  No.
23      Q.  Okay.  Why -- why did you go to ask them
24  to evaluate him for capacity?
25          MR. LACHONA:  Objection.  Who are you

Page 139

1   referring to?
2   BY MR. CROSS:
3       Q.  Why did you ask the medical staff to
4   evaluate Mr. Struthers' capacity?
5       A.  I -- I didn't.  I didn't go to the
6   hospital staff to ask for those letters.  I went to
7   Dr. Okerblom's office and --
8       Q.  Forgive me.  You're correct.  Let me ask
9   it a better way and again.
10          So were you prompted to go to that
11  doctors' office to ask about capacity because of a
12  phone call on July 7, 2017 with J. Johnson's office?
13      A.  No.
14      Q.  What prompted you to go to the doctors'
15  office and ask about capacity?
16      A.  I was at the -- at J. Johnson's office,
17  and Darlene was resigning -- resigning her duties.
18  And he said that, before your dad leaves with Ronda,
19  you need to get -- he told -- he advised me that I
20  get letters of incapacity, at least from two
21  different physicians, before dad left so it would
22  protect him from anybody trying to take advantage of
23  him.
24      Q.  And that occurred on July 7, 2017; is that
25  right?

Page 140

1       A.  Yes.
2       Q.  Okay.  Who else was there during this
3   meeting with J. Johnson's office?
4       A.  It wasn't a meeting.  I just went into the
5   office.  I didn't have a meeting.  I just went to
6   the office.
7       Q.  Who was there during this drop-in, or
8   whatever?  Was it just you and J. Johnson?
9       A.  Are you talking about at the lawyer's
10  office?
11      Q.  Yes.
12      A.  Oh, I thought you were talking about the
13  medical office.
14      Q.  I'm sorry.
15      A.  So --
16      Q.  Yeah.
17      A.  Okay.  At J. Johnson's office there was --
18  it was me, and I believe Julie there, and Darlene
19  was there, and J. Johnson.  I don't -- I don't think
20  Hannah was there.
21      Q.  Okay.  And is that it?  Is that everyone
22  you remember?
23      A.  That's all I remember right now, yes.
24      Q.  Okay.  And then are you aware of a letter
25  from a Dr. Gruenefeldt?

Page 141

1       A.  That's dad's personal physician once he
2   moved to Auburn.
3       Q.  And is it your understanding that
4   Dr. Gruenefeldt wrote a letter indicating that
5   Mr. Struthers was capable of making his own
6   decisions since at least May of 2017?
7       A.  I believe he wrote that.
8       Q.  Okay.  And let's go to the documents.
9   Let's see.  What exhibit would this be?  Exhibit 4
10  on the documents in front of you -- tell me when
11  you're there.
12          (Brief pause.)
13  BY MR. CROSS:
14      Q.  I'm sorry.  Exhibit 5.  Ready?
15      A.  Okay.  Exhibit 5.  I'm there now, yes.
16      Q.  Okay.  And so is this one of the letters
17  that you were referring to that stated that
18  Mr. Struthers didn't have capacity?
19      A.  Yes.
20      Q.  Okay.  And this other letter by Okerblom,
21  is this the other letter you're referring to?
22      A.  Yes.
23      Q.  Okay.  And these were from July 10, 2017
24  and July 11, 2017?
25      A.  Mm-hmm.

In the Matter of: RALPH C. STRUTHERS REVOCABLE TRUST UDT
Connor, Belinda on 10/22/2017

Page 142

1    Q.  So I believe you testified that
2    Dr. Okerblom saw him in person.  But do you know if
3    Dr. Jezierski did?
4        A.  I wasn't there every day of the week.  I'm
5    sure they had rounds, and they did see dad often, at
6    least once -- once a day, I think.
7        Q.  Okay.  But do you know whether
8    Dr. Jezierski saw him in person?
9        A.  I don't know.
10       Q.  Okay.  I'm going to Exhibit 3.  Tell me
11   when you're there.  It's the letter from
12   Gruenefeldt.
13           (Brief pause.)
14           THE WITNESS:  I'm there.
15   BY MR. CROSS:
16       Q.  Okay.  And this is the letter from
17   Dr. Gruenefeldt where -- that you were referencing
18   earlier where he stated that Mr. Struthers was able
19   to make his own decisions, correct?
20       A.  It says that in his belief he's -- his
21   living conditions are far better and suited for his
22   need and --
23       Q.  Well, here, let me be more specific so you
24   don't have to read the whole thing.
25           On the paragraph starting, although --

Page 143

1    although he suffered a stroke on or about May 2017,
2    dot, dot, dot, the nature and extent of his bounty
3    and is able to coherently follow thoughts and make
4    and express knowing and rational decisions related
5    to his personal care.  Do you see that?
6        A.  Yes.
7        Q.  Okay.  On October 24, 2017 a check was
8    written to J. Johnson.
9            MR. LACHONA:  Mr. Cross?
10           MR. CROSS:  Yeah.
11           MR. LACHONA:  Hold on.  Was there a
12   question that you had before, or were you just
13   asking --
14           MR. CROSS:  Whether it said that.
15           MR. LACHONA:  -- to confirm what the words
16   are on the piece of paper?
17           MR. CROSS:  Yeah.  Yeah.  Not the best
18   question.  But yes.
19           MR. LACHONA:  Okay.
20   BY MR. CROSS:
21       Q.  So are you aware of a check that was
22   written for $2,156.06 to J. Johnson from the
23   Struthers trust?
24       A.  Yes.
25       Q.  Okay.  And that check was written -- or

Page 144

1    signed on October 24, 2017; is that -- do you know
2    that --
3        A.  Is that an --
4        Q.  -- do you know that to be true?
5        A.  -- exhibit?  Do you want me to check that
6    out, the date; is that what you're asking me to do?
7    What's the exhibit number?  Oh, there it is.  I see
8    it.  Yeah, October 24, 2017.
9        Q.  Which exhibit is it?  Oh, I see it.  Okay.
10   So this would be after she resigned, correct?
11       A.  Correct.
12       Q.  Okay.
13           MR. LACHONA:  Objection.  I assume you are
14   talking about Darlene.
15           MR. CROSS:  Yes, Darlene.
16       Q.  The withdrawal of 75- or 76k that we
17   talked about earlier in July and September -- do you
18   remember that?
19       A.  Yes.
20       Q.  Okay.  How long -- excuse me.
21           When, if ever, in 2017 did Julie buy a new
22   truck?
23       A.  I don't know.
24       Q.  Do you know if she received any of that
25   money?

Page 145

1            MR. LACHONA:  Objection.
2            THE WITNESS:  She did not.
3            MR. LACHONA:  Belinda, hold on.  What
4    money are you talking about?
5            MR. CROSS:  The 75- to 76k that was
6    withdrawn that we talked about earlier from July --
7    in July and September.
8            THE WITNESS:  No.  It was moved from one
9    bank to another bank titled in the trust; the same
10   amount of money plus interest.  So that's -- that's
11   what we -- that's how we -- no money was given to
12   anybody else.  It was the same amount taken from the
13   bank and then put into the bank.
14           MR. CROSS:  Okay.
15           THE WITNESS:  So the one from -- the one
16   from July was taken out of a CD, because they didn't
17   have one in Lancaster, and it was put into dad and
18   Darlene's joint savings account, the same amount
19   with interest.
20           MR. CROSS:  Understood.
21           THE WITNESS:  Okay.
22   BY MR. CROSS:
23       Q.  I'm going to Exhibit -- within this
24   exhibit, Exhibit 1, if you will.  And I'll bring it
25   up on the screen.  And it should say Kern Schools.

Page 146

1    Do you see that?
2        A.  Yes.
3        Q.  So my understanding of this is that it's
4    related to getting a reimbursement for a check.  And
5    this document -- excuse me.  The date of the check
6    at the top left is 5/18/2018.
7            Have you ever seen this document before?
8        A.  I have seen it, yes.
9        Q.  Okay.  And what do you understand it to
10   be?
11       A.  We sent care checks to Ronda monthly.  And
12   we continued doing so because we were advised to.
13   We did it until May.  This is probably the last one
14   that we sent her, even though she had already taken
15   all of the money from the bank account -- or half of
16   the money from each of the bank accounts.  We sent
17   it to Ronda, one of the cashier's checks.  And when
18   it came -- when it came back, it never -- I don't
19   know.  It got lost in the mail, or whatever.  But
20   eventually -- eventually the bank where she bought
21   the cashier's check reimbursed her, because Ronda
22   never picked up the cashier's check.
23       Q.  Do you know if this money ever made its
24   way to Ronda?
25       A.  It made its way to Ronda.  But Ronda

Page 147

1    refused to pick it up at the post office.
2        Q.  Okay.  So as far as you're aware, she has
3    never cashed it?
4        A.  She never did, no.
5        Q.  Okay.
6        A.  And then it got returned to sender.
7        Q.  And this was a payment that was supposed
8    to come from the 1993 trust; is that correct?
9        A.  Yes.  So what we did is we took -- so
10   there's $1,253 a month for her care -- for dad's
11   care; plus we added dad's social security check in a
12   different -- in a different cashier's check so Ronda
13   couldn't say she wasn't receiving dad's social
14   security check as well.  So all together that made
15   $2,000.
16           So what we did is we gave -- we weren't
17   getting dad's -- I wasn't a payee for his social
18   security any longer.  And that's the reason why it's
19   just $1,253.  So we took money out of -- out of the
20   bank, Mission -- Mission Bank, and we gave the cash
21   to Julie, and Julie bought the cashier's check from
22   her own bank, because we didn't want Ronda to invade
23   any more of our accounts.
24       Q.  So just to make sure --
25       A.  We didn't want her to really know where we

Page 148

1    were banking, basically.
2        Q.  So just to make sure I understand, what
3    you are saying is you took money out of the 1993
4    trust account for Julie to take that money and get a
5    cashier's check from her personal account?
6        A.  No.  Well, she was supposed to take the
7    money and buy a cashier's check for Ronda.
8        Q.  Right.  That's what I mean.
9        A.  And then we mailed it to Auburn for Ronda.
10       Q.  I'm not -- I'm not saying that the end
11   goal here isn't to get it to Ronda.  But the process
12   that I just outlined is correct; yes?
13       A.  Do you want me to go through it again?
14       Q.  No.  No.  Am I correct that what you did
15   here was you took money out of the 1993 trust, and
16   Julia, then -- Julie just then used that money to
17   get a cashier's check; is that accurate?
18       A.  Correct.
19       Q.  Okay.  And it was from Julie's personal
20   account that that --
21       A.  No.
22       Q.  -- cashier's check came from?
23       A.  It's the cash that we got from the bank.
24       Q.  Understood.  But she is using her personal
25   account to make this happen?

Page 149

1        A.  No.  She was buying a cashier's check.
2    She wasn't -- she wasn't using her account.  She had
3    an account there.  But she bought the cashier's
4    check at Kern Schools.
5        Q.  Okay.
6        A.  That's where the cashier's check was
7    written from.
8        Q.  Thank you.  And is there a reason why it
9    was payable to Ronda Myers or Julia Ratridge?
10       A.  Because for the last six months we had
11   been sending money to Ronda for care, and she wasn't
12   accepting them.  She was leaving them at the post
13   office.  And eventually they found their way back to
14   us.  So it would -- just so the process of
15   reclaiming that money and putting it back into the
16   trust account, it would make it easier because both
17   of their names would have been on it.
18       Q.  Okay.  Who -- what attorney wrote the 1993
19   trust?
20       A.  That was -- was that -- oh, I'm getting
21   all of these names -- Gravelak.
22       Q.  Was there a reason why you didn't choose
23   to go to him when you wanted to, I think you said,
24   update the trust?
25       A.  I didn't even know we (inaudible) --

In the Matter of: RALPH C. STRUTHERS REVOCABLE TRUST UDT
Connor, Belinda on 10/22/2017

Page 150

```
1              MR. LACHONA:  Objection.  Misstates
2    testimony.
3    BY MR. CROSS:
4        Q.  What was the answer?
5        A.  Do you mean simplify?  Because --
6        Q.  Sure.  Simplify.
7        A.  So we didn't even know we were going to do
8    it.  When we went to the Johnsons we had -- we
9    didn't even know anything was going to be
10   simplified.  That was the suggestion by J. Johnson,
11   to simplify it.
12       Q.  Okay.  So who first brought up the idea of
13   going to J. Johnson?
14       A.  That was -- Carole called me, and she said
15   she thinks that since dad and Darlene are both
16   getting up there in age, that it would be a good
17   idea to make sure all of the assets were included in
18   the trust and titled in the trust.
19       Q.  Okay.  And when that -- after that
20   discussion, is there a reason why you didn't take
21   that to the original trust writer?
22       A.  I didn't even know --
23              MR. LACHONA:  Okay.  Belinda, hold on.
24   Take what?
25              MR. CROSS:  Take that need to make sure
```

Page 151

```
1    the assets are included.
2              MR. LACHONA:  Take that -- I guess, what
3    do you mean, take that need?
4              MR. CROSS:  Sure.  So -- it's a bad --
5    it's bad phrasing.
6        Q.  So you just testified that there were
7    certain reasons you wanted to go to J. Johnson.  And
8    my question is, is there a reason that you didn't go
9    to the person who wrote the 1993 trust instead?
10       A.  I had no reason to.  I didn't -- they
11   lived in Santa Maria.  They were both elderly.  They
12   couldn't take long trips.  So we chose somebody that
13   was close to Santa Maria.  And that's why we ended
14   up at J. Johnson's.
15       Q.  Okay.  So it wasn't anything negative
16   about the original trust writer.  It was some things
17   that were positive about J. Johnson, i.e., he was
18   closer; is that correct?
19       A.  Correct.
20       Q.  Okay.
21       A.  Correct.
22       Q.  And so during one of the J. Johnson
23   meetings there were people you listed, and I want to
24   make sure I go through all of them.  I know who
25   Carole is.  Was Bill present for one of these
```

Page 152

```
1    meetings?
2        A.  Bill was, yes.
3        Q.  And who is he?
4        A.  He is Carole's husband.
5        Q.  Okay.  And was your husband present for
6    one of these meetings?
7        A.  Yes.
8        Q.  And what was his name?  I think you told
9    me already.  I'm sorry.
10       A.  Mike.
11       Q.  Mike.  Okay.  And so was there anyone else
12   who I haven't mentioned other than you, Darlene and
13   Ralph who were -- who was present?
14              MR. LACHONA:  Objection.  Asked and
15   answered.
16              MR. CROSS:  You can answer.
17              THE WITNESS:  Hannah was there.
18   BY MR. CROSS:
19       Q.  Hannah.  Who is Hannah?  You mean the
20   attorney?
21       A.  Yes, Hannah Johnson.
22       Q.  Oh, okay.  Other than the attorney, have
23   we mentioned everyone who was there?
24       A.  On that first meeting, yes.
25       Q.  Okay.  In the second meeting was there
```

Page 153

```
1    anyone additional present, other than attorneys?
2        A.  The second meeting was at home.  It was a
3    conference call with those same people, plus
4    J. Johnson.
5        Q.  Okay.  But not including attorneys, no one
6    additional was added to the list, correct?
7        A.  Correct.
8        Q.  Okay.  And Carole, at the time, was
9    present at this meeting when she lived in -- let me
10   rephrase that.
11           Carole lived in Texas during that first
12   meeting, correct?
13       A.  Correct.
14       Q.  So she flew from Texas to be there at the
15   meeting?
16       A.  No.
17       Q.  How did she get to the meeting if she
18   lived in Texas?
19       A.  She flew -- she didn't fly to do a
20   meeting.  She flew to make a visit.  She was
21   visiting dad, because he was, you know, getting
22   older, and she wanted to -- it was her vacation.
23   She was just coming out on vacation.  It wasn't to
24   go to J. Johnson's --
25       Q.  Okay.
```

In the Matter of: RALPH C. STRUTHERS REVOCABLE TRUST UDT
Connor, Belinda on 10/22/2017

Page 154

```
1        A. -- or anything to do with the trust.
2        Q. And then while she was there she mentioned
3   being worried about the inclusion of assets; is that
4   correct?
5            MR. LACHONA: Objection. Who are you
6   referring to?
7            MR. CROSS: While Carole was in town.
8            THE WITNESS: So Carole -- Carole came to
9   visit me first. And after she spent some days with
10  me, then she drove out to visit dad before she was
11  going to -- she would end up flying home after
12  seeing dad. So what was the question?
13  BY MR. CROSS:
14       Q. It was during this visit -- Carole's visit
15  that she mentioned some concern about the inclusion
16  of assets --
17       A. Mm-hmm.
18       Q. -- in the trust, correct?
19       A. Correct.
20       Q. Okay. Is Darlene currently able to make
21  her own medical decisions?
22           MR. LACHONA: Objection.
23           THE WITNESS: No.
24           MR. LACHONA: Calls for expert testimony.
25  BY MR. CROSS:
```

Page 155

```
1        Q. And has anyone told you -- well, what is
2   your opinion as to why, if any?
3            MR. LACHONA: Objection. Calls for expert
4   testimony.
5            MR. CROSS: You can still answer.
6            THE WITNESS: Darlene is older now, and
7   she -- she doesn't communicate as well as she used
8   to, and --
9   BY MR. CROSS:
10       Q. Is there a particular condition or
11  diagnosis that relates to her incapacity?
12           MR. LACHONA: Objection. Calls for expert
13  testimony.
14           MR. CROSS: You can test- -- you can
15  answer.
16           THE WITNESS: I believe the doctors think
17  that she has Alzheimer's.
18  BY MR. CROSS:
19       Q. And did you ever instruct anyone to
20  withhold the 1993 trust from Ronda or Darlene?
21       A. Never.
22       Q. Okay. Do you recall who were the original
23  trustees of the 1993 trust before the J. Johnson
24  involvement?
25       A. It was -- Ralph and Darlene were the
```

Page 156

```
1   trustees.
2        Q. And who were the second in line, then?
3        A. For -- are you talking about medical POA?
4   Are you talking about financial POA?
5        Q. Let me ask a better question.
6            After meeting with J. Johnson did the
7   trustee configuration change in the 1993 trust?
8        A. No.
9            MR. LACHONA: Objection. Configuration as
10  to?
11           MR. CROSS: The trustees.
12       Q. Who's first, who's second, did that
13  change?
14       A. No.
15           MR. CROSS: Give me a second here.
16           (Brief pause.)
17           MR. CROSS: I'm going to shift gears a
18  little bit, if you don't mind. Do you need a break,
19  anyone?
20           MR. LACHONA: Yeah, that would be good.
21  We've been going a while.
22           MR. CROSS: All right. Let's take five?
23           MR. LACHONA: No. 15.
24           MR. CROSS: 15? Okay. Let's go off the
25  record, and be back at 3:00?
```

Page 157

```
1            MR. LACHONA: Yeah.
2            MR. CROSS: Okay. Thank you.
3            (Recess.)
4            MR. CROSS: Okay. I've, kind of, put
5   together some of my questions that were missed so
6   that I -- you know, whatever. And so I might be
7   jumping around a little. So if I go too fast, just
8   stop me.
9        Q. In the objection that was filed there was
10  an objection related to wanting an itemized -- oh,
11  no. Sorry. We covered that already.
12           There was an objection related to Laura
13  Willis. Do you know -- do you have an understanding
14  as to what her role is, if any, with the 2017 trust?
15       A. I know she has done some accountings for
16  the 2017 trust.
17       Q. Okay. So are you objecting to $300 being
18  unreasonable for an accounting?
19       A. I think we were wanting to know if she
20  also worked for Ronda.
21       Q. Okay. So if we resolve that question, it
22  would resolve part of that objection?
23           MR. LACHONA: Objection. Calls for
24  speculation.
25           MR. CROSS: You can answer.
```

In the Matter of: RALPH C. STRUTHERS REVOCABLE TRUST UDT
Connor, Belinda on 10/22/2017

Page 158

1    THE WITNESS:  I -- does she -- I think
2    what we asked for was just, like, an itemized
3    invoice --
4         MR. CROSS:  Okay.
5         THE WITNESS:  -- for the accounting --
6    BY MR. CROSS:
7    Q.  With regard to --
8    A.  -- an invoice for $300.
9    Q.  Right.  With regard to your -- you
10   mentioned where you wanted to know about the
11   relationship.  If you found out that she volunteers
12   her time at the Enoch TBI Center, would that explain
13   to you the relationship enough to withdraw the
14   objection?
15   A.  I just want her to admit that she had a --
16   she has a business relationship with her, as well as
17   an accounting relationship with her.
18   Q.  Okay.  Another objection you have is
19   related to the Montecito Memorial Park.  I believe
20   this would be $530 for burial expenses.  Did you
21   find $530 to be unreasonable for burial expenses?
22   A.  We just wanted a receipt and an invoice.
23   That's all.
24   Q.  I understand.  But do you find that to be
25   an unreasonable amount?

Page 159

1    A.  No.
2    Q.  Okay.  There was an objection that talked
3    about $839.25.  And I'm quoting part of the
4    objection here.  Belinda didn't pay back when gave
5    her receipt; put on C/C, end quote.  I think that
6    was from an accounting.
7         Do you know what this is related to?
8    A.  Yes.
9    Q.  What is it related to?
10   A.  It's related to the time period before
11   Ronda became trustee for the Ralph trust.  Ronda did
12   three accountings for the 1993 trust.  And her first
13   accounting she gave us -- she gave us receipts for
14   the accounting.  But on one particular item she gave
15   us a reservation confirmation for a rental van.  And
16   we didn't pay her for it because it was just a
17   reservation for a van to --
18   Q.  And what was your understanding as to her
19   reasoning for using the van?  Did she tell you what
20   it was for?
21   A.  My problem is not that she used the van.
22   My problem is that she didn't give us an invoice for
23   the van.  She only gave us a reservation
24   confirmation.  It didn't say how long she had the
25   van.  It didn't say what the total amount for the

Page 160

1    van would be.  But it did have a number figure of, I
2    believe -- and I'm guessing.  It was, like, $650.
3         And so she -- we told her we weren't going
4    to pay her back for the van until she gave us the
5    actual invoice that has how much it actually cost
6    her to rent it.  So she did finally give that to us.
7    But she gave it to us in her second accounting --
8    her second official -- unofficial accounting.  And
9    so the final total for the van was -- I believe it
10   was, like -- let me see -- $738 for this van.
11   Q.  Can I -- can I ask what you just looked at
12   to refresh your recollection?
13   A.  When Ronda put that on her liabilities,
14   that I owed her --
15   Q.  Can I stop you, please?
16   A.  -- for her credit card -- pardon me?
17   Q.  Can I stop you, please?  Because I want to
18   get you out of here, too.  All I want to know is
19   what document you looked at just now to refresh your
20   recollection.
21   A.  I looked at -- at her old accounting that
22   she sent us --
23   Q.  Okay.  That's what I wanted to know.  Are
24   you still there?
25   A.  -- from when she had dad for the first

Page 161

1    three months.
2    Q.  I'm sorry.  You cut out on my screen.
3    Your said which accounting?
4    A.  The accounting that Ronda made for us; the
5    very first --
6    Q.  Which one?
7    A.  -- accounting she made for us.
8    Q.  Okay.
9    A.  So --
10   Q.  Thank you.
11   A.  And then she made a second accounting with
12   the appropriate amount for the -- she gave us the
13   invoice, and it was 700-and-some-odd dollars.
14   Q.  Okay.
15   A.  Well, she never --'
16   Q.  And did --
17   A.  She never scratched off how much we, you
18   know -- so what she did is, in the corner of all of
19   her informal accountings, under credit card she
20   would take the total of how much she spent on her
21   credit card.  So on the total of her credit card she
22   never scratched off the reservation confirmation
23   price, which was 600 and something.  So --
24   Q.  Okay.
25   A.  And then it went to the next one.  So what

In the Matter of: RALPH C. STRUTHERS REVOCABLE TRUST UDT
Connor, Belinda on 10/22/2017

Page 162

1    she did is she added all -- she did three
2    accountings, and she did all three, and she added
3    all of the three totals together, but she never took
4    off the reservation confirmation number. And then
5    there were three or four other things that didn't --
6    she didn't have receipts for in the first
7    accounting. But, yet, then she gave it to us in the
8    second accounting that she came up with, and we paid
9    for them when we got receipts.
10        So -- but she never scratched off what she
11   did in the first accounting, thereby making it --
12   the figure much larger when you add all of those
13   totals together from the corners of her accounting
14   for credit card charges. So it was the first, the
15   second and the third accounting that she --
16       Q.  Okay.
17       A.  -- had essentially done.
18       Q.  Okay. Thank you. And did Ronda convey to
19   you what the van was used for?
20       A.  Yes. It was to take dad home.
21       Q.  From?
22       A.  From Villa Maria.
23       Q.  Thank you. And so did you -- it sounds
24   like you said that the invoices for this issue have
25   been given to you; is that right?

Page 163

1    A.  Yeah -- yes. Correct.
2    Q.  Okay. There's also an objection related
3    to ApexCare on August 8, 2017 in the amount of $624.
4    What is ApexCare?
5    A.  It's a -- somebody that Ronda hired.
6    Q.  For what?
7    A.  To take care of dad.
8    Q.  Okay. And do you disagree that she should
9    be reimbursed for that payment?
10   A.  No.
11   Q.  So why is this objection in place?
12   A.  I disagree because she took it twice.
13   Q.  So you don't disagree with this in
14   principle; you disagree because you think it's been
15   double-dipped?
16   A.  Correct.
17   Q.  Okay. And do you believe that you're
18   entitled to documentation related to the trust from
19   Ronda or April from the time period before
20   Mr. Struthers passed away?
21   A.  I believe so. Because we were responsible
22   to document all the money leaving the trust. And we
23   needed to get receipts from Ronda so we could
24   reimburse her and have documentation of all moneys
25   leaving the trust.

Page 164

1        MR. LACHONA:  I'm going to object.
2    Steven, are you referring to the liability schedule
3    in the accounting; is that what your focus is right
4    now?
5        MR. CROSS:  No. I'm just -- whether,
6    generally, she's entitled to documentation from
7    before Ralph passed related to the trust.
8        MR. LACHONA:  So is there -- what is the
9    link between that and the accounting, if any?
10       MR. CROSS:  Like, documents supporting
11   things that happened before he passed.
12       MR. LACHONA:  Okay. Well, I'm going to
13   object based on relevancy.
14       MR. CROSS:  That's fair. I would agree.
15       Q.  So let's see. There's another issue
16   regarding a payment to Mr. Gruenefeldt. Am I saying
17   that correct, if you know?
18       A.  Gruenefeldt.
19       Q.  And what was that payment for?
20       A.  That was for the attorney that Ron- --
21   that they hired to divorce dad and Darlene.
22       Q.  Okay. And you object to that based on
23   that being an improper payment?
24       THE REPORTER:  I'm sorry. I'm sorry. Can
25   you repeat the last part of your answer?

Page 165

1        (Record read.)
2        THE WITNESS:  That was for a divorce
3    lawyer that was hired to divorce dad and Darlene.
4    BY MR. CROSS:
5        Q.  And do you think that payment wasn't -- or
6    that -- yeah, that payment to Mr. Gruenefeldt was
7    improper?
8        A.  It wasn't timely.
9        Q.  If the courts allow for a late claim to be
10   filed because of COVID, would you still have the
11   same objection?
12       MR. LACHONA:  Objection. Calls for a
13   legal conclusion.
14       MR. CROSS:  You can still answer.
15       THE WITNESS:  I haven't received anything
16   that says it was because of COVID. I've only heard
17   that from Ronda.
18   BY MR. CROSS:
19       Q.  Okay. There's one other -- not one other.
20   There's another issue regarding Kevin Eckard in the
21   amount of $75. I think the objection was that it
22   should have been paid out of probate, not the trust
23   estate. Is that still an ongoing objection?
24       A.  Yes.
25       Q.  Okay. There's another objection regarding

Page 166

1    payment to HM Partners, tax preparation, on April
2    18, 2022 in the amount of $671.
3         Do you find $671 to be an unreasonable
4    amount to pay for tax preparation?
5              MR. IACHONA: Objection. Calls for a
6    legal conclusion.
7              MR. CROSS: You can answer.
8              THE WITNESS: I just -- I don't know.
9    BY MR. CROSS:
10       Q.  Well, is this an ongoing objection you
11   have?
12       A.  Yes.
13       Q.  Okay.  There are multiple objections
14   related to Scarpelli Court Reporting, asking for
15   itemized invoices.  Do you -- have you received
16   those invoices?
17       A.  Yes.
18       Q.  So are those objections still standing?
19             MR. IACHONA: Objection. Calls for a
20   legal conclusion.
21             MR. CROSS: You can answer.
22             THE WITNESS: I haven't had a chance to go
23   through all of them. I think we just got that a
24   couple days ago.
25   BY MR. CROSS:

Page 167

1    Q.  Okay.  Do you know what the -- what
2    Conservator and Trust Services listed in the
3    accounting represents?
4        A.  I believe it's an accounting firm that
5    LaRonda uses.
6        Q.  Do you find $2,000 -- $2,007.50 to be an
7    unreasonable amount to pay for --
8              MR. IACHONA: Objection.
9    BY MR. CROSS:
10       Q.  -- a trust accounting?
11             MR. IACHONA: Objection. Calls for a
12   legal conclusion.
13             MR. CROSS: You can answer.
14             THE WITNESS: We just wanted to see the
15   invoice.
16   BY MR. CROSS:
17       Q.  But do you have an opinion related to
18   whether or not that's reasonable?
19             MR. IACHONA: Objection. Calls for a
20   legal conclusion.
21             MR. CROSS: You can answer.
22             THE WITNESS: I don't know.
23             MR. CROSS: That's fair. I'm just going
24   through.
25             (Brief pause.)

Page 168

1              MR. CROSS: Okay.  Here's where it might
2    get a little not connected.
3         Q.  Was it Carole who made the appointment --
4    first appointment with J. Johnson?
5         A.  Yes.
6         Q.  There was a figure we talked about earlier
7    from the settlement agreement of around $4,535.  Do
8    you remember that?
9         A.  Yes.
10        Q.  Did this money go to Ronda; do you know?
11        A.  Yes.
12        Q.  Via a check, or how?
13        A.  Two personal checks to Ronda.
14        Q.  How much were the -- each amount in?
15        A.  Can I look at the records, or do you want
16   me to go from memory?
17        Q.  Do you want to see the settlement
18   agreement, or what do you want to see?
19             Well, let's do this -- let's do this:  So
20   we've said it's about 4,500 bucks.  Approximately
21   how much was each check, if you recall?  If not, I
22   can move on.
23        A.  I'm not going to do that. I'm sorry. I'm
24   not going to do that. I'm not going to just go by
25   what I recall. I'm going to try to find the

Page 169

1    information for you.
2         Q.  That's okay.  I can move on.  Frankly,
3    it's not a huge deal.
4         A.  Okay.
5         Q.  I'm just establishing a record.
6              So how did you -- how were these checks
7    delivered to her?  Were they mailed, handed in
8    person, or what?
9         A.  The mail.
10        Q.  Okay.  Were they sent, both of them, at
11   the same time?
12        A.  Yes.
13        Q.  And do you have any documentation that
14   shows they were deposited?
15        A.  Into Ronda's account?
16        Q.  Yeah.  Or that they were removed from your
17   account -- not your account --
18        A.  Yes.
19        Q.  -- but the account they came from.
20        A.  The account from -- yeah.  The Struthers
21   trust, yes.  From the Struthers check account.
22        Q.  Okay.  Did Ronda speak to you about
23   Mr. Struthers' foot doctor in 2017?  Do you recall
24   that -- any conversations related to that?
25        A.  I know he's seen a foot doctor in Villa

In the Matter of: RALPH C. STRUTHERS REVOCABLE TRUST UDT
Connor, Belinda on 10/22/2017

Page 170

```
1   Maria.
2        Q.  Do you recall that his tail -- excuse me
3   -- toenail at some point was ripped off?  Do you
4   remember that happening?
5        A.  No.
6        Q.  Okay.  Do you recall ever denying care
7   related to his feet?
8        A.  I never -- I never denied care.
9        Q.  Okay.  So the settlement agreement that we
10  talked about earlier, do you recall whether that
11  required the accounting be approved before
12  distributions could happen?
13       A.  It was included with each of our --
14       Q.  Okay.
15       A.  -- petitions.
16       Q.  How many trust- -- how many trustees do
17  you serve on -- excuse me.
18           How much trusts are you a trustee of?
19       A.  Just the 1993.
20       Q.  Okay.  And what were Mr. Struthers' wishes
21  for burial, if you recall?
22       A.  He and my stepmom bought cemetery plots in
23  Sylmar, California, in 2002.  And his wishes were to
24  be buried there.
25       Q.  Did he want to be embalmed; do you know?
```

Page 171

```
1        A.  I know that the grave sites were large
2   enough for him to be embalmed; that they were
3   regular size.  It wasn't just, like, a small area so
4   he could be buried --
5        Q.  Okay.
6        A.  -- he could be embalmed.
7        Q.  But do you recall him ever expressing to
8   you, positive or negative, wanting or not wanting to
9   be embalmed?
10           MR. LACHONA:  Objection.  (Inaudible.)
11           THE WITNESS:  I don't know --
12           MR. CROSS:  What was the answer?
13           THE REPORTER:  I'm sorry.
14           MR. CROSS:  It was a relevance objection.
15           THE REPORTER:  What was the objection?
16           MR. LACHONA:  Objection.  Irrelevant.
17           THE REPORTER:  Thank you.
18           MR. CROSS:  You can still answer.
19           THE WITNESS:  I -- I believe -- I believe
20  that my father wanted to be embalmed and buried in
21  the place that he chose in Sylmar.
22  BY MR. CROSS:
23       Q.  And why -- what brought you to that
24  conclusion?
25       A.  He bought the cemetery plot.  So that
```

Page 172

```
1   pretty much shows me that that's what he wanted to
2   have done.
3        Q.  Okay.
4        A.  It didn't state in his -- it didn't state
5   in his directions to the trustees.
6        Q.  Okay.  Before Mr. Struthers passed how
7   many -- well, let me back up.
8           Before the first meeting with J. Johnson
9   how many bonds did Ralph and Darlene own together?
10       A.  Before he went to J. Johnson?
11       Q.  Correct.
12       A.  I know that it was probably -- I'm
13  guessing.  I'm not going to do that.  Sorry.  I'd
14  have to look at --
15       Q.  Okay.  Let me ask you a different
16  question.
17       A.  -- my records.
18       Q.  Let me ask you a different question.
19           As part of the current 1993 trust as it
20  stands today, do you know how many bonds are
21  included in it, if any?
22           MR. LACHONA:  Objection.  Not reasonably
23  calculated to lead to the discovery of admissible
24  evidence.
25           MR. CROSS:  You can answer.
```

Page 173

```
1           THE WITNESS:  I know that LaRonda and
2   Darlene -- when dad was in the hospital Darlene
3   cashed a bond.  And Ronda was either in attendance
4   or out in the car.  She drove her to the bank.  So I
5   know there was -- there was a bond then, and that
6   was in -- that was in probably June of 2017.  And I
7   know that Darlene cashed a bond so she could pay --
8   pardon?
9           MR. CROSS:  I'm sorry.  Were you still
10  answering?
11           THE WITNESS:  Oh.  I know another bond was
12  cashed so that Darlene could have funds to pay Ronda
13  for half of Kay's funeral.
14  BY MR. CROSS:
15       Q.  But currently, as it stands now, how many
16  bonds have been -- does the 1993 trust account for?
17           MR. LACHONA:  Objection.  Relevance.
18           THE WITNESS:  So are you -- are you asking
19  me --
20  BY MR. CROSS:
21       Q.  So other than -- other than anything sold
22  in the past, how many bonds currently?
23       A.  Well, there's Dar- --
24           MR. LACHONA:  Objection.  Relevance.
25           THE WITNESS:  I'm sorry.
```

In the Matter of: RALPH C. STRUTHERS REVOCABLE TRUST UDT
Connor, Belinda on 10/22/2017

Page 174

1   BY MR. CROSS:
2       Q.  Sorry.  What was your answer?
3       A.  Are you asking how many bonds does Darlene
4   have --
5       Q.  Sure.
6       A.  -- today?
7       Q.  Yes.
8           MR. LACHONA:  Objection.  Can I get
9   clarification?  Do you mean Darlene, or the
10  co-trustees of the 1993 trust?
11          MR. CROSS:  The co-trustees of the 1993
12  trust.
13      Q.  How many bonds are part of that trust
14  currently?
15      A.  Six.
16      Q.  Did Darlene or Ralph ever ask you to hold
17  a savings bond for them?
18      A.  Never.
19          MR. LACHONA:  Objection.  Relevance.
20  BY MR. CROSS:
21      Q.  Did you sell the Yaris?
22      A.  No.
23      Q.  Do you know where it is currently?
24      A.  Darlene sold the Yaris; not me.
25      Q.  And when did she do that?

Page 175

1       A.  After dad passed.
2       Q.  And who is in possession of the L.A.
3   plots, the deeds to them?
4       A.  It's in the trust booklet.
5       Q.  So it would be under the control of the
6   trustees through the 1993 trust?
7       A.  Yes.
8       Q.  Okay.  So did you file a fraud case for a
9   withdrawal at Bank of America; a claim of some sort?
10          MR. LACHONA:  Objection.  Can we get a
11  time period?
12          MR. CROSS:  Sure.
13      Q.  Between 2016 and 2018 did you make a claim
14  for fraud related to a Bank of America withdrawal?
15      A.  Yes.
16      Q.  And was that -- I'm sorry.  What was that?
17      A.  Yes.
18      Q.  And was it -- did it turn out that it was
19  a withdrawal made by Ralph?
20      A.  I wasn't there.
21      Q.  Have you formed an opinion as to who it
22  was who withdraw -- who withdrew the money that you
23  made the claim for?
24      A.  I believe that she -- that Ronda took --
25  now I believe that Ronda took dad to the bank, the

Page 176

1   Bank of America where she banked, and that dad
2   withdrew funds from those accounts with no -- with
3   no -- she didn't tell anybody what she was up to.
4   She just did it.
5           And then I -- well, Darlene got a phone
6   call, and I just happened to be visiting at the
7   time, and the bank red-flagged one of the
8   withdrawals, because it was a large sum of money out
9   of a CD account.  And he asked me if I knew who did
10  it, and I told him I was unaware of anybody taking
11  funds out of the bank.  And so that's when we had --
12  we went down and we tried to investigate what --
13  what happened.
14      Q.  And that withdrawal amount was considered
15  in the settlement agreement, correct?
16      A.  That was -- that was the money that was
17  included in the funds of money -- the money that
18  Ronda took was part of all of that.  We did,
19  actually -- when one of our claims against -- in the
20  checking account they gave us that money back,
21  because that was done wrong.
22      Q.  Okay.  So did Mr. Struthers ever return
23  the money?
24      A.  I don't really know if the Bank of America
25  made them put back the funds into -- I don't think

Page 177

1   so, though.  I think they kept it.  And they -- the
2   Bank of America also gave us those funds from the
3   checking account back.
4       Q.  So --
5       A.  Because those funds were Darlene's --
6   that's where she collected her social security
7   payments.
8       Q.  So based on your fraud claim, Bank of
9   America gave you a certain amount of money back?
10      A.  Only in the checking account --
11      Q.  How much?
12      A.  -- because it was determined that Ralph
13  was the one that withdrew the money.
14      Q.  How much did they give you?
15      A.  It was $5,000.
16      Q.  Okay.  So --
17      A.  So Ronda kept $5,000; and then we got it
18  back.  She never had to return the money.
19      Q.  So based on what you are saying, the
20  amount withdrawn was $5,000, and, as far as you
21  know, was kept by Mr. Struthers or Ronda?
22      A.  Mm-hmm.
23      Q.  And then Bank of America also gave you
24  back $5,000; is that accurate?
25      A.  That's accurate.

Page 178

1    Q.  Okay.  You mentioned a list of assets that
2    was talked about during the J. Johnson meeting.  Do
3    you still have that list?
4        A.  J. Johnson has that list.
5        Q.  Okay.  And do you have a copy of the 1993
6    trust from before J. Johnson's involvement?
7            MR. LACHONA:  Objection.  Asked and
8    answered.
9    BY MR. CROSS:
10       Q.  What's the answer?
11       A.  We have the 1993 trust.
12       Q.  Do you have both versions?
13       A.  There's only one version.
14       Q.  Well, the version before you met with
15   J. Johnson, do you have that?
16       A.  That is it.
17           MR. LACHONA:  Objection.  Assumes facts
18   not in evidence.
19   BY MR. CROSS:
20       Q.  What was the answer?
21       A.  The trust has not changed.  It was never
22   simplified.  It is the trust -- the 1993 trust.
23   It's not been simplified.  It's the trust.  The only
24   thing that has been changed was done by my parents
25   years ago.

Page 179

1        Q.  So my question is -- you said before that
2    beneficiaries were added.  Do you have the trust
3    post addition and pre addition of beneficiaries?
4        A.  When I became involved those pages were
5    already in the trust.
6        Q.  So you don't -- you don't have a copy from
7    before --
8        A.  No.
9        Q.  -- right?
10           MR. CROSS:  Okay.  And I just need five
11   minutes to look over my notes.  But I might be done.
12   Can we take five; 3:40 come back?
13           MR. LACHONA:  Sure.
14           MR. CROSS:  Okay.  Let's go off the
15   record.
16           (Recess.)
17           MR. CROSS:  Okay.  We're back on the
18   record.  I have just a couple more questions.
19       Q.  Approximately when did Darlene lose
20   capacity?
21           MR. LACHONA:  Objection.  States facts not
22   in evidence.  Relevancy.  Calls for expert
23   testimony.
24           MR. CROSS:  You can answer.
25           THE WITNESS:  I'm not a doctor.  I can't

Page 180

1    make that decision.  I know for the first several
2    years that she was living in Lancaster she lived in
3    assisted living.  And if she had no capacity, they
4    would not have accepted her.  She was diagnosed as
5    being -- having a mild cognitive disorder.  She
6    wasn't even diagnosed with dementia when she moved
7    down here; not by her physician at Prestige Assisted
8    Living, nor by her personal physician in Santa Maria
9    before she left.
10   BY MR. CROSS:
11       Q.  Okay.  Do you recall when -- wait.  Let me
12   ask you a different question.
13           You are currently under the impression
14   that she doesn't have capacity, correct?
15           MR. LACHONA:  Objection.  Calls for expert
16   testimony.  Relevancy.  Assumes facts.
17   BY MR. CROSS:
18       Q.  Is that correct?
19       A.  I think Darlene requires more help now.  I
20   think she has declined since, I'd say, after she got
21   COVID the end of 2020.
22       Q.  Okay.  But --
23       A.  It just seemed like she wasn't as --
24       Q.  Okay.  I know you're not a doctor.  I know
25   you're not evaluating her.  But is it your opinion

Page 181

1    that currently she does not have capacity to make
2    her own decisions?
3            MR. LACHONA:  Objection.  Calls for expert
4    testimony.  Relevancy.
5            MR. CROSS:  You can answer.
6            THE WITNESS:  I don't know.
7    BY MR. CROSS:
8        Q.  Okay.  I want to show you -- do you see
9    the text in front of you?
10       A.  I don't see --
11       Q.  It's what you produced today.
12       A.  Okay.  Yes.
13       Q.  So this looks like a text -- is this
14   between you and April?
15       A.  Yes.
16       Q.  And it looks like you wrote, he never
17   should have redid another trust without seeing dad
18   first.  Who is the he?
19       A.  The attorney that wrote the 2017 trust.
20       Q.  Okay.  And then we have an -- well, let me
21   go back.
22           When was this text sent; do you know?
23       A.  I don't know.
24       Q.  Sometime after the 2017 trust was written,
25   I'd imagine?

In the Matter of: RALPH C. STRUTHERS REVOCABLE TRUST UDT
Connor, Belinda on 10/22/2017

Page 182

1    A.  Way after.  I would say in the last,
2  maybe, four months.
3    Q.  Okay.  And this email -- what is this
4  email you're producing?
5    A.  This email -- you said you wanted to know
6  how I came to find out something about there being a
7  2017 trust, because nobody knew about it.  So this is
8  done in secret.  So this is -- my sister, Diane,
9  told me that Ronda had taken dad to a lawyer, and he
10  was getting his trust put in his own name, and that
11  divorce was discussed, but dad shook his head no, he
12  didn't want a divorce.  And so Diane was just
13  telling me that there was a document.
14    Q.  Okay.  And is there a reason why you
15  wrote -- you wrote this email, correct?
16    A.  I wrote this email, yes.
17    Q.  Okay.  Is there a reason why you included
18  the sentence, we're grateful to Ronda for caring for
19  dad?
20    A.  Because I was grateful to Ronda for caring
21  for dad, because I -- I didn't like the nursing home
22  either.  Dad couldn't ring for a nurse.  He couldn't
23  use a telephone.  He couldn't do anything.  He was
24  confined to his bed.  And when you're in a nursing
25  home -- it depends on the nursing home.  I'm sure

Page 183

1  there's better ones.
2    But you have -- you have nurses that take
3  rounds.  And if it's not time for them to get their
4  Depends changed for another three hours, then they
5  have to sit there for three hours waiting for the
6  rotations to come around and for them to -- it
7  wasn't a good situation for dad.
8    He couldn't ring the nurse and say, hey,
9  I'm thirsty, or, hey, you know, I need to get
10  changed, or, you know --
11    Q.  Yeah.
12    A.  It was a bad situation.
13    Q.  And do you believe that Ronda was the only
14  one who could help take care of him at that time?
15    A.  She was the only one that thought she
16  could take care of him.
17    Q.  Well, you wrote here, Ronda is the only
18  daughter that can do the care with the support from
19  the therapist in Auburn.
20    So is she the one that you thought best
21  equipped to take care of him at this time?
22    A.  Yes.  Because she had her own son, who had
23  a brain injury.  And she thought that she could use
24  some of the same therapists to help with getting dad
25  to talk again.

Page 184

1    Q.  Okay.
2    A.  She was really hoping he could swallow
3  again and maybe start eating food again.  But that
4  never did happen.
5    Q.  Okay.  This is the same email, right, this
6  next page?
7    A.  Correct.
8    Q.  And it says here that, dad has severe
9  dementia.
10    Do you have an opinion, based on anything
11  that you were told by any doctors, as to when
12  dementia was first diagnosed or introduced?
13    A.  Yes.  In 20- --
14    MR. LACHONA:  Objection.  Calls for expert
15  testimony.  Sorry.  What was the answer?
16    THE WITNESS:  I sent away for dad's
17  medical records from Dr. Okerblom's office.  And in
18  2003 when he suffered his first stroke, he was
19  declining from then on.  He had to -- he couldn't
20  use his computer anymore.  He couldn't drive
21  anymore.
22    MR. CROSS:  I'm sorry.  Can I reask the
23  question, please?
24    THE WITNESS:  Sure.
25  BY MR. CROSS:

Page 185

1    Q.  When was -- when was the first time any
2  doctor talked about dementia with you in relation to
3  your dad?
4    A.  With me?  I -- they didn't talk to me.  I
5  read it in doctors' reports.
6    Q.  And what was the first instance in his
7  records that you saw that, dementia --
8    MR. LACHONA:  Objection.  Relevance.
9  BY MR. CROSS:
10    Q.  -- being mentioned?  You can answer.
11    A.  I believe 2006 they asked questions -- the
12  doctor asked questions.  And it was put in the
13  report that he didn't know -- he didn't know what
14  the date was; he didn't know who the president was.
15  And they -- it was put on there that he had vascular
16  dementia.
17    Q.  And from looking at those records, from
18  what you can recall, when was -- was that the first
19  time -- was he diagnosed in that -- in that -- on
20  that date with dementia?
21    A.  I --
22    MR. LACHONA:  Objection.  What date?
23    MR. CROSS:  The date she just mentioned.
24  The 2003, I think, or '-6.  I'm sorry.
25    THE WITNESS:  2006 is when I seen one of

In the Matter of: RALPH C. STRUTHERS REVOCABLE TRUST UDT
Connor, Belinda on 10/22/2017

Page 186

1  the reports that he was diagnosed with vascular
2  dementia; and they started medicating him with
3  medication for Alzheimer's.
4       MR. CROSS: Okay. I apologize. I've got
5  to read through these, because I, obviously, just
6  got these today.
7       Q. And this next picture is a continuation of
8  that email, correct, that we were already on?
9       A. Correct.
10      Q. Okay. So do you believe that the push for
11 divorce came from Ronda within your family?
12      MR. LACHONA: Objection. Relevance.
13      MR. CROSS: You can answer.
14      THE WITNESS: Yes.
15 BY MR. CROSS:
16      Q. Okay. And so this next picture, which
17 would be the -- one, two, three -- fourth picture
18 relating to that same email, correct?
19      A. Correct.
20      Q. Okay. And then there's a fifth picture
21 also related to the email, correct?
22      A. Yes.
23      Q. It says, on November 17th Ronda Myers took
24 dad to the Bank of America and took half of the
25 joint savings and a CD account. Do you know what

Page 187

1  amount that was?
2       A. Off the top of my head, no.
3       Q. Approximately?
4       A. I would have to have some records to look
5  at. I'm not going to approximate that.
6       Q. Well, let me ask it this way: Was it in
7  the $1- to $10,000 range; the $100- to $200,000
8  range? I would take --
9       A. Well, I --
10      Q. -- a very broad range.
11      A. Okay. I will go with the checking account
12 first, because that one is the easy one. That was
13 only -- she took half of that. That was over $5,000
14 that she took for herself. And for the CD account
15 -- I'm not going to guess. I'm not going to do
16 that. I'm sorry.
17      Q. No, I don't -- I don't want you to guess.
18 So if you have absolutely no idea, then that's your
19 answer. But if you can give me an estimate, I would
20 appreciate it. So you're saying you can't?
21      A. I -- I think all of the totals together --
22 I'm not even going to guess. I'm not going to do
23 that. Sorry. I'm going to look at records for
24 that, sir.
25      Q. That's fine. So now we're on this sixth

Page 188

1  picture. It's a continuation of that same email,
2  correct?
3       A. Yes.
4       Q. And then we have another email from, it
5  looks like, December 17, 2017 from a Diana Struthers
6  to Mr. Gravelak; is that right?
7       A. Correct.
8       Q. Okay. And what is this email -- why did
9  you produce this email?
10      A. We wanted Mr. Gravelak to know that we
11 weren't all happy with Ronda changing -- well, we
12 didn't really know, really, what was going on,
13 honestly. But we heard -- well, we knew for sure
14 she had the medical POA for dad, because they
15 wouldn't let me talk to dad's physicians anymore,
16 even after I sent my medical POA in.
17      So when I was sending my medical POA in in
18 October, she was down in San Diego changing the POA
19 to herself. And the lady at the office told me that
20 Ronda has created documents, and she is now the
21 medical POA, and that they couldn't give me any
22 of -- any information any longer, and that Ronda
23 asked them not to talk to me.
24      Q. This $70,000 that you are referencing in
25 this email, do you know if that ended up in the 2017

Page 189

1  trust account?
2       A. I think it did. I --
3       Q. Okay.
4       A. You would have to look at her bank
5  records.
6       Q. Okay.
7       A. But there's a total for you, if you want
8  to go back and look at that.
9       Q. Okay.
10      A. There's an approximate total right there.
11      Q. Where is it? Am I missing it?
12      A. Taking advantage of my dad, Ronda has
13 taken $70,000 from his account. So I'm thinking
14 that's probably close to what she took.
15      Q. Okay. And who is Diana Struthers?
16      A. She is my sister.
17      Q. And your sister wrote this two-page email
18 that's attached here?
19      A. Yes.
20      Q. And so is it your belief that Ronda
21 withdrew $70,000, or Mr. Struthers withdrew it at
22 the direction of Ronda, or something else?
23      A. My belief is that my dad had no way to get
24 to a bank to withdraw any money. So it had -- he
25 had to have -- dad had to have her assistance. The

In the Matter of: RALPH C. STRUTHERS REVOCABLE TRUST UDT
Connor, Belinda on 10/22/2017

Page 190

1  signature doesn't look like dad's.  But -- all it is
2  is a circle in one of them; and a line in another.
3  And none of them look like dad's signature.
4      Q.  Okay.  And so what is this next document?
5      A.  That's from my sister, Cheryl, to
6  Mr. Gravelak.
7      Q.  Okay.  So there's -- this email from
8  Cheryl is -- one, two -- three pages, correct?
9      A.  Oh, I can't push down.  You can count
10  them.
11      Q.  Yeah.  Or is this four pages?  Is this a
12  -- no.  This is something else.  Never mind.
13      A.  Yeah.
14      Q.  So it looks like this email from Cheryl to
15  Mr. Gravelak -- on the third page I see, quote, she
16  may even -- she may have even contributed to his
17  major stroke.
18          Do you share the belief -- or do you have
19  the belief that Ronda somehow contributed to
20  Mr. Struthers' stroke?
21      A.  No.
22      Q.  Okay.  She then says, it is my wish that
23  my dad be moved to an intense rehabilitation
24  hospital.
25          Was there someone preventing that from

Page 191

1  happening?
2      A.  Just, like, Ronda took him to her house.
3  So that -- that goes back to that intensive care
4  place up in Pismo Beach in 2016.  That's where there
5  was a better recovery center for strokes.  And
6  Cheryl's wishing that dad could stay and -- not, you
7  know, like, be with Ronda, and go there instead, and
8  hoping that Ronda would make sure he gets the
9  intensive care that he needed.
10      Q.  Okay.
11      A.  And then there's -- there's also an email
12  from Carole.  But it doesn't look like it opened.
13  It's just --
14      Q.  This one?
15      A.  Yes.
16      Q.  The one that says, Carole Campbell, with
17  an attachment to BLS Connor?
18      A.  Uh-huh.
19      Q.  Is that you?
20      A.  Yes.
21      Q.  Okay.  What was this email supposed to
22  show?  What was the contents?
23      A.  It was a letter to Mr. Gravelak as well,
24  stating her concerns.
25      Q.  Okay.  This is that letter?

Page 192

1      A.  Oh, there it is.  Yeah, there it is.
2      Q.  Can I ask, if you have a copy of this
3  that's not a picture, like a PDF, that you can
4  produce it to your counsel?  Because I'm having a
5  terrible time trying to read this.  If you don't
6  mind.
7      A.  Carole --
8          MR. CROSS:  Anyway, that's all my
9  questions, yeah.  I might -- I'm going to look at it
10  while Kevin asks you.  But I think I'm done.
11          So, Kevin, if you want to go ahead.
12          MR. LACHONA:  Yeah.  Thank you.
13          MR. CROSS:  All right.
14          MR. LACHONA:  So, Belinda, I'm going to go
15  over just a couple of various aspects that were
16  discussed today.  Give me a moment while I bring up
17  these documents.  I'm going to try to do a share
18  screen as well.  All right.  How am I going to do
19  that?
20          (Brief pause.)
21                EXAMINATION
22  BY MR. LACHONA:
23      Q.  Do you see the document on the screen in
24  front of you, Belinda, that says (inaudible) --
25          THE REPORTER:  I'm sorry.  I'm sorry.

Page 193

1  Kevin, you're breaking up, at least on my end.  I'm
2  sorry.  Is anyone else having trouble?
3          MR. CROSS:  Same.
4          MR. LACHONA:  Okay.
5          MR. CROSS:  It's better.
6  BY MR. LACHONA:
7      Q.  Belinda, do you see a document that's in
8  front of you that at the top it says, The Ralph C.
9  Struthers Revocable Trust?
10      A.  Yes.
11      Q.  Okay.  Then underneath that there's a date
12  range of January 1, 2021 through December 31, 2021.
13  Do you see that?
14      A.  Yes.
15      Q.  And then underneath that it says, Schedule
16  I, Liabilities.  Do you see that?
17      A.  Yes.
18      Q.  Do you know what this page is?
19      A.  I'm sorry.  I couldn't hear the question.
20      Q.  Do you know what this page is?
21      A.  It is part of her third accounting -- a
22  part of the 2017 trust third amended accounting, I
23  believe.
24      Q.  And what is the significance of this
25  liabilities schedule?

In the Matter of: RALPH C. STRUTHERS REVOCABLE TRUST UDT
Connor, Belinda on 10/22/2017

Page 194

1    A.  I think that she wants to be reimbursed
2  for everything that you see here.
3    Q.  Do you object to these items?
4    A.  I object to at least two that I can see.
5    Q.  Which two are those?
6    A.  The very first one that says, 7/8/17,
7  Belinda didn't pay back when gave her receipts, put
8  on credit card.
9    Q.  Okay.  Why are you objecting to that line
10  item?
11    A.  Because Ronda has been paid in full for
12  her credit card.
13    Q.  Do you object to any other items on this
14  schedule?
15    A.  I object to one more -- let's see if I can
16  find it -- where it says, on the very last one,
17  8/8/17, ApexCare, deposit for care for dad, $624.
18    Q.  Why are you objecting to this line item?
19    A.  This was also included in her first
20  account:  ApexCare, same date.  We have a copy of
21  the check to Ronda Myers.  April signed it.  So, to
22  me, it looks like she's getting her -- you know,
23  being paid twice for everything.  It shouldn't be in
24  liabilities if she already had it in her first
25  accounting.

Page 195

1    Q.  And do you object to any other items on
2  this schedule?
3        (Brief pause.)
4  BY MR. LACHONA:
5    Q.  Let me withdraw that question and ask you
6  this:  Do you have receipts to substantiate the line
7  items on this schedule that Ms. Myers is requesting
8  reimbursement for?
9    A.  I'm not sure if we do.  I don't know.
10    Q.  I'm going to switch documents -- actually,
11  before I do that, Belinda, you were asked earlier
12  what the monthly care facility fee is for Darlene.
13  You gave a particular figure.  Was that figure
14  correct?
15    A.  No.  I checked --
16    Q.  What is the -- what is the correct figure?
17    A.  She -- Darlene pays $3,800 a month for
18  rent and care.
19        MR. LACHONA:  Bear with me.
20        (Brief pause.)
21  BY MR. LACHONA:
22    Q.  The documents that Mr. Cross was showing
23  you a few moments ago, one including a letter -- or
24  an email that you sent to Mr. Gravelak in, I
25  believe, December 2017.  Do you recall that email?

Page 196

1    A.  Yes.
2    Q.  At that time you sent the email to
3  Mr. Gravelak were you aware of the existence of the
4  2017 trust?
5    A.  We were -- we were sure that she changed
6  and she got -- she got the medical POA.  We were
7  sure of that, because that's what the medical office
8  said at Dr. Gruenefeldt's office.  We were still --
9  we didn't know for sure, but we thought that it was
10  possible that she got the financial POA as well.
11  But we didn't --
12    Q.  Was there any -- I'm sorry.
13    A.  Pardon?
14    Q.  I cut you off.  You can continue.
15    A.  We suspected it -- let's just put it that
16  way -- that there was a financial POA, because we
17  just figured she probably did -- she probably went
18  for both.
19    Q.  And at the time of you sending that email
20  to Mr. Gravelak in December of 2017 did you have a
21  copy of the 2017 trust in your possession?
22    A.  No.
23    Q.  When did you first discover the existence
24  of the 2017 trust?
25    A.  During the -- during the divorce that was

Page 197

1  initiated by April Sharp originally.  And then
2  our -- the lawyer that worked for Darlene wanted to
3  see a document that proved that April was able to
4  sign a document such as that.  And she asked for the
5  document to show that she had the authority to sign
6  this document, and they refused to give it to us.
7  And it wasn't given to us for another -- it wasn't
8  given to us until July 2018 when they couldn't
9  refuse giving it to us any longer.  Because we
10  just -- the divorce lawyer just kept on asking for
11  it, and they finally provided it in July 2018.
12    Q.  Okay.
13    A.  And that's when I read it.
14        MR. LACHONA:  I'm going to go ahead and
15  share my screen again.
16        (Brief pause.)
17  BY MR. LACHONA:
18    Q.  In front of you should be a document that
19  has number 5 at the very bottom.  Do you see that?
20    A.  Could you repeat that, please?
21    Q.  In front of you on the screen there's a
22  document.  And at the bottom of the document there's
23  a number 5.  Do you see that?
24    A.  Yes.
25    Q.  Does this page look familiar to you?

Page 198

1      A.  Yes.
2      Q.  **What is this?**
3      A.  This is the settlement agreement between
4  the 2017 trust and the 1993 family trust.
5      Q.  **I would like you to focus in on the**
6  **first -- let me scroll down.  Sorry -- the first**
7  **full paragraph on this page.  And there's a**
8  **settlement figure at the very beginning of that**
9  **first full paragraph.  What is that dollar figure?**
10     A.  $12,476.21.
11     Q.  **Can you explain to me what the**
12  **significance is of that dollar figure?**
13     A.  That's the money that the 1993 trust owed
14  to Ronda and April as trustees of the 2017 trust.
15     Q.  **How was that figure calculated?**
16     A.  That figure was calculated from the
17  settlement agreement.  So in looking at the
18  settlement agreement --
19           MR. CROSS:  Kevin, can we -- can we not do
20  this?  I know what the document says.  We went
21  through it yesterday.
22           MR. LACHONA:  I know.  But --
23           MR. CROSS:  If you are just going to have
24  her go through this document, I would ask that we
25  move on, please.

Page 199

1           MR. LACHONA:  I just have a couple
2  questions that I need to clarify.
3           MR. CROSS:  Okay.
4           THE WITNESS:  Okay?
5           MR. CROSS:  Please do, yeah.
6           THE WITNESS:  Okay.  So if you take the
7  amounts from the settlement agreement, $6,607.06,
8  and $11,983.47, and $521, and you add those figures
9  together, you get a total of $19,111.53.  And then
10  when you subtract the money that the 2017 trust owed
11  to Darlene, the 1993 trust, you are left with a
12  figure of $12,476.21.  So that is the figure that
13  you see -- that's the first figure that you see in
14  the settlement agreement, right there, that you are
15  referring to.
16  BY MR. LACHONA:
17     Q.  **Okay.  And once this figure was**
18  **calculated, what obligations, if any, did you and**
19  **your co-trustee -- co-trustees of the 1993 trust**
20  **have to do?**
21     A.  I'm sorry.  I couldn't really hear you,
22  because you're kind of gravelled.
23     Q.  **Sorry.  Once this figure was calculated,**
24  **what did you and Julie Hatridge, as co-trustees of**
25  **the 1993 trust, have to do?**

Page 200

1      A.  We were to transfer two U.S. savings bonds
2  that Darlene owned to pay this debt off to the 2017
3  trust.
4      Q.  **And was that done?**
5      A.  Yes, that was done.
6      Q.  **And once the bonds were transferred to the**
7  **2017 trustees, what were they supposed to do with**
8  **it?**
9      A.  Ronda was supposed to take out $8,388.23
10  for herself; and the rest was to be deposited into
11  the trust.
12     Q.  **Why was it supposed to be deposited into**
13  **the trust?**
14     A.  Pardon?
15     Q.  **Why was it supposed to be deposited into**
16  **the trust?**
17     A.  Because these were the monies that were
18  owed to the 2017 beneficiaries.
19     Q.  **And what is the significance of $100 being**
20  **paid to you and Julie as co-trustees of the 1993**
21  **trust?**
22     A.  Because we overpaid them with the two
23  bonds, Ronda and the 2017 trust was to write a check
24  for us for $100 to make it even.
25     Q.  **How was the $100 calculated?**

Page 201

1      A.  The bonds were worth $20,864 -- no.  Wait.
2  Let's see.  How did that go?
3           We owed $20,864.  But the bonds were worth
4  $20,964.  So if you do the math and subtract that
5  amount, you have $100 left over.  So we overpaid by
6  $100.  And she was supposed to return that $100 to
7  the 1993 trust.
8      Q.  **And did she do that?**
9      A.  Yes, she did.
10     Q.  **Do you believe there are any other**
11  **obligations under the settlement agreement with**
12  **respect to payments to the 2017 trust?**
13     A.  No.  This was supposed to settle all of
14  our differences, and we were supposed to be free and
15  clear of each other.
16           MR. LACHONA:  Thank you.
17           MR. CROSS:  Okay.  Are you done?
18           MR. LACHONA:  Yeah.
19           MR. CROSS:  Okay.  Belinda, just one
20  more -- a question and a couple requests.
21                FURTHER EXAMINATION
22  BY MR. CROSS:
23     Q.  **Why didn't you return that money to Bank**
24  **of America after you found out your dad had it?**
25           MR. LACHONA:  Objection.  What money are

In the Matter of: RALPH C. STRUTHERS REVOCABLE TRUST UDT
Connor, Belinda on 10/22/2017

Page 202

1    you talking about?
2         MR. CROSS:  The money that you made the
3    fraud claim for that they gave -- then they -- Bank
4    of America reimbursed you for.
5         THE WITNESS:  It was -- it was -- it
6    was -- the bank put it back in there.
7    BY MR. CROSS:
8         Q.  Okay.  So your father took it, and then
9    also B of A gave it to you, right?
10        A.  And it was put back into the checking
11   account.
12        Q.  Right.  So then there's a double-dip.  Did
13   you return it to Bank of America, say --
14        MR. LACHONA:  Objection.  Argumentative.
15   Assumes facts not in evidence.
16        MR. CROSS:  You can answer.
17        THE WITNESS:  The bank put it back in.
18   There wasn't a check.  The bank just put it back in.
19   BY MR. CROSS:
20        Q.  Put it back in where?
21        A.  Into the checking account.  So it was
22   taken from the checking account, and then placed
23   back into the checking account by the Bank of
24   America.  And we got a letter stating that they
25   honored our fraud charge and it was put back,

Page 203

1    because they realized it was done by mistake.  It
2    should not have been done.
3         Q.  So the --
4         A.  They should not have taken that money from
5    the bank.
6         Q.  So the total amount that was the basis of
7    your fraud claim was -- I think you testified to
8    around $5,000; is that right?
9         A.  For the checking account only.
10        Q.  Okay.  So then that withdrawal was kept by
11   Mr. Struthers.  And then you received, based on your
12   claim -- so now we have $10,000, and none of it was
13   returned, correct?
14        A.  No.
15        Q.  Okay.  Can I ask that you produce to your
16   counsel, if you have it, proof of the $4,535.24 that
17   you said was two checks, and also an updated list of
18   the beneficiaries so we can send them things?
19   Because you said the addresses were wrong.  If you
20   have information related to an update, can you let
21   your attorney know, please?
22        MR. CROSS:  But that's all I have for
23   today.
24        MR. LACHONA:  Mr. Cross, I gave you the
25   substantiation for the two checks totaling $4,535

Page 204

1    yesterday.
2         MR. CROSS:  I'm not saying I don't have
3    it.  I said if she hasn't given it to you.  You
4    know, that sounds great.
5         MR. LACHONA:  You have it in your -- you
6    have it in your possession.  That's what I'm saying.
7         MR. CROSS:  No.  I understand.  I
8    understand.  I understand.  All right.  That's all
9    I've got.  All done?
10        MR. LACHONA:  Yes.
11        MR. CROSS:  All right.  Thank you very
12   much, Belinda, for your time.  Have a good one.
13        THE WITNESS:  Thanks.
14        (Discussion off the record.)
15        THE REPORTER:  If I could ask the
16   attorneys to place their transcript purchase orders
17   on the record, if they are ordering?  And if they
18   are not, please state that as well.  Go right ahead,
19   whenever you're ready.
20        MR. CROSS:  Can I get an electronic copy,
21   please?
22        MR. LACHONA:  I as well, please?
23        THE REPORTER:  Great.  Thank you very
24   much.
25        (Whereupon, Exhibits A through F were

Page 205

1    marked for identification.)
2    (The deposition concluded at 4:26 p.m.)
3                   --oOo--
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

In the Matter of: RALPH C. STRUTHERS REVOCABLE TRUST UDT
Connor, Belinda on 10/22/2017

Page 206

```
 1                DEPONENT'S SIGNATURE
 2        Please be advised that I have read the
 3        foregoing deposition, pages 1 through
 4        205, inclusive.  I hereby state there are:
 5
 6            (Check one)        no corrections.
 7                               corrections attached.
 8
 9
10
11
         Date              Belinda Connor
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 207

```
 1         DEPONENT'S CHANGES OR CORRECTIONS
 2    DEPONENT:         Belinda Connor
      CASE:             In re the 2017 Ralph C. Struthers
 3                      Revocable Trust
      DEPOSITION DATE:  July 9, 2024
 4
      NOTE:  If you are adding to your testimony, print
 5           the exact words you want to add.  If you are
             deleting words from your testimony, print the
 6           exact words you want to delete.  Specify with
             "Add" or "Delete" and sign this form.
 7
      Page    Line    Change/Add/Delete
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21    Pursuant to Section 2025(q)(1) of the Code of Civil
      Procedure of the State of California, I hereby
22    certify that I have read my deposition transcript,
      made those changes and corrections that I deem
23    necessary, and approve the same as now true and
      correct.
24
25
         Date              Belinda Connor
```

Page 208

```
 1                CERTIFICATE OF REPORTER
 2
 3        I, KRISTEN D. ADAMSON, CSR 10474, a
 4    Certified Shorthand Reporter in and for the State of
 5    California, hereby certify that the witness in the
 6    foregoing deposition,
 7                   BELINDA CONNOR,
 8    was by me duly sworn to tell the truth, the whole
 9    truth and nothing but the truth in the
10    within-entitled cause; that said deposition was
11    taken down remotely in shorthand by me, a duly
12    Certified Shorthand Reporter and a disinterested
13    person, at the time and place herein stated, and was
14    thereafter reduced to typewriting, by computer,
15    under my direction and supervision.
16        I further certify that I am not of counsel
17    or attorney for either or any of the parties to the
18    said deposition, nor in any way interested in the
19    outcome of this cause, and that I am not related to
20    any of the parties thereto.
21        IN WITNESS WHEREOF, I have hereunto set my
22    hand on August 10, 2024.
23
24            Kristen D Adamson
              KRISTEN D. ADAMSON, CSR NO. 10474
25
```

Page 209

```
 1      REPORTER'S CERTIFICATION OF CERTIFIED COPY
 2
 3        I, KRISTEN D. ADAMSON, CSR No. 10474, a
 4    Certified Shorthand Reporter in the State of
 5    California, certify that the foregoing pages 1
 6    through 205 constitute a true and correct copy of
 7    the original deposition of Belinda Connor, taken
 8    remotely on Tuesday, July 9, 2024.
 9        I declare under penalty of perjury under
10    the laws of the State of California that the
11    foregoing is true and correct.  I hereunto set my
12    hand on August 10, 2024.
13
14
15
16
17            Kristen D Adamson
              KRISTEN D. ADAMSON, CSR NO. 10474
18
19
20
21
22
23
24
25
```

**In the Matter of: RALPH C. STRUTHERS REVOCABLE TRUST UDT**
**Connor, Belinda on 10/22/2017**

Page 210

| | | |
|---|---|---|
| 1 | Check One: | Date |
| 2 | | Signature waived on the record. |
| 3 | | The deponent indicated he/she did |
| | | not wish to review the deposition |
| 4 | | transcript by signing and returning |
| | | the notification letter attached. |
| 5 | | |
| | | I certify that the deponent was |
| 6 | | given the statutory allowable time |
| | | within which to read and sign the |
| 7 | | deposition transcript, and the |
| | | deponent failed to appear for such |
| 8 | | reading and signing or failed to |
| | | submit a copy of their changes/ |
| 9 | | corrections/signature page. |
| 10 | | I certify that the deponent has |
| | | read and signed the deposition |
| 11 | | transcript and has made any changes |
| | | indicated herein. |
| 12 | | |
| | | Through counsel, the deponent has |
| 13 | | made corrections/changes to the |
| | | deposition transcript.  See |
| 14 | | attachment. |
| 15 | | The deponent approved his/her |
| | | deposition transcript with/without |
| 16 | | corrections.  See attachment. |
| 17 | | |
| 18 | | |
| | By | _____ |
| 19 | | Scarpelli Court Reporting Services |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |

In the Matter of: RALPH C. STRUTHERS REVOCABLE TRUST UDT
Connor, Belinda on 10/22/2017

**Exhibits**

**Ex. F Exhibit C Belinda** 126:24 145:24

**Ex. A SANOD BELINDA** 3:11 16:14

**Ex. B Settlement Agreement** 3:12 18:23

**Ex.**
**C Objection to Petition for Acc ounting** 3:13 55:5 126:23

**Ex. D eStmt_2020-04-17_ Redacted** 3:15 76:12

**Ex. E** 3:17 77:4

**$**

**$1,200** 80:21

**$1,253** 147:10,19

**$1-** 187:7

**$10,000** 187:7 203:12

**$100** 21:2 22:12 31:22 32:9,18,21 33:1,16 63:17,18 64:4,6,15 200:19, 24,25 201:5,6

**$100-** 187:7

**$11,983.47** 21:19 72:23 199:8

**$12,476-** 23:19

**$12,476.21** 23:16 63:14 65:12 67:1 198:10 199:12

**$19,111.53** 199:9

**$2,000** 147:15 167:6

**$2,007.50** 167:6

**$2,156.06** 143:22

**$2,500** 15:8

**$2,800** 14:1,13

**$20,000** 21:11,22 22:17 23:7,14 24:2 26:9

**$20,864** 20:21 21:4 22:6,11,22 46:24 65:18 66:23 201:1,3

**$20,964** 22:14 201:4

**$200,000** 187:7

**$28,000** 46:23 47:6 57:15

**$3,600** 14:18,25

**$3,800** 195:17

**$3,900** 15:9,15

**$30** 67:17 69:14,17

**$300** 157:17 158:8

**$33,000** 51:18

**$39,275.31** 75:25

**$4,535** 168:7 203:25

**$4,535.24** 21:16 203:16

**$40,000** 51:8

**$5,000** 177:15,17,20,24 187:13 203:8

**$50** 71:18

**$521** 21:21 199:8

**$530** 158:20,21

**$6,607** 21:13

**$6,607.06** 72:21 199:7

**$6,635** 32:9

**$6,635-** 31:17

**$6,635.32** 22:1,16 23:9 31:20

**$624** 58:1,3,5 163:3 194:17

**$65,000** 58:11,14,17

**$650** 160:2

**$671** 166:2,3

**$70,000** 188:24 189:13,21

**$738** 160:10

**$75** 165:21

**$75,285.38** 125:10

**$750** 70:18,23 71:2,8

**$76,295** 130:12

**$8,388.23** 21:10 23:14 24:1 31:8 47:4 57:14 62:5,15 63:13 64:18 65:12,21,24 66:9 67:7 73:6,12,19 75:13,18 200:9

**$800** 80:21

**$839.25** 159:3

**$900** 15:4

**$97,000** 78:13

**$97,970.40** 77:1 78:1

**(**

**(b)** 21:13 25:3

**-**

**--ooo--** 4:14 205:3

**-2950** 76:20 77:25

**-6** 185:24

**1**

**1** 100:1 124:25 125:14 126:24 145:24 193:12

**10** 36:12 43:22 141:23

**100** 34:8 53:3 62:12 99:14

**10:07** 4:3

**10th** 94:13 116:11

**11** 56:4,5 64:21 133:24 141:24

**11(a)** 21:10

**11(b)(i)** 72:20

**12** 22:1 36:4 118:21

**12(l)** 22:16

**12/10/19** 20:16

**12th** 43:25 118:18

**13** 56:4,5,6 64:20 73:5 74:2

**14** 19:19,20,21 20:14 23:13 64:5,16, 18 65:23 66:14 67:5 130:2,3,4

**15** 156:23,24

**15(b)** 24:5

**15(c)** 27:11

**16** 55:13

**17** 19:21 20:3 188:5

**171** 73:6

**17th** 186:23

**18** 166:2

**19-** 32:3

**199-** 34:11 41:2

**1993** 11:9 15:17 18:21 24:17 25:9,23 26:4,13,18 27:1 31:15 32:4 33:7,15 34:2,7,13 39:16 41:4 43:2,6,8,17 44:8 51:15,18 52:1,6,23 66:10 75:20 86:2,13 87:12 89:18 90:16 92:13 93:8 97:7 105:2,24 106:19 107:3,6, 10,19,23 112:24 113:6,10,13,15,25 114:1,3,5,11,25 115:2,6 123:10,14 126:4,6 130:23 131:12,13,15,20 147:8 148:3,15 149:18 151:9 155:20,23 156:7 159:12 170:19 172:19 173:16 174:10,11 175:6 178:5,11,22 198:4,13 199:11,19,25 200:20 201:7

**2**

**2** 67:24 126:25 132:18

**2,000** 15:7

**20** 77:21 122:13

**20-** 34:13 94:13 184:13

**2000** 107:2

**2002** 27:5 170:23

**2003** 89:12 184:18 185:24

**2006** 185:11,25

**2010** 124:2

**2015** 72:14

**2016** 99:20 102:25 175:13 191:4

**2017** 4:24,25 13:1 18:2,6,20 20:19 22:13 25:3,10,22 26:4,12 27:10 31:15 33:16 34:2,7,24 35:10 40:14, 24 41:2 42:18,20 43:11,16 44:2,8 45:4 46:22 47:4 48:14 54:2 57:10,12 62:4,7,9,12 63:15 73:10,11,13,16,25 75:19 82:3 84:23,25 85:3,6,9,19,20 86:13,19 88:11 93:13,15 94:5,8 95:22 98:24 103:17 104:4,5,22 105:1,11,18,22 107:24 108:25 109:16 110:18 112:25 113:7,10,21 114:17 116:16 118:21 119:4 121:20 122:24 124:25 125:15 128:5,6,15 130:17,18 133:12,15,24 138:2 139:12,24 141:6,23,24 143:1,7 144:1,8,21 157:14,16 163:3 169:23 173:6 181:19,24 182:7 188:5,25 193:22 195:25 196:4,20,21,24 198:4,14 199:10 200:2,7,18,23 201:12

**2018** 175:13 197:8,11

**2019** 43:20,21,22

**2020** 12:3,14 13:2 42:12 73:5 74:2, 13 75:24 107:2 180:21

**2021** 38:7 46:19 193:12

**2022** 42:14 48:22 50:15 53:1 67:25 81:15,19 166:2

**2024** 4:2 49:10

**22** 4:24 73:25

**23** 126:22

**24** 75:24 99:14 143:7 144:1,8

**24-hour** 100:1,21

**26** 36:13,14

**29** 88:11

**2nd** 68:3

**3**

**3** 53:1 81:19 127:1 142:10

**3/24/2020** 77:1,21,24

**31** 193:12

**32778** 10:4

**35** 10:20

**36** 30:20 36:4,10

**36-** 15:1

**37-** 15:1

**3726** 4:4 10:3

**3:00** 156:25

**3:40** 179:12

**3rd** 50:15 68:2

**4**

**4** 114:1 141:9

**4,500** 168:20

**43** 10:21

**4:26** 205:2

**5**

**5** 62:22,24 64:11 141:14,15 197:19, 23

**5/18/2018** 146:6

**50** 5:23 71:21

**50/50** 43:12

**55** 12:9

**6**

**6** 130:5

**600** 161:23

**7**

**7** 122:24 130:6,7,8 138:2 139:12,24

**7/7/17** 127:5

**7/7/2017** 123:9

**7/8/17** 194:6

**700-and-some-odd** 161:13

**75-** 144:16 145:5

**76k** 144:16 145:5

**7th** 95:21 131:1 136:14,17 138:20

**8**

**8** 163:3

**8/8/17** 194:17

**9**

**9** 4:2

**900** 133:22

**93** 16:11 29:22

**A**

**a.m.** 4:3

**ability** 7:9 99:23

**above-entitled** 4:9

**absolutely** 46:19 187:18

**accepted** 180:4

**accepting** 149:12

**account** 76:20 77:16,22,25 78:5 124:22 125:22 126:2,6,11 127:12, 14,18 145:18 146:15 148:4,5,20,25 149:2,3,16 169:15,17,19,20,21 173:16 176:9,20 177:3,10 186:25 187:11,14 189:1,13 194:20 202:11, 21,22,23 203:9

**accountant** 79:8

**accounting** 14:21 37:23 38:1,5,9, 13,15,17 39:17 44:2,3,11,17,19 50:10,22 52:7 54:2,9,14,20,22 55:2, 10,24 57:25 58:2,3,10,11,12,13,21, 22 59:19 69:2 70:20,25 71:14 72:18 76:7 77:8,15 79:1,2,3,6,10,13,19 82:2 157:18 158:5,17 159:6,13,14 160:7,8,21 161:3,4,7,11 162:7,8,11, 13,15 164:3,9 167:3,4,10 170:11 193:21,22 194:25

**accountings** 4:23 7:22,25 44:14 55:25 56:20 58:18 157:15 159:12 161:19 162:2

**accounts** 146:16 147:23 176:2

**accrued** 47:7

**accurate** 47:10 58:7 96:12 148:17 177:24,25

**acquire** 84:6

**acting** 36:25

**action** 4:10 37:18 38:2

**actions** 37:5,12

**acts** 37:6

**actual** 32:14 160:5

**Adamson** 4:5

**add** 22:24,25 23:17 24:1 46:23 114:19,20,22 115:15 162:12 199:8

**added** 32:10 64:6 113:11,20 114:5,7 115:4,9 147:11 153:6 162:1,2 179:2

**addition** 179:3

**additional** 153:1,6

**additions** 77:1

**address** 10:2 11:24

**addresses** 83:1,5 203:19

**administer** 67:11

**administration** 37:13 45:4,21 81:14

**administrators** 36:8

**admissible** 172:23

**admit** 158:15

**admitted** 117:25

**adult** 12:8

**advanced** 73:23 119:16

**advantage** 138:10 139:22 189:12

**advised** 139:19 146:12

**affect** 7:9

**afford** 51:4,8

**age** 10:19 150:16

**agent** 29:21 121:13

**agents** 36:24 121:12

**aggressive** 102:23,25 103:16 104:3,7,16,22

**agree** 36:6,22 43:20 164:14

**agreed** 5:10 116:23

**agreement** 18:20 19:3,6,23,24 20:1, 5,18,20 25:2 26:6 27:10 31:5 33:5 34:4,16 35:14 36:5,6 37:9,16 39:8, 19 41:1,9 42:21 43:19 44:5,8,9,12, 17 47:13,15 50:4,5 60:24 62:19 69:24 70:2,22,23 71:15 72:20 73:15, 22 74:12,19 75:2 84:5 126:25 168:7, 18 170:9 176:15 198:3,17,18 199:7, 14 201:11

**agreements** 20:2

**ahead** 27:22 80:7 88:10 91:23 94:25 103:9 108:24 192:11 197:14 204:18

**albeit** 74:22

**allowed** 56:17 57:13

**allowing** 68:10

**alterations** 107:20

**Alzheimer's** 155:17 186:3

**ambiguous** 40:19

**amended** 55:10 58:22 77:8,16 79:2 193:22

**America** 76:16 126:1,2 129:4 175:9, 14 176:1,24 177:2,9,23 186:24 201:24 202:4,13,24

**Amore** 11:23 13:7,10 15:5,6

**amount** 20:23 22:10 23:8,17,18,25 31:6 39:18 47:5 51:16 56:14 58:4 62:1 64:3,9,14 65:8,18,20 66:15,22 70:7 73:6 74:2,23 145:10,12,18 158:25 159:25 161:12 163:3 165:21 166:2,4 167:7 168:14 176:14 177:9, 20 187:1 201:5 203:6

**amounts** 31:25 34:17 67:6 199:7

**and/or** 82:11 85:18,23

**angry** 48:14

**anniversary** 68:2

**answering** 33:10 78:7 89:15 173:10

**anymore** 14:23 69:13,16 95:6 100:13,17 184:20,21 188:15

**apartments** 12:9

**Apexcare** 57:25 163:3,4 194:17,20

**apologize** 62:17 186:4

**apparently** 29:21

**appeared** 4:5

**appearing** 123:7

**applied** 64:4,15 65:9

**appointment** 86:3,20 168:3,4

**appointments** 111:10

**appraisal** 24:20,22 42:12,13 71:24 72:3,8 83:20,24,25 84:1,3

**appraised** 84:8

**Approval** 55:10

**approved** 170:11

**approximate** 187:5 189:10

**approximately** 14:12,15,24 46:24 47:7 87:22 94:12 110:16 168:20 179:19 187:3

**approximations** 15:11,12

**April** 27:12,16 44:21 46:8 48:1 58:1 77:16 78:6 81:14,22 82:11 89:5 90:2 163:19 166:1 181:14 194:21 197:1,3 198:14

**area** 84:24 128:13 130:13 171:3

In the Matter of: RALPH C. STRUTHERS REVOCABLE TRUST UDT
Connor, Belinda on 10/22/2017                                                    Index: areas..bought

**areas** 55:22

**Argumentative** 202:14

**arise** 37:8

**arm** 29:4

**arrive** 23:6

**arrived** 26:9

**asks** 192:10

**aspects** 192:15

**asset** 70:20

**assets** 17:4 43:2 70:18 71:10 72:18 86:2,21 87:9 122:19 150:17 151:1 154:3,16 178:1

**assigned** 71:8 120:6

**Assignment** 122:18

**assigns** 36:7,24

**assistance** 189:25

**assistant** 136:12

**assisted** 12:20,22 13:15,24 180:3,7

**association** 33:20

**assume** 144:13

**Assumes** 29:12 31:1 178:17 180:16 202:15

**assuming** 96:11 131:13

**attached** 189:18

**attachment** 191:17

**attempt** 70:19

**attendance** 173:3

**attorney** 8:17 9:12 17:15,25 18:5,15 49:5 50:24 56:13 82:4,7 83:23 86:24 93:14 94:6 95:17 98:7 101:7,11 110:3 121:14 149:18 152:20,22 164:20 181:19 203:21

**attorney's** 75:25 78:19 79:23

**attorney/client** 15:21 16:2

**attorneys** 7:2 153:1,5 204:16

**Auburn** 141:2 148:9 183:19

**August** 107:24 119:4 163:3

**authority** 197:5

**aware** 17:17 27:19,21,23 28:6 33:5 35:11 57:23 60:18 85:17,22 89:8

102:12 111:5,12 113:19 126:17 133:19 134:17,20 140:24 143:21 147:2 196:3

---

## B

**back** 19:14 22:8 34:10 39:2 42:12,17 49:9,13,14,16,17 56:17 62:11,18 69:25 70:20 78:6 83:16 84:13 90:22 125:25 128:8 129:25 136:11 146:18 149:13,15 156:25 159:4 160:4 172:7 176:20,25 177:3,9,18,24 179:12,17 181:21 189:8 191:3 194:7 202:6,10, 17,18,20,23,25

**bad** 108:4,12 151:4,5 183:12

**balance** 79:13

**bank** 38:5 71:1 74:10,20,25 76:16, 23 77:25 125:21,23,25 126:1 128:2, 21 129:4 145:9,13 146:15,16,20 147:20,22 148:23 173:4 175:9,14,25 176:1,7,11,24 177:2,8,23 186:24 189:4,24 201:23 202:3,6,13,17,18, 23 203:5

**banked** 176:1

**banking** 128:19,20 130:15 148:1

**base** 58:9

**based** 20:20 25:2 26:6 27:10 30:22 31:5 34:16 41:22 47:11 48:5,25 50:3 53:12 59:18 61:25 63:10 68:9,18 70:19 80:16 100:22 101:16 104:23 116:14 126:13 164:13,22 177:8,19 184:10 203:11

**basically** 9:2,19 18:11 39:20 126:2, 6 148:1

**basis** 203:6

**bathroom** 99:23

**Beach** 110:6 191:4

**Bear** 195:19

**bed** 182:24

**beginning** 52:10 58:13 198:8

**belabor** 104:20

**belief** 142:20 189:20,23 190:18,19

**believed** 38:12

**believing** 55:18

**Belinda** 4:8,18,20 9:24 16:7 56:24

83:18 84:14 90:24 91:13 94:18 103:10,21 106:7 114:21 116:2 121:11,18 129:14 132:23 145:3 150:23 159:4 192:14,24 193:7 194:7 195:11 201:19 204:12

**belong** 26:23 53:3 57:10

**belongs** 26:18 62:13

**beneficiaries** 36:7 38:4,13 39:12 41:11 45:12,14 47:2 50:20 51:1 52:5 62:12 63:15,24 73:13,16 75:19,20 83:2 113:11,20 114:7,19,22 115:4, 15 130:22 131:10,15,19 179:2,3 200:18 203:18

**beneficiary** 34:24 35:10 38:1,10,11 48:13 73:10

**Benjamin** 115:7

**big** 23:1 28:7,9 59:9 99:24

**bigger** 91:16

**biggest** 45:18 56:2

**bill** 32:18 42:8 88:25 151:25 152:2

**bills** 33:19 34:11 52:3 56:15 129:5

**binding** 36:6

**biological** 27:7 30:10,11

**bit** 22:3 58:14 156:18

**blood** 133:22

**BLS** 191:17

**bond** 31:24 63:14 173:3,5,7,11 174:17

**bonds** 21:1 22:12 31:11,12,13 39:20,22 45:6,17 46:22 47:1,2,6 52:3 53:1,3 56:3 57:9,14,20 60:23 61:18 62:8,9,12 63:2,5,11,20 64:3, 14,19 65:9,18,25 66:2,20,21,25 67:7 87:6 172:9,20 173:16,22 174:3,13 200:1,6,23 201:1,3

**book** 101:23

**booklet** 98:10 109:24 175:4

**Boosalis** 10:15

**born** 114:3,4 115:5

**bothered** 29:21

**bottom** 19:21 130:8 197:19,22

**bought** 24:14,16,24 27:4 41:6,7,23, 24,25 42:2,3,4,5,6 80:22,25 146:20

In the Matter of: RALPH C. STRUTHERS REVOCABLE TRUST UDT
Connor, Belinda on 10/22/2017

Index: bounty..city

147:21 149:3 170:22 171:25

**bounty** 143:2

**box** 68:11 76:23 81:18,20,25 82:15, 17,21

**boxes** 81:13

**brain** 183:23

**branch** 130:16

**branches** 125:23

**brave** 9:16

**breach** 48:1,5,25 53:13

**break** 52:11,15 156:18

**breaking** 193:1

**bring** 145:24 192:16

**brings** 65:18

**broad** 187:10

**brother** 124:1,12

**brought** 81:16 87:5,11 138:6 150:12 171:23

**bucks** 34:8 168:20

**bunch** 12:9 75:17

**burial** 24:5 73:24 158:20,21 170:21

**buried** 170:24 171:4,20

**business** 89:19 158:16

**busy** 109:22

**buy** 24:15 41:12 144:21 148:7

**buying** 149:1

---

**C**

**C/c** 159:5

**calculated** 172:23 198:15,16 199:18,23 200:25

**calculation** 32:16

**California** 4:7 170:23

**call** 4:17,20,24 25:13 45:8 82:1 84:2, 13 92:10 105:24 110:23 111:1 138:19 139:12 153:3 176:6

**called** 4:9 12:21,22 13:7,9 19:2 44:18 80:13 86:23 112:23 116:18,22 150:14

**calls** 15:20 45:25 46:4 60:10,15 74:5 75:4 99:2 102:5,15 112:2,6 127:24 154:24 155:3,12 157:23 165:12 166:5,19 167:11,19 179:22 180:15 181:3 184:14

**Campbell** 34:19 88:25 191:16

**capable** 99:16 109:8 141:5

**capacity** 37:13 100:23 101:16 122:9 134:7,15,18,21 135:10,19 138:5,18, 24 139:4,11,15 141:18 179:20 180:3,14 181:1

**car** 173:4

**card** 81:4,5 160:16 161:19,21 162:14 194:8,12

**care** 11:21 34:5 51:22 70:24 73:25 99:14 100:1,13,14,17,21 103:1 118:8 120:21 122:11 129:6 134:11 135:4 143:5 146:11 147:10,11 149:11 163:7 170:6,8 183:14,16,18, 21 191:3,9 194:17 195:12,18

**cared** 135:12 136:4

**caring** 182:18,20

**Carole** 8:21,24 16:10 32:3 34:19 38:10 39:11 48:21 50:6,19 51:5 53:4 68:15 69:9,13,19 81:16 82:6 85:7, 18,23 86:1,11 88:25 92:9 150:14 151:25 153:8,11 154:7,8 168:3 191:12,16 192:7

**Carole's** 152:4 154:14

**carries** 5:7

**Casa** 11:23 13:7,10 15:5,6

**case** 19:24 44:10 53:11,14 56:8 57:21 69:19 74:23 175:8

**cash** 29:10 30:23 31:12 32:15 72:18 129:3 147:20 148:23

**cashed** 125:18,19 147:3 173:3,7,12

**cashier's** 125:9,18 146:17,21,22 147:12,21 148:5,7,17,22 149:1,3,6

**cashing** 62:9

**categories** 17:2

**category** 73:1

**CD** 124:17,22 126:2,3 145:16 176:9 186:25 187:14

**CD/IRA** 127:3

**CDS** 87:1,3

**cemetery** 40:9,10,12 41:3,4 170:22 171:25

**center** 103:5 158:12 191:5

**Certified** 4:6,11

**cetera** 37:6 55:11

**chain** 119:21

**challenge** 99:24

**chance** 11:24 84:6 166:22

**change** 10:14 62:16 90:18 91:4,9,25 107:19 109:1 156:7,13

**changed** 15:6 51:12,14 52:21 105:2,3,15 178:21,24 183:4,10 196:5

**changing** 86:12 188:11,18

**Chapel** 42:5

**characterization** 41:23

**charge** 94:9,16,20,22 95:10 97:8,13, 19,22 98:1,14,17 118:13,15,16,19, 22,24 120:13,14 202:25

**charged** 24:16

**charges** 162:14

**check** 32:15,20 57:24 58:1 63:18 73:6 86:20 92:9 125:9,18,25 143:7, 21,25 144:5 146:4,5,21,22 147:11, 12,14,21 148:5,7,17,22 149:1,4,6 168:12,21 169:21 194:21 200:23 202:18

**checked** 195:15

**checking** 176:20 177:3,10 187:11 202:10,21,22,23 203:9

**checks** 22:8 51:7 62:4 146:11,17 168:13 169:6 203:17,25

**Cheryl** 190:5,8,14

**Cheryl's** 191:6

**children** 114:2

**choose** 102:18 149:22

**chose** 100:24 101:17 151:12 171:21

**circle** 190:2

**circumstances** 92:4

**city** 12:11,23 126:19 128:3

In the Matter of: RALPH C. STRUTHERS REVOCABLE TRUST UDT
Connor, Belinda on 10/22/2017

Index: civilly..court

civilly 38:3

claim 46:25 52:25 165:9 175:9,13,23 177:8 202:3 203:7,12

claimed 39:18

claiming 45:6 51:15 71:16

claims 37:5 176:19

clarification 83:19,22 174:9

clarify 5:15,18 104:21 105:17 121:10 199:2

clean 30:4

clear 23:6 64:13 109:16 201:15

client 58:25 91:4

close 49:8,24 125:22,23 127:12 151:13 189:14

closed 77:22 127:17

closer 103:4 151:18

closet 30:8

closing 124:21 127:14

co- 97:4

co-trustee 8:22 11:10,11 27:24 39:16 95:23 199:19

co-trustees 17:5 77:17 123:16 174:10,11 199:19,24 200:20

coffin 42:4

cognitive 180:5

coherently 143:3

collected 177:6

column 79:16

combined 31:10

comfortable 132:16

command 119:22 122:1 123:13

commencing 4:2

communicate 46:12 155:7

communicating 89:13

communication 16:1 45:14 46:14

community 70:18 71:10,17

Compared 58:5

compel 38:15 54:4 81:16

compelled 38:22

compiled 8:3

complaints 83:2

compliance 68:9,10

Complying 128:10

computer 184:20

concern 154:15

concerned 72:12

concerns 53:20 191:24

concert 36:25

concluded 205:2

conclusion 46:5 60:11,16 165:13 166:6,20 167:12,20 171:24

condition 100:9 102:2 135:22 155:10

conditions 99:19 102:13 142:21

condo 30:5 33:21

conference 92:10 153:3

configuration 156:7,9

confined 182:24

confirm 20:15 34:6 64:25 66:14 77:9 143:15

confirmation 159:15,24 161:22 162:4

conflating 113:8

confused 13:17

confusing 79:7 102:24 104:1

confusion 76:8,11

connected 168:2

connection 4:22

Connor 4:8,17,19 9:24 10:12,13,18 88:24 132:23 191:17

Conservator 167:2

considered 22:17 23:14 25:3 176:14

contact 29:22

contention 61:17

contents 47:12 191:22

continuation 186:7 188:1

continue 84:17 196:14

continued 146:12

continues 48:17

contributed 190:16,19

control 91:20 175:5

convenience 126:7,13

conversa- 17:15

conversation 85:17,23 86:11 98:21 107:8 120:8 138:3

conversations 54:15 98:12 169:24

convey 109:11 162:18

copied 87:10,12 98:9

copy 114:11,13 178:5 179:6 192:2 194:20 196:21 204:20

corner 161:18

corners 162:13

correct 20:17 22:15 23:10,11,12 24:2,8 25:5,11,12 27:13,17,18 30:24,25 32:16,17 33:2 34:3 37:16, 17,19,24 39:9,10 44:18 47:15,21 48:2,3 53:10,23 54:5 55:18,20 61:1, 19,20,21 62:2,3 63:9 64:5,16,22,23 65:21 66:4,15 72:23 74:24 75:3 76:7,20,21 77:22 79:13 83:1 87:13 89:4 91:6 94:10,11 95:12 103:17 104:24 111:23 113:3 118:13 119:7, 8,23,24 122:3,25 123:2,7,8 126:15 127:2,3 132:7,8 133:14 138:21 139:8 142:19 144:10,11 147:8 148:12,14,18 151:18,19,21 153:6,7, 12,13 154:4,18,19 163:1,16 164:17 172:11 176:15 180:14,18 182:15 184:7 186:8,9,18,19,21 188:2,7 190:8 195:14,16 203:13

corrected 121:16

correctly 33:14 64:25 65:2,4

cost 15:2 160:5

costs 13:20,22 51:10 52:22

counsel 6:6 8:9 192:4 203:16

count 190:9

couple 6:3 17:2 50:1 51:1 166:24 179:18 192:15 199:1 201:20

court 5:8 6:5 7:21 38:14 39:1 44:4,6 53:1 57:8 67:24 68:8,9 81:19 131:17

166:14

**courts** 165:9

**cover** 52:3 55:22 59:9

**covered** 34:1 157:11

**COVID** 12:2 68:1 165:10,16 180:21

**created** 18:8 99:24 113:11,25 115:6 188:20

**creation** 18:6 113:22

**credit** 81:4 160:16 161:19,21 162:14 194:8,12

**Cross** 4:16 8:9,11,16 15:22 16:1,5, 17 19:1,15,18 20:12 26:2 29:13 31:3,21 32:7 35:16 36:21 37:21 39:1,5 40:20 45:4,10 46:7 52:19 54:1,5,7,19,22,25 55:8 56:23 57:1 58:24 59:2,8,13,17 60:13,17 61:24 62:25 64:24 65:2,5 66:18 67:3 68:25 69:4,15 70:11,15 71:7,11 72:1,3,10 74:6 75:6,11 76:15 77:7,11 80:4,6, 10 83:9,12,14,16 84:9,12 86:17 87:14,17 91:2,6,8,18 94:22,25 95:8 96:10,14 99:4 101:2,3,5,8,12,14 102:7,10,17 103:14,23 104:1 105:16,20 106:15,21 107:1 109:17, 19 112:9,11,13 113:16 114:23,25 115:2,12,22 119:13,15,18 121:15,19 124:16 126:21 128:1,4 129:18,21,25 131:7,12,14,17 132:21 137:24 138:1 139:2 141:13 142:15 143:9,10,14, 17,20 144:15 145:5,14,20,22 150:3, 25 151:4 152:16,18 154:7,13,25 155:5,9,14,18 156:11,15,17,22,24 157:2,4,25 158:4,6 164:5,10,14 165:4,14,18 166:7,9,21,25 167:9,13, 16,21,23 168:1 171:12,14,18,22 172:25 173:9,14,20 174:1,11,20 175:12 178:9,19 179:10,14,17,24 180:10,17 181:5,7 184:22,25 185:9, 23 186:4,13,15 192:8,13 193:3,5 195:22 198:19,23 199:3,5 201:17, 19,22 202:2,7,16,19 203:22,24 204:2,7,11,20

**curious** 126:13

**current** 18:2 37:23 54:2,5 55:24 172:19

**cut** 6:10 49:12 161:2 196:14

---

**D**

**dad** 27:4,6 39:25 40:2 41:5 88:25

89:10 91:24 92:7,21 95:1 99:11,19 103:1 104:6 107:25 108:4,14,23 109:23 110:9,10 115:9 118:24 119:2 120:19,21 122:12 124:10 129:2,5,6 132:15 135:4,18,22 136:22 138:8,13 139:18,21 142:5 145:17 150:15 153:21 154:10,12 160:25 162:20 163:7 164:21 165:3 173:2 175:1,25 176:1 181:17 182:9,11,19,21,22 183:7,24 184:8 185:3 186:24 188:14 189:12,23,25 190:23 191:6 194:17 201:24

**dad's** 25:19 40:2 84:7 99:19 141:1 147:10,11,13,17 184:16 188:15 190:1,3

**Dar-** 173:23

**Darlene** 11:16,18 16:11 24:23 26:16,20,21 27:20 29:16 31:14 34:22 35:4,7 39:24 40:2,6,11 41:6 42:8,25 43:5,8 51:19,20 85:8,18,24 86:22,25 87:8,11 89:1,2,25 92:22 94:6 95:21,25 96:17,21,22,24 97:1, 2,5,12 99:15,24 100:12,19,20,23 102:4,8 103:1 105:14 106:4 107:9, 11,18,25 108:13,21,25 110:2 111:19 114:6 115:9 116:21,22 117:22,24 118:7,19,22 119:1,6,9,22 120:4,21 122:1,4,14 123:9,14 124:1,11 125:4, 22 126:5 127:20 130:12,23 131:20 132:15 135:21 136:18,22 137:13 139:17 140:18 144:14,15 150:15 152:12 154:20 155:6,20,25 164:21 165:3 172:9 173:2,7,12 174:3,9,16, 24 176:5 179:19 180:19 195:12,17 197:2 199:11 200:2

**Darlene's** 35:18 40:4 97:9,10 113:1 114:4 125:8 145:18 177:5

**date** 53:17 58:4 87:18,21 117:15 118:17,20 122:24 123:3,5 125:14 127:4 144:6 146:5 185:14,20,22,23 193:11 194:20

**daughter** 137:6 183:18

**daughters** 119:25

**day** 59:22 60:2,19 88:3 90:20 91:11, 17 92:11 99:14 103:3 108:2 117:10 122:8 127:8 131:3,5 132:2 142:4,6

**days** 17:18 50:16,17 68:12 81:18 154:9 166:24

**deal** 169:3

**debt** 200:2

**December** 43:22 99:20 102:25 188:5 193:12 195:25 196:20

**decide** 102:18 120:9

**decided** 39:23 42:15 50:19 51:3 101:18

**decision** 118:10 120:15 125:6,8 126:5 127:20 180:1

**decision-making** 95:19 97:13 120:4 121:22

**decisions** 18:17 94:9,23 95:11 96:2,4,19 97:9,14,19,23 98:2,15,25 99:16 100:10 101:8,16 102:4 118:13 119:2,5,6,18 120:5,9,20 141:6 142:19 143:4 154:21 181:2

**declared** 93:17 95:20 118:25

**declined** 180:20

**declining** 184:19

**deed** 40:8,10,21,25

**deeds** 175:3

**delay** 60:7

**delivered** 169:7

**demand** 84:2

**demanded** 72:6,8 83:23

**demanding** 71:23

**dementia** 180:6 184:9,12 185:2,7, 16,20 186:2

**denied** 170:8

**deny** 103:16

**denying** 170:6

**dependent** 95:6

**depends** 182:25 183:4

**depo** 126:24

**deposit** 194:17

**deposited** 169:14 200:10,12,15

**deposition** 4:22 5:21,23 7:13,16 8:18,25 16:16,23 17:19 18:25 55:7 61:6 76:14 77:6 115:21 205:2

**deposits** 76:25

**describe** 41:16,25

**descriptor** 127:12

desk 7:3,4

detail 92:18

determination 29:3

determined 177:12

diabetic 100:1

diagnosed 180:4,6 184:12 185:19 186:1

diagnosis 155:11

Diana 8:23 9:9,10 188:5 189:15

Diane 182:8,12

Diego 17:16 188:18

difference 6:17 63:7

differences 201:14

differently 22:15 39:6 53:19 101:25

difficult 128:9 130:14

dimension 102:3

directed 125:2

direction 189:22

directions 172:5

directive 119:17

disagree 163:8,12,13,14

disagreement 47:11

disbursement 73:5 75:24

discover 196:23

discovery 17:7,8 18:4 172:23

discrepancy 58:11,19

discuss 66:15 85:4 90:15

discussed 33:16 40:23,25 60:24 62:19 69:23 112:15 115:15 136:8 182:11 192:16

discusses 63:2 67:6

discussing 63:6

discussion 41:16 108:2 129:24 150:20 204:14

discussions 65:7 66:6 93:6

disorder 180:5

displeasure 106:3 107:9

distraught 99:19

distribute 48:10 51:8 92:16

distributed 50:1 57:6 64:20

distributing 46:16 49:8

distribution 76:10 79:1,6

distributions 57:22 170:12

divorce 56:13 164:21 165:2,3 182:11,12 186:11 196:25 197:10

doctor 99:7 102:23 110:9 118:6 135:8 169:23,25 179:25 180:24 185:2,12

doctors 93:18 97:22,24 100:18 110:8 132:14 134:7,17,20,23 135:1, 15 136:3,4,11 155:16 184:11

doctors' 134:9 136:1 139:11,14 185:5

document 16:13,21 17:17 50:14 54:21 66:16 76:22 77:12 95:18 115:23 122:8 123:4 124:14,17,20 126:21 135:25 146:5,7 160:19 163:22 182:13 190:4 192:23 193:7 197:3,4,5,6,18,22 198:20,24

documentation 38:6 163:18,24 164:6 169:13

documents 7:15 8:2,3,6 16:18 17:3,10 18:1,6 38:12,16 42:14 44:14 50:9,17,22 51:17 54:4 61:12 74:8 81:13,17,18,21,25 82:2,10 83:8 110:15,24,25 111:3 129:9,11,16 141:8,10 164:10 188:20 192:17 195:10,22

dollar 26:3 198:9,12

dollars 161:13

dot 143:2

double-dip 202:12

double-dipped 163:15

double-negatives 103:22

doubled 46:21

doubt 79:12 80:19 112:18

drink 104:8

drive 81:23,24 103:2 110:5 130:15 184:20

drop 51:3

drop-in 140:7

dropped 44:10 50:6 69:20

drove 86:23 110:2 154:10 173:4

duly 4:10

duties 123:10 139:17

duty 47:1 48:2 49:1

---

**E**

earlier 43:19 116:18 121:11 136:20 138:18 142:18 144:17 145:6 168:6 170:10 195:11

earmark 57:10

easier 149:16

easy 187:12

eat 51:22 95:2 104:8

eating 184:3

Eckard 165:20

Eddie 97:5,8 124:2,12

Edwin 124:3,12

effect 5:7

efficient 59:16

elaborate 94:3

elbow 28:23 29:5

elderly 151:11

electric 61:9

electronic 61:10 204:20

email 54:12 129:17,19 182:3,4,5,15, 16 184:5 186:8,18,21 188:1,4,8,9,25 189:17 190:7,14 191:11,21 195:24, 25 196:2,19

emails 17:15 54:16

embalmed 170:25 171:2,6,9,20

encouragement 9:3,8

end 58:12 79:17 148:10 154:11 159:5 180:21 193:1

ended 151:13 188:25

ending 76:20

Enoch 158:12

entitled 25:11 61:18 62:2,5 73:13 163:18 164:6

In the Matter of: RALPH C. STRUTHERS REVOCABLE TRUST UDT
Connor, Belinda on 10/22/2017

Index: entry..flying

entry 72:25

envelope 82:25

equipped 183:21

essentially 162:17

establish 7:1 119:20

established 74:22 121:13

establishing 169:5

estate 29:21 165:23

estimate 6:18,19,25 7:5 14:6,10
187:19

evaluate 138:24 139:4

evaluating 180:25

eventually 146:20 149:13

evidence 31:2 172:24 178:18
179:22 202:15

exact 15:10 74:10

EXAMINATION 4:15 192:21 201:21

excess 62:1 63:22,23,24 66:15
67:6,8

exchanging 22:8

excuse 13:12 21:9 29:15 42:19
63:23 69:5 91:24 113:4 124:8
134:18 136:12 144:20 146:5 170:2,
17

executors 36:8

exhibit 16:14,15 18:23,24 55:5,6
76:12,13 77:4,5 115:19,20 126:22,
23,24,25 127:1 130:3,5,6,7,8,10
132:18 141:9,14,15 142:10 144:5,7,
9 145:23,24

exhibits 130:5 204:25

exist 130:16

existed 28:5 30:16 105:22

existence 196:3,23

expense 73:20 74:24 75:12

expenses 33:19,25 34:14 73:24
74:8 79:5 158:20,21

expensive 92:14

expert 99:2 102:5 154:24 155:3,12
179:22 180:15 181:3 184:14

explain 66:20 91:22 92:4 158:12

198:11

explanation 58:14 74:18 92:3

express 105:14 106:3 118:5 143:4

expressed 107:9 114:18 118:2

expressing 171:7

extended 56:18

extent 143:2

extra 56:18

extremely 92:13

---

**F**

---

facility 11:20 100:14 195:12

fact 52:24

facts 29:12 31:1 61:23 96:11 178:17
179:21 180:16 202:15

fair 52:5 109:12 113:1 164:14 167:23

fall 119:6

fall- 96:19

fallout 95:11

familiar 197:25

family 11:10 25:8 38:11 97:18
100:14 108:18 113:5,6 116:24
186:11 198:4

farfetched 75:21

fast 157:7

faster 49:6

father 13:4 26:22 27:7 30:6,9,10,11,
13 35:6,8 48:17 91:4,9 103:16 104:4
111:18 114:6 136:5 171:20 202:8

father's 48:16

fee 195:12

feeding 110:11

feel 5:17 94:2,3 132:16

feels 68:8

fees 16:3,6 33:20 57:21 75:25 78:19
79:23

feet 28:17,18 170:7

fell 96:4,19,21,22

fiduciary 48:2,25 49:7,23 53:13

fight 50:21 57:8

fighting 49:11

figure 14:5 15:14 21:7,11,14,17,24
22:2,4,5,17,19 23:7 24:2 26:3 65:21
72:21,23 73:12 75:1 80:23 84:8
160:1 162:12 168:6 195:13,16
198:8,9,12,15,16 199:12,13,17,23

figured 196:17

figures 6:24 15:10 28:11 32:10
199:8

file 60:3 175:8

filed 4:23 37:18,23 38:7 39:8 44:16
47:25 59:5,20 157:9 165:10

filing 54:8

filings 7:21

final 66:7 70:22 110:10 160:9

finally 39:17 49:3 50:6,14 160:6
197:11

finances 94:7

financial 94:9,23 95:11 96:2,18 97:4
120:24 123:18 156:4 196:10,16

find 35:14 60:6 82:17 106:1,18
107:16 158:21,24 166:3 167:6
168:25 182:6 194:16

fine 4:20 9:1,4 17:1 19:10 52:16
78:10 89:11 105:1 108:6 187:25

finger 101:22

fingertips 28:23 29:6

finish 6:4

finished 65:16

fired 50:2

firm 15:15 85:25 86:20 88:13 167:4

fixed 51:11

flash 81:23,24

flew 153:14,19,20

floor 29:15,23

Florida 4:4 10:4

Flowers 42:5

fly 153:19

flying 154:11

**focus** 164:3 198:5

**follow** 59:23,24 60:8 84:4 106:10 143:3

**follow-ups** 103:11

**food** 184:3

**foot** 169:23,25

**force** 5:7 23:22 39:21

**forgive** 84:19 139:8

**forgot** 124:6

**form** 55:14 61:10 107:3

**formed** 175:21

**forward** 67:16 109:10 133:12

**found** 29:20 149:13 158:11 201:24

**fourth** 7:25 19:20 20:13 186:17

**Frankly** 169:2

**fraud** 175:8,14 177:8 202:3,25 203:7

**free** 5:17 94:3 201:14

**front** 15:13 19:3 62:20 76:17 122:17 124:18 129:10,11 136:12 141:10 181:9 192:24 193:8 197:18,21

**full** 9:22 40:11 71:14 81:5,8 194:11 198:7,9

**funding** 15:18

**funds** 17:4 34:13 56:9 61:9 173:12 176:2,11,17,25 177:2,5

**funeral** 40:3 42:4,7 73:24 81:6 173:13

**G**

**gain** 95:18

**gardener** 67:17 69:14

**gave** 14:5 22:12,19 23:7 42:7 67:22 78:6 81:18 98:6 108:1 110:9 147:16, 20 159:4,13,14,23 160:4,7 161:12 162:7 176:20 177:2,9,23 194:7 195:13 202:3,9 203:24

**gears** 156:17

**generally** 53:9 55:23 164:6

**gift** 48:16

**give** 7:2,5 25:7 38:15 44:10 49:8,12, 13,16,17 50:9 62:11 66:10,19,21

73:11 81:8,16 82:5 83:24 91:21 93:24 100:21 110:24,25 111:2 129:21 156:15 159:22 160:6 177:14 187:19 188:21 192:16 197:6

**giving** 9:8 48:6,7 197:9

**go-ahead** 108:1

**goal** 148:11

**good** 4:17 6:20 28:11 52:4 57:1 101:21 126:23 129:10 150:16 156:20 183:7 204:12

**goodness** 14:8

**Gotcha** 100:8 124:13

**grab** 19:10

**grandchild** 115:8

**grandchildren** 115:8 131:24

**Granite** 80:13

**grateful** 182:18,20

**grave** 40:1 171:1

**Gravelak** 17:15 149:21 188:6,10 190:6,15 191:23 195:24 196:3,20

**gravelled** 199:22

**great** 6:2 204:4,23

**ground** 6:3

**group** 82:1 133:4

**Grover** 110:5

**Gruenefeldt** 140:25 141:4 142:12, 17 164:16,18 165:6

**Gruenefeldt's** 196:8

**guess** 6:18,20 7:4 14:1,6,7,9,19 29:18 64:1 82:25 87:24,25 126:10 129:12 151:2 187:15,17,22

**guessing** 15:8 99:8 160:2 172:13

**guys** 67:19 83:1

**H**

**half** 25:4,11 64:2 73:23 146:15 173:13 186:24 187:13

**handed** 68:11 71:16 169:7

**handful** 100:20

**handle** 132:17

**handled** 17:4

**handling** 18:2 69:12 89:19

**Hang** 20:8 28:21 62:21

**Hannah** 87:7 88:23 137:6,11 140:20 152:17,19,21

**happen** 17:18 51:3 148:25 170:12 184:4

**happened** 44:13 48:19 58:15 111:16 120:17 123:3 124:11 125:21 136:14 164:11 176:6,13

**happening** 170:4 191:1

**happy** 188:11

**hard** 19:11 92:13 106:24

**Hatridge** 8:22 35:2 95:23 149:9 199:24

**head** 6:14,22 14:22 105:25 133:9 182:11 187:2

**headstone** 80:12,20 82:15

**headstones** 80:20

**health** 90:4 98:7 99:19 110:3,8 120:23,24,25 121:1

**healthcare** 119:17

**hear** 46:3 49:14 54:15 193:19 199:21

**heard** 29:17,18 53:2 61:6 62:17 165:16 188:13

**hearing** 50:7,8,12,15,16,18 59:19 60:2 68:5 107:11

**hearings** 38:16 49:2

**heirs** 36:7,24

**helped** 120:9

**helpful** 54:20 70:12

**hey** 183:8,9

**hidden** 29:15 30:5

**high** 13:25 51:11

**highest** 14:16,17

**highly** 79:12 80:19

**Hill** 12:13 125:20 126:1

**hire** 111:17

**hired** 30:4 56:13 111:19 163:5 164:21 165:3

hiring 129:6

HM 166:1

hold 46:20 48:17 87:14 90:24 91:18
94:19 101:5 103:21 104:14 113:14
114:21 120:7 121:9 143:11 145:3
150:23 174:16

holding 48:15

home 7:5 11:20,21 13:4,7,10,14
29:16 68:1 103:4 117:2,8,12,16,18,
19,21,23 118:1,4,7,12 132:15 134:4
135:6,13 153:2 154:11 162:20
182:21,25

honestly 28:9 47:24 67:20 74:17
75:7 105:8 188:13

honored 202:25

hope 9:4 47:22 138:15

hoping 50:24 184:2 191:8

hospital 90:11 91:10 92:1 93:1,7,9
98:7,13 100:18 103:6 104:6 108:12,
24 110:22 117:3,8,16 118:1 129:2,5
133:13,19,25 136:11 138:17 139:6
173:2 190:24

hounding 83:25

hour 4:3

hours 99:14 183:4,5

house 30:7,20 100:15 138:8 191:2

huge 169:3

husband 9:13,14 10:5 85:7,18,23
86:12 88:24 152:4,5

I

I's 69:10

i.e. 63:17 151:17

idea 7:3 14:25 24:25 29:9 78:17
101:21 150:12,17 187:18

identification 205:1

identified 64:5,16,19

imagine 5:24 181:25

impacted 60:19

implement 92:14

impression 44:20 180:13

improper 18:1 47:9 56:19 164:23
165:7

improperly 17:4

in-office 111:9

in-person 112:1

inactions 37:12

inaudible 40:15 46:1 71:24 112:4
149:25 171:10 192:24

incapable 96:1,6,7,15 98:24

incapacitated 95:21 97:11 109:4
118:25

incapacitation 136:6

incapacity 135:23 136:7 138:7
139:20 155:11

incapsulate 44:13

include 70:19

included 21:6,11,14,17,22 22:2
42:13 70:22 80:23 89:21 120:8
150:17 151:1 170:13 172:21 176:17
182:17 194:19

includes 26:9 37:11 106:16

including 54:16 71:13 153:5 195:23

inclusion 154:3,15

income 51:6,11

incompetent 93:18 99:22

incorrect 45:22,23

independent 49:7,23

indicating 28:12 134:14 141:4

individual 21:10 44:12 45:7 57:13
64:21 66:8,24

individually 31:7 43:5

infection 133:13,19,21 134:1

inform 130:22,25 131:5,14,19,21,25
132:12

informal 161:19

information 14:22 29:14 38:25 48:7
53:9,21 70:6 74:7 87:3 102:1 104:17
110:8 169:1 188:22 203:20

informed 120:12,13 131:21 132:10
133:1

initial 86:22

initially 106:12

initiated 197:1

injury 183:23

insensitive 104:18

instance 185:6

institution 128:21

institutions 128:19

instruct 111:2 155:19

instructing 15:22

instructs 6:7

instrument 120:18

intense 190:23

intensive 191:3,9

intentionally 45:12,23 47:20

interest 47:7 145:10,19

interested 92:24

interrupt 54:16 57:16

introduced 16:14 18:23 55:5 76:12
77:4 115:19 184:12

invade 147:22

inventory 24:20,22 42:11,13 87:7,
10

investigate 176:12

invoice 80:18,25 81:1,9,11 82:14
158:3,8,22 159:22 160:5 161:13
167:15

invoices 69:21 70:1 74:25 81:17
162:24 166:15,16

involved 51:25 52:23,24 53:4 65:6
113:22,24 179:4

involvement 155:24 178:6

Irma 11:15

irrelevant 171:16

issue 27:15 45:16,18 69:13,16,17
70:9 73:1 76:6 79:11 82:18 135:18
162:24 164:15 165:20

issues 45:19,20 52:21 55:24 84:20
89:11 102:12

item 66:8 159:14 194:10,18

itemized 80:12 81:11 157:10 158:2

166:15

**items** 194:3,13 195:1,7

**iv** 21:21

## J

**jackets** 87:1

**January** 13:2 193:12

**Jennifer** 10:12,14

**Jezierski** 142:3,8

**jibe** 79:17

**job** 6:2 11:1 120:20

**Johnson** 85:24 86:4 87:7 88:23
90:8 92:10,12 106:17 109:25
110:16,23 111:12 123:6 135:21
136:9,20,24 137:6,7,12,13 138:6
140:8,19 143:8,22 150:10,13 151:7,
17,22 152:21 153:4 155:23 156:6
168:4 172:8,10 178:2,4,15

**Johnson's** 86:20,24 88:13 90:3
106:23 109:21,23 111:1,7,13
117:11,13,16 122:6 127:9 135:20
136:17 137:17 138:3,20 139:12,16
140:3,17 151:14 153:24 178:6

**Johnsons** 101:20 111:18,19 150:8

**Johnsons'** 87:6 106:6 108:3 110:6

**joint** 120:3 145:18 186:25

**Jose** 25:16 41:18,20,25 42:2,10
43:14

**judge** 38:24 50:13 53:2 68:8

**Julia** 148:16 149:9

**Julie** 8:22 9:5 31:14 35:2 39:14
95:23 96:4,20 97:3 119:10,23
120:13,16 121:11,13,21 123:15
140:18 144:21 147:21 148:4,16
199:24 200:20

**Julie's** 36:1,2 39:13 148:19

**July** 4:2 13:1 73:25 84:24 85:1,3
94:13 95:22 110:18 116:12,15
122:24 128:6,18,25 130:17 133:12,
15,24 136:14,17 138:2,20 139:12,24
141:23,24 144:17 145:6,7,16 197:8,
11

**jumping** 157:7

**June** 12:3,14 46:19 50:15 53:1
67:24 68:2,3 81:19 84:23,25 85:3
108:23,25 114:1 116:15,18 118:18,
21 119:4 173:6

## K

**Kay** 24:25

**Kay's** 24:5 42:3 73:24 173:13

**Kern** 145:25 149:4

**Kevin** 46:2 54:12 165:20 192:10,11
193:1 198:19

**kids** 10:9,19

**kind** 38:2,6 44:13 61:11 78:5,13
98:20 157:4 199:22

**kinds** 108:9

**kitchen** 30:18

**knee** 28:20,21

**knew** 30:2 118:8 129:7 176:9 182:7
188:13

**knowing** 143:4

**knowledge** 18:8 55:19

**Kristen** 4:5 131:18

## L

**L-O-U** 10:1

**L.A.** 19:24 25:14,17,19 26:15 41:4
53:11 56:8 57:21 175:2

**LACHONA** 8:10,12 15:20,24 16:4
25:25 29:12 31:1 32:6 37:20 40:15,
19 44:24 45:2,25 46:4 53:24 54:3,6,
19,24 56:23 58:24 59:5,10,14 60:10,
15 61:22 64:24 65:3 66:16 68:21,23
69:2 70:11 71:7 74:5 75:4 80:2,4,7
83:18 84:10 86:14,16 90:21,24 91:3,
7,13,15 94:18,24 96:10 99:2 101:2,
5,10,13 102:5,15 103:10,21,25
105:16 106:7,10,14,20 109:15,18
112:2,4,6 113:14 114:21,24 115:1
119:11,15 121:9,17 127:24 129:14,
20 131:6,9,13,16 137:22 138:25
143:9,11,15,19 144:13 145:1,3
150:1,23 151:2 152:14 154:5,22,24
155:3,12 156:9,20,23 157:1,23
164:1,8,12 165:12 166:5,19 167:8,
11,19 171:10,16 172:22 173:17,24

174:8,19 175:10 178:7,17 179:13,21
180:15 181:3 184:14 185:8,22
186:12 192:12,14,22 193:4,6 195:4,
19,21 197:14,17 198:22 199:1,16
201:16,18,25 202:14 203:24 204:5,
10,22

**lack** 46:14 68:19,25

**lacked** 134:15,21

**lady** 188:19

**Lancaster** 11:19 12:24 125:20,24
145:17 180:2

**Lancaster/palmdale** 130:16

**land/property** 33:20

**large** 171:1 176:8

**larger** 91:17 162:12

**Laronda** 24:14 167:5 173:1

**late** 59:19,21 60:2,19 165:9

**Laura** 157:12

**law** 5:8 85:25 110:6

**lawyer** 44:11 49:21 56:7,9 57:21
59:25 88:24 165:3 182:9 197:2,10

**lawyer's** 140:9

**lawyers** 116:11

**lead** 172:23

**leave** 40:6

**leaves** 139:18

**leaving** 149:12 163:22,25

**led** 138:4

**left** 13:14 14:17 22:11,22 40:1 51:19
66:25 95:15 99:21 139:21 146:6
180:9 199:11 201:5

**leftover** 31:23

**legal** 46:5 60:11,15 165:13 166:6,20
167:12,20

**legally** 96:15 119:1

**legitimate** 75:12

**length** 7:3,4 28:23

**lengthwise** 28:22

**letter** 140:24 141:4,20,21 142:11,16
191:23,25 195:23 202:24

**letters** 134:7,14,18,21 135:9,15,23 136:6 138:7 139:6,20 141:16

**liabilities** 160:13 193:16,25 194:24

**liability** 164:2

**lie** 102:21

**limited** 70:6

**link** 164:9

**list** 58:25 153:6 178:1,3,4 203:17

**listed** 151:23 167:2

**listening** 50:13

**lists** 66:7

**litigation** 15:18 16:3,7 18:14 39:9 47:11 48:11 51:10,13 52:22

**live** 10:5,7 12:15,25 13:3 51:21

**lived** 12:1,2,16 13:1,4 30:20 122:12 151:11 153:9,11,18 180:2

**livelihood** 95:7

**living** 11:18,19,21 12:20,22 13:15, 24 15:7 51:19 93:5 142:21 180:2,3,8

**location** 12:15,16 74:24

**locations** 130:20

**long** 12:1,14,25 30:19 36:12 52:13 66:8 126:10 144:20 151:12 159:24

**longer** 46:20 70:9 71:16,20 93:12 95:2,4 118:8 147:18 188:22 197:9

**looked** 82:11 87:9 160:11,19,21

**lose** 179:19

**lost** 26:7 99:23 146:19

**lot** 18:8 46:18 49:6 60:5 71:4 83:7 89:11 99:25 104:18 108:17 129:7

**Lou** 9:24,25

**low** 13:25

**Luis** 103:3

**lunch** 83:15

**Lye** 124:4

---

**M**

---

**made** 52:25 79:8,9 86:3,20 101:15 120:15 126:5 127:20 146:23,25 147:14 161:4,7,11 168:3 175:19,23

176:25 202:2

**mail** 54:11 146:19 169:9

**mailed** 61:7 148:9 169:7

**main** 53:20 57:2

**major** 190:17

**make** 6:6,15 7:5 18:17 21:7 51:8 52:4 67:20 79:17 83:19,21 86:1,21 92:5 107:19 108:16 119:5 120:5,19 126:22 142:19 143:3 147:24 148:2, 25 149:16 150:17,25 151:24 153:20 154:20 175:13 180:1 181:1 191:8 200:24

**makes** 65:15 128:9

**making** 29:1 61:17 89:20 96:1,18 98:24 99:16 100:10 102:4 109:8 119:1,18 141:5 162:11

**Malad** 4:4 10:3

**managed** 8:12

**managing** 100:2

**manner** 40:24

**marble** 80:12

**March** 75:24

**Maria** 13:5 93:5 103:6 116:11 122:13 126:19 128:2 130:15 134:3 151:11,13 162:22 170:1 180:8

**marked** 16:15 18:24 55:6 76:13 77:5 115:20 205:1

**married** 10:13,18

**math** 23:23 201:4

**matter** 17:5 37:8 53:20,25 68:8

**Mayflower** 12:6,7,8 13:2,17 15:2,4

**meaning** 48:1 61:3 74:25 91:3 92:25 105:11 117:1 118:11 128:17

**meant** 35:16 49:16 92:19 96:15

**Media** 11:6

**medical** 94:9,22 95:11 96:1,18 97:5, 9,14,19,22 98:1,13,14,25 99:16 100:10 101:6,8,10 102:1,2,4,12,16 118:13 119:5,18 120:5 121:2,3,11, 14,22 123:20,25 124:3 139:3 140:13 154:21 156:3 184:17 188:14,16,17, 21 196:6,7

**medically** 93:18 95:20 99:21

**medicating** 186:2

**medication** 186:3

**medications** 7:8

**meeting** 87:19 88:12,22 90:2,8 111:6,12,13 112:20 136:10 140:3,4, 5 152:24,25 153:2,9,12,15,17,20 156:6 172:8 178:2

**meetings** 111:21,24 112:1,15,17,21 136:8,19,20 151:23 152:1,6

**member** 25:8

**member's** 100:15

**Memorial** 158:19

**memory** 7:9 25:19 40:3 168:16

**mention** 65:23 89:5

**mentioned** 39:11 52:10 63:21 105:17 121:10 136:19 138:18 152:12,23 154:2,15 158:10 178:1 185:10,23

**merchandiser** 11:4

**message** 132:11,23

**messages** 17:14 18:9

**met** 178:14

**Michael** 88:24

**Mike** 152:10,11

**mild** 180:5

**mind** 19:7,8 36:17 57:5 66:11 108:24 156:18 190:12 192:6

**Minnesota** 61:8

**minute** 60:22

**minutes** 49:5,19 179:11

**misleading** 45:12

**missed** 49:12 157:5

**missing** 67:17 69:6 189:11

**Mission** 147:20

**misstates** 61:22 150:1

**mistake** 79:8,9 203:1

**misunderstanding** 47:12

**misunderstood** 83:22

**mixing** 69:9

Mm-hmm 10:16 11:12 17:12 26:1 36:11 37:7,10,15 40:22 44:15 55:12 64:23 65:22 76:18 115:25 116:13,25 123:21 124:19 125:11,13 128:14,22 141:25 154:17 177:22

moment 192:16

moments 195:23

money 23:17,18 25:8 26:9,11 31:12, 13 32:25 33:3 34:1,7,10 38:8 39:18 41:10 43:11,15 46:20,21 47:5 48:15, 16 49:11 50:21 51:1,6,16,20,23,24 52:23 56:10,16 57:8 58:15 78:5,23, 24 79:4 80:19 126:6 127:16,23 129:7 130:13 144:25 145:4,10,11 146:15,16,23 147:19 148:3,4,7,15, 16 149:11,15 163:22 168:10 175:22 176:8,16,17,20,23 177:9,13,18 189:24 198:13 199:10 201:23,25 202:2 203:4

moneys 73:23 163:24

monies 200:17

Montecito 158:19

month 10:20 13:20,23 15:3,4 88:13, 18,19,20 147:10 195:17

monthly 146:11 195:12

months 12:17 13:17 14:3,4 29:20 49:9,14 50:1 51:2 56:17,18 149:10 161:1 182:2

morning 4:17

mother 35:6,8,9

mother's 11:14

motion 81:16

move 12:5 59:13 67:16 79:15 96:16 109:10 168:22 169:2 198:25

moved 12:3,6 13:2,6,14 72:25 86:8 126:9,14 128:13 141:2 145:8 180:6 190:23

moving 126:8 128:3,7,18 130:19 133:12

multiple 166:13

Mutual 36:15

mutually 36:23

Myers 77:16 149:9 186:23 194:21 195:7

**N**

named 121:13

names 10:11,14 114:5 134:10 149:17,21

nature 143:2

nearby 62:20

necessarily 34:9

needed 110:2 118:6,7 163:23 191:9

nefarious 44:21 45:1,8

negative 22:18 151:15 171:8

negatively 60:19

nephew 114:3,4

nervous 102:8

net 32:12

netted 22:6

neurologist 102:19

nice 60:20

niece 35:3

nodding 105:25 133:9

nos 6:13

notary 101:23 123:7

notebook 87:1

notes 179:11

notice 4:2 16:23 17:2 58:10 59:19 60:1 126:24

November 186:23

number 23:1 36:4,10 66:9 144:7 160:1 162:4 197:19,23

numbers 74:18 75:9 79:16 130:7

nurse 182:22 183:8

nurses 183:2

nursing 117:19,21,22,25 134:4 135:5,13 182:21,24,25

**O**

oath 4:13 5:4 78:8

Obispo 103:3

object 70:19 71:13 103:21 164:1,13, 22 194:3,4,13,15 195:1

object- 60:1

objected 80:14

objecting 6:9 59:18 67:15,16,21 68:18,24 69:2,14 73:5,7 78:22,25 80:16,17 157:17 194:9,18

objection 4:22 15:20 25:25 29:12 31:1 32:6 37:20,23 40:15,18 44:24 45:25 46:3,4 53:24 54:2 55:9,17 58:24 59:6,11,15 60:3,5,10,13 61:22 64:24 66:16 68:21 69:5,10,11 70:11, 13,17 71:7 72:24 73:18 75:3,4,14,23 80:2,11 81:10 86:14 90:21 94:18 96:10 99:2 102:5,15 105:16 106:20 109:15 112:2,5,6 113:14 114:21 119:11 127:24 131:6,9 137:22 138:25 144:13 145:1 150:1 152:14 154:5,22 155:3,12 156:9 157:9,10, 12,22,23 158:14,18 159:2,4 163:2, 11 165:11,12,21,23,25 166:5,10,19 167:8,11,19 171:10,14,15,16 172:22 173:17,24 174:8,19 175:10 178:7,17 179:21 180:15 181:3 184:14 185:8, 22 186:12 201:25 202:14

objections 6:7 7:17,19,20,21,24 39:8 55:24 56:24 57:4,22 58:23 59:1 69:10,19 72:15,17 166:13,18

obligations 37:5 199:18 201:11

obvious 109:9

occasion 114:17

occasions 81:21 135:5

occur 125:3

occurred 88:14 139:24

October 4:24 73:25 143:7 144:1,8 188:18

office 30:8 85:15 86:25 87:7 106:23 109:21,24 110:6 111:1,7,11,13 117:11,13,17 122:6 135:4,20 136:1, 17,21 137:10,17,19 138:3,20 139:7, 11,12,15,16 140:3,5,6,10,13,17 147:1 149:13 184:17 188:19 196:7,8

official 160:8

offset 79:14

Okerblom 122:11 134:12,13 135:2, 8,11 141:20 142:2

Okerblom's 139:7 184:17

**older** 12:9 89:22 153:22 155:6

**oldest** 10:12 124:3

**ongoing** 165:23 166:10

**opened** 86:25 126:10 191:12

**opinion** 43:4 63:7 65:7 67:6 100:23 101:1,4 105:2 107:3 112:14,16 155:2 167:17 175:21 180:25 184:10

**order** 21:3 44:4,6 49:10

**ordering** 204:17

**orders** 204:16

**original** 24:20 25:15 42:12 114:13 150:21 151:16 155:22

**originally** 22:20 24:20 197:1

**other's** 36:6,24

**outlined** 148:12

**overpaid** 21:2 200:22 201:5

**owe** 66:23,24

**owed** 20:20,21 22:7,10 23:2,17,19, 25 27:10 31:5,6,15 47:20 52:7 56:16 66:5,6 160:14 198:13 199:10 200:18 201:3

**owes** 42:18,20 51:18

**owned** 24:23 39:24 42:25 43:5 87:3 200:2

**owner** 33:20

**ownership** 39:18 51:15 63:7

**owns** 26:15,23 42:19,20,23 43:9 61:17

---

**P**

**p.m.** 205:2

**Pacific** 128:23

**pages** 59:12 179:4 190:8,11

**paid** 20:23,25 21:1 24:18,19 32:15 39:19 42:17 46:21 52:8 56:7,13 57:12 81:4 162:8 165:22 194:11,23 200:20

**Palmdale** 86:23

**paper** 22:9 23:16 32:12 143:16

**paragraph** 36:13 63:1 64:2,5,16,18, 20,21 65:23 142:25 198:7,9

**pardon** 131:4 160:16 173:8 196:13 200:14

**parents** 178:24

**Park** 158:19

**part** 18:20 22:2 23:14 32:15 33:4 43:3,5 47:19 56:3 65:12,19,20 66:23 69:4 72:21,22 79:6 80:11 82:24 93:7 98:5 112:20 136:9 157:22 159:3 164:25 172:19 174:13 176:18 193:21,22

**partially** 78:18

**parties** 16:22 36:5,23 41:2

**Partners** 166:1

**party** 37:12 42:6

**passed** 39:25 48:18 56:14 124:2 163:20 164:7,11 172:6 175:1

**past** 173:22

**pause** 19:17 20:10 31:19 35:15 36:19 62:23 77:10 87:16 124:15 132:20 141:12 142:13 156:16 167:25 192:20 195:3,20 197:16

**pay** 39:21 44:11 51:22 52:2,6 56:8, 15 73:17 159:4,16 160:4 166:4 167:7 173:7,12 194:7 200:2

**pay-** 63:3

**payable** 149:9

**payee** 147:17

**paying** 16:2,6,10,11

**payment** 21:21,22 32:23 56:19 64:4,15 65:10 68:19 74:1 147:7 163:9 164:16,19,23 165:5,6 166:1

**payments** 69:1,6,22 70:10 177:7 201:12

**pays** 195:17

**PDF** 192:3

**penalty** 5:11

**penny** 74:11

**people** 12:9 30:4 38:11 83:7 96:12 123:22 151:23 153:3

**percent** 53:3 62:12 71:21 99:14

**perfect** 24:3 70:3

**period** 58:12,13 75:14 85:1 98:2 99:17,22 102:20 106:16,17 107:23

**119:3 159:10 163:19 175:11**

**perjury** 5:11

**person** 96:9 98:17 134:24 135:11 136:16,21 137:23 142:2,8 151:9 169:8

**personal** 122:11 129:18 134:11 141:1 143:5 148:5,19,24 168:13 180:8

**personally** 107:4

**persons** 36:25 37:4

**pertinent** 87:2 110:7

**petition** 47:25 48:5,19 50:3 52:21 53:8,12 54:4 55:10,15 69:4

**petitioners** 71:13

**petitions** 170:15

**phone** 19:12 111:11 136:16,24 137:11,23,24 139:12 176:5

**phrasing** 151:5

**physical** 102:1,2,19

**physician** 122:10,11 141:1 180:7,8

**physician's** 134:11

**physicians** 135:24 139:21 188:15

**pick** 109:24 147:1

**picked** 110:1,7 146:22

**picture** 96:18 186:7,16,17,20 188:1 192:3

**piece** 143:16

**Pismo** 191:4

**place** 13:6,11,13 24:23 90:19 105:11,23 163:11 171:21 191:4 204:16

**plan** 47:19

**playing** 50:10

**plot** 24:5 27:3 39:24 41:3,4,17,25 42:2,4,10,23,24,25 43:4,10,14 81:6 171:25

**plots** 24:5,15,17,22,24 25:2,14,16, 18,19 26:15 27:2,4 40:9,10,12 41:16 170:22 175:3

**POA** 95:24 97:6 110:8 120:6 121:11 123:18,20,25 124:3 156:3,4 188:14, 16,17,18,21 196:6,10,16

In the Matter of: RALPH C. STRUTHERS REVOCABLE TRUST UDT
Connor, Belinda on 10/22/2017

point 30:21 37:22 39:7 51:17 52:11 93:20,21,25 94:5 98:23 104:20 107:2 109:20 110:23 117:7 121:20 170:3

portion 66:10 97:6

position 120:7

positive 151:17 171:8

possesses 42:9

possession 61:4 175:2 196:21 204:6

possibly 79:11

post 147:1 149:12 179:3

Powell 10:17

power 93:14 94:5 95:17,19 98:7 101:6,10 110:3 120:4 121:14,21

practice 135:3

prayed 9:10

pre 179:3

predecessors 36:25

prefer 4:18

pregnant 114:2

Premier 128:23

preparation 7:16 166:1,4

present 68:10 88:21 89:3 90:8 111:6,14,15,22 122:14 151:25 152:5,13 153:1,9

president 185:14

pressure 107:18

prestige 12:20,22 13:3,15,20,22,24 180:7

pretty 6:20 9:7 172:1

prevented 102:3

preventing 190:25

price 14:4,14 161:23

prices 15:6

principle 163:14

printer 84:20

prior 12:14 52:21 105:6,23

privilege 15:21

probate 165:22

problem 70:15 159:21,22

problems 108:18

procedures 59:23

proceed 7:13

proceeds 24:10 25:9 32:13 63:11 79:24

process 91:20 126:10 148:11 149:14

produce 49:3 188:9 192:4 203:15

produced 16:19 44:17 75:13 181:11

producing 8:6 17:3,10,13,14,21 182:4

production 17:18 54:4,21

profit 67:10,14

promises 37:5

prompted 139:10,14

prompting 138:19

promptly 60:21

proof 203:16

proper 45:9

properly 38:9

properties 69:23

property 42:16 68:20 70:18 71:10, 17 78:19 79:24

protect 139:22

protection 135:23

prove 61:12 80:24

proved 197:3

provide 81:17

provided 64:21 197:11

providers 98:13

proving 74:21

provisions 105:7

pull 59:15 70:13

purchase 204:16

purchased 27:2

purposes 41:15

pursuant 4:1

pursue 93:12

pursuing 69:8

push 186:10 190:9

put 7:17,20 22:15 23:16 24:22 40:7 42:11 52:6 53:18 58:21 72:18 74:24 76:1 78:25 79:1,4,5,9 80:5 83:3 88:6 101:22,25 104:15 107:18 117:19 125:25 126:7 129:4 132:19 145:13, 17 157:4 159:5 160:13 176:25 182:10 185:12,15 194:7 196:15 202:6,10,17,18,20,25

putting 117:22 126:3 149:15

---

## Q

Quartz 12:12 125:20 126:1

question 5:14,16 6:9 15:25 23:5 33:11 39:2 65:1 67:4 70:5 71:12 78:14 83:22 91:5,15 92:7 98:11 102:10 103:11 106:8,11 115:13 117:5 119:21 128:22,24 130:9 136:13 137:14,16 138:15 143:12,18 151:8 154:12 156:5 157:21 172:16, 18 179:1 180:12 184:23 193:19 195:5 201:20

questions 5:18 21:5 78:7 84:11,21 138:4,17 157:5 179:18 185:11,12 192:9 199:2

quick 36:17 91:19 115:18

quit 68:14

quote 37:3,4 65:19 81:9 159:5 190:15

quoting 159:3

---

## R

Ralph 4:23,25 27:8,20 30:9,10,11 40:6 73:15 76:19 89:25 111:18 112:25 123:14 152:13 155:25 159:11 164:7 172:9 174:16 175:19 177:12 193:8

Ralph's 27:11,17 29:16 73:16,25

range 6:20 10:19 14:10,14 187:7,8, 10 193:12

ranges 10:20 14:4

In the Matter of: RALPH C. STRUTHERS REVOCABLE TRUST UDT
Connor, Belinda on 10/22/2017

Index: rate..reporter

**rate** 80:20

**rational** 143:4

**re-** 28:10

**reached** 19:6 20:19 44:16

**reaction** 100:8

**read** 7:17,18 13:19 36:20 39:2,4 47:17 59:6 65:2,4,13 106:6,23,25 142:24 165:1 185:5 186:5 192:5 197:13

**reading** 36:17 64:25

**ready** 141:14 204:19

**real** 29:20 81:1,9,11 82:20,22 91:18, 19 115:17

**realized** 203:1

**reask** 184:22

**reason** 7:12 39:14 46:19 48:12 51:25 53:4 54:1 57:11 60:3 68:14 79:7 84:16 89:7,16 90:2,7,9 94:15 95:9 96:13,19 99:10 100:9 125:21 126:16 130:11 147:18 149:8,22 150:20 151:8,10 182:14,17

**reasonable** 167:18

**reasoning** 126:12 128:25 159:19

**reasons** 46:15 100:24 101:17 151:7

**recall** 18:19 36:2 48:4 59:10,18,20 67:24 71:5 76:2 85:22 88:12 98:20 107:8,13,22 108:19 114:17 115:13 116:1,2,8 125:2 134:9 155:22 168:21,25 169:23 170:2,6,10,21 171:7 180:11 185:18 195:25

**receipt** 67:17 76:9 79:3,5 80:12 158:22 159:5

**receipts** 38:17 68:11,19,25 69:6,22 70:1 75:17 79:4,15 81:17 159:13 162:6,9 163:23 194:7 195:6

**receive** 25:4 31:9 32:18,25 54:11 65:25 66:1

**received** 25:23 32:3,5,8,11,20 33:4, 15,18 34:1,2,7,17 44:2,3 54:8 55:2 62:1 63:19 65:11 81:12,20,23,25 82:4,11 83:7 144:24 165:15 166:15 203:11

**receiving** 53:21 147:13

**recent** 69:10,11 117:1,6

**recent-** 16:24

**recently** 85:2

**receptionist** 136:2

**recess** 83:15 157:3 179:16

**reclaiming** 149:15

**recognize** 77:12

**recollection** 127:13 160:12,20

**recommend** 102:23

**recommended** 102:20,25 104:3, 24,25

**record** 7:1 9:23 11:13 19:16,18 23:23 39:4 83:10,17 98:3 104:21 129:22,24 130:1 156:25 165:1 169:5 179:15,18 204:14,17

**records** 71:1,4 98:6 127:19 168:15 172:17 184:17 185:7,17 187:4,23 189:5

**recovery** 191:5

**red-flagged** 176:7

**redid** 181:17

**refer** 15:13

**referencing** 142:17 188:24

**referring** 22:6 23:23 41:19 48:21 49:17 53:14,25 54:20 68:23 70:12 71:9 85:11 94:21 132:25 139:1 141:17,21 154:6 164:2 199:15

**reflect** 6:14

**reflected** 40:14,23

**reflecting** 75:25

**refresh** 160:12,19

**refund** 21:2

**refunding** 22:11

**refuse** 197:9

**refused** 38:17 50:8,9 147:1 197:6

**refuses** 48:11

**regard** 44:22 63:6 158:7,9

**regular** 171:3

**rehab** 102:23 103:16 104:3,22

**rehabilitation** 103:5 190:23

**reimburse** 163:24

**reimbursed** 146:21 163:9 194:1 202:4

**reimbursement** 146:4 195:8

**relate** 17:3 18:1 82:2

**related** 4:23 5:24 18:6,14,20 19:6 31:15 32:9,18,22 33:1,4 35:7 44:2 53:21 55:15 68:19,25 69:6,22 70:17 71:1 72:15 75:23 81:13 82:14 93:7 94:14 102:1 125:15 127:13 128:7,18 130:19 143:4 146:4 157:10,12 158:19 159:7,9,10 163:2,18 164:7 166:14 167:17 169:24 170:7 175:14 186:21 203:20

**relates** 155:11

**relating** 186:18

**relation** 34:20,22 185:2

**relationship** 35:7 158:11,13,16,17

**release** 36:15,23 37:3,11

**relevance** 171:14 173:17,24 174:19 185:8 186:12

**relevancy** 164:13 179:22 180:16 181:4

**reliant** 99:13

**relinquished** 123:9

**remaining** 64:3,8,14 65:8,12,20

**remember** 14:9 29:25 30:1 35:23 61:11 67:21 97:25 98:12,16 107:11 111:10 132:9 140:22,23 144:18 168:8 170:4

**REMEMBERED** 4:1

**remodel** 30:18,21,23

**remotely** 4:5,10

**remove** 47:25 53:12

**removed** 42:14 49:4 50:12 169:16

**rent** 51:22 160:6 195:18

**rental** 159:15

**repeat** 13:21 117:5,14 164:25 197:20

**rephrase** 15:25 16:4 23:5 40:16 91:7 124:8 134:19 153:10

**report** 185:13

**reporter** 4:6,11 6:5 39:1,3 40:17 46:2,6 71:25 72:2,5 83:11,13 112:5,

8 129:23 131:17 164:24 171:13,15, 17 192:25 204:15,23

**Reporting** 166:14

**reports** 185:5 186:1

**represents** 73:23 167:3

**requesting** 195:7

**requests** 201:20

**require** 99:25 105:5

**required** 170:11

**requires** 180:19

**reservation** 159:15,17,23 161:22 162:4

**residence** 12:8

**residential** 11:21

**residing** 13:11 125:24 130:14 134:2

**resign** 96:12 100:24 101:17,19 127:10

**resignation** 122:5,15,18,21 133:1

**resigned** 95:21 96:5,6,8,22 97:1,2, 12 101:22,23 119:9 123:5 127:11 130:23 131:1,8,20 132:1,13 135:21 136:18 144:10

**resigning** 137:13 139:17

**resolve** 73:1 75:3,14 79:10 81:10 82:18 157:21,22

**resolved** 80:15

**respect** 201:12

**respective** 37:14

**responsibility** 46:17

**responsible** 163:21

**rest** 117:2,8,12,16 118:4 200:10

**restate** 103:23

**restriction** 64:22

**resulted** 136:10

**retired** 10:24

**return** 78:18 79:21,23 176:22 177:18 201:6,23 202:13

**returned** 147:6 203:13

**returning** 78:23

**review** 8:4

**reviewed** 7:15 8:2

**Revocable** 4:24 76:19 193:9

**revolves** 45:16

**rights** 26:21 37:25 40:11

**ring** 27:11 72:1,2,4,9 83:20 84:4,7 182:22 183:8

**ripped** 170:3

**role** 39:12,13,14,15 157:14

**Ron-** 164:20

**Ronda** 21:10 22:12,13 23:1,18 24:1, 18 25:1 26:10 27:12,16 28:2 29:15, 17 31:7 38:1,5,12,16 39:16 41:7,11 42:3 44:4,21 46:8 47:5,14 48:1 50:21 51:8,15 52:2,6 53:1 55:3 56:2 60:25 61:16 62:13 63:13 64:4,15,20 65:10,13,24 66:24,25 71:17 72:7,8, 22 73:12,23 75:16 77:16 78:6 80:17 81:14,21 82:11 83:3,24 89:5 90:2 97:24 98:5,9 109:23 110:1,5,15 111:3 115:24 117:24 129:6 139:18 146:11,17,21,24,25 147:12,22 148:7,9,11 149:9,11 155:20 157:20 159:11 160:13 161:4 162:18 163:5, 19,23 165:17 168:10,13 169:22 173:3,12 175:24,25 176:18 177:17, 21 182:9,18,20 183:13,17 186:11,23 188:11,20,22 189:12,20,22 190:19 191:2,7,8 194:11,21 198:14 200:9, 23

**Ronda's** 49:5 54:8 61:4 63:7 83:23 102:24 138:8 169:15

**room** 19:8 92:12,21,23,25 93:1,4,5

**rotations** 183:6

**rounds** 142:5 183:3

**roundtable** 108:1,6

**Ruhkala** 80:13

**rules** 6:3 59:23 60:9,14

**running** 51:24

---

S

**sacred** 47:3

**safe** 27:15 28:6 29:7,10,15,19,22 30:7,8,15,24 71:14,16,18 85:8,11,19 86:7,25 87:8 114:16

**safes** 27:19

**sale** 25:4 64:3,14,19 65:9,25 66:15 67:7 78:19

**San** 17:16 25:16 41:18,20,25 42:2, 10 43:14 103:3 188:18

**Santa** 13:5 93:5 103:6 122:12 126:19 128:2 130:15 134:3 151:11, 13 180:8

**sat** 92:11

**savings** 60:23 63:2,5 87:5 145:18 174:17 186:25 200:1

**Scarpelli** 166:14

**scenarios** 120:16

**schedule** 75:24 80:5 164:2 193:15, 25 194:14 195:2,7

**scheduled** 92:10

**Schools** 145:25 149:4

**scratched** 161:17,22 162:10

**screen** 16:19 76:1 84:21 132:19 145:25 161:2 192:18,23 197:15,21

**screens** 62:17

**scroll** 198:6

**sec** 62:21

**secret** 182:8

**section** 21:10,13 22:1,16 23:13 24:5 27:11 32:19,23 65:8 66:14 67:5 76:10 79:5,19

**security** 51:6,7 147:11,14,18 177:6

**seeking** 69:21 71:20 80:11

**Select** 11:6

**sell** 25:6 174:21

**selling** 63:11

**send** 8:13 116:5,7 129:16,19,20 203:18

**sender** 147:6

**sending** 149:11 188:17 196:19

**sends** 82:6

**sense** 6:15 7:6 21:7 79:17

**sentence** 64:11 182:18

**separate** 70:17 71:10 98:11

**September** 124:25 125:14 128:5, 15,17 130:18 144:17 145:7

**serve** 170:17

**services** 11:6 42:5 167:2

**settle** 48:9,20 49:6,9 201:13

**settle-** 44:7

**settled** 50:1,3

**settlement** 18:20 19:3,5,23,24 20:1, 2,5,18 26:6 31:5 33:4 34:4,16 35:13 39:19 41:9 42:21 43:18 44:5,7,9 47:13,15 60:24 62:18 65:7 69:23 70:2,21,23 71:15 72:19 73:14,22 74:12,19 75:1 84:5 126:25 168:7,17 170:9 176:15 198:3,8,17,18 199:7, 14 201:11

**settling** 48:8 49:25

**settlor** 51:21

**severe** 184:8

**shaking** 6:13

**share** 25:9 33:19,21 38:12 39:17 50:25 69:25 190:18 192:17 197:15

**shared** 24:11 34:10,13 43:12,16

**sharing** 50:23

**Sharp** 77:17 197:1

**shift** 156:17

**shook** 182:11

**short** 49:5,10

**Shorthand** 4:6,11

**shortly** 50:2

**show** 5:15 16:13 35:13 55:4 67:21 75:1 115:17 124:13 181:8 191:22 197:5

**showing** 70:25 74:10 77:7 195:22

**shown** 80:18

**shows** 76:25 77:24 169:14 172:1

**Shuttleworth** 32:20 63:19 76:1 77:21,25 78:4,23

**sic** 6:6 105:11 126:23,25 127:1

**side** 114:4

**sign** 35:23 55:14 95:17 108:15 117:22 197:4,5

**signature** 19:22 20:14,15 35:18 36:1,2 55:14 190:1,3

**signatures** 43:24

**signed** 37:16 43:20,21 115:10 122:5,7,8,15,22 144:1 194:21

**significance** 193:24 198:12 200:19

**signing** 37:22 39:7

**similar** 91:15

**simpler** 67:1

**simplified** 92:18 105:4,9 150:10 178:22,23

**simplify** 108:1 110:1 111:19 150:5, 6,11

**sir** 7:23 32:1 187:24

**sister** 8:21,23 34:21 73:24 182:8 189:16,17 190:5

**sisters** 114:1 120:8,14 131:21,25

**sit** 183:5

**site** 40:1

**sites** 171:1

**situation** 183:7,12

**six-month** 99:22

**sixth** 187:25

**size** 171:3

**small** 171:3

**social** 51:5,7 97:25 98:13 147:11, 13,17 177:6

**sold** 24:10 25:10 33:21 41:9 43:10, 14 46:18 61:3 173:21 174:24

**sole** 39:25 40:6

**someplace** 118:7

**son** 124:3 183:22

**sort** 9:19 60:14 175:9

**sought** 17:2

**sound** 43:23 122:25 123:2

**sounds** 28:24 100:22 104:18 121:16 138:14 162:23 204:4

**spaces** 35:21 41:3,5,8

**speak** 25:1 66:14 95:2 99:11 136:3 137:12 169:22

**speaking** 53:9

**speaks** 66:17

**special-needs** 92:8

**specific** 87:20 102:11 142:23

**specifically** 67:9

**speculation** 74:5 75:5 86:16 112:7 127:25 157:24

**spell** 9:25

**spells** 73:21

**spend** 48:10

**spending** 57:7

**spent** 80:19 154:9 161:20

**split** 51:20

**spoke** 8:21,22 49:5,21 137:12

**spoken** 8:18,20

**spot** 73:3

**spreadsheet** 66:7 70:22

**staff** 136:4 138:18 139:3,6

**standing** 28:19 166:18

**stands** 172:20 173:15

**start** 94:12 184:3

**started** 13:25 15:7 45:5 90:3 94:13 186:2

**starting** 115:23 142:25

**starts** 64:8

**state** 4:6 61:8 172:4 204:18

**stated** 59:11 141:17 142:18

**statement** 74:10 76:17

**statements** 38:5 74:21,25 76:24

**states** 84:5 135:25 179:21

**stating** 191:24 202:24

**status** 24:4,7,24 25:17 61:3

**stay** 117:3 191:6

**stepmom** 26:16 170:22

**stepmother** 11:17 34:23 35:3 96:3, 5 111:19

**Steven** 84:11 94:20 121:9 129:16 131:9 164:2

stipulated 44:18

stomach 104:15

stone 25:20 40:3

stop 54:14 129:14,15 157:8 160:15, 17

story 91:16

street 103:6

stressed 132:17

stroke 88:1,4,14 89:13 90:11 92:1 93:3 95:12 99:20,21 104:23 108:12 109:10,11,16,17,20,22 116:25 117:6 143:1 184:18 190:17,20

strokes 89:12 92:8 108:7 191:5

strong 9:16

Struthers 4:23 11:10,16 27:8 76:19 85:8,19,24 86:12 89:2,25 90:10 91:2,25 93:14 94:10 95:25 96:17 97:11 98:24 99:17 101:9 109:2 111:6,14,18,22 112:25 114:18 115:14 117:1,7 118:2,12 119:5,19, 22 120:1,4 121:23 122:1 124:5 133:13,18 134:14,21 135:9 141:5,18 142:18 143:23 163:20 169:20,21 172:6 176:22 177:21 188:5 189:15, 21 193:9 203:11

Struthers' 88:1 90:4 96:1 97:9,13, 21 98:14 102:19 122:9 139:4 169:23 170:20 190:20

stuck 86:9

stuff 56:22 87:8 92:9

subject 37:8

subsection 21:9 24:4 25:3

substance 133:8

substantiate 195:6

substantiation 203:25

subtract 23:1 66:24 199:10 201:4

subtracted 22:4,7,10,21 32:11

subtracting 23:8

successor 27:24 77:17 95:23 123:15

successors 36:7,24

suffered 143:1 184:18

sugar 133:22

suggested 92:17

suggestion 150:10

suited 142:21

suits 37:5

sum 176:8

summarize 52:20 56:24 95:9 103:15 130:17

summary 57:2

summer 29:24

support 74:25 183:18

supported 74:20

supporting 38:6 164:10

supposed 17:18 24:15 25:4 26:11 31:12 38:2,3 47:3 56:8,15,19 58:7 62:6 63:12,13,15,22,24 67:11 73:15 147:7 148:6 191:21 200:7,9,12,15 201:6,13,14

surprise 68:7

survived 26:22

survivor 39:25 40:7

survivorship 26:22 40:11

suspected 196:15

suspended 49:4,18

suspension 49:17

swallow 95:5 184:2

switch 195:10

sworn 4:10

Sylmar 24:23 41:5,19,21 42:23,25 43:4 170:23 171:21

symptoms 104:23

---

**T**

tail 170:2

taking 6:21 103:1 126:3 176:10 189:12

talk 8:24 9:6,14 84:23 85:16 89:14 90:3 95:4 101:19 105:24 108:9,15 119:2 135:14 136:5,23 137:7,9,17, 18,22 183:25 185:4 188:15,23

talked 31:4 32:23 43:19 57:20,21 85:7 128:6 130:19 136:2,15 137:6, 11 144:17 145:6 159:2 168:6 170:10 178:2 185:2

talking 5:1 33:25 39:9 40:8 45:2 48:24 53:11 54:3 69:17 87:19 90:25 93:4 101:6 115:5 119:16 120:23 130:3 140:9,12 144:14 145:4 156:3, 4 202:1

Tara 10:13,17

Tavares 4:4 10:3

tax 166:1,4

TBI 158:12

telephone 182:23

telling 18:12 75:16 81:15 97:25 182:13

ten 11:2 137:3

terms 84:4

terrible 5:19 192:5

test- 155:14

testified 4:12 61:16 142:1 151:6 203:7

testify 7:10

testimony 30:22 99:3 102:6,16 103:19 104:2,22 128:16 150:2 154:24 155:4,13 179:23 180:16 181:4 184:15

Texas 153:11,14,18

text 17:14 18:9 116:1,2 132:11,23,25 181:9,13,22

therapies 103:1,3,5

therapist 183:19

therapists 183:24

therapy 102:19 104:7,16

thereof 4:3 104:23

thing 9:7,19 51:14 52:2 56:2 138:12 142:24 178:24

things 17:22 26:8 27:9 33:17 45:21 55:22 108:10 151:16 162:5 164:11 203:18

thinking 66:21 72:22 189:13

thinks 60:25 62:1 150:15

thirsty 183:9

thought 66:12 83:23 101:21 105:15, 18 106:24 107:12 109:1 121:15 138:12 140:12 183:15,20,23 196:9

thoughts 143:3

threw 67:19

time 5:18 8:4 27:23 35:14 37:22 39:7 44:3 50:11,16 53:2 56:14 68:10 70:7 75:14 85:1 87:6 93:13 94:8 97:12,14 98:2 99:17,18 100:7,23 102:4,14,20, 25 103:2 105:11,14 106:4,5,16,17, 18,20,22 107:2 108:4,5 113:19 115:14 117:20 118:11,16 119:3 120:2 121:20 122:12 133:18 134:2,6 135:7 153:8 158:12 159:10 163:19 169:11 175:11 176:7 183:3,14,21 185:1,19 192:5 196:2,19 204:12

timely 165:8

times 90:14 136:23 137:16,19

timing 63:3

titled 19:21 55:9 86:2,21 92:6 122:18 126:4 145:9 150:18

today 4:21 5:4,13 7:9,13 8:5,7 17:9, 11 39:9 78:8 172:20 174:6 181:11 186:6 192:16 203:23

today's 7:16 8:18

toenail 170:3

told 18:9 28:2 30:2,3,6,7 78:21 97:24 100:16 108:25 116:22 120:12, 14 132:14 139:19 152:8 155:1 160:3 176:10 182:9 184:11 188:19

top 6:21 14:22 24:16 146:6 187:2 193:8

total 20:22 22:4,5 23:8,19 31:6,10, 11 60:25 62:6,7 63:21 65:15,17 66:22 137:23 159:25 160:9 161:20, 21 189:7,10 199:9 203:6

totaling 203:25

totally 95:6 99:13

totals 22:25 162:3,13 187:21

tough 100:4,7

town 154:7

townhome 11:20

Toyota 72:15,21

train 66:12

transaction 75:23

transactions 128:17

transcript 5:15 6:15 68:4,5 204:16

transfer 77:25 117:10 200:1

transferred 27:12,16 61:9 117:2,7, 15,21 118:12 200:6

transferring 78:23

treatment 121:22

trial 48:20 51:4,8 67:16 68:16

trick 5:13

trips 151:12

trivial 67:20

trouble 116:24 193:2

truck 144:22

true 34:9 55:18 56:12 68:12 75:15 99:6,8 104:2 119:4 144:4

trust 4:24,25 5:25 11:7,10 15:17 16:11 18:2,6 19:6 20:3,19 22:13 24:1,12,14,17,19 25:3,9,10,22,23 26:4,10,11,12,18,24 27:1,10,17 29:22 31:4,15,16 32:4 33:7,15,16,18 34:2,7,8,13,25 35:11 39:16 40:7,14, 24,25 41:2 42:17,18 43:6,8,11,16,17 44:2,8,22 45:2,4 46:16,22 47:4 48:8, 9,14 49:6,8,25 50:23,25 51:9 52:1,6, 23 53:21 56:4,5,9 57:7,10,12 60:19 62:4,7,10,13 63:16 65:11 67:11 69:12 70:1 73:11,16,20 75:12,20 76:20 77:21 81:13 82:3 86:3,13,22 87:1,11,12 89:17,18,21 90:16,18 91:5,10,25 92:6,8,13,17 93:8 97:7 98:9 101:6 105:2,10,15,18,22,23,24 106:4,19,23 107:3,5,7,10,19,23 108:14 109:2,24 110:1 111:20 112:24,25 113:1,6,7,10,11,13,15,20, 22,25 114:5,12,23,24,25 115:2,9,10 119:16 120:18 122:19 123:10,14 126:4,7 130:23 131:15,20 135:25 143:23 145:9 147:8 148:4,15 * 149:16,19,24 150:18,21 151:9,16 154:1,18 155:20,23 156:7 157:14,16 159:11,12 163:18,22,25 164:7 165:22 167:2,10 169:21 172:19 173:16 174:10,12,13 175:4,6 178:6, 11,21,22,23 179:2,5 181:17,19,24 182:7,10 189:1 193:9,22 196:4,21, 24 198:4,13,14 199:10,11,19,25

200:3,11,13,16,21,23 201:7,12

trust- 170:16

trust-owned 42:16

trustee 11:7,9 27:24 38:4 39:16 47:9 49:4 51:15 52:1,4 58:6 67:10 122:18 137:15 156:7 159:11 170:18

trustees 27:12,17 32:8 36:8 48:1 63:25 78:6 89:19,24 123:12,13 155:23 156:1,11 170:16 172:5 175:6 198:14 200:7

trusts 18:21 37:14 43:13 113:5 170:18

truth 4:11,12 5:10

tube 104:15 110:11

Tuesday 4:2

turn 26:23 175:18

turned 18:13

twelve 28:8,9 56:17

two-page 189:17

type 6:5 100:1 111:12

## U

U.S. 200:1

uh-huh 6:13 125:1 191:18

unable 120:19,21

unavailable 109:2

unaware 176:10

underneath 193:11,15

understand 5:3,14 6:17 33:8 47:14, 18 59:5 92:13 96:15 107:4,6 146:9 148:2 158:24 204:7,8

understanding 25:22 30:15 61:2 63:10 78:12,15 141:3 146:3 157:13 159:18

understood 5:17 145:20 148:24

unfair 105:12,19 106:1,19,25 107:3, 5,12

unofficial 160:8

unreasonable 60:6 157:18 158:21, 25 166:3 167:7

update 107:19 149:24 203:20

In the Matter of: RALPH C. STRUTHERS REVOCABLE TRUST UDT
Connor, Belinda on 10/22/2017

**updated** 203:17

**upset** 118:9

**utilities** 33:21

**utility** 68:19 69:1,6,22 70:9

---

**V**

---

**vacation** 153:22,23

**Vague** 25:25 32:6 37:20 40:19 68:21 94:18

**valued** 70:18

**values** 62:14

**van** 159:15,17,19,21,23,25 160:1,4, 9,10 162:19

**vascular** 185:15 186:1

**verification** 55:14

**verified** 55:17

**version** 178:13,14

**versions** 178:12

**videoconference** 4:4,13

**view** 47:10 121:21

**Villa** 116:11 134:3 162:22 169:25

**violation** 47:1

**visit** 86:22,24 90:10 153:20 154:9, 10,14

**visiting** 153:21 176:6

**visits** 90:15

**volunteers** 158:11

---

**W**

---

**wait** 77:20 180:11 201:1

**waited** 50:7 52:13

**waiting** 60:21 183:5

**walk** 95:3 99:12 108:8

**wanted** 22:24,25 38:8,9 39:23 41:8 44:14 49:3 53:9 68:17 83:19 86:1 92:4,9 101:18 103:4 110:10 118:3 125:22 127:22 149:23 151:7 153:22 158:10,22 160:23 167:14 171:20 172:1 182:5 188:10 197:2

**wanting** 157:10,19 171:8

**water** 33:19

**wedding** 27:11 72:1,2,3,9 83:20 84:3,7

**week** 54:10 87:23 104:13 132:4,6 142:4

**wide** 29:5

**Willis** 157:13

**wishes** 110:10 170:20,23

**wishing** 191:6

**withdraw** 127:23 158:13 175:22 189:24 195:5

**withdrawal** 124:18 125:3 127:3 128:5,7,25 129:1 130:18 144:16 175:9,14,19 176:14 203:10

**withdrawals** 74:15 176:8

**withdrawn** 145:6 177:20

**withdrew** 130:12 175:22 176:2 177:13 189:21

**withhold** 155:20

**word** 29:24 45:8

**wording** 74:11

**words** 9:3,8 64:8 143:15

**work** 38:21 99:25

**worked** 157:20 197:2

**workers** 98:1,13

**working** 10:22

**worried** 100:19 154:3

**worries** 20:9

**worse** 84:22

**worth** 22:13,14 46:23 47:6 57:15 63:20 84:8 201:1,3

**wreck** 102:9

**write** 89:14 95:3 99:12 108:8 109:8 134:7,13,14 200:23

**writer** 150:21 151:16

**writing** 13:19 136:6

**written** 97:6 143:8,22,25 149:7 181:24

**wrong** 22:16 99:10 138:9 176:21

203:19

**wrote** 57:24,25 58:1 134:18,21 135:9,15 141:4,7 149:18 151:9 181:16,19 182:15,16 183:17 189:17

---

**Y**

---

**Yaris** 72:15,21 174:21,24

**year** 30:1

**years** 5:23 11:2 30:20 46:17 48:9,17 57:7 115:5,6 122:13 178:25 180:2

**yeses** 6:13

**yesterday** 61:6 198:21 204:1

**youngest** 10:18 115:7

---

**Z**

---

**Zach** 10:20

**Zachary** 10:18

**Zoom** 4:3 5:6

# Exhibit C-3

EXHIBIT C-3 — Zillow/Listing screenshot (prior CA residence "Sold" 12/18/2023)

Used in: ¶89; Count 5

Pins: Sale date on screenshot

Proves: Connor's relocation; nondisclosure impacting notice.

Why it matters: Service/jurisdiction.

Constitutional hooks: —

Damage bucket: Extra service/mailing cost; delay.



3 bds    2 ba    1,398 sqft

4752 Avenida Vista Verde, Palmdale, CA 93551

Sold: $497,777    Sold on 12/18/23

Zestimate®: $514,600

Est. refi payment: $2,671/mo

# Exhibit D-1

EXHIBIT D-1 — 7/18/2025 Order Compelling Accounting

Used in: ¶81; Counts 2–3, 5–6, 9–10

Pins: Order date and directive paragraph

Proves: Accounting ordered; not enforced.

Why it matters: Ongoing concealment; denial-by-delay.

Constitutional hooks: 14A (timely adjudication/enforcement).

Damage bucket: Prolonged admin expenses; delay.

Electronically Submitted on 08/24/2025 10:08 AM

1   G. Kevin Lachona, SBN 286072
    LACHONA LAW
2   2450 Venture Oaks Way, Suite 200
    Sacramento, CA 95833
3   Telephone: (916) 235-3095
    Facsimile: (916) 415-3528
4
    Attorneys for:
5   BELINDA CONNOR
    JULIE HATRIDGE
6
7
8               IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA
9                     IN AND FOR THE COUNTY OF PLACER
10
11  In the Matter of:                    CASE NO.: SPR0010066
12                                        EX PARTE ORDER EXTENDING TIME
                                          TO RESPOND TO REQUEST FOR
13      THE STRUTHERS FAMILY              PRODUCTION OF DOCUMENTS OF
        1993 REVOCABLE TRUST              LARONDA MYERS
14      dated June 4, 1993.
                                          [CCP § 2031.260]
15
16
                                          Date:   June 25, 2025
17                                        Time:   8:00 am
                                          Dept.:  40
18
19      Petitioners, JULIE HATRIDGE and BELINDA CONNOR, as Co-Trustees of

20  THE STRUTHERS FAMILY 1993 REVOCABLE TRUST dated June 4, 1993, having filed

21  their *EX PARTE APPLICATION FOR ORDER EXTENDING TIME TO RESPOND TO*

22  *REQUEST FOR PRODUCTION OF DOCUMENTS OF LARONDA MYERS*, came on for ex

23  parte hearing on the above date and time. On evidence given to the satisfaction of this Court and

24  good cause, this Court makes the finding that notice of this ex parte application has been given as

25  required as law and that no further or other notice be required.

26  //

27  //

28

                        EX PARTE ORDER EXTENDING TIME

FILED
SUPERIOR COURT OF CALIFORNIA
COUNTY OF PLACER

JUN 25 2025

JAKE CHATTERS
EXECUTIVE OFFICER & CLERK
By: B. Baldock, Deputy

**THEREFORE, IT IS ORDERED** that:

1.  The deadline to respond to LaRonda Myers' Request for Production of Documents, Set No. One, be extended to September 30, 2025; and

2.  The court reserves the hearing date of August 29, 2025 for Petitioner's motion for protective order.

Dated: ___JUN 2 5 2025___

JUDGE OF THE SUPERIOR COURT

Michael Jacques

**EX PARTE ORDER EXTENDING TIME**

2

# Exhibit E-1

EXHIBIT E-1 — Orders Authorizing Cashing of U.S. Savings Bonds

Used in: ¶84; Counts 1–2, 10, 13

Pins: Order date(s) and operative text

Proves: State authorization/advocacy to liquidate bonds for fees.

Why it matters: Federal preemption conflict (31 U.S.C. §3105; 31 C.F.R. Pt 353).

Constitutional hooks: Supremacy Clause; 14A as-applied restraint.

Damage bucket: Risk to federally governed assets; emergency motion costs.

Electronically Submitted on 08/24/2025 10:08 AM

G. Kevin Lachona, SBN 286072
LACHONA LAW
2450 Venture Oaks Way, Suite 200
Sacramento, CA 95833
Telephone: (916) 235-3095
Facsimile: (916) 415-3528

Attorneys for:
BELINDA CONNOR
JULIE HATRIDGE

FILED
SUPERIOR COURT OF CALIFORNIA
COUNTY OF PLACER

JUN 25 2025    B.B.

JAKE CHATTERS
EXECUTIVE OFFICER & CLERK
By: B. Baldock, Deputy

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF PLACER

| | |
|---|---|
| In the Matter of: | CASE NO.: SPR0010066 |
| | **EX PARTE ORDER CONFIRMING US SAVINGS BONDS AS ASSETS OF THE STRUTHERS FAMILY 1993 REVOCABLE TRUST** |
| THE STRUTHERS FAMILY 1993 REVOCABLE TRUST dated June 4, 1993. | [Prob. C. § 17200(a)] |
| | Date: June 25, 2025<br>Time: 8:00 am<br>Dept.: 40 |

Petitioners, JULIE HATRIDGE and BELINDA CONNOR, as Co-Trustees of

THE STRUTHERS FAMILY 1993 REVOCABLE TRUST dated June 4, 1993, having filed

their *EX PARTE APPLICATION FOR ORDER CONFIRMING US SAVINGS BONDS AS*

*ASSETS OF THE STRUTHERS FAMILY 1993 REVOCABLE TRUST,* came on for ex parte

hearing on the above date and time. On evidence given to the satisfaction of this Court and good

cause, this Court makes the finding that notice of this ex parte application has been given as

required as law and that no further or other notice be required.

//

//

EX PARTE ORDER CONFIRMING ASSETS

1

1   **THEREFORE, IT IS ORDERED** that:

2   1.   The following U.S. Savings Bonds, identified by the serial numbers, are assets of THE

3   STRUTHERS FAMILY 1993 REVOCABLE TRUST dated June 4, 1993:

4         a.   V002177179
          b.   V001304882
5         c.   V001304884

6   2.   JULIE HATRIDGE and BELINDA CONNOR, as Co-Trustees of THE STRUTHERS

7   FAMILY 1993 REVOCABLE TRUST dated June 4, 1993 have the authority to and are entitled

8   to negotiate and/or redeem said U.S. Savings Bonds;

9

10

11  Dated:   **JUN 2 5 2025**

                                    JUDGE OF THE SUPERIOR COURT
12
                                            Michael Jacques
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**EX PARTE ORDER CONFIRMING ASSETS**

2

# Exhibit E-2

EXHIBIT E-2 — Bank statement/signature-card ("Darlene / Belinda / Julie" — Ralph removed)

Used in: ¶¶90B, 139; Counts 3, 5

Pins: Statement page date; signature-card date

Proves: Wrongful retitling; elder property "taking/retaining."

Why it matters: Direct proof of W&I §15610.30 elements.

Constitutional hooks: 14A (property); Equal Protection (as-applied).

Damage bucket: Asset loss risk; tracing costs.

DARLENE STRUTHERS
BELINDA CONNOR
JULIA HATRIDGE
43454 30TH ST W APT 220
LANCASTER CA 93536

Date    8/15/18
Account Number
Enclosures

Page      1
21509773
3

There are new liability limits for VISA Debit Cards. Unless you have been
negligent or have engaged in fraud, you will not be liable for any unauthorized
transactions using your lost or stolen VISA® Debit Card. The change in limits
on liability does not apply to ATM transactions outside of the U.S.to ATM
transactions not sent over Visa or Plus networks, or to transactions using your
Personal Identification Number which are not processed by VISA®.

| Senior Checking | | Number of Enclosures | 3 |
|---|---|---|---|
| Account Number | 21509773 | Statement Dates  7/17/18 thru | 8/15/18 |
| Previous Balance | 3,404.28 | Days in the statement period | 30 |
| 1 Deposits/Credits | 3,000.00 | Average Ledger | 3,525 |
| 3 Checks/Debits | 231.34 | Average Collected | 3,525 |
| 1 Electronic DRs | 3,250.00 | | |
| Monthly Service Fee | .00 | | |
| Interest Paid | .00 | | |
| Ending Balance | 2,922.94 | | |

### Deposits and Additions

| Date | Description | Amount |
|---|---|---|
| 8/02 | DEPOSIT | 3,000.00 |

### Checks and withdrawals

| Date | Description | Amount |
|---|---|---|
| 8/06 | CASH TRANS PRESTIGE CARE | 3,250.00 AW |
| | 1880510011        08/06/18 | |
| | TRACE #-091000013133629 | |

### Checks in Serial Number Order

| Date | Check No | Amount | Date | Check No | Amount |
|---|---|---|---|---|---|
| 7/18 | 1030 | 41.34 | 7/24 | 1032 | 150.00 |
| 7/17 | 1031 | 40.00 | | | |

### Daily Balance Information

| Date | Balance | Date | Balance | Date | Balance |
|---|---|---|---|---|---|
| 7/17 | 3,364.28 | 7/24 | 3,172.94 | 8/06 | 2,922.94 |
| 7/18 | 3,322.94 | 8/02 | 6,172.94 | | |

1717494-1

# Exhibit F-3

EXHIBIT F-3 — 5/29/2017 nurse note to Belinda: "Darlene has dementia"

Used in: ¶¶67, 91; Counts 3, 5

Pins: Note date/author

Proves: Dementia predates July 2017 control shift.

Why it matters: Capacity/undue-influence context.

Constitutional hooks: —

Damage bucket: Care/placement consequences.



**10:55**

〈 Inbox

Found in iCloud Inbox

**April Spaulding**
To: ronda Myers >

8/10/19

# No Subject





HOA CC&R for property and I Drop off thanks t...

# Exhibit F-4

EXHIBIT F-4 — Darlene's placement move (Prestige → halfway house)

Used in: ¶¶91, 187; Counts 3, 5

Pins: Facility records/dates (cover sheet identify dates)

Proves: Care downgrade while no accounting.

Why it matters: Elder-abuse context & fiduciary breach.

Constitutional hooks: —

Damage bucket: Increased care risk; oversight costs.

SENIOR RESOURCES
HEALTHCARE PROFESSIONAL RESOURCES



Senior
LIVINGGUIDE.com

# Prestige Assisted Living at Lancaster



Prestige Care, Inc.
Prestige Senior Living, L.L.C.

*Assisted Living and Memory Care in Lancaster, CA*

📍 43454 30th Street West, Lancaster, CA 93536 **$$$**

⊙ Check Availability          $ Get Pricing





Just an hour outside of Los Angeles, Prestige Assisted Living at Lancaster is a pet-friendly community located in a quiet residential neighborhood just off the Antelope Valley Freeway. Lancaster was awarded the 2021 Antelope Valley's Best Care Giving Award!

44123 Westridge Dr

# Exhibit F-5

EXHIBIT F-5 — Message: "doesn't need medical treatment for a month"

Used in: ¶70B; Counts 3, 5

Pins: message date/time (screenshot header)

Proves: Belinda relayed "no treatment for a month," used to block rehab/PCP alignment and routine follow-up.

Why it matters: Shows deliberate care obstruction during a high-risk post-hospital window; supports motive to preserve the non-treating "incapacity" narrative.

Constitutional hooks: 14A procedural due process (as-applied barriers to basic care/administration); access to courts (obstruction theme).

Damage bucket: Elevated health risk; added medical costs; delay.

Counts: 3 (elder abuse), 5 (Belinda), 9 (admin barriers context).

doctor's name
to write

I do that right
know

He has to use
Santa Maria
doctor as
primary until
August first.
He has to have
a referral from
okerblom

Sutter Rehab

324 of 583

# Exhibit F-6

EXHIBIT F-6 — Bank closures & authority packet (incl. Kern Schools cashier's check + "loss" declaration)

Used in: ¶¶90A–90C, 145B; Counts 3–5, 7, 10, 13

Pins: 7/7/2017; 9/1/2017; instrument images (by page)

Proves: Removal of Ralph's access; false "paid" record; title manipulation.

Why it matters: Elder-abuse taking/retaining; fiduciary breach.

Constitutional hooks: 14A (property).

Damage bucket: Asset loss risk; tracing/recovery costs.



**DECLARATION OF LOSS &
CLAIM FOR REIMBURSEMENT
OF CASHIER'S CHECK**

| Date of Check: 05/18/2018 | Check Number: 0100013604 | Amount: 1253.00 |
|---|---|---|
| Payable to: RONDA MYERS OR JULIA HATRIDGE | | |
| Account Number (if applicable): | Remitter: JULIA HATRIDGE | |
| Declarant's Name: JULIA HATRIDGE | | Phone #: 661-205-5090 |
| Address: 3504 PANORAMA DR BAKERSFIELD, CA 93306 | | |

- Cashier Check Status: • Lost    Stolen    Destroyed

- I hereby certify that I am the remitter or payee of the above referenced cashier's check.

- I hereby declare that I have lost possession of the above referenced cashier's check ("check"), and that this loss of possession was not the result of a transfer by me or a lawful seizure. I cannot reasonably obtain possession of the check because it was destroyed, its whereabouts cannot be determined, or it is in the wrongful possession of an unknown person or a person who cannot be found or is not amenable to service of process.

- Based upon the forgoing, I hereby request payment in the amount of the check be made by the Credit Union to me.

- I understand and agree that this Declaration of Loss & Claim for Reimbursement ("Declaration & Claim") is not enforceable by me against the Credit Union until the later of (a) the time this Declaration & Claim is delivered to the Credit Union; or (b) the 90th day following the date of the cashier's check.

- Until this Declaration & Claim becomes enforceable, I understand and agree that the Credit Union may pay or authorize the payment of the check and that any such payment to a person entitled to enforce the check discharges the Credit Union from all liability with respect to the check.

- If this Declaration & Claim becomes enforceable, I understand and agree that the Credit Union will pay the amount of the check to me, subject to the claims of any holder in due course and provisions of the Uniform Commercial Code, and that any such payment discharges the Credit Union from all liability with respect to the check. If payment is made to me and the Credit Union must make subsequent payment on the check to a holder in due course, I agree to promptly refund the payment made to me. If the Credit Union pays the amount of the check to me, I agree to indemnify, defend and hold the Credit Union harmless from any and all third party claims upon the Credit Union related to the check.

- I acknowledge a receipt of a copy of this Declaration & Claim and accept and agree to the terms hereof. I declare under penalty of perjury that the foregoing is true and correct.

Declarant/Member Signature          01/08/2019          Date

*CREDIT UNION USE ONLY*

Witnessed and accepted at LIT VERNON 45          By ESTEFANIA BLANCO
                        (Branch)                      (Employee)

(Signature of Manager or Designee approving 90 day waiver)          Reason for Waiver

Effective Date of Credit _____ Replaced By _____
                                              (Employee)
Replacement Check No _____ OR Credit to Acct. # 8004780    Suffix 1

SD-10 (05.18)

*Send original to Accounting Department, Copy to Member, Copy in Branch.

• Probate transparency/fiduciary duties: refusal of non-privileged identity records (notary journals/thumbprints) violates baseline transparency owed to beneficiaries.

Sub-tabs included:

• G-1 — Subpoena Response Refusal (Law Offices of Johnson, Murphy & Jones, Inc.)

• G-2 — July 7, 2017 "Incapacity" Declaration (prepared by J. Dean Johnson)

• G-3 — Subpoena Package (drafts/execution copies/notary journals/thumbprints)

• G-4 — Refusal Letter (Law Offices of Johnson, Murphy & Jones, Inc.)

• G-5 — Formal Records Request re authenticity chain

• G-6 — Incapacity-papers packet (July 7 declaration + July 10–11 letters)

Issues/Evidentiary notes (for the Court):

• Identity/authentication materials (notary journals & thumbprints) are not privileged communications; any privacy concerns can be handled by a narrow protective order (redact SSNs/addresses, but produce names/dates/signatures).

• The requested materials are proportional and central to instrument validity and capacity chronology; refusal undermines accurate adjudication.

# Exhibit G-1

EXHIBIT G-1 — Subpoena refusal (Law Offices of Johnson, Murphy & Jones, Inc.)

Used in: ¶¶78, 85F; Counts 2–3, 7, 10

Pins: Refusal letter date/letterhead

Proves: Non-production of execution packets/notary logs.

Why it matters: Necessity of evidentiary hearing/neutral review.

Constitutional hooks: Access to Courts; 14A.

Damage bucket: Delay; increased expense.

# Exhibit G

EXHIBIT G — SUBPOENA OBSTRUCTION & MULTI-FIRM PATTERN
(Refusal/objections by Law Offices of Johnson, Murphy & Jones, Inc.; filings by G. Kevin
Lachona through Harris & Plottel, LLP; Drobny Law Offices, Inc.; and Lachona Law)

Used in: ¶¶78, 78A, 78B, 85F; ¶¶90–92 (context); Counts 2, 3, 4, 5, 7, 10, 13.
Pin cites (from packet): pp. 24, 29, 33, 35.

Exhibit G

Summary:
This packet shows repeated obstruction of subpoenas for authenticity records (drafts, execution
packets, notary journals, thumbprint logs) tied to the June 4, 1993 trust. Law Offices of Johnson,
Murphy & Jones, Inc. refused production and asserted blanket privileges; G. Kevin Lachona (via
Harris & Plottel, LLP; Drobny Law Offices, Inc.; and Lachona Law) coordinated
motions/practice to delay or quash. Transcripts and timeline materials show bank closures and re-
titling (July 7 & Sept. 1, 2017) preceded the July 12, 2017 faxing of Santa Maria "incapacity"
letters, underscoring why authenticity discovery is critical and why the refusals caused due-
process harm.

Exhibit G

Proves (key facts):
• Coordinated refusal to produce core authenticity/identity materials (drafts, notary journals,
thumbprints).
• Pattern of multi-firm participation (Johnson/Murphy & Jones + filings by Lachona through
multiple firms).
• Timing gap: account actions pre-dated the later faxed "incapacity" letters.
• Discovery obstruction contributed to non-evidentiary handling and deprivation of a meaningful
hearing.

Exhibit G

Why it matters (legal theory):
• Fourteenth Amendment — Procedural Due Process (Mathews): obstruction → heightened risk
of erroneous deprivation by blocking authentication and evidence.
• First Amendment — Petition/Retaliation (as context for Counts 1–2): obstruction and
protective-order tactics chilled and burdened petitioning.
• 42 U.S.C. § 1983 — Joint Action/Under Color of Law: private actors' coordinated use of court
process with officials supports joint-participation liability.

SUBP-001

| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address): | FOR COURT USE ONLY |
|---|---|
| LaRonda Myers<br>12060 Mont Vista Drive<br>Auburn, CA 95603<br><br>TELEPHONE NO.: 530-320-1727     FAX NO.:<br>ATTORNEY FOR (Name): | |

NAME OF COURT: Superior Court of California, Placer County
STREET ADDRESS: 10820 Justice Center Drive
MAILING ADDRESS: P.O. Box 619072
CITY AND ZIP CODE: Roseville, CA 95678 BRANCH
NAME: Probate Division

PLAINTIFF/ PETITIONER: LaRonda Myers
DEFENDANT/ RESPONDENT: J. Dean Johnson

| **CIVIL SUBPOENA**<br>**For Personal Appearance at Trial or Hearing** | CASE NUMBER: S-PR-0010066 |
|---|---|

THE PEOPLE OF THE STATE OF CALIFORNIA, TO (name, address, and telephone number of witness, if known):

Johnson, Murphy & Jones, LLP - Attn: J. Dean Johnson-See attached "Attachment 3(d)-Documents Requested from J. Dean Johnson"
928 W. Grand Avenue
Grover Beach, CA 93433

1. **YOU ARE ORDERED TO APPEAR AS A WITNESS** in this action at the date, time, and place shown in the box below UNLESS you make an agreement with the person named in item 2:

   a. Date: August 29, 2025     Time: 8:30 A.M.     [x] Dept.: 40     [ ] Div.:     [ ] Room:
   b. Address: 10820 Justice Center Drive, Roseville, Ca 95678

2. **IF YOU HAVE ANY QUESTIONS ABOUT THE TIME OR DATE FOR YOU TO APPEAR, OR IF YOU WANT TO BE CERTAIN THAT YOUR PRESENCE IS REQUIRED, CONTACT THE FOLLOWING PERSON BEFORE THE DATE ON WHICH YOU ARE TO APPEAR:**

   a. Name of subpoenaing party or attorney:         b. Telephone number:
   LaRonda Myers, Pro Per                               530-320-1727

3. **Witness Fees:** You are entitled to witness fees and mileage actually traveled both ways, as provided by law, if you request them at the time of service. You may request them before your scheduled appearance from the person named in item 2.

**DISOBEDIENCE OF THIS SUBPOENA MAY BE PUNISHED AS CONTEMPT BY THIS COURT. YOU WILL ALSO BE LIABLE FOR THE SUM OF FIVE HUNDRED DOLLARS AND ALL DAMAGES RESULTING FROM YOUR FAILURE TO OBEY.**

Date issued:

Cindy P Baldock
(TYPE OR PRINT NAME)

C. BALDOCK
(SIGNATURE OF PERSON ISSUING SUBPOENA)
Deputy Clerk
(TITLE)

### Requests for Accommodations

Assistive listening systems, computer-assisted real-time captioning, or sign language interpreter services are available if you ask at least 5 days before the date on which you are to appear. Contact the clerk's office or go to www.courtinfo.ca.gov/forms for Request for Accommodations by Persons With Disabilities and Order (form MC-410). (Civil Code, § 54.8.)

Form Adopted for Mandatory Use
Judicial Council of California
SUBP-001 (Rev. January 1, 2007)

(Proof of service on reverse)
**CIVIL SUBPOENA FOR PERSONAL**
**APPEARANCE AT TRIAL OR HEARING**

Page 1 of 2

Code of Civil Procedure, §§
1985,1986,1987 www.courts.ca.gov

SUBP-001

| PLAINTIFF/PETITIONER:   LaRonda Myers | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT:   Struthers Family Trust of June 4, 1993 | S-PR-0010066 |

**PROOF OF SERVICE OF CIVIL SUBPOENA FOR PERSONAL APPEARANCE AT TRIAL OR HEARING**

1. I served this *Civil Subpoena for Personal Appearance at Trial or Hearing* by personally delivering a copy to the person served as follows:
   a. Person served *(name):*   J Dean Johnson
   b. Address where served:
      928 W. Grand Avenue, Grover Beach, CA 93433
   c. Date of delivery:   Monday, June 09, 2025
   d. Time of delivery:   11:56 AM PDT
   e. Witness fees *(check one):*
      (1) ☐ were offered or demanded
         and paid. Amount:         $
      (2) ☒ were not demanded or paid.
   f. Fee for service:              90.00
2. I received this subpoena for service on *(date):*
3. Person serving:
   a. ☐ Not a registered California process server.
   b. ☐ California sheriff or marshal.
   c. ☒ Registered California process server.
   d. ☐ Employee or independent contractor of a registered California process server.
   e. ☐ Exempt from registration under Business and Professions Code section 22350(b).
   f. ☐ Registered professional photocopier.
   g. ☐ Exempt from registration under Business and Professions Code section 22451.
   h. Name, address, telephone number, and, if applicable, county of registration and number:
      Maurene A. Schuler
      San Luis Obispo County Reg #PS280
      1241 Knollwood Drive #74
      Cambria, CA 93428 San Luis Obispo
      323-64-SERVE

I declare under penalty of perjury under the laws of the State of
California that the foregoing is true and correct.

Date:   June 10, 2025

_____
(SIGNATURE)

(For California sheriff or marshal use only)
I certify that the foregoing is true and correct.

Date:

_____
(SIGNATURE)

By fax

SUBP-001

| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address): | FOR COURT USE ONLY |
|---|---|
| LaRonda Myers<br>12060 Mont Vista Drive<br>Auburn, CA 95603<br><br>TELEPHONE NO.: 530-320-1727   FAX NO.:<br>ATTORNEY FOR (Name): | |

NAME OF COURT: Superior Court of California, Placer County
STREET ADDRESS: 10820 Justice Center Drive
MAILING ADDRESS: P.O. Box 619072
CITY AND ZIP CODE: Roseville, CA 95678 BRANCH
NAME: Probate Division

PLAINTIFF/ PETITIONER: LaRonda Myers

DEFENDANT/ RESPONDENT: Hannah Johnson

| CIVIL SUBPOENA<br>For Personal Appearance at Trial or Hearing | CASE NUMBER: S-PR-<br>0010066 |
|---|---|

THE PEOPLE OF THE STATE OF CALIFORNIA, TO (name, address, and telephone number of witness, if known):
Johnson, Murphy & Jones, LLP- Attn: Hannah Johnson- See attached "Attachment 3(d)-Documents Requested from Hannah Johnson"
928 W. Grand Avenue
Grover Beach, CA 93433

1. **YOU ARE ORDERED TO APPEAR AS A WITNESS** in this action at the date, time, and place shown in the box below UNLESS you make an agreement with the person named in item 2:

   a. Date: August 29, 2025   Time: 8:30 A.M.   [x] Dept.: 40   ☐ Div.:   ☐ Room:
   b.
   Address: 10820 Justice Center Drive, Roseville, Ca 95678

2. **IF YOU HAVE ANY QUESTIONS ABOUT THE TIME OR DATE FOR YOU TO APPEAR, OR IF YOU WANT TO BE CERTAIN THAT YOUR PRESENCE IS REQUIRED, CONTACT THE FOLLOWING PERSON BEFORE THE DATE ON WHICH YOU ARE TO APPEAR:**

   a. Name of subpoenaing party or attorney:
   LaRonda Myers, Pro Per
   b. Telephone number:
   530-320-1727

3. **Witness Fees:** You are entitled to witness fees and mileage actually traveled both ways, as provided by law, if you request them at the time of service. You may request them before your scheduled appearance from the person named in item 2.

**DISOBEDIENCE OF THIS SUBPOENA MAY BE PUNISHED AS CONTEMPT BY THIS COURT. YOU WILL ALSO BE LIABLE FOR THE SUM OF FIVE HUNDRED DOLLARS AND ALL DAMAGES RESULTING FROM YOUR FAILURE TO OBEY.**

Date issued:



*Cindy P Baldock*
(NAME)

*C. BALDOCK*
(SIGNATURE OF PERSON ISSUING SUBPOENA)

Deputy Clerk
(TITLE)

---

**Requests for Accommodations**

Assistive listening systems, computer-assisted real-time captioning, or sign language interpreter services are available if you ask at least 5 days before the date on which you are to appear. Contact the clerk's office or go to www.courtinfo.ca.gov/forms for Request for Accommodations by Persons With Disabilities and Order (form MC-410). (Civil Code, § 54.8.)



Form Adopted for Mandatory Use
Judicial Council of California

SUBP-001

| PLAINTIFF/PETITIONER: LaRonda Myers | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: Struthers Family Trust of June 4, 1993 | S-PR-0010066 |

### PROOF OF SERVICE OF CIVIL SUBPOENA FOR PERSONAL APPEARANCE AT TRIAL OR HEARING

1. I served this *Civil Subpoena for Personal Appearance at Trial or Hearing* by personally delivering a copy to the person served as follows:
   a. Person served *(name):* Hannah Johnson
   b. Address where served:
      928 W. Grand Avenue, Grover Beach, CA 93433
   c. Date of delivery:   Thursday, May 29, 2025
   d. Time of delivery:   09:22 AM PDT
   e. Witness fees *(check one):*
      (1) ☐  were offered or demanded
          and paid. Amount:        $
      (2) ☒  were not demanded or paid.
   f. Fee for service:              $85.00
2. I received this subpoena for service on *(date):*   May 27, 2025
3. Person serving:
   a. ☐  Not a registered California process server.
   b. ☐  California sheriff or marshal.
   c. ☒  Registered California process server.
   d. ☐  Employee or independent contractor of a registered California process server.
   e. ☐  Exempt from registration under Business and Professions Code section 22350(b).
   f. ☐  Registered professional photocopier.
   g. ☐  Exempt from registration under Business and Professions Code section 22451.
   h. Name, address, telephone number, and, if applicable, county of registration and number:
      Maurene A. Schuler
      San Luis Obispo County Reg #PS280
      1241 Knollwood Drive #74
      Cambria, CA 93428 San Luis Obispo
      323-64-SERVE

I declare under penalty of perjury under the laws of the State of
California that the foregoing is true and correct.

Date:   05/30/2025

_____
(SIGNATURE)

(For California sheriff or marshal use only)
I certify that the foregoing is true and correct.

Date:

_____
(SIGNATURE)

# Exhibit G-2

EXHIBIT G-2 — 7/7/2017 "Incapacity" declaration (J. Dean Johnson)

Used in: ¶¶69–71; Counts 3–7

Pins: Declaration date/notary block

Proves: Notarized incapacity without Auburn exam; later used to seize control.

Why it matters: Keystone paper enabling closures/re-titling.

Constitutional hooks: —

Damage bucket: Downstream asset/control harm.

# RESIGNATION OF TRUSTEE AND ASSIGNMENT OF TRUST ASSETS TO NEW TRUSTEE

My husband, RALPH CHARLES STRUTHERS, is unable to act as Trustee due to his physical disabilities.

I, DARLENE L. STRUTHERS, remaining Trustee of the STRUTHERS FAMILY 1993 REVOCABLE TRUST, Dated June 4, 1993, resign as Trustee and assign all of the assets of the Trust to the Successor Co-Trustees, named by myself and my husband, in the 1993 Trust, namely JULIA LYNN HATRIDGE and BELINDA LOU CONNOR.

Dated: 7 - 7 - 17

**DARLENE L. STRUTHERS, Trustee**

---

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

---

STATE OF __CALIFORNIA__ )
COUNTY OF __San Luis Obispo__ )

On __July 22, 17__ before me, J JOHNSON, Notary Public, personally appeared DARLENE L. STRUTHERS, who proved to me on the basis of satisfactory evidence to be the persons whose names are subscribed to the within instrument and acknowledged to me that they executed the same in their authorized capacities, and that by their signatures on the instrument the persons, or the entity upon behalf of which the persons acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

J Johnson, Notary Public



J. JOHNSON
COMM. # 2053526
NOTARY PUBLIC • CALIFORNIA
SAN LUIS OBISPO COUNTY
Comm. Exp. JAN. 23, 2018

# Exhibit G-3

EXHIBIT G-3 — Subpoena package (drafts/execution packets/notary journals/thumbprints)

Used in: ¶78; Counts 2–3, 7, 10

Pins: Subpoena schedule (identify items)

Proves: The authentication universe being withheld.

Why it matters: Defines scope for compelled production.

Constitutional hooks: Access to Courts; 14A.

Damage bucket: Delay; costs.

**ATTACHMENT 3(D) – DOCUMENTS REQUESTED FROM HANNAH JOHNSON**

1. All communications (written, email, or internal) between you and/or J. Dean Johnson's office and Belinda Connor, Julie Hatridge, Carole Campbell, or Darlene Struthers from January 1, 2017 to present.

2. All appointment logs, call records, notes, or emails referencing contact with or about the Struthers Family Trust.

3. Any drafts, files, or documents you personally created, edited, reviewed, or filed in relation to trust amendments, incapacity letters, or trustee changes.

4. Any internal documents or entries referring to notarial credentials used from Don Gravalec's office without permission.

5. Notarial logs, thumbprint entries, or acknowledgement forms linked to Ralph or Darlene Struthers.

6. Any document scans, audio, or video relating to trust document preparation, execution, or conversations involving the Struthers family.

1

ATTACHMENT 3(D) – DOCUMENTS REQUESTED FROM HANNAH JOHNSON

# ATTACHMENT 3(D) – DOCUMENTS REQUESTED FROM J. DEAN JOHNSON

1. All communications (written, email, or electronic) between your office and Belinda Connor, Julie Hatridge, Carole Campbell, or Darlene Struthers from January 1, 2017 to present.

2. All call logs, appointment records, emails, handwritten notes, or documentation of visits, contacts, or telephone calls involving the above individuals regarding the Struthers Family Trust.

3. All drafts, executed trust documents, powers of attorney, incapacity statements, or other instruments involving Ralph or Darlene Struthers.

4. Any records showing the removal of Darlene Struthers from a care facility for purposes of trust modification or financial transactions.

5. Any use or reference to notarial credentials or stamps affiliated with Don Gravalec's office, particularly if used without permission or outside proper notarial procedure.

6. All notarial logs, thumbprint journals, and acknowledgment forms tied to Ralph or Darlene Struthers from 2017 to present.

7. Any electronic document scans, recordings, videos, or transcriptions relating to document execution or trust revisions.

1

ATTACHMENT 3(D) – DOCUMENTS REQUESTED FROM J. DEAN JOHNSON

# Exhibit G-4

EXHIBIT G-4 — Refusal letter (Law Offices of Johnson, Murphy & Jones, Inc.)

Used in: ¶78; Counts 2–3, 7, 10

Pins: Refusal letter date/author

Proves: Blanket refusal.

Why it matters: Confirms obstruction pattern.

Constitutional hooks: Access; 14A.

Damage bucket: Delay.

1  The Law Offices of Johnson, Murphy, & Jones, Inc.
2  Cori B. Jones (SBN 261018)
3  928 W. Grand Ave. Grover Beach, CA 93433
   Phone: 805-489-4111
4  Fax: 805-489-4222
5  Cori@jmjlegal.com

6  Attorneys for Non-Party, JOHNSON, MURPHY & JONES, INC.,
7  HANNAH MURPHY, J JOHNSON

8
9                IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA
10                    IN AND FOR THE COUNTY OF PLACER
11
12  In the Matter of:                          CASE NO.: SPR0010014
13
14                                             **WRITTEN OBJECTIONS TO CIVIL**
15                                             **SUBPOENA FOR PERSONAL**
                                               **APPEARANCE AT TRIAL OR**
16        **RALPH C. STRUTHERS**               **HEARING**
17        **REVOCABLE LIVING TRUST UDT**
          **OCTOBER 22, 2017**                 [CCP §§ 1987.1(a), 2020.220(l)]
18
19                                             Date: August 29, 2025
                                               Time: 8:30 A.M.
20                                             Dept.: 40

21          JOHNSON, MURPHY & JONES, INC. ("JMJ"), a non-party, hereby objects to the
22
23  subpoena served on it by Petitioner LaRONDA MYERS, Co-Trustee of the RALPH C.
24  STRUTHERS REVOCABLE TRUST, Dated October 22, 2017 ("Subpoenaing Party") on the
25  following grounds:

26          1.   Under California law, information otherwise discoverable information may be
27               protected by a statutory privilege. Board of Registered Nursing v. Superior
28
    WRITTEN OBJECTIONS TO CIVIL SUBPOENA FOR PERSONAL APPEARANCE AT TRIAL OR HEARING. - 1

Court (2021) 59 Cal.App.5th 1011, 1039. Attorney-client privilege obligates an attorney to refuse to disclose confidential communications between herself and a client. Evid. Code, § 955. The protection afforded by attorney-client privilege is robust and expansive, including both legal advice and opinions communicated directly to the client and that which concerned the client, but exchanged between members of the firm. Fireman's Fund Ins. Co. v. Superior Court (2011) 196 CA 4th 1263, 1273-1274. The privilege is not compromised because the confidential communication is revealed to a non-client third-party, where that third party is "present to further the interest of the client" or because said disclosure "is reasonably necessary for the transmission of the information or the accomplishment of the purpose for which the lawyer is consulted." Evid. Code, § 952. Here, given the nature of the information sought, in terms of both its subject matter and its source, compliance with the Subpoenaing Party's requests would violate attorney-client privilege.

2. The scope of discovery is not without limits; thus alongside any discovery request a party must provide evidence demonstrating that the request is reasonable in scope, and the information is sought in good faith. Calcor Space Facility, Inc. v. Superior Court (1997) 53 Cal.App.4th 216, 224. Although this requirement applies to all discovery requests, a moving party's justification will be put to heightened scrutiny where the subject is a nonparty, from whom only a limited scope of discovery is available. Board of Registered Nursing v. Superior Court (2021) 59 Cal.App.5th 1011, 1039. Before it will order a nonparty to comply, a court must be satisfied that the discovery request is

"reasonably calculated to lead to [the] discovery of admissible evidence." <u>Calcor Space Facility, Inc.</u> at 216. Section 1985 of the Code of Civil Procedure requires nonparty discovery requests to be accompanied by an affidavit outlining exactly what is sought and why. For the request to be enforced, this affidavit must set forth a factual basis sufficiently detailed to permit "an informed ruling on the issues of materiality and good cause." <u>Johnson v. Superior Court for Santa Barbara County</u> (1968) 258 Cal.App.2d 829, 837. Here, the Subpoenaing Party has failed to provide the required affidavit, having instead merely listed the desired records. In addition to being overbroad, there is no factual basis provided justifying the request. Beyond rendering it procedurally defective, this omission prevents the subpoena from being properly evaluated for statutory compliance. Absent the court's satisfaction that the discovery request is proper, a nonparty cannot be forced to submit.

3. Relatedly, nonparties are also sheltered from discovery requests deemed oppressive or prohibitive. Code Civ. Proc., § 2020.220(l). The general admonishment against imposing undue burden on an adverse party during discovery is given even greater importance when applied to nonparty discovery requests. <u>Calcor Space Facility, Inc.</u> at 225. Here, the Subpoenaing Party's request clearly imposes an undue burden on JMJ, a nonparty. The subpoena includes sweeping requests covering broad categories of documents, records, emails, and the like. Full compliance with the request would require retrieval of information dating as far back as 2017. This issue is compounded by the omission of the required affidavit and failure to offer any basis to support a

WRITTEN OBJECTIONS TO CIVIL SUBPOENA FOR PERSONAL APPEARANCE AT TRIAL OR HEARING. - 3

claim that the request is neither oppressive nor prohibitive. Without any basis on which to draw a conclusion on the acceptability of the request when imposed on a nonparty, it should not be enforced.

4. California discovery statutes mandate strict compliance with the procedure outlined therein. Board of Registered Nursing v. Superior Court (2021) 59 Cal.App.5th 1011, 1030. Full compliance requires the use of the proper Judicial Council form. Wherever applicable, all forms adopted for "mandatory use" must be used by all parties. Here, the Subpoenaing Party used Judicial Council Form SUBP-001, a mandatory form associated with civil subpoenas requesting personal appearance at a trial or hearing. This form is incongruous with the substance of the subpoena. The correct form is SUBP-010, a mandatory form associated with deposition subpoenas for the production of business records. This error renders the subpoena defective.

5. Item 1: All communications between JMJ and Belinda Connor, Julie Hatridge, Carol Campbell, and/or Darlene Struthers are shielded from discovery under attorney-client privilege. Moreover, the sweeping scope of the request imposes an undue burden on Johnson, Murphy & Jones, a nonparty to this action. Even if the material sought was not privileged, given the absence of any explanation or justification from the Subpoenaing Party for the request, there is no reason to believe that

6. Item 2: All administrative records, documents, notes, and the like that reference or pertain to the Struthers Family 1993 Revocable Trust Dated June 4, 1993, are shielded from discovery under attorney-client privilege. Moreover, the

WRITTEN OBJECTIONS TO CIVIL SUBPOENA FOR PERSONAL APPEARANCE AT TRIAL OR HEARING. - 4

sweeping scope of the request, without explanation or justification, imposes an undue burden on Johnson, Murphy & Jones as a nonparty to this action.

7. **Item 3**: All drafts, files, and documents of any kind drafted, edited, reviewed, or filed by JMJ in connection with the Struthers Family 1993 Revocable Trust Dated June 4, 1993, are shielded from discovery under attorney-client privilege. Moreover, the sweeping scope of the request, without explanation or justification, imposes an undue burden on Johnson, Murphy & Jones as a nonparty to this action.

8. **Item 4**: JMJ has no knowledge of any such information being in its possession. Even if JMJ did have the materials sought, this request, so broad in scope and unsupported by any facts demonstrating its connection to admissible evidence, is unduly burdensome on Johnson, Murphy & Jones as a nonparty to this action.

9. **Item 5**: Any and all such records liked to Ralph Struthers or Darlene Struthers are shielded from discovery under attorney-client privilege. Further, the Subpoenaing Party, as with all its requests, fails carry its burden by presenting a factual basis justifying such an overbroad request.

10. **Item 6**: As with all of Subpoenaing Party's similar requests, any document scans, audio, or video content that JMJ may have related to the Struthers Family 1993 Revocable Trust Dated June 4, 1993 is protected from disclosure under attorney-client privilege.

Dated: 8/26/2025

Cori B. Jones,
Attorney for Johnson, Murphy & Jones,
Hannah Murphy & J Johnson

WRITTEN OBJECTIONS TO CIVIL SUBPOENA FOR PERSONAL APPEARANCE AT TRIAL OR HEARING. - 5

# Exhibit G-5

EXHIBIT G-5 — Formal records request to Law Offices of Johnson, Murphy & Jones, Inc.

Used in: ¶78; Counts 2–3, 7, 10

Pins: Request date/recipient

Proves: Diligence; specific notice of what is needed.

Why it matters: Supports tolling; need for neutral production.

Constitutional hooks: —

Damage bucket: Delay.

laRonda Myers
12060 Mont Vista Dr
Auburn, CA 95603
530-320-1727

**J, Johnson, Esq.**
[The Law Offices of Johnson, Murphy & Jones, Inc.
928 W. Grand Avenue,
Grover Beach, CA 93433

**Subject:** Formal Request for Records Pertaining to the Struthers Family Trust (June 4, 1993)

Dear Mr. Johnson,

I am writing to formally request the production of all records related to the creation,
amendment, and administration of the Struthers Family Trust dated June 4, 1993. As a
trustee of the Ralph C. Struthers Trust (October 22, 2017) and on behalf of the beneficiaries
of the Struthers Family Trust, I believe these records are critical to uncovering
discrepancies and potential mismanagement.

It is important to note that Ralph C. Struthers was an original party to this trust and had
vested interests in its proper administration before apparent corruptions occurred. As
such, his trustees, including myself, have the legal right to review and access these files to
ensure the integrity of the trust and its amendments.

Recent revelations indicate significant concerns about the legitimacy of amendments
made to the Struthers Family Trust and the designation of its current trustees, Belinda
Connor and Julie Hattridge. We have strong reason to believe that material changes were
made to the trust under circumstances that were not properly disclosed to the rightful
beneficiaries and trustees.

As such, I am requesting the following records for immediate review:

1. All documents, communications, and records related to the original creation of the
   Struthers Family Trust (June 4, 1993).

2. Any amendments or modifications made to the trust, including dates, signatures,
   and related correspondence.

3. Records of meetings, notes, or communications involving the settlors, beneficiaries,
   or trustees.

4. Records showing asset transactions, distributions, or transfers involving the trust.

5. The original notarized records related to the trust creation and amendments, including the notary's logbook entries with the thumbprint of the signing parties.

This request is made in accordance with California Probate Code § 16061 and § 16061.7, which mandate the disclosure of trust records to beneficiaries and trustees with vested interests. Failure to provide these records could result in further legal action, including court intervention to compel their production.

If you no longer retain these records, please provide written confirmation of their current custodian or location. Kindly respond to this request no later than [insert deadline, e.g., 15 days from the date of this letter].

The inclusion of the notarized logbook with the thumbprints is crucial to verifying the authenticity and legitimacy of the trust-related transactions and amendments. This level of transparency is essential to protect the interests of all parties involved.

Your cooperation in this matter is not only required by law but essential for the transparency and resolution of trust-related concerns.

Sincerely,

**LaRonda Myers**

Trustee, Ralph C. Struthers Trust (October 22, 2017)
Beneficiary Representative, Struthers Family Trust (June 4, 1993)

# Exhibit G-6

EXHIBIT G-6 — Incapacity packet (7/7 + 7/10–11/2017 letters; office-doctor later reversal)

Used in: ¶¶68A, 70, 145; Counts 3–7, 13

Pins: Packet index (cover sheet)

Proves: Non-treating signers; July 10 office-doctor reversal after seeing therapy communication.

Why it matters: Undercuts incapacity narrative used to seize control.

Constitutional hooks: —

Damage bucket: Control/asset harm avoided by transparency.



**CENTRAL COAST FAMILY CARE**
MEDICAL ASSOCIATES OF SANTA MARIA, INC.

**Michael P. Schrager, M.D.**
Board Certified in Family Practice
**Richard L. Zachrich, M.D.**
Board Certified in Family Practice
**Barbara Armstrong, C.N.P.**
Certified Nurse Practitioner
821 E. Chapel Street, Suite 203
Santa Maria, CA 93454
Phone: (805) 925-8334
Fax: (805) 922-5923

**John P. Okerblom, M.D.**
Board Certified in Family Practice
**Melinda Jezierski, M.D., PhD**
Board Certified in Family Practice
**Scarlett Okerblom, PA-C**
Physician Assistant
**Diane Agraz, PA-C**
Physician Assistant
915 E. Stowell Rd. #B
Santa Maria, CA 93454
Phone: (805) 938-7444
Fax: (805) 938-7422

**Brian Desmond, M.D.**
Board Certified in Family Practice
**Laura J. Thele, M.D.**
Board Certified in Family Practice
**Adrienne Dingler, C.N.P.**
Certified Nurse Practitioner
220 S Palisades Drive, Suite 104B
Santa Maria, CA 93454
Phone: (805) 925-2521
Fax: (805) 925-8721

**Mohammad A. Arain, M.D.**
Board Certified in Internal Medicine
1505 S. Shepard Drive, Suite 104
Santa Maria, CA 93454
Phone: (805) 928-2645
Fax: (805) 928-1995

**Kamlesh M. Desai, M.D.**
Board Certified in Family Practice
355 Daniel Drive # 105
Santa Maria, CA 93454
Phone: (805) 937-0368
Fax: (805) 937-3622

**Juleen Stimson**
Administrator
426 E Barcellus Ave, Ste 301
Santa Maria, CA 93454
Phone: (805) 925-1009
Fax: (805) 925-1137
juleen_stimson@ccfmedical.com

7/10/2017

To Whom it may concern:

Our patient Ralph Struthers (DOB 02/28/1933) recently suffered a severe stroke. He is unable to care for himself or make financial decisions and is now medically incapacitated. He is unable to act as his own agent or trustee.

His condition is not expected to improve. If you need any further information please contact this office.

Sincerely,

John P. Okerblom, M.D.



CENTRAL COAST FAMILY CA
MEDICAL ASSOCIATES OF SANTA MARIA, INC.

**Michael P. Schrager, M.D.**
Board Certified in Family Practice
**Richard L. Zaebrich, M.D.**
Board Certified in Family Practice
**Barbara Armstrong, C.N.P.**
Certified Nurse Practitioner
821 E. Chapel Street, Suite 203
Santa Maria, CA 93454
Phone:  (805) 925-5334
Fax:  (805) 922-5923

**John P. Okerblom, M.D.**
Board Certified in Family Practice
**Melinda Jezierski, M.D., PhD**
Board Certified in Family Practice
**Scarlett Okerblom, PA-C**
Physician Assistant
**Diane Agraz, PA-C**
Physician Assistant
915 E Stowell Rd, #B
Santa Maria, CA 93454
Phone:  (805) 938-7444
Fax:  (805) 938-7422

**Brian Desmond, M.D.**
Board Certified in Family Practice
**Laura J. Theis, M.D.**
Board Certified in Family Practice
**Adrienne Dingler, C.N.P.**
Certified Nurse Practitioner
220 S Palisades Drive, Suite 104B
Santa Maria, CA 93454
Phone:  (805) 925-2521
Fax:  (805) 925-8721

**Mohammad A. Arain, M.D.**
Board Certified in Internal Medicine
1505 S. Shepard Drive, Suite 104
Santa Maria, CA 93454
Phone:  (805) 928-2645
Fax:  (805) 928-1095

**Kamlesh M. Desai, M.D.**
Board Certified in Family Practice
355 Daniel Drive # 105
Santa Maria, CA 93454
Phone:  (805) 937-3366
Fax:  (805) 937-3622

**Juleen Stimson**
Administrator
126 E Barcellus Ave, Ste 301
Santa Maria, CA 93454
Phone:  (805) 925-1609
Fax:  (805) 925-1137
juleen_stimson@ccfcmedical.com

7/11/2017

To Whom it may concern:

Our patient Ralph Struthers (DOB 02/28/1933) recently suffered a severe stroke. He is unable to care for himself or make financial decisions and is now medically incapacitated. He is unable to act as his own agent or trustee.

His condition is not expected to improve. If you need any further information please contact this office.

Sincerely,

Melinda Jezierski, M.D., PhD

New iMessage                    Cance

## To: Belinda Connor

**Jul 8, 2017,** 6:25 PM

Hey I just wanted to give you a heads up. Darlene resigned her duties as trustee to Julie and I so any financial questions will be addressed by the two of us

# EXHIBIT H-1-2-3

## OMNIBUS DECLARATION OF LARONDA MYERS

(Covers Exhibits H-1, H-2, and H-3)

Myers v. Lachona, Hatridge, Connor, et al., No. 2:25-cv-1925-TLN-CSK (PS)

I, LaRonda Myers, declare:

1. I am the Plaintiff in this action. I make this declaration of my own personal knowledge. If called to testify, I could and would competently do so.

2. This omnibus declaration authenticates Exhibits H-1, H-2, and H-3, which are true and correct copies of the documents described below, kept or obtained by me in the regular course of administration and litigation of the matters at issue.

A. **Exhibit H-1** (Check to Law Offices of Johnson, Murphy & Jones, Inc.)

a. Exhibit H-1 is a true and correct copy of a check dated October 24, 2017 issued from Darlene Struthers's trust account to Law Offices of Johnson, Murphy & Jones, Inc. in the amount of $2,156.06.

b. At or around the same period, opposing parties and counsel asserted Darlene's incapacity when it supported their control positions; nevertheless, the firm accepted payment from Darlene on 10/24/2017.

c. This inconsistency corroborates the selective-capacity posture alleged in the Complaint (¶73; Count Seven).

B. **Exhibit H-2** (Burial/Embalming Documents + Plaintiff Declaration)

a. Exhibit H-2 contains true and correct copies of documents reflecting Ralph C. Struthers's preference for embalming and burial, plus related communications.

b. Despite those expressed wishes, Ralph was ultimately cremated, following delays and process mismanagement described in the Complaint.

c. This demonstrates interference with settlor's expressed wishes and supports the allegations in Counts Four–Six.

1

C. **Exhibit H-3** (Darlene Dementia Evidence)

a. Exhibit H-3 consists of true and correct copies of a May 2017 nurse note and contemporaneous messages stating that Darlene Struthers had dementia, together with related items showing memory/care concerns.

b. These materials show cognitive decline before the 2017 control-changes and support the capacity context alleged in the Complaint (¶¶67, 91; Counts Three and Five).

c. The exhibit corroborates that account actions and refusal to account occurred during a dementia window and that I acted diligently to obtain transparency.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on September 18, 2025, at Auburn, California.

LaRonda Myers, Plaintiff

# Exhibit H-1

EXHIBIT H-1 — 10/24/2017 check from Darlene to Law Offices of Johnson, Murphy & Jones, Inc.

Used in: ¶73; Count 7

Pins: Check image/amount

Proves: Selective capacity (to pay firm) vs claimed incapacity.

Why it matters: Credibility/consistency.

Constitutional hooks: —

Damage bucket: Fee leakage.

Amount:        $2,156.06
Account:       121403099
Bank Number: 12100035

Sequence Number: 8292421454
Capture Date:    10/30/2017
Check Number:    4120

---

**RALPH C STRUTHERS**
**DARLENE L STRUTHERS**
**1258 JACKIE LN**
**SANTA MARIA CA 93454-5928**

4120
11-35/1210 CA
4150

Oct. 24, 2017

Pay To The Order Of  Johnson Law Office      | $ 2,156.06

Two Thousand One Hundred Fifty-Six dollars and 06/100

**Bank of America**

ACH R/T 121000358

For  4545  (Struthers Trust)      Darlene Struthers

⑈121000358⑈ 000121403099⑈4120

---

Electronic Endorsements

| Date       | Sequence         | Bank #    | Endrs Type   | TRN | RRC | Bank Name            |
|------------|------------------|-----------|--------------|-----|-----|----------------------|
| 10/30/2017 | 008292421454     | 121103886 | Pay Bank     | N   |     | BANK OF AMERICA, NA  |
| 10/30/2017 | 000008172857865  | 91000019  | Undetermined | N   |     | WELLS FARGO BANK, NA |
| 10/27/2017 | 037030000017090  | 122238420 | Rtn Loc/BOFD | Y   |     | RABOBANK, NATIONAL A |

Amount:          $2,156.06        Sequence Number: 8292421454
Account:         121403099        Capture Date:    10/30/2017
Bank Number: 12100035             Check Number:    4120

102717  37030000017090 >122238420< RB

J JOHNSON LAW OFFICE, ¿C
03304 346011
FOR DEPOSIT ONLY
RABOBANK, N.A.
PAY TO THE ORDER OF

Electronic Endorsements

| Date | Sequence | Bank # | Endrs Type | TRN | RRC | Bank Name |
|------|----------|--------|------------|-----|-----|-----------|
| 10/30/2017 | 008292421454 | 121103886 | Pay Bank | N | | BANK OF AMERICA, NA |
| 10/30/2017 | 000008172857865 | 91000019 | Undetermined | N | | WELLS FARGO BANK, NA |
| 10/27/2017 | 037030000017090 | 122238420 | Rtn Loc/BOFD | Y | | RABOBANK, NATIONAL A |

# Exhibit H-2

EXHIBIT H-2 — Burial/Embalming documents + Plaintiff declaration

Used in: ¶91; Counts 4–6

Pins: Consent/refusal forms; declaration paragraphs

Proves: Burial wishes vs forced cremation.

Why it matters: Interference with settlor's wishes; undue influence.

Constitutional hooks: 14A (family/settlor interests); state elder-abuse.

Damage bucket: Emotional distress; remedial costs.



**Heritage Oaks Memorial Chapel**
FUNERAL AND CREMATION SERVICES FD1990
6920 Destiny Drive, Rocklin, CA 95677
916-791-CARE (2273) ~ 800-316-1987
www.HeritageOaksMC.com

July 1, 2019

To whom it may concern,

LaRonda Myers and April Sharp have been working with our funeral home to see that LaRonda's father's wishes to be buried are carried out. The legal action has taken so long to complete we have been forced to recommend cremation followed by burial. Until now there was a small possibility to have a casket burial but that is no longer the case. Ralph remains have decomposed to the extent that a casket burial was not practical or advised. It is our professional opinion that to bury him on July 13th cannot be accomplished except by cremation.

We are glad to work with LaRonda Myers and April Sharp to accomplish to the best of their ability her father's wishes.

Sincerely

*Ronald R Harder*

Ron Harder FDR2875
Heritage Oaks Memorial Chapel FD1990



Lol. I'm thinking she
just doesn't do the
showers and probably
does just sponge
baths. She told me
don't worry about it.
So I'm not going to say
anything else

Subject

Message

Yes! She was a kook ...All of us saw it Cheryl, Belinda, Diane and I picked her up after visiting dad in the big hospital... To go to Coco's... we were all sitting in the booth there and she said she where are my keys to her car:/ we had to tell her we picked her up and she didn't drive there..She said oh I thought I drove here. That's when I knew she wasn't right mind anymore... And she wasn't showering or changing her clothes/



**April Spaulding**

Coco's... we were all sitting in the booth there and she said she where are my keys to her car:/ we had to tell her we picked her up and she didn't drive there..She said oh I thought I drove here. That's when I knew she wasn't right mind anymore... And she wasn't showering or changing her clothes/ underwear... She wouldn't wash her hair she had so much hairspray in it was gross. I'll look in my old texts and if I have anything.

Amount:        $1,806.45        Sequence Number: 8492703599
Account:       121403099        Capture Date:     07/12/2017
Bank Number: 12100035           Check Number:     4068

RALPH C. STRUTHERS
DARLENE L. STRUTHERS                                      4068
1250 JAONE LN                                           11-70/1210 CA
SANTA MARIA CA 93454-8928                                   4180

                                                   7-7-17
                                                        Date

Pay To The
Order Of   PRestige ASSisted Living  $ 1806 45/xx

One thousand eight Egetshe 45/100            Dollars

**Bank of America**

ACH R/T 121000358

For_____          Darlene Struthers

⑆121000358⑆ 000121403099⑈4068

Electronic Endorsements:
Date         Sequence            Bank #       Endrs Type    TRN   RRC   Bank Name
07/12/2017   000000382531661     91000019     Rtn Loc/BOFD  Y           WELLS FARGO BANK, NA
07/12/2017   008492703599        121103866    Pay Bank      N           BANK OF AMERICA, NA

ITEMIZED TRANSACTIONS
DISBURSEMENTS OF INCOME
The Struthers Family Revocable Trust Dated 1992
For Period 07/01/17 Through 3/31/18

**Assisted Living - Darlene Struthers**

| | |
|---|---|
| 07/12/17 Assisted Living - Darlene Struthers - Prestige Assisted Living Payment Check number 4069 | $ 1,806.45 |
| 08/02/17 Assisted Living - Darlene Struthers - Prestige Assisted Living Payment Check number 4082 | 2,462.25 |
| 09/05/17 Assisted Living - Darlene Struthers - Prestige Assisted Living Payment Check number 4096 | 3,004.04 |
| 10/03/17 Assisted Living - Darlene Struthers - Prestige Assisted Living Payment Check number 4108 | 2,075.00 |
| 11/02/17 Assisted Living - Darlene Struthers - Prestige Assisted Living Payment Check number 4123 | 3,075.00 |
| 11/29/17 Assisted Living - Darlene Struthers - Prestige Assisted Living Payment Check number 4133 | 3,250.00 |
| 01/04/18 Assisted Living - Darlene Struthers - Prestige Assisted Living Payment Check number 1003 | 3,250.00 |
| 02/07/18 Assisted Living - Darlene Struthers - Prestige Assisted Living Payment Check number 1010 | 3,250.00 |
| 03/05/18 Assisted Living - Darlene Struthers - Prestige Assisted Living Payment Check number 1013 | 3,250.00 |
| | ------------ |
| | $ 25,422.74 |

# Exhibit I-1

EXHIBIT I-1 — Protective-order motions (Lachona)

Used in: ¶¶78, 85F; Counts 2–3

Pins: Filing date/caption pages

Proves: Efforts to block Johnson-firm authentication discovery.

Why it matters: Joint-action & access-to-courts thread.

Constitutional hooks: 1A (limits— "sham" exception); 14A; Access.

Damage bucket: Delay; expense.

<table>
<tr><td>

1
2
3
4
5
6

</td><td>

G. Kevin Lachona, SBN 286072
LACHONA LAW
2450 Venture Oaks Way, Suite 200
Sacramento, CA 95833
Telephone: (916) 235-3095
Facsimile: (916) 415-3528
Email: kevin@lachonalaw.com

Attorney for:
BELINDA CONNOR
JULIE HATRIDGE

</td><td>

**ELECTRONICALLY FILED**
Superior Court of California,
County of Placer
**07/22/2025 at 06:52:35 AM**
By: Cristina Vallan-Brown
Deputy Clerk

</td></tr>
</table>

7

8                  IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                       IN AND FOR THE COUNTY OF PLACER

10

| | |
|---|---|
| 11  In the Matter of: | CASE NO.:  SPR0010066 |
| 12 | **NOTICE OF MOTION AND MOTION FOR: (1) PROTECTIVE ORDER; (2) AN AWARD OF ATTORNEY'S FEES AND COSTS; AND (3) IMPOSITION OF MONETARY SANCTIONS AGAINST LARONDA MYERS; MEMORANDUM OF POINTS AND AUTHORITIES THEREOF** |
| 13   STRUTHERS FAMILY 1993 | |
| 14   REVOCABLE TRUST, | |
| 15   DATED JUNE 4, 1993. | |
| 16 | |
| 17 | [CCP §§ 2017.020, 2019.030(a), 2023.010, 2023.020, 2023.040, 2023.050, 2031.060] |
| 18 | |
| 19 | Date:    August 29, 2025 (reserved by clerk) |
|  | Time:    8:30 am |
| 20 | Dept.:    40 |

21        **NOTICE IS HEREBY GIVEN** that on the above-referenced date and time, or as soon as

22   the matter may be heard, in Department 40 of the above-entitled Court located at 10820 Justice

23   Center Drive, Roseville, CA 95678, Moving Parties Julie Hatridge and Belinda Connor ("Moving

24   Parties"), through their counsel, will and hereby does move the Court for a protective order that

25   none of the items in the Request for Production of Documents, Set No. One, propounded by

26   LaRonda Myers need to be produced.

27        This motion is made pursuant to Code of Civil Procedure sections 2017.020(a),

28   2019.030(a), and 2031.060(b)(1) on the grounds that the Request for Production of Documents,

**NOTICE OF MOTION AND MOTION FOR: (1) PROTECTIVE ORDER; ETC.**

1

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    INTRODUCTION

1.   LaRonda Myers has engaged in several misuses of the discovery process. She also unreasonably believes that she will be conducting an evidentiary hearing on the first day the matter will be heard by the court. Ms. Myers refuses to acknowledge that she cannot dictate the court's calendar despite numerous emails and letters informing her of this fact.  For the following reasons, the request for a protective order should be granted in order to protect Moving Parties from incurring significant and unnecessary legal fees, Moving Parties should be awarded attorney's fees and costs, and monetary sanctions should be assessed against LaRonda Myers for her unjustified actions.

### II.    PROCEDURAL AND FACTUAL HISTORY

2.   Moving Parties JULIE HATRIDGE and BELINDA CONNOR are the currently serving Co-Trustees of THE STRUTHERS FAMILY 1993 REVOCABLE TRUST dated June 4, 1993 (herein the "Struthers' Trust").  Declaration of G. Kevin Lachona, ¶ 4, (hereinafter referred to as "GKL Decl."), **Exhibit A**.

3.   On May 22, 2025, LaRonda Myers filed a *Notice of Motion and Motion for Full-Day Evidentiary Hearing* (herein the "Motion").  GKL Decl., ¶ 5, **Exhibit B**.  The Motion was served on G. Kevin Lachona, Attorney for JULIE HATRIDGE and BELINDA CONNOR, on May 27, 2025.  GKL Decl., ¶ 5.  The Motion is set for hearing on August 29, 2025. *Id*.   The heart of Ms. Myers' Motion is that she is contesting the validity of the Struthers' Trust despite her entering into a total of three settlement agreements with Moving Parties.  Two of the said settlement agreements were considered by this Court, and of significance, the settlement agreement executed in December 2019 and approved by this Court in February 2020 contained a provision wherein Ms. Myers waived her rights to contest the Struthers' Trust. GKL Decl., ¶ 5, **Exhibit C**; see page 9 of settlement agreement.

4.   On May 27, 2025, LaRonda Myers caused to be served a Request for Production of Documents, Set No. One (herein the "Document Production Request"), on G. Kevin Lachona, attorney for JULIE HATRIDGE and BELINDA CONNOR.  GKL Decl., ¶ 6, **Exhibit D**. A proof

MEMORANDUM OF POINTS AND AUTHORITIES ISO
MOTION FOR: (1) PROTECTIVE ORDER; ETC.

1

1    of service signed on June 26, 2025 reflects the Document Production Request being served on May

2    27, 2025. GKL Decl., ¶ 6, **Exhibit E**.

3        5.    The deadline to respond to the Document Production Request was extended to July 18,

4    2025 via ex parte order filed on June 25, 2025. GKL Decl., ¶ 7, **Exhibit F**.

5        6.    The Document Production Request names the Responding Parties as Belinda Connor,

6    Julie Hatridge, and Carole Campbell. GKL Decl., ¶ 8; see **Exhibit D**. Ms. Campbell is not a party

7    to the Motion nor is she a named defendant in the Motion. Instead, Ms. Campbell is a remainder

8    beneficiary of the Struthers' Trust. GKL Decl., ¶ 8; see **Exhibit A**.

9        7.    Moving Parties' attorney emailed and mailed a detailed meet-and-confer letter to

10    LaRonda Myers on June 17, 2025, explaining the multitude of procedural and substantive defects

11    in her Motion, the improper nature of the Document Production Request, and requesting that Ms.

12    Myers withdraw the Motion and withdraw the Document Production Request. GKL Decl., ¶ 9,

13    **Exhibit G**. Most importantly, the meet-and-confer letter clearly identified the salient provision of

14    a Settlement Agreement that was executed by Ms. Myers (and Moving Parties) in December 2019,

15    and approved by this Court in February 2020, in which Ms. Myers waived her right to contest the

16    Struthers' Trust. GKL Decl., ¶ 9, **Exhibit G**; see page 9 of the settlement agreement. In fact, a

17    copy of the Settlement Agreement was enclosed with the meet-and-confer letter as evidence for

18    the Moving Parties' position that Ms. Myers' right to seek the invalidation of the Struthers' Trust

19    was waived. GKL Decl., ¶ 9. Although the issue is now moot due to the aforementioned ex parte

20    order, Moving Parties' counsel requested that, at a minimum, Ms. Myers and counsel jointly

21    stipulate to an extension of the response deadline to the Document Production Request. GKL

22    Decl., ¶ 9. Ms. Myers refused to entertain any extension. *Id.*

23        8.    On June 21, 2025, Ms. Myers responded to the meet-and-confer letter stating that she

24    "will not be withdrawing anything." GKL Decl., ¶ 10, **Exhibit H**.

25        9.    Ms. Myers remains unjustifiably steadfast in her belief that the court will be conducting

26    an evidentiary hearing on August 29, 2025, e.g., witnesses will be called to testify, documentary

27    evidence will be introduced into evidence, etc. GKL Decl., ¶ 11. For example, Ms. Myers filed a

28    document entitled *Proof of Service and Witness Notice for Evidentiary* filed on June 16, 2025

MEMORANDUM OF POINTS AND AUTHORITIES ISO
MOTION FOR: (1) PROTECTIVE ORDER; ETC.

2

1   which includes a list of individuals Ms. Myers believes she will be calling as witnesses on August

2   29, 2025. GKL Decl., ¶ 11; See Request for Judicial Notice (hereinafter referred to as "RJN") , at

3   ¶ 1.a. Ms. Myers has most recently filed her "Pre-Hearing Brief" on July 17, 2025 which lists the

4   individuals that Ms. Myers believes will be testifying during the regular probate calendar on

5   August 29, 2025. GKL Decl., ¶ 11; RJN, at ¶ 1.b.

6         10. It appears that Ms. Myers is making a very bold yet erroneous assumption that simply

7   because she titles a document "Motion For Full-Day Evidentiary Hearing," she is also entitled to

8   dictate the court's calendar and conduct a trial the first-day the matter will be heard by the Court.

9         11. Moving Parties' Counsel has informed Ms. Myers on numerous occasions that the

10  Court will not be conducting an evidentiary hearing on August 29, 2025 yet Ms. Myers is insistent

11  that her belief is correct. GKL Decl., ¶ 12. On July 17, 2025, Moving Parties responded to the

12  Document Production Request by way of serving objections to the discovery requests. GKL Decl.,

13  ¶ 13, **Exhibit I**.

14        **III.    LEGAL ARGUMENT**

15        **A. Legal Authority for Motion for Protective Order**

16        12. Pursuant to Code of Civil Procedure ("CCP") section 2031.060, subds. (a)–(b)(6), the

17  authority for seeking a protective order is as follows (emphasis added):

18

19        (a) When an inspection, copying, testing, or sampling of documents, tangible
        things, places, or electronically stored information has been demanded, the party to
20       whom the demand has been directed, and any other party or affected person, may
        promptly move for a protective order. This motion shall be accompanied by a meet
21       and confer declaration under Section 2016.040.

22        (b) The court, for good cause shown, may make any order that justice requires *to
        protect any party or other person from unwarranted annoyance, embarrassment,*
23       *or oppression, or undue burden and expense*. This protective order may include,
        but is not limited to, one or more of the following directions:
24

25            (1) That all or some of the items or categories of items in the demand
            need not be produced or made available at all.
26

27            (2) That the time specified in Section 2031.260 to respond to the set
            of demands, or to a particular item or category in the set, be extended.
28

MEMORANDUM OF POINTS AND AUTHORITIES ISO
MOTION FOR: (1) PROTECTIVE ORDER; ETC.

3

(3) That the place of production be other than that specified in the demand.

(4) That the inspection, copying, testing, or sampling be made only on specified terms and conditions.

(5) That a trade secret or other confidential research, development, or commercial information not be disclosed, or be disclosed only to specified persons or only in a specified way.

(6) That the items produced be sealed and thereafter opened only on order of the court.

13. Oppression exists where there is "some showing either of an intent to create an unreasonable burden or that the ultimate effect of the burden is incommensurate with the result sought." *West Pico Furniture Co. v. Superior Court* (1961) 56 Cal.2d 407, 417. The trial court is vested with wide discretion to prevent oppression, the exercise of which will not be disturbed on appeal in the absence of abuse. *Cembrook v. Superior Court* (1961) 56 Cal.2d 423, 427.

14. The court must "limit the scope of discovery if it determines that the burden, expense, or intrusiveness of the discovery clearly outweighs the likelihood that the information sought will lead to the discovery of admissible evidence." CCP §2017.020(a).

15. The court must restrict the frequency or the extent of use of a discovery method if it finds either of the following (CCP § 2019.030(a)):

a. The discovery sought is unreasonably cumulative or duplicative or is obtainable from some other source that is more convenient, less burdensome, or less expensive.

b. The selected discovery method is unduly burdensome or expensive, taking into account the needs of the case, the amount in controversy, and the importance of the issues at stake in the litigation.

16. In *Greyhound Corp. v. Superior Court* (1961) 56 Cal.2d 355 ("*Greyhound*"), the California Supreme Court set out the factors to be considered in balancing the rights of parties seeking discovery against those of parties from whom information is sought and who seek protective orders. Under *Greyhound*, a court that has been asked to issue a protective order should apply the following factors to the particular case (56 Cal.2d at p. 382):

MEMORANDUM OF POINTS AND AUTHORITIES ISO
MOTION FOR: (1) PROTECTIVE ORDER; ETC.

4

1          a.   The purpose of the information sought;

2          b.   The effect disclosure would have on the parties and the trial;

3          c.   The nature of the objections urged by the party resisting disclosure; and

4          d.   The court's authority to make an alternative order that may grant partial disclosure,

5              disclosure in another form, or disclosure only in the event that the party seeking the

6              information undertakes certain specified burdens justified by the circumstances.

7                        **B.  The Motion for Protective Order**

8                        **Should be Granted on a Procedural Basis.**

9          17. On a procedural basis, Ms. Myers has served her Document Production Request

10    prematurely.  The earliest a plaintiff (which you are not) may serve a demand on any defendant is

11    10 days after that defendant has been served with the summons or has appeared in the action,

12    whichever occurs first. CCP §2031.020(b).  However, the Document Production Request was

13    served the same day the Motion was served, making the service of the Document Production

14    Request untimely.

15         18. Additionally, Ms. Myers propounded the Document Production Request on Carole

16    Campbell who is NOT a party to Ms. Myers' Motion.  While Ms. Campbell is a remainder

17    beneficiary of the Struthers' Trust, that does not make her a party to the action.  Pursuant to CCP

18    section 2031.010(a), "any party may obtain discovery…of any other *party* to the action." Emphasis

19    added.  *See also* CCP § 2020.010 [a list of the authorized methods to obtain discovery from a

20    nonparty].

21         19. Finally, the format in which Ms. Myers propounded the Document Production Request

22    is erroneous.  She included all three individuals, Belinda Connor, Julie Hatridge, and Carole

23    Campbell, on the single Document Production Request.  CCP section 2031.030 does not permit

24    discovery to be propounded in this manner.  If Ms. Myers desires to seek documents from the

25    parties, she must prepare separate discovery demands for each party, excluding Carole Campbell.

26                        **C.  The Motion for Protective Order**

27                        **Should be Granted on a Substantive Basis.**

28         20. Moving Parties will be demurring under CCP section 430.10 to Ms. Myers' Motion.

1   The court clerk has reserved a hearing date of October 24, 2025 for the demurrer. Moving Parties'
2   counsel has detailed the grounds for pursuing a demurrer in the meet-and-confer letter sent to Ms.
3   Myers, much of it is based on Ms. Myers' waiver of her right to contest the Struthers' Trust. If
4   Moving Parties prevail on the demurrer, then any associated discovery demands become moot.
5   Thus, providing the demanded documents, other than those subject to privilege, would be unduly
6   burdensome and at a great expense given the Moving Parties' demurrer on the horizon.

7          21. If Moving Parties' demurrer is overruled, then Moving Parties request that they be
8   given thirty (30) days to amend their responses and objections to the Document Production
9   Request, if necessary, and provide the demanded documents, other than those subject to privilege.

10         22. As discussed above, the court should apply the *Greyhound* factors when determining
11  the question of issuing a protective order. The factors are listed below with the Moving Parties'
12  analysis thereunder:

13         a. *The purpose of the information sought.*

14              i. The crux of Ms. Myers' Motion is an attempt to invalidate the Struthers'
15  Trust. The discovery that Ms. Myers propounded seeks information that far exceeds the scope of
16  the relief sought in her Motion. For example, Ms. Myers seeks all communications between the
17  Moving Parties regarding the Struthers' Trust "from 2016 to present." In effect, Ms. Myers seeks
18  nine and a half years of privileged information which amounts to thousands of pages of documents.
19  Ms. Myers also seeks all documents that Moving Parties relied upon or provided to their counsel
20  regarding the Struthers Trust. Again, Ms. Myers seeks privileged information which amounts to
21  voluminous records. As importantly, Ms. Myers waived her right to contest the Struthers' Trust
22  so the Moving Parties should not have to produce any documents sought in the Document
23  Production Request. GKL Decl., ¶ 9, **Exhibit G**; see page 9 of the settlement agreement.

24         b. *The effect disclosure would have on the parties and the trial.*

25              i. Many of the documents that Ms. Myers seeks are privileged information.
26  But with respect to the documents that are not subject to privilege, if the present motion is not
27  granted, Moving Parties will need to spend a significant amount of time and expense gather said
28  documents. That effort will be rendered moot if the Moving Parties' demurrer to Ms. Myers'

MEMORANDUM OF POINTS AND AUTHORITIES ISO
MOTION FOR: (1) PROTECTIVE ORDER; ETC.

6

1   Motion is sustained.   Additionally, granting a protective order in favor of Moving Parties will
2   not affect Ms. Myers' interests in this matter. Despite Ms. Myers' unreasonable belief that she
3   will be conducting an evidentiary hearing on August 29, 2025 thus necessitating the information
4   in the Document Production Request, Moving Parties' counsel has informed her that the Court
5   will not have time to hold an evidentiary hearing during its regular probate calendar. Thus, even
6   if the Moving Parties' demurrer to Ms. Myer' Motion is overruled, Ms. Myers will have
7   sufficient time to address discovery in this matter and the Document Production Request.

8           c.   *The nature of the objections urged by the party resisting disclosure.*

9                       i.   As stated above, many of the documents that Ms. Myers seeks are subject
10   to a privilege, and/or the requests are vague, ambiguous, unduly burdensome, oppressive, and/or
11   overbroad. Plus, Ms. Myers is fully aware of the fact that Moving Parties are intending to file a
12   demurrer to her Motion, and has been informed that the hearing on August 29, 2025 will not be an
13   evidentiary hearing, so there is no justification or reasonable basis for Ms. Myers to insist that she
14   be provided the information as stated in the Document Production Request prior to the Court's
15   decision on the Moving Parties' demurrer.

16           d.   *The court's authority to make an alternative order that may grant partial*
17           *disclosure, disclosure in another form, or disclosure only in the event that the party*
18           *seeking the information undertakes certain specified burdens justified by the*
        *circumstances.*

19                       i.   As stated above, Moving Parties' demurrer is scheduled for hearing on
20   October 24, 2025.  In the event that the demurrer is overruled, Moving Parties seek alternative
21   relief herein which is that they be given thirty (30) days to amend their responses and objections
22   to the Document Production Request, if necessary.  Such alternative relief will have no material
23   impact on the status of the case nor will affect Ms. Myers' interests in this matter.

24           23. Thus, the application of the *Greyhound* factors to the facts of this case demonstrates
25   that issuing a protective order is warranted and justified, and is based on good cause to protect the
26   Moving Parties from undue burden and expense.

27           24. Similarly, it can readily be demonstrated that CCP section 2019.030(a)(2) supports

28

MEMORANDUM OF POINTS AND AUTHORITIES ISO
MOTION FOR: (1) PROTECTIVE ORDER; ETC.

7

1  granting the present motion. Namely, the needs of the case are such that there is no justified

2  reason or controlling basis for Ms. Myers to demand that she receive the information in the

3  Document Production Request earlier than August 29, 2025. Ms. Myers has yet to identify the

4  amount in controversy; instead, she is seeking to invalidate the Struthers' Trust at the core of her

5  Motion. Moving Parties recognize that the issues at stake are important but there is no reason

6  that Ms. Myers must receive the propounded documents prior to the first hearing on her Motion,

7  when trial has not yet been set (assuming a trial is set). Plus, the information subject to the

8  Document Production Request amounts to thousands of pages of documents which will take

9  considerable time and expense to review such documents. Thus, the Court should find that Ms.

10  Myers' selected discovery method is unduly burdensome and expensive warranting the issuance

11  of the protective order.

12      25. Finally, Moving Parties request an order from this Court that LaRonda Myers is

13  prohibited from propounding any further discovery regarding her *Motion for Full-Day*

14  *Evidentiary Hearing* until the court issues its decision on the demurrer to be filed by Moving

15  Parties and heard on October 24, 2025.

16                    **D. Moving Parties Request the Court to Impose**
17                       **Monetary Sanctions Against LaRonda Myers**

18      26. CCP section 2017.020(b) mandates the imposition of monetary sanctions against a

19  party who unsuccessfully makes or opposes a motion for protective order and provides as follows:

20      The court shall impose a monetary sanction under Chapter 7 (commencing with
        Section 2023.010) against any party, person, or attorney who unsuccessfully makes
21      or opposes a motion for a protective order, unless it finds that the one subject to the
        sanction acted with substantial justification or that other circumstances make the
22      imposition of the sanction unjust.
23

24      27. CCP section 2031.060(h) provides similar authority for imposition of monetary

25  sanctions as follows:

26      Except as provided in subdivision (i), the court shall impose a monetary sanction
        under Chapter 7 (commencing with Section 2023.010) against any party, person, or
27      attorney who unsuccessfully makes or opposes a motion for a protective order,
28

MEMORANDUM OF POINTS AND AUTHORITIES ISO
MOTION FOR: (1) PROTECTIVE ORDER; ETC.

8

1    unless it finds that the one subject to the sanction acted with substantial justification
     or that other circumstances make the imposition of the sanction unjust.

2    28. Moving Parties' Counsel has incurred seven (7) hours in preparing, researching, and

3    revising the present Motion, and anticipates spending an additional four (4) hours in reviewing

4    Ms. Myers' objection documents, preparing a reply, and preparing for and attending any hearing

5    on the present motion. Thus, if Moving Parties are successful in this motion, they request that the

6    court impose a monetary sanction against LaRonda Myers in an amount not to exceed $4,400

7    pursuant to CCP section 2017.020(b).

8    29. Additionally, CCP section 2023.010 defines "[m]isuses of the discovery process" as

9    including, but not limited to, the following:

10
11         a. Using a discovery method in a manner that does not comply with its specified
              procedures.

12
13         b. Employing a discovery method in a manner or to an extent that causes unwarranted
              annoyance, embarrassment, or oppression, or undue burden and expense.

14   30. Ms. Myers has engaged in both of these misuses of the discovery process. First, as

15   examples of item a. above, Ms. Myers served the Document Production Request prematurely in

16   violation of CCP section 2031.020(b), she combined multiple discovery demands intended for

17   separate parties into one singular demand in violation of CCP section 2031.030, and she served an

18   unauthorized method of discovery to a nonparty in violation of CCP section 2020.010. Second,

19   as an example of item b. above, even though Ms. Myers has been informed that the hearing on

20   August 29, 2025 will not be an evidentiary hearing, and having been informed that a demurrer will

21   be considered on October 24, 2025 in response to her Motion, Ms. Myers is unreasonably persistent

22   in obtaining the requested information despite there being no harm to Ms. Myers' interests in not

23   receiving the requested information prior to August 29, 2025.

24   31. Moreover, the court must impose an additional $1,000 sanction if it finds that a party,

25   person, or attorney failed to meet and confer to resolve a dispute regarding a document request in

26   good faith pursuant to CCP section 2023.050 as follows:

27         Notwithstanding any other law, and in addition to any other sanctions imposed
28         pursuant to this chapter, a court shall impose a one-thousand-dollar ($1,000)
           sanction, payable to the requesting party, upon a party, person, or attorney if,

**MEMORANDUM OF POINTS AND AUTHORITIES ISO
MOTION FOR: (1) PROTECTIVE ORDER; ETC.**

9

upon reviewing a request for a sanction made pursuant to Section 2023.040, the court finds any of the following:

...

(3) The party, person, or attorney failed to confer in person, by telephone, letter, or other means of communication in writing, as defined in Section 250 of the Evidence Code, with the party or attorney requesting the documents in a reasonable and good faith attempt to resolve informally any dispute concerning the request.

32. CCP section 2023.020 also authorizes monetary sanctions against a party who fails to confer as required to pay the reasonable expenses, including attorney's fees.

33. Here, LaRonda Myers made no reasonable or good faith attempt to meet-and-confer with Moving Parties' counsel. While Ms. Myers did respond via email to the meet-and-confer letter, she did not agree to discuss this matter in person or on the phone. Ms. Myers' emailed response only reiterated her position and did not even consider the legal arguments addressed in the meet-and-confer letter. Thus, Moving Parties request that the court impose sanctions against LaRonda Myers in the amount of $1,000 pursuant to CCP section 2023.050.

### E. Moving Parties Request Attorney's Fees And Costs Against LaRonda Myers

34. Probate Code section 1002 authorizes the court to order costs to be paid by a party to the action, and also controls over the general rules concerning costs as set forth in the Code of Civil Procedure. See CCP § 1021 et seq.

35. In addition to Probate Code section 1002, Moving Parties seek a court order determining that they are the prevailing party and are entitled to recovery of attorney fees and costs under CCP sections 1032 and 1033.5. CCP sections 1032 and 1033.5 provide that costs are generally recovered by a prevailing party in a civil action. Some costs are recoverable as a right and any others are awardable in the discretion of the court. *See* CCP §§ 1032(b), 1033.5(a), (c). Items allowable as costs include: (1) filing and motion fees; (2) attorney fees; (3) fees for electronic filing or service of documents through an electronic filing provider if the court requires or orders electronic filing or service of documents; and (4) any other item that is required to be awarded to the prevailing party pursuant to statute as an incident to prevailing in the action. CCP § 1033.5(a).

MEMORANDUM OF POINTS AND AUTHORITIES ISO
MOTION FOR: (1) PROTECTIVE ORDER; ETC.

10

1  Additionally, items not mentioned in the statute and items assessed upon application may be
2  allowed in the court's discretion. CCP § 1033.5(c)(4).

3      36. Here, Moving Parties' Counsel has incurred (and will incur) costs in an amount not
4  greater than $200.00.  Additionally, as stated above, Moving Parties' Counsel has incurred (and
5  anticipates incurring) attorneys' fees in the amount of $4,400.00 related to the present motion.

6      37. Accordingly, Moving Parties seek a court order determining that they are the prevailing
7  party and shall be entitled to recover all costs of this proceeding not to exceed $200.00, including
8  reasonable attorney's fees, not to exceed $4,400.00.

9  **IV.  CONCLUSION**

10      38. Moving Parties have acted in good faith and attempted to resolve this dispute
11  without the need of the Court's intervention. However, Ms. Myers continues to insist that the
12  documents within the Document Production Request be provided to her prior to the hearing on her
13  Motion even though she has been informed that the court will not have time on its regular probate
14  calendar to conduct an evidentiary hearing.  For the reasons stated above, the present motion
15  should be granted, monetary sanctions should be imposed against LaRonda Myers, and Moving
16  Parties should be awarded attorneys' fees and costs.

17      **WHEREFORE**, Moving Parties request an order from this Court as follows:

18      1.  The *MOTION FOR: (1) PROTECTIVE ORDER; (2) AN AWARD OF  ATTORNEY'S*
19  *FEES AND COSTS; AND (3) IMPOSITION OF MONETARY SANCTIONS AGAINST LARONDA*
20  *MYERS* be granted;

21      2.  Moving Parties Belinda Connor and Julie Hatridge need not produce any of the
22  documents demanded in the Document Production Request propounded by LaRonda Myers;

23      3.  In the alternative, that Moving Parties be given thirty (30) days to amend their
24  responses and objections to the Document Production Request after the Court renders its decision
25  on the Demurrer to be filed in response to LaRonda Myers' *Notice of Motion and Motion for Full-*
26  *Day Evidentiary Hearing* in the event the Demurrer is overruled;

27      4.  Order that LaRonda Myers be prohibited from propounding any further discovery
28

MEMORANDUM OF POINTS AND AUTHORITIES ISO
MOTION FOR: (1) PROTECTIVE ORDER; ETC.

11

1  Set No. One, propounded by LaRonda Myers constitutes undue burden and expense and was not
2  propounded in conformity with the laws of California and for the reasons set forth in the supporting
3  Memorandum of Points and Authorities, and supporting Declaration of G. Kevin Lachona
4  concurrently filed and served with this Motion. Therefore, Moving Parties move for an order for:
5  (1) a protective order; (2) an award of attorney fees and costs; and (3) monetary sanctions against
6  LaRonda Myers.

7  **NOTICE IS FURTHER HEREBY GIVEN** that Moving Parties bring this motion
8  pursuant to Code of Civil Procedure sections 2017.020(b), 2023.010, 2023.020, 2023.040,
9  2023.050, and 2031.060(h) on the basis that LaRonda Myers engaged in discovery misconduct,
10 including but not limited to serving the above-identified discovery prematurely, propounding
11 discovery on an individual who is not a party to the action, and failing to confer in person or by
12 telephone with counsel for Moving Parties in a reasonable and good faith attempt to resolve
13 informally any dispute concerning discovery. Based on this conduct, Moving Parties request
14 monetary sanctions against Laronda Myers which are warranted under the circumstances.

15        This Motion is based on this Notice of Motion, the attached Memorandum of Points and
16 Authorities, the accompanying Declaration of G. Kevin Lachona, exhibits filed and served
17 herewith, all pleadings and records filed in this action, and all other such oral and documentary
18 evidence as the Court may consider.

19

20                                    LACHONA LAW

21

22
23 Dated: July 21, 2025                *Kevin Lachona*
                                       _____
24                                     G. Kevin Lachona, Attorney for
                                       Julie Hatridge and Belinda Connor
25

26

27

28

1    regarding her *Motion for Full-Day Evidentiary Hearing* until the court issues its decision on the
2    demurrer currently scheduled for hearing on October 24, 2025;

3        5.  Impose monetary sanctions against LaRonda Myers in the total amount of $5,400.00
4    to be payable to Moving Parties Belinda Connor and Julie Hatridge, as Co-Trustees of the Struthers
5    Family 1993 Revocable Trust;

6        6.  Find that Moving Parties are the prevailing party, and award attorneys' fees and costs
7    against LaRonda Myers in an amount not to exceed $4,600.00, subject to proof, to be payable to
8    Moving Parties Belinda Connor and Julie Hatridge, as Co-Trustees of the Struthers Family 1993
9    Revocable Trust, by and through their counsel Lachona Law; and

10       7.  Any additional relief deemed appropriate by the Court.

12                                          LACHONA LAW

13   Dated: July 21, 2025                   *Kevin Lachona*
14
                                            G. Kevin Lachona, Attorney for
15                                          Julie Hatridge and Belinda Connor

16

17

18

19

20

21

22

23

24

25

26

27

28

MEMORANDUM OF POINTS AND AUTHORITIES ISO
MOTION FOR: (1) PROTECTIVE ORDER; ETC.

12

1
## **VERIFICATION**

2       I am the attorney for Julie Hatridge and Belinda Connor, parties to this action.  Such parties

3   are absent from the county of aforesaid where such attorney has his office, and I make this

4   verification for and on behalf of that party for that reason.  I am informed and believe and on that

5   ground allege that the matters stated in the foregoing document are true.

6       I declare under penalty of perjury under the laws of the State of California that the foregoing

7   is true and correct.

8       Executed on July 21, 2025, at Sacramento, California.

9

10

11                                          *Kevin Lachona*

                                          G. Kevin Lachona, Attorney for
12                                          Julie Hatridge and Belinda Connor,

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **MEMORANDUM OF POINTS AND AUTHORITIES ISO**
## **MOTION FOR: (1) PROTECTIVE ORDER; ETC.**

13

# Exhibit I-2A

EXHIBIT I-2A — Email: Demiris to Lachona (9/27/2023) ("we step in the shoes... we get our client's records")

Used in: Counts 2, 10, 11 (and ¶¶285–289 context)

Pins: header (From/To/Date/Time) and the quoted line "we step in the shoes of the deceased. We get our client's records ... too late for privacy at this point."

Proves: Party-opponent admission that the records should be produced; undercuts later privilege/"privacy" objections; supports access/due-process theory and tolling.

Constitutional hooks: 14A Procedural Due Process; Access to Courts.

Damage bucket: Delay costs; added motion practice.

# Exhibit I-2B

EXHIBIT I-2B — State Bar Mandatory Fee Arbitration Letter (8/26/2024) (Myers v. Demiris)

Used in: Count 11 (¶¶303–314), Count 12 (context re fee dispute)

Pins: date, caption ("Mandatory Fee Arbitration"), instruction re April Sharp join/statement.

Proves: Formal, timely fee dispute process was initiated; supports reasonableness challenge and restitution; shows Demiris fee controversy is real and preserved.

Hooks: 14A property (fee restitution), statutory fee protections.

Damage bucket: $ exposure; interest; arbitration/administrative costs.

# Exhibit I-3

EXHIBIT I-3 — Firm correspondence (Harris & Plottel) linking Lachona

Used in: ¶¶285–287; Counts 10–11

Pins: Letterhead; email headers

Proves: Supervisory knowledge/affiliation.

Why it matters: Negligent supervision / aiding & abetting.

Constitutional hooks: —

Damage bucket: Fee leakage; obstruction carry-through.

# Kevin

## G. Kevin Lachona

*Certified Specialist Estate Planning, Trust & Probate Law*

# HARRIS & PLOTTEL, LLP

## 466 Vallombrosa Avenue

## Chico, California 95926

## (530) 893-2882 p

## (530) 893-2855 f

kevin@HarrisPlottel.com

www.HarrisPlottel.com

*Open Monday – Thursday*

# Exhibit I-4

EXHIBIT I-4 — Shuttleworth invoice + accountant reconciliation

Used in: ¶322; ¶¶323B–323F; Count 12

Pins: Liquidated balance $39,275.31; list of post-closing "date-stamped" entries; credits not applied

Proves: Money had and received; estoppel against after-the-fact entries.

Why it matters: Restitution proof with liquidated sum.

Constitutional hooks: 14A (property).

Damage bucket: $39,275.31 + prejudgment interest.

| | | | |
|---|---|---|---|
| 1/30/20 | | 50% Jackie Lane Seller Proceeds | 137,245.71 | Confirmed with 4/17/20 Bank Statement |
| 3/24/20 | | From Shuttleworth Client Trust Account to Bank of America Savings 2950 | -97,970.4 | |
| | | | 39,275.31 | |

**Shuttleworth Law Office Client Trust Account**

| 3/24/20 | W/D | Shuttleworth Law Office - Refund of Remaining Funds in Client Trust Account | 39,275.31 | This description was probablt incorrect |
|---|---|---|---|---|
| | | Total Shuttleworth Client Trust Account | | |

**Fees Paid**

| 8/7/19 | | Shuttleworth Law Office - Attorney Fee | -5,000 | Paid by Ronda |
|---|---|---|---|---|
| 1/16/20 | | Shuttleworth Lawyer Fee Trust | -1,852.5 | Paid by Ronda |

**Bank of America Relationship Banking Account No xxx2921**

| 8/27/20 | EFT | Shuttleworth Law Office - Probate Retainer | -2,000 | |
|---|---|---|---|---|
| 8/31/20 | 5067 | Shuttleworth Law Office - Attorney Fees | -14,352.5 | |
| 8/31/20 | 5066 | Shuttleworth Law Office - Los Angeles County Case Attorney Fees | -13,164 | |
| | | Total Bank of America Banking Account | -29,516.5 | |

**Bank of America Advantage Savings Account No xxx2950**

| 3/24/21 | | Scott Shuttleworth - Attorney Fees | -1,945.4 | Third Accounting 1/1/21 to 12/31/21 |
|---|---|---|---|---|
| | | Total Bank of America Adv Savings Account | -1,945.4 | |

| | Total Fees Paid | -38,314.4 |
|---|---|---|

**Accounts Opened**
01/30/20    Shuttleworth Law Office Client Trust Account (For Deposit of Sellers Proceeds)

**Accounts Closed**
03/24/20    Shuttleworth Law Office Client Trust Account

Ronda;s Amended Fourth Account 1/1/22 - 12/31/22
Ronda;s Amended Third Account 1/1/21 - 12/31/21
Ronda;s Amended Secod Account 3/1/19 - 12/31/20
Ronda's Estate Account 6/8/19 - 12/7/22          No fees
Ralph's Trust 11/17/2017 - 2/28/2019
Struther's Trust 7/1/17 - 3/31/18

$5,000.00 Retainer

Shuttleworth Law Offices
Page No.:  4

| 12/18/2020 | MSS | Conf with Myers - re Counter Offer - Prop Agmt of Other Props - Funeral Plots | 1.00 | $350.00 | $350.00 |
|---|---|---|---|---|---|
| 1/11/2021 | MSS | Phone conference with Client regarding offer on lot 23, request for accounting information, and discuss burial plot - Subject Line "FW: Struthers Trust". Discuss moving forward. | 0.50 | $350.00 | $175.00 |
| 1/12/2021 | MSS | Email from client regarding her addressing issues raised in 3 emails sent to her on 1/11/2021. Subject line "RE: Your emails" - Review accounting for ending balances and draft email regarding client needing to begin accounting for that period. Note file. | 0.40 | $350.00 | $140.00 |

|  |  |  | Total Fees | $4,246.45 |
|---|---|---|---|---|

| Total New Charges | $4,246.45 |
|---|---|
| Previous Balance | $34,275.31 |
| Balance Due | $38,521.76 |

| Previous Balance of Client Trust Account |  | $142,245.71 |
|---|---|---|
| 3/24/2020 | Withdrawal from Client Trust Account - Return on deposit on Struthers Tru | $-5,000.00 |
| 3/24/2020 | Withdrawal from Client Trust Account - Sales proceeds minus balance due | $-97,970.40 |
| New Balance of Client Trust Account |  | $39,275.31 |

**A/R Aging**

| Current | Current | 30 Days | 60 Days | 90 Days | 120 and Over | Total |
|---|---|---|---|---|---|---|
| $4,246.45 | $0.00 | $0.00 | $0.00 | $34,275.31 | $0.00 | $38,521.76 |

Any payments received after the invoice date will be reflected on the next bill. If you have any questions regarding this bill, please do not hesitate to call our office.

Thank you for choosing Shuttleworth Law Offices

# EXHIBIT I-4

**EXHIBIT I-4 — SHUTTLEWORTH INVOICE + INDEPENDENT ACCOUNTANT**

RECONCILIATION ($39,275.31)

Case: *Myers v. Lachona, Hatridge, Connor, Campbell, et al.*, No. 2:25-cv-1925-TLN-CSK (PS)

Exhibit Pages: **111–113**

Used in: ¶322; ¶¶323B–323F; **Count 12**

Short cite: "Exh. I-4 (invoice + reconciliation confirming $39,275.31 net due)."

**Summary (what this is):**

Invoice/escrow disbursement reflecting **$39,275.31** taken from escrow/trust funds, plus an
independent accountant reconciliation confirming the **same liquidated balance** due to Plaintiff;
shows promised credits were **not applied**.

**Proves (how it ties to claims):**

• Liquidated sum certain for restitution (Count 12).

• Supports **promissory estoppel** (promised credits not applied).

• Supports **estoppel** against post-closing "supplemental" entries lacking contemporaneous
outputs.

**Why it matters:**

Establishes a clear, documentary **money had and received** claim and prejudgment-interest
entitlement; anchors the requested **constructive trust/equitable lien** and alternative
**surcharge/offset** relief.

**Damage bucket(s):** Restitution/disgorgement; prejudgment interest; fees/costs (as allowed).

1

*Myers v. Lachona, Hatridge, Connor, Campbell, et al.*, No. 2:25-cv-1925-TLN-CSK (PS) —
**Exhibit I-4**

**DECLARATION OF LARONDA MYERS (re Exhibit I-4)**

I, LaRonda Myers, declare:

1. Exhibit I-4 contains a true and correct copy of (a) the Shuttleworth invoice/escrow disbursement reflecting **$39,275.31** taken from escrow/trust funds, and (b) the independent accountant reconciliation confirming a net liquidated balance of **$39,275.31** owed to me.

2. The reconciliation shows credits that were promised to me were **not** applied.

3. These documents are kept in my files in the ordinary course.

I declare under penalty of perjury that the foregoing is true and correct.

Executed **September 18, 2025**, at **Auburn, California**.

LaRonda Myers

*Myers v. Lachona, Hatridge, Connor, Campbell, et al.*, No. 2:25-cv-1925-TLN-CSK (PS) —
**Exhibit I-4**

# Exhibit I-5

EXHIBIT I-5 — Notice of Evidentiary Hearing (May 2025)

Used in: ¶86A; Count 1 ¶105; Count 9 ¶267–268

Pins: filing date and caption line showing "Evidentiary Hearing."

Proves: Case was set in an evidentiary posture.

Why it matters: Establishes the baseline that was later re-labeled "not evidentiary."

Hooks: 14A Due Process; Access to Courts.

Damage: sunk prep costs; delay.

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**IN AND FOR THE COUNTY OF PLACER**

| | FOR COURT USE ONLY |
|---|---|
| Struthers Fam 1993 Trust; In re the | |
| **NOTICE OF HEARING** | CASE NUMBER:<br><br>S-PR-0010066 |

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD HEREIN:

You are hereby notified that a Motion Hearing has been set for hearing on August 29, 2025 at 8:30 AM in Department 40 at the Placer County Superior Court, located at 10820 Justice Center Dr  ROSEVILLE CA 95678.

Dated: 07/09/2025

Jake Chatters,
Clerk of the Superior Court

C. Baldock, Deputy Clerk

# Exhibit I-5A

Exhibit I-5A — POS + Witness/Exhibit Notice (6/16/2025)

Used in: ¶86A; Count 1 ¶105; Count 9 ¶¶267–268 · Pins: 6/16 service stamp; witness/exhibit page

Proves: Reliance/prep for evidentiary setting.

Why it matters: Confirms prejudice when evidentiary was pulled.

Hooks: 14A; Access.

FILED
SUPERIOR COURT OF CALIFORNIA
COUNTY OF PLACER

MAY 22 2025    BB

JAKE CHATTERS
EXECUTIVE OFFICER & CLERK
By: B. Baldook, Deputy

1  LaRonda Myers
2  12060 Mont Vista Drive
   Auburn, CA 95603
3  Phone: 530-320-1727
   Email: rondamyers@me.com
4
5            SPERIOR COURT OF THE STATE OF CALIFORNIA
                     COUNTY OF PLACER
6
7
8  In the Matter of:                    Case No.: S-PR-0010066
9                                        NOTICE OF MOTION AND MOTION
   THE STRUTHERS FAMILY TRUST           FOR FULL-DAY EVIDENTIARY
10 DATED JUNE 4, 1993                    HEARING
11                                       FILED BY BENEFICIARY LARONDA
12                                       MYERS
13                                       DATE: 08/29/2025
                                         TIME: 8:30 AM
14                                       DEPT.: 40
15
16          TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:
17
18        PLEASE TAKE NOTICE that Beneficiary LaRonda Myers respectfully moves
19 this Court to schedule and grant a full-day evidentiary hearing in this matter.
20        I. INTRODUCTION
21        This motion requests that the Court set aside a full-day evidentiary hearing due to
22
23 the complex and serious nature of issues raised in prior pleadings, including:
24    • Allegations of fraudulent incapacitation,
25    • Use of forged and altered trust documents,
26                                    1
27 NOTICE OF MOTION AND MOTION FOR FULL-DAY EVIDENTIARY HEARING
28
   FILED BY BENEFICIARY LARONDA MYERS

- **Improper trustee appointments and displacements,** and

- **Elder abuse and financial manipulation** involving both Ralph and Darlene Struthers.

These issues demand a full evidentiary record with live testimony from multiple witnesses and submission of authenticated documentary evidence.

## II. LEGAL GROUNDS FOR EVIDENTIARY HEARING

In addition to the statutory and case law grounds, Petitioner also asserts that:

- **Equitable tolling applies** due to delayed discovery of the full scope of fraud, with key evidence (including the March 2019 sealed amendment) not revealed until 2025;

- **Fraudulent concealment tolling** applies under California law because Respondents took affirmative steps to conceal the true nature of the trust instruments and the rightful trustee succession, preventing earlier action;

- Petitioner's **constitutional rights under the 14th Amendment** have been implicated, including the denial of due process and equal protection under law, by the continued obstruction of trust administration and manipulation of judicial access;

- The facts may also support federal law claims under **42 U.S.C. § 1983,** if the pattern of concealment, retaliation, and denial of access to rightful legal remedies is further supported by discovery and judicial findings.

California Probate Code § 17200 authorizes the Court to determine trust validity, trustee status, and breach of fiduciary duty. Where material factual disputes exist—particularly where fraud, elder abuse, and unauthorized trustee conduct are alleged—a full evidentiary hearing is both appropriate and necessary.

2

NOTICE OF MOTION AND MOTION FOR FULL-DAY EVIDENTIARY HEARING
FILED BY BENEFICIARY LARONDA MYERS

**Key Legal Authorities Supporting Evidentiary Hearing:**

- *Riverisland Cold Storage, Inc. v. Fresno-Madera Prod. Credit Ass'n* (2013) 55 Cal.4th 1169 – establishes that extrinsic evidence of fraud may be used to invalidate a written agreement.

- *Terry v. Bender* (1956) 143 Cal.App.2d 198 – supports rescission of contracts obtained through fraud.

- *Clark v. Millsap* (1926) 197 Cal. 765 – fiduciaries who misuse trust funds are personally liable.

- *Wood v. Jamison* (2008) 167 Cal.App.4th 156 – confirms that trustees who engage in self-dealing can be compelled to make restitution.

- *Bonfigli v. Strachan* (2011) 192 Cal.App.4th 1302 – defines financial elder abuse under California law and trustee liability for wrongful takings.

- *Estate of Bowles* (2008) 169 Cal.App.4th 684 – supports holding third parties liable for assisting fiduciary breaches.

- *Estate of Giraldin* (2012) 55 Cal.4th 1058

- *Estate of Gump* (1991) 1 Cal.App.4th 582

- *Conservatorship of Kane* (2006) 137 Cal.App.4th 400

- California Code of Civil Procedure §§ 128.5, 128.7 (sanctions and fraud)

### III. WITNESSES AND EVIDENCE TO BE PRESENTED

Petitioner intends to present live testimony and exhibits including, but not limited to:

3

NOTICE OF MOTION AND MOTION FOR FULL-DAY EVIDENTIARY HEARING
FILED BY BENEFICIARY LARONDA MYERS

- **Belinda Connor** (Respondent)

- **Julie Hattridge** (Respondent)

- **Carol Campbell** (Respondent)

- **J. Johnson,** Notary/Attorney of altered trust

- **Hannah Johnson,** associate at the same law firm as J. Johnson, who is referenced in
  trust-related matters and expected to provide testimony regarding her involvement in the
  alleged alterations

- **Roger Myers,** eyewitness to events involving coercion

- **LaRonda Myers,** beneficiary

- **Original notary to the true 1993 Trust,** who will testify that the version currently being
  used by Respondents was not the document she notarized, and will confirm discrepancies
  in the notarial record. She is also expected to testify that her notary seal and signature
  were used without her authorization to facilitate bank account changes and the transfer of
  financial control over Ralph and Darlene Struthers' accounts.

- **Donald Gravalec,** original trust attorney who drafted the June 4, 1993 Struthers Family
  Trust and the October 22, 2017 Ralph C. Struthers Trust, who will testify regarding the
  authenticity and intended structure of both instruments, as well as the legal context
  surrounding Ralph Struthers' decisions

Supporting evidence includes:

- A text message from Respondent Belinda Connor to another beneficiary acknowledging
  that the true line of succession under the 1993 Trust designated Edward Lye Sr. ("Big

4

NOTICE OF MOTION AND MOTION FOR FULL-DAY EVIDENTIARY HEARING
FILED BY BENEFICIARY LARONDA MYERS

Eddie") as the initial successor trustee and Edward George Lye ("Little Eddie") as the rightful trustee following Big Eddie's death in December 2010,

- Text messages from other named beneficiaries of the 1993 Trust affirming that the version currently being portrayed by Respondents is not the true trust and constitutes a fraudulent instrument,

- Ralph Struthers' sealed, notarized March 2019 amendment letter, which was marked "To be opened upon death" and affirms his intent to disqualify anyone who altered or manipulated the 1993 Trust. The letter was opened in or around February 2025 by Donald Gravalec, Ralph's original trust attorney, during a review of trust documents.

- Deposition transcripts

- Notarized trust documents

- Medical records, bank account statements, and estate/trust communications

## IV. PURPOSE AND NEED FOR EVIDENTIARY HEARING

Petitioner further states that for several years she had strong suspicions regarding the legitimacy of the trust version being presented by Respondents. However, mere suspicion was insufficient to support legal action. Only upon obtaining Belinda Connor's deposition in 2024, and the opening of Ralph Struthers' sealed and notarized March 2019 amendment in February 2025, did concrete evidence emerge confirming Petitioner's concerns. These critical pieces of evidence established that the trust being asserted was not the true trust and justified the need to proceed with legal remedies.

A full-day evidentiary hearing will:

NOTICE OF MOTION AND MOTION FOR FULL-DAY EVIDENTIARY HEARING

FILED BY BENEFICIARY LARONDA MYERS

- Allow the Court to weigh credibility of witnesses under oath
- Provide a complete factual and legal record to resolve the dispute
- Avoid piecemeal litigation and redundant filings
- Ensure due process and fairness to all parties

Petitioner asserts that the settlement agreement at issue is void due to fraud and concealment, and that opposing parties acted with unclean hands and bad faith in administering the 1993 Trust. Additionally, since their assumption of control in May 2017, Respondents have failed to provide any annual accounting to the beneficiaries as required under California Probate Code § 16062. This noncompliance spans from the period of alleged manipulation of Darlene Struthers—just prior to Ralph Struthers' hospitalization in July 2017—through the present. The prolonged lack of transparency in trust administration further justifies the necessity of an evidentiary hearing to investigate and remedy potential breaches of fiduciary duty and concealment of financial actions.

## V. CONCLUSION

Petitioner also respectfully reserves the right to retain legal counsel for further representation in both this matter and the related Ralph C. Struthers Trust dated October 22, 2017. Due to the interrelated factual allegations involving improper trust administration, financial harm, and litigation obstruction, Petitioner's future attorney may elect to formally appear in both trusts' proceedings and supplement or amend this motion as appropriate under Probate Code § 1000 and Code of Civil Procedure § 473.:

1. Grant a full-day evidentiary hearing at the earliest availability,

6

NOTICE OF MOTION AND MOTION FOR FULL-DAY EVIDENTIARY HEARING
FILED BY BENEFICIARY LARONDA MYERS

2. Permit the introduction of live testimony and documentary evidence,

3. Rule on the issues of trustee validity, disqualification of beneficiaries, and restoration of trust integrity,

4. Address claims for sanctions, accounting, and restitution as outlined in previously filed motions.

Respectfully submitted,

LaRonda Myers

Beneficiary, Struthers Family Trust (1993)

Executed under penalty of perjury under the laws of the State of California.

Dated: 5/22/2025

7

NOTICE OF MOTION AND MOTION FOR FULL-DAY EVIDENTIARY HEARING

FILED BY BENEFICIARY LARONDA MYERS

1    **NOTICE OF HEARING ON MOTION FOR FULL-DAY EVIDENTIARY**

2    **HEARING**

3              TO ALL INTERESTED PARTIES:

4
              PLEASE TAKE NOTICE that the hearing on Petitioner LaRonda Myers' Motion
5
6    for Full-Day Evidentiary Hearing is scheduled as follows:

7    Date: _8 / 25 / 2025_

8    Time: _8:30 am_

9
     Department: _40_
10
11   Location: Placer County Superior Court, Dept. 40

12   Howard G. Gibson Courthouse, 10820 Justice Center Drive, Roseville, CA 95678

13             At the hearing, the Court will consider Petitioner's motion requesting an all-day

14   evidentiary hearing to address allegations of trust fraud, elder abuse, improper trustee succession,

15   and related legal claims as set forth in the filed motion.
16
17   Dated: _5 / 22 / 2025_

18   Respectfully submitted,

19

20   LaRonda Myers, Beneficiary

21

22

23

24

25

26
                                             8
27
     NOTICE OF MOTION AND MOTION FOR FULL-DAY EVIDENTIARY HEARING
28
     FILED BY BENEFICIARY LARONDA MYERS

# LEGAL AUTHORITY ADDENDUM IN SUPPORT OF EVIDENTIARY HEARING

**Filed by: LaRonda Myers, Beneficiary**

**Case No.: S-PR-0010066**

**Trust: Struthers Family Trust dated June 4, 1993**

## 1. EQUITABLE TOLLING

Equitable tolling applies when a party, through no fault of their own, is unable to discover the full extent of misconduct. Petitioner had long-standing suspicions but did not obtain clear evidence until:

- Belinda Connor's 2024 deposition, and
- The opening of Ralph Struthers' sealed, notarized March 2019 amendment in February 2025.

See:

- *Lantzy v. Centex Homes* (2003) 31 Cal.4th 363
- *McDonald v. Antelope Valley Community College Dist.* (2008) 45 Cal.4th 88

## 2. FRAUDULENT CONCEALMENT TOLLING

Under California Code of Civil Procedure § 338(d), the statute of limitations may be tolled where a party affirmatively conceals facts. Respondents withheld documents, used a forged version of the trust, and prevented Petitioner from discovering the truth.

See:

- *Fox v. Ethicon Endo-Surgery, Inc.* (2005) 35 Cal.4th 797

9

NOTICE OF MOTION AND MOTION FOR FULL-DAY EVIDENTIARY HEARING FILED BY BENEFICIARY LARONDA MYERS

- *Bernson v. Browning-Ferris Industries* (1994) 7 Cal.4th 926

### 3. 14TH AMENDMENT VIOLATIONS

Petitioner's due process and equal protection rights under the U.S. Constitution, Amendment XIV, have been infringed by ongoing obstruction and denial of her role as a rightful beneficiary.

### 4. POTENTIAL FEDERAL CLAIMS UNDER 42 U.S.C. § 1983

If discovery reveals intentional interference with court access or trust participation, civil rights violations may apply.

See:

- *Lugar v. Edmondson Oil Co.* (1982) 457 U.S. 922

- *Dennis v. Sparks* (1980) 449 U.S. 24

This addendum is submitted to support the necessity of a full-day evidentiary hearing and ensure full judicial review of the facts and law.

LaRonda Myers    5/22/2025

10

NOTICE OF MOTION AND MOTION FOR FULL-DAY EVIDENTIARY HEARING

FILED BY BENEFICIARY LARONDA MYERS

# Exhibit I-5B

Exhibit I-5B — Plaintiff letter re evidentiary hearing & accounting duties

Used in: ¶86A; Count 9 ¶270; Counts 3 & 5 · Pins: date line; §16062(a); "Aug 29 evidentiary"

Proves: Defense on notice of evidentiary posture & statutory duties.

Why it matters: Reinforces diligence; breach of duties.

Hooks: 14A; Access.

Damage bucket: Delay; costs.

LaRonda Myers
**12060 Mont Vista Dr**
**Auburn, CA 95603**
**rondamyers@me.com**

**Pro Se Beneficiary of the Struthers Family Trust (June 4, 1993)**

**Date**: 6-5-2025

To: J Johnson, Esq.
    Cori B. Jones
    928 W. Grand Ave.
    Grover Beach, CA 93433

Re: Subpoena Compliance and Document Production – Struthers Family Trust (June 4, 1993)

## RE: DEMAND FOR DOCUMENT PRODUCTION / CLARIFICATION OF MISREPRESENTATIONS

Dear Mr. Johnson and Ms. Jones:

This letter is in response to your recent communication denying responsibility for the subpoenaed documents relating to the **Struthers Family Trust dated June 4, 1993**. I must formally clarify several errors in your response and reiterate my lawful rights to these records as a **named beneficiary of Darlene Struthers.**

### 1. Subpoena Scope and Your Office's Involvement

Your letter appears to confuse the issue by referring to the **Ralph C. Struthers Trust of 2017** — which is entirely irrelevant to this request. The subpoenas issued were **for records relating to the Family Trust dated June 4, 1993**. Your office's involvement in this 1993 trust has already been established through a paper trail.

- On **July 7, 2017**, your office drafted and notarized a legal document stating that **Darlene Struthers would no longer make financial or legal decisions**. That same day, she was placed in a secured dementia facility.
- Yet on **October 24, 2017**, your office **accepted a $2,156.06 check from Darlene**, drawn from a joint account with Ralph Struthers, with the memo line reading: **"For Struthers Trust"**. This raises serious concerns about your office's **continued financial engagement** in trust matters after Darlene was no longer legally authorized to act.

This contradiction is material and must be addressed. If your office accepted trust-related payment from an individual no longer legally empowered to make such decisions, then your office **has legal and ethical obligations** to disclose your records related to this transaction and the trust itself.

## 2. Relevance of New Evidence

New documents have come to light — including the **notarized March 1, 2019 amendment** to the **Ralph C. Struthers Trust** — which directly reference the **fraudulent manipulation** of the **June 4, 1993 trust**. While your office may not have drafted the 2017 trust, **the amendment references actions stemming from your office regarding the 1993 trust**.

- On **March 14, 2025**, Don Gravalec — the original drafting attorney of both the 1993 and 2017 trusts — appeared in open court with a notarized amendment.
- After the hearing, in the courthouse lobby, **he personally handed attorney Kevin Lachona** a copy of the amendment and a notarized **declaration** stating that the version of the 1993 trust being enforced in court **was not the version he authored**.
- Mr. Gravalec's declaration is supported by **the original notary** of the 1993 trust, who also confirmed the version currently being used in Placer County **is not the same document she notarized** in 1993.

This proves that the trust records at issue **are disputed and potentially fraudulent**. Since the paper trail leads back to your office — as early as July 2017 — we are entitled to review any and all records your office generated, modified, or facilitated in connection with the **June 4, 1993 Family Trust**.

## 3. Legal Basis for Record Access

As a **beneficiary of Darlene Struthers**, I have standing to demand the trust records pursuant to:

- **Probate Code § 16060** – Duty to inform and account to beneficiaries.
- **Probate Code § 17200** – Authority of the court to compel production of trust documents.
- **Probate Code § 16061.7** – Beneficiaries are entitled to receive notice and information regarding trust terms and administration.
- **Probate Code § 15800** – Rights of beneficiaries while the trust is revocable, which changed upon Darlene's incapacity.

Moreover, under **42 U.S.C. § 1983**, refusal to produce trust documents—particularly when the documents are in dispute or alleged to be forged—**violates my federal due process rights**. If a state actor or officer participates in the concealment of fraud or obstruction of access to trust rights, **federal oversight becomes appropriate.**

I also cite:

- **Estate of Sanders, 40 Cal.3d 607 (1985)** – Fraud voids all trust amendments or transactions tainted by misrepresentation or undue influence.
- **Kougasian v. TMSL, Inc., 359 F.3d 1136 (9th Cir. 2004)** – Federal courts may intervene in state matters where **extrinsic fraud** has deprived a party of a fair tribunal.
- **Free v. Bland, 369 U.S. 663 (1962)** – Federal supremacy over certain assets (e.g., U.S. Savings Bonds) preempts state courts and agents.

**4. Preservation for Federal and Appellate Review**

This letter shall also serve as notice that your response will be preserved as evidence in both:

- My pending federal complaint in the **Eastern District of California**, and
- My appeal to the **California Court of Appeal, Third District.**

Should you refuse to voluntarily produce these records, I will pursue further remedies including:

- Motion to compel under **Probate Code § 17200**, and/or
- Application for contempt or sanctions for failure to comply with subpoena, if appropriate.

## CONCLUSION

You are respectfully reminded that the trust in question is **not the Ralph C. Struthers Trust**, but the **Family Trust dated June 4, 1993**, and your office is directly linked to key actions involving that trust.

Your mischaracterization of the subpoena's scope is incorrect. The subpoenas were timely, properly served, and narrowly tailored to obtain documents relating to the manipulation of the 1993 trust. I hereby renew my demand for all trust-related files handled by your office on or after **July 1, 2017**, relating to the Struthers Family Trust dated June 4, 1993.

Please respond no later than **10 business days from 6/5/2025**.

Sincerely,


**LaRonda Myers**
Beneficiary of the Struthers Family Trust (June 4, 1993)
Pro Se

LaRonda Myers
12060 Mont Vista Drive
Auburn, CA 95603
Phone: 530-320-1727
Email: rondamyers@me.com

SPERIOR COURT OF THE STATE OF CALIFORNIA
COUNTY OF PLACER

**Case No.: S-PR-0010014**

**IN THE MATTER OF:**

**THE STRUTHERS FAMILY TRUST DATED JUNE 4, 1993**

**PROOF OF SERVICE AND WITNESS NOTICE FOR EVIDENTIARY HEARING**

**DATE: AUGUST 29, 2025**
**TIME: 8:30 A.M.**
**DEPT.: 40**

TO ALL INTERESTED PARTIES AND TO THE COURT:

Pursuant to court requirements and applicable notice provisions under California Probate

Code, the following individuals have been served with notice of the scheduled **Evidentiary**

**Hearing** in this matter.

**PARTIES SERVED:**

1. **J. Johnson** – Served directly

2. **Hannah Johnson** – Served directly

3. **Carole Campbell** – Served **via counsel Kevin Lachona**, attorney of record

4. **Belinda Conner** – Served **via counsel Kevin Lachona**, attorney of record

5. **Julie Hatridge** – Served **via counsel Kevin Lachona**, attorney of record

Proofs of service are attached.

1

PROOF OF SERVICE AND WITNESS NOTICE FOR EVIDENTIARY HEARING

**NOTICE REGARDING TESTIMONY FORMAT:**

All witnesses and parties have been informed that **personal in-court appearance is not required**.

Testimony may be given **via Zoom or video conferencing**, subject to court approval and scheduling.

**VOLUNTARY WITNESSES – NOTICE OF INTENT TO CALL:**

1. **Donald Gravalec** – Attorney and witness to trust-related events June 4, 1993

   STRUTHERS FAMILY TRUST

2. **Anna Ridyard** – Notary and witness to trust documentation June 4, 1993 STRUTHERS

   FAMILY TRUST

**FACT WITNESSES TO TESTIFY:**

1. **Roger Myers**

2. **LaRonda Myers**

Filed by:

Date: _____

Respectfully submitted,

_____

**LaRonda Myers**
Pro Per

12060 Mont Vista Drive
Auburn, CA 95603
Phone: 530-320-1727
Email: rondamyers@me.com

<div align="center">2</div>

PROOF OF SERVICE AND WITNESS NOTICE FOR EVIDENTIARY HEARING

## rogerlaronda@gmail.com

| | |
|---|---|
| **From:** | rogerlaronda@gmail.com |
| **Sent:** | Sunday, August 24, 2025 11:46 PM |
| **To:** | hannah@jmjlegal.com; johnson@jmjlegal.com |
| **Subject:** | Subject: Courtesy Copy - Notice of Continuance of Evidentiary Hearing (S-PR-0010066) |

To J. Johnson and Hannah Johnson,

For clarity:

All subpoenas issued to you regarding the Family Struthers Trust of June 4, 1993 are placed on hold.
There will be no evidentiary hearing until direction is received from either the presiding judge of Placer County or the
United States District Court for the Eastern District of California.

This email is provided solely to ensure timely notice.

Respectfully,
LaRonda Myers
Trustee, Ralph C. Struthers Trust of October 22, 2017 (as amended)
Executor, Estate of Ralph Struthers
Beneficiary, Family Struthers Trust of June 4, 1993

1

# Exhibit I-7

EXHIBIT I-7 — Court Order on Ex Parte (7/22/2025) — "no witness/no testimony."

Used in: ¶86A; Count 1 ¶105; Count 9 ¶¶266–268

Pins: order language specifying "no witness/no testimony."

Proves: Administrative conversion to a non-evidentiary proceeding.

Why it matters: Core due-process injury (Mathews/Logan).

Hooks: 14A Due Process; Access to Courts.

Damage: foreclosed evidence; wasted prep.

1  L+aRonda Myers
   12060 Mont Vista Drive
2  Auburn, CA 95603
3  Phone: 530-320-1727
   Email: rondamyers@me.com
4
                    SUPERIOR COURT OF THE STATE OF CALIFORNIA
5                             COUNTY OF PLACER
6
   | IN THE MATTER OF: | Case No.: S-PR-0010066 |
7  |---|---|
8  | THE STRUTHERS FAMILY TRUST DATED JUNE 4, 1993 | EX PARTE APPLICATION TO COMPEL PRODUCTION OF ORIGINAL TRUST, WILL, AND ACCOUNTING RECORDS; REQUEST FOR SANCTIONS |
9
10
11 |  | DATE: JULY 22, 2025<br>TIME: 8:30 AM<br>DEPT.: 40 |
12

13              TO THE HONORABLE COURT, ALL PARTIES, AND THEIR ATTORNEYS

14 OF RECORD:

15      Petitioner LaRonda Myers, a beneficiary of the Struthers Family Trust dated June
16
17 4, 1993, respectfully applies *ex parte* for an order compelling immediate production of the

18 following:

19   1. The original, unaltered June 4, 1993 Struthers Family Trust, including all drafts,

20      amendments, notarial pages, and any correspondence relating to its revision or

21      alteration.
22
23   2. The Last Will and Testament executed in conjunction with the 1993 Trust;

24   3. A full accounting of trust and estate assets from May 2017 to present, including:

25        o  **Bank statements**

26        o  **Ledgers**
27                                          1
28 EX PARTE APPLICATION TO COMPEL PRODUCTION OF ORIGINAL TRUST, WILL,
   AND ACCOUNTING RECORDS; REQUEST FOR SANCTIONS

   o   **Property deeds and valuations**

   o   **Disbursement logs**

   o   **Asset inventories**

4. **All communications with J. Johnson's law office relating to trust administration or asset transfer.**

5. **Any records removed from Ralph Struthers' home or personal safe, including handwritten notes or digital media.**

6. **Meeting records, notes, or documentation of trust activity between 2017 and 2019, particularly during Ralph's hospitalization and amendment process.**

**LEGAL GROUNDS AND URGENCY**

This application is made pursuant to California Probate Code §§ 16060, 17200(b)(7), 850, and 16420, and Code of Civil Procedure §§ 2031.300 and 2023.010, as well as under Article I, § 7 of the California Constitution and the 14th Amendment to the U.S. Constitution.

Respondents were ordered to produce discovery by July 18, 2025, following their own ex parte request for more time. Instead of complying, opposing counsel G. Kevin Lachona filed only blanket objections to every discovery request. A copy of these objections is attached as Exhibit B.

These objections assert vague burdens, privilege, and procedural defenses — while failing to produce a single responsive document. Notably, the objections were signed under penalty of perjury by Belinda Connor and Julie Hatridge, who falsely identified themselves as co-trustees. However, my father's valid trust is the October 22, 2017 Trust, and he

2

EX PARTE APPLICATION TO COMPEL PRODUCTION OF ORIGINAL TRUST, WILL, AND ACCOUNTING RECORDS; REQUEST FOR SANCTIONS

confirmed to multiple witnesses that his June 4, 1993 Trust was manipulated while he was hospitalized. The sealed envelope containing a March 2019 amendment was opened in February 2025 by original estate attorney Donald Gravalec, and personally handed to Mr. Lachona in court in March 2025 (Exhibit A).

That amendment disinherits Belinda Connor, Julie Hatridge, and Carole Campbell due to their involvement in the manipulation of the 1993 Trust. Their continued filings as beneficiaries or trustees are not only unauthorized, but amount to a deliberate attempt to mislead the Court.

Further, Respondents have scheduled a Motion for Protective Order on August 29, 2025 — the exact date of the evidentiary hearing — which appears designed to prevent discovery from being reviewed in time. This is not a good-faith discovery dispute. It is a strategy of evasion.

Petitioner is entitled to this discovery as a matter of law. Under Estate of Gump (1991) 1 Cal.App.4th 582, beneficiaries must be provided "all information reasonably necessary to enforce their rights under the trust." In Esslinger v. Cummins (2006) 144 Cal.App.4th 517, the court held that fiduciaries may not withhold information that impairs a beneficiary's ability to protect their interests.

The Court's July 18, 2025 discovery deadline (Exhibit C) was valid and enforceable. Respondents' refusal to comply is a direct violation of Probate Code and CCP requirements and warrants immediate judicial intervention.

CONSTITUTIONAL & FEDERAL IMPLICATIONS

3

EX PARTE APPLICATION TO COMPEL PRODUCTION OF ORIGINAL TRUST, WILL, AND ACCOUNTING RECORDS; REQUEST FOR SANCTIONS

This Court's intervention is also required to preserve Petitioner's constitutional rights under the 14th Amendment to the United States Constitution, which guarantees due process and equal protection under the law. Continued obstruction of discovery, denial of access to records, and reliance on pleadings filed by disinherited individuals not only deprives Petitioner of her statutory trust rights but also violates federal civil rights standards. These ongoing violations lay the groundwork for potential federal removal under 28 U.S.C. § 1443(1) and a separate action under 42 U.S.C. § 1983 for deprivation of due process and abuse of probate process. Petitioner must be given a fair and timely opportunity to present evidence and secure the records essential to defending her interests — without further delay or manipulation by parties with no standing.

**NOTICE**

Petitioner has complied with CRC 3.1203 by notifying opposing counsel Kevin Lachona by email and voicemail on Monday, July 21, 2025 at 7:00 a.m., at least 24 hours before this scheduled ex parte appearance. A copy of this email is attached as Exhibit D.

Alternatively, Petitioner respectfully requests that notice be waived under CRC 3.1204(b)(2) due to the Respondents' continued delay, bad-faith filings, and likelihood of further prejudice if notice provides opportunity for document tampering or strategic evasion.

**NEED FOR EXPEDITED RELIEF**

This request is time-sensitive. The documents must be reviewed by Petitioner's accountant and trust counsel in preparation for the August 29, 2025 evidentiary hearing. Delayed production would irreparably impair Petitioner's ability to challenge improper

4

EX PARTE APPLICATION TO COMPEL PRODUCTION OF ORIGINAL TRUST, WILL, AND ACCOUNTING RECORDS; REQUEST FOR SANCTIONS

distributions, establish bad-faith litigation by disinherited parties, and expose historical manipulation of trust terms.

### RELIEF REQUESTED

Petitioner respectfully requests that the Court:

1. Compel immediate production of the documents listed above.

2. Set a firm deadline no later than July 26, 2025.

3. Issue sanctions against Respondents and/or Mr. Lachona for failure to comply with the July 18, 2025 court-ordered deadline.

4. Warn that continued noncompliance or concealment may result in evidentiary sanctions, monetary penalties, and/or referrals for fiduciary breach or elder abuse under applicable law.

### SUPPORTING PAPERS

This application is supported by:

- **Declaration of LaRonda Myers**

- **Exhibit A: March 2019 Trust Amendment (Notarized)**

- **Exhibit B: Responses and Objections to Request for Production, dated July 17, 2025**

- **Exhibit C: July 18, 2025 Discovery Order**

- **Exhibit D: Email Notice to Opposing Counsel**

Respectfully submitted,

Dated: July 21, 2025

_(signature)_

5

EX PARTE APPLICATION TO COMPEL PRODUCTION OF ORIGINAL TRUST, WILL, AND ACCOUNTING RECORDS; REQUEST FOR SANCTIONS

1  **LaRonda Myers**

2  **Petitioner,** *In Pro Per*

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27                                           6

28  EX PARTE APPLICATION TO COMPEL PRODUCTION OF ORIGINAL TRUST, WILL,
    AND ACCOUNTING RECORDS; REQUEST FOR SANCTIONS

1

2

3

**FILED**
SUPERIOR COURT OF CALIFORNIA
COUNTY OF PLACER

4    **JUL 22 2025**

5    JAKE CHATTERS
EXECUTIVE OFFICER & CLERK
By: C. Vallan-Brown, Deputy

6    *CVB*

7

8                SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                    IN AND FOR THE COUNTY OF PLACER

10

11   In re the Matter of:                Case No.: SPR 0010066

12   THE STRUTHERS FAMILY TRUST

13   DATED JUNE 4, 1993                  ORDER ON EX PARTE
                                         APPLICATION

14

15

16        The ex parte application by LaRonda Meyers is denied.

17        The court takes this as its starting point: As the court stated at the

18   recent ex parte appearance, there will not be an evidentiary hearing held on

19   August 29. This case has a low case number, and the cases are called on the

20   Probate calendar according to their number. Accordingly, applicant has

21   probably never had the opportunity to witness the entire calendar, so the

22   court offers the following information:

23        This is a "law and motion" calendar only. It is not a trial calendar and

24   no witness testimony or submission of exhibits will be had. Evidentiary

25   hearings are never conducted on this calendar.  "Law and motion" consumes

26   the entirety of the calendar in advance of the next calendar of a different

27   case type, which is heard at 10:00. At the recent ex parte hearing, the court

28   stated that no witnesses will be heard or exhibits received on August 29. The

- 1 -

1   other parties have also referred to this once or twice in their papers; in
2   addition the opposition states that counsel for the trustees has so advised
3   applicant repeatedly in emails. Still, in the instant application's supplemental
4   declaration, 2:14-18, applicant still seems be under the impression that an
5   evidentiary hearing will be held on August 29. See also, applicant's trial
6   brief, witness list, etc. filed July 17, 2025. It will not.

7       No contested petition is heard on the merits until it is "at-issue." A
8   case is at issue, in probate, when a verified petition is filed, and verified
9   opposition is filed.

10      The court's posture in any case is akin to that of an umpire in a
11  sporting contest: To enforce the rules evenly, without favor to either side.
12  Nevertheless, particularly in respect to self-represented persons, it is not
13  improper for the court to make observations that, while they may the effect
14  of benefitting a party, do not prejudice the other, and assist in the case
15  proceeding on an efficient basis. The first exposure the court had to the
16  motion set for hearing on August 29, 2025, was at the recent ex parte
17  hearing, when the court opened the file and read the motion. The court
18  stated then, and reiterates now, that the petition is not properly pleaded,
19  and unlikely to withstand demurrer. The court advised applicant that she
20  might consider amending her petition to properly state her claim(s) for
21  relief.

22      Objections to petitions in Probate Court are timely as late as the date
23  of the hearing. The opposing parties have reserved a hearing date of
24  October 24, 2025, for their demurrer. They can file the demurrer papers as
25  late as August 29. While the moving papers have not even been filed yet,
26  the pleading is undisputably facially insufficient for the reasons the court
27  outlined at the ex parte hearing, and the court anticipates that it will
28  probably sustain a demurrer with leave to amend within thirty days. Given

1  the state of the court's calendar, it is likely that the next date would be set
2  some time in January. If an amended petition is filed, the opponents could
3  file a verified opposition so that the matter became at issue, or, if they still
4  thought the pleading was deficient, they could file yet another demurrer. If
5  the former, filing of a verified opposition, took place, then only at that
6  January hearing date would the motion be at issue and ready to be set for
7  trial. However, in light of the state of the trial calendar, the opposition's
8  estimate that the matter will not actually go to trial for at least a year and a
9  half is probably a fair estimate[1].

10       No one benefits from the long delay and proliferation of filings in this
11  and the two related matters, including frivolous ex parte applications like the
12  one filed June 26, 2025, and this frivolous filing (more on this presently.)
13  Under the law, applicant may still, as a matter of right, amend her petition.
14  She should give serious consideration to doing so, and thereby avoid the
15  long further delays the court has just outlined.

16       This application is frivolous for these reasons: First, as the court has
17  already explained, this matter will not be tried on August 29. The exigency,
18  the purported need to have the documents before that time, is without
19  merit.

20       In enacting the Discovery Act of 1991, one of the express purposes of
21  the Legislature was to reduce the burden on courts in addressing discovery
22  issues. The processes for the propounding of requests, response or motion
23  for protective order, motion to compel responses, etc. are statutory, and

24

25  [1] The court has only had the briefest opportunity to review the opposition, but this point stands out: Trustees
    state that waiver of the right to contest this trust is part of the global settlement reached in the related case, which
26  is the subject of a petition to enforce. The court has not had the time to review the voluminous other file to verify
    this assertion. However, taking it as true for purpose of this discussion, the court hereby places on the agenda for
27  August 29 whether the court should, on its own motion, stay the pending motion in this case until the adjudication
    of that petition in the related case. This is the notice; at the hearing of August 29 there will be an opportunity to be
28  heard.

- 3 -

1  good faith compliance is required of all persons. Every application is
2  determined on its own merits, but it is still fair to observe that this judicial
3  officer, in his many years of private practice, then service on the bench, has
4  never seen an instance in which the exigency of compelling responses to
5  discovery was sufficient to justify ex parte relief. Given that no trial will take
6  place on August 29, sufficient exigency to justify this ex parte application is
7  lacking as a matter of law. See requirements of CRC, rule 3.1203(a).

8       Those processes provided for in the Discovery Act are mechanical in
9  nature[2]. The filing of the motion for protective order essentially stays the
10  need to respond to the discovery because it is only after the court hears the
11  motion for a protective order and denies it, in whole or in part, that the court
12  may order production of the materials sought. CCP Sec. 2031.060(g).

13      As the court observed in its order after another recent ex parte
14  application, all relief sought from the court must have a statutory basis.
15  Among other things, this means that the parties cannot make up and
16  advocate for procedures that are not sanctioned by law, or are contrary to
17  law. The second reason this application is frivolous is because it seeks,
18  contrary to the statutory procedure just discussed, to summarily strip the
19  opponents from their right to have their motion for a protective order heard
20  before the court orders the production of materials (unless, of course, the
21  motion is granted in its entirety.)

22  ////
23  ////
24  ////
25  ////
26
27
28

[2] And all of the requirements thereof will be strictly enforced. The court's attention is drawn to the discussion in the opposition as to what are claimed to be timing, form, and formatting defects of the discovery. All statutory requirements will be enforced; timing and formatting defects, in and of themselves, are sufficient to support grant of the motion for protective order in its entirety.

- 4 -

1        The court declines to administer this case through ex parte
2    applications for matters that are not truly exigencies required by CRC, rule
3    3.1203(a), and even more clearly stated in Local Rule 10.8. In this vein, on
4    reflection, the court should have declined to hear the trustees' recent ex
5    parte application seeking extension of the due date for the discovery. As
6    already discussed, filing the motion for protective order, in light of Sec.
7    2031.060(g) effectively operates as a stay on the pending discovery until the
8    motion is ruled upon. Trustees could have, and should have, simply filed
9    their motion for protective order, rather than seeking ex parte relief, and
10   therefore no exigency existed.

11       The parties are instructed that they are to file no further ex parte
12   applications in which sufficient exigency does not exist, and/or applications
13   which seek relief that is not provided for in, or is contrary to, the law. That
14   justice be done, as much time as is reasonably necessary will be expended
15   by the court in this case. However, applications in which exigency does not
16   exist, and/or which are frivolous, squander judicial resources, and these are
17   not to be repeated. Judicial officers are required to be good stewards of the
18   public recourses that are entrusted to them, including the judicial officer's
19   time. This judicial officer has seven different assignments at this time,
20   hearing over 200 cases each week. These orders on the successive frivolous
21   applications are personally written by their signatory, and unjustifiably
22   consume a large amount of time. This order, for example, took about two
23   hours to prepare over two days when this judicial officer also heard over 120
24   criminal cases.

25       Which causes the court to reflect on the filing of frivolous papers in
26   this, and in the related case: A party upon whom a Request for Production is
27   served, or any other party affected by the discovery directed to that party,
28   may move for a protective order. Sec. 2030.060(a). On July 1, 2025,

1   applicant filed another motion, seeking a protective order as to the discovery
2   she herself propounded. The gist of the motion is that, before production,
3   applicant sought orders for the form and format of the response to the
4   discovery. As already discussed, an express purpose of the minute detail of
5   the Discovery Act as designed by the Legislature was, in part, to relieve the
6   court's burden in the great time that discovery disputes often entail. The law
7   does not contemplate the court regulating discovery in the minute detail the
8   applicant wishes it to, and it is therefore not going to.   The referenced
9   motion appears frivolous because it seeks for the court to make orders for
10  form and format of response, when such is already regulated by Sec.
11  2031.020. This is an example of what the court mentioned, *infra*. The
12  application seeks the court to make orders and follow procedures that are
13  not provided for, and are beyond, that which the law prescribes. That is
14  what makes the motion frivolous.

15       The court is concerned that the applicant's series of filings which the
16  court has herein discussed may be violative of CCP Sec. 391(3). The court
17  will not issue the Order to Show Cause re: Vexatious Litigant contemplated
18  by CCP Sec. 391.7 for the making of a prefiling order at this time, but the
19  applicant is advised that the court is seriously considering doing so. To the
20  court's mind, good cause already exists for issuance of the OSC. However,
21  the court takes with the utmost gravity the restriction prefiling orders make
22  on a person's rights under the "redress of grievances" clause of the First
23  Amendment to the Constitution of the United States. In the course of almost
24  fourteen years as a judicial officer, with many scores of thousands of cases
25  heard, this judicial officer has made prefiling orders in only two cases. This is
26  because it is only with great reticence and circumspection the court
27  contemplates such an action, in light of the right implicated. However,
28  frivolous filings in this and the related case must stop, and filing of further

- 6 -

1  frivolous papers will almost certainly result in the court's issuance of the
2  OSC.

3       For all of these reasons, the application is denied.

4

5       IT IS SO ORDERED.

6

7       **JUL 2 2 2025**

8  DATED:                                    _____

9                                            THE HONORABLE MICHAEL A. JACQUES
10                                           Commissioner of the Superior Court
                                             Judge Pro Tempore

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 7 -

# Exhibit I-8A

EXHIBIT I-8A — Email (August 26, 2025, 11:35 AM): "there will be NO evidentiary hearing on August 29, 2025 …" + acknowledges "MOTION FOR FULL-DAY EVIDENTIARY HEARING" & POS complaint

Used in: ¶86A; ¶105; Count 9 ¶267, ¶270

Pins: August 26, 2025 — 11:35 AM (header); body lines:

• "there will be NO evidentiary hearing on August 29, 2025"

• acknowledges "MOTION FOR FULL-DAY EVIDENTIARY HEARING"

• POS/non-receipt complaint ("Sharon Smith… I did not receive any email…")

Proves: Defense reiterated non-evidentiary posture on 8/26 and admitted the case was noticed for a full-day evidentiary hearing (admission against interest), pivoting to POS quibbles while the setting was being sidelined.

Why it matters: Confirms evidentiary posture + two-track handling (protective order vs. evidentiary).

Constitutional hooks: 14A due process; 1A petition/access (as-applied).

Damage bucket: Sunk evidentiary prep; delay.

Filename (suggested): I-8A_Email_2025-08-26_1135.pdf



**From: Kevin Lachona >**
To: rogerlaronda@gmail.com >
August 26, 2025 at 11:35 AM

---

Ms. Myers, I object to your request that the "Evidentiary Hearing" in the Struthers Family 1993 Revocable Trust matter (Case No. S-PR-0010066) be held in "abeyance" until resolution of the federal proceeding.   You cite no legal authority for such relief and you did not provide adequate notice for the request.  Additionally, in paragraph 2 of the Notice of Continuance, you state that "you have not been served with any order altering the scopy or status of the evidentiary hearing."  That is an entirely incorrect statement.  In the ex parte order filed on July 22, 2025, the court was perfectly clear that no evidentiary hearing was going to be held on August 29, 2025.  It is perplexing why you keep insisting that there will be an evidentiary hearing on August 29, 2025 when the matter is not

# Exhibit I-8B

EXHIBIT I-8B — Follow-Up Email Objection / "Courtesy Copy" (8/27/2025)

Used in: ¶86A; Count 1 ¶105; Count 9 ¶¶266–268

Pins: 8/27/2025 6:04 PM; confirmation of the same position on eve of hearing.

Proves: Continued insistence that the hearing would not be evidentiary.

Hooks: 14A; First Amendment (petition/access).

Damage: same-day disruption; delay.

**From: Kevin Lachona** ❯

To: rogerlaronda@gmail.com ❯

August 27, 2025 at 6:04 PM            🏴

# Re: Courtesy Copy - Notice of Continuance of Evidentiary Hearing (S-PR-0010066)

Ms. Myers, I am following up on my email from August 26, 2025.  Please advise if my understanding is not correct that the *AMENDED VERIFIED PETITION TO COMPEL FORENSIC ACCOUNTING, REMOVE FRAUDULENT TRUSTEES, INVALIDATE UNAUTHORIZED TRUST MODIFICATIONS, ETC.* filed on August 7, 2025 is the amended pleading titled "MOTION FOR FULL-DAY EVIDENTIARY HEARING".

G. Kevin Lachona
**Principal Attorney**

# Exhibit I-8C

EXHIBIT I-8C — Email (June 27, 2025, 10:56 AM): "NO evidentiary hearing on August 29, 2025 … I only object to discovery delays that push production beyond the August 29, 2025 evidentiary hearing."

Used in: ¶86A; Count 9 ¶267

Pins: June 27, 2025 — 10:56 AM (header); body lines quoted above

Proves: As early as late June, defense said no evidentiary hearing would be held on 8/29/2025 and framed objections as only to discovery delays beyond that date—laying the groundwork for the later re-label.

Why it matters: Advance notice + intent before the August emails; supports diligence and the two-track handling.

Constitutional hooks: 14A due process; 1A petition/access (as-applied).

Damage bucket: Sunk evidentiary prep; delay.

Filename (suggested): I-8C_Email_2025-06-27_1056.pdf



**From: Kevin Lachona ›**

To: rogerlaronda@gmail.com ›

June 27, 2025 at 10:56 AM

Ms. Myers, I object to your ex parte application as it is both procedurally and substantively defective. I will be filing and serving my objections in due time.

Certainly you must be aware that the court did not only issue an oral ruling on June 25, 2025. The court signed two ex parte orders that day. See attached. Additionally, the court could not have been any clearer with you that there will be NO evidentiary hearing on August 29, 2025. Yet, in your application, you state, "...**I only object to discovery delays that push production beyond the August 29, 2025 evidentiary hearing**." I have also informed you in my previous correspondences that the court does not have time for an evidentiary hearing on the regular

**delays that push production beyond
the August 29, 2025 evidentiary
hearing."** I have also informed you in
my previous correspondences that the
court does not have time for an
evidentiary hearing on the regular
probate calendar. Yet you insist that
there will be such a hearing on August
29, 2025.

For the reasons stated above, I demand
that you withdraw all of the Civil
Subpoenas that were served in this
matter. You have been put on notice
that the court will not be holding an
evidentiary hearing on August 29, 2025
and for that reason, to compel personal
appearance constitutes harassment
and a frivolous action.

G. Kevin Lachona
Principal Attorney
Lachona Law
2450 Venture Oaks Way #200

rogerlaronda@gmail.com
To: 'Kevin Lachona Case 2:25-cv-01926-TLN-CSK    Document 5    Filed 09/23/25    Page 430 of 583    Jun 24, 2025 at 7:49 PM

Details

## Clarification Regarding Discovery and Fiduciary Accounting Obligations

Dear Mr. Lachona,

I am writing to clarify my prior reference regarding the timeline for your clients' response to my discovery and accounting demands.

While formal service under Case No. S-PR-0010066 occurred on May 27, 2025, your clients — Belinda Connor and Julie Hatridge — have been on notice of my intent to obtain an evidentiary hearing and full accounting since February 20, 2025, when I filed a detailed petition under Case No. S-PR-0010014. That filing addressed the same trust assets, parties, and legal violations now at issue. The case number was later corrected, but your office has been fully aware of the nature of my demands for months.

More importantly, your clients have had a continuing fiduciary duty under California Probate Code § 16062(a) to provide annual accountings to beneficiaries. This duty is not dependent on a petition or discovery request — it is imposed by law:

"A trustee shall account at least annually, at the termination of the trust, and upon a change of trustee, to each beneficiary to whom income or principal is required or authorized in the trustee's discretion to be distributed."

(Cal. Prob. Code § 16062(a))

In addition, Probate Code §§ 16060–16061.7 require trustees to keep beneficiaries reasonably informed and to provide requested information. If your clients had complied with these duties, the documents I now seek would already have been available.

As such, I continue to oppose your ex parte application for additional time. The requested extension is not justified and only rewards a pattern of fiduciary noncompliance that has now continued for several years.

I also oppose your ex parte request to confirm the U.S. Savings Bonds as assets of the 1993 Trust. These bonds are held by a federal facility, and the U.S. Treasury has exclusive jurisdiction over their redemption. The Treasury Department has already placed a hold on processing due to active litigation and the need to ensure that Darlene Struthers' well-being and interests are protected. They are watching this case closely and have suspended all action until the court makes a final determination. This decision came from the federal agency itself—not from me—and was made to prevent misuse of federal bond funds, including for unauthorized legal fees.

Accordingly, any state court order attempting to prematurely confirm ownership of those bonds risks overstepping jurisdiction and interfering with a federal administrative hold. The matter must be resolved at the evidentiary hearing on August 29, 2025, not through a rushed ex parte request.

Sincerely,

LaRonda Myers

In Pro Per

rondamyers@me.com

# Exhibit I-9

EXHIBIT I-9 — OSC re Vexatious Litigant

Used in: ¶87A; Count 9

Pins: OSC date; operative language

Proves: Prefiling threat.

Why it matters: Chilling effect; lack of neutral standards.

Constitutional hooks: 1A; 14A.

Damage bucket: Chilled petitioning.

1
2
3
4
5
6
7

**FILED**
Superior Court of California
County of Placer

AUG 2 1 2025

Jake Chatters
Executive Officer & Clerk
By: L. Rees, Deputy

8              SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                  IN AND FOR THE COUNTY OF PLACER

10

| 11  In re the Matter of: | Case No.: SPR 0010066 |
|---|---|
| 12  THE STRUTHERS FAMILY TRUST | |
| 13  DATED JUNE 4, 1993 | ORDER TO SHOW CAUSE RE: MAKING OF VEXATIOUS LITIGANT DESIGNATION & MAKING OF PREFILING ORDER |
| 14 | |
| 15 | Date: October 24, 2025 |
| 16 | Time: 8:30 a.m. Dept: 40 |

17

18          To RESPONDENT LARONDA MEYERS: YOU ARE HEREBY ORDERED TO

19  APPEAR in Department 40 of this court at 8:30 a.m. on October 24, 2025 at

20  the hour of 8:30 a.m. or as soon thereafter as the matter may be heard,

21  then and there to show cause, if any you have, why the court should not find

22  you to be a vexatious litigant within the meaning of CCP Sec. 391(3), and,

23  on its own motion, make a prefiling order per CCP Sec. 391.7, in the form

24  hereto attached.

25          The basis of this OSC is that respondent appears to have filed multiple

26  papers and pleadings that were not meritorious and/or frivolous within the

27  meaning of CCP Sec. 391(3).

28

- 1 -

1    Any response shall be in a verified writing, filed with the clerk and
2  served by mail on all persons entitled to notice in this matter, no later than
3  October 7, 2025.

4    The conduct upon which the court considers issuing the prefiling order
5  is as follows:

6

7              **APPLICATIONS BASED ON SPURIOUS AUTHORITY**

8

9  1. On February 4, 2025, in case No. SPR 0010014, Ms. Meyers filed for ex
10    parte relief, specifically extension of the statute of limitations in a civil to
11    be filed in the future. She cited CCP Sec. 352(b) in support of her
12    application. Courts lack jurisdiction to extend the Statute of Limitations
13    fixed by the Legislature, and nothing in Sec. 352(b) is to the contrary.
14    The application for such relief was therefore was unmeritorious as a
15    matter of law. Further, applications for relief citing spurious authority in
16    support therefore also frivolous.

17  2. On July 24, 2025, filed her *Petitioner's Formal Objection to Calendar*
18    *Reassignment* (etc.) Among the relief sought was priority setting for
19    certain petitions filed by Ms. Meters in this, and the related, cases. The
20    citation to authority was to Pr.C. Sec. 10421. However, there is no such
21    section in the Probate Code. The application was therefore unmeritorious
22    and, applications which cite to non-existent authority in support thereof
23    are also frivolous.

24

25              **APPLICATION WHICH WAS UNMERITORIOUS**

26

27  3. The aforementioned application of July 24, 2025, was primarily
28    concerned with the issue of a law and motion matter set for hearing on

                                    - 2 -

1    August 29, 2025. The application falsely claimed that a full day
2    evidentiary hearing had been set in this cause for August 29, 2025, but
3    had been canceled by the court, and demanded a resetting. In fact, no
4    evidentiary hearing had ever been set for that day, and the application
5    was filed though the court explained at length in its order of July 22 that
6    no evidentiary hearing had been set, and the subject application could
7    not be tried in any event, because it was not at issue. Despite the court
8    making those advisements, respondent filed this unmeritorious
9    application.

11    **APPLICATIONS WHICH WERE FRIVOLOUS BECAUSE THEY SOUGHT**
12    **RELIEF NOT SANCTIONED BY LAW**

14    4. On July 1, 2025, Ms. Meyers filed her Motion for Protective Order
15       Setting Terms (etc.). This motion was frivolous because it sought for
16       the court to order responses to Requests for Production of Documents
17       contrary to the statutory requirements set forth in CCP Sec.
18       2031.010.

19    **5.** On July 22, 2025, Ms. Meyers filed her Objection to Proposed Order
20       (etc.). The objection was frivolous because objections only lie as to the
21       form and content of the proposed order. The only inquiry before the
22       court, when presented with a proposed order is whether or not it
23       corresponds to the minutes. An objection to a proposed order cannot
24       be used as a substitute for appropriate challenge to the order after the
25       order is executed by the court and served.

1     **RESPONDENT WILL BE ADMONISHED THAT APPLICATIONS**

2     **WHICH ARE DUPLICATIVE IN THE RELIEF REQUESTED CAUSE**

3     **UNNECESSARY EXPENDITURE OF RESOURCES, AND DELAY.**

4

5     On or about August 22, 2025, the court will cause to be published in

6 the Probate Notes for the Probate Law & Motion calendar for August 29,

7 2025 tentative rulings on all the matters before the court, to include an

8 instruction that respondent cease filing duplicative requests for the same

9 relief. Said tentative rulings will also include a discussion of this Order to

10 Show Cause, to include an explanation that the filing of duplicative requests

11 for the same relief are improper, and needlessly cause delay and the undue

12 expenditure of judicial resources in addressing them. If respondent does not

13 cease that practice between the issuance of this Order to show Cause and

14 the hearing of October 24, the court may consider continuing duplicative

15 filings as a further basis for issuance of the Prefiling Order.

16

17

18

19 DATED: August 21, 2025

20                         THE HONORABLE MICHAEL A. JACQUES

21                         Commissioner of the Superior Court

                              Judge Pro Tempore

22

23

24

25

26

27

28

- 4 -

VL-100

| ATTORNEY OR PARTY WITHOUT ATTORNEY: (To be completed only if a party is making the motion) NAME: | STATE BAR NUMBER: | FOR COURT USE ONLY |
|---|---|---|
| FIRM NAME: | | |
| STREET ADDRESS: | | |
| CITY: STATE: ZIP CODE: | | |
| TELEPHONE NO.: FAX NO.: | | |
| E-MAIL ADDRESS: | | |
| ATTORNEY FOR (name): | | |

☐ COURT OF APPEAL, _____ APPELLATE DISTRICT, DIVISION _____

☐ SUPERIOR COURT OF CALIFORNIA,  COUNTY OF  Placer
STREET ADDRESS: 10820 Justice Center Drive
MAILING ADDRESS: P.O. Box 619072
CITY AND ZIP CODE: Roseville, CA 95678
BRANCH NAME:

CASE NAME:
In re The Struthers Family Trust Dated June 4, 1993

| PREFILING ORDER—VEXATIOUS LITIGANT | CASE NUMBER: SPR 0010066 |
|---|---|

1. Name and address of each plaintiff or cross-complainant or other party subject to this prefiling order:

   LARONDA MYERS
   12060 Mont Vista Road
   Auburn, CA 95603

2. This prefiling order is entered pursuant to a motion made by ☒ the court ☐ party (name):

3. The person or persons identified in item 1, unless represented by an attorney, are prohibited from filing any new litigation in the courts of California without approval of the presiding justice or presiding judge of the court in which the action is to be filed.

4. The clerk is ordered to provide a copy of this order to the Judicial Council of California by fax at 415-865-4329 or by mail at the address below.

   Vexatious Litigant Prefiling Orders
   Judicial Council of California
   455 Golden Gate Avenue
   San Francisco, California 94102-3688

Date: _____

_____
JUDICIAL OFFICER

Form Adopted for Mandatory Use
Judicial Council of California
VL-100 [Rev. September 1, 2018]

PREFILING ORDER—VEXATIOUS LITIGANT

Code of Civil Procedure, § 391.7
www.courts.ca.gov

For your protection and privacy, please press the Clear This Form button after you have printed the form.    Print this form    Save this form

# Exhibit I-10

EXHIBIT I-10 — 9/27/2023 Lachona email ("delay the release," "move to quash")

Used in: ¶¶78, 85F; Counts 2, 3, 7, 10

Summary: Suppression plan re LOJMJ records.

Proves / Why it matters: Direct coordination to obstruct.

Damage bucket(s): Discovery cost; delay.

Constitutional hook(s): First Amendment (access); Fourteenth Amendment (procedural due process); § 1983 (joint action; sham exception).

On Wed, Sep 27, 2023 at 4:16 PM
Kevin Lachona
<kevin@harrisplottel.com> wrote:

Kosta, this email confirms our conversation today.  You agreed to delay the release any records obtained by Titan Legal Services in order to me to file a motion to quash the subpoena issued on the Johnson, Murphy, & Jones, Inc. firm, if necessary.  We didn't discuss the deadline but I'm proposing a two-week extension, to October 13th to file a motion to quash.  Please confirm your agreement via email.  Thank you.


Kevin


G. Kevin Lachona

*Certified Specialist Estate Planning, Trust & Probate Law*

# Exhibit I-11

EXHIBIT I-11 — April Sharp declaration (Nov. 2024/Jan. 2025)

Used in: ¶76C, ¶85H; Counts 5, 6, 13

Pins: Declaration date/caption

Proves: Alignment with settlement filings advanced by opponents.

Why it matters: Conflicts/authority defects.

Constitutional hooks: —

Damage bucket: Delay; confusion.

April Sharp
1624 Strauss Lane
Redding Ca 96003
(530) 320-1727

Co-Trustees

ELECTRONICALLY FILED
Superior Court of California,
County of Placer
01/21/2025 at 03:52:29 PM
By: Karlee M Parsons
Deputy Clerk

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF PLACER

In the Matter of:

RALPH C. STRUTHERS
REVOCABLE TRUST UDT
OCTOBER 22, 2017.

CASE NO.:  SPR0010014

AMENDED DECLARATION OF APRIL
SHARP REGARDING CONSENT TO
SETTLEMENT AGREEMENT

Date: 3/14/25
Time: 8:30 a.m.
Dept.: 40

I, April Sharp, declare:

1.    I am a Petitioner in the above-entitled proceeding. I am a co-trustee and co-trustee for the RALPH C. STRUTHERS REVOCABLE TRUST UDT OCTOBER 2017.

2.    I have read the PETITION TO APPROVE SETTLEMENT AGREEMENT AND ACCOUNTINGS AND REPORTS OF TRUSTEES (hereafter "Petition"), filed on July 31, 2024, and the FIRST SUPPLEMENT to the Petition, filed on October 31, 2024, and know their contents.

3.    In my personal representative capacity as a co-trustee of the RALPH C. STRUTHERS REVOCABLE TRUST UDT OCTOBER 2017, I consent to the Settlement Agreement attached to the Petition as Exhibit 1 (hereafter "Settlement Agreement"). In my personal representative capacity as a co-trustee of the RALPH C. STRUTHERS REVOCABLE

1  TRUST UDT OCTOBER 2017, I consent to having the Court Approve the Settlement

2  Agreement.

3      4.    However, I do want to ask the Court to alter section 2.6 of the agreement as the

4  figure presented ($6,582 each) should have actually been $1,505 each. Only $3,010 was paid

5  for the attorneys' fees that section 2.6 relates to. When split between the co-trustees, it should

6  be $1,505. The $6,582 figure related to a covered trust expense, Mr. Struthers' divorce

7  lawyer's fees.

8

9  I declare under penalty of perjury under the laws of the State of California that the foregoing is

10  true and correct.

11

12

13  Date: 1/21/25

14

15  April Sharp,
   Co-Trustee

16

# Exhibit I-12

EXHIBIT I-12 — April Sharp Consent (docket screenshot)

Used in: ¶76C; Counts 5, 6, 13

Summary: Proof of consent filing.

Proves / Why it matters: Confirms posture.

Damage bucket(s): Admin.

Constitutional hook(s): Fourteenth Amendment; § 1983.

Notice: Other of Errata Regarding Supplemental Declaration and Proposed Order    01/15/2025
03/14/25

Declaration: Supplemental Amended Declaration of April Sharp regarding consent    01/21/2025
to Settlement Agreement

Declaration: of G. Kevin Lachona regarding Order after Hearing and Meet and    01/24/2025
Confer Attempts

Response: to Misrepresentations and Clarification for the Court    01/28/2025

# Exhibit I-13

EXHIBIT I-13 — Subpoena timeline (2023–2025)

Used in: ¶78A; Counts 1–3, 7, 9–10

Pins: 2023 / 2024 / 2025 attempts (list dates on cover)

Proves: Repeated efforts + non-enforcement → tolling/continuing violation.

Why it matters: Justifies neutral forensic orders.

Constitutional hooks: 14A; Access to Courts.

Damage bucket: Delay; costs.

# EXHIBIT I-13

**EXHIBIT I-13 — SUBPOENA TIMELINE (2023–2025)**

Title: Subpoenas for Originals, Drafts, Execution Packets, and Notary/Thumbprint Logs (Law Offices of Johnson, Murphy & Jones, Inc.)

Used in: ¶¶78, 78A, 85F; Counts 1–3, 7, 9–10

Summary: A dated timeline showing Plaintiff's repeated efforts to authenticate the controlling instruments and obtain identity/notarial materials from **Law Offices of Johnson, Murphy & Jones, Inc.**, the coordinated resistance to production, and the court's non-evidentiary handling.

Why it matters: Supports delayed-discovery/fraudulent-concealment tolling; demonstrates denial of a meaningful evidentiary hearing; and corroborates joint-action/obstruction relevant to § 1983 due-process and access-to-courts claims.

## TIMELINE OF EVENTS (DATED ENTRIES)

• 09/27/2023 — Coordination to obstruct production

Event: Email from G. Kevin Lachona (then at Harris & Plottel, LLP) proposing to "delay the release" of Titan-served records and to "move to quash" subpoenaed materials directed to **Law Offices of Johnson, Murphy & Jones, Inc.**

Support: Ex. I-10 (Lachona email, 9/27/2023).

Why it matters: Direct evidence of a plan to block authenticity discovery (drafts, execution packets, notary journals, thumbprint logs).

• Late 2023 — First subpoena round served (Titan)

Event: Subpoena package served for originals/drafts/execution packets/notary

journals/thumbprint logs; refusal posture begins.

Support: Ex. G-3 (Subpoena Package to **Law Offices of Johnson, Murphy & Jones, Inc.**); Ex.

G-4 (Refusal Letter — **Law Offices of Johnson, Murphy & Jones, Inc.**); Ex. G-5 (Formal

Records Request to **Law Offices of Johnson, Murphy & Jones, Inc.**).

Why it matters: Establishes diligence and early non-production.

• 2024 (continuing) — Refusals persist

Event: Ongoing refusal/stonewalling regarding authenticity materials.

Support: Ex. G-4; Ex. G-5.

Why it matters: Shows continuing concealment into 2024.

• 03/14/2025 — Court declines evidentiary intake; subpoena intent noted on record

Event: On the law-and-motion calendar, court states "not an evidentiary proceeding … No, not at

this time." Drafting counsel states intent to subpoena originals and notary/thumbprint logs from

**Law Offices of Johnson, Murphy & Jones, Inc.**

Support: Ex. C-1 (3/14/2025 Transcript) at p. 8 (court declines evidence), p. 11 (subpoena

intent).

Why it matters: Confirms Plaintiff attempted to tee up authentication; court moved it off an

evidentiary track.

• 07/18/2025 — Accounting order issued (not enforced)

Event: Superior Court orders an accounting for the 1993 Trust/Darlene assets.

Page **2** of **6**

Myers v. Lachona, Hatridge, Connor, Campbell, et al., No. 2:25-cv-1925-TLN-CSK (PS) —
**Exhibit I-13 (Subpoena Timeline)**

Support: Ex. D-1 (Order Compelling Accounting, 7/18/2025).

Why it matters: Transparency was ordered but not enforced; supports continuing harm.

• 07/21–22/2025 — Gatekeeping/prefiling barrier appears (context)

Event: Plaintiff's ex parte and subsequent order result in "no witness/no testimony" handling and a gatekeeping designation that chills access.

Support: Ex. I-6 / I-7 (7/21–22/2025).

Why it matters: Confirms procedural barriers while subpoenas remain un-enforced.

• 08/29/2025 — Written objections + blanket privilege by Law Offices of Johnson, Murphy & Jones, Inc.; same-day protective handling; court treats as non-evidentiary

Event: **Law Offices of Johnson, Murphy & Jones, Inc.** files written objections asserting blanket privilege over drafts/identity materials; court discussion reflects protective-order handling and re-affirms non-evidentiary posture.

Support: Ex. K-2 (8/29/2025 Transcript) at pp. 15–16 (protective-order rulings), pp. 6:22–7:5 (non-evidentiary handling); Ex. G-1 (Subpoena Response Refusal — **Law Offices of Johnson, Murphy & Jones, Inc.**).

Why it matters: Shows "all-drafts/all-notary" privilege posture to avoid authentication; court still does not enforce production.

• 09/2025 — Further non-enforcement/continuance order

Event: Order continuing/denying production while acknowledging prior orders.

Support: Ex. I-14 (Commissioner Jacques Order, Sept. 2025).

Why it matters: Confirms continuing refusal to enforce transparency/authentication.

Page **3 of 6**

Myers v. Lachona, Hatridge, Connor, Campbell, et al., No. 2:25-cv-1925-TLN-CSK (PS) —
**Exhibit I-13 (Subpoena Timeline)**

• Continuing through present — Ongoing non-production

Event: **Law Offices of Johnson, Murphy & Jones, Inc.** has not produced originals, drafts, execution packets, notary journals, or thumbprint logs; accountings for the 1993 Trust/Darlene assets remain unproduced notwithstanding D-1.

Support: Ex. D-1; Ex. G-1 / G-3 / G-4 / G-5; Ex. K-2; Ex. I-14.

Why it matters: Supports continuing-violation doctrine, tolling, and due-process/access claims.

INDEX OF SUPPORTING EXHIBITS & PIN CITES (QUICK REFERENCE)

• **Ex. I-10** — 09/27/2023 Lachona email ("delay the release" / "move to quash") — supports 9/27/2023 entry.

• **Ex. G-3** — Subpoena Package to **Law Offices of Johnson, Murphy & Jones, Inc.** — supports late-2023 entry.

• **Ex. G-4** — Refusal Letter (**Law Offices of Johnson, Murphy & Jones, Inc.**) — supports late-2023/2024 entries.

• **Ex. G-5** — Formal Records Request (**Law Offices of Johnson, Murphy & Jones, Inc.**) — supports late-2023/2024 entries.

• **Ex. G-1** — Subpoena Response Refusal (**Law Offices of Johnson, Murphy & Jones, Inc.**) — supports 8/29/2025 entry.

• **Ex. C-1** — 3/14/2025 Transcript: p. 8 (declines evidentiary intake); p. 11 (subpoena intent) — supports 3/14/2025 entry.

• **Ex. D-1** — 7/18/2025 Accounting Order — supports 7/18/2025 and "continuing" entries.

• **Ex. I-6 / I-7** — 7/21–22/2025 Ex Parte + Order — supports 7/21–22/2025 entry.

• **Ex. K-2** — 8/29/2025 Transcript: pp. 6:22–7:5 (non-evidentiary handling), pp. 15–16 (protective rulings), p. 30 (vex/prefiling discussion), p. 31:13–22 (prefiling seriousness) —

Page **4 of 6**

Myers v. Lachona, Hatridge, Connor, Campbell, et al., No. 2:25-cv-1925-TLN-CSK (PS) —
**Exhibit I-13 (Subpoena Timeline)**

supports 8/29/2025 entry.

• **Ex. I-14** — Sept. 2025 Order (continuance/non-enforcement) — supports 9/2025 entry.

## CROSS-REFERENCE TO COMPLAINT PARAGRAPHS

• ¶¶78, 78A (subpoena record and resistance) • ¶85F (subpoena resistance noted again) • ¶86A (evidentiary setting noticed, then relabeled) • ¶¶106–107, 87A (prefiling/gatekeeping context) • Counts 1–3, 7, 9–10.

28 U.S.C. § 1746 DECLARATION

**I, LaRonda Myers, declare:**

1. I am the Plaintiff in this action. I have personal knowledge of the matters stated in Exhibit I-13 and could competently testify to them.

2. Exhibit I-13 is a true and correct "Subpoena Timeline (2023–2025)" that I compiled from my records. Each entry is supported by the exhibits cited in the "Index of Supporting Exhibits & Pin Cites," including Exs. I-10, G-1, G-3, G-4, G-5, C-1, D-1, I-6, I-7, K-2, and I-14.

3. The timeline accurately reflects the dates, filings, objections, and court handling related to my efforts to obtain originals, drafts, execution packets, and notary journals/thumbprint logs from **Law Offices of Johnson, Murphy & Jones, Inc.**, and the resulting non-production and non-evidentiary handling.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on September 18, 2025, at Auburn, California.

LaRonda Myers, Plaintiff Pro Se

# Exhibit I-14

EXHIBIT I-14 — Commissioner Jacques Order (Aug. 2025)

Used in: ¶85; Counts 1, 2, 9

Pins: date on the face of the order; passages denying/continuing production despite D-1

Proves: continued non-enforcement and asymmetric treatment immediately after the federal filing

Why it matters: supports retaliation/non-evidentiary handling and due-process injury

Constitutional hooks: First Amendment (retaliation/as-applied access); Fourteenth Amendment (procedural due process)

Damage bucket: delay, extra motion/printer/service costs

1
2
3
4
5
6
7

**FILED**
SUPERIOR COURT OF CALIFORNIA
COUNTY OF PLACER

AUG 29 2025  8⁰

JAKE CHATTERS
EXECUTIVE OFFICER & CLERK
By: S. Green, Deputy

8              SUPERIOR COURT OF THE STATE OF CALIFORNIA
9                  IN AND FOR THE COUNTY OF PLACER
10

11  In re the Matter of:              Case No.: SPR 0010066
12  THE STRUTHERS FAMILY TRUST
13  DATED JUNE 4, 1993                ORDER ON REQUEST FOR
                                      CONTINUANCE
14
15                                    Date: August 29, 2025
                                      Time: 8:30 a.m.
16                                    Dept: 40

17

18          The request for continuance of the August 29, 2025 hearings by
19  LaRonda Meyers is dropped as moot in part and denied in part, as follows:

20          This is a California state court. Setting aside specialized federal courts
21  such as the United States Bankruptcy Court and the United States Tax
22  Court, the structure of our state court system and the federal court system
23  are the same. In California, the trial court is the Superior Court; the federal
24  trial court is the United States District Court. In California, the first level of
25  appellate review is the District Court of Appeal; in the federal system its
26  corollary is the Circuit Court of Appeal. In California the highest appellate
27  court is the California Supreme Court; in the federal system it is the United
28  States Supreme Court.

1        Under the California Constitution, the courts with authority to review
2   this court's determinations are the Third District Court of Appeal, the
3   California Supreme Court and, by Writ of Certiorari, the Supreme Court of
4   the United States. The United States District Court is not a reviewing court
5   or a superior tribunal to this court. While undoubtedly that honorable court
6   will proceed with the matters before it per federal law and procedure,
7   pendency of proceedings in that federal trial court does not constitute good
8   cause for continuance of matters pending before this state trial court.

9        The court's order of July 22, and the tentative rulings published for
10  today's hearings, make clear the court's determination on the issue of the
11  purported evidentiary hearing. It is inaccurate, as claimed in this application,
12  that applicant has not been served with any order stating that no evidentiary
13  hearing would be held today. Such is explicitly stated in the court's order of
14  July 22, 2025, at 1:23-24, and 1:27-2:6. However, that an unequivocally
15  clear record be made, and for the reasons explained in the order of July 22,
16  and in the tentative rulings published in advance of today's hearing, the
17  court reiterates its ruling with respect to an evidentiary hearing, as follows:

18       None of the matters on calendar for August 29 are now, nor have they
19  or any of them ever been, set for evidentiary hearing today.

20       This is the court's ruling on this issue. Ms. Meyers has made an
21  adequate record for review of this issue. Given the numerous matters on
22  calendar in this case today, as well as the remaining matters in other cases
23  on this calendar, the court will not entertain any further argument on this
24  issue today.

25       Accordingly, since there was never an evidentiary hearing set for
26  today, the instant request for a continuance of evidentiary hearing is
27  dropped as moot. As to the request to continue the other matters on
28  calendar today, for the reason stated in the first paragraph on this page,

1 | good cause has not been shown in the instant application to continue the
2 | matters on calendar today, and the request is therefore denied.

3

4

5

6 | DATED: August 29, 2025

7 |                          THE HONORABLE MICHAEL A. JACQUES
8 |                          Commissioner of the Superior Court
                             Judge Pro Tempore
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 3 -

# Exhibit I-15

EXHIBIT I-15 — Notice of Motion for Protective Order, fees, sanctions (Lachona) — "Reserved by Clerk" (8/29/2025)

Used in: ¶¶78, 85F; Counts 2, 7, 9, 10

Pins: Caption/date; "Reserved by Clerk" stamp

Proves: Defense protective-order track heard while Plaintiff's evidentiary track sidelined.

Why it matters: Two-track treatment; access/equal-treatment issues.

Constitutional hooks: 14A; Equal Protection (as-applied).

Damage bucket: Delay; costs.

Myers v. Lachona, Hatridge, Connor, Campbell, et al., No. 2:25-cv-1925-TLN-CSK(PS)
EXHIBIT I-15 — Notice of Motion for Protective Order, fees, sanctions (Lachona) — "Reserved by Clerk"
(8/29/2025)

G. Kevin Lachona, SBN 286072
LACHONA LAW
2450 Venture Oaks Way, Suite 200
Sacramento, CA 95833
Telephone: (916) 235-3095
Facsimile: (916) 415-3528
Email: kevin@lachonalaw.com

Attorney for:
BELINDA CONNOR
JULIE HATRIDGE

**ELECTRONICALLY FILED**
Superior Court of California,
County of Placer
**07/22/2025 at 06:52:35 AM**
By: Cristina Vallan-Brown
Deputy Clerk

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF PLACER

In the Matter of:

STRUTHERS FAMILY 1993
REVOCABLE TRUST,
DATED JUNE 4, 1993.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

CASE NO.: SPR0010066

**NOTICE OF MOTION AND MOTION
FOR: (1) PROTECTIVE ORDER; (2) AN
AWARD OF ATTORNEY'S FEES AND
COSTS; AND (3) IMPOSITION OF
MONETARY SANCTIONS AGAINST
LARONDA MYERS; MEMORANDUM
OF POINTS AND AUTHORITIES
THEREOF**

[CCP §§ 2017.020, 2019.030(a), 2023.010,
2023.020, 2023.040, 2023.050, 2031.060]

Date:    August 29, 2025 (reserved by clerk)
Time:   8:30 am
Dept.:   40

**NOTICE IS HEREBY GIVEN** that on the above-referenced date and time, or as soon as

the matter may be heard, in Department 40 of the above-entitled Court located at 10820 Justice

Center Drive, Roseville, CA 95678, Moving Parties Julie Hatridge and Belinda Connor ("Moving

Parties"), through their counsel, will and hereby does move the Court for a protective order that

none of the items in the Request for Production of Documents, Set No. One, propounded by

LaRonda Myers need to be produced.

This motion is made pursuant to Code of Civil Procedure sections 2017.020(a),

2019.030(a), and 2031.060(b)(1) on the grounds that the Request for Production of Documents,

**NOTICE OF MOTION AND MOTION FOR: (1) PROTECTIVE ORDER; ETC.**

1

1   regarding her *Motion for Full-Day Evidentiary Hearing* until the court issues its decision on the

2   demurrer currently scheduled for hearing on October 24, 2025;

3       5.  Impose monetary sanctions against LaRonda Myers in the total amount of $5,400.00

4   to be payable to Moving Parties Belinda Connor and Julie Hatridge, as Co-Trustees of the Struthers

5   Family 1993 Revocable Trust;

6       6.  Find that Moving Parties are the prevailing party, and award attorneys' fees and costs

7   against LaRonda Myers in an amount not to exceed $4,600.00, subject to proof, to be payable to

8   Moving Parties Belinda Connor and Julie Hatridge, as Co-Trustees of the Struthers Family 1993

9   Revocable Trust, by and through their counsel Lachona Law; and

10      7.  Any additional relief deemed appropriate by the Court.

11

12                                          LACHONA LAW

13

14  Dated: July 21, 2025                    *Kevin Lachona*
                                            _____

15                                          G. Kevin Lachona, Attorney for
                                            Julie Hatridge and Belinda Connor

16

17

18

19

20

21

22

23

24

25

26

27

28

**MEMORANDUM OF POINTS AND AUTHORITIES ISO
MOTION FOR: (1) PROTECTIVE ORDER; ETC.**

1

## **VERIFICATION**

2     I am the attorney for Julie Hatridge and Belinda Connor, parties to this action.  Such parties

3   are absent from the county of aforesaid where such attorney has his office, and I make this

4   verification for and on behalf of that party for that reason.  I am informed and believe and on that

5   ground allege that the matters stated in the foregoing document are true.

6     I declare under penalty of perjury under the laws of the State of California that the foregoing

7   is true and correct.

8     Executed on July 21, 2025, at Sacramento, California.

9

10                                        *Kevin Lachona*

11                                        G. Kevin Lachona, Attorney for
                                         Julie Hatridge and Belinda Connor,
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

<div align="center">

**MEMORANDUM OF POINTS AND AUTHORITIES ISO
MOTION FOR: (1) PROTECTIVE ORDER; ETC.**

13

</div>

# Exhibit I-16

EXHIBIT I-16 — Responses & Objections to Requests for Production (Lachona; Set One)

Used in: ¶¶127–127A (tolling); Count 2

Pins: Objection pages (privilege/overbreadth/refusal)

Proves: Continued suppression of authenticity materials.

Why it matters: Supports tolling; shows ongoing obstruction of due-process verification.

Constitutional hooks: Access; 14A.

Damage bucket: Delay; expense.

G. Kevin Lachona, SBN 286072
LACHONA LAW
2450 Venture Oaks Way, Suite 200
Sacramento, CA 95833
Telephone: (916) 235-3095
Facsimile: (916) 415-3528
Email: kevin@lachonalaw.com

Attorney for:
BELINDA CONNOR and JULIE HATRIDGE

1
2
3
4
5
6
7

8

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

9

## IN AND FOR THE COUNTY OF PLACER

10

11 | IN THE MATTER OF: ) Case No.: SPR0010066
12 | )
13 | )  **RESPONSES AND OBJECTIONS TO**
     )  **REQUEST FOR PRODUCTION OF**
     STRUTHERS FAMILY 1993 )  **DOCUMENTS, SET NO. ONE**
14 | REVOCABLE TRUST, )
15 | DATED JUNE 4, 1993. )
     )
16 | )                                    .
17 | )

18

PROPOUNDING PARTY: LARONDA MYERS

19

RESPONDING PARTIES: BELINDA CONNOR, JULIE HATRIDGE

20

21        SET NUMBER: One (1)

22        BELINDA CONNOR and JULIE HATRIDGE ("Responding Parties"), hereby submit the

23 following responses and objections to LARONDA MYERS' ("Propounding Party") Request for

24 Production of Documents, Set No. 1, as follows:

25                            **PRELIMINARY STATEMENT**

26        The responses and objections below reflect the current state of Responding Parties'

27 knowledge, understanding and belief with respect to the matters about which inquiry is made

28

1  based upon Responding Parties' discovery and investigation to date. Responding Parties'
2  discovery, investigation and preparation for trial are not yet complete and are continuing as of
3  the date of this response and objection. Responding Parties anticipate that, as this action
4  proceeds, Responding Parties may discover additional facts and information.

5      Further, these responses and objections are given without prejudice to Responding
6  Parties' right to rely on or use at trial subsequently discovered documents or information, or
7  documents and information omitted from these responses as a result of mistake, error, oversight
8  or inadvertence. Responding Parties further reserve the right to produce additional documents
9  and information as evidence at trial, and to object on appropriate grounds to the introduction of
10 all or any part of these responses.
11

12     As a general objection to these requests, the Request for Production of Documents, Set
13 No. One does not comply with Code of Civil Procedure section 2031.010(a) which permits a
14 document production request to be propounded on a party. Carole Campbell is named as a
15 Responding Party to the Request for Production of Documents, Set No. One, but she is not a
16 party to the action nor a named defendant in the underlying action, i.e., Motion for Full-Day
17 Evidentiary Hearing filed by LaRonda Myers on May 22, 2025.

18     As a general objection to these requests, Responding Parties object to these requests on
19 the basis that the Responding Parties are filing forthwith a Motion for Protective Order pursuant
20 to CCP section 2031.060(b)(1) regarding the Request for Production of Documents, Set No. One
21 which is set for hearing on August 29, 2025.

22     Responding Parties submit the following specific responses and objections:

23
## RESPONSES AND OBJECTIONS TO REQUEST
24 ## FOR PRODUCTION OF DOCUMENTS

25
### REQUEST NO. 1:
26
27 All versions (draft or final) of the Struthers Family Trust dated June 4, 1993 in your possession,
28 including any amendments or notarial pages.

**RESPONSE TO REQUEST NO. 1:**

Responding Parties object to the request on the basis that it is vague, ambiguous, and unreasonably cumulative.

Responding Parties object to this request as the information requested is equally available to the Propounding Party and is already in the possession or control of the Propounding Party.

Responding Parties object to this request on the basis that it does not comply with the statutory requirements of Code of Civil Procedure section 2031.020(b). The earliest a plaintiff/petitioner may serve a demand on any defendant is 10 days after that defendant has been served with the summons or has appeared in the action, whichever occurs first.

Responding Parties object to this request on the basis that the Responding Parties are filing forthwith a Motion for Protective Order pursuant to CCP section 2031.060(b)(1) regarding the Request for Production of Documents, Set No. One which is set for hearing on August 29, 2025.

**REQUEST NO. 2:**

All communications between any of you (Belinda, Julie, Carole) regarding the Struthers Family Trust from 2016 to present.

**RESPONSE TO REQUEST NO. 2:**

Responding Parties object to the request on the basis that it is overbroad, unduly burdensome, vague, ambiguous, unreasonably cumulative, and oppressive.

Responding Parties object to the request on the ground that the information sought is protected under the work product doctrine under CCP §§2018.010–2018.080, the attorney-client privilege, and rights of privacy.

- 3 -
Responses and Objections to Request for Production of Documents. Set No. One

Lawvaw Package ID: 8d2h18hf-5a16-4e33-a16h-00h3h184e78e

Parsing the page.

Responding Parties object to the request on the basis that that the requested information is not designed to lead to the discovery of admissible evidence pursuant to CCP §§2031.010–2031.510 and is otherwise outside the scope of discovery authorized by CCP §2017.010.

Responding Parties object to this request on the basis that the Responding Parties are filing forthwith a Motion for Protective Order pursuant to CCP section 2031.060(b)(1) regarding the Request for Production of Documents, Set No. One which is set for hearing on August 29, 2025.

Responding Parties object to this request on the basis that it does not comply with the statutory requirements of Code of Civil Procedure section 2031.020(b). The earliest a plaintiff/petitioner may serve a demand on any defendant is 10 days after that defendant has been served with the summons or has appeared in the action, whichever occurs first.

## REQUEST NO. 3:

All communications between any of you and J. Johnson, Hannah Johnson, or Johnson, Murphy & Jones, LLP, relating to the Struthers Family Trust.

## RESPONSE TO REQUEST NO. 3:

Responding Parties object to the request on the basis that it is overbroad, unduly burdensome, vague, ambiguous, unreasonably cumulative, and oppressive.

Responding Parties object to the request on the ground that the information sought is protected under the work product doctrine under CCP §§2018.010–2018.080 the attorney-client privilege, and rights of privacy.

Responding Parties object to this request on the basis that the Responding Parties are filing forthwith a Motion for Protective Order pursuant to CCP section 2031.060(b)(1) regarding the Request for Production of Documents, Set No. One which is set for hearing on August 29, 2025.

1

2  Responding Parties object to this request on the basis that it does not comply with the statutory

3  requirements of Code of Civil Procedure section 2031.020(b). The earliest a plaintiff/petitioner

4  may serve a demand on any defendant is 10 days after that defendant has been served with the

5  summons or has appeared in the action, whichever occurs first.

6

7  Responding Parties object to the request on the basis that that the requested information is not

8  designed to lead to the discovery of admissible evidence pursuant to CCP §§2031.010–2031.510

9  and is otherwise outside the scope of discovery authorized by CCP §2017.010.

10

11  **REQUEST NO. 4:**

12  All notes, letters, emails, or meeting records referencing Darlene Struthers and her role in trust

13  modifications or incapacity evaluations.

14

15  **RESPONSE TO REQUEST NO. 4:**

16  Responding Parties object to the request on the basis that it is overbroad, unduly burdensome,

17  vague, ambiguous, unreasonably cumulative, and oppressive.

18

19  Responding Parties object to the request on the ground that the information sought is protected

20  under the work product doctrine under CCP §§2018.010–2018.080, the attorney-client privilege,

21  and rights of privacy.

22

23  Responding Parties object to this request on the basis that the Responding Parties are filing

24  forthwith a Motion for Protective Order pursuant to CCP section 2031.060(b)(1) regarding the

25  Request for Production of Documents, Set No. One which is set for hearing on August 29, 2025.

26

27

28

1  Responding Parties object to this request on the basis that it does not comply with the statutory

2  requirements of Code of Civil Procedure section 2031.020(b). The earliest a plaintiff/petitioner

3  may serve a demand on any defendant is 10 days after that defendant has been served with the

4  summons or has appeared in the action, whichever occurs first.

5

6  Responding Parties object to the request on the basis that that the requested information is not

7  designed to lead to the discovery of admissible evidence pursuant to CCP §§2031.010–2031.510

8  and is otherwise outside the scope of discovery authorized by CCP §2017.010.

9  **REQUEST NO. 5:**

10

11  Any and all documents you relied upon or provided to your legal counsel regarding the Struthers

12  Family Trust.

13  **RESPONSE TO REQUEST NO. 5:**

14  Responding Parties object to the request on the basis that it is overbroad, unduly burdensome,

15  vague, ambiguous, unreasonably cumulative, and oppressive.

16

17  Responding Parties object to the request on the ground that the information sought is protected

18  under the work product doctrine under CCP §§2018.010–2018.080, the attorney-client privilege,

19  and rights of privacy.

20

21  Responding Parties object to this request on the basis that the Responding Parties are filing

22  forthwith a Motion for Protective Order pursuant to CCP section 2031.060(b)(1) regarding the

23  Request for Production of Documents, Set No. One which is set for hearing on August 29, 2025.

24

25  Responding Parties object to this request on the basis that it does not comply with the statutory

26  requirements of Code of Civil Procedure section 2031.020(b). The earliest a plaintiff/petitioner

27

28

may serve a demand on any defendant is 10 days after that defendant has been served with the summons or has appeared in the action, whichever occurs first.

Responding Parties object to the request on the basis that that the requested information is not designed to lead to the discovery of admissible evidence pursuant to CCP §§2031.010–2031.510 and is otherwise outside the scope of discovery authorized by CCP §2017.010.

## REQUEST NO. 6:

Any communications or documents that refer to the creation, amendment, or enforcement of the 1993 Trust between yourselves, or with J. Johnson's office.

## RESPONSE TO REQUEST NO. 6:

Responding Parties object to the request on the basis that it is overbroad, unduly burdensome, vague, ambiguous, unreasonably cumulative, and oppressive.

Responding Parties object to this request as the information requested is equally available to the Propounding Party.

Responding Parties object to the request on the ground that the information sought is protected under the work product doctrine under CCP §§2018.010–2018.080, the attorney-client privilege, and rights of privacy.

Responding Parties object to this request on the basis that the Responding Parties are filing forthwith a Motion for Protective Order pursuant to CCP section 2031.060(b)(1) regarding the Request for Production of Documents, Set No. One which is set for hearing on August 29, 2025.

1  Responding Parties object to this request on the basis that it does not comply with the statutory
2  requirements of Code of Civil Procedure section 2031.020(b). The earliest a plaintiff/petitioner
3  may serve a demand on any defendant is 10 days after that defendant has been served with the
4  summons or has appeared in the action, whichever occurs first.
5
6  Responding Parties object to the request on the basis that that the requested information is not
7  designed to lead to the discovery of admissible evidence pursuant to CCP §§2031.010–2031.510
8  and is otherwise outside the scope of discovery authorized by CCP §2017.010.
9
10  **REQUEST NO. 7:**
11  Any documents related to the use of Don Gravalec's notary or office in connection with trust
12  document execution.
13
    **RESPONSE TO REQUEST NO. 7:**
14
15  Responding Parties object to the request on the basis that it is overbroad, unduly burdensome,
16  vague, ambiguous, unreasonably cumulative, and oppressive.
17
18  Responding Parties object to this request as the information requested is equally available to the
19  Propounding Party.
20
21  Responding Parties object to the request on the ground that the information sought is protected
22  under the work product doctrine under CCP §§2018.010–2018.080, the attorney-client privilege,
23  and rights of privacy.
24
25  Responding Parties object to this request on the basis that the Responding Parties are filing
26  forthwith a Motion for Protective Order pursuant to CCP section 2031.060(b)(1) regarding the
27  Request for Production of Documents, Set No. One which is set for hearing on August 29, 2025.
28

Responding Parties object to this request on the basis that it does not comply with the statutory requirements of Code of Civil Procedure section 2031.020(b). The earliest a plaintiff/petitioner may serve a demand on any defendant is 10 days after that defendant has been served with the summons or has appeared in the action, whichever occurs first.

Responding Parties object to the request on the basis that that the requested information is not designed to lead to the discovery of admissible evidence pursuant to CCP §§2031.010–2031.510 and is otherwise outside the scope of discovery authorized by CCP §2017.010.

## REQUEST NO. 8:

Any drafts, declarations, or media reflecting trust meetings or estate planning actions from 2017-2019.

## RESPONSE TO REQUEST NO. 8:

Responding Parties object to the request on the basis that it is overbroad, unduly burdensome, vague, ambiguous, unreasonably cumulative, and oppressive.

Responding Parties object to this request as the information requested is equally available to the Propounding Party.

Responding Parties object to the request on the ground that the information sought is protected under the work product doctrine under CCP §§2018.010–2018.080, the attorney-client privilege, and rights of privacy.

Responding Parties object to this request on the basis that the Responding Parties are filing forthwith a Motion for Protective Order pursuant to CCP section 2031.060(b)(1) regarding the Request for Production of Documents, Set No. One which is set for hearing on August 29, 2025.

1

2  Responding Parties object to this request on the basis that it does not comply with the statutory

3  requirements of Code of Civil Procedure section 2031.020(b). The earliest a plaintiff/petitioner

4  may serve a demand on any defendant is 10 days after that defendant has been served with the

5  summons or has appeared in the action, whichever occurs first.

6

7  Responding Parties object to the request on the basis that that the requested information is not

8  designed to lead to the discovery of admissible evidence pursuant to CCP §§2031.010–2031.510

9  and is otherwise outside the scope of discovery authorized by CCP §2017.010.

10  Dated: July 17, 2025                    LACHONA LAW

11

12                                          *Kevin Lachona*

13                                          _____
                                            G. KEVIN LACHONA, Attorney
14                                          for BELINDA CONNOR and JULIE
                                            HATRIDGE
15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 10 -
Responses and Objections to Request for Production of Documents. Set No. One

## VERIFICATION

I, the undersigned, declare:

I am a Co-Trustee of the Struthers Family 1993 Revocable Trust. I have read the foregoing **RESPONSES AND OBJECTIONS TO REQUEST FOR PRODUCTION OF DOCUMENTS, SET NO. ONE** and know their contents. The responses are true of my own knowledge except for matters stated on my information and belief, and as to those matters, I believe them to be true.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and accurate.

07/17/2025

**Dated** _____

**BELINDA CONNOR**

## VERIFICATION

I, the undersigned, declare:

I am a Co-Trustee of the Struthers Family 1993 Revocable Trust. I have read the foregoing **RESPONSES AND OBJECTIONS TO REQUEST FOR PRODUCTION OF DOCUMENTS, SET NO. ONE** and know their contents. The responses are true of my own knowledge except for matters stated on my information and belief, and as to those matters, I believe them to be true.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and accurate.

07/17/2025

**Dated** _____

**JULIE HATRIDGE**

# Exhibit J-1

EXHIBIT J-1 — Auburn ER/ICU notes (7/10–11/2017)

Used in: ¶70; Counts 3–7

Summary: Ralph in Auburn; alert; communicative.

Proves / Why it matters: Contradicts Santa Maria letters.

Damage bucket(s): Medical harm risk; rebuttal cost.

Constitutional hook(s): Fourteenth Amendment (procedural due process).



Legal Copy

**SUTTER AUBURN FAITH HOSPITAL**
11815 Education Street
Auburn CA 95602
IP/OBS/SDS Legal Rec

Struthers, Ralph
MRN: 61654437, DOB: 2/28/1933, Sex: M
Adm: 7/11/2017, D/C: 7/17/2017

**Consults (continued)**

Consults by Russell, Catherine, RN at 07/11/17 1906 (continued)

**Referral Source:** Other: MD

**Referral reason:** Team/Patient/Family needs help with complex decision making

**Primary diagnosis that triggered PC consult:** Multi-System Involvement

**History of Present Illness:** hyperosmolality due to uncontrolled diabetes

**Patient/Family Goals:** Lengthy discussion with Dr. Calmac, patient's daughter Rhonda (DPAHC #3) to further clarify patient goals of care. Patient was being transferred from Southern California and needed admission to acute care for hyperosmolality. Patient brings a POLST that indicates no CPR and no intubation with the goal of receiving medical management that does not contribute to functional decline or burdensome outcomes. Daughter will have patient reside with her and hopes to engage patient in outpatient PT and ST so that he can recover back to his previous pre CVA functional level. He has a feeding tube and will keep this until he can successfully resume po intake. Daughter acknowledges that patient has a challenge ahead of him for a full and meaningful recovery and that he has declined in his functional ststus, however she is motivated to be able to support her father.

**Recommendations/Plan:** Address blood sugars while remaining in ICU, treat decub on coccyx, provide instructions on insulin management, continue with abx for UTI, address renal function challenges and keep patient's family well informed as to patient's progress. I recommend AIM and home health when patient is discharged. Support for patient and family as one of patient's daughter died recently and they are hoping for a relatively rapid recovery so patient can attend the funeral. I have requested a copy of the AHCD. I have seen the electronic copy on daughter's phone and verified decision makers. Rhonda shares that the sisters all make collective decision making, however Belinda is the primary agent.

**Past Medical History:**
Review of patient's past medical history indicates:
Diabetes mellitus type 1 (HCC)

**Medications:**
**Current Facility-Administered Medications**
Medication
- acetaminophen (TYLENOL) Tab 650 mg
- bisacodyl (DULCOLAX) Supp 10 mg
- cefTRIAXone (ROCEPHIN) 1000mg in 0.9% NaCl 50mL IVPB (minibag)
- dextrose 50% Inj 12.5 g
- dextrose 50% Inj 25 g
- glucagon (GLUCAGEN HYPOKIT) Inj 1 mg
- glucagon (GLUCAGEN HYPOKIT) Inj 1 mg
- glucose (GLUTOSE 15) Oral Gel 15 g
- glucose (GLUTOSE 15) Oral Gel 30 g
- HEParin Inj 5,000 Units
- HYDROcodone/acetaminophen (NORCO 10) 10mg/325mg 1 Tab
- HYDROcodone/acetaminophen (NORCO 5) 5mg/325mg 1 Tab
- insulin REGULAR human (humuLIN R, novoLIN R) 1 unit/mL IV BOLUS FROM DRIP 8.35 Units

# Exhibit J-3

EXHIBIT J-3 — Treating-team clinical notes (communication/command-following)

Used in: ¶¶68B, 70F, 184A; Counts 3–7

Pins: entries noting head-nod yes/no; command-following (open mouth, stick out tongue); smiles/puckers

Proves: Purposeful yes/no communication and command-following after the stroke.

Why it matters: Impeaches "can't walk/speak" claims; undercuts non-treating office letters used to seize control.

Constitutional hooks: 14A due process (authentic record vs. narrative).

Damage bucket: Authentication costs; litigation delay.

Counts: 3–7 (capacity/authority facts).



**Marian Regional Medical Center**
1400 East Church St
Santa Maria, CA 93454-
Facility Phone #:   (805) 739-3000

Name: ███████████ JOSEPH,CHARLES
MRN: ███████████
Acct #: ███████ MMC): 3200329775(MMC)
Pt Loc: MMC.TELE.0.229.1

DOB: 2/28/1933   Age: 84 years      Sex:M
Admit Date:  5/29/2017
Disch Date:  6/12/2017
Physician:   Tunali Madenci,Larzan MD
PCP:         Okerblom,Robert MD ; Okerblom,J█
             Lai,Michael K MD

---

### Therapies

|  | Charted By | Morrison,Courtney PT | | |
|--|--|--|--|--|
|  | Charted Date | 6/1/2017 | | |
|  | Charted Time | 13:45 PDT | | |

| Procedure | | Units | Reference Range |
|--|--|--|--|
| PT D/C Recommendations | See Below T507 | | |
| General Transfers Assistive Device | Front wheel walker | | |
| Ambulation | Moderate assistance | | |
| Ambulation Assistive Devices | Front wheel walker | | |
| PT Recs - Activity Intolerance | See Below T827 | | |
| PT Recs - At Risk for Falls | See Below T837 | | |
| PT Recs - Impaired Physical Mobility | See Below T566 | | |

**Textual Results**
T493:  6/1/2017 13:45 PDT (Physical Therapy Assessment)
Patient continues to favor (L) side with shuffled gait L>R that does improve with VCs. Patient ideally █████████

Fall risk
Nods Y/N consistently
Dementia at baseline
Subjective Information : Patient states "yes" when ███████████████████████ Patient ██████████████████
husband to go to a rehab facility in Santa Maria because she doesn't want to drive to AG.
Treatment Narrative :  Mod A supine to sitting and to scoot to EOB. Patient continues to lean toward the (L) side █████████████
to correct with VCs. Mod to stand then ambulated out of room with FWW mod A to navigate FWW, shuffled gait ███████████
VCs.
Mobility :  Yes
Assessment :  Yes
PT Discharge Recommendations :  Yes
Preferred Language for Healthcare Discussions :  English
Charges :  Yes

**Mobility**
Bed Mobility :  Moderate assistance
General Transfers :  Moderate assistance
General Transfers Assistive Device :  Front wheel walker
Ambulation :  Moderate assistance
Ambulation Assistive Devices :  Front wheel walker
Ambulation Distance :  80 ft

Morrison, Courtney PT - 06/01/2017 ██████

**Assessment**
Physical Therapy Assessment :  Patient continues to favor (L) side with shuffled gait L>R that does improv█
ideally would benefit from █████████ has acting as he is normally ambulatory with FWW without assistance, h██
she would only want a rehab facility in Santa Maria.
PT Recs - Activity Intolerance :  Encourage up in chair for meals, Encourage out of bed activities

Morrison, Courtney PT - 06█

Date/Time Printed:  ██████████ 16:33 PDT

Report Request ID:  ██████

You're welcome

May 31, 2017, 10:46 AM

Any news about Dad?
Can he eat yet or talk?

He shakes his head
yes and no but doesn't
try to talk. He smiles
and looks better today.
They got him out of
bed and into a
wheelchair. He's not
eating yet. I don't think
they have figured out
why he can't swallow.
Darlene doesn't want
to spend her money on

   iMessage  

 

# Exhibit J-4

EXHIBIT J-4 — Treating-physician letter (Dr. Alan Gruenefeldt, Auburn — 08/01/2017)

Used in: ¶70H, ¶70K–70M, ¶184A; Counts 3–7

Pins: letter date/signature block; sentence stating patient can make his own medical/financial decisions

Proves: Treating doctor says Ralph could make his own decisions on 8/01/2017.

Why it matters: Direct treating-source capacity affirmation contradicts July 2017 non-treating office letters.

Constitutional hooks: 14A due process (need for evidentiary hearing on authenticity/authority).

Damage bucket: Delay and motion practice caused by ignoring treating evidence.

Counts: 3–7.

My name is Alan Gruenefeld and I am a [illegible] California.

I have cared for [illegible] Struthers as his [illegible] since [illegible]

I am aware of both his physical and mental needs.

Although he suffered a stroke on or about May 2017 [illegible] that he is aware of his surroundings, the nature and [illegible] thoughts and make and express knowing and rational [illegible]

Prior to this current living situation, Mr. Struthers [illegible] significantly deteriorated, and the move was in [illegible] better suited for his individual needs [illegible]

It is my belief that [illegible]
[illegible]
[illegible]
interests. People [illegible]
[illegible]

# Exhibit J-5

EXHIBIT J-5 — Treating-physician letter (Dr. Lai, Santa Maria — 06/11/2018)

Used in: ¶70H, ¶184A; Counts 3–7

Pins: letter date/signature block; sentence stating patient seems capable of making healthcare/finance decisions

Proves: Treating doctor later affirmed decisional capacity.

Why it matters: Longitudinal treating evidence undermines the non-treating "incapacity" posture used to control assets.

Constitutional hooks: 14A due process (as-applied).

Damage bucket: Continued delay; unnecessary litigation costs.

Counts: 3–7.

Central Coast Endocrinology

Michael L. Lai, MD

1250 Peach St, Suite H

San Luis Obispo, CA 93401


RE: Ralph Struthers DOB 02/28/1933                                    June 11, 2018


Patient, Ralph Struthers seems capable of making his own decisions regarding healthcare and finances.


*Michael Lai*

Michael Lai, MD

# Exhibit J-6

EXHIBIT J-6 — Treating notes/orders: "Aggressive rehabilitation recommended" (Santa Maria and Auburn excerpts)

Used in: ¶¶68C, 70J, 70N; Counts 3, 5

Pins: pages with the "aggressive rehabilitation" language highlighted

Proves: Treating teams twice recommended aggressive rehab—first post-stroke (Santa Maria) and again post-MRSA (Auburn).

Why it matters: Confirms a medically indicated path that was blocked, explaining diminished outcome compared to immediate, continuous rehab.

Constitutional hooks: 14A (as-applied due process around basic medical continuity); Access to courts (obstruction theme).

Damage bucket: Added care costs; diminished functional gains; delay.



**Marian Regional Medical Center**
1400 East Church St
Santa Maria, CA 93454–
Facility Phone #:   (805) 739-3000

Name: **STRUTHERS, RALPH CHARLES**
MRN:   12057698(AMB); 3000320775(MMC)
Acct #: 74007871762
Pt loc:  MMC TEL2; 225; 1

DOB: 2/28/1933  Age:  84 years        Sex:M
Admit Date:  5/29/2017
Disch Date:  6/12/2017
Physician:   Tunali Madenci,Lerzan MD
PCP:         Okerblom,Robert MD ; Okerblom,John MD ;
             Lai,Michael K MD

---

### Speech Therapy Documentation

DOCUMENT NAME:                        Speech Progress Note
RECEIVED DATE/TIME:                   5/31/2017 11:00 PDT
RESULT STATUS:                        Auth (Verified)
PERFORM INFORMATION:                  Foster,Lori MA,CCC/SLP (5/31/2017 12:09 PDT)
SIGN INFORMATION:                     Foster,Lori MA,CCC/SLP (5/31/2017 12:09 PDT)

Inpatient ST Daily Progress Note Entered On:  05/31/2017 11:42 PDT
Performed On:  05/31/2017 11:00 PDT by Foster, Lori MA,CCC/SLP

**Services Provided**
Treatment Narrative :   Pt followed directions to open mouth, stick out tongue, although only to teeth, smile and pucker.  Shows
right droop.  Pt trialed with ice chips and tsp of water.  Showed holding of each in mouth for up to 20 sec before swallow.  Showed
delayed cough, became red in face, trials stopped.  Pt is non verbal.  Daugher has been through rehab with her son who had a tbi
so understands situation.  Spoke to family regarding NGT, which they are in favor of.
Education Documented :  Yes
Treatment Plan & Goals Review :  Yes
Charges :  Yes

Foster, Lori MA,CCC/SLP - 05/31/2017 12:09 PDT

Precautions/Contraindications :

# Exhibit K-1

EXHIBIT K-1 — Transcript (July 11, 2025) — suspension; "13 bonds"; no noticed motion

Used in: ¶¶12, 85, 85C, 110, 115E; Counts 1–2, 3, 5, 7, 10, 13

Pins: 8:24–26; 9:19–25; 9:24–10:13

Proves: Next-day suspension after the federal filing; no noticed removal motion/tentative addressing removal; confusion over "13 U.S. savings bonds" as "trust" assets.

Why it matters: Shows retaliation timing and due-process failure (suspension without noticed motion) and mischaracterization of bonds that feeds the preemption issue.

Constitutional hooks: 1A (retaliation/petition); 14A procedural due process.

Damage bucket: Loss of trustee functions; chilled petitioning; added motion/appeal costs.

Counts: 1 (prospective relief vs. Jacques), 2 (joint action), 5 (Belinda), 7 (Johnson/Murphy), 10 (supervising firms), 13 (bond diversion).

Filename (suggested): K-1_Transcript_2025-07-11.pdf

SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF PLACER

--oOo--

DEPARTMENT NO. FORTY          HON. MICHAEL JACQUES, COMMISSIONER

IN RE THE RALPH C. STRUTHERS TRUST,  )
                                     )
                                     )
                                     )  Case No. S-PR-0010014
                                     )
                                     )
                                     )

**CERTIFIED COPY**

--oOo--

REPORTER'S TRANSCRIPT

JULY 11, 2025

ACCOUNTING HEARING

--oOo--

APPEARANCES:

FOR TRUSTEES BELINDA CONNOR        LACHONA LAW
and JULIE HATRIDGE:               BY:  G. KEVIN LACHONA
                                  2450 Ventura Oaks Way, Suite 200
                                  Sacramento, CA  95833-4226

Appearing in Pro Per              LARONDA MYERS


Reported By:                      LAURIE J. WARD, CSR 9756



Scarpelli Court Reporting Service
601 Commerce Drive, Suite 130
Roseville, CA 95678
(916) 412-0152

Scarpelli
COURT REPORTING SERVICES

1            **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

2              **IN AND FOR THE COUNTY OF PLACER**

3                      **--oOo--**

4   **DEPARTMENT NO. FORTY**     **HON. MICHAEL JACQUES, COMMISSIONER**

5   **IN RE THE RALPH C. STRUTHERS TRUST,**   )
                                  )

6                                  )
                                 )   **Case No. S-PR-0010014**

7                                  )

8                                  )   **CERTIFIED COPY**

9

10                       **--oOo--**

11                  **REPORTER'S TRANSCRIPT**

12                    **JULY 11, 2025**

13                **ACCOUNTING HEARING**

14                       **--oOo--**

15   **APPEARANCES:**

16

17   **FOR TRUSTEES BELINDA CONNOR**     **LACHONA LAW**
     **and JULIE HATRIDGE:**          **BY:  G. KEVIN LACHONA**

18                                  **2450 Ventura Oaks Way, Suite 200**
                                  **Sacramento, CA  95833-4226**

19   **Appearing in Pro Per**          **LARONDA MYERS**

20

21

22

23

24   **Reported By:**                **LAURIE J. WARD, CSR 9756**

25

26

27

28

Page 2

1                      **ROSEVILLE, CALIFORNIA**

2                      **FRIDAY, JULY 11, 2025**

3                      --oOo--

4       The matter of IN RE THE RALPH C. STRUTHERS REVOCABLE

5  TRUST, case number S-PR-0010014, came regularly this day before

6  the Honorable MICHAEL JACQUES, Commissioner of the Superior

7  Court of the State of California, in and for the County of

8  Placer, Department Number 40 thereof.

9       The Trustees, Belinda Connor and Julie Hatridge, Belinda

10  Connor and Carole Campbell, beneficiaries, were represented by

11  G. KEVIN LACHONA, Attorney at Law, acting as their Counsel.

12       LARONDA MYERS, appearing in pro per.

13       ALSO PRESENT:  Belinda Connor appearing by video and April

14  Sharp appearing telephonically.

15       The following proceedings were had, to wit:

16                      --oOo--

17       THE COURT:  We will be in session and on the record in the

18  matter of Ralph C. Struthers Revocable Trust.  Before we went on

19  the record, Mr. Lachona, you were starting to state your

20  appearance.  Please go ahead.

21       MR. LACHONA:  Good morning, your Honor.  Kevin Lachona

22  appearing for Belinda Connor and Julie Hatridge, the trustees of

23  the 1993 Struthers Trust; Belinda Connor and Carole Campbell as

24  beneficiaries of the 2017 Ralph C. Struthers Trust.

25       THE COURT:  Very well.  Thank you.  Ms. Myers, we have a

26  court reporter, so if you would kindly indicate out loud you are

27  here.

28       MS. MYERS:  Yes.  I'm LaRonda Myers.  I'm a co-trustee of

Page 3

```
 1   the Ralph C. Struthers Trust of October 22nd, 2017.  I'm the
 2   beneficiary of that trust.  I'm the beneficiary of the Family
 3   Struthers Trust of June 4th of 1993.
 4           THE COURT:  Thank you.  Appearances on line in the
 5   Struthers Trust matter.
 6           MS. CONNOR:  Belinda Connor.
 7           THE COURT:  Ms. Connor.  Good morning.
 8           MS. CONNOR:  Yes.
 9           THE COURT:  Anyone else?  So in this matter I want to
10   start today by following up on something I said last time.  Bear
11   with me while I bring up the file here.  Give me a second.
12           Ms. Sharp is indicating by e-mail to my clerk she can't
13   hear us.  Do you have a phone number for Ms. Sharp?  We'll call
14   her.
15           MR. LACHONA:  I see Carole Campbell listed C.C.  I didn't
16   hear her respond.
17           THE COURT:  Ms. Campbell, are you able to hear me, ma'am?
18           MS. CAMPBELL:  Yes.
19           THE COURT:  Good morning.
20           MS. SHARP:  Hello.
21           THE COURT:  Is it Ms. Sharp?
22           MS. SHARP:  Yes.  I'm sorry.  I was having a problem.
23           THE COURT:  That's okay.  We're happy to have you
24   telephonically.  We hadn't essentially said anything yet except
25   starting the case.
26           I wanted to reflect on something I said last time.  I made
27   a tentative ruling to suspend the trustees because they're at
28   impasse, and the trustees need to act jointly.  I propose to do
```

Page 4

 1    that today.

 2          In this matter Mr. Lachona's clients have nominated

 3    Ms. Cain.  I reviewed her credentials, curriculum vitae.  It

 4    seems to be in order.  I think that's what I'm going to do.  We

 5    need to find a way to --

 6          MS. SHARP:  Who is Ms. Cain?  I'm sorry.

 7          THE COURT:  Is the person nominated by Mr. Lachona's

 8    clients to serve as interim trustee in this matter.  I didn't

 9    write down her first name.  What is her first name?

10          MR. LACHONA:  Kathryn.

11          THE COURT:  Kathryn.  We need to find a way to address --

12    it just keeps getting bigger and more -- ma'am, I am going to

13    come to you in a minute.  First I want to give my thoughts, and

14    certainly I want to hear your response, Ms. Myers.

15          It keeps getting bigger, so I'm thinking that if I appoint

16    an interim trustee -- step one is I am going to try to deal with

17    the accounts.  I'll order the interim trustee to review the

18    accounts and either adopt them or weigh in on the sufficiency of

19    the accounts.  I have five accounts in my file, although as the

20    probate notes properly note, the sixth one was never noticed for

21    hearing, but it's sitting in my file.  I think that's what I'm

22    going to do today, is suspend the trustees because they are at

23    impasse and then appoint an interim trustee.

24          Ms. Myers, I will invite you to be heard.

25          MS. MYERS:  Okay.  First of all, your Honor, that is

26    violating my due process right under the 14th Amendment and the

27    42 USC 1993.  I have done everything.  The trust has no money in

28    it.  I have personally contributed money for legal fees.  I am

Re the Ralph C. Struthers Revocable Trust
Civil Hearing,   on 07/11/2025

Page 5

1   trying to find an attorney to represent both of us.  I've done
2   everything.  Also, your accounting within your tentative notes
3   it says that they did not receive it.  It's back here stamped
4   with your court on the sixth accounting.

5         THE COURT:  Are you referring -- you have to read it more
6   carefully, Ms. Myers.  What it says is the probate notes
7   acknowledge the sixth account was filed and it was served, which
8   is what you are saying right now.  It wasn't noticed for
9   hearing.  There isn't a notice of hearing and a proof of service
10  on a notice of hearing.  So everyone knows about it, I suspect,
11  because everyone was served with it, but you have to set it for
12  hearing.  It's like the motion you recently filed in the other
13  matter with respect to discovery.  It's just sitting in my file.
14  It hasn't been noticed for hearing, and it's not going to be
15  heard.  I don't want to talk about that.  I'm just pointing to
16  it by way of illustration.  Let's not focus on that.  I want you
17  to continue your other thoughts, because you think I should not
18  suspend the trustees.

19        MS. MYERS:  Right.  I believe that we should have counsel
20  here before anything happens.

21        THE COURT:  But you've been through at least two, and I
22  was disappointed to see that Mr. Gravalec recently substituted
23  out.

24        MS. MYERS:  I have -- first of all, he got ill with Covid,
25  which you know.  Then second of all, he said he would be a
26  better witness than our lawyer, and so he asked me that.  And we
27  both agreed that he would be a better witness in the evidential
28  hearing than he would be as attorney, so he asked me to seek for

Re the Ralph C. Struthers Revocable Trust
Civil Hearing,  on 07/11/2025

Page 6

1    attorney, and I'm seeking for attorney to represent both of us.

2    That's what I've been trying to do.

3            The last appointment I had was Friday.  I believe it was

4    Friday.  I had one last Wednesday.  So I've been proactive in

5    that.  I believe before any decisions are made -- because I have

6    done everything in my power and over my duties of funding the

7    trust.  And Kevin Lachona and his client are not the true

8    trustees of the 1993 trust.  And here in a letter from my

9    father, right here it actually states that his 1993 trust was

10   changed.  He amended his trust.  He said anybody that changed

11   his trust are not beneficiaries of the 2017.  This would be

12   minute because they are not beneficiaries to argue this case.

13           At this point what I would like is my accountings, and

14   whatever you want me to do with the sixth accounting I have no

15   problem in doing that.  I would like to go ahead and get this

16   accounting done so I can start distributing the money to the

17   beneficiaries.  It's been well long overdue.

18           The only reason why it happened is because opposing

19   counsel and his clients keep on rejecting the accounting.  The

20   accounting is paying legal fees, paying the court reporter, the

21   stamps, the mailing.  It's all legit.  There is nothing out of

22   the ordinary.  April and I have never taken money out for

23   trustees' fees.

24           THE COURT:  Thank you, Ms. Myers.  Ms. Sharp, do you wish

25   to be heard?

26           MS. SHARP:  No.  I agree with what Ronda said.

27           THE COURT:  Okay.  Then let me ask you this.  What do you

28   make of the notion that I pointed to before that you guys have

Re the Ralph C. Struthers Revocable Trust
Civil Hearing,   on 07/11/2025

Page 7

1   had serious disagreements in the administration of this trust?

2   I certainly recall that Ms. Myers, who was a petitioner on the

3   petition to approve the settlement agreement, renounced it.  At

4   that time you agreed that the petition to approve the settlement

5   should be approved.  I forget.  There was one or two little

6   exceptions to that.  I forget what they were.  It's pretty

7   significant when trustees are in disagreement on such an

8   important issue.

9        MS. SHARP:  I agree with the settlement agreement.  I

10   think that we need to distribute the money before it's nothing

11   at all in the trust.  I think it's going down to almost nothing

12   now because of all of the lawyer fees.  And I'd like to also

13   note that I'm the secondary after Belinda on the first trust, so

14   if it should go to another person, it could go to me.  I don't

15   know this other person they nominated.  I don't know who that

16   is, but I was second in line.

17        THE COURT:  Mr. Lachona, I hope you don't think me

18   discourteous.  I'm not going to be hearing from you because I am

19   about to rule in your favor.

20        The matter is submitted.  This is the decision of the

21   Court.  The Court finds, as Ms. Sharp's statements just now

22   emphasized and recapitulated, the trustees must act jointly, are

23   at impasse.  It is therefore impracticable to leave them in

24   office as co-trustees.  The co-trustees, LaRonda Myers, April

25   Sharp, are suspended forthwith.  Kathryn Cain is appointed as

26   interim trustee in this matter.  She will be ordered on the date

27   we're going to decide to review the submitted accounts,

28   including the sixth account, and offer her opinion as the

1    interim trustee on whether the account should be approved.

2         Mr. Lachona, what are you thinking about bond for

3    Ms. Cain?

4         MR. LACHONA:  Your Honor, are you referring to a date?

5         THE COURT:  No, a bond.

6         MR. LACHONA:  A bond.

7         THE COURT:  If I said date, I meant to say bond.

8         MR. LACHONA:  I don't think a bond is necessary.  She is a

9    professional fiduciary.  There is minimal liquid assets in the

10   trust, although there are 13 U.S. savings bonds that should be

11   assets of the trust.  They are not included yet.  I would ask

12   the Court to --

13        THE COURT:  I will defer the issue of bond until next

14   time.

15        Do you wish to be heard, Ms. Myers, on the issue of

16   whether I should order a bond at this time?

17        MS. MYERS:  Actually, your Honor, I am really confused

18   because my 14th Amendment has just been ripped away from me.

19        THE COURT:  Ma'am, I would invite you if you believe

20   that --

21        MS. MYERS:  I will appeal.

22        THE COURT:  You will kindly not talk over me.  If you

23   believe that your rights under the federal constitution are

24   violated, commence a federal action.  If you wish to take

25   today's matters to the attention of the Court of Appeal, I would

26   encourage you to do that.  What I'm not going to be able to do

27   is to allow you to argue my ruling.  I understand you disagree

28   with my ruling, and you are instructed not to argue my ruling.

Page 9

1  Do you wish to heard on issue of bond?  I think I'm going to

2  defer it until --

3       MS. MYERS:  I would like to tell you, there is no money in

4  the trust.  I'm the one that is fronting the trust.

5       THE COURT:  I'm not going to order bond at this time.  You

6  did mention that before, and thank you for repeating it.

7       The suspended trustees are ordered within 14 days' time to

8  turn over to Ms. Cain all of the books and records, control of

9  the trust assets, and all other documentary information relating

10  to the trust.

11       Mr. Lachona, you are going to prepare the order after

12  hearing to include the instructions to the interim trustee to

13  review the second through sixth accounts and state her opinion

14  on those.  I'm going to propose that we come together again if

15  the day is good for everybody on October 24th.  I will stay with

16  you, Mr. Lachona.  Is it good?

17       MR. LACHONA:  Yes, your Honor.  If I may respond to the

18  issue of the interim trustee review and accountings.  So

19  accountings two through five were part of the settlement

20  agreement when we signed --

21       THE COURT:  Thank you for refreshing my memory

22       MR. LACHONA:  -- one year ago today.  5-11-2024 we had the

23  settlement agreement executed.  There is a motion to enforce the

24  settlement agreement on file before this Court.  The request in

25  that motion is to enforce settlement agreement with respect to

26  suspending the co-trustee, which your Honor has done today,

27  appointing an interim trustee so that the interim trustee can

28  file a petition to seek approval of the settlement agreement,

Page 10

 1   which the settlement should encompass accountings two through
 2   five.

 3          THE COURT:  You are right.

 4          MR. LACHONA:  With respect to the sixth accounting, I have
 5   filed a motion to strike because that was found solely by
 6   Ms. Myers, not by Ms. Sharp.  That is set for October 24th.
 7   That date works if we need to come back.

 8          THE COURT:  I saw that in the file.  I didn't study it
 9   because it hadn't been noticed for hearing.

10          Is it true, Ms. Myers, that you and Ms. Sharp did not
11   jointly file?  In other words, if I open that up and look at the
12   caption, which is at the top of the document, I will see only
13   your name.  Is that correct?

14          MS. MYERS:  I have an e-mail to Ms. Sharp --

15          THE COURT:  Ms. Sharp, I'm not speaking to you just at
16   this moment.  I'm sorry.  What did you say, Ms. Myers?

17          MS. MYERS:  I have an e-mail stating to April, Ms. Sharp,
18   if there is anything that should be corrected in the accountings
19   or whatever.

20          THE COURT:  I know, but she needs to sign it.  This is
21   what I mentioned a moment ago and the reason why I suspended the
22   two of you, is because you must act jointly as trustees, and
23   that means her signature needed to have been on the sixth
24   account.  She needs to be a proponent of that just as you are.

25          I'm not going to rule on the issue today.  I will give a
26   tentative ruling that if Ms. Sharp -- again, I didn't study that
27   aspect until Mr. Lachona pointed it out just now -- when we come
28   together on October 24th, if she has not signed the account, or

Re the Ralph C. Struthers Revocable Trust
Civil Hearing, on 07/11/2025

Page 11

1   she can submit a separate document saying, "I adopt that that's
2   my account as well."  That would be fine.  If she is not a
3   proponent of that account, the account will be stricken.  That's
4   my tentative ruling on that.
5           MS. MYERS:  Your Honor.
6           THE COURT:  Ms. Myers.
7           MS. MYERS:  The savings bonds in my father's trust, my
8   father put them in the estate.  They have nothing to do with the
9   trust.
10          THE COURT:  Ma'am, I'm not making any rulings as to what
11  is or is not in the trust.  I heard Mr. Lachona's comments.  My
12  orders today are limited in appointing the interim trustee.
13  We're going to continue the matter as well to the 24th.
14          Go ahead, Mr. Lachona
15          MR. LACHONA:  Just to confirm, your Honor, the accountings
16  are going to be continued?
17          THE COURT:  Yes.
18          MR. LACHONA:  The interim trustee is not going to be
19  reviewed.
20          THE COURT:  No.  I'm not ordering that.
21          MR. LACHONA:  Is the Court going to issue a ruling
22  regarding the motion to enforce that or is that going to be
23  reserved?
24          THE COURT:  That's going to be reserved.  Everything else
25  is going to be continued.
26          I will return to Ms. Sharp, but final point for you,
27  Ms. Myers.
28          MS. MYERS:  Thank you, your Honor.  I just want to state

Re the Ralph C. Struthers Revocable Trust
Civil Hearing,  on 07/11/2025

1   that the settlement agreement was against the law.

2         THE COURT:  Ma'am, I understand your assertions with

3   respect to the settlement agreement.  That's why -- I understand

4   those concerns to be the reason why you petitioned for approval

5   and then repudiated your own petition for approval.  I

6   understand all of that.

7         MS. MYERS:  April Sharp, I explained to her in the e-mail

8   about the mediation.  I invited her to look up the law to state

9   that the settlement agreement is not in the best interest of the

10  beneficiaries, nor is it in the best interest of anybody

11  involved.  And I think that this Court needs to honor my

12  father's wishes.  He states in his sealed envelope that was

13  amended that Don Gravalec opened and stated right there that his

14  1993 trust was altered.  And Julie Hatridge, as she knows, she

15  is not the true trustee.  So Belinda and Carole are removed;

16  therefore, it is voided.

17        And I'm just really upset that the Court is taking this,

18  because mainly why the accounting or anything hasn't been

19  approved is because opposing counsel and his clients keep on

20  objecting to the accounting.  April and I would have had this

21  totally done.  We can under the law have disagreements, but I

22  think that's why I need to get an attorney involved and why I

23  was trying to get an attorney for this hearing, because it's

24  very important, and to let April understand the rules of what is

25  in front of us.  It's not -- I think that it's best for counsel

26  to explain to her and not my role.  I can advise her, but the

27  thing is is April and I should be together, and this is the only

28  time that we have ever had a disagreement.  I really believe

Re the Ralph C. Struthers Revocable Trust
Civil Hearing,   on 07/11/2025

Page 13

1    that we need to get together with an attorney and handle this.

2    This is why I really feel that before any decisions are handed,

3    that we have an attorney representing them --

4         THE COURT:  I have already made my decision, ma'am.  I

5    already also instructed you to stop arguing my decision.  That

6    is my decision in this matter.

7         Ms. Sharp, any brief final word?  I do want to say this.

8    Ms. Myers, something you just said very much echoed something

9    that I have observed in the past with these words, and I forget

10   exactly what you filed that really triggered my attention on

11   that.  When you have co-trustees, it is not for one to bend the

12   other to her will.  That's what you've tried to do with respect

13   to Ms. Sharp.  Everything that you and Ms. Sharp keep saying to

14   me only reinforces my view that you are at impasse.

15        Ms. Sharp, I can give you like ten seconds if you have

16   anything else.  If not, we're done for today.

17        MS. SHARP:  My only question, your Honor, was I never

18   heard of the person that you appointed to be in charge of the

19   trust.  I don't know who that person is.

20        THE COURT:  Mr. Lachona by Monday will send that to you,

21   Ms. Sharp.

22        MR. LACHONA:  I will provide that, yes.

23        THE COURT:  We are done for today.  Mr. Lachona, prepare

24   the order after hearing.

25        MR. LACHONA:  Will do.  Thank you, your Honor.

26                    (The matter was concluded.)

27                          --oOo--

28

Re the Ralph C. Struthers Revocable Trust
Civil Hearing,   on 07/11/2025

Page 14

1              SUPERIOR COURT OF THE STATE OF CALIFORNIA

2                   IN AND FOR THE COUNTY OF PLACER

3                              --oOo--
   IN RE THE RALPH C. STRUTHERS              )
4  REVOCABLE TRUST                           )
                                             )
5                                            )
                                             )  Case No. S-PR-0010014
6                                            )
                                             )
7                                            )
                                             )  REPORTER'S
8                                            )  TRANSCRIPT
9

10   STATE OF CALIFORNIA       )
                              )  ss
11   COUNTY OF PLACER          )

12

13         I, LAURIE J. WARD, Certified Shorthand Reporter of the

14   State of California, do hereby certify that the foregoing pages

15   1 through 13, inclusive, comprises a true and correct transcript

16   of the proceedings had in the above-entitled matter held on

17   JULY 11, 2025.

18         I also certify that portions of the transcript are

19   governed by the provisions of CCP237(a)(2).

20         IN WITNESS WHEREOF, I have subscribed this certificate at

21   Auburn, California, this 13th day of July 2025.

22   _____

23                            LAURIE J. WARD, CSR No. 9756

24

25

26

27

28

Re the Ralph C. Struthers Revocable Trust
Civil Hearing,    on 07/11/2025

Index: --ooo--..continue

Re the Ralph C. Struthers Revocable Trust
Civil Hearing,    on 07/11/2025
--ooo--  2:3,16 13:27

**1**

**11**  2:2

**13**  8:10

**14**  9:7

**14th**  4:26 8:18

**1993**  2:23 3:3 4:27 6:8,9 12:14

**2**

**2017**  2:24 3:1 6:11

**2025**  2:2

**22nd**  3:1

**24th**  9:15 10:6,28 11:13

**4**

**40**  2:8

**42**  4:27

**4th**  3:3

**5**

**5-11-2024**  9:22

**A**

**account**  5:7 7:28 8:1 10:24,28 11:2, 3

**accounting**  5:2,4 6:14,16,19,20 10:4 12:18,20

**accountings**  6:13 9:18,19 10:1,18 11:15

**accounts**  4:17,18,19 7:27 9:13

**acknowledge**  5:7

**act**  3:28 7:22 10:22

**acting**  2:11

**action**  8:24

**address**  4:11

**administration**  7:1

**adopt**  4:18 11:1

**advise**  12:26

**agree**  6:26 7:9

**agreed**  5:27 7:4

**agreement**  7:3,9 9:20,23,24,25,28 12:1,3,9

**ahead**  2:20 6:15 11:14

**altered**  12:14

**amended**  6:10 12:13

**Amendment**  4:26 8:18

**appeal**  8:21,25

**appearance**  2:20

**Appearances**  3:4

**appearing**  2:12,13,14,22

**appoint**  4:15,23

**appointed**  7:25 13:18

**appointing**  9:27 11:12

**appointment**  6:3

**approval**  9:28 12:4,5

**approve**  7:3,4

**approved**  7:5 8:1 12:19

**April**  2:13 6:22 7:24 10:17 12:7,20, 24,27

**argue**  6:12 8:27,28

**arguing**  13:5

**aspect**  10:27

**assertions**  12:2

**assets**  8:9,11 9:9

**attention**  8:25 13:10

**attorney**  2:11 5:1,28 6:1 12:22,23 13:1,3

**B**

**back**  5:3 10:7

**Bear**  3:10

**Belinda**  2:9,12,13,22,23 3:6,7,11,12,15

**bend**  13:11

**beneficiaries**  2:10,24 6:11,12,17 12:10

**beneficiary**  3:2

**bigger**  4:12,15

**bond**  8:2,5,6,7,8,13,16 9:1,5

**bonds**  8:10 11:7

**books**  9:8

**bring**  3:11

**C**

**C.C.**  3:15

**Cain**  4:3,6 7:25 8:3 9:8

**California**  2:1,7

**call**  3:13

**Campbell**  2:10,23 3:15,17,18

**caption**  10:12

**carefully**  5:6

**Carole**  2:10,23 3:15 12:15

**case**  2:5 3:25 6:12

**changed**  6:10

**charge**  13:18

**clerk**  3:12

**client**  6:7

**clients**  4:2,8 6:19 12:19

**co-trustee**  2:28 9:26

**co-trustees**  7:24 13:11

**commence**  8:24

**comments**  11:11

**Commissioner**  2:6

**concerns**  12:4

**concluded**  13:26

**confirm**  11:15

**confused**  8:17

**Connor**  2:9,10,13,22,23 3:6,7,8

**constitution**  8:23

**continue**  5:17 11:13

Re the Ralph C. Struthers Revocable Trust
Civil Hearing,   on 07/11/2025                                          Index: continued..including

continued 11:16,25

contributed 4:28

control 9:8

correct 10:13

corrected 10:18

counsel 2:11 5:19 6:19 12:19,25

County 2:7

court 2:7,17,25,26 3:4,7,9,17,19,21,
  23 4:7,11 5:4,5,21 6:20,24,27 7:17,
  21 8:5,7,12,13,19,22,25 9:5,21,24
  10:3,8,15,20 11:6,10,17,20,21,24
  12:2,11,17 13:4,20,23

Covid 5:24

credentials 4:3

curriculum 4:3


**D**

date 7:26 8:4,7 10:7

day 2:5 9:15

days' 9:7

deal 4:16

decide 7:27

decision 7:20 13:4,5,6

decisions 6:5 13:2

defer 8:13 9:2

Department 2:8

disagree 8:27

disagreement 7:7 12:28

disagreements 7:1 12:21

disappointed 5:22

discourteous 7:18

discovery 5:13

distribute 7:10

distributing 6:16

document 10:12 11:1

documentary 9:9

Don 12:13

due 4:26

duties 6:6


**E**

e-mail 3:12 10:14,17 12:7

echoed 13:8

emphasized 7:22

encompass 10:1

encourage 8:26

enforce 9:23,25 11:22

envelope 12:12

essentially 3:24

estate 11:8

evidential 5:27

exceptions 7:6

executed 9:23

explain 12:26

explained 12:7


**F**

Family 3:2

father 6:9 11:8

father's 11:7 12:12

favor 7:19

federal 8:23,24

feel 13:2

fees 4:28 6:20,23 7:12

fiduciary 8:9

file 3:11 4:19,21 5:13 9:24,28 10:8,
  11

filed 5:7,12 10:5 13:10

final 11:26 13:7

find 4:5,11 5:1

finds 7:21

fine 11:2

focus 5:16

forget 7:5,6 13:9

found 10:5

Friday 2:2 6:3,4

front 12:25

fronting 9:4

funding 6:6


**G**

give 3:11 4:13 10:25 13:15

good 2:21 3:7,19 9:15,16

Gravalec 5:22 12:13

guys 6:28


**H**

handed 13:2

handle 13:1

happened 6:18

happy 3:23

Hatridge 2:9,22 12:14

hear 3:13,16,17 4:14

heard 4:24 5:15 6:25 8:15 9:1 11:11
  13:18

hearing 4:21 5:9,10,12,14,28 7:18
  9:12 10:9 12:23 13:24

honor 2:21 4:25 8:4,17 9:17,26
  11:5,15,28 12:11 13:17,25

Honorable 2:6

hope 7:17


**I**

ill 5:24

illustration 5:16

impasse 3:28 4:23 7:23 13:14

important 7:8 12:24

impracticable 7:23

include 9:12

included 8:11

including 7:28

indicating 3:12

information 9:9
instructed 8:28 13:5

instructions 9:12

interest 12:9,10

interim 4:8,16,17,23 7:26 8:1 9:12,
18,27 11:12,18

invite 4:24 8:19

invited 12:8

involved 12:11,22

issue 7:8 8:13,15 9:1,18 10:25 11:21

**J**

JACQUES 2:6

jointly 3:28 7:22 10:11,22

Julie 2:9,22 12:14

JULY 2:2

June 3:3

**K**

Kathryn 4:10,11 7:25

Kevin 2:11,21 6:7

kindly 2:26 8:22

**L**

Lachona 2:11,19,21 3:15 4:10 6:7
7:17 8:2,4,6,8 9:11,16,17,22 10:4,27
11:14,15,18,21 13:20,22,23,25

Lachona's 4:2,7 11:11

Laronda 2:12,28 7:24

law 2:11 12:1,8,21

lawyer 5:26 7:12

leave 7:23

legal 4:28 6:20

legit 6:21

letter 6:8

limited 11:12

liquid 8:9

listed 3:15

long 6:17

loud 2:26

**M**

made 3:26 6:5 13:4

mailing 6:21

make 6:28

making 11:10

matter 2:4,18 3:5,9 4:2,8 5:13 7:20,
26 11:13 13:6,26

matters 8:25

means 10:23

meant 8:7

mediation 12:8

memory 9:21

mention 9:6

mentioned 10:21

MICHAEL 2:6

minimal 8:9

minute 4:13 6:12

moment 10:16,21

Monday 13:20

money 4:27,28 6:16,22 7:10 9:3

morning 2:21 3:7,19

motion 5:12 9:23,25 10:5 11:22

Myers 2:12,25,28 4:14,24,25 5:6,19,
24 6:24 7:2,24 8:15,17,21 9:3 10:6,
10,14,16,17 11:5,6,7,27,28 12:7
13:8

**N**

needed 10:23

nominated 4:2,7 7:15

note 4:20 7:13

notes 4:20 5:2,6

noticed 4:20 5:8,14 10:9

notion 6:28

number 2:5,8 3:13

**O**

objecting 12:20

observed 13:9

October 3:1 9:15 10:6,28

offer 7:28

office 7:24

open 10:11

opened 12:13

opinion 7:28 9:13

opposing 6:18 12:19

order 4:4,17 8:16 9:5,11 13:24

ordered 7:26 9:7

ordering 11:20

orders 11:12

ordinary 6:22

overdue 6:17

**P**

part 9:19

past 13:9

paying 6:20

person 4:7 7:14,15 13:18,19

personally 4:28

petition 7:3,4 9:28 12:5

petitioned 12:4

petitioner 7:2

phone 3:13

Placer 2:8

point 6:13 11:26

pointed 6:28 10:27

pointing 5:15

power 6:6

Re the Ralph C. Struthers Revocable Trust
Civil Hearing,   on 07/11/2025

Index: prepare..study

prepare 9:11 13:23

PRESENT 2:12
pretty 7:6

pro 2:12

proactive 6:4

probate 4:20 5:6

problem 3:22 6:15

proceedings 2:15

process 4:26

professional 8:9

proof 5:9

properly 4:20

proponent 10:24 11:3

propose 3:28 9:14

provide 13:22

put 11:8

## Q

question 13:17

## R

Ralph 2:4,18,24 3:1

read 5:5

reason 6:18 10:21 12:4

recall 7:2

recapitulated 7:22

receive 5:3

recently 5:12,22

record 2:17,19

records 9:8

referring 5:5 8:4

reflect 3:26

refreshing 9:21

regularly 2:5

reinforces 13:14

rejecting 6:19

relating 9:9

removed 12:15

renounced 7:3

repeating 9:6

reporter 2:26 6:20

represent 5:1 6:1

represented 2:10

representing 13:3

repudiated 12:5

request 9:24

reserved 11:23,24

respect 5:13 9:25 10:4 12:3 13:12

respond 3:16 9:17

response 4:14

return 11:26

review 4:17 7:27 9:13,18

reviewed 4:3 11:19

Revocable 2:4,18

rights 8:23

ripped 8:18

role 12:26

Ronda 6:26

ROSEVILLE 2:1

rule 7:19 10:25

rules 12:24

ruling 3:27 8:27,28 10:26 11:4,21

rulings 11:10

## S

S-PR-0010014 2:5

savings 8:10 11:7

sealed 12:12

secondary 7:13

seconds 13:15

seek 5:28 9:28

seeking 6:1

send 13:20

separate 11:1

serve 4:8

served 5:7,11

service 5:9

session 2:17

set 5:11 10:6

settlement 7:3,4,9 9:19,23,24,25,28 10:1 12:1,3,9

Sharp 2:14 3:12,13,20,21,22 4:6 6:24,26 7:9,25 10:6,10,14,15,17,26 11:26 12:7 13:7,13,15,17,21

Sharp's 7:21

sign 10:20

signature 10:23

signed 9:20 10:28

significant 7:7

sitting 4:21 5:13

sixth 4:20 5:4,7 6:14 7:28 9:13 10:4,23

solely 10:5

speaking 10:15

stamped 5:3

stamps 6:21

start 3:10 6:16

starting 2:19 3:25

state 2:7,19 9:13 11:28 12:8

stated 12:13

statements 7:21

states 6:9 12:12

stating 10:17

stay 9:15

step 4:16

stop 13:5

stricken 11:3

strike 10:5

Struthers 2:4,18,23,24 3:1,3,5

study 10:8,26

Re the Ralph C. Struthers Revocable Trust
Civil Hearing,   on 07/11/2025

| | |
|---|---|
| **submit** 11:1 | **U** |
| **submitted** 7:20,27 | |
| **substituted** 9:22 | **U.S.** 8:10 |
| **sufficiency** 4:18 | **understand** 8:27 12:2,3,6,24 |
| **Superior** 2:6 | **upset** 12:17 |
| **suspect** 5:10 | **USC** 4:27 |
| **suspend** 3:27 4:22 5:18 | |
| **suspended** 7:25 9:7 10:21 | **V** |
| **suspending** 9:26 | |
| | **video** 2:13 |
| **T** | **view** 13:14 |
| | **violated** 8:24 |
| **taking** 12:17 | **violating** 4:26 |
| **talk** 5:15 8:22 | **vitae** 4:3 |
| **telephonically** 2:14 3:24 | **voided** 12:16 |
| **ten** 13:15 | |
| **tentative** 3:27 5:2 10:26 11:4 | **W** |
| **thereof** 2:8 | |
| **thing** 12:27 | **wanted** 3:26 |
| **thinking** 4:15 8:2 | **Wednesday** 6:4 |
| **thoughts** 4:13 5:17 | **weigh** 4:18 |
| **time** 3:10,26 7:4 8:14,16 9:5,7 12:28 | **wishes** 12:12 |
| **today** 3:10 4:1,22 9:22,26 10:25 11:12 13:16,23 | **wit** 2:15 |
| **today's** 8:25 | **word** 13:7 |
| **top** 10:12 | **words** 10:11 13:9 |
| **totally** 12:21 | **works** 10:7 |
| **triggered** 13:10 | **write** 4:9 |
| **true** 6:7 10:10 12:15 | |
| **trust** 2:5,18,23,24 3:1,2,3,5 4:27 6:7, 8,9,10,11 7:1,11,13 8:10,11 9:4,9,10 11:7,9,11 12:14 13:19 | **Y** |
| **trustee** 4:8,16,17,23 7:26 8:1 9:12, 18,27 11:12,18 12:15 | **year** 9:22 |
| **trustees** 2:9,22 3:27,28 4:22 5:18 6:8 7:7,22 9:7 10:22 | |
| **trustees'** 6:23 | |
| **turn** 9:8 | |

# Exhibit K-2

EXHIBIT K-2 — 8/29/2025 Transcript

Used in: ¶85B–H, 87A; Counts 1–2, 3, 5, 7, 9, 10, 13

Summary: "Not evidentiary"; prefiling threats; court read amendment; sanctions Plaintiff.

Proves / Why it matters: Denial of evidentiary access + gatekeeping.

Damage bucket(s): Sanctions risk; deterrent harm.

Constitutional hook(s): First Amendment (access/retaliation); Fourteenth Amendment (procedural due process).

SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF PLACER

--oOo--

DEPARTMENT NO. 40    HON.  MICHAEL JACQUES, COMMISSIONER


In the Matter of:                )
                                 )
THE STRUTHERS FAMILY 1993        )  Case No. S-PR-0010066
TRUST dated June 4, 1993         )
                                 )
                                 )
_____  )

**CERTIFIED COPY**


--oOo--

REPORTER'S TRANSCRIPT

FRIDAY, AUGUST 29, 2025

MOTION HEARINGS

--oOo--


Reported By:              LISA MARIE USSERY
                          Certified Shorthand Reporter
                          CSR License #11534



Scarpelli Court Reporting Service
601 Commerce Drive, Suite 130
Roseville, CA 95678
(916) 412-0152

# Exhibit K-2

EXHIBIT K-2 — Transcript (August 29, 2025) — "not evidentiary"; prefiling talk; court read amendment

Used in: ¶¶85B–85H, 87A, 96, 105, 108; Counts 1–2, 3, 5, 7, 9, 10, 13

Pins: 6:22–7:5; 30:8–19; 31:13–22

Proves: Matter handled as not evidentiary; court discussed vexatious/prefiling orders; acknowledgment on the record that the court read the amendment while other matters were addressed.

Why it matters: Confirms evidentiary shut-off and chilling gatekeeping; ties directly to the due-process/access claims and the two-track handling alongside protective-order practice.

Constitutional hooks: 1A petition/access (as-applied); 14A procedural due process.

Damage bucket: Sunk evidentiary prep (courtroom/reporter/subpoenas); delay; additional motion practice.

Counts: 1 (prospective relief vs. Jacques), 2 (joint action), 3/5 (elder-abuse narrative context), 7 (authentication suppression), 9 (admin practices), 10 (supervising firms), 13 (bond diversion).

Filename (suggested): K-2_Transcript_2025-08-29.pdfEXHIBIT L-1 — Still image (Santa Maria) + note that Ralph could talk/ambulate

Used in: ¶¶68, 68A; Counts 5–7 (and 7)

Pins: Photo metadata/date; note reference

Proves: He could walk/talk with therapy; impeaches "can't walk/speak."

Why it matters: Undercuts incapacity narrative.

Constitutional hooks: —

Damage bucket: Credibility support.

1              SUPERIOR COURT OF THE STATE OF CALIFORNIA

2                  IN AND FOR THE COUNTY OF PLACER

3                            --oOo--

4     DEPARTMENT NO. 40    HON.   MICHAEL JACQUES, COMMISSIONER

5

6     In the Matter of:                )
                                       )
7     THE STRUTHERS FAMILY 1993        )  Case No. S-PR-0010066
      TRUST dated June 4, 1993         )
8                                      )
                                       )
9     _____)    CERTIFIED COPY

10

11

12

13                           --oOo--

14                   REPORTER'S TRANSCRIPT

15                 FRIDAY, AUGUST 29, 2025

16                    MOTION HEARINGS

17                           --oOo--

18

19

20

21

22

23

24    Reported By:            LISA MARIE USSERY
                              Certified Shorthand Reporter
25                            CSR License #11534

Page 2

1                    A P P E A R A N C E S:

2

3    FOR THE PETITIONERS:      LACHONA LAW
                               2450 Venture Oaks Way
4                              Suite 200
                               Sacramento, CA 95833
5                              BY: G. KEVIN LACHONA, ESQ.
                               kevin@lachonalaw.com
6

7

8    FOR THE BENEFICIARY:      LaRonda Myers
                               In Propria Persona
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

in the matter of the Struthers Family 1993 Trust
MOTION HEARING,   on 08/29/2025

Page 3

1              ROSEVILLE, CALIFORNIA

2              Friday, August 29, 2025

3                   --oOo--

4         The matter of The Struthers Family 1993 Trust

5    dated June 4, 1993, Case Number S-PR-0010066 came

6    regularly this day before the Honorable MICHAEL JACQUES,

7    Commissioner of the Superior Court of the State of

8    California, in and for the County of Placer, Department

9    Number 40 thereof.

10        The Petitioners, Julie Hatridge and Belinda

11   Connor (via video remote) were present and were

12   represented by G. KEVIN LACHONA, an Attorney at Law,

13   acting as their Counsel.

14        The Beneficiary, LARONDA MYERS, was present in

15   Propria Persona.

16        The following proceedings were had, to wit:

17                  --oOo--

18        THE COURT:   We'll be in session on the record

19   in the matter of Struthers 1993 Trust.

20        Miss Myers, please, we do have a court reporter

21   if you would indicate out loud that you are here.

22        MS. MYERS:   Excuse me.   I was getting ready.

23        THE COURT:   Sure.   We have a court reporter.   I

24   was just asking to indicate out loud that you are here.

25        MS. MYERS:   LaRonda Myers.

in the matter of the Struthers Family 1993 Trust
MOTION HEARING,   on 08/29/2025

Page 4

1           THE COURT:  Thank you.  And, Mr. Lachona, your

2    appearance kindly and introduce your client.

3           MR. LACHONA:  Good morning, Your Honor.  Kevin

4    Lachona appearing for Respondents Julie Hatridge which

5    is -- who is present with me in court today and Belinda

6    Connor who is present remotely.

7           THE COURT:  Let's make sure that Miss Connor is

8    hearing me.

9           Miss Connor, are you hearing me okay?

10          MS. CONNOR:  Yes, I am.

11          THE COURT:  Good morning to you as well, ma'am.

12          So, Mr. Lachona, do you wish to be heard in

13   response to Miss Myers' request for continuance?

14          MR. LACHONA:  Regarding the calendar notes?

15          THE COURT:  No.  Did you receive her request

16   for continuance?  I want to say it was filed on Tuesday,

17   maybe Monday.  And according to the proof of service it

18   was e-mailed to your office.

19          MR. LACHONA:  I did.

20          THE COURT:  I will let you be heard.

21          MR. LACHONA:  I did receive that.  And there

22   was also a request to essentially stay all these

23   proceedings.  I object to the continuance.

24          THE COURT:  Please, give me the basis.

25          MR. LACHONA:  So there are several matters on

Page 5

1  calendar that the Court had indicated that it was going

2  to either drop, advance or make substantive rulings on.

3  And I am happy to go through those various matters that

4  are before the court.

5         THE COURT:  I think with respect to that

6  granular level of detail, obviously, I personally wrote

7  the tentative ruling.  I know what they are.  You don't

8  need to recap those.

9         MR. LACHONA:  So I am in support of what the

10 Court had issued with respect to the calendar notes.  I

11 believe that that's a correct characterization of the

12 status of the matters.  And I believe it accurately

13 characterizes the appropriate rulings in these various

14 matters.  I think the Court can make decisions --

15 substantive decisions regarding the various matters that

16 are before the Court today.

17        THE COURT:  Thank you, Mr. Lachona.

18        Miss Myers, anything else in support of your

19 request for a continuance?  I have read your papers.

20 Please don't repeat what is in your papers.  But anything

21 else?

22        MS. MYERS:  Yes.  Yes, there is a few things.

23 For the record my 14th Amendment and my due process

24 rights are being violated.  And for the record the Court

25 is placing my filing and deciding in advance what I can

Page 6

1    submit and what I can't submit and violating my 14th

2    Amendments and the right of my -- sorry -- 42 1993.

3                And also I want to state for the record Don

4    Gravalec handed Kevin Lachona and put my notice on March

5    14, 2025, that his clients were removed after that day

6    and had no right to file in this case for -- and I am

7    puzzled why the Court is not going after the people who

8    committed fraud against the trust of June 4, 1993.

9                This document in my father's notarized

10   amendment and confirmed by Don Gravalec that this draft

11   is not the one that he drafted in June 4, 1993.  I do not

12   understand why the Court is allowing the imposters to act

13   as trustees instead of addressing the fraud.

14                THE COURT:  Thank you, Miss Myers.  The issue

15   of the request for continuance is submitted; meaning that

16   I have read the papers.  I have heard from both sides

17   this morning.  As I noted in the tentative rulings, the

18   large influx of filings in this case, the Court is always

19   under an obligation to create a clear record for

20   appellate review.

21                But it's all the more pressing in this case

22   because there's been so many things to address.  So I

23   have prepared a written order on the request for

24   continuance that I am going to read into the record at

25   this time.  And both sides will receive a copy to take

Page 7

1   with them today.

2           The request for continuance of the August 29,

3   2025 hearings by LaRonda Myers is dropped as moot in part

4   and denied in part as follows:   This is a California

5   state court.   Setting aside specialized federal courts

6   such as the United States Bankruptcy Court and the United

7   States Tax Court, the structure of our state court system

8   and the federal court system are the same.

9           In California, the trial court is the Superior

10  Court; the federal trial court is the United States

11  District Court.   In California, the first level of

12  appellate review is the District Court of Appeal; in the

13  federal system it's corollary is the Circuit Court of

14  Appeal.

15          In California, the highest appellate court is

16  the California Supreme Court; in the federal system, it

17  is the United States Supreme Court.   Under the California

18  Constitution, the courts with authority to review this

19  Court's determinations are the Third District Court of

20  Appeal, the California Supreme Court and, by Writ of

21  Certiorari, the Supreme Court of the United States.

22          The United States District Court is not a

23  reviewing court or a superior tribunal to this court.

24  While undoubtedly that honorable court will proceed with

25  the matters before it per federal law and procedure,

Page 8

1  pendency of proceedings in that federal trial court does

2  not constitute good cause for continuance of matters

3  pending before this state trial court.

4       The Court's order of July 22, and the tentative

5  rulings published for today's hearing, make clear the

6  Court's determination on the issue of the purported

7  evidentiary hearing.  It is inaccurate, as claimed in

8  this application, that applicant has not been served with

9  any order stating that no evidentiary hearing would be

10 held today.

11      Such is explicitly stated in the Court's order

12 of July 22, 2025, at page 1, lines 23 through 24 and page

13 1, line 27 through page 2, line 6.  However, that an

14 unequivocally clear record be made, and for the reasons

15 explained in the order of July 2022 -- July 22, and in

16 the tentative rulings published in advance of today's

17 hearing, the Court reiterates its ruling with respect to

18 an evidentiary hearing as follows:

19      None of the matters on calendar for August 29th

20 are now, nor have they or any of them ever been, set for

21 evidentiary hearing today.

22      This is the Court's ruling on this issue.  Miss

23 Myers has made an adequate record for review of this

24 issue.  Given the numerous matters on calendar in this

25 case today, as well as the remaining matters in other

Page 9

1   cases on this calendar, the Court will not entertain any

2   further argument on this issue today.

3            Accordingly, since there has never been an

4   evidentiary hearing set for today, the instant request

5   for a continuance of evidentiary hearing is dropped as

6   moot.

7            As to the request to continue the other matters

8   on calendar today, for the reasons stated in the first

9   paragraph on this page, talking about the

10  responsibilities of the courts, good cause has not been

11  shown in the instant application to continue the matters

12  on calendar today.  And the request is therefore denied.

13           I am going to sign the order at this time.

14  Before the both sides leave today, you will receive an

15  endorsed copy of the order.  So we are going to proceed

16  now on the Court's tentative ruling.  So we'll take them

17  sequentially.

18           The first is the motion for a full day

19  evidentiary hearing.  As I have already indicated, the

20  issue of evidentiary hearing is already determined.  But,

21  Miss Myers, I interpret your amended verified petition

22  filed on August the 7th as a superseding petition.  And

23  that is the reason why the tentative ruling is to drop

24  that motion.

25           Please, do you wish to be heard?

in the matter of the Struthers Family 1993 Trust
MOTION HEARING,   on 08/29/2025

Page 10

1    MS. MYERS:  Yes, mainly on May 14, 2025, Kevin

2  Lachona and his clients have no right to --

3    THE COURT:  I am going to address that now.

4  It's talked about later on.  I have read what is

5  represented to be the amendment by the late

6  Mr. Struthers.  As indicated in other tentative rulings,

7  I have no authority to summarily throw them out of this

8  case.

9    I use that expression loosely, but I think

10  that's a fair statement of what you're requesting.  I

11  would point the parties' attention to Probate Code

12  Section 1046.  It talks about essentially trials to be

13  conducted by the court.  And it says the Court is to

14  conduct the hearings on matters that have been --

15  verified petitions that have been served and that are at

16  issue.

17    The other side has the ability to respond to

18  this evidence.  As I indicated also elsewhere in the

19  tentative rulings, Mr. Lachona -- I know they have not

20  yet filed responsive pleadings.

21    So I know of one defense that they have because

22  Mr. Lachona has talked about it in his papers, which is

23  if the settlement agreements are not set aside, the 2020

24  and 2024 settlement agreements, I think -- and I am not

25  making this ruling -- I think you are going to be barred

in the matter of the Struthers Family 1993 Trust
MOTION HEARING,   on 08/29/2025

1  from bringing forth that evidence.

2          But until the pleadings are at issue and ready

3  to set for trial, then I cannot summarily determine that

4  matter without them having the opportunity to file

5  responsive pleadings.  I have read the amended verified

6  petition filed on August the 7th.

7          These are not rulings.  These are just my

8  reactions to things that I see there.  And the reason why

9  I suspect Mr. Lachona will still want to either demurrer

10  or move to strike or both, I am not at all -- and, again,

11  I didn't do any research.  These are my off-the-cuff

12  reactions.

13          I am not at all certain that the Welfare and

14  Institutions Code cause of action relating to the remains

15  of the late Mr. Struthers and the elder abuse allegations

16  are properly heard in this trust case.  But if they are,

17  I think the statute of limitations has run as to both of

18  them.

19          They haven't filed the responsive pleadings.  I

20  am answering your question as to why I am not going to

21  summarily -- my words -- throw them out of the case.  And

22  I am not going to.

23          And so I believe -- back to where we started; I

24  believe your amended petition is the update, the amended

25  version of the motion for evidentiary hearing.  And that

Page 12

1   is why I propose to drop that.  Please focus your answer

2   on that.

3              MS. MYERS:  Yes.  I have -- and I have

4   submitted to the courts a notarized document from Don

5   Gravalec.

6              THE COURT:  I have read it.

7              MS. MYERS:  Okay.

8              THE COURT:  Ma'am, until they have a chance to

9   respond in writing to your request that I enforce that, I

10  cannot throw them out of the case.  I understand your

11  evidence.  And it's important.  I agree it's important.

12  I have read it.  And I have read Mr. Gravalec's

13  declaration as well.

14             Until they have a chance to respond in writing,

15  I do not have the power to toss them out of this case.

16  But I need you, if you would please, focus on the point

17  that I have put to you a couple times, which is we need

18  one verified petition.

19             I interpret your August 7th filing as the

20  amendment to the -- to your papers filed on May 22.  If

21  so, this should drop out, and the August 7th pleadings

22  should go forward.  I need you to focus on that narrow

23  procedural issue.

24             MS. MYERS:  I am and I am going to answer you.

25  On late January, 2025, and early February, 2025, Don

Page 13

```
 1   Gravalec when I went to retain him, he opened his files.

 2   And that's where we found this sealed envelope.  He

 3   opened it, read it out loud.  And that's when I -- or I

 4   would have used this a long time ago, you know.  None of

 5   this -- we wouldn't be here today if I knew what I knew

 6   now.

 7              THE COURT:  Thank you, Miss Myers.

 8              Do you wish to be heard in response to the

 9   tentative ruling on the motion for full day of

10   evidentiary hearing, Mr. Lachona?

11              MR. LACHONA:  I do, Your Honor.  My

12   understanding was that the amended verified petition did

13   in fact fully amend the motion for full day evidentiary

14   hearing.  I had contacted Miss Myers by e-mail to confirm

15   that.  I did not get a response.

16              But my understanding is that -- in an abundance

17   of caution I still filed my demurrer to the motion for

18   evidentiary hearing.  But if the Court takes the verified

19   amended petition as the amended, too -- as it reflecting

20   the pleading which amends the motion for a full day

21   evidentiary hearing, then of course I would drop them --

22   the demurrer that I have filed.  But I agree with the

23   Court's thoughts and sentiments on that issue.

24              THE COURT:  The matter is submitted.  The

25   tentative ruling is adopted.  Mr. Lachona, you will
```

in the matter of the Struthers Family 1993 Trust
MOTION HEARING,   on 08/29/2025

Page 14

1   prepare the order after hearing.  Attach and refer by
2   reference and incorporate the tentative ruling.
3               MR. LACHONA:  Yes.
4               THE COURT:  Moving on to the motion for
5   protective orders setting terms, et cetera, filed July
6   1st.  Miss Myers, this is your motion for protective
7   order.  The tentative ruling is adverse to you.  Do you
8   wish to be heard?
9               MS. MYERS:  Yes.  Mainly I need a protective
10  order due to that all this I have been doing nothing
11  other than trying to do right by my father and right by
12  what I learned.  And I have been a pro per not at choice.
13  But, however, I am doing my best.  I am reading the law.
14              I am finding out a lot more that -- what has
15  been violated.  And I have noticed my 14th Amendment is
16  violated.  And I just want the truth.  You know, I am
17  black and white.  Is it -- you know, I want the truth,
18  and I want it out.  And I want to do what my father's
19  wishes are.
20              THE COURT:  Thank you, Miss Myers.
21              Mr. Lachona, do you wish to be heard?
22              MR. LACHONA:  I do, Your Honor.  I agree with
23  the Court's tentative ruling.  Miss Myers does not have
24  statutory authority as a propounding party to file a
25  motion for protective order.

in the matter of the Struthers Family 1993 Trust
MOTION HEARING,   on 08/29/2025

Page 15

1          THE COURT:  Thank you.  The matter is
2    submitted.  This is the decision of the Court:  The
3    tentative ruling is adopted.
4          And, Mr. Lachona, you will attach and refer to
5    and incorporate by reference the terms of the adopted
6    tentative ruling.
7          MR. LACHONA:  Will the Court want one singular
8    order after hearing or separate?
9          THE COURT:  One order.
10         MR. LACHONA:  One final issue on the motion --
11   Miss Myers' motion for protective order.  In my objection
12   I did request sanctions and attorney's fees.
13         THE COURT:  I did not see that.  Was that filed
14   recently?  I have pretty thorough familiarity with the
15   file, and I did not see it.
16         MR. LACHONA:  About two weeks ago.  I think I
17   have a copy here.  I do.  I do have a copy here.
18         THE COURT:  Just tell me the filing date.  The
19   issue of attorney's fees and sanctions will be submitted.
20   What was it again?
21         MR. LACHONA:  August 18th.
22         THE COURT:  Moving on to the objection to the
23   proposed order filed July 17th set for hearing on October
24   31st.  As the tentative ruling points out your
25   suspension, Miss Myers, was in case S-PR-0010014.  It's

in the matter of the Struthers Family 1993 Trust
MOTION HEARING,   on 08/29/2025

Page 16

1   inappropriate to make any filings with respect to your

2   suspension in this case because it's not an issue in this

3   case.   The tentative ruling proposes to advance the

4   hearing from October 31st to today and drop it.

5            Do you wish to be heard?

6            MS. MYERS:   Yes, I do.   For the record I

7   believe any sanctions sanctioned me and violating my due

8   process rights.   I have due notice wrongs.   And in fact I

9   have gone over and beyond what a trustee is supposed to

10  do, but yet I am being punished.

11           THE COURT:   Ma'am, with all due respect I need

12  you to focus on the issues.   The issue in this tentative

13  ruling is you're suspended in the other case.   You can't

14  file papers in this case that relate to your suspension.

15  The cases have to be kept separate or the thing just

16  becomes a bit jumbled.

17           MS. MYERS:   I am a beneficiary in this case.

18           THE COURT:   It's the objection to the order

19  suspending you as trustee.   I am not saying you don't

20  have standing in this case to interact and to participate

21  in this case.   I am saying you were suspended in the

22  other case.   And any requests relating to your suspension

23  need to be filed in case ending in 114.

24           MS. MYERS:   14?

25           THE COURT:   Yeah.

Page 17

1           MS. MYERS:  So --

2           THE COURT:  They are two separate cases.  We

3    have to keep them separate or it becomes a mess.

4           MS. MYERS:  I do understand that.  That's why I

5    was told to file in both cases.

6           THE COURT:  I very much doubt anyone here in

7    court told you to do that.

8           MS. MYERS:  No, not in court.

9           THE COURT:  Well, that was the wrong advice.

10           Mr. Lachona, do you wish to be heard?

11           MR. LACHONA:  I agree with the Court's

12    tentative rulings.

13           THE COURT:  And so the hearing in this matter

14    set by the clerk on October 31st is advanced to now.  The

15    tentative ruling is adopted.  And the matter is dropped.

16    With respect to the stay of proceedings on the Court's

17    own motion, as I explained, I raised this issue in a

18    recent order.  But I am not going to stay the action

19    today.  So we don't need to discuss it further.  I am not

20    going to stay it.

21           Let's move on to Mr. Lachona's clients' motion

22    for protective order.  Miss Myers, the tentative ruling

23    is adverse to you.  I will invite you to be heard.  One

24    more thing.  And I am sorry, I didn't get it when I

25    prepared the tentative ruling.

Page 18

 1          But in preparing for today I came across

 2     Probate Code Section 1,000 subsection (b) that

 3     clarifies --

 4          MS. MYERS:   What's that?

 5          THE COURT:   1,000 subsection (b) that clarifies

 6     that the ten days before discovery commences starts on

 7     the day the petition is served.   I did say that, but

 8     that's an additional bit of authority on that point.

 9     Miss Myers, I will invite you to be heard.

10          MS. MYERS:   And can you rephrase what you want

11     me to --

12          THE COURT:   Sure.   When you -- it was

13     appropriate for you to send discovery to the other side,

14     but you have to wait ten days after the petition is

15     served on the other side before you can do that.   You

16     didn't wait ten days.   You served your discovery on the

17     same day that you served the petition.

18          That's sufficient to blow it out.   In the

19     tentative ruling it says you can do it over again.   But

20     they have objected on the basis that you did not wait ten

21     days.  As I indicated in my order of July 22nd, all

22     provisions of the discovery, including timing issues

23     because I flagged this issue in that order, will be

24     enforced.   The discovery was served too soon.   Does that

25     help?

in the matter of the Struthers Family 1993 Trust
MOTION HEARING, on 08/29/2025

Page 19

1    MS. MYERS:  On May 22nd of 2025, is when I

2    filed it.  And I didn't do anything for discovery until I

3    would like to say until June.  I am going off -- I don't

4    have my documents in front of me.

5    THE COURT:  The proof of service attached by

6    Mr. Lachona in his declaration -- Mr. Lachona, was it May

7    27?  That's just my memory.

8    MR. LACHONA:  Correct, Your Honor.

9    THE COURT:  Indicates that the petition and the

10   discovery were served on his office on May 27th.  That's

11   the only evidence I have before me.  That's the proof of

12   service that -- your proof of service that's in the file.

13   MS. MYERS:  Yeah, I don't have my -- that file

14   with me right now, so I can't -- I just know Shirley

15   Simple (phonetic) did serve it to his office.  And I know

16   that I didn't do any extra stuff for discovery until --

17   well, included with that it was asking for discovery.  I

18   do remember that.  And then I didn't file anything with

19   the court until --

20   THE COURT:  It's not when it's filed with the

21   court.  It's when the petition and the discovery are

22   served.  And they were served at the same time on May

23   27th.  That is the timing, not when you file something

24   with the court.

25   It has to be you serve them; you can do

in the matter of the Struthers Family 1993 Trust
MOTION HEARING,   on 08/29/2025

Page 20

1    discovery ten days later or any time after that.   That's

2    the issue.

3              MS. MYERS:   And, well, they were served first

4    in the 14 case and realized that --

5              THE COURT:   Right, and withdrawn.   I am talking

6    about the service in this case.

7              MS. MYERS:   Okay.   I apologize because from

8    what -- you know, I am getting advice by other people

9    and -- but I have asked for discovery.   I have asked for

10   records for years now.   I have asked for accounting for

11   years.

12             And I have not received accountings from May

13   2017 to present.   And in the estate or in the -- in her

14   trust, my stepmother -- I don't understand.   She had

15   enough money to live out her life in a good facility.

16   And now she is in a halfway house.

17             So I don't know the status because I am not --

18   I have been told that I cannot see her so when I have

19   tried to visit her.   So I don't know the status of her.

20   I am concerned about that.

21             THE COURT:   Thank you.

22             And so, Mr. Lachona, do you wish to be heard?

23             MR. LACHONA:   I agree with the Court's

24   tentative ruling on the procedural issue of the timing of

25   the service of the discovery and for the reasons stated

in the matter of the Struthers Family 1993 Trust
MOTION HEARING, on 08/29/2025

```
 1   in the moving papers on the substantive basis.

 2            THE COURT:  Thank you.  The tentative ruling is

 3   adopted.  Again, it will be incorporated within the order

 4   that Mr. Lachona is going to prepare.  With respect to

 5   the petitioner's formal objection to calendar

 6   reassignment --

 7            MR. LACHONA:  Your Honor, I am so sorry to

 8   interrupt.  There was one final note about the sanctions

 9   in my discovery motion with the Court.

10            THE COURT:  On?

11            MR. LACHONA:  I had requested sanctions and

12   attorney's fees on my discovery motion as well.

13            THE COURT:  But I ordered that.  It's in the

14   second to last paragraph.

15            MR. LACHONA:  Thank you, Your Honor.  I just

16   wanted to confirm.

17            THE COURT:  With respect to the formal

18   objection to calendar reassignment and request to

19   prioritize filed July 24th, as I have already indicated

20   this morning, we are not going to be discussing the

21   evidentiary hearing issue further this morning.

22            But in the middle of that tentative ruling,

23   Miss Myers, I observed that in your papers twice you

24   cited to Probate Code Section 10421 as --

25            MS. MYERS:  One zero --
```

in the matter of the Struthers Family 1993 Trust
MOTION HEARING,  on 08/29/2025

Page 22

1          THE COURT:  It's in your papers; 10241.  You

2   cite that twice in your papers as a basis on which I

3   should prioritize your filings.  However, there is no

4   code section.  And so I propose in the tentative ruling

5   that this application be determined to be a frivolous

6   filing because the request for relief that rely on

7   authority that does not exist are by their very nature

8   frivolous.  I will invite you to be heard.

9          MS. MYERS:  It's the research in the law

10   library.  I'm sorry; I don't quote codes.

11          THE COURT:  And listen -- and thank you for

12   that.  And while you did cite it twice you said -- hold

13   on just a moment.  And obviously I am paraphrasing.  You

14   said my petitions are entitled to priority because of

15   this code section.

16          And I read that, and I open the code, and there

17   is no 10421, which is the section you cite.  This brings

18   up another point that I want to caution you about going

19   forward.  I have not read the various cases that are in

20   your papers except for one.  It caught my eye.  And it

21   isn't part of this tentative ruling, but I think it's

22   important to say.

23          And I am sorry; I did not write down the name

24   of the case.  The first name in the case starts with a G.

25   I am not trying to be obtuse; that's just all that I

in the matter of the Struthers Family 1993 Trust
MOTION HEARING,   on 08/29/2025

 1   remember.  And you cite this for the proposition that

 2   disagreements between trustees is not a proper basis for

 3   suspension of a trustee.

 4          And I went -- I happened -- it caught my eye

 5   and struck me as important, and so I went and read that

 6   case.  And that's not what it says.  What that case says

 7   is that disagreement between a trustee and a beneficiary

 8   is not a basis for suspension.

 9          Again, your suspension is not before the court

10   today.  I am just flagging that for you that it's super

11   important.  You can't just throw numbers and case names

12   on a page because people read the cases.  And if they

13   don't stand for the proposition you think they stand for,

14   it's difficult.  So anyway do you wish to be heard

15   further in response to this tentative ruling?

16          MS. MYERS:  Well, mainly the -- what I do is I

17   go down to the law library and try to do my best.  Like I

18   said I didn't want to be a lawyer in this case.  I prefer

19   to be lawyered up.  But, however, I was going to have a

20   lawyer today, but because of the evidentiary hearing was

21   not -- didn't seem like you were going to allow the

22   witnesses or the exhibits.

23          THE COURT:  The only interjection I would make

24   at this point is -- and you said this in other recent

25   filings, and I forget which one -- is that it looks like

in the matter of the Struthers Family 1993 Trust
MOTION HEARING,   on 08/29/2025

1  or you thought that maybe I wasn't going to allow

2  witnesses and testimony.  I couldn't have possibly stated

3  it any clearer in the July 22nd order.

4         It is not reasonable that anyone was under any

5  confusion about that.  I have been crystal clear on this

6  issue from the time it was first raised orally at the ex

7  parte hearing.  I think it was in June or July, whenever

8  it was.  I apologize for interrupting you.

9         Do focus on this one issue if you would please,

10  which is I propose to label this application as frivolous

11  because it relies on authority that does not exist.

12         MS. MYERS:  And I could amend that.  I

13  apologize.  I do do my due diligence in the law library.

14  I am not nor do I ever want to be a lawyer.  And I am

15  doing my best because two lawyers, especially one, has

16  drained the trust, so therefore, limited funds.

17         I have been fronting the trust since 2023 when

18  one of the lawyers literally drained it.  And with my

19  co-trustee we agreed on everything other than the part of

20  the -- part of the mediation which when fraud is -- when

21  fraud is brought to our knowledge, that any settlement,

22  anything that is agreed between the two was based upon a

23  fraudulent document.

24         And so, therefore, all mediation settlements is

25  void.  And she agreed which I was surprised that she

in the matter of the Struthers Family 1993 Trust
MOTION HEARING,   on 08/29/2025

1   wanted the mediation to go through.  So that took me --

2   and then I just wanted the bar association -- California

3   Bar Association to do what they said that they

4   overcharged the trust, and then let them decide.

5           I paid for arbitration and my niece -- you

6   know, and this has dragged out for six years so with

7   continuance and continuance.  And all I wanted to do was

8   -- all we wanted to do is just get our accounting

9   approved.  And our accounting is still in there from the

10  second to the sixth waiting for the Court's approval.

11          But opposing counsel and his clients keep on

12  objecting.  And they are basic -- IRS they object to.

13  They object to paying for a lawyer.  You know, so it's

14  been -- mainly we just wanted the accounting and

15  distribute the funds.

16          But now that it came to our knowledge in

17  2025 -- early 2025, you know, that it's fraudulent.  So

18  anything that we thought is void.  And that's pretty

19  much -- I do know I read that several times in the law

20  book.

21          THE COURT:  Thank you.

22          Mr. Lachona, do you wish to be heard?

23          MR. LACHONA:  I agree with the Court's

24  tentative.

25          THE COURT:  Tentative ruling is adopted and

Page 26

1   will be included in the order after hearing.   With

2   respect to the motion to compel accounting and the motion

3   to enforce the 2019 amendment, I make a reference here

4   the S.I.C in parens.   Ma'am, under the probate code

5   applications for relief are to be titled as petitions or

6   applications.

7          It doesn't say so in the code, but it's the

8   usual practice of lawyers if they are going to bring a

9   motion that's provided for in the Code of Civil Procedure

10  such as a discovery motion or a motion to strike, they

11  label it motion to strike or motion to compel responses

12  to discovery.

13         All other applications for relief must either

14  be titled as a petition or as an application.   In general

15  use everyone uses petition.   No one uses application.

16  But you can properly use either.   But kindly in any

17  future papers use that word because that is how they are

18  properly titled.

19         In the tentative ruling with respect to the

20  motion to compel accounting and the motion to enforce the

21  2019 agreement, as I indicated earlier in the hearing, we

22  need one petition going forward.   Those issues are raised

23  in your amended petition filed August the 7th.

24         We only need it raised once in one document.

25  So I propose to drop those two because the issues are

in the matter of the Struthers Family 1993 Trust
MOTION HEARING,   on 08/29/2025

Page 27

1    already inside the amended pleading.  That's the essence

2    of the tentative ruling.

3            Give me your response to what I just said.  We

4    need one pleading, not three pleadings -- actually more

5    than three pleadings that ask for the same things.  One

6    pleading that asks for everything you want.

7            MS. MYERS:  I hear you.  I have been taking --

8    if you notice, I have been taking your advice by refiling

9    with the -- you said to refile for the -- I am trying to

10   remember the title -- fraudulent -- I can't think of the

11   title right now.

12           THE COURT:  It doesn't matter.  Your claims; we

13   all know that.

14           MS. MYERS:  So anyway and I did, and I did what

15   you asked me to do.

16           THE COURT:  Right.  I am just saying you don't

17   need additional motions.

18           MS. MYERS:  Well, now that I know that I -- and

19   I was advised twice when I had been searching for

20   attorneys that I need to file in both cases.

21           THE COURT:  I didn't say both cases.  We are

22   talking about filings in this case.  In this case you

23   need to end up with one petition that they have responded

24   to.  And then that petition can move forward towards

25   trial.

in the matter of the Struthers Family 1993 Trust
MOTION HEARING,   on 08/29/2025

Page 28

1    I am not saying do or don't file in another

2    case.  I am talking about the fact that the accounting

3    and enforcing the 2019 amendment, they are already in

4    your amended petition.  You filed them on August 7th.

5    You only need to state them in one document.  That's my

6    meaning; not three documents.

7    MS. MYERS:  Okay.  I will go ahead -- and I

8    apologize.

9    THE COURT:  Don't apologize.  I am going to go

10   ahead and drop them.  The tentative rulings are adopted

11   with respect to those two.  With respect to the amended

12   verified petition to compel forensic accounting and other

13   relief filed on August 7th, Mr. Lachona, you told me that

14   you filed a demurrer to the motion for evidentiary

15   hearing.  That's set for hearing on August 24th?

16   MR. LACHONA:  October 24th.

17   THE COURT:  And so the demurrer that is

18   presently set on October 24th is dropped.  Will you be

19   renewing your demurrer and/or making a motion to strike?

20   MR. LACHONA:  Probably both.

21   THE COURT:  And so October 24th at 8:30 in this

22   department is reserved for Mr. Lachona's client's

23   demurrer and/or motion to strike.

24   Isn't there another reserved date on November

25   7th that I can drop, or am I mistaken?  I thought I saw a

```
 1   motion to strike is reserved for November 7th.
 2          MR. LACHONA:  Your Honor is probably correct.
 3   It might be in reference to one of the matters that have
 4   been dropped already.  I will need a moment to review
 5   this.
 6          THE COURT:  What I would ask you to do is just
 7   send in a document dropping it if in fact it's
 8   duplicative.
 9          MR. LACHONA:  I understand.
10          THE COURT:  All right.  Motion to vacate the
11   July 11, 2025 suspension order.  As I have already
12   indicated before, filed in the wrong case.  I am going to
13   drop it from the calendar because anything relating to
14   the suspension has to be filed in case 10014.  So that
15   tentative ruling is adopted.
16          MS. MYERS:  So, Your Honor, so to refile it in
17   the 14?
18          THE COURT:  I am not telling you to file
19   anything.  I am saying that if you wish to file relating
20   to it, it has to be in the case in which that order was
21   made.
22          MS. MYERS:  Sure.  I will do that.
23          THE COURT:  With respect to the notice of
24   intent to introduce exhibits, as I indicated in the
25   tentative ruling, that's not a tentative ruling.  It's a
```

in the matter of the Struthers Family 1993 Trust
MOTION HEARING,   on 08/29/2025

Page 30

1   ruling.   The request to produce evidence today under

2   California Rules of Court Rule 3.1306 has already been

3   denied.

4         But so that a clear record be made,

5   Mr. Lachona, I want that in the order after hearing as

6   well.

7         MR. LACHONA:   Of course.

8         THE COURT:   With respect to the order to show

9   cause regarding vexatious litigant, that is just

10   discussion.   It's not before me today.   The hearing on

11   that is on October the 24th.   I am hoping, Miss Myers, as

12   I say in the second paragraph of that discussion, I take

13   the issuance of prefiling orders with the utmost

14   seriousness.

15         Come Monday I will have been a commissioner of

16   this court for 14 years.   I have had I am sure 75 or

17   100,000 matters before me.   In all of those matters, I

18   have issued prefiling orders in precisely three cases.   I

19   need you to stop with the frivolous and duplicative

20   filings.

21         I just urge you because I mean it with

22   sincerity in the second paragraph where I am saying --

23   I'm paraphrasing.   I don't want to do this.   Don't make

24   me do this by continuing to file duplicative and

25   frivolous filings because it has to stop.   This avalanche

1   of papers into this file is not sustainable.

2             I am honored to have this job.  I do not have

3   any problem at all and I welcome working hard for the tax

4   payers who pay my salary.  I work every weekend.  I am

5   not complaining about that.  But this case in the last 60

6   days has occupied about 30 hours of my time.

7             And that is far in excess of what should have

8   been expended.  And it's because of the frivolous

9   filings.  And it's because of the duplicative filings.

10  We are not going to discuss it today.  We are going to

11  discuss it on October 24th.

12            MS. MYERS:  Can I make a statement though?

13            THE COURT:  No, thank you because we are going

14  to have a hearing on that on October 24th.

15            MS. MYERS:  I was just going to make a real

16  quick statement.

17            THE COURT:  No, thank you because we are 45

18  minutes into this hearing.  I still have 13 matters to

19  hear before my 10 o'clock calendar.  I am just saying

20  please to take to heart -- whether you follow my advice

21  or not --

22                  (Overlapping voices.)

23            MS. MYERS:  I have taken your advice.

24            THE COURT:  All right.  And, again, that's not

25  a ruling for today, but I wanted to include it in the

Page 32

1    order after hearing.   That concludes the matters before

2    the court today.   Thank you for your appearance.   And we

3    are concluded and off the record.

4           (Whereupon, the proceedings were concluded.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

in the matter of the Struthers Family 1993 Trust
MOTION HEARING,   on 08/29/2025

Page 33

1              SUPERIOR COURT OF THE STATE OF CALIFORNIA

2                   IN AND FOR THE COUNTY OF PLACER

3

4                                        )
         In the Matter of:              )
5                                        )
         THE STRUTHERS FAMILY 1993      )   Case No. S-PR-0010066
6        TRUST dated June 4, 1993       )
                                         )
7        _____)

8        STATE OF CALIFORNIA       )
                                    )   ss
9        COUNTY OF PLACER          )

10           I, LISA MARIE USSERY, Certified Shorthand Reporter

11      of the State of California, do hereby certify that the

12      foregoing pages 1 through 33, inclusive, comprises a true

13      and correct transcript of the proceedings had in the

14      above-entitled matter held on AUGUST 29, 2025.

15           I also certify that portions of the transcript are

16      governed by the provisions of CCP237(a)(2) and that all

17      personal juror identifying information has been redacted.

18           IN WITNESS WHEREOF, I have subscribed this

19      certificate at Roseville, California, this 7th day of

20      September, 2025.

21

22

23

24      _____
         LISA MARIE USSERY, CSR
25       License No. 11534

| | | |
|---|---|---|
| **(** | **22** 8:4,12,15 12:20 | **abuse** 11:15 |
| | **22nd** 18:21 19:1 24:3 | **accounting** 20:10 25:8,9,14 26:2, 20 28:2,12 |
| **(b)** 18:2,5 | **23** 8:12 | |
| | **24th** 21:19 28:15,16,18,21 30:11 31:11,14 | **accountings** 20:12 |
| **--ooo--** 3:3,17 | **27** 8:13 19:7 | **accurately** 5:12 |
| | | **act** 6:12 |
| **1** | **27th** 19:10,23 | **acting** 3:13 |
| | **29** 3:2 7:2 | **action** 11:14 17:18 |
| **1** 8:12,13 | **29th** 8:19 | **additional** 18:8 27:17 |
| **1,000** 18:2,5 | | **address** 6:22 10:3 |
| **10** 31:19 | **3** | **addressing** 6:13 |
| **100,000** 30:17 | | **adequate** 8:23 |
| **10014** 29:14 | **3.1306** 30:2 | **adopted** 13:25 15:3,5 17:15 21:3 25:25 28:10 29:15 |
| **10241** 22:1 | **30** 31:6 | **advance** 5:2,25 8:16 16:3 |
| **10421** 21:24 22:17 | **31st** 15:24 16:4 17:14 | **advanced** 17:14 |
| **1046** 10:12 | | **adverse** 14:7 17:23 |
| **11** 29:11 | **4** | **advice** 17:9 20:8 27:8 31:20,23 |
| **114** 16:23 | | **advised** 27:19 |
| **13** 31:18 | **4** 3:5 6:8,11 | **agree** 12:11 13:22 14:22 17:11 20:23 25:23 |
| **14** 6:5 10:1 16:24 20:4 29:17 30:16 | **40** 3:9 | |
| **14th** 5:23 6:1 14:15 | **42** 6:2 | **agreed** 24:19,22,25 |
| **17th** 15:23 | **45** 31:17 | **agreement** 26:21 |
| **18th** 15:21 | | **agreements** 10:23,24 |
| **1993** 3:4,5,19 6:2,8,11 | **6** | **ahead** 28:7,10 |
| **1st** 14:6 | | **allegations** 11:15 |
| | **6** 8:13 | **allowing** 6:12 |
| **2** | **60** 31:5 | **amend** 13:13 24:12 |
| | | **amended** 9:21 11:5,24 13:12,19 26:23 27:1 28:4,11 |
| **2** 8:13 | **7** | |
| **2017** 20:13 | | **amendment** 5:23 6:10 10:5 12:20 14:15 26:3 28:3 |
| **2019** 26:3,21 28:3 | **75** 30:16 | |
| **2020** 10:23 | **7th** 9:22 11:6 12:19,21 26:23 28:4, 13,25 29:1 | **Amendments** 6:2 |
| **2022** 8:15 | | **amends** 13:20 |
| **2023** 24:17 | **8** | **and/or** 28:19,23 |
| **2024** 10:24 | | **answering** 11:20 |
| **2025** 3:2 6:5 7:3 8:12 10:1 12:25 19:1 25:17 29:11 | **8:30** 28:21 | **apologize** 20:7 24:8,13 28:8,9 |
| | **ability** 10:17 | **Appeal** 7:12,14,20 |
| | **abundance** 13:16 | |

Scarpelli Court Reporting Services   (916) 412-0152
601 Commerce Drive, Suite 130, Roseville, CA 95678

**appearance** 4:2 32:2

**appearing** 4:4

**appellate** 6:20 7:12,15

**applicant** 8:8

**application** 8:8 9:11 22:5 24:10 26:14,15

**applications** 26:5,6,13

**approval** 25:10

**approved** 25:9

**arbitration** 25:5

**argument** 9:2

**asks** 27:6

**association** 25:2,3

**attach** 14:1 15:4

**attached** 19:5

**attention** 10:11

**Attorney** 3:12

**attorney's** 15:12,19 21:12

**attorneys** 27:20

**August** 3:2 7:2 8:19 9:22 11:6 12:19,21 15:21 26:23 28:4,13,15

**authority** 7:18 10:7 14:24 18:8 22:7 24:11

**avalanche** 30:25

---

**B**

**back** 11:23

**Bankruptcy** 7:6

**bar** 25:2,3

**barred** 10:25

**based** 24:22

**basic** 25:12

**basis** 4:24 18:20 21:1 22:2 23:2,8

**Belinda** 3:10 4:5

**beneficiary** 3:14 16:17 23:7

**bit** 16:16 18:8

**black** 14:17

**blow** 18:18

**book** 25:20

**bring** 26:8

**bringing** 11:1

**briefs** 22:17

**brought** 24:21

---

**C**

**calendar** 4:14 5:1,10 8:19,24 9:1,8, 12 21:5,18 29:13 31:19

**California** 3:1,8 7:4,9,11,15,16,17, 20 25:2 30:2

**case** 3:5 6:6,18,21 8:25 10:8 11:16, 21 12:10,15 15:25 16:2,3,13,14,17, 20,21,22,23 20:4,6 22:24 23:6,11,18 27:22 28:2 29:12,14,20 31:5

**cases** 9:1 16:15 17:2,5 22:19 23:12 27:20,21 30:18

**caught** 22:20 23:4

**caution** 13:17 22:18

**Certiorari** 7:21

**cetera** 14:5

**chance** 12:8,14

**characterization** 5:11

**characterizes** 5:13

**choice** 14:12

**Circuit** 7:13

**cite** 22:2,12,17 23:1

**cited** 21:24

**Civil** 26:9

**claimed** 8:7

**claims** 27:12

**clarifies** 18:3,5

**clear** 6:19 8:5,14 24:5 30:4

**clearer** 24:3

**clerk** 17:14

**client** 4:2

**clients** 6:5 10:2 25:11

**clients'** 17:21

**co-trustee** 24:19

**code** 10:11 11:14 18:2 21:24 22:4, 15,16 26:4,7,9

**codes** 22:10

**commences** 18:6

**commissioner** 3:7 30:15

**committed** 6:8

**compel** 26:2,11,20 28:12

**complaining** 31:5

**concerned** 20:20

**concluded** 32:3,4

**concludes** 32:1

**conduct** 10:14

**conducted** 10:13

**confirm** 13:14 21:16

**confirmed** 6:10

**confusion** 24:5

**Connor** 3:11 4:6,7,9,10

**constitute** 8:2

**Constitution** 7:18

**contacted** 13:14

**continuance** 4:13,16,23 5:19 6:15, 24 7:2 8:2 9:5 25:7

**continue** 9:7,11

**continuing** 30:24

**copy** 6:25 9:15 15:17

**corollary** 7:13

**correct** 5:11 19:8 29:2

**counsel** 3:13 25:11

**County** 3:8

**couple** 12:17

**court** 3:7,18,20,23 4:1,5,7,11,15,20, 24 5:1,4,5,10,14,16,17,24 6:7,12,14, 18 7:5,6,7,8,9,10,11,12,13,15,16,17, 19,20,21,22,23,24 8:1,3,17 9:1 10:3, 13 12:6,8 13:7,18,24 14:4,20 15:1,2, 7,9,13,18,22 16:11,18,25 17:2,6,7,8, 9,13 18:5,12 19:5,9,19,20,21,24 20:5,21 21:2,9,10,13,17 22:1,11 23:9,23 25:21,25 27:12,16,21 28:9, 17,21 29:6,10,18,23 30:2,8,16

in the matter of the Struthers Family 1993 Trust
MOTION HEARING,   on 08/29/2025

Index: Court's..focus

31:13,17,24 32:2

**Court's** 7:19 8:4,6,11,22 9:16 13:23
14:23 17:11,16 20:23 25:10,23

**courts** 7:5,18 9:10 12:4

**create** 6:19

**crystal** 24:5

---

### D

**date** 15:18 28:24

**dated** 3:5

**day** 3:6 6:5 9:18 13:9,13,20 18:7,17

**days** 18:6,14,16,21 20:1 31:6

**decide** 25:4

**deciding** 5:25

**decision** 15:2

**decisions** 5:14,15

**declaration** 12:13 19:6

**defense** 10:21

**demurrer** 11:9 13:17,22 28:14,17,
19,23

**denied** 7:4 9:12 30:3

**department** 3:8 28:22

**detail** 5:6

**determination** 8:6

**determinations** 7:19

**determine** 11:3

**determined** 9:20 22:5

**difficult** 23:14

**diligence** 24:13

**disagreement** 23:7

**disagreements** 23:2

**discovery** 18:6,13,16,22,24 19:2,
10,16,17,21 20:1,9,25 21:9,12
26:10,12

**discuss** 17:19 31:10,11

**discussing** 21:20

**discussion** 30:10,12

**distribute** 25:15

**District** 7:11,12,19,22

**document** 6:9 12:4 24:23 26:24
28:5 29:7

**documents** 19:4 28:6

**don** 6:3,10 12:4,25

**doubt** 17:6

**draft** 6:10

**drafted** 6:11

**dragged** 25:6

**drained** 24:16,18

**drop** 5:2 9:23 12:1,21 13:21 16:4
26:25 28:10,25 29:13

**dropped** 7:3 9:5 17:15 28:18 29:4

**dropping** 29:7

**due** 5:23 14:10 16:7,8,11 24:13

**duplicative** 29:8 30:19,24 31:9

---

### E

**e-mail** 13:14

**e-mailed** 4:18

**earlier** 26:21

**early** 12:25 25:17

**elder** 11:15

**end** 27:23

**ending** 16:23

**endorsed** 9:15

**enforce** 12:9 26:3,20

**enforced** 18:24

**enforcing** 28:3

**entertain** 9:1

**entitled** 22:14

**envelope** 13:2

**essence** 27:1

**essentially** 4:22 10:12

**establish** 26:22

**evidence** 10:18 11:1 12:11 19:11
30:1

**evidentiary** 8:7,9,18,21 9:4,5,19,20

11:25 13:10,13,18,21 21:21 23:20
28:14

**excess** 31:7

**Excuse** 3:22

**exhibits** 23:22 29:24

**exist** 22:7 24:11

**expended** 31:8

**explained** 8:15 17:17

**explicitly** 8:11

**expression** 10:9

**extra** 19:16

**eye** 22:20 23:4

---

### F

**facility** 20:15

**fact** 13:13 16:8 28:2 29:7

**fair** 10:10

**familiarity** 15:14

**Family** 3:4

**father** 14:11

**father's** 6:9 14:18

**February** 12:25

**federal** 7:5,8,10,13,16,25 8:1

**fees** 15:12,19 21:12

**file** 6:6 11:4 14:24 15:15 16:14 17:5
19:12,13,18,23 27:20 28:1 29:18,19
30:24 31:1

**filed** 4:16 9:22 10:20 11:6,19 12:20
13:17,22 14:5 15:13,23 16:23 19:2,
20 21:19 26:23 28:4,13,14 29:12,14

**files** 13:1

**filing** 5:25 12:19 15:18 22:6

**filings** 6:18 16:1 22:3 23:25 27:22
30:20,25 31:9

**final** 15:10 21:8

**finding** 14:14

**finding** 14:14

**flagged** 18:23

**flagging** 23:10

**focus** 12:1,16,22 16:12 24:9

in the matter of the Struthers Family 1993 Trust
MOTION HEARING,   on 08/29/2025

**follow** 31:20

**forensic** 28:12

**forget** 23:25

**formal** 21:5,17

**forward** 12:22 22:19 26:22 27:24

**found** 13:2

**fraud** 6:8,13 24:20,21

**fraudulent** 24:23 25:17 27:10

**Friday** 3:2

**frivolous** 22:5,8 24:10 30:19,25 31:8

**front** 19:4

**fronting** 24:17

**full** 9:18 13:9,13,20

**fully** 13:13

**funds** 24:16 25:15

**future** 26:17

**G**

**general** 26:14

**give** 4:24 27:3

**good** 4:3,11 8:2 9:10 20:15

**granular** 5:6

**Gravalec** 6:4,10 12:5 13:1

**Gravalec's** 12:12

**H**

**halfway** 20:16

**handed** 6:4

**happened** 23:4

**happy** 5:3

**hard** 31:3

**Hatridge** 3:10 4:4

**hear** 27:7 31:19

**heard** 4:12,20 6:16 9:25 11:16 13:8 14:8,21 16:5 17:10,23 18:9 20:22 22:8 23:14 25:22

**hearing** 4:8,9 8:5,7,9,17,18,21 9:4, 5,19,20 11:25 13:10,14,18,21 14:1 15:8,23 16:4 17:13 21:21 23:20 24:7 26:1,21 28:15 30:5,10 31:14,18 32:1

**hearings** 7:3 10:14

**heart** 31:20

**held** 8:10

**highest** 7:15

**hold** 22:12

**Honor** 4:3 13:11 14:22 19:8 21:7,15 29:2,16

**honorable** 3:6 7:24

**honored** 31:2

**hoping** 30:11

**hours** 31:6

**house** 20:16

**I**

**important** 12:11 22:22 23:5,11

**imposters** 6:12

**inaccurate** 8:7

**inappropriate** 16:1

**include** 31:25

**included** 19:17 26:1

**including** 18:22

**incorporate** 14:2 15:5

**incorporated** 21:3

**influx** 6:18

**inside** 27:1

**instant** 9:4,11

**institutions** 11:14

**intent** 29:24

**interact** 16:20

**interjection** 23:23

**interpret** 9:21 12:19

**interrupting** 24:8

**introduce** 4:2 29:24

**invite** 17:23 18:9 22:8

**IRS** 25:12

**issuance** 30:13

**issue** 6:14 8:6,22,24 9:2,20 10:16 11:2 12:23 13:23 15:10,19 16:2,12 17:17 18:23 20:2,24 21:21 24:6,9

**issued** 5:10 30:18

**issues** 16:12 18:22 26:22,25

**J**

**JACQUES** 3:6

**January** 12:25

**job** 31:2

**Julie** 3:10 4:4

**July** 8:4,12,15 14:5 15:23 18:21 21:19 24:3,7 29:11

**jumbled** 16:16

**June** 3:5 6:8,11 19:3 24:7

**K**

**Kevin** 3:12 4:3 6:4 10:1

**kindly** 4:2 26:16

**knew** 13:5

**knowledge** 24:21 25:16

**L**

**label** 24:10 26:11

**Lachona** 3:12 4:1,3,4,12,14,19,21, 25 5:9,17 6:4 10:2,19,22 11:9 13:10, 11,25 14:3,21,22 15:4,7,10,16,21 17:10,11 19:6,8 20:22,23 21:4,7,11, 15 25:22,23 28:13,16,20 29:2,9 30:5,7

**Lachona's** 17:21 28:22

**large** 6:18

**Laronda** 3:14,25 7:3

**late** 10:5 11:15 12:25

**law** 3:12 7:25 14:13 22:9 23:17 24:13 25:19

**lawyer** 23:18,20 24:14 25:13

**lawyered** 23:19

**lawyers** 24:15,18 26:8

**learned** 14:12

**leave** 9:14

**level** 5:6 7:11

**library** 22:10 23:17 24:13

**life** 20:15

**limitations** 11:17

**limited** 24:16

**lines** 8:12

**listen** 22:11

**literally** 24:18

**litigant** 30:9

**live** 20:15

**long** 13:4

**loosely** 10:9

**lot** 14:14

**loud** 3:21,24 13:3

―――――――――――

**M**

―――――――――――

**made** 8:14,23 29:21 30:4

**make** 4:7 5:2,14 8:5 16:1 23:23 26:3 30:23 31:12,15

**making** 10:25 28:19

**March** 6:4

**matter** 3:4,19 11:4 13:24 15:1 17:13, 15 27:12

**matters** 4:25 5:3,12,14,15 7:25 8:2, 19,24,25 9:7,11 10:14 29:3 30:17 31:18 32:1

**meaning** 6:15 28:6

**mediation** 24:20,24 25:1

**memory** 19:7

**mess** 17:3

**MICHAEL** 3:6

**middle** 21:22

**minutes** 31:18

**mistaken** 28:25

**moment** 22:13 29:4

**Monday** 4:17 30:15

**month** 20:15

**moot** 7:3 9:6

**morning** 4:3,11 6:17 21:20,21

**motion** 9:18,24 11:25 13:9,13,17,20 14:4,6,25 15:10,11 17:17,21 21:9,12 26:2,9,10,11,20 28:14,19,23 29:1,10

**motions** 27:17

**move** 11:10 17:21 27:24

**moving** 14:4 15:22 21:1

**Myers** 3:14,20,22,25 5:18,22 6:14 7:3 8:23 9:21 10:1 12:3,7,24 13:7,14 14:6,9,20,23 15:25 16:6,17,24 17:1, 4,8,22 18:4,9,10 19:1,13 20:3,7 21:23,25 22:9 23:16 24:12 27:7,14, 18 28:7 29:16,22 30:11 31:12,15,23

**Myers'** 4:13 15:11

―――――――――――

**N**

―――――――――――

**names** 23:11

**narrow** 12:22

**nature** 22:7

**niece** 25:5

**notarized** 6:9 12:4

**note** 21:8

**noted** 6:17

**notes** 4:14 5:10

**notice** 6:4 16:8 27:8 29:23

**noticed** 14:15

**November** 28:24 29:1

**Number** 3:5,9

**numbers** 23:11

**numerous** 8:24

―――――――――――

**object** 4:23 25:12,13

**objected** 18:20

**objecting** 25:12

**objection** 15:11,22 16:18 21:5,18

**obligation** 6:19

**observed** 21:23

**obtuse** 22:25

**occupied** 31:6

**October** 15:23 16:4 17:14 28:16,18, 21 30:11 31:11,14

**off-the-cuff** 11:11

**office** 4:18 19:10,15

**open** 22:16

**opened** 13:1,3

**opportunity** 11:4

**opposing** 25:11

**orally** 24:6

**order** 6:23 8:4,9,11,15 9:13,15 14:1, 7,10,25 15:8,9,11,23 16:18 17:18,22 18:21,23 21:3 24:3 26:1 29:11,20 30:5,8 32:1

**ordered** 21:13

**orders** 14:5 30:13,18

**overcharged** 25:4

**overlapping** 31:22

―――――――――――

**P**

―――――――――――

**paid** 25:5

**papers** 5:19,20 6:16 10:22 12:20 16:14 21:1,23 22:1,2,20 26:17 31:1

**paragraph** 9:9 21:14 30:12,22

**paraphrasing** 22:13 30:23

**parens** 26:4

**part** 7:3,4 22:21 24:19,20

**parte** 24:7

**participate** 16:20

**parties'** 10:11

**party** 14:24

**pay** 31:4

**payers** 31:4

| | | |
|---|---|---|
| paying 25:13 | procedural 12:23 20:24 | real 31:15 |
| pendency 8:1 | procedure 7:25 26:9 | realized 20:4 |
| pending 8:3 | proceed 7:24 9:15 | reason 9:23 11:8 |
| people 6:7,20,8 23:12 | proceedings 3:16 4:23 8:1 17:16 20:2 32:4 | reasonable 24:4 |
| Persona 3:15 | | reasons 8:14 9:8 20:25 |
| personally 5:6 | process 5:23 16:8 | reassignment 21:6,18 |
| petition 9:21,22 11:6,24 12:18 13:12,19 18:7,14,17 19:9,21 26:14, 15,22,23 27:23,24 28:4,12 | produce 30:1 | recap 5:8 |
| | proof 4:17 19:5,11,12 | receive 4:15,21 6:25 9:14 |
| | proper 23:2 | received 20:12 |
| petitioner's 21:5 | properly 11:16 26:16,18 | recent 17:18 23:24 |
| Petitioners 3:10 | propose 12:1 22:4 24:10 26:25 | recently 15:14 |
| petitions 10:15 22:14 26:5 | proposed 15:23 | record 3:18 5:23,24 6:3,19,24 8:14, 23 16:6 30:4 32:3 |
| phonetic 19:15 | proposes 16:3 | |
| Placer 3:8 | proposition 23:1,13 | records 20:10 |
| placing 5:25 | propounding 14:24 | refer 14:1 15:4 |
| pleading 13:20 27:1,4,6 | Propria 3:15 | reference 14:2 15:5 26:3 29:3 |
| pleadings 10:20 11:2,5,19 12:21 27:4,5 | protective 14:5,6,9,25 15:11 17:22 | refile 27:9 29:16 |
| | provided 26:9 | refiling 27:8 |
| point 10:11 12:16 18:8 22:18 23:24 | provisions 18:22 | reflecting 13:19 |
| points 15:24 | published 8:5,16 | regularly 3:6 |
| possibly 24:2 | punished 16:10 | reiterates 8:17 |
| power 12:15 | purported 8:6 | relate 16:14 |
| practice 26:8 | put 6:4 12:17 | relating 11:14 16:22 29:13,19 |
| precisely 30:18 | puzzled 6:7 | relief 22:6 26:5,13 28:13 |
| prefer 23:18 | | relies 24:11 |
| prefiling 30:13,18 | **Q** | rely 22:6 |
| prepare 14:1 21:4 | | remaining 8:25 |
| prepared 6:23 17:25 | question 11:20 | remains 11:14 |
| preparing 18:1 | quick 31:16 | remember 19:18 23:1 27:10 |
| present 3:11,14 4:5,6 20:13 | quote 22:10 | remote 3:11 |
| presently 28:18 | | remotely 4:6 |
| pressing 6:21 | **R** | removed 6:5 |
| pretty 15:14 25:18 | | renewing 28:19 |
| prioritize 21:19 22:3 | raised 17:17 24:6 26:22,24 | repeat 5:20 |
| priority 22:14 | reactions 11:8,12 | rephrase 18:10 |
| pro 14:12 | read 5:19 6:16,24 10:4 11:5 12:6,12 | reporter 3:20,23 |
| probate 10:11 18:2 21:24 26:4 | reading 14:13 | represented 3:12 10:5 |
| problem 31:3 | ready 3:22 11:2 | |

**request** 4:13,15,22 5:19 6:15,23 7:2
9:4,7,12 12:9 15:12 21:18 22:6 30:1

**requested** 21:11

**requesting** 10:10

**requests** 16:22

**research** 11:11 22:9

**reserved** 28:22,24 29:1

**respect** 5:5,10 8:17 16:1,11 17:16
21:4,17 26:2,19 28:11 29:23 30:8

**respond** 10:17 12:9,14

**responded** 27:23

**Respondents** 4:4

**response** 4:13 13:8,15 23:15 27:3

**responses** 26:11

**responsibilities** 9:10

**responsive** 10:20 11:5,19

**retain** 13:1

**review** 6:20 7:12,18 8:23 29:4

**reviewing** 7:23

**rights** 5:24 16:8

**ROSEVILLE** 3:1

**Rule** 30:2

**Rules** 30:2

**ruling** 5:7 8:17,22 9:16,23 10:25
13:9,25 14:2,7,23 15:3,6,24 16:3,13
17:15,22,25 18:19 20:24 21:2,22
22:4,21 23:15 25:25 26:19 27:2
29:15,25 30:1 31:25

**rulings** 5:2,13 6:17 8:5,16 10:6,19
11:7 17:12 28:10

**run** 11:17

———————————
**S**
———————————

**S-PR-0010014** 15:25

**S-PR-0010066** 3:5

**S.i.c** 26:4

**salary** 31:4

**sanctioned** 16:7

**sanctions** 15:12,19 16:7 21:8,11

**sealed** 13:2

**searching** 27:19

**section** 10:12 18:2 21:24 22:4,15,17
22:18 23:13 29:7

**sentiments** 13:23

**separate** 15:8 16:15 17:2,3

**sequentially** 9:17

**seriousness** 30:14

**serve** 19:15,25

**served** 8:8 10:15 18:7,15,16,17,24
19:10,22 20:3

**service** 4:17 19:5,12 20:6,25

**session** 3:18

**set** 8:20 9:4 10:23 11:3 15:23 17:14
28:15,18

**setting** 7:5 14:5

**settlement** 10:23,24 24:21

**settlements** 24:24

**Shirley** 19:14

**show** 30:8

**shown** 9:11

**side** 10:17 18:13,15

**sides** 6:16,25 9:14

**sign** 9:13

**Simple** 19:15

**sincerity** 30:22

**singular** 15:7

**sixth** 25:10

**specialized** 7:5

**stand** 23:13

**standing** 16:20

**started** 11:23

**starts** 18:6 22:24

**state** 3:7 6:3 7:5,7 8:3 28:5

**stated** 9:11,9,8 20:25 24:7

**statement** 10:10 31:12,16

**States** 7:6,7,10,17,21,22

**stating** 8:9

**status** 5:12 20:17,19

**statute** 11:17

**statutory** 14:24

**stay** 4:22 17:16,18,20

**stepmother** 20:14

**stop** 30:19,25

**strike** 11:10 26:10,11 28:19,23 29:1

**struck** 23:5

**structure** 7:7

**Struthers** 3:4,19 10:6 11:15

**stuff** 19:16

**submit** 6:1

**submitted** 6:15 12:4 13:24 15:2,19

**subsection** 18:2,5

**substantive** 5:2,15 21:1

**sufficient** 18:18

**summarily** 10:7 11:3,21

**super** 23:10

**superior** 3:7 7:9,23

**superseding** 9:22

**support** 5:9,18

**supposed** 16:9

**Supreme** 7:16,17,20,21

**surprised** 24:25

**suspect** 11:9

**suspended** 16:13,21

**suspending** 16:19

**suspension** 15:25 16:2,14,22 23:3,
8,9 29:11,14

**sustainable** 31:1

**system** 7:7,8,13,16

———————————
**T**
———————————

**takes** 13:18

**taking** 27:7,8

**talked** 10:4,22

in the matter of the Struthers Family 1993 Trust
MOTION HEARING,   on 08/29/2025

Index: talking..years

**talking** 9:9 20:5 27:22 28:2

**talks** 10:12

**tax** 7:7 31:3

**telling** 29:18

**ten** 18:6,14,16,20 20:1

**tentative** 5:7 6:17 8:4,16 9:16,23 10:6,19 13:9,25 14:2,7,23 15:3,6,24 16:3,12 17:12,15,22,25 18:19 20:24 21:2,22 22:4,21 23:15 25:24,25 26:19 27:2 28:10 29:15,25

**terms** 14:5 15:5

**testimony** 24:2

**thereof** 3:9

**thing** 16:15 17:24

**things** 5:22 6:22 11:8 27:5

**thought** 24:1 25:18 28:25

**thoughts** 13:23

**throw** 10:7 11:21 12:10 23:11

**time** 6:25 9:13 13:4 19:22 20:1 24:6 31:6

**times** 12:17 25:19

**timing** 18:22 19:23 20:24

**title** 27:10,11

**titled** 26:5,14,18

**today** 4:5 5:16 7:1 8:10,21,25 9:2,4, 8,12,14 13:5 16:4 17:19 18:1 23:10, 20 30:1,10 31:10,25 32:2

**today's** 8:5,16

**told** 17:5,7 20:18 28:13

**toss** 12:15

**trial** 7:9,10 8:1,3 11:3 27:25

**trials** 10:12

**tribunal** 7:23

**trust** 3:4,19 6:8 11:16 20:14 24:16, 17 25:4

**trustee** 16:9,19 23:3,7

**trustees** 6:13 23:2

**truth** 14:16,17

**Tuesday** 4:16

---

**U**

**understand** 6:12 12:10 17:4 20:14 29:9

**understanding** 13:12,16

**undoubtedly** 7:24

**unequivocally** 8:14

**United** 7:6,10,17,21,22

**update** 11:24

**urge** 30:21

**usual** 26:8

**utmost** 30:13

---

**V**

**vacate** 29:10

**verified** 9:21 10:15 11:5 12:18 13:12,18 28:12

**version** 11:25

**vexatious** 30:9

**video** 3:11

**violated** 5:24 14:15,16

**violating** 6:1 16:7

**visit** 20:19

**voices** 31:22

**void** 24:25 25:18

---

**W**

**wait** 18:14,16,20

**waiting** 25:10

**wanted** 21:16 25:1,2,7,8,14 31:25

**weekend** 31:4

**weeks** 15:16

**Welfare** 11:13

**white** 14:17

**wit** 3:16

**withdrawn** 20:5

---

**witnesses** 23:22 24:2

**word** 26:17

**words** 11:21

**work** 31:4

**working** 31:3

**Writ** 7:20

**write** 22:23

**writing** 12:9,14

**written** 6:23

**wrong** 17:9 29:12

**wrongs** 16:8

**wrote** 5:6

---

**Y**

**years** 20:10,11 25:6 30:16

# Exhibit L-1

EXHIBIT L-1 — Still image (Ralph ambulating) + note "could talk"

Used in: ¶¶68, 68A, 70; Counts 5–7

Summary: Photo contradicting "can't walk/speak."

Proves / Why it matters: Capacity contrary to letters.

Damage bucket(s): Rebuttal cost.

Constitutional hook(s): Fourteenth Amendment.



# Exhibit M-1

EXHIBIT M-1 — Delay costs / distribution impact (detail)

Used in: Prayer; Counts 1–3, 5–7, 9–11

Summary: Line items for delay/cost.

Proves / Why it matters: Quantifies harm from non-adjudication/obstruction.

Damage bucket(s): Delay; fees; admin.

Constitutional hook(s): First Amendment (access); Fourteenth Amendment (procedural due process).

# EXHIBIT M-1, M-2

## COUNTS QUICK INDEX

**Count 1 — p. 45; Count 2 — p. 56; Count 3 — p. 62; Count 4 — p. 71; Count 5 — p. 79; Count 6 — p. 91; Count 7 — p. 98; Count 8 — p. 103; Count 9 — p. 107; Count 10 — p. 114; Count 11 — p. 120; Count 12 — p. 126; Count 13 — p. 133. Prayer — p. 137; Jury Demand — p. 147; Verification — p. 148.**

## EXHIBIT M-1 — DAMAGES BY COUNT

**Count 1** — Procedural Due Process & Retaliation (Commissioner Michael A. Jacques, official capacity only)
Harm: Loss of trustee functions w/o notice or hearing; evidentiary setting cancelled; prefiling restriction; prolonged non-adjudication of fully-submitted accountings.
Remedy: Prospective declaratory/injunctive relief (no damages); reinstatement pending due-process removal; preserve U.S. Savings Bonds under federal law.
Record anchors: ¶¶101–118; Exhs. B-3, C-1, I-5, I-6/I-7, K-1, K-2.

**Count 2** — Joint Action / Discovery Obstruction (G. Kevin Lachona)
Harm: Coordinated suppression of authenticity records (drafts, execution packets, notary journals, thumbprints); non-evidentiary handling; delay costs; reputational harm.
Damages: Compensatory & punitive; 42 U.S.C. § 1988 fees (if represented).
Record anchors: ¶¶119–137; Exhs. G-1/G-3/G-4/G-5 (refusals by Law Offices of Johnson, Murphy & Jones, Inc.); I-8 (Objection re Evidentiary Hearing); **I-15 (8/29/2025 Motion for Protective Order/fees/sanctions — "Reserved by Clerk" stamp)**; I-10 (9/27/2023 "delay the release / move to quash" email); I-13; K-2.

**Count 3** — Financial Elder Abuse (Connor, Hatridge, Campbell)
Harm: Bank access blocked; account closures/re-titling; no accountings since 2017.
Damages/Fees: Compensatory & punitive; W&I §15657.5 fees; potential double damages under Prob. Code §859; §17211(b) fees.
Record anchors: ¶¶138–159; Exhs. **E-2 (bank title showing Ralph removed; Darlene/Belinda/Julie naming)**, F-6/O-2/O-3 (closures/"loss" declaration), G-2/G-6 (capacity papers), J-1/J-3 (Auburn records communication), D-1.

**Count 4** — Fraud & Fiduciary Misconduct (Julie Hatridge)
Harm: False "paid" trail (cashier's check + loss declaration); title manipulation; burial interference; continued concealment after D-1.

Damages: Compensatory & punitive; surcharge; §17211(b) fees.

Record anchors: ¶¶160–181; Exhs. F-6/O-2/O-3; G-2/G-6; H-2; D-1; C-2; I-10 (coordination).

**Count 5** — Fraud, Elder Abuse, Medical Neglect (Belinda Connor)

Harm: Insurance/PCP blockade; "visiting" directive; rehab denial; vehicle proceeds unaccounted; blame campaign.

Damages/Fees: Compensatory & punitive; elder-abuse remedies; potential §859; §17211(b).

Record anchors: ¶¶182–204B; Exhs. **F-3 (5/29/2017 nurse note: Darlene dementia), F-4 (Prestige → halfway house move), O-1 (pre-scheduled Auburn PCP + infection after delay), "Exhibit 4" (Preventing PCP) / "Exhibit 5" (Instructing to mislead)**, P-1/P-2 (vehicle), C-2 (admissions), J-1/J-3, D-1.

**Count 6** — Fraud, Trust Interference, Elder Financial Abuse (Carole Campbell)

Harm: Forced safe opening; participation in incapacity scheme; support for bond-diversion; resistance to accountings.

Damages: Compensatory & punitive.

Record anchors: ¶¶205–226; Exhs. B-2/B-2A (texts re safe; "made changes"/successors), G-2/G-6, J-1/J-3, D-1; I-10 (coordination).

**Count 7** — Fraudulent Trust Alteration & Concealment (J. Dean Johnson; Hannah E. Murphy; Law Offices of Johnson, Murphy & Jones, Inc.)

Harm: July 7 "incapacity" + July 10–11 office letters used to alter control; refusal to produce originals/notary logs; selective "capacity for payment."

Remedies: Declaratory/injunctive; compensatory; punitive; production/preservation orders.

Record anchors: ¶¶227–247; Exhs. G-2/G-6; H-1; G-1/G-3/G-4/G-5; I-13; I-10; **L-1 / "L contradicts" (Ralph ambulating/talking)**.

**Count 8** — Judicial Delay & Structural Due Process (Commissioner Michael A. Holley, official capacity only)

Harm: Serial continuances; non-resolution of uncontested elder matter; downstream prejudice.

Remedy: Prospective declaratory/injunctive (no damages) re minimal timelines.

Record anchors: ¶¶248–263; Exhs. D-1; I-5.

**Count 9** — Systemic Due Process & Equal Protection (Court Administration Officials, official capacities only)

Harm: Placeholder holds; mis-docketing/re-labeling; untimely/no tentatives; unequal ex parte access; misfilings/omissions.

Remedy: Prospective declaratory/injunctive (no damages) — as-applied guardrails.

Record anchors: ¶¶264–282; Exhs. I-5, I-6/I-7, I-8, I-9, K-2.

**Count 10** — Aiding & Abetting Trust Fraud; Negligent Supervision (Harris & Plottel, LLP; Drobny Law Offices, Inc.; Lachona Law; G. Kevin Lachona)

Harm: Supervisory tolerance of obstruction and bond-diversion after A-2/B-1/C-1 notice.

Myers v. Lachona, Hatridge, Connor, Campbell, et al., No. 2:25-cv-1925-TLN-CSK (PS)
Center: Exhibit M1, M-2 — Damages Category Backup

Damages: Compensatory; surcharge; §17211(b) fees.

Record anchors: ¶¶283–300; Exhs. E-1, I-3, I-10, I-13, G-1/G-3/G-4/G-5.

**Count 11** — Professional Negligence / Breach; Elder-Abuse Facilitation (Konstantine "Kosta" Demiris; The Demiris Law Firm, PC)

Harm: Unreasonable/unapproved fees; confidentiality breaches; interference with administration; refusal of fee arbitration.

Damages/Fees: Restitution/disgorgement; compensatory & punitive; statutory fees where applicable.

Record anchors: ¶¶301–318; Exh. I-3 (plus billing/engagement/ledger production to be compelled).

**Count 12** — Escrow Reimbursement / Restitution (Michael Scott Shuttleworth)

Harm: Double-payment scenario; $39,275.31 liquidated balance unreimbursed; promised credits not applied.

Damages: Restitution $39,275.31 + prejudgment interest (Civ. Code §3287) + post-judgment interest (28 U.S.C. §1961); constructive trust/equitable lien.

Record anchors: ¶¶319–336; Exh. I-4, N-1/N-2.

**Count 13** — Unlawful Diversion Advocacy / §1983 Civil Conspiracy (G. Kevin Lachona & Does)

Harm: Advocacy to liquidate U.S. Savings Bonds for fees; attempted gag limits on trustee disclosures.

Remedies/Damages: Declaratory & injunctive relief under Supremacy Clause; compensatory & punitive vs private actors.

Record anchors: ¶¶337–359; Exhs. C-1, E-1, K-1, K-2.

# Exhibit M-2

EXHIBIT M-2 — Trustee reimbursements / Plaintiff advances (detail)

Used in: ¶79F; Prayer; cross-reference Count 12

Summary: Personal funds advanced to keep trust afloat.

Proves / Why it matters: Reimbursement entitlement.

Damage bucket(s): Reimbursement; interest.

Constitutional hook(s): Fourteenth Amendment (procedural due process where state actions impede reimbursement).

## EXHIBIT M-2 — LEGAL VIOLATIONS MATRIX

**Count 1** — 42 U.S.C. §1983; First Amendment; Fourteenth Amendment (Mathews v. Eldridge)
Proofs: B-3; C-1 (evidentiary refusal); I-5/I-6/I-7 (no witness/no testimony orders); K-1/K-2 (suspension; prefiling threat).
Relief: Prospective declaratory/injunctive only.

**Count 2** — 42 U.S.C. §1983 (joint action); Due Process / Access to Courts
Proofs: G-1/G-3/G-4/G-5 (Law Offices of Johnson, Murphy & Jones, Inc. refusals); I-8 (objection to evidentiary hearing); **I-15 (8/29/2025 protective-order motion/fees/sanctions)**; I-10 (9/27/2023 plan to "delay…/move to quash"); I-13; K-2.
Relief: Compensatory/punitive; §1988 (if represented).

**Count 3** — W&I §15610.30; Prob. Code §§16060–16062, 17200(b)(7), 17211(b); Prob. Code §859
Proofs: **E-2 (bank title removal of Ralph)**; F-6/O-2/O-3; G-2/G-6; J-1/J-3; D-1.
Relief: Compensatory/punitive; statutory fees/doubles where proven.

**Count 4** — Civ. Code §3294; W&I §15610.30; Prob. Code §§16060–16062, 17200(b)(7)
Proofs: F-6/O-2/O-3; G-2/G-6; H-2; D-1; I-10 (context).
Relief: Compensatory/punitive; surcharge; fees.

**Count 5** — Fraud/Elder Abuse/Medical Neglect overlay
Proofs: **F-3 (nurse note 5/29/2017 — dementia)**; **F-4 (facility → halfway house)**; O-1 (PCP delay/harm); P-1/P-2; C-2; J-1/J-3; D-1.
Relief: Compensatory/punitive; statutory fees.

**Count 6** — W&I §15610.30; aiding/abetting; trust interference
Proofs: B-2/B-2A (safe/changes texts); G-2/G-6; J-1/J-3; D-1; I-10 (context).
Relief: Compensatory/punitive.

**Count 7** — 42 U.S.C. §1983 (joint participation); fraud/concealment
Proofs: G-2/G-6; H-1; G-1/G-3/G-4/G-5; I-13; I-10; **L-1 / "L contradicts" (talking/ambulation)**.
Relief: Declaratory/injunctive; compensatory/punitive; production orders.
NOTE: Spell out **Law Offices of Johnson, Murphy & Jones, Inc.** everywhere.

**Count 8** — 42 U.S.C. §1983 (prospective relief only)
Proofs: D-1; I-5.
Relief: Declaratory/injunctive only.

**Count 9** — 42 U.S.C. §1983 (prospective relief only)
Proofs: I-5; I-6/I-7; I-8; I-9; K-2.
Relief: Declaratory/injunctive only.

**Count 10** — Aiding & Abetting / Negligent Supervision; §1983 joint-participation overlay
Proofs: E-1; I-3; I-10; I-13; G-1/G-3/G-4/G-5.
Relief: Compensatory; surcharge; §17211(b) fees.

Count **11** — Professional Negligence / Breach; elder-abuse facilitation
Proofs: I-3 + (billing/engagement/ledger productions to be compelled).
Relief: Restitution/disgorgement; compensatory/punitive; statutory fees.

**Count 12** — Restitution / Account Stated
Proofs: I-4; N-1/N-2.
Relief: $39,275.31 + interest; constructive trust/equitable lien.

**Count 13** — Supremacy Clause / §1983 conspiracy (private actors)
Proofs: C-1; E-1; K-1; K-2.
Relief: Declaratory/injunctive; compensatory/punitive.

# Exhibit N-1

EXHIBIT N-1 — "Dad can talk" packet (family texts + video stills, 2017–2018)

Used in: Counts 5–7; ¶¶68, 68A, 70

Pins: p.5 (5/31/2017 Belinda text); p.6 (7/20/2017 family replies incl. Belinda); pp.2–4, 7 (2018 confirmations)

Proves: Belinda knew he could communicate shortly after stroke; 2018 fluent speech with selected family.

Why it matters: Impeaches incapacity narrative; supports undue-influence framing.

Constitutional hooks: —

Damage bucket: Credibility; supports Counts 5–7 factual core.

**To: April Sharp April Strut... & 1 more**



Yes for sure ! Keep him talking Ronda good job 👏 ⚱️



O I will

↺ **Replay**

April Spaulding

Surprise...surprise... that video made me cry of happy tears

Diane Struthers

So nice to hear your voice dad!!! I love you, keep talking : ) (sent with Confetti)

To: April She███████

**Belinda Connor**

**Diane Struthers**

**April Spaulding**

**Jul 20, 2017,** 10:21 PM

iMessage

To Whom It May Concern,

My Dad is fully capable of communicating. My Dad verbally said happy birthday Diana to me last June 2018. My Dad can talk some, he mostly nods his head yes and no when you talk to him. My Dad is very aware of what's going on and is able to communicate his wishes to attorneys and his kids.

My Dad was very hurt that Darlene didn't want to move up to Auburn to be close to him. When I was with Darlene and Dad for a visit after Dad moved to Ronda's, Darlene didn't seem to care much that they live so far from each other. I was told by Belinda that Darlene doesn't even want to come visit Dad at Ronda's house.

It's very clear to me that my father is hurt by Darlene and that he no longer wants to be married to her.

Sincerely Diana Struthers

To Whom it May Concern,

I just wanted the Court of Law, to know the truth that my father Ralph can communicate with us if he wants to. Belinda asked him herself if he wants to move to Ronda's house and he nodded his head yes. So she knows he can communicate. For example; he said "Happy Birthday April" to me on Oct 2nd 2018. He can nod his head yes or no if you ask him questions. My father also FaceTime me not that long ago and he gave Ronda 3 high-five's when I asked him about their vacation. He was very excited about it! I even screen shot it so I could have that moment forever.

There have been rumors of "Julie" saying that my father doesn't communicate at all. Which is false statement. Especially the sisters don't want to see him in a convalescent home again. When he was in that home he was in the worst shape unable to communicate and on the brink of dying. At that point in his life he was then truly unable to communicate that good.

My Dad is hurt by his daughter Belinda. She is using his money to fight against his wishes and changed his Will or in her words "simplify the Will". I'm not sure why but Belinda has lied to all four of her sisters and tried to start division between us all. My Dad wanted Darlene (his wife) to move with him up North where Ronda (his daughter lives). Darlene didn't want to and didn't act like she cared that he even left. She still won't move up there to be with him in his last part of his life.

If my husband was dying and I had a choice to be with my Husband. I would choose to be with him and nothing would stop me from being with the man I love, until his last day. They are living separate life's now for way over a year. Not even wanting to see him when his daughter Kay past away. She wouldn't go with Belinda to the funeral to see her husband. I do agree with my Dad about getting a divorce. Please allow my Dad to be heard if he wants a divorce give it to him.

Thank you!

April Spaulding #7

**To: April Spaulding**



**High five**



**Love, Cheryl**

## Sun, May 27, 9:50 AM



Ronda, Dad was talk-
ing up a storm yester-
day. It's easier to un-
derstand what he is
saying in person.
Could you ask him
what he was talking
about, and text me
back what he said?

## Sun. Jun 3. 10:08 AM

**Subject**

 Text Message 

# Exhibit O-1

EXHIBIT O-1 — Auburn PCP confirmations + Plaintiff declaration (post-MRSA)

Used in: ¶¶70C, 186D–186E; Counts 3, 5

Pins: 7/12 and 8/1 confirmations (attach screens)

Proves: PCP handoff was scheduled; "visiting/insurance" directive blocked it; infection followed.

Why it matters: Elder-neglect/medical interference.

Constitutional hooks: 14A (bodily integrity interests in context); state elder-abuse.

Damage bucket: Health risk; added medical costs.



**< 2017**

# July

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
|   |   |   |   |   |   | 1 |
| 2 | 3 | 4 | 5 | 6 | 7 | 8 |
| 9 | 10 | 11 | **12** | 13 | 14 | 15 |
| 16 | 17 | 18 | 19 | 20 | 21 | 22 |
| 23 | 24 | 25 | 26 | 27 | 28 | 29 |
| 30 | 31 |   |   |   |   |   |

| | |
|---|---|
| **Roger Semple** ⊘ Birthday | 8:30AM 9:30AM |
| **Roger Semple** ⊘ Birthday | 8:30AM 9:30AM |
| **Koda an sweetie fie drop** | 9:00AM 10:00AM |
| **Dad Doc appt** | 10:15AM 11:15AM |

Today        ⓘ Calendars        Inbox

**7:09**



# August

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
|   |   | **1** | 2 | 3 | 4 | 5 |
| 6 | 7 | 8 | 9 | 10 | 11 | 12 |
| 13 | 14 | 15 | 16 | 17 | 18 | 19 |
| 20 | 21 | 22 | 23 | 24 | 25 | 26 |
| 27 | 28 | 29 | 30 | 31 |   |   |

**Dr Gruenefeldt MD Dad**       7:45AM
8:45AM

**Rick miner back crack**       11:45AM
12:45PM

# Exhibit O-2

Exhibit O-2 — Additional bank closure/authority pages (Belinda/Julie)

Used in: ¶¶90A–90C; Counts 3,5 · Pins: form dates

Proves: Account changes and presented authority docs.

Why it matters: Tracing & elder-abuse elements.

Hooks: 14A (property).

Damage bucket: Tracing cost.



**PACIFIC PREMIER BANK**

Capture Date: September 01, 2017
Item Number: 77530000009363
Posted Date: September 01, 2017
Posted Item Number: 244040767
Serial Number:
Amount: 75,285.38

RALPH STRUTHERS TRUSTEE
DARLENE L STRUTHERS TRUSTEE
STRUTHERS FAMILY 1993 REVOCABLE TRUST
RETURN MAIL 93454-5928

**DEBIT**     **C. D. WITHDRAWAL**
ACCOUNT TITLE

PREPARED BY   APPROVED BY   DATE  9/1/17   PACIFIC PREMIER BANK

CUSTOMER NAME (PLEASE PRINT)  D. Smithers

CUSTOMER SIGNATURE:

DESCRIPTION  Closing CD — moved out of area

ACCOUNT NUMBER  4108301644     TRAN CODE  94     $  75285.38

⑆5086⑈0000⑆

⑆090117   7753   77530000009363⑈322285781⑇   PPB

# Exhibit O-3

EXHIBIT O-3 — Account histories / check images (Belinda/Julie)

Used in: ¶¶90A–90C; Counts 3,5 · Pins: statement ranges; check images

Proves: Outflows; "loss" declaration trail; false "paid" ledger.

Why it matters: Restitution/surcharge proof.

Hooks: 14A (property).

Damage bucket: Restitution + interest..



Check 1006 Date 3/26/2018 Amount $639.00



Check 1006 Back



Check 1007 Date 3/20/2018 Amount $61.28



Check 1007 Back



Check 0 Date 2/8/2018 Amount $1,253.00

# Exhibit P-1 / P-2

EXHIBIT P-1 / P-2 — Vehicle sale packet (merged) (VIN; "Check No. 15089")

Used in: ¶¶90E–90G; Count 5

Pins: Sale date; VIN; referenced check

Proves: Sole vehicle sold under purported POA; no proceeds accounting; probable undervaluation.

Why it matters: Elder-property taking/retaining.

Constitutional hooks: 14A (property).

Damage bucket: FMV delta + tracing; restitution.

# EXHIBIT P-1/P-2

### EXHIBIT P-1 / P-2 — VEHICLE SALE PACKET (MERGED)

Counts / Complaint cross-refs: ¶¶90E–90G; Count 5

Pin cites (if you want to show where this lands in your binder): add after pagination

Proves: Unauthorized sale of Ralph's only vehicle, missing authority/DMV/payment trail, and proceeds not traced to fiduciary accounts.

Why it matters (short):

• The only "proof" used to allocate vehicle proceeds between the June 4, 1993 trust and the Oct. 22, 2017 trust was a single slip of paper.

• Later evidence shows the purported "trustees" (Belinda Connor and Julie Hatridge) lacked lawful authority; any settlement/mediation allocation tied to their signatures is void for fraud/lack of authority.

• Plaintiff seeks rescission, full chain-of-authority, and tracing of proceeds—or FMV + interest if proceeds were dissipated.

### EXHIBIT P 1 P 2

### (Attach P-1 declaration first, then the one-page "sale sheet" as P-2.)

### PLAINTIFF DECLARATION (FOR EXHIBIT P-1 / P-2)

### I, LaRonda Myers, declare:

1. The only document I was ever given to justify a sale of Ralph C. Struthers's 2015 Toyota Yaris and to split "proceeds" between the June 4, 1993 trust and the October 22, 2017 trust was a single one-page slip (the next page of this exhibit). No full transaction packet (dealer/buyer contract, odometer disclosure, title/DMV transfer, payment proofs, or bank deposit confirmations) was provided.

2. Based solely on that one slip, money was allocated in a "settlement/mediation" context between the two trusts. I did not concede the accuracy of the amount, the lawfulness of the sale, or the authority of the signers; I was simply shown the slip and told that was the number.

3. Subsequent discovery shows that the individuals asserting authority (Belinda Connor and Julie Hatridge) were not duly appointed trustees and lacked lawful power to sell Ralph's vehicle or to bind either trust. Their use of disputed "incapacity" papers and a fraudulent 1993 instrument calls into question any sale authority. Any settlement/mediation allocation tied to that unauthorized sale is void for fraud and lack of authority.

1

4. I therefore demand complete verification that (a) the vehicle was actually sold, (b) for the amount shown on the slip, and (c) that the gross/net proceeds were deposited to proper fiduciary accounts. I have not been shown the buyer identity, signed purchase agreement, price/payment instruments, the title/DMV transfer record, or bank deposit confirmations.

5. The car was Ralph's only vehicle and, at the relevant time, in excellent condition with very low mileage. Disposing of it without notice to both co-trustees, without prior court approval, and under color of defective "authority" is consistent with elder financial abuse. Presenting or relying on false authority documents also supports allegations of forgery and perjury.

Records demanded for tracing and authority:

(a) Buyer name/contact and any dealer/broker used;

(b) Signed purchase agreement(s), bill of sale, odometer disclosure, and any condition report;

(c) Title/DMV transfer filings and release-of-liability confirmation;

(d) All payment instruments (check images, ACH/wires, receipts) and remittance statements;

(e) The power(s) of attorney or trustee appointment documents relied upon at the time of sale;

(f) All communications/notes showing who authorized the sale, when, and why no notice was given to both co-trustees;

(g) Bank statements/ledgers showing deposit(s) of sale proceeds and any "split" transfers tied to the slip amount.

Relief requested: Rescission/voiding of any settlement or allocation tied to this vehicle sale; restitution and surcharge of the full proceeds into the proper fiduciary account(s); constructive trust over any proceeds or traceable substitutes; and, if proceeds cannot be traced, an award based on fair-market value at the time of disposition with prejudgment interest.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 18 day of September 2025, at Auburn, California.

LaRonda Myers

P-1 / P-2 — Vehicle sale packet (Plaintiff declaration + one-page "sale sheet"). Used in ¶¶90E–90G; Count 5. Pages:

NAME                                    NUMBER                  DATE

CARLENE STRUTHERS
USED PURCHASE
STK#91056P  KR
ACCT#   AMOUNT      CTRL#        DESC
2402      7800.00  91056P       VNKJTUD31FA020B39  15  TOYOT

| REMITTANCE ADVICE DETACH AND RETAIN | TOYOTA OF LANCASTER | CHECK NO. 15089 | NET AMOUNT | $7,800.00 |
|---|---|---|---|---|

# Exhibit P-3

EXHIBIT P-3 — First settlement agreement (non-confidential; circulated)

Used in: ¶¶76C, 90G, 99; Relief ¶363A

Summary: Agreement advanced by unauthorized persons; preemption conflicts.

Proves / Why it matters: Void/unenforceable as to Plaintiff; supports federal claims.

Damage bucket(s): Litigation cost; delay.

Constitutional hook(s): Fourteenth Amendment (procedural due process—authority); Supremacy Clause (preemption re bonds); § 1983.

# Exhibit P-3

**EXHIBIT P-3 — FIRST "SETTLEMENT" AGREEMENT (NON-CONFIDENTIAL)**
Used in: ¶¶76C, 90G, 99; Prayer ¶363A. Pin cites to complaint pages: pp. 23, 35, 37, 123.

**Exhibit P3**

Summary (what this is): Agreement circulated to all beneficiaries (not a confidential mediation writing), signed by Belinda Connor; referenced as notice only.
Proves: (i) Signatories who purported to bind the 1993/2017 trusts lacked lawful trustee authority; (ii) Clauses directing liquidation/diversion of U.S. Savings Bonds conflict with federal law unless Treasury-compliant.
Why it matters: This is not about enforcing the deal — it shows the unauthorized control theory and the federal preemption problem the Court must guard against as-applied to Plaintiff.
Constitutional & federal hooks:
• Supremacy Clause: 31 U.S.C. §3105; 31 C.F.R. Part 353 preempt conflicting state orders/agreements on U.S. Savings Bonds (see Free v. Bland; Yiatchos).
• Fourteenth Amendment (Due Process): Private parties cannot bootstrap deprivations via an unauthorized "settlement" absent lawful authority and process.
• §1983 joint-participation posture preserved against private actors pressing enforcement under color of state process.
Corroboration cross-refs: Exh. A-2 (3/1/2019 sealed amendment disinheriting anyone who altered/attempted to alter 1993 Trust), Exh. B-1 (drafter swears the 1993 trust in use wasn't his instrument).
Damage/relief bucket: Declaratory guardrail (void/unenforceable as-applied), preemption injunction, plus downstream fees/costs against private actors where appropriate.
Record cites (FAC): ¶¶76C, 90G, 99; Prayer ¶363A; Counts referencing preemption and authority defects begin p. 38 (Count 1), p. 86 (Count 7), p. 100 (Count 10), p. 118 (Count 13).

1

## SETTLEMENT AGREEMENT

LaRonda Myers, as trustee of the Ralph C. Struthers Revocable Trust dated October 22, 2017 ("Ralph's Trust") and as an individual ("Ronda"), April Sharp as trustee of Ralph's Trust and as an individual ("April"), Julie Hatridge, as trustee of the Struthers Family 1993 Trust ("Struthers' Trust") and as an individual ("Julie"), Belinda Connor as trustee of the Struthers' Trust and as an individual ("Belinda"), and Darlene Struthers, as a settlor of the Struthers' Trust and as an individual ("Darlene"), (collectively referred to as the "Parties" and individually referred to as a "Party" as context dictates), agree as follows:

### Background and Purpose:

1) Ralph C. Struthers ("Ralph") and Darlene, as husband and wife, created the Struthers Trust in 1993. Ralph had seven (7) children from another marriage. Darlene never had any biological children.

2) In or about May of 2017, Ralph suffered a stroke. In the months thereafter, Ralph was moved to Auburn, CA where Ronda, one of his daughters, would provide care for Ralph at the rate of $2,000 per month.

3) In or about July of 2017, Belinda and Julie began acting as trustee on the stated grounds that Darlene resigned and Ralph was incapacitated. Ralph never resigned nor expressly consented to their appointment as trustee.

4) On October 22, 2017, Ralph created Ralph's Trust and funded Ralph's Trust with one-half of all of his community property and all of his separate property by way of a written assignment. However, no funds were actually withdrawn and deposited into Ralph's Trust until in or about November of 2017, when $134,291.52 in funds were withdrawn from individual accounts or

1

43) **No Admission.** By entering into this Agreement, the Parties do not admit any fact, conclusion of law, or liability as to any matters contained in this Agreement.

44) **Modifications.** Modifications to this Agreement can only be made by a writing signed by all Parties.

45) **Court's Jurisdiction.** The court shall maintain jurisdiction in order to enforce this Agreement pursuant to C.C.P. §664.6.

Dated:

_____
LaRonda Myers, individually and as Trustee of the
Ralph C. Struthers Revocable Trust

Dated:

_____
April Sharp, individually and as Trustee of the Ralph
C. Struthers Revocable Trust

Dated:

_____
Delinda Conner, individually and as Trustee of the
Struthers Family 1993 Trust

Dated: 12/10/19

_____
John Hastings, individually and as Trustee of the
Struthers Family 1993 Trust

Dated:

_____
Darlene Struthers, individually and as settlor of the
Struthers Family 1993 Trust

**APPROVED AS TO FORM:**

_____
Michael K. Wentworth, attorney for Trustees
LaRonda Myers and April Sharp

_____
H. Kevin Lackner, attorney for defendants
Delinda Conner and John Hastings

14

43) **No Admission.** By entering into this Agreement, the Parties do not admit any fact, conclusion of law, or liability as to any matters contained in this Agreement.

44) **Modifications.** Modifications to this Agreement can only be made by a writing signed by all Parties.

45) **Court's Jurisdiction:** The court shall maintain jurisdiction in order to enforce this Agreement pursuant to C.C.P. §664.6.

Dated: _____

LaRonda Myers, individually and as Trustee of the Ralph C. Struthers Revocable Trust

Dated: _____

April Sharp, individually and as Trustee of the Ralph C. Struthers Revocable Trust

Dated: 12-10-19

Belinda Connor, individually and as Trustee of the Struthers Family 1993 Trust

Dated: _____

Julie Hatridge, individually and as Trustee of the Struthers Family 1993 Trust

Dated: 12-10-19

Darlene Struthers, individually and as settlor of the Struthers Family 1993 Trust

APPROVED AS TO FORM:

_____
Michael S. Shuttleworth, attorney for Trustees, LaRonda Myers and April Sharp

_____
G. Kevin Lachona, attorney for Trustees, Belinda Connor and Julie Hatridge

14