LaRonda Myers
12060 Mont Vista Drive
Auburn, CA 95603
Email: rondamyers@me.com
Telephone: (530) 320-1727
Plaintiff, Pro Se



**FILED**

NOV 20 2025

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY_____
DEPUTY CLERK

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

LARONDA MYERS,
PLAINTIFF, PRO SE

**Case No. 2:25-cv-01926-TLN-CSK**

V.

JULIE HATRIDGE, AN INDIVIDUAL; LACHONA LAW, A CALIFORNIA LAW FIRM; G. KEVIN LACHONA, AN INDIVIDUAL; DROBNY LAW OFFICES, INC., A CALIFORNIA PROFESSIONAL CORPORATION; HARRIS & PLOTTEL, LLP, A CALIFORNIA LIMITED LIABILITY PARTNERSHIP; J. DEAN JOHNSON, AN INDIVIDUAL; THE LAW OFFICES OF JOHNSON, MURPHY & JONES, INC., A CALIFORNIA PROFESSIONAL CORPORATION; HANNAH E. MURPHY, AN INDIVIDUAL; CORI B. JONES, AN INDIVIDUAL; [CURRENT FIRM OF HANNAH MURPHY], A LAW FIRM; BELINDA CONNOR, AN INDIVIDUAL; CAROL CAMPBELL, AN INDIVIDUAL; AND DOES 1–50, INCLUSIVE,DEFENDANTS.

FIRST AMENDED COMPLAINT FOR:
DECLARATORY RELIEF (U.S. SAVINGS BONDS, SUPREMACY CLAUSE / PREEMPTION) ELDER FINANCIAL ABUSE (WELF. & INST. CODE § 15610.30), FRAUD / FORGERY INTENTIONAL INTERFERENCE WITH EXPECTED INHERITANCE (IIEI) INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS / MISHANDLING OF REMAINS NEGLIGENT HIRING, SUPERVISION, AND RETENTION, RESPONDEAT SUPERIOR / RATIFICATION UNFAIR COMPETITION (BUS. & PROF. CODE § 17200)

DEMAND FOR JURY TRIAL

**INDEX / TABLE OF CONTENTS**

I. NATURE OF THE ACTION ................................................. page 1

II. JURISDICTION AND VENUE ............................................. page 1

III. PARTIES ............................................................ page 2

IV. FACTUAL ALLEGATIONS .................................................. page 5

  A. The 1993 Trust and the 2017 Trust ................................. page 5

  B. The March 1, 2019 Amendment – Ralph's Written Intent ............. page 6

  C. Darlene's Dementia and Vulnerability ............................. page 6

  D. Forced Meeting at Johnson's Office and the Safe ................. page 7

  E. Stroke, Rehab Potential, Rest-Home Placement, and MRSA ........... page 8

  F. Second Hospitalization, ICU Recovery, and Second Denial of Rehab. Page 9

  G. Denial of Primary Care After MRSA ................................ page 9

  H. Sudden Bank Closures and Missing Funds ........................... page 10

  I. Savings Bonds: From About 143 to About 13 ....................... page 11

  J. Forged 1993 Trust ................................................ page 12

  K. Cremation Against Ralph's Wishes and Retaliation ................ page 12

  L. Impact on Ralph – Continuous Stress and Harm .................... page 13

  M. Years of Subpoenas and Lawyer Obstruction ....................... page 22

V. RELIEF NOT SOUGHT ..................................................... page 15

VI. CAUSES OF ACTION ..................................................... page 16

FIRST CAUSE OF ACTION – Declaratory Relief

(U.S. Savings Bonds – Supremacy Clause / Preemption) ............. page 16

SECOND CAUSE OF ACTION – Elder Financial Abuse

(Welf. & Inst. Code § 15610.30) .................................. page 16

THIRD CAUSE OF ACTION – Fraud / Forgery ............................ page 17

FOURTH CAUSE OF ACTION – Intentional Interference with

Expected Inheritance (IIEI) ...................................... page 18

FIFTH CAUSE OF ACTION – Intentional Infliction of Emotional Distress /

Mishandling of Remains .......................................... page 18

SIXTH CAUSE OF ACTION – Negligent Hiring, Supervision, and Retention. page 20

SEVENTH CAUSE OF ACTION – Respondeat Superior / Ratification ......... page 21

EIGHTH CAUSE OF ACTION – Unfair Competition

(Bus. & Prof. Code § 17200) ...................................... page 21


VII. PRAYER FOR RELIEF .................................................... page 22


VIII. SIGNATURE BLOCK .................................................... page 23

## I. NATURE OF THE ACTION

1. This case is about elder abuse, forgery, and concealment by private individuals and law firms. Plaintiff does not ask this Court to run a probate case. Instead, Plaintiff brings this action because, while her father, Ralph C. Struthers, was recovering from a stroke and her stepmother, Darlene Struthers, was declining into dementia, Defendants manipulated their trusts and assets, diverted U.S. Savings Bonds and other property, blocked subpoenas, and caused Ralph to be cremated against his clearly expressed wish to be buried.

2. Plaintiff alleges that Defendants exploited Ralph's and Darlene's vulnerability to change their estate plan, used an altered version of the June 4, 1993 family trust, diverted or concealed assets including Savings Bonds, and then worked together to prevent Plaintiff from ever seeing the law-office files that would reveal what was done.

3. Plaintiff seeks in-personam relief against private actors: money damages, restitution, and declaratory relief concerning U.S. Savings Bonds under federal regulations, along with court-supervised discovery tools (such as a neutral forensic accounting and subpoenas) to uncover the truth and hold Defendants accountable.

## II. JURISDICTION AND VENUE

4. This Court has federal-question jurisdiction under 28 U.S.C. § 1331 because Plaintiff asserts claims arising under the Supremacy Clause and federal regulations governing U.S. Savings Bonds.

5. This Court has supplemental jurisdiction under 28 U.S.C. § 1367 over Plaintiff's related state-law claims for elder financial abuse, fraud, IIEI, IIED, negligent

hiring/supervision/retention, and unfair competition because those claims arise from the same nucleus of operative facts.

6. The amount in controversy in this action exceeds $75,000, exclusive of interest and costs.

7. Plaintiff seeks only in-personam relief. Plaintiff does not ask this Court to probate or annul any will, to administer any trust or estate, to appoint or remove any trustee, or to exercise in-rem control over property held by a state court. Any accounting or forensic audit Plaintiff seeks is for the limited purpose of determining Defendants' misconduct and the amount of damages and restitution they owe.

8. Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to these claims occurred in this District and many Defendants reside or conduct business here.

## III. PARTIES

9. Plaintiff LaRonda ("Ronda") Myers is Ralph's daughter. She is a beneficiary of the family trust dated June 4, 1993 and of the Ralph C. Struthers Trust dated October 22, 2017. She previously served as co-trustee and executor under the 2017 trust and has advanced her own funds to pay trust-related expenses when trust assets were tied up.

10. Defendant Belinda Connor is Ralph's daughter. She is a beneficiary and participated in the acts described in this Complaint.

11. Defendant Julie Hatridge is Ralph's daughter (by marriage; Darlene's niece). She is a beneficiary and participated in the acts described in this Complaint.

12. Defendant Carole Campbell is Ralph's daughter and a beneficiary. She arranged and pushed a key law-office meeting to change Ralph's trust and had a financial motive to include her son as a beneficiary.

13. Defendant G. Kevin Lachona, Esq. is a California attorney. At relevant times he was employed by Drobny Law Offices, Inc., by Harris & Plottel, LLP, and by his own firm, Lachona Law. He represented family members adverse to Plaintiff in trust and remains matters and took positions and actions that helped delay an accounting and burial and helped conceal records.

14. Defendant Drobny Law Offices, Inc. is a California professional corporation based in Sacramento, California. At relevant times it employed Lachona and is vicariously and directly liable for his conduct in the course and scope of his employment.

15. Defendant Harris & Plottel, LLP is a California law firm based in Chico, California. At relevant times it employed Lachona and participated in efforts to resist subpoenas and protect records from disclosure.

16. Defendant Lachona Law is a California law firm associated with Lachona and based in Sacramento, California.

17. Defendant J. Dean Johnson is a California attorney and one of the three owner-attorneys of The Law Offices of Johnson, Murphy & Jones, Inc. He met with Ralph and Darlene, reviewed their trust and estate documents, and participated in or supervised the handling and modification of those documents.

18. Defendant Hannah E. Murphy (formerly Hannah Johnson) is a California attorney and one of the three owner-attorneys of The Law Offices of Johnson, Murphy & Jones, Inc.

She participated in meetings with Ralph and Darlene and in work on their trust and estate documents.

19. Defendant Cori B. Jones is a California attorney and one of the three owner-attorneys of The Law Offices of Johnson, Murphy & Jones, Inc. She has acted as an attorney and custodian of records for the firm and has had control over its files relating to Ralph and Darlene and their trusts. Plaintiff is informed and believes that Jones personally participated in and approved decisions to refuse production of those files in response to subpoenas.

20. Defendant The Law Offices of Johnson, Murphy & Jones, Inc. is a California professional corporation with an office in Grover Beach, California. It is owned and operated by Johnson, Murphy, and Jones. It served as the law office where Ralph and Darlene brought their trust, will, and asset information and where disputed trust changes were handled. It holds the case files and related records that have never been fully produced.

21. Defendant Hannah E. Murphy is a California attorney and one of the owner-attorneys and principals of The Law Offices of Johnson, Murphy & Jones, Inc. She is sued in her individual capacity for her direct participation in, supervision of, and ratification of the conduct alleged in this Complaint, including the handling and concealment of trust and estate records, the obstruction of subpoenas, and other acts performed by or through the law office she co-owns.

22. The true names and capacities of Does 1 through 50 are unknown to Plaintiff. They may include additional attorneys, staff, financial institutions, and other persons or entities who

received or controlled diverted assets. Plaintiff will amend this Complaint when their identities are known.

23. Plaintiff is one of Ralph's four surviving children. Her siblings (Ralph's other children) have also been harmed by the conduct described in this Complaint, because the same actions that diverted assets and covered up elder abuse reduced or delayed what they should have received from their father's estate and trusts. At this time Plaintiff's siblings are not named as plaintiffs because Plaintiff is proceeding in propria persona and cannot act as their attorney. Plaintiff does not bring this case on behalf of grandchildren or other more remote relatives. Plaintiff reserves the right to seek leave to amend this Complaint to add her siblings (Ralph's other children) as co-plaintiffs if and when they choose to appear on their own or through counsel.

## IV. FACTUAL ALLEGATIONS

### A. The 1993 Trust and the 2017 Trust

24. On or about June 4, 1993, Ralph and Darlene executed a family trust ("1993 Trust") drafted by an experienced estate-planning attorney.

25. By late 2016 and early 2017, Darlene was already declining mentally. Plaintiff took her to doctor appointments where doctors noted that Ralph did most of the talking for her and that she was not doing well on her own. Darlene was evaluated for placement in a dementia facility and eventually placed in such a facility.

26. In 2017 Ralph suffered a stroke but retained enough awareness to know what was happening around him. He began to sense that "something strange" was going on with his

trust and finances and that certain family members were pushing changes he did not truly want.

27. On or about October 22, 2017, Ralph executed a new trust (the "2017 Trust"), naming Plaintiff in a role he trusted to make decisions for him when he declined. This was his attempt to correct problems he was seeing and to protect himself, Darlene, and his intended estate plan.

## B. The March 1, 2019 Amendment – Ralph's Written Intent

28. On March 1, 2019, Ralph signed a notarized amendment to the 2017 Trust. In that amendment, he wrote that if any beneficiary named in his trust was found to have been a party to changing his 1993 Trust, that beneficiary would be removed from his 2017 Trust.

29. In the same amendment, he confirmed that certain Savings Bonds for grandchildren were to be held in trust until they became adults, that Plaintiff would have the final say over his final resting place if there was a family disagreement, and that Plaintiff should be reimbursed for funeral or caregiving expenses before other distributions.

30. Ralph told Plaintiff and her husband that he was not planning to change his trust to what others wanted and that his trust was going to stay the way he intended. For a long time, Plaintiff's understanding of his wishes was treated as just "her word." In or about 2025, Plaintiff discovered the 2019 amendment, which confirmed in writing what Ralph had told her.

## C. Darlene's Dementia and Vulnerability

31. By the time Ralph suffered his stroke and later hospitalizations, Darlene was in a dementia facility and was not capable of managing complex financial decisions on her own. The hospital later told the family that, because of Darlene's dementia and Ralph's health, they should not continue living alone unless they lived near one of Ralph's daughters and someone checked on them regularly.

32. Despite this, people around them treated Darlene as if she could make decisions about closing accounts, moving money, and changing trusts, and treated Ralph as if he no longer had any say in his own estate plan, even though he remained aware and was trying to fight back.

## D. Forced Meeting at Johnson's Office and the Safe

33. Ralph did not schedule the key meeting at Johnson's law office. Carole Campbell did. After learning that one of her sons was not included as a beneficiary under the existing trust, Carole arranged a meeting at the law office now known as The Law Offices of Johnson, Murphy & Jones, Inc.

34. At this meeting, Johnson, Murphy, and family members including Carole and Belinda were present with Ralph and Darlene. Ralph was told that the trust should be changed to make it "more fair" or "more even" and to "make things easier." He felt ganged up on and pressured.

35. After the meeting, Ralph told Plaintiff and her husband that he was not going to change his trust and that it would stay the way it was. Darlene said the same thing at that time.

36. Around this time, Ralph was pressured to open his personal safe and bring all of his trust, will, and asset papers to Johnson's office. He told Plaintiff he did not want to do this but

felt he had no choice because of pressure, including concern about what Carole's husband might do if he refused. Once everything was brought to Johnson's office, that office had the opportunity to review, inventory, and control the documents and information Ralph and Darlene had previously kept in their safe.

37. Plaintiff is informed and believes that Johnson's office and the people present had the opportunity to decide what would be included in their version of the trust records and what would be hidden from the rest of the family.

## E. Stroke, Rehab Potential, Rest-Home Placement, and MRSA

38. In late May 2017, Ralph was hospitalized at Marian Regional Medical Center in Santa Maria, California after a stroke. During that hospital stay, therapy records showed that he could follow directions, respond appropriately with nods, and participate in treatment. He was medically vulnerable but not mentally gone. A photograph from early June 2017 shows Ralph standing and walking with a walker with assistance. He was considered an appropriate candidate for aggressive rehabilitation, and the expectation at the hospital was that he could improve with proper rehab.

39. Instead of supporting that path, people aligned with Johnson's office and certain family Defendants pushed for Ralph to be moved to a rest home. At that rest home, Ralph received little or no meaningful rehabilitation and was mostly left in bed. During that stay, he developed a serious infection that Plaintiff later learned was MRSA. At the time, Plaintiff only knew he had a "super bug" and that he was very sick.

40. The decision to place him in that rest home, rather than keep him in a rehab pathway
    where he was already making progress, directly exposed him to conditions in which he
    became infected and his health was put at serious risk.

## F. Second Hospitalization, ICU Recovery, and Second Denial of Aggressive Rehab

41. After Plaintiff brought Ralph home from the rest home, there was a point where he again
    began to look very ill. On or about July 10, 2017, Plaintiff rushed him to the emergency
    room because something was clearly wrong. He was admitted, and on or about July 11,
    2017, he was placed in the ICU for treatment of an infection. With proper medical care he
    responded well. Within one to two days, he improved enough that he was moved from
    ICU to a regular hospital room. Plaintiff understood from this that he was doing
    significantly better.

42. Once again, the hospital recommended aggressive rehabilitation so he could continue to
    recover and regain strength. However, Belinda stated that aggressive rehab was "too
    expensive" and that they were not going to change his insurance to allow him to go into
    that level of rehab. This was the second time aggressive rehab was recommended and the
    second time it was denied.

43. Plaintiff is informed and believes that denying aggressive rehab has to be viewed in the
    context of the trust changes and asset issues. At the same time these medical decisions
    were being made, Belinda and others were working with Johnson's office on attempts to
    change Ralph's trust and to position themselves around his assets.

## G. Denial of Primary Care After MRSA

44. After Ralph was released following his MRSA treatment, he came to stay with Plaintiff so she could monitor him and help his recovery. Before his discharge, Plaintiff had already arranged for him to see a primary care doctor in her area, because he was now living with her and needed follow-up care and medication supervision after a serious infection.

45. When Plaintiff tried to take him to that primary care appointment after discharge, Belinda told her that she was not allowed to take him and insisted his "primary doctor" must be the doctor in Santa Maria, even though he was no longer living there and was not being treated there. Plaintiff spoke with Medicare and was told that he could see a primary doctor near her because he was now residing with her.

46. Despite that, Belinda repeatedly told Plaintiff she could not take him to the local primary doctor she had arranged. As a result, Ralph was denied primary medical care for approximately two weeks, including follow-up after MRSA, medication oversight, and monitoring for complications. Ralph was frustrated and asked why they had to "go through Belinda" for his care; Plaintiff told him she did not know, because medically it made no sense. This denial of primary care is another example of elder abuse and neglect.

## H. Sudden Bank Closures and Missing Funds

47. While Ralph was living with Plaintiff during his recovery, he received letters from banks stating that his accounts had been closed and that substantial sums of money— approximately $65,000 to $75,000—had been withdrawn or moved. Ralph was extremely confused. He had not closed these accounts and had not authorized anyone else to do so.

48. Plaintiff took Ralph to his bank so he could withdraw money and find out what was happening. When he tried, the bank refused to allow him to access his funds. This caused him distress and confusion. Later, Plaintiff learned that one of the reasons given for some of these closures was that Darlene was "moving out of the area," even though Ralph never approved this and Darlene was already in dementia care.

49. Plaintiff is informed and believes that Darlene was being manipulated into signing or approving financial changes she did not understand, including closure of joint accounts and movement of funds into new accounts, and that others exploited her dementia to strip Ralph of access to his savings. This situation caused Ralph so much stress that he sought a divorce lawyer, at first believing Darlene herself was responsible, before later realizing that she was also being used.

## I. Savings Bonds: From About 143 to About 13

50. For many years, Ralph and Darlene told Plaintiff they had approximately 143 U.S. Savings Bonds, much of it in Series I bonds. They repeated this number many times, and Plaintiff believed them.

51. Ralph and Darlene lived very frugally. Their house was paid off. They had no mortgage. They ate modestly and bought basic cars outright every few years. Their lifestyle did not explain a large consumption of Savings Bonds.

52. At some point after 2017, Plaintiff learned that only about 13 Savings Bonds remained. Given what Ralph and Darlene had always told her and how they lived, this drastic reduction is not consistent with normal spending.

53. Plaintiff is informed and believes that some or all of the Savings Bonds were cashed, retitled, or diverted under the appearance of being put "into the trust," and that some may be held under the names of people who were not the true trustees, or left in the estate or other accounts without full disclosure. Plaintiff does not yet know exactly when the Savings Bonds were changed or who signed which forms, but believes those answers are in the law-office and bank records she has been trying to obtain since 2022.

## J. Forged 1993 Trust

54. Plaintiff is informed and believes that the version of the June 4, 1993 trust now being used by Defendants is not the same document that was originally drafted and signed. The original drafting attorney has stated that the document currently being used is not a true or accurate copy of what he prepared and appears to be a forgery with significant changes.

55. Despite this, Defendants have relied on the altered version as if it were genuine, using it to justify actions and positions that benefit themselves and harm Plaintiff and her siblings.

## K. Cremation Against Ralph's Wishes and Retaliation

56. Ralph was clear that he wanted to be buried in a casket, not cremated. His original 1993 trust and the 2017 trust reflected this, and in the 2019 amendment he gave Plaintiff the final say over his final resting place if there was a family disagreement.

57. After his death, there was a dispute over the right to control his remains. During that time, certain Defendants, including family members and attorneys, took positions and

engaged in tactics that delayed any decision on embalming or burial. While they argued and delayed, Ralph's body remained unembalmed.

58. By the time the court confirmed Plaintiff's authority over his remains, the funeral home informed her that his body had decomposed to the point where casket burial was no longer practical or advisable and that the only realistic option was cremation. As a result, Ralph was cremated against his clearly expressed wishes.

59. This forced cremation caused Plaintiff and her siblings deep emotional pain, especially two disabled siblings who had hoped to see their father buried as he wanted. Knowing that Ralph had put his wishes in writing and trusted Plaintiff to carry them out, yet still did not receive the burial he chose, has been a constant source of grief and distress.

60. Ralph did not simply accept what was being done to him. Even after his stroke and financial shocks, he continued to fight to regain his rights, protect Darlene, and correct what he believed had been done wrong with his trust and assets. Based on the timing and context, Plaintiff is informed and believes that when Ralph would not back down and continued to challenge what had been done, certain Defendants, including Julie, Belinda, and G. Kevin Lachona, chose not to honor his burial wishes out of spite and retaliation. Denying him burial and allowing his body to decompose until cremation was the only option was, in Plaintiff's view, another way to punish him for fighting them.

## L. Impact on Ralph – Continuous Stress and Harm

61. Throughout this period, while Ralph was trying to recover from a stroke, from MRSA, and from repeated hospitalizations, he was hit over and over with new emotional and financial shocks. Every time he seemed to be improving, another blow was thrown in his

face. He was pressured to bring the contents of his safe to a law office he did not trust; he received letters saying large sums of money had been withdrawn or that his accounts were closed; he was denied aggressive rehabilitation twice despite medical recommendations; he was denied primary care after a major infection; he was refused access to his own trust documents when a doctor needed them; and he was confused and upset when Darlene, who was already in cognitive decline, no longer sounded like herself and appeared to be signing or approving things she did not understand. All of this occurred while Defendants were positioning themselves around his assets and seeking to change his estate plan. The continuous stress, confusion, and loss of control caused Ralph great emotional suffering during a time when he was working hard to recover and deserved care, protection, and truth—not pressure, secrecy, and manipulation.

## M. Years of Subpoenas and Lawyer Obstruction

62. From approximately 2022 through 2025, Plaintiff and multiple attorneys served subpoenas on Johnson's firm and related parties seeking trust files, drafts, account records, and other documents showing what was done with Ralph's and Darlene's assets. Each time, law-firm Defendants—including Harris & Plottel, Lachona Law, Drobny, and Johnson's firm—objected, threatened motions to quash, or sought protective orders. Johnson's firm admitted that it has a full case file relating to the Struthers matter but refused to produce it.

63. The state probate court has never compelled full production of these records, and Plaintiff was suspended as trustee without a full evidentiary hearing on her concerns. Plaintiff is not asking this Court to reverse those orders or reinstate her as trustee. These facts are

alleged only to show that state processes have not forced these private Defendants to open their files or account for what they did.

64. Plaintiff comes to this Court not to have the federal judge run probate, but because federal court is the only forum where she can combine a federal Savings Bond question with tort claims and obtain a neutral forensic accounting and federal discovery to uncover the truth.

## V. RELIEF NOT SOUGHT

65. Plaintiff does not ask this Court to probate or annul any will, interpret or reform any trust instrument, appoint or remove any trustee, administer any trust or estate, or review, reverse, or modify any state-court order. She seeks independent in-personam relief against private individuals and law firms for their own misconduct and asks this Court to use federal jurisdiction and discovery powers to uncover what they did to Ralph's and Darlene's property and rights.

# VI. CAUSES OF ACTION

## FIRST CAUSE OF ACTION

Declaratory Relief – U.S. Savings Bonds (Supremacy Clause / Preemption)

(Against All Defendants Involved With Savings Bonds)

66. Plaintiff incorporates paragraphs 1 through 65.

67. Ralph and Darlene owned U.S. Savings Bonds governed by federal regulations. Plaintiff is informed and believes that Defendants caused many of these bonds to be cashed, retitled, or diverted in ways that violated federal regulations and that were not fully disclosed to Ralph, Darlene, or Plaintiff.

68. An actual controversy exists concerning whether Defendants' actions regarding the Savings Bonds violated federal law and concerning Plaintiff's rights to the value of those bonds.

69. Plaintiff seeks a declaration that Defendants' acts were unlawful under federal Savings Bond regulations and that they are personally liable in money for the value of any bonds wrongfully cashed, retitled, or diverted, plus any applicable interest.

## SECOND CAUSE OF ACTION

Elder Financial Abuse (Welf. & Inst. Code § 15610.30)

(Against Individual Defendants and Law-Firm Defendants)

70. Plaintiff incorporates paragraphs 1 through 69.

71. At all relevant times, Ralph and Darlene were "elders" under California law. Defendants took, secreted, appropriated, obtained, or retained their real and personal property for

wrongful use or with intent to defraud, or assisted in doing so, by manipulating trusts and accounts, exploiting Darlene's dementia, diverting funds and bond proceeds, and blocking any full accounting.

72. Defendants' conduct caused Ralph and Darlene to lose property that should have been used for their care and for their intended beneficiaries and caused Plaintiff and her siblings to lose expected inheritance.

73. Plaintiff seeks all remedies available under the elder-abuse statutes, including compensatory damages and, if she later obtains counsel, attorneys' fees and any enhanced remedies the law permits.

## THIRD CAUSE OF ACTION

Fraud / Forgery

(Against Individual Defendants and Law-Firm Defendants)

74. Plaintiff incorporates paragraphs 1 through 73.

75. Defendants represented, by words and conduct, that the altered version of the 1993 Trust was the true and original instrument and that actions taken under it were legitimate and authorized.

76. In fact, the 1993 Trust now being used is not the same trust that was originally drafted and signed, and Defendants knew or should have known that it had been altered in material ways.

77. Defendants concealed the altered nature of the document, concealed how assets were really handled, and resisted discovery that would expose their acts.

78. Plaintiff relied on Defendants' representations and concealment to her detriment, including entering into a settlement at a time when she lacked access to the key files and records.

79. As a direct and proximate result, Plaintiff has suffered damages in an amount to be proven at trial.

**FOURTH CAUSE OF ACTION**

Intentional Interference with Expected Inheritance (IIEI)

(Against Individual Defendants and Law-Firm Defendants)

80. Plaintiff incorporates paragraphs 1 through 79.

81. Plaintiff had an expectation of inheritance under Ralph's genuine estate plan and the 2017 Trust as confirmed by the 2019 amendment.

82. Defendants engaged in independently wrongful acts—including forgery, elder financial abuse, and concealment—to interfere with that expected inheritance.

83. Defendants intended their conduct to interfere with Plaintiff's inheritance, or knew with substantial certainty that it would.

84. As a direct and proximate result, Plaintiff's expected inheritance has been reduced or lost, and she has been damaged in an amount to be proven at trial.

**FIFTH CAUSE OF ACTION**

Intentional Infliction of Emotional Distress / Mishandling of Remains

(Against Individual Defendants and Law-Firm Defendants)

85. Plaintiff incorporates paragraphs 1 through 84.

86. Ralph's original 1993 trust, his 2017 trust, and his 2019 amendment reflected his wish to be buried in a casket, not cremated, and he gave Plaintiff the authority to decide his final resting place if there was a family dispute.

87. After his death, Defendants engaged in delay and litigation tactics that prevented timely embalming and burial, even though they knew or should have known that delay could affect Ralph's body and the ability to carry out his wishes.

88. As a result of this delay, Ralph's body decomposed to the point that the funeral home advised that casket burial was no longer practical or advisable and that cremation was the only realistic option. Ralph was cremated against his clearly expressed wishes.

89. Defendants' conduct regarding Ralph's remains, combined with their broader pattern of exploiting Ralph and Darlene at their most vulnerable, blocking access to trust documents, denying or undermining recommended medical care, and causing repeated financial and emotional shocks, was extreme and outrageous and goes beyond all bounds of decency tolerated in a civilized society.

90. Plaintiff is informed and believes that when Ralph continued to fight back against the changes to his trust and estate plan and refused to simply accept what was being done, certain Defendants, including but not limited to Julie, Belinda, and G. Kevin Lachona, chose not to honor his burial wishes out of spite and retaliation. Instead of respecting his clearly stated desire for burial, they chose a course of conduct that ensured his body would remain unembalmed long enough that cremation would become the only option.

91. As a direct and proximate result of Defendants' conduct, Plaintiff has suffered severe emotional distress, including grief, anger, anxiety, and ongoing trauma from knowing

that her father's clearly expressed burial wishes were overridden and that he did not receive the burial he chose.

92. Plaintiff seeks compensatory damages for her emotional distress in an amount to be proven at trial, as well as punitive and exemplary damages against those Defendants found to have acted with malice, oppression, or fraud in connection with the mishandling of her father's remains and the intentional infliction of emotional distress.

## SIXTH CAUSE OF ACTION

Negligent Hiring, Supervision, and Retention

Against Drobny Law Offices, Inc.; Harris & Plottel, LLP; Lachona Law;

The Law Offices of Johnson, Murphy & Jones, Inc.;

Plaintiff incorporates paragraphs 1 through 92.

93. The law-firm Defendants owed duties to hire competent attorneys and to supervise and retain them in a way that would prevent harm to elders and beneficiaries.

94. Each law-firm Defendant knew or reasonably should have known of problems with its attorneys' conduct, including efforts to obstruct subpoenas, conceal law-office files, and take positions that contributed to denial of embalming and other harms.

95. Despite this, the firms failed to take reasonable steps to correct or prevent the misconduct and instead defended and ratified it.

96. As a direct and proximate result, Plaintiff has suffered damages in an amount to be proven at trial.

**SEVENTH CAUSE OF ACTION**

Respondeat Superior / Ratification

Against Drobny Law Offices, Inc.; Harris & Plottel, LLP; Lachona Law;

The Law Offices of Johnson, Murphy & Jones, Inc.;

Plaintiff incorporates paragraphs 1 through 97.

98. At all relevant times, the attorney Defendants were acting within the course and scope of
their employment or agency with the law-firm Defendants.

99. The law-firm Defendants accepted the benefits of their attorneys' actions, defended those
actions, and failed to repudiate them, thereby ratifying their attorneys' conduct.

100.    Under principles of respondeat superior and ratification, the law-firm Defendants
are liable for the harm caused by their attorneys.

**EIGHTH CAUSE OF ACTION**

Unfair Competition (Bus. & Prof. Code § 17200)

(Against All Defendants)

102.    Plaintiff incorporates paragraphs 1 through 101.

103.    Defendants' conduct—including elder financial abuse, fraud, forgery,
concealment, obstruction of subpoenas, and misuse of elders' assets—constitutes
unlawful and unfair business practices under California's Unfair Competition Law.

104.    Plaintiff seeks restitution and appropriate injunctive relief, including orders
requiring Defendants to disgorge ill-gotten gains and to provide a full accounting,
without asking this Court to administer any estate or trust.

## VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendants, and each of them, as follows:

1. For compensatory damages in an amount to be proven at trial;

2. For restitution of U.S. Savings Bond proceeds and other assets wrongfully taken, retitled, or diverted;

3. For pre-judgment and post-judgment interest as allowed by law;

4. For attorneys' fees and costs as permitted by statute and law, including under elder-abuse statutes if Plaintiff later obtains counsel;

5. For punitive and exemplary damages against Defendants found to have acted with malice, oppression, or fraud;

6. For declaratory relief concerning U.S. Savings Bonds and Defendants' violations of federal regulations;

7. For an order appointing a neutral, independent third-party forensic accountant or Special Master, selected by the Court and not by Defendants, to conduct a full forensic accounting of all trust and estate-related assets, accounts, U.S. Savings Bonds, financial records, and related transactions from May 2017 to the present;

8. For an order requiring that the reasonable fees and costs of the neutral forensic accountant or Special Master be advanced and paid by Defendant G. Kevin Lachona and the family Defendants aligned with him (including Belinda Connor, Carol Campbell, and Julie Hatridge), and/or jointly and severally by the law-firm Defendants, in light of their repeated refusal to produce records and their obstruction of subpoenas served in 2022, 2023, 2024, and 2025;

9. For appropriate injunctive relief under the Unfair Competition Law; and

10. For such other and further relief as the Court deems just and proper.

Plaintiff hereby demands a trial by jury on all issues so triable.

Respectfully submitted,

DATED: _____11/18/2025_____

LaRonda ("Ronda") Myers
Plaintiff, Pro Se
12060 Mont Vista Drive
Auburn, CA 95603
Email: rondamyers@me.com
Telephone: (530) 320-1727